Steven J. Nataupsky (SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (SBN 156511)
lynda.zadrasymes@knobbe.com
Marko R. Zoretic (SBN 233,952)
marko.zoretic@knobbe.com
Jason A. Champion (CA SBN 259207)
jason.champion@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>INTEGRATED SUPPLY NETWORK, LLC, a Florida limited liability company,<br><br>Defendant. | Case No. 5:17-CV-00548-CBM-RAO<br><br>**OPENING BRIEF IN SUPPORT OF MONSTER ENERGY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>HEARING:<br>April 17, 2018<br>10:00 a.m.<br>Courtroom 8B<br><br>Hon. Consuelo B. Marshall |

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 1

II.   FACTUAL BACKGROUND ................................................................ 3

    A.   Monster, Its Trademarks, And Its Trade Dress ............................... 3

    B.   ISN, Its Trademarks, And Its Trade Dress ...................................... 8

    C.   The Present Infringement Action ................................................... 11

III.  SUMMARY JUDGMENT STANDARD ............................................... 13

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE DISPUTED AFFIRMATIVE DEFENSES AND THE COUNTERCLAIM ............................................................................... 13

    A.   Summary Judgment Of Validity Should Be Granted On Monster's Incontestable Trademark Registrations ...................... 13

    B.   Summary Judgment Should Be Granted On ISN's Defense Of Invalidity As To All Of Monster's Registrations ................... 14

        1.   ISN's Defense Of Lack Of Secondary Meaning Is Completely Baseless For Many Reasons ........................... 15

            a.   The MONSTER Marks And The BEAST Marks Are Inherently Distinctive, And Thus No Proof Of Secondary Meaning Is Required ......................... 15

            b.   ISN Has Failed To Prove That The MONSTER Marks And The BEAST Marks Lack Secondary Meaning ................................................................ 16

            c.   There Is Overwhelming, Undisputed Evidence That The MONSTER And BEAST Marks Have Acquired Secondary Meaning .............................. 17

        2.   ISN's Defense That Monster Has Never Used The MONSTER ENERGY® Mark To Promote Sports And Music Events Is Also Completely Baseless ...................... 18

-i-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS
### *(cont'd.)*

**Page No.**

3.    ISN's Defense Of Trademark Misuse Through "Bullying" Is Legally And Factually Baseless....................20

C.    Summary Judgment Should Be Granted On ISN's Defense Of Unclean Hands...........................................................................22

D.    Summary Judgment Should Be Granted On ISN's Cancellation Counterclaim.............................................................24

V.    CONCLUSION ...........................................................................25

# TABLE OF AUTHORITIES

**Page No(s).**

*Adidas America, Inc. v. Skechers USA, Inc.,*
  149 F. Supp. 3d 1222 (D. Or. 2016)........................................................ 18

*Brookfield Communications v. West Coast Entertainment Corp.,*
  174 F.3d 1036 (9th Cir. 1999)................................................................. 23

*California Motor Transport Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ................................................................................ 21

*Capital Speakers Inc. v. Capital Speakers Club of Washington D.C.,*
  Cancellation No. 19,861, 1996 WL 754043 (T.T.A.B. 1996) ...................... 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................ 13

*Central Mfg. Co. v. Board of Regents,*
  Opposition No. 91125818, 2005 WL 2464005 (T.T.A.B. Sept.
  30, 2005).................................................................................................. 20

*Clamp Mfg. Co. v. Enco Mfg. Co.,*
  870 F.2d 512 (9th Cir. 1989).................................................................. 18

*Eastern R. Presidents Conference v. Noerr Motor Freight,*
  365 U.S. 127 (1961) ........................................................................ 21, 22

*Ennis, Inc. v. Beling,*
  Opposition No. 85324443, 2017 WL 412412 (T.T.A.B. Jan. 12,
  2017)........................................................................................................ 20

*Fleischer Studio, Inc. v. A.V.E.L.A., Inc.,*
  654 F.3d 958 (9th Cir. 2011).................................................................. 16

*Gucci Timepieces America v. Yidah Watch Co.,*
  No. CV 97-6985-KMW-MANx, 1998 WL 650078 (C.D. Cal.
  Aug. 4, 1998)........................................................................................... 18

*Hansen Beverage Co. v. Cytosport, Inc.,*
  No. CV 09-0031-VBF-AGRx, 2009 WL 5104260 (C.D. Cal.
  Nov. 4, 2009)........................................................................................... 18

1

**TABLE OF AUTHORITIES**
*(cont'd.)*

2

Page No(s).

3

4

*Imagewear Apparel Corp. v. Majestic Roar*,
   No. 91218736, 2015 WL 9906657 (T.T.A.B. 2015) .............................. 20, 21

5

6

*Momoh v. Wells Fargo Bank, N.A.*,
   No. 15-CV-04729-HSG, 2016 WL 8729939 (N.D. Cal. July 1,
   2016) ....................................................................................................... 23

7

8

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ............................................................................... 23

9

10

*Northwestern Corp. v. Gabriel Mfg. Co.*,
   48 U.S.P.Q.2d 1902 (N.D. Ill. 1998) ..................................................... 20

11

12

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) .................................................................... 15

13

14

*Rock River Communications, Inc. v. Universal Music Group, Inc.*,
   745 F.3d 343 (9th Cir. 2014) .................................................................. 22

15

16

*Star-Kist Foods v. P.J. Rhodes & Co.*,
   735 F.2d 346 (9th Cir. 1984) .................................................................. 24

17

18

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ............................................................................... 15

19

20

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965) ......................................................................... 21, 22

21

22

*VIP Products, LLC v. Jack Daniel's Properties*,
   No. CV 14-2057-PHX-SMM, 2016 WL 5408313 (D. Ariz. Sept.
   27, 2016) ................................................................................................. 18

23

24

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ................................................................ 22

25

26

*Zobmondo Entertainment v. Falls Media*,
   602 F.3d 1108 (9th Cir. 2010) ......................................................... 14, 15

27

28

# TABLE OF AUTHORITIES
### *(cont'd.)*

**Page No(s).**

# OTHER AUTHORITIES

15 U.S.C. § 1064 ................................................................. 14

15 U.S.C. § 1065 ............................................................ 13, 14

Fed. R. Civ. P. 56 .............................................................. 13

J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition*
(5th ed. 2017) ........................................................ 15, 16, 18

Plaintiff Monster Energy Company ("Monster") hereby moves for summary judgment against Defendant Integrated Supply Network, LLC ("ISN") on (1) ISN's affirmative defenses of trademark invalidity, trademark unenforceability, and unclean hands and (2) ISN's counterclaim for cancellation of Monster's trademark registrations.

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Monster is the owner of the MONSTER ENERGY® trademark, one of the most heavily promoted and most famous trademarks in the nation.  Monster filed this action alleging that ISN infringed Monster's rights by using the trademarks MONSTER and MONSTER MOBILE, as well as Monster's green and black trade dress and a variation of another Monster trademark, UNLEASH THE BEAST!®.  Monster has asserted 36 federal trademark registrations for its MONSTER ENERGY® trademark and variations of it, and 11 federal trademark registrations for the trademark UNLEASH THE BEAST!® and variations of it.[1]

As defenses, ISN asserts that all 47 of Monster's trademark registrations are invalid, that Monster has misused its trademarks by asserting infringement claims with "no realistic chance" of success, and that Monster has unclean hands.  ISN also filed a counterclaim seeking cancellation of some, but not all of Monster's registrations.  Monster now moves for summary judgment on these affirmative defenses and the counterclaim.

ISN's main defense is that Monster's marks allegedly lack secondary meaning.  That is, ISN asserts that the relevant consuming public does not recognize Monster's trademarks as trademarks.  This assertion is simply preposterous.  As an initial matter, Monster's marks are inherently distinctive, and thus, as a matter of law, no showing of secondary meaning is even required.

---

[1] Since filing its Complaint, Monster has voluntarily abandoned one of its registrations, Registration No. 3,924,797 for ASSAULT M MONSTER ENERGY, because it is no longer in use.  Monster is no longer asserting this registration in this action.

Moreover, the undisputed evidence establishes that Monster's marks are among the most heavily promoted and famous brands in the United States, clearly establishing secondary meaning. In addition, ISN has the burden of proving its defense of lack of secondary meaning because Monster's marks are federally registered. ISN has come forward with no evidence that is even probative of the issue.

ISN also asserts that two of Monster's registrations are invalid because Monster allegedly has not used its trademarks in connection with the services listed in the registration – the promotion of sports and music events for others. Again, this defense is entirely baseless. The undisputed evidence shows that Monster has used its trademarks to promote the sports and music events of others continuously and extensively since at least 2003. Again, ISN has the burden of proving the contrary and has come forward with no such evidence.

ISN's assertion that Monster has misused its trademarks by "bullying" defendants with weak claims of infringement is perhaps even more frivolous. Trademark misuse through bullying is not even a recognized defense in trademark law. Moreover, the activity of which ISN complains – the filing of trademark infringement lawsuits – is protected by the First Amendment as a form of petitioning the government for redress.

Furthermore, ISN has no evidence tending to show that Monster has ever asserted its trademarks without a reasonable basis. ISN appears to rely primarily upon the present case as proof. Here, however, ISN not only adopted the MONSTER mark, but it also adopted Monster's trade dress and a variant of Monster's UNLEASH THE BEAST!® mark. Thus, it appears that ISN is intentionally trading on Monster's goodwill. Indeed, when Monster was named the sponsor of NASCAR's races, ISN's executives enthused that "This could be good for our Monster brand" and it "Certainly creates awareness!" Ex. 35[2].

---

[2] Exhibits 1-20 are attached to the Declaration of Rodney Sacks, and

Under these circumstances, to call Monster's infringement suit baseless is itself baseless.

ISN's unclean hands defense is also baseless. The defense is premised entirely on an **unsuccessful** argument Monster made to the Patent & Trademark Office ("PTO") 15 years ago. ISN contends that Monster's current position is inconsistent with that argument, and Monster should be held to the position it unsuccessfully advocated 15 years ago. However, the PTO never accepted Monster's argument. Consequently, as a matter of law, Monster is not estopped or otherwise barred from taking a different position today. Moreover, even if it were barred, Monster's position today is consistent with the position it took 15 years ago.

Finally, ISN's counterclaim, which merely incorporates ISN's defenses, is baseless for all the same reasons. Accordingly, this Court should grant summary judgment against ISN on its counterclaim and the disputed affirmative defenses.

## II.  FACTUAL BACKGROUND

### A.  Monster, Its Trademarks, And Its Trade Dress

Monster is a nationwide leader in the business of developing, marketing, selling, and distributing beverages. In 2002, Monster launched its MONSTER ENERGY® drink brand, bearing its now-famous MONSTER™ and MONSTER ENERGY® trademarks. Sacks Decl. ¶ 3. Monster now uses literally dozens of different trademarks that incorporate the basic MONSTER™ trademark, including such trademarks as MONSTER REHAB®, MUSCLE MONSTER®, JUICE MONSTER®, MONSTER ASSAULT®, PUNCH MONSTER®, JAVA MONSTER®, UBERMONSTER®, MONSTER UNLEADED®, and many others ("the MONSTER Marks"). *Id.* at ¶ 6. Nearly all of the MONSTER Marks are

---

Exhibits 21-48 are attached to the Declaration of Jason A. Champion, both filed concurrently herewith.

federally registered.  *See* Dkt. No. 1, Exs. A1-A36.

Also in 2002, Monster launched its now-famous UNLEASH THE BEAST!® trademark.  Sacks Decl. ¶ 3.  As with the MONSTER Marks, the UNLEASH THE BEAST!® trademark rapidly expanded to become a large family of marks, including PUMP UP THE BEAST!®, REHAB THE BEAST!®, UNLEASH THE NITRO BEAST!®, UNLEASH THE ULTRA BEAST!®, and many others ("the BEAST Marks").  *Id.* at ¶ 7.  Again, nearly all of the BEAST Marks are federally registered.  *See* Dkt. No. 1, Exs. B1-B11.

Also since 2002, Monster has consistently used a green and black trade dress for its packaging and promotional materials ("the MONSTER Trade Dress").  Sacks Decl. ¶ 4, Ex. 1.  An example of the MONSTER Trade Dress, together with the original MONSTER ENERGY® and UNLEASH THE BEAST!® trademarks, is shown below.  *Id.* at ¶ 4, Exs. 1, 15.



While Monster's main product line is beverages, Monster has long used its MONSTER Marks, BEAST Marks, and MONSTER Trade Dress on a wide variety of other products, including clothing, such as t-shirts, sweatshirts, gloves, and caps.  A few examples are shown below.  Sacks Decl. ¶ 4, Ex. 1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    In addition to apparel, Monster's MONSTER ENERGY® trademark and
19   other trademarks have appeared on many products associated with the
20   automotive industry.  These products include motorcycles, motorcycle helmets,
21   replica cars, and wheels for trucks, as shown below.  *Id*. at ¶ 5, Ex. 2.

22
23
24
25
26
27
28







In addition, since at least 2003, Monster has been very actively promoting and sponsoring sporting events and music concerts under the MONSTER ENERGY® trademark.  *Id.* at ¶ 9.  Monster has been particularly active in promoting and sponsoring motorsports and the athletes who participate in motorsports.  *Id.* at ¶¶ 9-14, Exs. 3-6.  One of Monster's earliest sponsorships was for the Balls of Steel Stunt Show, which features motorcyclists riding inside

a hollow spherical steel cage.  This sponsorship began in 2003.  *Id.* at ¶ 11, Ex. 4.  Since that time, Monster has sponsored a wide variety of motorsport athletes, teams, and activities, including NASCAR, Formula 1, MotoGP, Moto2, Supercross, motocross, MXGP, MX2, drag racing, drifting, flat track, off road, rally, rallycross, snowmobile, speedway, stunt, superbike, and freestyle motocross.  *Id.* at ¶ 10, Ex. 3.  For nearly all of these sponsorships, Monster's MONSTER Marks and MONSTER Trade Dress are prominently featured on the athletes' vehicles and clothing, and they are often displayed on banners throughout the venue hosting the competition.  An example is shown below.  *Id.*



Moreover, Monster promotes all of these events on its website, thereby raising awareness of the events and benefiting the event's promoter.  Sacks Decl. ¶ 9.

On January 1, 2017, Monster became the title sponsor of NASCAR's premier series (formerly called the NASCAR Sprint Cup Series), which is now called the Monster Energy® NASCAR Cup Series.  *Id.* at ¶ 14.  Monster also became the official energy drink of NASCAR.  *Id.*  NASCAR is the second most watched sport in the U.S., with over 5 million fans watching each of the 41 races.  *Id.*

Because Monster's promotional and sponsorship activities are so extensive, Monster has even obtained a federal trademark registration for MONSTER ENERGY® for the specific services of "promoting goods and services in the sports, motorsports, electronic sports, and music industries through the distribution of printed, audio and visual promotional materials; promoting sports and music events and competitions for others."  Dkt. No. 1, Ex. A1.  This registration is U.S. Trademark Registration No. 4,721,433 ("the '433 Registration").  Monster has also obtained a registration for its famous "M-Claw" logo Ⓜ for these same services.  That registration is U.S. Trademark Registration No. 4,721,432 ("the '432 Registration").  Ex. 46.

Through these promotional and sponsorship activities, as well as through the sales of beverages, the MONSTER Marks and the BEAST Marks have acquired incredible consumer recognition and fame.  Since 2002, Monster has spent over $4.6 **billion** in advertising, promoting, and marketing the MONSTER Marks and the BEAST Marks.  Sacks Decl. ¶ 8.  In 2017 alone, Monster spent $537 million in advertising, promoting, and marketing its brand and marks.  *Id*. Monster now sells approximately 3 billion cans of drinks per year, with estimated retail sales at approximately $6 **billion** per year.  *Id*. at ¶ 37.  The MONSTER brand has established itself as the best-selling energy drink brand in the United States by unit volume and dollar value.  *Id*.  In fact an independent third party has ranked the MONSTER brand as the tenth most popular brand in the world.  *Id*. at ¶ 36, Ex. 20.

**B.   ISN, Its Trademarks, And Its Trade Dress**

ISN is engaged in the business of marketing and selling automotive tools and other products, such as t-shirts, sweatshirts, gloves, and snacks.  ISN sells its products under many brand names, one of which is MONSTER.

ISN launched its MONSTER brand in December 2010.  Ex. 36 at 11:3-8. Starting in 2013, it began sometimes using the name MONSTER MOBILE.

-8-

Exs. 37-38; 41.   But it made the deliberate decision to emphasize the "MONSTER" portion of the name, and de-emphasize the "MOBILE" portion. In fact, internal emails reveal that ISN included the word "MOBILE" in its mark only to make it easier to register the mark with the Patent and Trademark Office. Exs. 38; 41.  Those same emails show that ISN wanted to make the "MOBILE" portion of its trademark as small as possible.  *Id.*  Commercially, even today, ISN often omits the "MOBILE" portion of its mark from its products altogether, and marks its products with just the word "MONSTER."  These "MONSTER" products include ISN's tools, hats, t-shirts, sweatshirts, water bottles, and beverage tumblers, all offered under the MONSTER brand without the word "MOBILE." Ex. 29-31; 33; 39; 42-43.

ISN has also chosen to use the same green and black trade dress as Monster.  In fact, the specific shade of green chosen by ISN is known as Pantone 376, which is essentially identical to Monster's Pantone 375.  Ex. 21. ISN even calls the shade of green that it uses "Monster green."   Ex. 24. Examples of ISN's MONSTER and MONSTER MOBILE branded products using green and black trade dress are shown below.

 







ISN has also chosen to use a variant of Monster's UNLEASH THE BEAST!® trademark.  ISN has marketed so-called "Monster Snacks" using the trademark "FEED THE BEAST."  This is shown below.  Ex. 26.



**C.    The Present Infringement Action**

Because ISN is causing consumer confusion by using the trademarks MONSTER and MONSTER MOBILE, as well as green and black trade dress and a variant of the UNLEASH THE BEAST!® trademark, Monster filed this action against ISN for trademark and trade dress infringement.    Monster believes that ISN's simultaneous use of all of these source identifiers in combination evidences an unmistakable intent by ISN to trade upon Monster's goodwill.   This is confirmed by ISN's reaction to Monster's selection as the title sponsor of NASCAR's races.   ISN was very happy with this selection, gushing that "This could be good for our Monster brand" and it "Certainly creates awareness!"  Ex. 35.

In response to this suit, ISN has frivolously asserted as an affirmative defense that Monster's trademarks are "invalid and/or unenforceable."  Dkt. No. 10 ¶ 84.   ISN is alleging that all 36 of the registrations for the asserted MONSTER Marks and all 11 of the registrations for the asserted BEAST Marks are invalid or unenforceable.  Ex. 45.

In discovery, ISN has articulated two theories of invalidity against all of

Monster's asserted trademarks. First, ISN has argued that the MONSTER Marks and the BEAST Marks lack secondary meaning. Ex. 22 at 15-27. That is, ISN claims that consumers do not associate the MONSTER Marks or the BEAST Marks with Monster, even though the undisputed evidence establishes that Monster's marks are among the most famous in the country. Second, ISN has argued that MONSTER "misused" its trademarks by "bullying" ISN and third parties with weak claims of trademark infringement. *Id.* at 33-34. ISN asserts this defense even though "misuse" through "bullying" is not a legally recognized defense and even though ISN has no evidence that Monster has brought unreasonable claims of trademark infringement against anyone.

ISN also asserts an additional invalidity defense against Monster's registration of MONSTER ENERGY® for use in promoting sports and music events and competitions for others. ISN contends that Monster has never used the MONSTER ENERGY® mark for this purpose even though, again, all evidence is to the contrary. *See id.* at 32-33.

In a separate affirmative defense, ISN alleges that Monster's infringement claims are barred by "unclean hands." Dkt. No. 10 ¶ 89. According to ISN, Monster told the PTO 15 years ago that multiple companies could operate simultaneously under MONSTER-based trademarks, and Monster now has allegedly advanced a different point of view in this Court. Ex. 22 at 35-37. ISN advances this defense even though the PTO never relied on Monster's argument 15 years ago. Moreover, Monster's position today is consistent with its former position. In the past 15 years, Monster has developed much stronger trademark rights than it had in 2003, making Monster's statements about the marketplace 15 years ago completely inapplicable today.

Finally, ISN has filed a counterclaim seeking cancellation of 21 of the registrations for the MONSTER Marks and 10 of the registrations for the BEAST Marks. Dkt. No. 10 ¶¶ 101-102. Through the meet-and-confer process,

ISN agreed to limit its cancellation counterclaim to two registrations: the '432 and '433 Registrations. Ex. 44. The grounds for cancellation are not articulated with precision; but they appear to be the same grounds that ISN has raised in connection with its affirmative defenses – lack of secondary meaning, trademark misuse through bullying, non-use of the MONSTER ENERGY® mark in connection with promoting sports and music events, and unclean hands based upon a statement to the PTO.

Monster now moves for summary judgment on ISN's affirmative defenses of invalidity and unclean hands, and ISN's cancellation counterclaim.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Here, ISN bears the burden of proving its defenses, and there is an absence of evidence supporting these defenses. In fact, there is undisputed evidence to the contrary. Moreover, in many cases, ISN's defenses are not recognized in the law. Accordingly, summary judgment should be granted.

### IV. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE DISPUTED AFFIRMATIVE DEFENSES AND THE COUNTERCLAIM

#### A. Summary Judgment Of Validity Should Be Granted On Monster's Incontestable Trademark Registrations

Under Section 15 of the Lanham Act, 15 U.S.C. § 1065, a trademark registration becomes incontestable after five years if certain procedural requirements are met. Once a registration becomes incontestable, it cannot be

challenged except on very limited grounds not applicable here.[3]   *Id.* (citing Section 14, Paragraph 3 of the Lanham Act, 15 U.S.C. § 1064 ¶ 3).   Here, fifteen of Monster's registrations have become incontestable:   Reg. Nos. 2,769,364, 3,044,314, 3,044,315, 3,057,061, 3,134,841, 3,134,842, 3,740,050, 3,852,118, 3,959,457, 3,908,600, 3,908,601, 3,914,828, 4,036,680, 4,036,681, and 4,111,964.  Ex. 47.  Accordingly, summary judgment should be granted on ISN's defense that these registrations are invalid.

**B.   Summary Judgment Should Be Granted On ISN's Defense Of Invalidity As To All Of Monster's Registrations**

In its affirmative defense of invalidity, ISN challenges the validity of all 36 of Monster's federal registrations for its MONSTER Marks and all 11 of Monster's federal registrations for its BEAST Marks.   Dkt. No. 10 ¶ 84. "[F]ederal registration provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark." *Zombondo Entertainment v. Falls Media*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C. §§ 1057(b), 1115(a)).   Accordingly, ISN bears the burden of proving that Monster's registered marks are invalid.  *Id*. at 1114.  In fact, "the presumption of validity is a strong one, and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy." *Id.* at 1115.

/ / /

/ / /

---

[3] Those grounds include that the mark has become generic or functional, that the mark has been abandoned, that the registration was obtained fraudulently, or that the mark is being used to misrepresent the source of the goods.  15 U.S.C. § 1064 ¶ 3.  ISN has not alleged any of these grounds for invalidation.

1.   **ISN's Defense Of Lack Of Secondary Meaning Is Completely Baseless For Many Reasons**

   a.   **The MONSTER Marks And The BEAST Marks Are Inherently Distinctive, And Thus No Proof Of Secondary Meaning Is Required**

"To be valid and protectable, a mark must be 'distinctive.'" *Id.* at 1113. A "mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (emphasis in original). A mark is inherently distinctive and is automatically entitled to protection as a trademark if it does not describe the nature or qualities of the goods or services with which it is used. J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:4 (5th ed. 2017) ("*McCarthy*"). *See also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391-92 (9th Cir. 1993). Thus, when a mark is inherently distinctive, there is no need to prove that it has acquired secondary meaning. *McCarthy* § 11:1.

Moreover, "[w]here the PTO issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive." *Zobmondo*, 602 F.3d at 1113-14. Here, the PTO did not require proof of secondary meaning for any of the registrations for the MONSTER Marks or the BEAST Marks. Ex. 47. Accordingly, the burden is on ISN to prove that Monster's marks are not inherently distinctive. That is, ISN must prove that Monster's marks describe the nature or quality of Monster's products or services.

ISN cannot meet its burden because it is plain that the MONSTER Marks and the BEAST Marks are not descriptive of the nature or quality of Monster's goods and services. For example, neither MONSTER ENERGY® nor UNLEASH THE BEAST!® describes in any way a characteristic of the

-15-

beverages sold by Monster.  Similarly, these marks do not describe the apparel sold by Monster, or the sporting events or music events sponsored by Monster.

ISN argues that the term "Monster" somehow describes the size of the cans of Monster's drinks.  Ex. 22 at 20.  However, as ISN itself points out, the dictionary definition of "monster" is "any animal or thing huge in size" or "anything unnatural or monstrous."  *Id*. at 17.  Monster's drinks and cans are not an animal and cannot reasonably described as "unnatural or monstrous."  Thus, again, the term "Monster" is not descriptive of Monster's drinks or their packaging.  Likewise, "Beast" is not descriptive of Monster's drinks or their packaging.  Indeed, ISN has not even argued otherwise.

Accordingly, the challenged trademarks are all valid as inherently distinctive.  For this reason, ISN's defense of lack of secondary meaning simply misses the point.  There is no need to prove secondary meaning for an inherently distinctive mark.  *McCarthy* § 11:1.

        **b.**    **ISN Has Failed To Prove That The MONSTER Marks And The BEAST Marks Lack Secondary Meaning**

Even if Monster's marks needed secondary meaning to be valid, ISN's invalidity defense would still fail because ISN has presented no evidence that Monster's marks lack secondary meaning.  A mark has secondary meaning when there is "a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] emanate from or are associated with the same source."  *Fleischer Studio, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011).  Thus, to prove invalidity, ISN must prove that consumers do not recognize that products bearing the MONSTER Marks or the BEAST Marks all come from a single source such as Monster.

ISN has no proof of this.  ISN has not conducted any survey showing that consumers do not associate products bearing the MONSTER Marks or the BEAST Marks with a single source.  Nor has ISN offered any other evidence

that bears on secondary meaning for the MONSTER or BEAST marks.

Instead, in discovery, ISN appeared to argue the term "MONSTER" by itself and the term "BEAST" by itself are not uniquely associated with Monster. Ex. 22 at 15-23. However, ISN is challenging the validity of each of the MONSTER and BEAST registrations, all of which include words or symbols in addition to the words "MONSTER" and "BEAST." ISN does not even offer any attorney argument, let alone evidence, tending to establish that Monster's full registered trademarks lack secondary meaning. To the contrary, ISN concedes in its interrogatory response that the entire "unitary phrases" or "the entire logo" may have acquired secondary meaning. Ex. 22 at 20:20-23. The complete absence of any evidence that Monster's marks lack secondary meaning mandates the grant of summary judgment on this defense.

### c. There Is Overwhelming, Undisputed Evidence That The MONSTER And BEAST Marks Have Acquired Secondary Meaning

Even if Monster had the burden of proving secondary meaning, and it does not, there is overwhelming undisputed affirmative evidence of secondary meaning. Simply put, the MONSTER Marks and the BEAST Marks are among the most widely recognized and heavily promoted marks in the United States. As explained above, Monster has spent over $4.6 **billion** in advertising, promoting, and marketing the MONSTER Marks and the BEAST Marks. Sacks Decl. ¶ 8. In 2017 alone, Monster spent $537 million in advertising, promoting, and marketing its brand and marks. *Id*. Monster now sells approximately 3 billion cans of drinks per year, with estimated retail sales at approximately $6 **billion** per year. *Id.* at ¶ 37. As a result, Monster is one of the world's ten most popular brands. *Id.* at ¶ 36, Ex. 20.

This is extraordinary evidence of secondary meaning. "Public association of a business symbol with a certain source and quality of goods or services is

-17-

most often achieved through the dual channels of actual sales and advertising." *McCarthy* § 15:50.  Thus, as the Ninth Circuit has recognized, "[e]vidence of use and advertising over a substantial period of time is enough to establish secondary meaning." *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989).

Accordingly, courts within the Ninth Circuit have repeatedly recognized that advertising and sales at Monster's levels and much lower are more than sufficient to establish secondary meaning.  *VIP Products, LLC v. Jack Daniel's Properties*, No. CV 14-2057-PHX-SMM, 2016 WL 5408313 at *8 (D. Ariz. Sept. 27, 2016) (sales of 75 million cases of whiskey and advertising "in the hundreds of millions of dollars" established secondary meaning); *Adidas America, Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1235 (D. Or. 2016) (sales of 40 million units and one million dollars in advertising established secondary meaning); *Gucci Timepieces America v. Yidah Watch Co.*, No. CV 97-6985-KMW-MANx, 1998 WL 650078 at *4 (C.D. Cal. Aug. 4, 1998) (sales of 27,000 units and advertising of $1.4 million established secondary meaning). *See also Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF-AGRx, 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) (Monster's predecessor established "strong secondary meaning" in 2009 with $500 million in advertising and $2 billion in annual sales).  There simply can be no genuine issue of fact that Monster's extraordinary sales and advertising establish secondary meaning.

> **2.     ISN's Defense That Monster Has Never Used The MONSTER ENERGY® Mark To Promote Sports And Music Events Is Also Completely Baseless**

ISN next asserts that Monster has never used the MONSTER ENERGY® mark to promote sports and music events – the services listed in the '433 Registration.  ISN, which has the burden of proof, has not provided Monster with any evidence to support its defense.

-18-

Moreover, the undisputed evidence is overwhelming and to the contrary. Monster began promoting sports and music events under the MONSTER ENERGY® mark in 2003, when it began promoting the Balls of Steel Stunt Show.  Sacks Decl. at ¶ 11, Ex. 4.  Since that time, Monster's promotion of sports and music events under its trademarks has expanded exponentially.  *Id*. at ¶¶ 9-25, Exs. 3-13.  For example, as discussed above, Monster has sponsored and promoted a wide variety of motorsport athletes, teams, and activities under its trademarks, including NASCAR, Formula 1, MotoGP, Moto2, Supercross, motocross, MXGP, MX2, drag racing, drifting, flat track, off road, rally, rallycross, snowmobile, speedway, stunt, superbike, and freestyle motocross.  *Id.* at ¶ 10, Ex. 3.  In addition, Monster has sponsored and promoted a variety of non-motor sports under the MONSTER ENERGY® mark, including the X-Games and the Ultimate Fighting Championship.  *Id.* at ¶ 15.  Further, Monster has sponsored and promoted a wide range of music events under its trademark, including OzzFest, the Monster Energy® Carolina Rebellion, Rock on the Range, Kansas City Rockfest, the EpiCenter Music Festival, the Vans Warp Tour, and many others.  *Id.* at ¶¶ 16-18, Exs. 8-9.

ISN appears to argue that this extensive evidence should be disregarded because Monster is not always paid for promoting and sponsoring events under its MONSTER ENERGY® mark.  Ex. 22 at 33:6.  Instead, Monster is compensated in the form of the positive publicity it receives from being associated with such popular events as NASCAR racing and the X-Games.  Sacks Decl. ¶ 27.  And the producers of the events receive a great benefit from Monster in the form of the publicity Monster generates for the events by promoting the events on Monster's website and elsewhere.  *Id.* at ¶ 26.

The PTO has made clear that there is no requirement that a trademark owner be compensated monetarily for its services to be entitled to a valid registration.  The provision of services alone is sufficient for registration.

*Capital Speakers Inc. v. Capital Speakers Club of Washington D.C.*, Cancellation No. 19,861, 1996 WL 754043, at *5 n.3 (T.T.A.B. 1996); *Central Mfg. Co. v. Board of Regents*, Opposition No. 91125818, 2005 WL 2464005 at *4 (T.T.A.B. Sept. 30, 2005).  Accordingly, ISN's defense has no basis in law. Moreover, Monster does sometimes receive cash payments for its sponsorships, including from the EpiCenter Music Festival.  Sacks Decl. ¶ 27.  Thus, ISN's defense has no basis in fact.

### 3.  ISN's Defense Of Trademark Misuse Through "Bullying" Is Legally And Factually Baseless

ISN also alleges that Monster's trademarks are invalid because Monster allegedly "has been abusing any trademark rights it may have by bullying third parties with relatively limited resources, who are also using marks that include the term 'monster.'"  Ex. 22 at 33.  This, ISN contends, constitutes "trademark misuse" and invalidates Monster's trademarks.  *Id*. at 34.

This defense fails as a matter of law.  While courts and scholars have occasionally discussed a concept of "trademark misuse," Monster is unaware of even a single case in which a court has invalidated a trademark on the ground of trademark misuse.  To the contrary, the courts have described "trademark misuse" as a "phantom defense," *Northwestern Corp. v. Gabriel Mfg. Co.*, 48 U.S.P.Q.2d 1902, 1907 (N.D. Ill. 1998), and have been "reticent to even acknowledge the defense's existence."  *Id*. at 1909.

Equally important, whatever the boundaries of this ill-defined phantom defense, Monster is unaware of any court holding that allegations of "bullying" suffice to establish the defense.  To the contrary, the PTO has repeatedly held that "bullying" or "overenforcement" is not a defense in trademark law.  *Ennis, Inc. v. Beling*, Opposition No. 85324443, 2017 WL 412412 at *3, *8 (T.T.A.B. Jan. 12, 2017); *Imagewear Apparel Corp. v. Majestic Roar*, No. 91218736, 2015 WL 9906657 at *2 (T.T.A.B. Jan. 12, 2015).  "Rather, trademark owners

are entitled to protect rights in their registered trademarks by seeking to preclude registration of what they believe to be confusingly similar marks." *Imagewear*, 2015 WL 9906657 at *2. Evidence of extensive enforcement efforts merely indicates that the trademark owner "actively polices" its marks. *Id.*

ISN's bullying defense is also factually baseless. ISN points to no evidence that Monster has asserted its trademark rights against anyone without a reasonable basis. Moreover, litigating such a defense would be virtually impossible and a tremendous waste of judicial resources. It would require numerous trials within a trial to determine the reasonableness of past actions, which would involve analyzing the evidence in all other cases.

ISN seems to believe that the present case is an example of a baseless suit. Ex. 22 at 34:21. However, this position is frivolous. As discussed above, ISN adopted the MONSTER name, Monster's green and black trade dress, and even a variant of Monster's UNLEASH THE BEAST!® trademark. This trifecta smacks of a bad faith effort to trade on Monster's goodwill and cause consumer confusion. So, too, does ISN's enthusiastic reaction to Monster being named NASCAR's title sponsor. Ex. 35. There is no explanation for this reaction other than ISN's desire to trade off Monster's goodwill. Thus, there can be no question that ISN's conduct gave Monster a good faith basis to file this suit.

Finally, the "bullying" defense proposed by ISN would violate a trademark owner's First Amendment right to petition the courts for redress, as developed by the Supreme Court under the *Noerr / Pennington* doctrine. *See generally Eastern R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). *See also California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (extending the *Noerr / Pennington* doctrine to access to the courts). While the *Noerr / Pennington* doctrine originally arose in the antitrust context, it

1   is based on the First Amendment right to petition and therefore applies equally

2   in all contexts.  *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

3          Under this doctrine, a party is free under the First Amendment to file

4   litigation or threaten to file litigation as long as the litigation is not a "sham."

5   *Rock River Communications, Inc. v. Universal Music Group, Inc.*, 745 F.3d 343,

6   351 (9th Cir. 2014).  "A 'sham' lawsuit is one where the suit is both 'objectively

7   baseless in the sense that no reasonable litigant could realistically expect success

8   on the merits' and 'an attempt to interfere *directly* with the business relationship

9   of a competitor through the use of the governmental *process* – as opposed to the

10  *outcome* of that process."  *Id.* (emphasis in original).

11         Here, as discussed above, ISN has no evidence whatsoever that Monster

12  has ever filed an objectively baseless suit.  ISN's suggestion that the present suit

13  is objectively baseless is itself objectively baseless.  Accordingly, the *Noerr* /

14  *Pennington* doctrine applies, and ISN's defense of bullying must be rejected.

15  **C.    Summary Judgment Should Be Granted On ISN's Defense Of**

16  **Unclean Hands**

17         ISN's unclean hands defense is also meritless.  ISN's defense relies upon

18  a dispute between Odwalla and Monster in 2003.  At that time, Monster was

19  seeking to register MONSTER ENERGY as its trademark.  Odwalla opposed,

20  arguing that confusion was likely with Odwalla's B-Monster and C-Monster

21  marks for use with juice.  As an affirmative defense in the PTO Opposition

22  proceedings, Monster argued:  "because of the numerous trademark registrations

23  and applications incorporating the word 'MONSTER' and the numerous

24  'MONSTER' marks existing in the marketplace, Odwalla has no grounds to

25  assert exclusive or broad rights in Odwalla's marks."  Ex. 48 at 3-4.  Monster

26  did not prevail at the PTO on this ground.  To the contrary, as ISN

27  acknowledges, Monster obtained its registration by entering into a settlement

28  agreement with Odwalla.  Ex. 22 at 39.

ISN now contends that Monster's current position is inconsistent with its position in 2003, and that this alleged inconsistency bars Monster's current assertion of rights.  ISN's defense once again is entirely baseless, both legally and factually.

Legally, there is no doctrine of law or equity that precludes a party from advocating a position in one proceeding, and advocating a different position 15 years later in a separate proceeding.  The closest relevant doctrine is that of judicial estoppel.  Under this doctrine, "where a party assumes a certain position in a legal proceeding, **and succeeds in maintaining that position**, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (emphasis added).  "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.  *Id*. at 750-51.

Here, Monster did not succeed in persuading the PTO that Odwalla had narrow rights because of the presence of other MONSTER-based marks.  Instead, Monster settled with Odwalla.  Thus, judicial estoppel cannot apply. *New Hampshire*, 532 U.S. at 750-51; *Momoh v. Wells Fargo Bank, N.A.*, No. 15-CV-04729-HSG, 2016 WL 8729939 at *4 (N.D. Cal. July 1, 2016) ("Without reliance and acceptance by the court in the other proceeding, judicial estoppel is not appropriate.").

Factually, Monster's position today is consistent with its position in 2003. Back then, Monster argued only that Odwalla had narrow rights because of the presence of other MONSTER-based marks.  Ex. 48 at 3-4.  Fifteen years later, Monster is situated very differently than Odwalla was in 2003.  As discussed above, Monster has developed an extraordinarily strong trademark, much stronger than Odwalla's C-Monster mark in 2003.  This great strength entitles

Monster to broader rights than Odwalla.  *Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) (the stronger the trademark, the greater the protection).

Moreover, even if Monster's marks were weak, ISN is not merely using one of Monster's marks.  ISN has combined its "MONSTER" mark with Monster's green and black trade dress, and with a variant of Monster's UNLEASH THE BEAST!® trademark.  Nothing Monster said in 2003 precludes it from asserting its rights against a party that is using both the MONSTER and BEAST family of marks and Monster's green and black trade dress, all in combination.

**D.    Summary Judgment Should Be Granted On ISN's Cancellation Counterclaim**

ISN's cancellation counterclaim seeks to cancel the '432 and '433 Registrations on the same grounds that ISN asserted in its invalidity defenses. For all the reasons just discussed, the cancellation counterclaim has no merit.

ISN's effort to cancel the '432 Registration is meritless for still another reason.  The '432 Registration is directed to Monster's M-Claw logo, Ⓜ, by itself, without the words "MONSTER ENERGY."  Ex. 46.  ISN has no standing to challenge this registration for the simple reason that Monster has never accused ISN of using the M-Claw logo, and ISN has never claimed any desire to use the M-Claw logo.  Under Ninth Circuit law, "a cancellation petitioner must show that he is more than an intermeddler but rather has a personal interest, and that there is a real controversy between the parties."  *Star-Kist Foods v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984).  The challenger "must show a real and rational basis for his belief that he would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in his own mark."  *Id.*

ISN cannot meet this standard.  There is simply no dispute between

Monster and ISN over the M-Claw logo.  ISN is nothing more than an intermeddler, seeking to punish Monster for filing suit against ISN on other trademarks and trade dress.  For this reason as well, ISN's claim for cancellation of the '432 Registration should be rejected on summary judgment.

### V.  CONCLUSION

Each of ISN's disputed affirmative defenses fails as a matter of law, fails on the undisputed facts, or both.  Accordingly, this Court should grant summary judgment in favor of Monster on these defenses and on the counterclaim that merely incorporates these defenses.

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:  March 20, 2018          By:  /s/ *Lynda J. Zadra-Symes*
                                Steven J. Nataupsky
                                Lynda J. Zadra-Symes
                                Marko R. Zoretic
                                Jason A. Champion

Attorneys for Plaintiff,
MONSTER ENERGY COMPANY

27756084