# EXHIBIT 2

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

# REBUTTAL EXPERT REPORT OF HAL PORET IN MATTER OF MONSTER ENERGY COMPANY V. INTEGRATED SUPPLY NETWORK, LLC

## ********************************

# RESPONSE TO EXPERT REPORT OF DR. BRUCE ISAACSON

REPORT PREPARED FOR:
Standley Law Group LLP

PREPARED BY:
Hal Poret
President, Hal Poret LLC
142 Hunter Ave
Sleepy Hollow, NY 10591

March 2018

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

## *BACKGROUND AND PURPOSE*

Plaintiff in the above-referenced lawsuit (Monster Energy) alleges that the use by Integrated Supply Network ("ISN") of the name MONSTER and black and green colors in connection with ISN's Monster Mobile line of tool products creates a likelihood of confusion with respect to Monster Energy and its marks.  In connection with the lawsuit, Monster Energy has submitted the Expert Report of Dr. Bruce Isaacson concerning a survey that Dr. Isaacson conducted to purportedly assess likelihood of confusion between ISN products bearing the name MONSTER with black and green colors and Monster Energy.  Based on his survey, Dr. Isaacson opines that there is a likelihood of confusion.

Standley Law Group LLP, counsel for ISN, retained me to review and provide my opinions regarding the Isaacson Report and Survey.  In the course of preparing this Rebuttal Report, I reviewed the following materials:

- Isaacson Report and Appendices
- Complaint
- Answer, Affirmative Defenses and Counterclaims
- Opposer's Responses to Revised Second Set of ROGS (Nos. 6-57)
- MEC's Responses to ISN's First set of Interrogatories (1-10)
- MEC's Responses to 2nd Set of Interrogatories (11-15)
- Supplemental Responses to ISN's First Set of Interrogatories
- MEC's Responses to Third Set of Interrogatories (16-18)
- Applicant's Answers to Opposer's Second Set of Interrogatories
- Applicant's Supplemental Answers to First Set of Interrogatories
- Supplemental Response to ISN's Second Set of Interrogatories
- Response to ISN's Fourth Set of Interrogatories

Page | 1

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

- ISN Tool Expo materials (ISN0024016, 24216)
- Tech's Edge Price Lists (ISN0026766, 26806, 26846, 26886, 26926, 26966, 27006)
- Images of ISN products (ISN0034697-34705 and ISN0038179-38210
- Monster Mobile webpages: Monster Mobile Facebook page and Monster Mobile blogspot website
- Catalogs: Tool Book 2018, Tech's Edge December New Products 2017, July/August 2017 Tech's Edge Plus-Priced Catalog, July/August 2017 Tech's Edge Plus-NonPriced Catalog, Monster Catalog Summer 2017, K Tool 2016 Catalog, Toolbook 2017 Catalog, Monster Catalog Spring 2016, Monster Catalog Spring 2015
- ISN Materials: ISN Brandbook final, ISN Paid Ad Specs 2017, ISN Media Planner, ISN Strategic Marketing 360 Final
- Sales Data (ISN0035488)
- Websites cited in Paragraph 27 of the Isaacson Report.
- Pilkenton, Kowalke, Rivera Deposition Transcripts
- ISN and Pilkenton Depositions in TTAB Opposition 91222672
- Parikh Report (MEC022045)
- Report of James Berger

I also conducted and reviewed the results of online searches for automotive tools, mobile tool trucks and other products using the term Monster.

My work in connection with this matter is being charged at my standard rate of $625 per hour and payment is not contingent upon any outcome of the litigation.

Page | 2

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

As described in more detail below, it is my opinion that Dr. Isaacson's survey is flawed and unreliable. One severe flaw alone renders the results and Dr. Isaacson's conclusions unreliable, which is that the survey entirely failed to simulate realistic marketplace conditions under which individuals at auto service or repair shops would encounter and consider purchase of the ISN products. As Dr. Isaacson notes, the ISN products are sold to auto service or repair shops through mobile tool trucks/distributors. Accordingly, a typical prospective customer of ISN products would be exposed to the products through a mobile tool distributor from a company such as Snap-On or through an independent distributor, and would be presented with a wealth of context that heavily emphasizes the automotive tool/equipment focus of the product line being offered. A prospective end customer of the ISN products would clearly understand that they are dealing with a mobile tool/equipment distributor who deals with auto professionals and that the context of the situation is focused on automotive tools and equipment. They would likely see a large assortment of Monster Mobile tools (including packaging) and may also see an assortment of tools from other automotive tool brands. They may also be shown catalogs or other materials showing the wide array of automotive tool products from the Monster Mobile brand and/or other brands of automotive tools and equipment. All of this context would have a strong bearing on whether the prospective customer perceives the products to be connected to an energy drink company (Monster Energy), as opposed to an unrelated company that produces automotive tool products under its own brand (Monster Mobile). The Isaacson Survey did nothing to simulate any such context. It merely showed each respondent a single image of a single product in the abstract, as if the product could be a random promotional item rather than a product that is obviously from a brand specializing in tools and equipment designed for automotive technicians. The survey did not inform respondents that the product is sold by a mobile tool

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

truck distributor, did not provide any other information, materials or imagery that could simulate the relevant context of a purchase from an automotive tool truck, and in most cases did not even show the packaging and/or the entire product.  Accordingly, the survey entirely fails to test whether real consumers would make a mistaken connection to Monster Energy under realistic marketplace conditions – i.e., a context where the prospective purchaser would be heavily focused on the topic of automotive tools and would certainly realize that the products come from a source with a specialty in tools and equipment for automotive technicians and could not possibly think they are looking at a random promotional item that has had the name "Monster" placed on it.

As further described below, the survey also contains additional flaws that further undermine its reliability:

1) Related to the marketplace conditions issue, the three items selected in the survey are not representative of many ISN products, both due to the nature of the product and the way the name Monster and various colors are used on the product.  Accordingly, even putting aside the flaws in the survey, the results from the specific products tested could not be applied to ISN's products generally, such as the many products that are highly specialized automotive industrial equipment and products that display the term Monster with different colors and/or packaging.

2) The control failed to fully account for the inherent demand effects of the survey, and failed to account for the fact that there are multiple third party uses of the brand Monster in various product categories (such as third party use of "Monster" for audio products, motorcycles and even other automotive and tool products).

Page | 4

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

3)  The survey improperly mentioned beverages and drinks in the screening section of the survey, which could have suggestively influenced respondents' answers regarding the automotive tools tested by placing the thought of beverages/drinks in their minds immediately before asking about the source or sponsorship of the ISN products.

4)  The survey did not collect sufficient information to determine whether a representative sample is drawn, most notably failing to determine the age of any respondent (other than that they are 18 or over), which leaves open the possibility of the sample being severely skewed toward Monster Energy's key demographic.

5)  The sample size for the survey of the beverage tumbler was only 29 Test Group respondents, which entails a very high error rate.

These and other flaws are discussed in more detail below.

If I receive additional materials or data relating to the Isaacson Survey, I reserve the right to supplement my opinions.

**AUTHORSHIP AND QUALIFICATIONS**

This report was prepared by Hal L. Poret, President at Hal Poret, LLC.  I have personally designed, supervised, and implemented over 1,000 surveys regarding the perceptions, behaviors, and opinions of consumers, over 300 of which have concerned trademarks or trade dress.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District

EX2-6

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research, publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*, the International Trademark Association, and the National Advertising Division of the Council of Better Business Bureaus (NAD).  I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelor's and master's degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## BRIEF OVERVIEW OF ISAACSON SURVEY

The following is a very brief description of the Isaacson Survey.  Additional details are discussed below and in the Isaacson Report.

Page | 6

EX2-7

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

The Isaacson Survey was an online survey among individuals age 18 or older who work in automotive or auto body service or repair and answered that they are likely to purchase certain items from a mobile tool distributor or tool truck within the next two years.  The screening questions specifically asked about "Hand tools," "Portable lights or lighting," or "Drink or beverage tumbler," among other options.

Three specific ISN product images were tested in the survey, each product image being viewed on its own by a separate group of respondents.  For each image, respondents were instructed as follows:

> "Below, you will see a picture of an item you might purchase.  You may or may not have seen this item before.
>
> Take as much time as you like to look at the picture.  You may need to scroll to see the entire picture.  When you are finished viewing the picture, click ">" to proceed.

No other information, images, or context were provided.

A Test Group of 104 respondents was asked about the following image of a screwdriver:

EX2-8

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Another Test Group of 100 respondents was asked about the following image of a work light:



Another Test Group of 29 respondents was asked about the following image of a beverage tumbler:

EX2-9

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Each respondent was asked three series of confusion questions:

- What company or brand makes or puts out the item in the picture

- Whether the company that makes or puts out the item in the picture makes or puts out any products or brands and, if so, what other products or brands.

- Whether whoever makes or puts out the item in the picture is sponsored or approved by another company or brand and, if so, what other company or brand.

Page | 9

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

According to Dr. Isaacson's coding of the answers, the following rates of confusion were found (combining all 3 items) yielding a total confusion rate of 24.5%:

- 4.3% identified Monster Energy as the company that makes or puts out the product[1]
- 10.3% identified Monster Energy as another product put out by the same company
- 9.9% identified Monster Energy as sponsoring or approving the product.

Dr. Isaacson's Survey also included Control Groups for each product, in which the term "Monster" was replaced with "Mountain" and the colors black and green were changed to blue and purple:

---

[1] The rate was 1.0% for the screw driver and 4.0% for the work light.

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY







No respondents identified Monster Energy in the control groups.

Accordingly, Dr. Isaacson concludes there is a net 24.5% rate of confusion.

Page | 11

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

## DETAILED OPINIONS REGARDING ISAACSON SURVEY

**I.      The Survey is Severely Flawed and Unreliable Because it Entirely Failed to Simulate Realistic Marketplace Conditions Under Which Prospective Customers Would Encounter the ISN Products**

It is among the most fundamentally accepted requirements for likelihood of confusion surveys that the survey replicate the marketplace conditions under which the relevant marks are encountered by prospective consumers.  As Professor McCarthy explains, a survey's methodology must mirror the situations in which consumers encounter the service or mark and should reflect marketplace conditions with respect to the presentation of survey stimuli.[2] Material failures to simulate realistic marketplace presentation of the marks is a flaw that has been frequently identified as leading to survey exclusion.[3]

The Isaacson Survey failed to comport with this basic requirement in a manner that renders the results unreliable.  As Dr. Isaacson notes, the ISN products are sold to auto service and repair shops through mobile tool truck distributors.[4] Prospective consumers who are offered tools through a mobile tool distributor would encounter a wealth of imagery, information, and overall context that would strongly influence their perception of the source or sponsorship of the products.  Specifically, a typical prospective customer of ISN products bearing

---

[2] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition (September 2007) at Section 32:163.*

[3] Swann, Jerre B. (2012), "Survey Critiques," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association (pp. 374-5).

[4] Deposition of ISN (Pilkenton) pages 51-52 (noting that there are approximately 10,000 mobile tool dealers (including approximately 1,500 independent distributors), about 4,000 of whom purchase from ISN).

EX2-13

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

the accused Monster mark would be exposed to the products in a scenario that
would heavily emphasize the automotive tool and equipment supply context,
and would make clear that any ISN product is part of a large line of products
from a company or brand with a heavily specialization in automotive tools.
Prospective customers would physically see a tool truck identifying a company
that supplies automotive tools, such as Snap-On or an independent distributor.
They would likely see that the distributor stocks a wide variety of automotive
tools and equipment.  Those who are offered ISN products through a mobile tool
truck would likely see a large assortment of Monster Mobile tools (including
packaging) and may also see an assortment of tools from other automotive tool
brands.  They may also be shown catalogs or other materials showing the wide
array of automotive tool products from the Monster Mobile brand and/or other
brands of automotive tools.  All of this would heavily emphasize the automotive
tool context of the sales situation and make clear to anyone considering purchase
of any ISN product that the product comes from a line of products that is heavily
specialized and focused on automotive tools/equipment.  This would have a
strong bearing on the likelihood that such customers would connect any product
to an energy drink company (Monster Energy), as opposed to an unrelated
company that produces automotive tool products under its own brand (Monster
Mobile).

To appreciate the critical nature of the purchase environment context on the
perception of the source or sponsorship of any ISN product, it is useful to
consider some examples of what a prospective customer might see when
presented with an opportunity to purchase the challenged ISN products.
Prospective customers of ISN products sold through mobile tool trucks would
see the trucks themselves, which contain company names and other advertising
emphasizing the context of tools and equipment.  For instance:

EX2-14

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Prospective customers would also typically see a large assortment of products,[5] making abundantly clear that there is an entire line of automotive tool and equipment products that fall under the Monster Mobile brand.  For instance, consider the following images from independent mobile tool truck:[6]



---

[5] Depo of ISN (Pilkenton) pages 194-195 (mobile tool trucks are typically heavily stocked with many products).

[6] The two photos show the inside of tool trucks of independent dealers Ed Clayton and Jake Savage respectively.

Page | 14

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Similarly, consider the following image of the inside of a mobile tool truck from a Cornwell dealer:

EX2-16

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



EX2-17

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

As these images make clear, an auto technician who is exposed to ISN products from a mobile tool truck would not merely see one isolated item in the abstract. They would see a large assortment of products, making clear that the products come from overall larger lines of specialized tool/equipment brands.

Many prospective customers would also be shown catalogs displaying the assortment of products from Monster Mobile and/or other automotive tool and equipment brands.  Consider, for instance, the following images from a Monster Mobile catalog:

Page | 17

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



EX2-19

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Consider the following images from a Tech's Edge catalog,[7] which includes Monster Mobile products:

---

[7] Deposition of ISN (Pilkenton), pages 44-47; 61-62 (ISN produces the Tech's Edge catalog, which is provided to mobile tool dealers who in turn provide the catalogs to the end customers who purchase ISN products.  Accordingly, the ultimate ISN customer is often exposed to these catalogs.)

Page | 19

EX2-20

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



EX2-21

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



Consider also the following webpage images advertising Monster Mobile products:

EX2-22

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



EX2-23

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



As these images make clear, any real prospective customer of ISN products, whether encountering the products in a mobile tool truck or in a catalog, or some combination, will easily understand that the products come from a large line of "Monster Mobile" products that are heavily focused on automotive tools and equipment.  Given such context, prospective customers will clearly understand that any given ISN item, such as a screwdriver or light or tumbler, is not a

EX2-24

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

random or isolated promotional item.  Rather, it would be clear under realistic
marketplace conditions that any ISN product is one of a wide array of products
that includes very specialized tools and equipment including motorized
polishers, high performance adhesives, automotive wrenches, infrared
thermometers, large work benches/cabinets, ram kits, welding helmets, and
countless other specialized items.  This context could severely reduce the
likelihood that a consumer would fail to realize that there is a distinct line of
"Monster" automotive products and would make a mistaken connection to a
company best known for energy drinks that are heavily sold in mainstream
convenience and grocery stores.

The Isaacson Survey, on the other hand, provided no such realistic context.  It
merely showed respondents a single item in the abstract, such as the following:



The survey did not even instruct respondents to consider the item as they would
if they were seeing it in connection with a mobile tool truck or distributor.  In the
absence of any attempt to set a realistic marketplace context for consideration of

EX2-25

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

the ISN items, the survey results have no reliability in predicting whether there would be confusion under real world conditions.  Rather, the survey simulates a completely unrealistic scenario, as if the product shown could be a random promotional item.

Several respondents volunteered answers explicitly confirming that the survey's presentation of a single item created the unrealistic and misleading impression that the item might merely be a random promotional item, as opposed to a product that is part of a specialized product line focused on automotive tools and equipment.  For instance:

- Respondent #2952 who viewed the work light answered: "Monster sponsors it, it looks like a "promo item," to me."  This respondent further elaborated: "…recently, at a Honda shops "anniversary" party, I got a free 32 gig USB flash drive with the Honda logo on it."  This clearly confirms that this respondent was viewing the light as the type of promotional item that a major company might put its brand on.
- Similarly, respondent #2596 viewed the work light and answered: "some chinese mass production company, probably produced by monster drink company as advertising/promo."
- Respondent #7258 gave the following answer about the screwdriver: "monster is an energy drink company looks like a promo item."

The impression that the product is a random promotional item is the result of the survey showing the product in isolation, divorced from any realistic marketplace context.  The product would clearly not convey the impression that it is a random promotional item if the consumer were encountering it as one of many

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

products in a line from a mobile tool truck that is clearly focused on specialized automotive tools and equipment.

It is also worth considering additional ways in which the survey failed to simulate realistic marketplace conditions with respect to each particular item.  In the case of the screwdriver, the Isaacson survey showed only an image of a single screwdriver from a larger set with no packaging:



Under realistic marketplace conditions, this screwdriver would be encountered as part of a larger tool set that includes other items and packaging.  For instance, consider the following 9-piece set in its packaging:

Page | 26

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



A prospective consumers' impression of a 9-piece set designated as a "tamper proof torx set" might be very different than their impression of a single screwdriver shown with no context.  Where a consumer might imagine it possible that a single isolated item might be produced as a promotional item, they would be far less likely to believe that an entire tool set clearly aimed at specialized technicians is the promotional product of an energy drink company.

Consider also how the impression of a screwdriver product is impacted by its presentation along with many other specialized tool products, for instance as shown in the following catalog page:

EX2-28

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



As shown above, the ISN screwdriver sets are shown along with multiple other products, the overall commercial impression making clear that the screwdriver is just one of a wide array of products from a brand focused on automotive tool supply.  A customer encountering an ISN screwdriver set sold through a mobile tool truck would similarly see a wider array of products, with such context creating a very different impression than is created by Dr. Isaacson's display of a single screwdriver outside of the packaging or the overall context of a mobile tool truck.

The same issues apply to the work light.  The work light was shown without packaging and in the absence of any of the context of a mobile tool truck, such as the appearance of many other automotive-focused products from the same brand.  For instance, consider the difference in commercial impression when a

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

Monster Mobile light is encountered in a realistic context along with other specialized products, such as in the following catalogs:



EX2-30

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

Such a realistic context makes clear that the product is not a random promotional item but rather is from a brand that is specialized in automotive tools and equipment.  The Isaacson Survey's presentation of the single light with no packaging or other context fails to simulate realistic marketplace conditions.

The Isaacson Survey's presentation of the beverage tumbler suffers from an even more serious problem.  As noted earlier, respondents were shown the following image of a single product:



Showing only the beverage tumbler without any of the context of the mobile tool truck scenario, including the failure to show that the product is one accessory in

EX2-31

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

a line of products that are overwhelmingly focused on auto tools and equipment, is unrealistic and improper.  Again, consider how the commercial impression of a tumbler product changes when shown in a realistic manner along with other products from the same brand, such as in the following catalog:



When viewed in the context of a line of products including a ratchet knife, wrench, jump starter, booster pack, and welding helmet, it becomes clear that the beverage tumbler is not an isolated promotional item, but an accessory that is from a brand of automotive tool and equipment products.  A respondent purchasing the beverage tumbler from a mobile tool truck/distributor would typically see such other items and be clear on this context.

Dr. Isaacson's presentation of a single beverage tumbler outside of any context or information relating to automotive tools and equipment is completely artificial

EX2-32

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

and entirely fails to test for confusion under realistic marketplace conditions. It is closer to a replication of a marketplace scenario where a consumer encounters a promotional beverage tumbler in a convenience store than where an auto repair professional is approached by a mobile tool distributor with a variety of automotive tool and equipment products and accessories.  Any tendency of respondents to name Monster Energy in the context presented by the Isaacson Survey does not reliably indicate whether confusion would occur under the actual marketplace conditions for the sale of the ISN products.

The realism of the beverage tumbler survey is further undermined by the fact that 5 of the 29 Test Group respondents actually answered that they would <u>not</u> purchase from a mobile tool truck distributor, and only qualified for the survey because they were asked an extra question through which they agreed that they would buy a beverage tumbler through <u>any retailer</u>.  Such respondents were not valid prospective ISN customers and were even further removed from experiencing the beverage tumbler in any realistic context.  Not surprisingly, four of these five invalid respondents were among those who identified Monster Energy drink.[8]  If these respondents were removed, the supposed "confusion" rate for the beverage tumbler would fall from 38% to 29%, with the 29% figure having an 18% error rate due to the small sample size.[9]

---

[8] ID# 4782, 4965, 5047, 6843.

[9] Removing the 5 invalid respondents would yield a total of 25 respondents, 7 of whom named Monster Energy (29%).  At a sample size of 25, a 29% result has a margin of error of 18% at a 95% confidence level.

EX2-33

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

## II.     The Specific ISN Products Tested Are Not Representative of Many
## ISN Monster Mobile Products

Even aside from the problems discussed above and below, the results for the

products tested in the Isaacson Survey could not be reliably projected to many of

the ISN Monster Mobile products because such products differ in significant

ways that are relevant to the perception of source.  Most notably, the Monster

Mobile line of products includes many products that are extremely specialized

products that would never be marketed to ordinary consumers and could never

be mistaken as common promotional items.  For instance, consider the following

Monster Mobile products:



EX2-34

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY



## MST8822
## 12 Volt Professional Start Booster
- 2200 Peak amps          • 22 Amp hour rated battery
- LED display with alternator output control
- Industrial pure brass clamps with an LED work light
- Heavy duty 4 AWG cables and a LED light on the negative cable

The Professional Start Booster features the highest grade shock
resistant ABS plastic construction with a specially designed series of
batteries for jump starting applications as well as high quality pure
copper cables, and components. Our industrial grade clamps and
fuses are used to ensure a safe connection. Assembled in the USA.




## MST284661
## 134A Brass
## Manifold Gauge Set
- Heavy duty brass construction
- Flutter free silicon dampened gauges
- Heavy duty manual couplers
- 60" SAE approved 134A hoses
- Protective color coded gauge guards
- Packaged in a protective plastic box
- **1 year warranty on material and workmanship**

Consumer reaction to the term Monster on an item such as a light or a tumbler

cannot predict the likelihood that an auto repair or service professional would

believe that highly specialized tools and equipment meant for automotive

professionals come from or are sponsored by Monster Energy.  As noted earlier,

even the awareness that such specialized products are part of the Monster

Page | 34

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

Mobile line could severely reduce the likelihood that consumers would perceive an item such as a light or tumbler to come from anything other than a company specializing in automotive tools and equipment.[10]

The Isaacson Survey results would also be inapplicable to many Monster Mobile products that do not use the color green in a manner comparable to the items tested in the survey.  For instance, consider the following Monster Mobile products:



Unlike the light shown in the Isaacson Survey, this product is primarily black and grey.

---

[10] This is empirically proven by Dr. Isaacson's own data, which showed a higher rate of naming Monster Energy for a tumbler than for the light or screwdriver.  The results to the first Isaacson question (asking what company or brand puts out the product) also demonstrates this phenomenon clearly – i.e., 17.2% initially named Monster Energy when shown the tumbler, whereas this figure dropped to 4.0% for the work light and further dropped to 1.0% for the screwdriver.  Undoubtedly any tendency to name Monster Energy is severely reduced as the relevant product becomes further removed from an energy drink and comes closer to a specialized automotive or industrial tool.

EX2-36

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

Further, other Monster Mobile products come in packaging that use other colors, such as light blue, as shown in the following images:





EX2-37

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

The rate of respondents connecting a single light or beverage tumbler to Monster Energy would not be projectable to the likelihood that a consumer experiences confusion over a sander in light blue packaging.

In sum, the results of the Isaacson Survey simply could not be applied to other ISN products that are materially different in the sense that they use different colors in packaging and/or on the product itself, or that the products are too heavily specialized automotive/industrial products to be comparable to the ones shown in the survey.

### III.    The Isaacson Control Was Not Effective to Fully Control For the Demand Effects Inherent to the Scenario Tested

As noted earlier, Dr. Isaacson's controls consisted of replacing the term "Monster" with the term "Mountain" and replacing the black and green colors with the colors blue and purple.  There are multiple deficiencies with this approach that significantly limit its effectiveness in accounting for the type of survey "noise" implicit in the current situation, and which make it unsurprising that his control yielded a 0% noise level.[11]

In considering the Isaacson control, it is important to consider the issue of "demand effects" in surveys.  Demand effects occur where the artificial environment of a survey causes respondents to speculate or search for an answer that is primarily a response to the cues provided by the survey rather than an unbiased response that would occur under actual marketplace conditions when

---

[11] In this context, "noise" consists of the tendency of respondents to identify Monster Energy not due to genuine confusion, but due to the influences of the artificial survey environment.

Page | 37

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

there is no "interviewer" prompting respondents to think about certain topics.[12] Demand effects are common in surveys and one of the reasons that a control is important, as a rigorous control can measure and weed out the impact of demand effects.

There is particular reason to be concerned about demand effects in the Isaacson Survey due to the pattern of answers leading to the total 25.4% confusion result. Dr. Isaacson's Survey provided respondents with three different opportunities to express confusion – first asking who makes or puts out the product, then asking about other products or brands from the same company, and then asking about sponsorship. While this is standard practice and I have no criticism of that approach, it is important to note that only 4.3% of respondents named Monster Energy in the first question when initially asked what company or brand makes or puts out the relevant product (combining all 3 products), and the result for the screwdriver product in particular was only 1.0%. Most of the supposed "confusion" did not occur until respondents were asked a second and third question – in fact, the combined rate of naming Monster Energy was only 10.6% and 13% for the screwdriver and light respectively until a third question was asked that finally led to a higher result. The concern regarding demand effects in such a scenario is strong. Respondents have been shown a product that says "Monster" and are asked repeated questions regarding its source or sponsor. The concern is that respondents will eventually get the idea that the survey is looking for an answer and will try to think about what the answer might be, leading them to come up with a "Monster" answer to provide that does not

---

[12] *See* Itamar Simonson and Ran Kivetz, *Demand Effects in Likelihood of Confusion Surveys*, Trademark and Deceptive Advertising Surveys: Law, Science, and Design (American Bar Association 2012) (Diamond & Swann, eds.); Martin T. Orne, *On the Social Psychology of the Psychological Experiment: With Particular Reference to Demand Characteristics and Their Implications*, 17 Am. Psychol. 776 (1962).

EX2-39

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

reflect any genuine confusion they had experienced on their own prior to being asked repeated questions.

Such concerns are not uncommon in surveys and can be controlled for.  The Isaacson Survey, however, did not effectively do so.  Dr. Isaacson's control does effectively demonstrate that respondents' naming of Monster Energy is related to the term Monster and the black/green colors, as these are the factors that differ between Test and Control Groups.  However, it does not establish that respondents experienced this confusion on their own while reviewing the product, as opposed to being cued by the survey to think about and come up with an answer that had not already occurred to them.  It does not establish this due to several deficiencies that resulted in the control having no ability to assess the tendency of respondents to guess Monster Energy in response to superficial cues that would not cause confusion in the actual marketplace.  For one, the control altered the product significantly more than was necessary to remove any alleged confusing similarity.  For instance, once the term "Monster" had been replaced with "Mountain," there should have been no need to also remove the black/green colors.  ISN's use of the term "Mountain" in connection with black and green colors does not raise any legitimate prospect of confusion with Monster Energy.  Accordingly, it was unnecessary to remove both the Monster name and the colors to create a clearly non-infringing control.  Had the control altered the term Monster but left the black and green colors, the control may have at least had some ability to measure the tendency to guess Monster Energy due to superficial similarities.  On the other hand, a product using the name Mountain and blue/purple colors did not contain even the barest superficial similarity that could test the extent of guessing.  Indeed, such a control product is so far afield that it assured that no respondents would guess Monster Energy.

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

In addition, the term "Mountain" is a poor control name, because it is unnecessarily far afield from the concept of "Monster." While I understand that ISN also uses "Mountain," this does not make it an effective control to account for the tendency to guess Monster Energy. A control that has a meaning that is somewhat closer to Monster – such as Mammoth or Giant or Ogre – would have been a more effective control to assess the tendency of the survey to cause respondents to guess Monster Energy.

Most significantly perhaps, the Isaacson control did nothing to account for the particular circumstances of this case, which involve a term (Monster) that is used by a variety of third parties for various products. For instance, the brand "Monster" is used in connection with Monster Cable, Ducati Monster Motorbikes, and even numerous other tools and equipment brands. Given the clear co-existence of numerous uses of "Monster," it would have been very valuable for the Isaacson Survey to include a control that also contained the word "Monster," in order to assess the extent to which the survey's series of three questions will induce respondents to come up with the answer "Monster Energy" even when shown a product that is not accused of being confusingly similar and co-exists with the Monster Energy brand. Had the survey used a control that is plainly non-infringing but includes the term "Monster" (such as a MonsterLithium tool from Snap-On or a Monster audio product) it would have far better controlled for the type of demand effects at issue here – i.e., that when shown a product with a single term on it (Monster) and asked a series of three questions about source/sponsorship, respondents will eventually search to come up with a "Monster" answer even if they had not genuinely experienced confusion on their own. In the absence of a control that includes a plainly non-infringing use of "Monster," we have no idea whether the survey result reflects genuine confusion or whether any non-confusing use of "Monster" would have

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

induced a similar percentage of respondents to come up with Monster Energy as an answer.  Accordingly, we have no way to rule out the possibility that the initial 1% and 4% rates of naming Monster Energy for the screwdriver and light are more accurate reflections of the confusion level,[13] and that the overall higher results are merely the product of the inherent demand effects of a survey.

### IV.    The Survey was Biased Due to the Survey's Suggestive Mention of the term "Beverage" or "Drink" in the Screener

The purpose of the survey was to test the extent to which respondents who encounter the ISN products make a mistaken connection to Monster Energy, which is primarily known as a drink or beverage company.  To perform this purpose properly, the survey needed to show and ask about the ISN products under realistic marketplace conditions without bias.  The realism and objectivity of the Isaacson Survey, however, was undermined by a problem in the screening process that injected bias into the survey.  The key screening question (F) asking which items respondents would purchase included a list of tools and automotive products along with the choice "drink or beverage tumbler."  This both puts the idea of drinks/beverages in respondents' minds immediately before being asked about the ISN products, and it draws a connection between tools and a drink/beverage product.  The next screening question (G) also mentioned a manufacturer or distributor of "drinkware."  Accordingly, the survey twice mentioned the term "drink" or "beverage" shortly before showing the ISN product and asking questions to see if respondents would name Monster Energy

---

[13] As already discussed, Dr. Isaacson's survey is so flawed due to the failure to simulate realistic marketplace conditions for the sale of the Monster Mobile products that even the 1% and 4% rates of naming Monster Energy for the screwdriver and light are unreliable.

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

or a drink/beverage company.  This is particularly problematic in the case of the screwdriver and light, as there is no justification for the concept of "drink" or "beverage" to be put in respondents' minds immediately before being asked about a work tool.  Even in the case of the tumbler, the mention of a "manufacturer or distributor of drinkware" is improperly suggestive and misleading, as this is not an accurate characterization of ISN, and improperly plants the idea of a company whose main business relates to drinks.  The multiple mentions of "drink" and "beverage" in the screener artificially primed respondents to be more likely to think of a drink or beverage company when thereafter shown the ISN product.  This further undermines the survey's ability to reliably predict the extent to which real consumers would have made a mistaken mental connection to Monster Energy under realistic marketplace conditions.

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

### V.     The Survey Failed to Collect Data to Determine Whether a Representative Sample Was Drawn

The survey is also unreliable due to the failure to collect data sufficient to determine whether a representative sample of relevant consumers was surveyed. It is standard practice to collect information regarding the age of respondents to ensure that the sample is representative of the consumer base by age, or at least to allow the results to be weighted based on the demographics of the relevant base.  Here, however, Dr. Isaacson only asked if respondents were age 18 or older, and did not ask for a more specific age range into which they fall.  This is a severe departure from standard practice and means that we have no idea to what extent the survey sample fails to represent the relevant base of auto repair or service professionals.[14]

There is obvious reason to be concerned over the representativeness of the population sampled by age.  Monster Energy's products and marks may be better known by some age groups and more poorly known by others.  If the survey sample was skewed toward an age group that is the core of Monster Energy's customer base, the result would not accurately reflect the perceptions of the relevant base of customers of ISN products.  Given the absence of any data on the specific age ranges of respondents in the survey, there is no way to validate that the sample is representative or that the results can be projected to the actual universe of purchasers.

---

[14] Having seen many of Dr. Isaacson's surveys in previous trademark cases, I can also confirm that the failure to ask for a specific age range is also a departure from Dr. Isaacson's own practices.  There is no explanation for why such standard age data would not be collected.

Page | 43

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

### VI.   The Sample Size For the Beverage Tumbler Survey Was Very Small and Entails a High Error Rate

While Dr. Isaacson reports what appears to be a significantly higher rate of "confusion" for the beverage tumbler (37.9%), it is important to note that this figure comes from a sample of only 29 respondents.  This result at a sample size of 29 has a very high error rate of 18%, which severely calls into question the accuracy and reliability of the 37.9% figure.  As noted earlier, if the 5 invalid respondents are removed – i.e., those who did not indicate that they would purchase from a mobile tool dealer – the result would be 29% with a margin of error of 18%.

### CONCLUSIONS

For the foregoing reasons, it is my opinion that the Isaacson survey is too flawed to have any value or reliability on the topic of likelihood of confusion.

Hal Poret

Dated:  March 16, 2018

EX2-45

# APPENDIX A

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

*Education*

1998    Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995    S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993    Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

*Employment*

2016 -    President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015    Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004    Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003    Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

EX2-47

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2018    Bratton v. **The Hershey Company**
        (Deposition)                         USDC Central District of MO

2018    Leadership Studies v. **Blanchard Training & Development**
        (Deposition)                         USDC Southern District of CA

2017    Superior Consulting v. **Shaklee**
        (Deposition)                         USDC Middle District of FL

2017    **Mercado Latino** v. Indio
        (Deposition)                         USDC Central District of CA

2017    Delalat v. **Nutiva**
        (Deposition)                         USDC Northern District of CA

2017    Dashaw v. **New Balance**
        (Deposition)                         USDC Southern District of CA

2017    **Bearing Tech** v. O'Reilly Automotive
        (Deposition)                         USDC Western District of MO

2017    Soundview v. **Facebook**
        (Deposition)                         USDC District of Delaware

2017    Rovi v. **Comcast**
        (Deposition)                         USDC Southern District of NY

2017    Puma v. **Black & Decker**
        (Trial)                              New Mexico Circuit Court

2017    **Select Comfort v.** Personal Comfort
        (Trial and Deposition)               USDC District of Minn

2017    **Alzheimer's Foundation of America** v. Alzheimer's Association
        (Deposition and trial)               USDC Southern District of NY

2017    **Banc of California** v. Farmers & Merchants Bank
        (Deposition)                         USDC Central District of CA

2017    PolyGroup v. **Willis Electric**
        (Deposition)                            Patent Trial and Appeal Board

2017    In re: NCAA Grant-in-Aid Cap Litigation
        (Deposition)                            USDC Northern District of CA

2017    Mullins v. **Premier Nutrition**        USDC Northern District of CA
        (Depositions in Class Cert and Merits phases)

2017    Lion's Gate v. **TD Ameritrade**
        (Deposition)                            USDC Central District of CA

2017    **Deere & Company** v. Fimco dba Schaben
        (Deposition and trial)                  USDC Western District of KY

2017    **Adidas & Reebok** v. TRB
        (Deposition)                            USDC District of Oregon

2017    **Church & Dwight** v. SPD              USDC Southern District of NY
        (Deposition/trial in liability phase; deposition/trial in damages phase)

2017    In re: **Coca Cola** Marketing and Sales Practices Litigation (No. II)
        (Deposition)                            USDC Northern District of CA

2017    **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
        (Deposition and Trial)                  USDC Western District of TN

2017    Globefill v. **Element Spirits**
        (Deposition and Trial)                  USDC Central District of CA

2017    Brickman v. **Fitbit**
        (Deposition)                            USDC Northern District of CA

2017    Network-1 Technologies v. **Alcatel-Lucent et al.**
        (Deposition)                            USDC Eastern District of TX

2017    Health Partner Plans v. **Reading Health Partners**
        (Deposition and Injunction hearing)     USDC Eastern District of PA

2017    In Re **Biogen** '755 Patent Litigation
        (Deposition)                            USDC District of NJ

2017    **Cava Mezze** v. Mezze Mediterranean Grill

(Trial)                                                    USDC District of MD

2017   Mastrandrea v. **Vizio**
       (Deposition)                                        USDC Central District of CA

2017   **Adidas** v. Skechers
       (Deposition and Injunction hearing)       USDC District of OR

2016   **Triumph International, Inc.** v. Gourmetgiftbaskets.com, Inc.
       (Deposition)                                        USDC Central District of CA

2016   Phelan Holdings v. **Rare Hospitality Management**
       (Deposition)                                        USDC Middle District of FL

2016   **Intellectual Ventures II** v. AT&T Mobility
       (Deposition)                                        USDC District of DE

2016   **One World Foods** v. Stubbs Austin Restaurant Company
       (Deposition)                                        USDC Western District of TX

2016   **Booking.com B.V.** v. Michelle Lee
       (Deposition)                                        USDC Eastern District of VA

2016   Variety Stores v. **Walmart Stores, Inc.**
       (Trial)                                             USDC Eastern District of NC

2016   **American Cruise Lines** v. American Queen Steamboat Company
       (Deposition)                                        USDC District of DE

2016   Universal Church v. **Univ. Life Church**
       (Deposition)                                        USDC Southern District of NY

2016   **U. of Houston** v. Houston Col. of Law
       (Deposition)                                        USDC Southern District of TX

2016   Navajo Nation v. **Urban Outfitters**
       (Daubert Hearing)                                   USDC District of NM

2016   Beaulieu v. **Mohawk Carpet Dist.**
       (Deposition)                                        USDC Northern District of GA

2016   Efficient Frontiers v. **Reserve Media**
       (Deposition)                                        USDC Central District of CA

2016   **McAirlaids** v. Medline Industries
(Deposition)                                    USDC Eastern District of VA

2016   **Under Armour** v. Ass Armor
(Deposition)                                    USDC Southern District of FL

2016   **C5 & CoorsTek** v. CeramTec
(Deposition and trial)                          USDC District of Colorado

2016   **BBC** v. Stander
(Deposition)                                    USDC Central District of CA

2016   **Caterpillar** v. Tigercat
(Deposition)                                    USPTO Opposition

2016   Premier v. **Dish Network**
(Deposition)                                    USPTO Opposition

2016   **Omaha Steaks** v. Greater Omaha
(Rebuttal Testimony)                            USPTO Opposition

2016   **EMC** v. Pure Storage
(Deposition)                                    USDC District of MA

2016   **Top Tobacco** v. North Atlantic
(Deposition)                                    USPTO Opposition

2016   Ascension Health v. **Ascension Ins.**
(Deposition)                                    USDC Eastern District of MO

2016   **Quoc Viet** v. VV Foods
(Deposition and trial)                          USDC Central District of CA

2016   Joules v. **Macy's Merchandising Group**
(Deposition and trial)                          USDC Southern District of NY

2015   MMG v. **Heimerl & Lammers**
(Deposition and trial)                          USDC District of MN

2015   **PRL USA** v. Rolex
(Deposition)                                    USDC Southern District of NY

2015   Bison Designs v. **Lejon**
(Deposition)                              USDC District of CO

2015   Barrera v. **Pharmavite**
(Deposition)                              USDC Central District of CA

2015   **Flowers** v. Bimbo Bakeries
(Deposition)                              USDC Middle District of GA

2015   Razor USA v. **Vizio**
(Deposition)                              USDC Central District of CA

2015   Allen v. **Simalasan**
(Deposition)                              USDC Southern District of CA

2015   BMG Rights Mgmt. v. **Cox Enterprises**
(Deposition and trial)                    USDC Eastern District of VA

2015   Verisign v. **XYZ.COM LLC**
(Deposition)                              USDC Eastern District of VA

2015   Farmer Boys v. **Farm Burger**
(Deposition)                              USDC Central District of CA

2015   Ono v. **Head Racquet Sports**
(Deposition)                              USDC Central District of CA

2015   **Select Comfort v.** Tempur Sealy
(Deposition)                              USDC District of Minn

2015   ExxonMobil v. **FX Networks**
(Deposition)                              USDC Southern District of TX

2015   **Delta** v. Network Associates
(Deposition)                              USDC Middle District of FL

2015   Brady v. **Grendene**
(Deposition)                              USDC Central District of CA

2015   **Zippo** v. LOEC
(Deposition)                              USDC Central District of CA

| | | |
|---|---|---|
| 2015 | Maier v. **ASOS** (Deposition) | USDC District of Maryland |
| 2015 | **Converse** In re: Certain Footwear (Deposition and trial) | International Trade Commission |
| 2014 | Scholz v. **Goudreau** (Deposition) | USDC District of Mass |
| 2014 | **Economy Rent-A-Car** v. Economy Car Rentals (TTAB Testimony) | USPTO |
| 2014 | Weber v. **Sears** (Deposition) | USDC Northern District of IL |
| 2014 | Native American Arts v. **Stone** (Deposition) | USDC Northern District of IL |
| 2014 | Gravity Defyer v. **Under Armour** (Trial) | USDC Central District of CA |
| 2014 | **Adams** v. Target Corporation (Deposition) | USDC Central District of CA |
| 2014 | PODS v. **UHAUL** **(**Deposition and trial**)** | USDC Middle District of FL |
| 2014 | Flushing v. **Green Dot Bank** (Deposition) | USDC Southern District of NY |
| 2014 | Amy's Ice Creams v. **Amy's Kitchen** (Deposition) | USDC Western District of TX |
| 2014 | **Unity Health** v. UnityPoint (Deposition) | USDC Western District of WI |
| 2014 | In re: NCAA Student-athlete litigation (Deposition and Trial) | USDC Northern District of CA |
| 2014 | Spiraledge v. **SeaWorld** (Deposition) | USDC Southern District of CA |
| 2014 | **Diageo N.A. v.** Mexcor | |

|      |                                                                         |                                |
|------|-------------------------------------------------------------------------|--------------------------------|
|      | (Deposition and trial)                                                  | USDC Southern District of TX   |
| 2014 | **Pam Lab** v. Virtus Pharmaceutical (Deposition and trial)             | USDC Southern District of FL   |
| 2014 | **US Soccer Federation** v. Players Ass'n (Arbitration Testimony)       | Arbitration                    |
| 2014 | **Estate of Marilyn Monroe** v. AVELA (Deposition)                      | USDC Southern District of NY   |
| 2014 | Kelly-Brown v. **Winfrey, et al.** (Deposition)                         | USDC Southern District of NY   |
| 2014 | Virco Mfg **v. Hertz & Academia** (Deposition)                          | USDC Central District of CA    |
| 2014 | In re: Hulu Privacy Litigation **(Deposition)**                         | USDC Northern District of CA   |
| 2013 | **Jackson Family Wines** v. Diageo (Deposition)                         | USDC Northern District of CA   |
| 2013 | Bubbles, Inc. v. **Sibu, LLC.** (Deposition)                            | USDC Eastern District of VA    |
| 2013 | Clorox v. **Industrias Dalen** (Deposition)                             | USDC Northern District of CA   |
| 2013 | Active Ride Shop v. **Old Navy** (Deposition and trial)                 | USDC Central District of CA    |
| 2013 | **Macy's Inc**. v. Strategic Marks LLC. (Deposition)                    | Northern District of CA        |
| 2013 | Karoun Dairies, Inc. v. **Karoun Dairies, Inc.** (Deposition)           | Southern District of CA        |
| 2013 | **Kraft Foods** v. Cracker Barrel Old Country (Deposition and Trial)    | Northern District of IL        |
| 2013 | **Bayer Healthcare** v. Sergeants Pet Care USDC (Deposition and Trial)  | Southern District of NY        |

| 2013 | JJI International v. **The Bazar Group, Inc.** (Deposition) | USDC District of RI |
| 2013 | **Fage Dairy USA** v. General Mills (Deposition) | Northern District of NY |
| 2013 | Gameshow Network v. **Cablevision** (Deposition and trial) | F.C.C. |
| 2013 | Telebrands v. **Meyer Marketing** (Deposition) | USDC Eastern District of CA |

*Presentations*

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May
9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference,
Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute)
(September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark
Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

<u>Cutting Edge Developments in Trademark Surveys</u> (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

<u>Hot Topics and Recent Developments in Trademark Surveys</u> (paper for May 2013 DRI Intellectual Property Conference)

<u>Surveys in Trademark and Advertising Litigation</u> (2013 National CLE Conference, Snowmass Colorado, January 2013)

<u>Trademark Litigation Online Consumer Surveys</u> (Practical Law Company Intellectual Property and Technology, May 2012)

<u>Hot Topics in Advertising Law 2012</u> (Contributor to Practising Law Institute publication)

<u>A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys</u>, 100 TMR 756 (May-June 2010)

<u>Recent Trends in Trademark Surveys</u> (paper for Virginia State Bar Intellectual Property conference, October 2009)

<u>Trademark Dilution Revision Act breathes new life into dilution surveys</u> (In Brief PLI website, June 2009)

<u>The Mark</u> (Survey Newsletter; three editions 2009)

<u>Hot Topics in Trademark Surveys</u> (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>The Mark</u> (Survey Newsletter, 2008)

<u>Trademark and Advertising Survey Report</u> (Summer 2007)

<u>Avoiding Pitfalls in Dilution Surveys under TDRA</u> (AIPLA Spring Conference, Boston, May 2007)

### *Commentary*

<u>Comment on Hotels.com case</u> (on TTABLOG.COM, July 24, 2009)

<u>Comment on Nextel v. Motorola</u> (on TTABLOG.COM, June 19, 2009)

<u>PLI All-Star Briefing Newsletter,</u> "What does the Trademark Dilution Revision Act
mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus