JEFFREY S. STANDLEY (OH # 0047248)
jstandley@standleyllp.com
MELISSA A. ROGERS MCCURDY (OH #0084102)
mmccurdy@standleyllp.com
F. MICHAEL SPEED, JR. (OH #0067541)
mspeed@standleyllp.com
Standley Law Group LLP
6300 Riverside Drive
Dublin, Ohio 43017
Telephone: (614) 792-5555
Fax: (614) 792-5536

DOUGLAS C. SMITH (SBN 160013)
dsmith@smitlaw.com
SMITH LAW OFFICES, LLP
4204 Riverwalk Parkway, Suite 250
Riverside, California 92505
Telephone: (951)509-1355
Facsimile: (951)509-1356
Attorneys for Defendant
Integrated Supply Network, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> INTEGRATED SUPPLY NETWORK, LLC, a Florida limited liability company, <br><br> Defendant. | Case No. 5:17-CV-00548-CBM-(RAO) <br><br> **DEFENDANT'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS, STATEMENT OF ADDITIONAL UNDISPUTED FACTS, AND CONCLUSIONS OF LAW IN OPPOSITION TO MONSTER ENERGY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:  April 17, 2018 <br> Time:  10:00 a.m. <br> Location: Courtroom 8B |

**1**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-2, Defendant Integrated Supply Network, LLC ("ISN") hereby submits its Statement of Genuine Disputes of Material Fact and Statement of Additional Material Facts in Dispute, in opposition to Plaintiff Monster Energy Company's Motion for Partial Summary Judgment:

## I.    Statement of Genuine Disputes of Material Facts

| MEC's Proposed Undisputed Fact | Defendant's Position: | Support for Defendant's Position (if not undisputed) |
|---|---|---|
| 1. In 2002, Monster launched its MONSTER ENERGY® drink brand bearing its MONSTER ENERGY® trademark. | Disputed | ISN disputes that Plaintiff is known as "Monster." Plaintiff has no evidence that it uses "Monster" on its own in commerce. *See* Compl. at ¶10. Plaintiff is Monster Energy Company and uses "Monster Energy" and other, similarly compound marks, on its products. *See* Compl. at ¶ 10; Declaration of Melissa Rogers McCurdy executed March 20, 2018 (Dkt. No. 80, hereinafter "McCurdy Decl. of 3/20/18"), Ex. 11 at pp. 1 – 11, 123:11 – 124:24, 143:11 –154:17, Ex. 11.  Otherwise, ISN does not dispute this fact. |

**2**

| | | |
|---|---|---|
| 2. Monster now uses literally dozens of different trademarks that incorporate the term "Monster" (the "MONSTER marks"). | Undisputed | |
| 3. Monster has obtained federal trademark registrations for all 36 MONSTER marks that it has asserted in this action. | Disputed | To the extent MEC is still trying to assert U.S. Reg. No. 3,924,797 for ASSAULT M MONSTER ENERGY, that registration has been cancelled. Decl. of Melissa Roger McCurdy executed March 27, 2018 (hereinafter "McCurdy Decl. of 3/27/18"), Ex. 1. |
| 4. The Patent & Trademark Office (PTO) did not require proof of secondary meaning for any of these 36 registrations. | Undisputed | |

**3**

| | | |
|---|---|---|
| 5. Of these 36 registrations, thirteen were issued more than five years ago and have been declared incontestable by the PTO. Those registrations are Reg. Nos. 3,044,314, 3,044,315, 3,057,061, 3,134,841, 3,134,842, 3,852,118, 3,959457, 3,908,600, 3,908,601, 3,914,828, 4,036,680, 4,036,681, and 4,111,964. | Undisputed | |
| 6. Also in 2002, Monster launched its UNLEASH THE BEAST!® trademark. | Undisputed | |
| 7. Monster now uses various other trademarks that incorporate the term "Beast" (the "BEAST marks"). | Undisputed | |
| 8. Monster has obtained federal trademark registrations for all 11 BEAST marks that it has asserted in this action. | Disputed | In its Complaint, MEC alleges that U.S. Registration No. 4,292,502 is for REHAB THE BEAST!, but the mark actually registered is "REHAB THE BEAST! WWW.MONSTERENERGY.COM" McCurdy Decl. of 3/27/18, Ex. 2. |

**4**

| | | |
|---|---|---|
| 9. The PTO did not require proof of secondary meaning for any of these 11 registrations. | Undisputed | |
| 10. Of these 11 registrations, one of them, Reg. No. 2,769,364, issued more than five years ago and has been declared incontestable by the PTO. | Undisputed | |
| 11. Also since 2002, Monster has consistently used a green and black trade dress for its packaging and promotional materials. | Disputed | Monster Energy uses many color combinations in commerce including on its beverage products. McCurdy Decl. of 3/20/18, Ex. 11 at pp. 1 – 11, 123:11 – 124:24, 143:11 – 154:17, Ex. 11.  Moreover, Monster Energy has not described/limited its asserted trade dress in this case as green and black.  Compl. at ¶13.  ISN disputes that MEC has alleged a protectable trade dress in this case. *See* ISN's Mot. for Summ. J. (Dkt. No. 77-1). |

| | | |
|---|---|---|
| 12. The specific shade of green used by Monster in its trade dress is known as Pantone 375. | Disputed | ISN does not dispute that one of the colors MEC uses in commerce is Pantone 375, which is a shade of green, but ISN does dispute that MEC has claimed that its trade dress is black and green, when that is not what MEC has alleged in this case. Compl. at ¶13 |
| 13. An example of Monster's trade dress, together with the original MONSTER ENERGY® and UNLEASH THE BEAST!® trademarks, is shown below.<br><br> | Disputed | ISN disputes that MEC has alleged a protectable trade dress in this case. *See* ISN's Mot. for Summ. J. (Dkt. No. 77-1); *see also* Compl. at ¶13. ISN further disputes that MEC has limited the asserted trade dress to the look of the beverage product shown here. *Id.* ISN does not believe MEC has proffered sufficient evidence to demonstrate that MEC has acquired secondary meaning in its purported trade dress. *Id.* |

| 14. Since at least 2003, Monster has been promoting and sponsoring sporting events and music concerts for others under the MONSTER ENERGY® trademark. | Disputed | MEC does not provide services for others as required to obtain trademark protection for services. MEC sponsors various events as a means of advertising and promoting its beverages.  MEC does not have any evidence that its marks have been used in conjunction with the sale or advertisement of services or that its marks have been used in conjunction with such services when the primary beneficiary has been someone other than MEC. *See* ISN's Response in Opposition to MEC's Motion for Summary Judgment. |
| --- | --- | --- |
| 15. One of Monster's earliest sponsorships was for the Balls of Steel Stunt Show, which features motorcyclists riding inside a hollow spherical steel cage. This sponsorship began in 2003. | Undisputed | |

**7**

| | |
|---|---|
| 16. Since that time, Monster has sponsored a wide variety of motorsport athletes, teams, and activities, including NASCAR, Formula 1, MotoGP, Moto2, Supercross, motocross, MXGP, MX2, drag racing, drifting, flat track, off road, rally, rallycross, snowmobile, speedway, stunt, superbike, and freestyle motocross. | Undisputed |

| 17. For nearly all of these sponsorships, Monster's MONSTER Marks and trade dress are prominently featured on the athletes' vehicles and clothing, and they are often displayed on banners throughout the venue hosting the competition. | Disputed | ISN disputes that MEC has alleged a protectable trade dress in this case. *See* ISN's Mot. for Summ. J. (Dkt. No. 77-1); *see also* Compl. at ¶13. ISN further disputes that MEC has limited the asserted trade dress to the look of the beverage product shown in paragraph 13 of its statement of allegedly uncontroverted facts. *Id.* Moreover, the asserted "MONSTER Marks" include 36 registrations for various compound marks most of which are for beverages and nutritional supplements in liquid form. *See* Compl. at ¶ 10. MEC has not proffered any evidence of most of these marks (i.e., MONSTER REHAB, MUSCLE MONSTER, JUICE MONSTER, MONSTER ASSAULT, PUNCH MONSTER, JAVA MONSTER, UBERMONSTER, MONSTER UNLEADED, MONSTER ENERGY UNLEADED, MONSTER ENERGY ABSOLUTELY ZERO, MONSTER ENERGY ULTRA RED, MONSTER ENERGY ULTRA BLUE, MONSTER ENERGY ULTRA BLACK, etc.) being featured or |

**9**

| | | displayed as described herein. *See* Compl. (which shows MEC's claw logo emphasized in MEC's advertisements and promotional activities); *see also* McCurdy Decl. of 3/20/2018, Ex. 14, Ex. 15, Ex. 16. |
|---|---|---|
| 18. On January 1, 2017, Monster became the title sponsor of NASCAR's premier series (formerly called the NASCAR Sprint Cup Series), which is now called the Monster Energy® NASCAR Cup Series. | Undisputed | |
| 19. Monster also became the official energy drink of NASCAR. | Undisputed | |

10

| | | |
|---|---|---|
| 20. Monster has obtained U.S. Trademark Reg. No. 4,721,433 ("the '433 Registration") for the MONSTER ENERGY® mark for use in connection with the following services: "promoting goods and services in the sports, motorsports, electronic sports, and music industries through the distribution of printed, audio and visual promotional materials; promoting sports and music events and competitions for others." | Undisputed | |
| 21. Monster has also obtained U.S. Trademark Reg. No. 4,721,432 ("the '432 Registration") for its M-Claw logo for use in connection with the same services. | Undisputed | |

**11**

| | |
|---|---|
| 22. When promoting sports and music events, Monster is typically compensated in the form of the publicity it receives from being associated with such popular events as NASCAR racing. The producers of the events receive a benefit from Monster in the form of the publicity Monster generates for the events by promoting the events on Monster's website and elsewhere. | Undisputed |

| | | |
|---|---|---|
| 23. Since 2002, Monster has spent over $4.6 billion in advertising, promoting, and marketing the MONSTER Marks and the BEAST Marks. | Disputed | The stated amount is for money spent "worldwide." Declaration of Rodney Sacks (Dkt. No. 71, hereinafter "Decl. of Sacks") at ¶8.  ISN disputes that spending outside of the US is relevant to this case.  Further, the asserted "MONSTER Marks" include 36 registrations for various compound marks most of which are for beverages and nutritional supplements in liquid form.  Compl. At ¶ 10. MEC's advertisements and promotional activities have all emphasized MEC's claw logo and the majority of the asserted "MONSTER Marks" do not appear to be featured in MEC's advertisement and promotional activities. *See* Compl. (which shows MEC's claw logo emphasized in MEC's advertisements and promotional activities); McCurdy Decl. of 3/20/18, Ex. 14-17, ¶17.  Moreover, MEC's BEAST Marks are inconsistently utilized and do not appear to be used in most of MEC's promotions and advertisements.  It would be incorrect to conclude that each of the MONSTER Marks and any of the |

| | | BEAST Marks has been promoted by MEC to the tune of $4.6 billion. |
|---|---|---|
| 24. In 2017 alone, Monster spent $537 million in advertising, promoting, and marketing its brand and marks. | Disputed | The stated amount is for money spent "worldwide." Decl. of Sacks at ¶8.  ISN disputes that spending outside of the US is relevant to this case. |
| 25. Monster now sells approximately 3 billion cans of drinks per year, with estimated retail sales at approximately $6 billion per year. | Disputed | According to the Complaint, this figure is for worldwide sales.  Compl. at ¶35.  ISN disputes that sales outside of the U.S. are relevant in this case. |

| 26. A recent report by Socialbakers ranked Monster as the tenth most popular global brand. | Disputed | The Socialbakers report is inadmissible under at least Fed. R. Evid. 901(a), 801(c), and 802.  MEC has not offered any testimony from the alleged creator of the Report that would render it admissible in this case.  *See* Decl. of Sacks at ¶36.  Therefore, this Report cannot be considered on Summary Judgment.  Moreover, Mr. Sack's testimony regarding The Report is inadmissible under at least Fed. R. Evid. 901(a), 801(c), and 802.  But, even so, the Report at best only shows that Monster Energy Company has the 10th highest number of Facebook Fans of "monitored pages." *See* Decl. of Sacks at Ex. 20.  We do not know what Facebook pages are being monitored.  *See Id.* |
| 27. ISN launched its MONSTER brand in December 2010. | Undisputed | |

| 28. Starting in 2013, it began sometimes using the name MONSTER MOBILE. | Disputed | There is some discrepancy regarding when ISN began using MONSTER MOBILE. ISN had a search of MONSTER MOBILE performed by its prior trademark counsel in June of 2012.  McCurdy Decl. of 3/20/2018, Ex. 1 at 113:18 – 117:19, 146:01 – 158:20, Ex. 2. |
| 29. ISN made the deliberate decision to emphasize the "MONSTER" portion of the name, and de-emphasize the "MOBILE" portion. | Undisputed | |
| 30. Internal emails reveal that ISN included the word "MOBILE" in its mark only to make it easier to register the mark with the Patent and Trademark Office. | Disputed | "MOBILE" is clearly used in commerce by ISN as part of the MONSTER MOBILE mark.  Declaration of David Pentecost (Dkt. No. 83, hereinafter "Decl. of Pentecost") at ¶17-50.  It signifies to the public how the product is distributed (via mobile tool dealers). Declaration of Jason Champion (Dkt. No. 72-18, hereinafter "Decl. of Champion"), Ex. 38, ISNE00043085. Consistency in using MOBILE as part of the mark has been an important consideration at ISN.  *Id.* |

**16**

| 31. Those same emails show that ISN wanted to make the "MOBILE" portion of its trademark as small as possible. | Disputed | This is not what the emails cited by MEC show. *See* Decl. of Champion, Ex. 38, Ex. 41. They do show that ISN wanted to emphasize the MONSTER component of MONSTER MOBILE. *See Id.* |
| 32. Commercially, even today, ISN often omits the "MOBILE" portion of its mark from its products altogether, and marks its products with just the word "MONSTER." These "MONSTER" products include ISN's tools, hats, t-shirts, sweatshirts, water bottles, and beverage tumblers, all offered under the MONSTER brand without the word "MOBILE." | Disputed | Almost all of ISN's MONSTER MOBILE products include the MONSTER MOBILE logo (including the words MONSTER MOBILE) on either the product or its packaging. *See* Decl. of Pentecost at ¶17-50. In marketing materials, ISN always uses the MONSTER MOBILE logo (including the words MONSTER MOBILE). *See* McCurdy Decl. of 3/27/2018, Ex. 5, Ex. 6; Declaration of Bruce Weber signed March 20, 2018 (Dkt. No. 88-12, hereinafter "Weber Decl."), Ex. 2, Ex. 3. |
| 33. ISN, like Monster, uses green and black trade dress. | Disputed | ISN does not dispute that it uses black and green in conjunction with the MONSTER MOBILE line. But, ISN does dispute that MEC has claimed that its trade dress is black and green, when that is not what MEC has alleged in this case. Compl. At ¶13 |

| | | |
|---|---|---|
| 34. The specific shade of green used by ISN is known as Pantone 376, one shade different from Monster's shade of Pantone 375. | Disputed | ISN disputes this statement of fact to the extent it intends to imply that Monster Energy owns Pantone shade 375. |
| 35. ISN refers to its shade of green as "Monster green." | Undisputed | |
| 36. In marketing its "Monster Snacks," ISN has used the slogan "FEED THE BEAST." | Disputed | ISN disputes that it has used "Monster Snacks" as a trademark. For a period of time, ISN did sell snacks under the MONSTER MOBILE logo and on one or two occasions an advertisement made reference to "monster snacks." *See* Compl. At ¶38; *see also* Weber Decl. at ¶¶ 50 – 51. |
| 37. Monster has filed this action alleging that ISN has engaged in trademark infringement, among other things. | Undisputed | |
| 38. As an affirmative defense, ISN alleges that Monster's 47 asserted trademark registrations are "invalid and/or unenforceable." | Disputed | In its Affirmative Defense, ISN has actually alleged that MEC's "purported trademark rights are invalid and/or unenforceable." Answer and Countercl. (Dkt. No. 10) at ¶84. |

**18**

| | | |
|---|---|---|
| 39. ISN has alleged two theories of invalidity or unenforceability against all of the MONSTER marks and the BEAST marks. First, ISN alleges that these marks lack secondary meaning. Second, ISN alleges that MONSTER has "misused" these trademarks by "bullying" ISN and third parties with weak claims of trademark infringement. | Disputed | ISN does not dispute that these are two theories ISN has submitted for invalidity or unenforceability of MEC's marks, but disputes that these are all or the complete theories of invalidity or unenforceability of MEC's marks.  ISN has laid out its allegations of invalidity or unenforceability in detail, including at least in its Interrogatory Responses. Decl. of McCurdy of 3/28/18, Ex. 4 at Interrogatory Nos. 10, 13, and 17; *see generally* Answer and Countercl. (Dkt. No. 10) |
| 40. ISN has asserted an additional invalidity defense against the '433 Registration. ISN asserts that Monster has never used the MONSTER ENERGY® trademark to promote sporting events and music events, the services listed in the registration. | Undisputed | |

**19**

| | | |
|---|---|---|
| 41. In a separate affirmative defense, ISN alleges that Monster's infringement claims are barred by "unclean hands." | Undisputed | |
| 42. ISN's defense relies upon a dispute between Odwalla and Monster in 2003. At that time, Monster was seeking to register MONSTER ENERGY as its trademark. Odwalla opposed, arguing that confusion was likely with Odwalla's B-Monster and C-Monster marks for use with juice. | Disputed | ISN disputes that its defense of unclean hands relies entirely upon the dispute between Odwalla and MEC to the extent that is what this assertion of fact is attempting to say.  Decl. of McCurdy of 3/28/18, Ex. 4 at Interrogatories Nos. 10, 13, and 17; *see generally* Answer and Countercl. (Dkt. No. 10) |

| | | |
|---|---|---|
| 43. As an affirmative defense in the PTO Opposition proceedings, Monster argued: "because of the numerous trademark registrations and applications incorporating the word 'MONSTER' and the numerous 'MONSTER' marks existing in the marketplace, Odwalla has no grounds to assert exclusive or broad rights in Odwalla's marks." Monster did not prevail at the PTO on this ground. To the contrary, as ISN acknowledged in discovery, Monster obtained its registration by entering into a settlement agreement with Odwalla. | Undisputed | |

| | | |
|---|---|---|
| 44. ISN also filed a counterclaim seeking cancellation of 21 of the registrations for the MONSTER Marks, 11 of the registrations for the BEAST Marks, and the '432 Registration for the M-Claw logo. | Undisputed | |
| 45. ISN subsequently agreed to limit the cancellation counterclaim to the '432 and '433 Registrations | Undisputed | |

## II.  ISN'S Statement of Additional Undisputed Facts ("ISN SUF")

| ISN Undisputed Material Fact ("ISN SUF") | Evidence |
|---|---|
| 1. Defendant, ISN, is a Florida Limited Liability Company that was founded in 1984. | Weber Decl. at ¶4. |
| 2. ISN is an automotive tool and equipment specialist whose primary business is distributing automotive tools and equipment for third parties. | Weber Decl. at ¶¶ 3 – 5; Pentecost Decl. at ¶4. |

**22**

| | |
|---|---|
| 3. One of the markets served by ISN is the mobile tool distribution market which is made of up mobile tool distributors. | Weber Decl. at ¶6; Pentecost Decl. at ¶5. |
| 4. Mobile tool distributors, are businesses that utilize trucks ("tool trucks") to travel to locations where tools are utilized on a daily basis to make sales of tools and related products. | Weber Decl. at ¶7; Pentecost Decl. at ¶6. |
| 5. In addition to the third-party brands it distributes, ISN has several "house brands" of automotive tools and equipment which ISN distributes under trademarks that were either created by ISN or acquired by ISN from a predecessor-in-interest. | Weber Decl. at ¶8; Pentecost Decl. at ¶7. |

| | |
|---|---|
| 6. The MONSTER MOBILE line of products accused in this case is one of ISN's house brands sold under a trademark created by ISN. | Weber Decl. at ¶9; Pentecost Decl. at ¶8. |
| 7. ISN developed the MONSTER MOBILE concept in 2010 after it recognized a need in its product offerings for a mobile-dealer exclusive line of tools. | Decl. of McCurdy of 3/20/18, Ex. 1 at 19:03 – 21, 113:18 – 117:19, 118:02 – 122:21. |
| 8. The MONSTER MOBILE line of tools was designed by ISN exclusively for mobile tool distributors so that they could offer high quality tools and not have to cut margins to compete with the prices of other distribution channels. | Decl. of McCurdy of 3/20/18, Ex. 1 at 113:10 – 122:21, 51:07 – 58:18. |

| | |
|---|---|
| 9.  When coming up with the name that would be used for its new mobile-dealer exclusive line of tools in 2010, "monster" fit the bold, dynamic, strong image that ISN was looking for. | McCurdy Decl. of 3/20/2018, Ex. 1 at 115:18 - 122:21. |
| 10. ISN's Vice President of Marketing, Scott Pilkenton, came up with the "monster" name for the mobile-dealer exclusive tool-line. | McCurdy Decl. of 3/20/2018, Ex. 1 at 19:03 – 21, 113:18 – 117:19, 118:02 – 122:21. |
| 11. Mr. Pilkenton has testified that he had no knowledge of Monster Energy Company or its products when he developed ISN's MONSTER MOBILE brand. | McCurdy Decl. of 3/20/2018, Ex. 1 at 90:07 – 91:17. |

| | |
|---|---|
| 12. Prior to launching the MONSTER MOBILE brand, ISN performed an in-house search to determine whether there was pre-existing trademark use that would prevent it from using "monster" on its line of tools and automotive equipment. | McCurdy Decl. of 3/20/108, Ex. 1 at 113:18 – 117:19, 146:01 – 158:20. |
| 13. The in-house search did not turn up any results that indicated to ISN that its use of "monster" on its mobile-dealer line of tools and automotive equipment would be a problem. | McCurdy Decl. of 3/20/2018, Ex. 1 at 113:18 – 117:19, 146:01 – 158:20. |
| 14. ISN subsequently had its trademark counsel at the time perform a search: that search also came back with nothing that indicated there would be a problem. | McCurdy Decl. of 3/20/2018, Ex. 1 at 146:01 – 158:20, Ex 2. |

| | |
|---|---|
| 15. The inspiration for the MONSTER MOBILE line was historic green and black monsters such as Frankenstein. | McCurdy Decl. of 3/20/2018, Ex. 1 at 113:18 – 117:19, 129:05 – 131:15. |
| 16. ISN developed the following logo that included the terms MONSTER and MOBILE as well as a skull and wings design, for its mobile-dealer exclusive line of tools:<br><br><br><br>(hereinafter the "MONSTER MOBILE logo") | Decl. of McCurdy of 3/20/18, Ex. 1 at 128:03 – 130:07, 145:17 – 145:22, 201:12 – 202:08; Pentecost Decl. at ¶11. |
| 17. ISN was granted a registration for the MONSTER MOBILE Logo under U.S. Reg. No. 4,951,671 which issued on May 3, 2016. | Weber Decl. at ¶23, Ex. 1; McCurdy Decl. of 3/27/2018, Ex. 8. |

| 18. ISN began selling its mobile-dealer line of MONSTER MOBILE tools in approximately December of 2010. | Decl. of McCurdy of 3/20/18, Ex. 1 at 161:13 – 161:16; Weber Decl. at ¶15. |
| --- | --- |
| 19. The following goods are sold as part of the MONSTER MOBILE line:<br><br>- work lights<br>- service jacks<br>- carts<br>- shop press<br>- light bulbs<br>- impact wrenches<br>- thermometers<br>- vacuum pumps<br>- tune up kits<br>- creepers<br>- mechanic's seats<br>- hammer tune up kits<br>- hammers<br>- in-line cut off tools | Weber Decl. at ¶16. |

- battery chargers

- air impact wrenches

- latex gloves

- manifold gauge sets

- utility knives

- chargers for work lights

- electronic charging scales

- protective wheel sockets

- protective sleeves for sockets

- rechargeable lights

- replacement legs for work

  lights

- circuit testers

- screwdrivers

- swivel casters

- welders

- welder carts

- plasma cutting systems

- bump lights

**29**

- pliers

- plier sets

- spline socket & bit sets

- spring assisted pocket knives

- torque wrenches

- underhood lights

- service tool carts

- roller tool cabinets

- tool chests

- tool lockers

- picks

- hooks

- files

- impact wrenches

- needle scaler attachments

- welding helmets

- sockets

- brake rewind adapters

- ratchets

- digital meters

- cutter pliers

- sockets with ratchet holders

- infrared thermometers

- brake fluid testers

- portable tire repair station

- wrench sets

- socket sets

- utility knife blade replacements

- air die grinders

- cut off tools

- die grinders

- truck jacks

- roadside assistance jacks

- bottle jacks

- jack stands

- ram kits

- headrests

- professional start boosters

**31**

- booster packs

- digital multimeters

- needle scalers

- tire changers

- lifts

- composite impact tools

- variable speed polishers

- grinders

- clocks

- torx sets

- file sets

- handle hook and pick sets

- pocket lights

- pen lights

- air ratchet wrenches

- impact ratchets

- charging adapter for rotatable

  work lights

- chargers

- wrench and bottle opener

  combo tools

- plier sets

- rivet tongue and groove pliers

- long reach plier sets

- butterfly impact wrenches hand

  tool sets

- t-bars

- foot pumps

- hook sets

- mortorq bit sets

- hose clamp assembly repair

  kits

- underhood light sets

- extension sockets

- lcd circuit testers

- tire inflators

- spanner wrenches

- hydraulic riveters

- painting tables

- pry bars

- work gloves

- keychain lights

- rope shears

- fractional calipers

- tools

- inspection lamps

- insulated tumblers

- ratchet knives

- socket trays

- hose clamp pliers

- bolt cutters

- tpms installation tool kits

- orbital sanders

- Master bearing and seal drivers

- Utility stands

- Bluetooth speakers

- Flood lights

- Saw kits

- Air tool holders

- Adhesive repair kits

- Air saws

- Ratchet drivers

- Impact bit driver sets

- Tripods for Bluetooth work lights

- Lithium ion jump starters

- Apparel namely, shirts, belts, caps, and socks

- Specialty electronics namely drones and dash cams

- Wrenches

- Combination wrenches

- Ratcheting wrenches

- Sportsman accessories such as ratchet knives, bottle openers, can coolers, water bottles,

| | |
|---|---|
| insulated tumblers, and growlers<br><br>- Impact sockets<br><br>- Flashlights<br><br>- Spot lights | |
| 20. Exemplary images of the MONSTER MOBILE products in their packaging have been provided to the Court in conjunction with ISN's Motion for Summary Judgment and show that the MONSTER MOBILE logo is typically displayed on each MONSTER MOBILE product or its packaging. | *See* ISN's Statement of Uncontroverted Facts in Support of ISN's Mot. Summ. J. (Dkt. No. 70) at ¶¶ 29 – 62; *see also* Pentecost Decl. at ¶¶ 17 – 50. |
| 21. ISN markets/advertises the MONSTER MOBILE products in the U.S. using several platforms including Tech's Edge and | Pentecost Decl. at ¶51; Pentecost Decl. at ¶54. |

**36**

| | |
|---|---|
| MONSTER MOBILE catalogs. | |
| 22. ISN's Tech's Edge and Monster Mobile catalogs, which are marketing materials used by ISN for the MONSTER MOBILE line, display the MONSTER MOBILE logo. | *See* Decl. of McCurdy of 3/27/2018, Ex. 5, Ex. 6; *see also* Pentecost Decl. at ¶¶ 51 – 56. |
| 23. ISN has sold and given away apparel items as a means of marketing/promoting its tool line. | Decl. of McCurdy of 3/20/2018, Ex. 1 at 311:08 – 312:06, Ex. 42 at 168:21 – 169: 15. |
| 24. As of March of 2017, the MONSTER MOBILE work-style Mechanix-Wear style gloves were not very popular compared to the nitrile disposable gloves. | Decl. of McCurdy of 3/20/2018, Ex. 1 at 168:19 – 170:01. |
| 25. ISN has sold gloves under the MONSTER MOBILE brand including a work-style glove by Mechanix-Wear as well as disposable nitrile gloves. | *See* Decl. of McCurdy of 3/20/2018, Ex. 1 at 168:19 – 170:01. |

| | |
|---|---|
| 26. Plaintiff Monster Energy Company ("Monster Energy") is in the business of developing, marketing, selling, and distributing beverages. | Compl. at ¶7. |
| 27. Monster Beverage Corporation is a holding company, that is the parent company of Monster Energy Company. | Decl. of McCurdy of 3/20/18, Ex. 4 at 12:02 - 12:22. |
| 28. Monster Energy generates operating revenue by selling ready-to-drink packaged drinks primarily to bottlers and full-service beverage distributors, retail grocery and specialty chains, wholesalers, club stores, mass merchandisers, convenience chains, food service customers, and the military. | Decl. of McCurdy of 3/20/18, Ex. 4 at 34:10 – 36:03, 137:06 – 142:06. |

| | |
|---|---|
| 29. Nearly all of MEC's revenues come from the sale of energy drink beverages and Monster Energy identifies its competitors as other beverage companies and competing products as other beverages. | Decl. of McCurdy of 3/20/18, Ex. 4 at 130:07 – 130:11, 137:08 – 142:06, Ex. 9 at pp. 4, 5, 12 |
| 30. The annual 10K document filed by Monster Beverage Corporation, which discusses the business of Monster Energy Company, does not indicate that Monster Energy Company is in the business of offering promotional services. | *See* McCurdy Decl. of 3/20/2018 at Ex. 9. |
| 31. The 10k document refers to the "Monster Energy" brand segment and takes care to use "Monster Energy" throughout as opposed to simply "Monster." | *See* McCurdy Decl. of 3/20/2018 at Ex. 9. |

**39**

| | |
|---|---|
| 32. Beverage World was a beverage industry trade publication in circulation in 2003. | McCurdy Decl. of 3/20/2018, Ex. 12 |
| 33. The January 15, 2003 edition of Beverage World magazine included an article on beverage package design and provided of Monster Energy Drink:  | McCurdy Decl. of 3/20/2018, Ex. 12 |
| 34. In its Complaint, Monster Energy alleges that its trade dress includes a stylized font for the mark MONSTER on a dark background, a bright contrasting accent color, including bright green, and an overall aggressive, edgy theme." | Compl. at ¶13. |

| | |
|---|---|
| 35. Not one of the asserted marks is just "MONSTER." | Compl. at ¶10. |
| 36. Instead, Monster Energy is asserting compound marks such as MONSTER ENERGY, MUSCLE MONSTER, MONSTER REHAB, JUICE MONSTER, PUNCH MONSTER, JAVA MONSTER, MONSTER ENERGY ABSOLUTELY ZERO, and logos such as:  | Compl. at ¶10. |

| | |
|---|---|
| 37. Most of the asserted registrations are associated with beverages and nutritional supplements. | Compl. at ¶¶10, 17 |
| 38. None of the asserted registrations recite automotive tools or equipment. | Compl. at ¶¶10, 17 |
| 39. Jim Berger, a marketing and branding expert, has opined that at least many of the asserted "Monster Marks" of MEC are descriptive because they "refer to an intended benefit or flavor component of a beverage.  For example, 'Monster Energy' refers to the large amount and/or strength of energy the drink is intended to supply and perhaps to the size of the can itself." | Declaration of Jim Berger (Dkt. No. 81 hereinafter "Berger Decl."), Ex. 1 at ¶17. |
| 40. U.S. Registration No. 3,908,601, which is asserted in this case, is for the following logo: | Compl. at ¶10. |



As associated with "clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely, hats and beanies."

| | |
|---|---|
| 41. U.S. Registration No. 4,721,433, which is asserted in this case, is for the MONSTER ENERGY mark as associated with the services of "Promoting goods and services in the sports, motorsports, electronic sports, and music industries through the distribution of printed, audio and visual promotional materials; promoting sports and music events and competitions for others" and claims a first use date of January 4, 2003. | Compl. at ¶10. |
| 42. U.S. Registration No. 4,721,432 is for the following logo:  | McCurdy Decl. of 3/27/2018, Ex. 12. |

**44**

| | |
|---|---|
| as associated with the services of "Promoting goods and services in the sports, motorsports, electronic sports, and music industries through the distribution of printed, audio and visual promotional materials; promoting sports and music events and competitions for others" and claims a first use date of January 4, 2003. | |
| 43. Nine of the asserted "Monster Marks" include the following claw as at least part of the registered logo:  | Compl. at ¶10. |
| 44. In its Complaint in this case, Monster Energy refers to itself as "Monster." | *See generally* Compl. |

| | |
|---|---|
| 45. The Complaint discusses the alleged "exposure and widespread recognition of the 'MONSTER' brand." | Compl. at ¶7. |
| 46. In its Complaint, Monster Energy alleges that its line of "MONSTER drinks has grown to include numerous… products, the contained and packaging of which are prominently marked with the MONSTER mark." | Compl. at ¶9. |
| 47. None of the beverage products being sold by Monster Energy, are sold under simply "monster." | *See* McCurdy Decl. of 3/20/2018, Ex. 11 at pp. 1 – 11, 123:11 – 124:24, 143:11 – 154:17, Ex. 11. |
| 48. Yet, in the Complaint, Monster Energy refers to many of the asserted trademarks collectively as the "MONSTER Marks." | Compl. at ¶¶10 – 11. |

| | |
|---|---|
| 49. At least many of the asserted "Monster marks" contain one or more elements that describe an intended benefit or flavor component of a beverage (i.e. ENERGY, JUICE, PUNCH, LO-CARB, ULTRA, etc.) | Complaint at ¶10; Berger Decl., Ex. 1 at ¶17. |
| 50. Monster Energy has also asserted a number of trademark registrations comprising the term "BEAST" with other terms (e.g., UNLEASH THE BEAST!, PUMP UP THE BEAST!). | Compl. at ¶17. |

**47**

| | |
|---|---|
| 51. In its Complaint, Monster Energy alleges that its promotion of the Asserted marks include the "sponsorship of athletes, athletic teams, athletic competitions, concerts and live events around the world, widespread distribution of promotional and point of sale materials…bearing the MONSTER Marks…" | Compl. at ¶21. |
| 52. Monster Energy's Complaint further alleges that Monster Energy "has an established and versatile history in motorsports.  A major part of Monster [Energy's] brand promotion focuses on racing and motorsports. Monster sponsors or has sponsored a wide variety of motorsport athletes, teams, and/or activities…" | Compl. at ¶22. |

| | |
|---|---|
| 53. When asked in deposition about the services it offers in commerce, Monster Energy explained that it sponsors events and that it "spends money at events and to promote events where [it] actually spend[s] the money to actually derive value from the publicity and the promotion of [its] brands and [its] brand names and trademarks at these events." | McCurdy Decl. of 3/27/2018, Ex. 3 at 15:03 – 18:14. |
| 54. Monster Energy promotes events to promote the Monster Energy brand. | McCurdy Decl. of 3/27/2018, Ex. 3 at 15:03 – 18:14. |
| 55. Monster Energy refers to third parties as the "actual promotor(s)" of the events it sponsors. | McCurdy Decl. of 3/27/2018, Ex. 3 at 15:03 – 18:14. |

| | |
|---|---|
| 56. When asked in deposition how Monster Energy advertises and promotes its beverages, Monster Energy relied upon its sponsorship of sports and music events. | McCurdy Decl. of 3/27/2018, Ex. 3 at 40:01 – 43:17. |
| 57. Monster Energy has asserted that ███ ████████████████████ ████████████████████ | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 62:17 – 63:09. |
| 58. Retail activation (undertaking in the retail promotion of its own beverages in areas surrounding sponsored events) is integral to Monster Energy's business. | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 90:14 – 91:24. |

| | |
|---|---|
| 59. When asked if it received payment for sponsoring and promoting events, Monster Energy indicated that it received a share of revenue from epicenter program events, otherwise it received "value… in the overall business plan from sponsorships." | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 16:12 – 17:25, 91:25 – 92:16. |
| 60. When specifically asked if it had ever received any direct revenue for the services recited by U.S. Trademark Registration No. 4,721,433, Monster Energy again referenced the "epicenter events" and then asserted that in most cases it "gets value out of the events by the…visibility of [its] brand, of [its] manes, of [its] products." | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 118:04 – 119:18 |

| | |
|---|---|
| 61. Rodney Sacks indicates that Monster Energy sponsored the Epicenter Music Festival from 2009 through 2012. | Dkt. No. 71 at ¶18. |
| 62. Monster Energy considers its sponsorship of NASCAR ███ █████████ ██████ | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 153:18 – 153:22. |
| 63. Monster Energy believes that its █████ ██████████ ████ | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 198:06 – 198:24. |
| 64. "Monster" is a dictionary-defined term. | Dkt. No. 69 at p. 16. |
| 65. Monster Energy's Motion for Summary Judgment agrees that "the dictionary definition of 'monster' is 'any animal or thing huge in size' or 'anything unnatural or monstrous.'" | Dkt. No. 69 at p. 16. |

| | |
|---|---|
| 66. "Beast" is similarly a term defined by the dictionary. | McCurdy Decl. of 3/27/2018, Ex. 11 |
| 67. "Beast" is defined by the dictionary as "a lower animal as distinguished from a human being" and as, *inter alia*, "the crude animal nature common to humans and the lower animals." | McCurdy Decl. of 3/27/2018, Ex. 11. |
| 68. Monster Energy has filed infringement claims against various companies who have used the colors green and black in commerce. | *See* McCurdy Decl. of 3/27/2018, Ex. 3 at 69:24 – 71:19. |
| 69. A search of the Trademark Trial and Appeal Board Inquiry System for proceedings relating to Monster Energy Company produces scores of proceedings that have been initiated in the U.S. Trademark Office by Monster Energy. | *See* McCurdy Decl. of 3/27/2018, Ex. 9. |

| | |
|---|---|
| 70. Trademarkia has dubbed Monster Energy as the biggest trademark bully every year since 2012. | *See* McCurdy Decl. of 3/27/2018, Ex. 11 |
| 71. Monster Energy has filed the more oppositions to trademark applications, than any other U.S. company, every year since 2012. | *See* McCurdy Decl. of 3/27/2018, Ex. 11 |
| 72. Odwalla, Inc. is a company owned by Coca-Cola. | McCurdy Decl. of 3/20/2018, Ex. 4 at 157:14 – 162:05. |
| 73. Odwalla, Inc. sells a beverage with the C-MONSTER mark on it in U.S. commerce. | McCurdy Decl. of 3/20/2018, Ex. 4 at 157:14 – 162:05. |

| | |
|---|---|
| 74. According to the current records of the United States Patent and Trademark Office, Odwalla, Inc. owns U.S. Trademark Registration No. 1,970,362 for C MONSTER which is associated with "nonalcoholic fruit juice based beverages" and which registered on April 23, 1996. | McCurdy Decl. of 3/20/2018 at ¶34, Ex. 33. |
| 75. Odwalla and Monster energy have previously been involved in trademark disputes involving their respective "monster" marks. | McCurdy Decl. of 3/20/2018, Ex 34. |
| 76. Odwalla's C MONSTER registration was cited against certain ones of Monster Energy's U.S. Trademark applications as a basis for refusing their registration. | McCurdy Decl. of 3/20/2018, Ex. 34. |

| | |
|---|---|
| 77. In conjunction with responding to such a rejection in U.S. Application Serial No. 78/658,118 (in which Monster Energy was trying to register MONSTER ENERGY + JUICE KHAOS) Hansen Beverage Company (Monster Energy) asserted in January 25, 2006 that "given the prevalence of MONSTER marks on the Register and in the marketplace, as discussed below, even minor differences in the marks would eliminate any likelihood of confusion." | McCurdy Decl. of 3/20/2018 at ¶37, Ex. 36. |
| 78. ISN's Statement of Uncontroverted Facts in support of its Motion for Summary Judgment discusses many additional third-party uses of "monster" in commerce, which ISN hereby incorporates by reference. | *See* Dkt. No. 89-1 at ¶¶ 157 – 243 and cited evidence. |

| | |
|---|---|
| 79. ISN's Second Affirmative Defense in this case provides that MEC's "claims... are barred because the Plaintiff's purported trademark rights are invalid and/or unenforceable." | Answer, Dkt. No. 10, at ¶84. |
| 80. In support of its Motion for Summary Judgment, Monster Energy has relied in part upon a purported report alleged to by Socialbakers ("the Socialbakers Document"). | Dkt. No. 71 at ¶36, Ex. 20. |
| 81. Rodney Sacks has cited to the Socialbakers Document as evidencing Monster Energy being ranked as the tenth most popular global brand. | Dkt. No. 71 at ¶36. |
| 82. Monster Energy has not provided any testimony authenticating the Socialbakers Document. | Dkt. No. 71, Dkt. No. 69. |

| 83. Monster Energy has not provided any foundation for the Socialbakers Document or what it purportedly shows or how its purported showings were determined. | Dkt. No. 71, Dkt. No. 69. |
|---|---|

### III.    ISN'S Conclusions of Law

1.    Summary judgment is only proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Self-Insurance Inst. of Am., Inc. v. Software & Info. Indus. Ass'n,* 208 F. Supp. 2d 1058, 1061 (C.D. Cal. Apr. 27, 2000) (quoting Fed. R. Civ. P. 56(c)).

2.    At the summary judgment stage, the court does not "make credibility determinations or weigh conflicting evidence," though the evidence considered must be admissible.  Fed. R. Civ. P. 56(e)(1).

3.    The court must draw "all reasonable inferences in the light most favorable to the nonmoving party." *Roxbury Entm't v. Penthouse Media Grp., Inc.,* 669 F. Supp. 2d 1170, 1174 (C.D. Cal. Nov. 9, 2009).

**58**

4.   A trade mark confers no right in gross or at large.  *Treager v. Gordon-Allen*, 71 F.2d 766, 768 (9th Cir. 1934).

5.   A mark is protectable only as to those goods or services for which its user has established in the minds of the public an association between it and the mark.  *Chrysler Corp. v. Vanzant*, 44 F.Supp.2d 1062, 1073 (C.D. Cal. Apr. 6, 1999).

6.   When a trademark owner is asserting a registered mark against goods other than those that are recited by its registration, the "Related Goods" rule requires the trademark owner to prove that the asserted mark had acquired secondary meaning as to the accused goods as of the time the defendant commenced use.  *See id.*

7.   A descriptive mark is one that "tells something about the product."  *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979).

8.   Descriptive marks can only be protected upon a showing of secondary meaning.  *Id.*

9.   Evidence that a registered mark is not inherently distinctive, rebuts the presumption of validity that is afforded by registration.  *Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760–61 (9th Cir. 2006).

10.  "Evidence of extensive advertising or other promotional efforts do[es]
not necessarily indicate that prospective buyers would associate the
trade mark with a particular source." *Perfumania, Inc. v. Perfumay,
Inc.*, CA No. 93-56500, 1994 U.S. App. LEXIS 11235, at *9 (9th Cir.
May 3, 1994).

11.  "Once secondary meaning is established, the protection afforded should
be commensurate with the degree of consumer association proven." *See
AMF, Inc.*, 599 F.2d at 349 n.12.

12.  Goods must be somehow related or complementary for the rights in one
class to impact the rights of another mark in another class. *See e.g., id.*
at 348; *Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d
1036, 1055 (9th Cir. 1999).

13.  A "service mark can only be registered for activities that constitute
services contemplated by the Trademark Act." (T.M.E.P. § 1301.01)
(citing 15 U.S.C. §§1051, 1052, 1053, and 1127).

**60**

14.   The following criteria are used to determine what constitutes a service: (1) a service must be a real activity; (2) a service must be performed to the order of, or for the benefit of, someone other than the applicant; and (3) the activity performed must be qualitatively different from anything necessarily done in connection with the sale of the applicant's goods or the performance of another service.  T.M.E.P. §1301(a).

15.   Section 1301.01(a)(ii) of the T.M.E.P. specifically explains that a service "must be primarily for the benefit of someone other than the applicant."

16.   Trademark misuse claims can take the shape of anti-trust claims or unclean hands.  *Gateway, Inc. v. Companion Prods.*, 320 F. Supp. 2d 912, 928 (D.S.D. Sep. 27, 2002) (citing *Juno Online Servs. v. Juno Lighting, Inc.*, 979 F. Supp. 684, 688 (N.D. Ill. Sep. 29, 1997); *Estee Lauder, Inc. v. Fragrance Counter, Inc.,* 189 F.R.D. 269, 270 (S.D.N.Y. Sep. 24, 1999)).

17.   The American courts have left open the possibility of recognizing trademark misuse as an affirmative claim for cancellation and that such a finding may result in cancellation of a trademark.  *Id.* at 690; *the Phi Delta Theta Fraternity v. J. A. Buchroeder & Co.,* 251 F. Supp. 968, 974 (W.D. Mo. Mar. 10, 1966).

**61**

18.  The affirmative defense of unclean hands is a "well-established principle of law" grounded in equity. *See United States Jaycees v. S.F. Junior Chamber of Commerce*, 354 F. Supp. 61, 74 (N.D. Cal. 1972)(citing *Precision Co. v. Automotive Co.*, 324 U.S. 806, 814, 65 S. Ct. 993, 89 L. Ed. 1381 (1945)).

19.  What actions constitute unclean hands can be almost anything, and rests "within the discretion of the trial judge." *Id.* (citing *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9 Cir. 1969)).

20.  Essentially, the court must weigh the rights of the plaintiff against any wrongdoing on their part which might foreclose their ability to assert such rights. *Id.* (citing *Coca-Cola Co. v. Koke Co.*, 254 U.S. 143, 145 (1920)).

21.  Standing is a "liberal" element which "requires only that a party believe that it is likely to be damaged by the registration." *Kleven v. Hereford*, No. CV 13-02783-AB (AGRx), 2015 U.S. Dist. LEXIS 111185, at *61 (C.D. Cal. Aug. 21, 2015)(citing *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000)).

22.   There is "no absolute test" for standing as a cancellation petitioner and "no requirement that damages be proved in order to established standing." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984).

23.   The petitioner must merely show a "real interest" in the proceeding, such as a real and rational basis that it would be damaged by the registration sought to be cancelled. *Id.*

24.   Only admissible documents and evidence may be considered on a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

25.   To be admissible, documents and evidence must be properly authenticated, which means, there must be evidence sufficient to support a finding that the document is what the proponent claims it is. Fed. R. Evid. 901(a).

26.   "Hearsay" is a statement that is not made while testifying at the current trial of hearing; and is offered in evidence to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).

27.   Hearsay is generally inadmissible.  Fed. R. Evid. 802.

Dated: March 27, 2018          By: /s/ Jeffrey S. Standley
                               JEFFREY S. STANDLEY
                               (OH# 047248)
                               jstandley@standleyllp.com
                               MELISSA A. ROGERS MCCURDY

**63**

(OH #0084102)
mmccurdy@standleyllp.com
F. MICHAEL SPEED, JR.
(OH #0067541)
mspeed@standleyllp.com
DOUGLAS C. SMITH
(SBN 160013)
dsmith@smitlaw.com

Attorneys for Defendant
Integrated Supply Network, LLC

**64**