JEFFREY S. STANDLEY (OH # 0047248)
jstandley@standleyllp.com
MELISSA A. ROGERS MCCURDY (OH #0084102)
mmccurdy@standleyllp.com
F. MICHAEL SPEED, JR. (OH #0067541)
mspeed@standleyllp.com
Standley Law Group LLP
6300 Riverside Drive
Dublin, Ohio 43017
Telephone: (614) 792-5555
Fax: (614) 792-5536

DOUGLAS C. SMITH (SBN 160013)
dsmith@smitlaw.com
SMITH LAW OFFICES, LLP
4204 Riverwalk Parkway, Suite 250
Riverside, California  92505
Telephone: (951)509-1355
Facsimile: (951)509-1356
Attorneys for Defendant
Integrated Supply Network, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>INTEGRATED SUPPLY NETWORK, LLC, a Florida limited liability company,<br><br>Defendant. | Case No. 5:17-CV-00548-CBM-(RAO)<br><br>Honorable Consuelo B. Marshall |

**REDACTED EXHIBIT 1 TO DECLARATION OF MICHAEL WAGNER IN SUPPORT OF INTEGRATED SUPPLY NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT, DKT. 84 (IN SUPPORT OF**

1

**INTEGRATED SUPPLY NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT, DKT. 77)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1
# REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MONSTER ENERGY COMPANY,**<br>**Plaintiff,**<br>**vs.**<br>**INTEGRATED SUPPLY NETWORK, LLC,**<br>**Defendant.**<br><br>**AND RELATED COUNTERCLAIMS.** | **Case No. 5:17-CV-00548-CBM-RAO** |

# EXPERT REPORT OF RUSSELL W. MANGUM III, PhD
## February 23, 2018

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.  Assignment

I have been engaged by Knobbe, Martens, Olson & Bear, LLP, counsel for plaintiff Monster Energy Company ("MEC"), to provide expert analysis and, if necessary, expert testimony in the above listed matter pending in the United States District Court for the Central District of California, under Case No. 5:17-cv-00548-CBM-RAO. I understand MEC has accused defendant Integrated Supply Network, LLC ("ISN") of unauthorized use of MEC's intellectual property. I have been asked to form my own opinions relating to the proper amount of damages in this matter. Specifically, I have been asked to evaluate and analyze ISN's sales information for products that MEC claims violate the Lanham Act by constituting trademark infringement, trade dress infringement and false designation of origin, and create unfair competition (collectively, "MEC's trademark infringement claims"). My analysis was conducted through an evaluation of the evidence relevant to the facts of the case available at the time of submitting this report.[1]

## II.  Qualifications

I am a professor at Concordia University Irvine, School of Business, Economics. I am also a Senior Vice President of Nathan Associates Inc., an economics consulting firm. I hold a Ph.D. and a M.A. in economics from the University of Southern California, and a B.A. in economics, with honors, from California State University, Fullerton.  I have been actively employed in the area of economic analysis for over 18 years. After completing my graduate education, I served as an economist with the United States Federal Trade Commission, Bureau of Economics, from July 1995 through August 1998.  After leaving the Commission, I held positions as an economist and expert for Nathan Associates, PricewaterhouseCoopers, and Analysis Group. In July 2007, I returned to Nathan Associates as Vice President, and Director of a new office in Orange County, California.

I am a member of several professional associations, including the American Economic Association, the Orange County Patent Law Association, the Los Angeles Intellectual Property Law Association, the American Bar Association, and the Licensing Executives Society, for which I currently serve as the Chair of the Orange County Chapter. In addition to my current faculty position, I have previously taught courses in undergraduate and graduate economics at Johns Hopkins University, the

---

[1] If additional relevant information becomes available, I will update my analysis and opinions appropriately.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

University of Southern California, and Pepperdine University. I have written articles and given presentations on various aspects of intellectual property damages.

I have often analyzed issues related to various commercial damages, including damages related to unlawful use of intellectual property, including copyrights, trademarks, trade dress, trade secrets, and patents. I have also addressed claims and damages related to unfair competition, false designation of origin, and false advertising. I have analyzed such claims and damages in many different industries, including electronics, software, semiconductors, telecommunications, oil refining, agriculture, medical instruments, music and entertainment, apparel, and various consumer goods. I have been qualified as an expert in both state and federal courts and have analyzed and provided opinions regarding lost profits, reasonable royalty, and unjust enrichment damages in many cases, for both plaintiffs and defendants.

Nathan Associates Inc. is compensated at the rate of $580 per hour for my time. The amount of Nathan Associates' compensation in this matter is not contingent on the outcome of this litigation. My curriculum vitae may be found in **Exhibit 1** of this report and includes a list of matters in which I have testified at deposition or trial for at least the past four years and a list of my publications for at least the past ten years.

## III. Documents Reviewed

In conducting my analysis, I, or supporting staff at my direction, have reviewed various documents and materials provided to me in this case. Those documents include, but are not limited to, materials produced by MEC, materials produced by ISN, interrogatory responses, deposition transcripts, and various pleadings in this case, including the March 22, 2017 *Complaint for Trademark Infringement, Trade Dress Infringement, False Designation of Origin, and Unfair Competition*.

The complete set of documents, materials, and information that I received are listed in **Exhibit 2** of this report. My analysis and conclusions are based on the information available to me. If additional relevant information becomes available to me, I will update my analysis appropriately.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

4

## IV. Summary of Conclusions

For the purposes of my analysis, I have assumed that ISN will be found liable for violation of the Lanham Act including trademark and/or trade dress infringement, as alleged by MEC.[2] I have conducted my analysis and prepared this report under this assumption.

Under the Lanham Act, MEC "shall be entitled... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."[3] "In assessing profits [MEC] shall be required to prove [ISN's] sales only; [ISN] must prove all elements of cost or deduction claimed."[4]

Based on my analysis and review of the evidence and facts of the case available to date, I have determined the following:



---

[2] It is my understanding that the same products are accused of trademark and trade dress infringement. Thus, my analysis would likely remain the same should the Court find ISN liable for trademark infringement and not trade dress infringement or vice versa.

2 See 15 U.S.C. § 1117(a).

[3] See 15 U.S.C. § 1117(a).

[4] *Ibid.*

[5] ████████████████████████   I offer no opinion in this report as to whether MEC should be awarded additional damages in the form of enhanced damages, punitive damages, costs, attorneys' fees or other relief. Moreover, by calculating the damages, I do not imply nor hold the opinion that damages in lieu of a permanent injunction would be an adequate remedy to compensate MEC for wrongful conduct by ISN and those acting in concert with it.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

## V. Background

### A. Plaintiff

Monster Energy Company ("Monster" or "MEC") is a Delaware corporation located in Corona, California.[6]  Monster is a nationwide leader in the business of developing, marketing, selling, and distributing beverages. Monster has achieved extensive exposure and widespread recognition of its MONSTER™ brand through its sponsorship of motorsports athletes, teams and events, among other sponsorships.[7] In 2002, Monster launched its Monster Energy drink brand, bearing its now famous Monster Mark and Monster Energy Mark.[8] Monster's successful line of MONSTER drinks has grown to include numerous other well-known products, the containers and packaging of which are prominently marked with the MONSTER mark.[9] Monster has also used or licensed the use of its MONSTER Mark in connection with apparel and accessories and products used in connection with or associated with motorized vehicles and motorsports, such as automotive wheels, replica cars, remote control cars, graphic kits for motorized vehicles, clothing, gloves, stickers, sports helmets, bags, backpacks, and other related accessories.[10]

### B. Defendant

Integrated Supply Network, LLC ("ISN") is primarily engaged in the business of producing, distributing, marketing and/or selling automotive tools and related goods, as well as other products.[11] The company was founded in 1984 and is the United States' largest independent automotive tool and equipment distribution specialist serving wholesalers and distributors throughout North America and the United Kingdom.[12] ISN's corporate office is located in Lakeland, Florida, with distribution centers in Arizona, California, Georgia, Iowa, Indiana, Michigan, New Jersey, Texas, and Washington, as well as Quebec and Ontario, Canada.[13] ISN launched its Monster line of

---

[6] Complaint, ¶ 5.

[7] Complaint, ¶ 7.

[8] Complaint, ¶ 8.

[9] Complaint, ¶ 9.

[10] Complaint, ¶ 10, 14.

[11] Complaint, ¶ 37.

[12] "About Us." ISN Website, http://isnweb.com/isnweb/about. Accessed November 30, 2017.

[13] "About Us." ISN Website, http://isnweb.com/isnweb/contact. Accessed November 30, 2017.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

products in December 2010.[14] In 2013, ISN expanded its product line to also include products branded with the mark "Monster Mobile."[15] ISN has continued to offer both MONSTER and MONSTER MOBILE products since that time and both the MONSTER and MONSTER MOBILE products primarily utilize the colors green and black.[16]

**C.   Trademarks and Trade Dress**

I understand that MEC claims to own the rights to its Monster and Monster Energy marks, as well as numerous trademark registrations for marks that incorporate the Monster and/or Monster Energy mark for use in association with beverages, nutritional supplements, clothing, sporting goods, promoting goods and services in the motorsports industry, and other products and services (collectively, the "Monster Marks").[17]

In addition, MEC has consistently used a distinctive trade dress for its beverage packaging, other products, and promotional materials since 2002, including a stylized font for the Monster Marks on a dark background, a bright contrasting accent color, including bright green, and an overall aggressive, edgy theme (the "Monster Trade Dress").[18] MEC has used, and continues to use, both its Monster Marks and/or Monster Trade Dress in connection with apparel and accessories, including, for example, t-shirts, hooded shirts, hooded sweatshirts, sweatshirts, jackets, pants, bandanas, sweat bands, gloves, headgear, stickers and decals.[19]

Since at least 2002, MEC has also used the "Unleash the Beast!" mark in association with its Monster Energy brand. In addition to its continued use of the "Unleash the Beast!" mark, MEC also uses its "Pump Up the Beast!", "Rehab the Beast!", "Rehab the Beast! www.MonsterEnergy.com", "Unleash the Nitro Beast!", "Unleash the Ultra Beast!", and "Unleash the Caffeine Free Beast!" marks on its products (collectively, the "Beast Marks"). MEC is the owner of numerous trademark

---

[14] See *Integrated Supply Network, LLC's Supplemental Responses to Interrogatories No. 1, 2, 3, 5, 6, 7, and 8,* February 20, 2018, p. 11. See also, ISN0038150.

[15] ISNE00071872; MEC018380.

[16] ISNE00021571; MEC018380; MEC018568; MEC018528; MEC018476; ISN010304; ISN0024432.

[17] Complaint, ¶ 10.

[18] Complaint, ¶ 13.

[19] Complaint, ¶ 15.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

registrations for the Beast Marks for use in association with beverages, nutritional supplements and clothing.[20]

MEC's Monster Marks, Monster Trade Dress, and Beast Marks are the subject of continuous marketing and promotion by MEC. Since 2002, MEC has spent over $4.3 billion in advertising, promoting and marketing its Monster brand, Monster Trade Dress, and Beast Marks, including $467 million in 2016 alone. MEC has and continues to widely market and promote the Monster Marks, Monster Trade Dress, and Beast Marks through its sales of beverage products. MEC's promotional efforts also include sponsorship of athletes, athletic teams, athletic competitions, concerts and other live events, widespread distribution of promotional and point-of-sale materials, product samplings, apparel and merchandise bearing the Monster Marks, Monster Trade Dress and/or Beast Marks, promotion in magazines and other industry publications, promotion on the Monster Energy website and other Internet websites, and attendance at trade shows.[21]

A major part of MEC's promotion of its Monster brand focuses on racing and motorsports and MEC sponsors or has sponsored a wide variety of motorsport athletes, teams and/or activities, including NASCAR, Formula 1, MotoGP, Moto2, Supercross, Motorcross, MXGP, MX2, drag racing, drifting, flat track, off road, rally, rallycross, snowmobile, speedway, stunt, superbike and freestyle motocross.[22] When competing, at public appearances, or both, the sponsored athletes and team members almost always wear clothing or use equipment that prominently displays one or more of the Monster Marks and/or the Monster Trade Dress.[23]

### D. MEC's Allegations Against ISN

MEC alleges that certain products manufactured, marketed, sold, and/or offered for sale by ISN constitute trademark infringement, trade dress infringement, and false designation of origin and thus constitute violations of the Lanham Act.[24] In particular, I understand that the manufacture, advertisement, promotion, production, distribution, sale or the offering of sale of items using trademarks and trade dress that are confusingly similar to one or more of the Monster Marks,

---

[20] Complaint, ¶ 16-17.

[21] Complaint, ¶ 20-21.

[22] Complaint, ¶ 22.

[23] Complaint, ¶ 29, 31.

[24] Complaint, ¶ 37-50.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

Monster Trade Dress, and one or more of the Beast Marks are subject to the violation. The items subject to the violations include food items, such as jerky, nuts, and candies, clothing, hats, gloves, bags, tumblers, and various automotive tools and related goods (collectively, the "ISN MONSTER products").[25]

## VI. Analysis

### A. Trademark/Trade Dress Infringement

I have been asked to evaluate, analyze, and calculate the damages to MEC from the alleged misappropriation of MEC's intellectual property and/or violation of the Lanham Act. I have calculated these damages in the form of ISN's profits from the sale of products alleged to infringe MEC's Monster Marks, Monster Trade Dress and/or Beast Marks, as well as the royalties that would have been paid to MEC by ISN had it entered into a licensing agreement to use the Monster Marks, Monster Trade Dress, and/or Beast Marks in ISN's sale of products.

### i. ISN's Profits

I have evaluated ISN's profits from the alleged misappropriation by identifying the revenue earned by ISN from operations related to the alleged misappropriation. I understand that ISN's profits may be an appropriate measure of damages for MEC's claims in this matter, and that in assessing profits, MEC (as plaintiff) is required to prove ISN's sales or revenues only.[26] I further understand that it is ISN's burden (as defendant) to identify relevant costs and deductions to this revenue and to identify any apportionment of resulting profits to factors other than the alleged infringement or violation.[27] Absent any identification and substantiation of such deductions and/or apportionment, I understand that my analysis can serve as a measure of ISN's profits for the purposes of damages in this matter.

My calculation of ISN's profits is supported by the evidence of ISN's revenue earned. The currently available financial data from ISN allows evaluation of ISN's profits, and thus disgorgement

---

[25] *Ibid.*

[26] See 15 U.S.C. § 1117 and 17 U.S.C. § 504.

[27] *Ibid.*

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

of profits damages, from December 29, 2010 through October 31, 2017.[28] This computation will be supplemented for the period after October 31, 2017 as additional information regarding ISN's revenue is produced in discovery.

ISN provided detailed sales transaction data by product (ISN0038150) showing the amount of revenue earned related to the sale of the ISN MONSTER products purportedly subject to the alleged violations.[29] This financial data was also discussed at the Rule 30(b)(6) deposition of ISN (Sarah Shelstrom).[30] The financial documents provide data on the sales ("Value"), cost of goods sold ("Cost"), and gross margin ("GM$") related to the accused products.[31] Under this assumption, ISN has accrued approximately ▬▬▬▬▬ in sales revenue, approximately ▬▬▬▬▬ ▬▬▬▬▬▬▬ sold, and approximately ▬▬▬▬▬▬▬▬▬▬) directly related to the sale of the ISN MONSTER products between December 29, 2010 and October 31, 2017, as shown in **Exhibit 3**.

Absent any identification and substantiation of additional deductions and/or apportionment, I understand that my analysis may serve as a measure of ISN's profits for the purposes of damages in this matter. More specifically, my calculation of gross profit will serve as my opinion of the amount of profits ISN has earned related to its use of the Monster Marks, Monster Trade Dress, and/or Beast Marks. I understand that MEC is still seeking additional production of documents from ISN and I reserve the right to amend or update my analysis and summaries based on any new or updated information.

As discussed below, there is evidence in this case that establishes that ISN entered into a



▬▬▬▬▬▬▬▬"[32] As shown in **Exhibit 4**, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬,

---

[28] See ISN0038150.

[29] See ISN0038150 and *Integrated Supply Network, LLC's Supplemental Responses to Interrogatories Nos. 1, 2, 3, 5, 6, 7 and 8*, pp. 7, 12, and 15, which represents the former as "[detailing] (up to the date the document was generated) each MONSTER MOBILE product sold by ISN through the point of its production including sales and costs information."

[30] See Rule 30(b)(6) Deposition of ISN (Sarah Shelstrom), Rough Draft, February 21, 2018, Part 2, 45:15-46:23 and 132:14-135:4.

[31] The field "GM$" is the difference between "Value" and "Cost", both on an individual product transaction basis as well as in the aggregate.

[32] See ISN011116.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

amounted to ▮▮▮▮▮▮ n total sales and ▮▮▮▮▮▮ in royalties.[33] These figures also represent revenues attributable to the alleged infringement of MEC's Monster mark and Monster Trade Dress, and should be included in the computation of ISN's profits.

### ii.   Royalty Damages[34]



<hr>

[33] I understand that an unidentified portion of these sales revenues and the related royalties may be attributable to non-MONSTER branded products. See Deposition of Darlene Lott, November 17, 2017, 118:5-13.

[34] As discussed below, royalty based damages can represent plaintiff's (MEC's) lost profits due to the alleged infringement.

[35] See Parr, R.L. (2007). *Royalty Rates for Licensing Intellectual Property*. Hoboken, NJ: John Wiley & Sons, Inc.

[36] See Deposition of Rodney Sacks, Rough Draft, February 5, 2018, 184:16-185:1.

[37] Complaint, ¶ 20-21.

[38] See, for example, MEC039684 and MEC060155.

[39] See, for example, MEC022135, MEC022185, MEC022363, and MEC022454.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

---

[40] See Deposition of Rodney Sacks, Rough Draft, February 5, 2018, 176:5-177:5.

[41] See, for example, Deposition of Rodney Sacks, Rough Draft, February 5, 2018, 111:22-112:18, 169:25-171:16, and 177:10-178:21.

[42] See, for example, MEC023633, Exhibit B, and MEC022214, Paragraph 2a.

[43] See, for example, Deposition of Rodney Sacks, Rough Draft, February 5, 2018, 16:13-17:6,111:20-112:18 and 160:16-162:15. Discussion with Rodney Sacks, February 22, 2018.

[44] See, for example, Deposition of Rodney Sacks, Rough Draft, February 5, 2018, 160:16-163:9 and 168:21-169:17. Discussion with Rodney Sacks, February 22, 2018.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

12



---

[46] Discussion with Rodney Sacks, February 22, 2018.

[47] See ISN011116.

[48] See Deposition of Darlene Lott, November 17, 2017, 43:9-44:3.

[49] See Appendices 1 through 4.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

15%, is most appropriate. This royalty rate range amounts to royalty damages of between ████████ and ██████████.[50] Since ISN has not in fact paid any royalty to MEC for the use of the Monster Marks, Monster Trade Dress, or Beast Marks, they have benefited from the avoidance of paying any royalties. The amounts identified in **Exhibit 6** are also a measure of royalty-based lost profits to MEC.

### iii.   Other Benefit to ISN

Aside from sales and profits of accused products and avoidance of royalties, ISN has also benefit from MEC's advertising of its Monster Marks, Monster Trade Dress, and Beast Marks.  One specific example is MEC's advertising and sponsor spending with NASCAR. To the extent ISN has benefit from this advertising spend despite not contributing to the cost, ISN has gained a "free rider"[51] benefit from MEC's spending and goodwill. ████████████████████████████████████████████████████████████████████████████████ ISN understood that MEC's NASCAR spending was beneficial to ISN.[53] Thus, ISN has benefit from avoiding costs related to advertising and promotion.

## Pre-Judgment Interest

I am aware that, at the court's discretion, pre-judgment interest may be awarded on damages. Sometimes the interest rate is the subject of expert testimony and analysis, and other times a court-dictated interest rate is applied. Courts have frequently used rates such as the one-year U.S. Treasury Bill rate, the prime rate, or the defendant's borrowing rate. If asked, I will compute pre-judgment interest at trial.

---

[50] The royalty rate and hypothetical agreement being contemplated in this case for the purposes of damages is a judicial fiction, in that there was no actual agreement and the analysis is retrospective. The retrospective nature of this inquiry precludes MEC's ability to include the type of oversight and brand-control terms it has received in past agreements. Thus, the hypothetical agreement necessarily provides decreased non-pecuniary value relative to the historical licenses.

[51] Free riding is benefiting from good without paying for it. (See Hubbard & O'Brien, 2015, Economics, 6th Ed., p. 166 and Glossary G-3, Pearson Education: New York.)

[52] See MEC065119.

[53] See ISNE00049777 and Deposition of Don Barry, Rough Draft, February 16, 2018, 200:17-208:13.

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

Russell W. Mangum III

HIGHLY CONFIDENTIAL – Attorneys' Eyes Only

E X H I B I T   1

# R U S S E L L   W.   M A N G U M   I I I



3 Park Plaza          T (949) 955 9025
Suite 1980            rmangum@nathaninc.com
Irvine, CA 92614

## CURRENT POSITIONS

Sr. Vice President, Nathan Associates Inc., 2007 to present
Associate Professor, Concordia Univ. Irvine, School of Business, Economics, 2013 to present

## EDUCATION

Ph.D., economics, University of Southern California, 1995
M.A., economics, University of Southern California, 1992
B.A., economics, with honors, Calif. State University, Fullerton, 1988

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust; Commercial Disputes; Intellectual Property; Statistics and Econometrics, Valuation

## PAST POSITIONS

| | | |
|---|---|---|
| 2002-2012 | Associate Adjunct Professor, USC, Dept. of Economics | Los Angeles, CA |
| 2001-2007 | Vice President, Analysis Group, Inc. | Los Angeles, CA |
| 2001 | Manager, PricewaterhouseCoopers, Financial Advisory Svcs. | Los Angeles, CA |
| 1998-2001 | Managing Associate, Nathan Associates Inc. | Arlington, VA |
| 1998-2000 | Adjunct Professor, John Hopkins University, Krieger School | Washington, DC |
| 1995–1998 | Economist, U.S. Federal Trade Commission | Washington, DC |

## COURSES TAUGHT

- Principles of Microeconomics, Principles of Macroeconomics, Intermediate Microeconomics, Managerial Economics, Statistics and Econometrics, Advanced Topics in Economics, Finance, Money and Financial Markets, Economics of Sin, Environmental Economics, Business Information Technology

## EXPERIENCE SUMMARY

Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. His consulting practice centers on economic analysis and damages quantification in mattes related to intellectual property and technology, antitrust, class certification, statistical analysis, and complex commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony in over 100 matters before local, state, and federal courts.  Dr. Mangum has taught graduate and undergraduate courses in economics, statistics, finance, and econometrics. He is currently an Associate Professor of Economics in the School of Business and Economics at Concordia University Irvine, and has previously taught at Johns Hopkins University, The University of Southern California, and Pepperdine University. Dr. Mangum previously worked at PricewaterhouseCoopers and The United States Federal Trade Commission, Bureau of Economics.

## PROFESSIONAL EXPERIENCE

*Intellectual Property*

Dr. Mangum has substantial experience in the area of intellectual property damages, including claims related to infringement of patents; FRAND licensing commitments; patent pools; copyrights; and trademarks; as well as theft of trade secrets; false designation of origin; and false advertising. The case contexts in which Dr. Mangum has performed these analyses include:

- Patent infringement related to:
  - Consumer advertising design via use of digital media
  - Automated stapling machines used in bed manufacturing
  - Specialized hardware and control systems used in high-rise elevators
  - Electronic exchange systems for trading of commodities futures contracts
  - Business software (eProcurement, business intelligence, design and simulation, call routing software, computer tracking, program and application management)
  - Clothing and clothing design (padded athletic shirts/pants, shoes, headwear, accessories)
  - Electronic data management system used in public transportation projects
  - Document and print inspection systems
  - Computer, electronics, and telecommunication industry (modem communication devices; wireless communication devices (routers, cards, including under FRAND licensing committments), including applications used in vehicle navigation; NIC hardware and chipsets; semiconductors, webswitching and IP router hardware; wired and wireless portable electronic temperature sensor devices; electronic eReader devices; LED packages, Digital TV Tuners under FRAND licensing committments)
  - Medical devices (artificial vertebral disc implants; trocar seals for laparoscopic surgery; spinal fusion implants; breast biopsy devices; remote medical information monitoring technology)
  - Energy (Specialized valves used in oil refining; Electric utility management systems, including wide-area real time phasor measurement and monitoring)
  - Food and agriculture (additive-infused candy, nutritional supplements; new variety of late ripening white grapes; structures and methods utilized in the growing of grapes and raisins)
  - Electronic nicotine delivery systems (NDS)
  - Personal watercraft devices and accessories
- Trademark, trade dress, or copyright infringement related to:
  - Real estate property aquizition services
  - Online dining reservation and payment services
  - Internet search engine terms related to retail sales of food and arranged food products
  - Enterprise Resource Plannning (ERP) software
  - Veterinary Teleradiology (online/internet) Services
  - Devices and software for online mobile device data extraction
  - Fashion clothing, shoes, and jewelry

- Advertising and marketing through wireless mobile communications
- Motion picture trademarks in the manufacture of children's clothing
- Furniture products (mechanized and non-mechanized)
- Portable combustion engines
- Infant care products
- Postal measuring products
- Scented candle products
- Children's toys and art
- Design plans for a theme amusement park

- Theft of trade secrets related to:
  - Techical documents, Product features, customer data, and marketing methods/models related to Systems for General Floor Hospital Monitiring of patient vital statistics
  - Training methods, pricing models, and customer status databases related to Enterprise Resourve Plannning (ERP) software
  - Customer data and information, and pricing models related to employee pension and benefits insurance brokerage services
  - Government contracted research into laser vibrometry
  - Devices and software for mobile device data extraction
  - IT system design and implementation for the US defense industry
  - Electronic engineering and CAD packages used in US naval warcraft architecture
  - Methods for mathematical simulations for the pricing of mortgage backed securities
  - Soy coffee alternative products
  - Design, development, marketing, and manufacturing of toys
  - Computer game accessories

- False advertising, false designation of orgin, or unauthorized use of likeness related to:
  - Real estate property aquizition services
  - Security monitoring systems and services
  - Consumer appliances
  - High Availability Disaster Recovery (HA/DR) business software
  - Medical data printer systems
  - Furniture products
  - Composed music and lyrics used in television commercials
  - Restaurant meals and shopping services
  - Internet advertising services via advertorial placement on publishers' websites
  - Nutritional supplements and beverages

- <u>Inventorship disputes related to:</u>
  - Spinal fusion implant systems
  - Interarterial guidewire and embolic filter devices

### *Commercial Disputes*

- Estimated damages in the form of disgorgement and lost company value related to brokerage services involving employee pension and benefit programs

- *E*valuated claims of replacement cost and lost profits damages related to alleged interference in the market for femtocell wireless communication products.

- Evaluated claims of damages in the form of lost profits and disgorgement of compensation and benefit from alleged unauthorized use of confidential materials in the market for government contracts for research into laser vibrometry.

- Estimated damages from employee theft of HDD computer memory products from s research/testing facility. Calculated value based on historical in-channel market price and on historical costs of manufacturing and sales.

- Evaluated claims of lost profits damages arising from alleged professional malpractice related to commercial development and land use.

- Provided statistical and data analysis of invoices for disaster recovery and construction services. Estimated lost profits related to alleged fraud, breach of contract, and tortious interference.

- Estimated damages related to alleged breaches of contract, including:
  - Contract involving the supply of active incredients in nutriceuticals.
  - Non-solicitation agreement between government defense contracting companies.
  - Contract for concession services at amusement parks.
  - Contract for creation and promotion of credit reporting services.
  - Contract for supply of MLB jerseys used in creation of sports memorabilia.
  - Contract for blending and supply contracts for specialized non-dairy beverages.
  - Non-compete clauses (restaurant lease, franchising, structural steel fabrication)
  - Contract for earning and redeeming of frequent flyer miles
  - Contract for purchase of television airtime on a local over-the-air station
  - Contract for representation and sale of television programming
  - Royalty contract regarding design and functionality elements use in toys
  - Contract for technology and support from software conference bridge ysstems

- Estimated damages from defamation related to the launch of a clinic for medical disorders.

- Evaluated claims by the CA Coastal Commission related to lost recreational value from proposed coastal bluff seawall construction.

- Evaluated concepts and methods for calculating proceeds from from a Qi Tam suit related to improper medical lab billing practices.

- Estimated damages related to Quantum Meruit claims involving use of software to manage viewing and storage of electronic medical images.

*Competition/Antitrust*

Dr. Mangum has substantial experience in the area of competition and antitrust, including analyses of relevant product and geographic markets, market power, monopolization, and likelihood of monopolization from impending events. These analyses usually include statistical and econometric analysis of market data to identify the extent of competition, and the magnitude of competition. The case contexts in which Dr. Mangum has performed these analyses include:

- Evaluation of alleged competitive forclosure in the market for sleep apnea products, including relevant markets, market power, and lost profits damages.

- Evaluated common impact and estimated damages, for direct and indirect purchasers, from price fixing conspiracies in the markets for commercial tissue paper, bulk vitamins, high-end automobiles, ready mix concrete, consumer apparel, Korean noodles, and Pharmaceuticals.

- Evaluation of alleged price discrimination across dealers of hardscape building materials.

- Evaluation of antitrust claims and affirmative defenses of patent misuse related to required terms in patent license programs for flash memory semiconductors and systems.

- Evaluation of market segments, market channels, and cost pass-through in the market for DRAM-containing products.

- Estimation of damages related to:

  - A conspiracy to boycott developments in DRAM packaging

  - Foreclosure of competition in market for footware insoles and inserts

- Evaluation of competitive effects of exclusive dealing clause in a franchise agreement.

- Evaluated the competitive effects of exclusive dealing policies regarding:

  - Acute care hospital and physician services

  - Customer purchase data exchange related to direct mail advertising and sales

  - Free standing insert advertising (coupon) services

  - Replacement parts for 3-piece body welder systems

  - Interconnect agreements between internet backbone communication services

  - Supply of biological inputs used in creating generic biologic therapeutic treatments

  - Professional sports branded athletic apparel

  - Durable medical equipment

  - Pharmaceuticals

- Analyzed the competitive effects from wrongful patent application and issuance (fraud on the patent office) related to processes and mechanisms for food preparation and processing.

- Analyzed the likely competitive effects of proposed mergers in various industries, including hospital services, physician services, pharmaceuticals, medical insurance, construction aggregates, supermarkets, auto parts, cable systems and programming, industrial refractories, and computer game software.

## *Employment and Labor*

- Estimated damages related to lost profits; lost company value, employee training and hiring expense, and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Estimated lost profits damages and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information involving government defense contracting companies.

- Estimated plaintiff's lost profits and disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the automated emergency/disaster response industry.

- Estimated disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the naval engineering industry.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Estimated lost earnings and compensation damages related to an alleged wrongful termination of an employee; evaluated lost wages/earnings, lost retirement benefits, and lost compensation through stock options.

- Estimated damages to an employee/inventor related to exclusion as an inventor from PCT applications following termination from a start-up medical devices company; evaluated the plaintiff's claims of lost share of proceeds from technology share.

## *Statistical and Econometric Analysis*

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Evaluated regression and statistical analysis offered in support of damages related to an alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Evaluated regression and statistical analysis offered in support of damages and common impact in an indirect purchaser class action related to alleged false advertising for nutritional supplement beverages.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Performed regression analysis to estimate class-wide damages related to class certification in the context of alleged price fixing in markets for ready mix concrete.

- Performed regression analysis to estimate pass-through of anticompetitive price increases in the manufacturing and sale of DRAM and DRAM containing devices.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Provided sampling techniques and statistical analysis of customer service database to estimate the extent of use of an allegedly infringing feature in a commercial router.

- Evaluated sampling techniques and extrapolation estimates related to allegedly improper medical billing practices and in the context of damages related to construction defects.

- Provided statistical and econometric analysis of survivorship related to consumer membership attrition in credit reporting programs.

- Provided statistical and econometric analysis of the correlation between purchase of infringing products and consequential purchase of related services.

- Provided statiscal analysis and estimate of medical product sales in the absence of data from third party sales force.

- Conducted statistical analysis of incremental costs in support of lost profits calculations.

## EXPERT WITNESS EXPERIENCE (SINCE 2013)

- *In Re: Transpacific Passenger Air Transportation Antitrust Litigation*, United States District Court, Northern District of California San Francisco Division (2018). Submitted expert report on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages.

- *Express Homebuyers USA, LLC, v. WBH Marketing Inc.*, United States District Court, Eastern District of Virgina, Alexandria Division (2018). Provided deposition testimony on behalf of defendant/counterplaintiff related to damages from alleged trademark infringement and trade libel involving real estate propery acquisition services

- *Schneider* et *al. v. Chipotle Mexican Grill, Inc.*, United States District Court, Northern District of California, San Francisco Division (2017). Provided deposition testimony on behalf of defendant related to class certification and price premium damages involving alleged false statements about food product ingredients.

- *In Re Korean Ramen Antitrust Litigation,* United States District Court, Northern District of California, San Francisco Division (2017). Provided deposition testimony on behalf of a class of purchasers of Korean Noodles related to damages from an alledged antitrust price fixing conspiracy.

- *Microsoft Corporation v. A&S Electronic Inc.* United States District Court, Northern District of California (2017). Submitted an expert report on behalf of defendant related to damages from alleged trademark and copyright infringement involving business productivity software packages.

- *Personal Watercraft Product SAS v. Flydive, Inc., et al.,* United States District Court, Central District of California, Southern Division (2017). Submitted an expert declaration on behalf of plaintiff related to irreparable harm from alleged patent infringement in the personal watercraft industry.

- *ADT LLC and ADT US Holdings v. Vivint Inc.,* United States District Court, Southern District of Florida, Palm Beach Division (2017). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Profoot Inc. v. Bayer Healthcare LLC,* United States District Court, Easterm District of New Jersey (2017). Provided deposition testimony on behalf of plaintiff Profoot, involving lost profits damages related to alleged anticompetitive actions in the market for footware insoles and inserts.

- *In re: Sotera Wireless, Inc., Debtor,* United States Bankruptcy Court, Southern District of California (2017). Provide trial testimony on behalf of creditor Masimo Corporation, involving lost profits, unjust enrichment, and royalty damages related to alleged theft of trade secrets in the market for systems used in general floor hospital patent monitoring.

- *Globeride Inc., v. Pure Fishing, Inc.,* United States District Court, Central District of California (2017). Provided deposition testimony on behalf of plaintiff concerning reasonable royalty damages related to alleged patent infringement involving fishing reels.

- *ADT LLC and ADT US Holdings v. Capital Connect Inc., et al.,* United States District Court, Northern District of Texas, Dallas Division (2016). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *3B Medical Inc. v. ResMed et al.,* United States District Court, Middle District of Florida, Tampa Division (2016). Provided deposition testimony on behalf of plaintiff related to alleged competitive foreclosure in the market for sleep apnea products.

- *ADT LLC and ADT US Holdings v. Alarm Protection LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2016). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Reserve Media Inc. v. Efficient Frontiers Inc. et al.,* United States District Court, Central District of California (2016). Provided deposition testimony on behalf of counterdefendant concerning damages related to alleged trademark infringement involving restaurant reservation services.

- *Adel Tawfilis, DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery and Hamid A. Towhidian, M.D., et al. v. Allergan, Inc.,* United States District Court, Central District of California, Southern Division (2016). Provided deposition testimony on behalf of a class of purchasers of Botox cosmetic products related to the certification of a class alledging an anticompetitive exclusive supply agreement.

- *Homeland Housewares, LLC. and Nutribullet, LLC v. Shark Ninja Operating LLC,* United States District Court, Central District of California, Western Division (2016). Provided deposition testimony on behalf of defendant concerning damages related to false advertising involving consumer appliances.

- *Evolv LLC v. Joyetech USA, LLC, Joyetech (Changzhou) Electronics Co., Ltd., and Wismec Industry Co., Ltd.,* United States District Court, Central District of California, Southern Division (2016). Submitted an expert declaration on behalf of plaintiff concerning irreparable harm from patent infringement involving electronic nicotine delivery system (ENDS) technology and products.

- *Edible Arrangements v. Provide Commerce Inc.,* United States District Court, Central District of Connecticut (2016). Submitted an expert report on behalf of defendant concerning claimed trademark disgorgement damages and lost royalty damages involving internet search engine terms related to retail sales of food and arranged food products.

- *Zenith et al. v. Scepter Inc.,* United States District Court, Central District of California (2015). Provided deposition testimony on behalf of defendant concerning royalty damages related to alleged patent infringement involving digital television and tuners, in the context of FRAND licensing committments.

- *R.W.L. Enterprises v. Oldcastle Inc. et al.*, Superior Court for the State of California, County of San Diego, North County Division (2015). Testified at trial on behalf of plaintiff concerning alleged price discriminatin among dealers of hardscape building materials.

- *Trustees of Boston University v. Epistar Corporation, Lite-On Inc., Everlight Electronics Co. Ltd., and Everlight Americas Inc.*, United States District Court, District of Massachusetts, (2015).  Prodivded trial testimony on behalf of Defendants related to reasonable royalty damages related to alleged patent infringement involving LED semiconductor chips and packages.

- *Epicor Software Corporation v. Alternative Technolgy Solutions et al.,* United States District Court, Central District of California (2015).  Provided deposition testimony on behalf of Plaintiff concerning disgorgement and lost partner revenue damages related to alleged theft of trade secrets, copyright infringement, and breach of contract involving enterprise resource planning (ERP) software.

- *Pension & Benefit Insurance Services v. Benefit Compass LLC et al.,* Superior Court for the State of California, County of Orange, Central Justice Center (2015).  Provided trial testimony for the Plaintiff concerning lost company value and disgorgement of Defendants' profits related to misappropriation of trade secrets, breach of fudiciary duty, interference, unfair competition, and breach of contract involving brokerage services for employee pension and benefit programs.

- *Seth Wallack and San Diego Veterinary Imaging Inc. v. Idexx Laboratories Inc., et al.*, United States District Court, Southern District of California (2015). Provided deposition testimony on behalf of defendant Idexx concerning damages related to alleged trademark infringement involving veterinary teleradiology services.

- *Nichia v. Everlight.*, United States District Court, Eastern District of Texas, Marshall Division (2015). Provided trial testimony on behalf of defendant Everlight concerning injunctive relief related to alleged patent infringement involving light-emitting diodes (LEDs).

- *Young Living Essential Oils LC v. doTERRA Inc.*, Fourth Judicial District Court, State of Utah, Utah County (2015). Provided deposition testimony on behalf of defendant doTERRA concerning alleged breach of non-solicitation agreement and unauthorized use of confidential information by departing employees in the MLM health and wellness industry.

- *Broadspring Inc. v. Congoo LLC, et al.*, United States District Court, Southern District of New York (2015). Provided trial testimony on behalf of plaintiff Broadspring concerning lost profits and disgorgement damages related to alleged false advertising in the sale and placement of advertorial advertising on the internet.

- *EPI Solution Technology Co., et al., v. VEECO Instruments Inc., et al.,* Superior Court for the State of California, County of Los Angeles (2015). Provided deposition testimony on behalf of Defendants/CounterPlaintiffs concerning lost profits and amounts due under a contract related to machines used in semiconductor wafer manufacturing.

- *Electric Power Group, LLC v. Alstom Grid, et al.,* United States District Court, Central District of California (2014). Provided deposition testimony on behalf of Defendants concerning lost profits and reasonable royalty damages related to alleged patent infringement involving Electric utility management systems measurement and monitoring.

- *Dang v. San Francisco Forty Niners, et al.,* United States District Court, Northern District of California (2014). Provided deposition testimony on behalf of proposed plaintiff class relate to allegations of horizontal and vertal exclusive licensing agreements in the market for NFL branded athletic apparel. Evaluated whether common proof and common damages methodologies could be applied to members of proposed class of indirect purchasers.

- *Imaginal Systematics v. Leggett & Platt, Inc. and Simmons Bedding Company,* United States District Court, Central District of California, Western Division (2014). Provided deposition testimony on behalf of defendants Leggett & Platt, Inc. and Simmons Bedding Company concerning reasonable royalty damages related to alleged patent infringement involving automated stapling machines used in bed manufacturing.  The analysis relates to alleged ongoing infringement and damages after a trial between the same parties over a subset of the same patents.

- *Wyde Voice LLC and Free Conferencing Corporation v. Global IP Solutions, Inc. and Google Inc.*Superior Court for the State of California, for the County of San Francisco (2014).  Provided deposition testimony for the Plaintiff concerning lost profits, lost commercial value, and mitigation damages related to an alleged breach of contract involving conference call software bridge technology and support.

- *Robert McCrary v. The Elations Company, LLC,* United States District Court, Central District of California (2014).  Submitted an expert report on behalf of Defendant concerning restitution and disgorgement damages related to alleged false advertising involving nutritional supplement beverages.

- *River Light V and Tory burch LLC v. Lin & J Int'l Inc., et al.,* United States District Court, Southern District of New York (2014).  Submitted an expert report on behalf of Plaintiffs concerning lost profits and disgorgement damages related to alleged trademark and copyright infringement involving designer jewelry.

- *Phaedrus Internet Developoment, Inc. v. Kaiser Foundatoin Health Plan, et al.,* Superior Court of California, County of Alameda, Hayward Division (2014).  Provided trial testimony on behalf of plaintiff concerning damages related to Quantum Meruit claims involving medical software for viewing and storage electronic images and data.

- *Metrolaser Inc. v. Advanced Systerms & Technologies Inc.,* Superior Court of California, County of Orange – Central Justice Center (2014). Provided deposition testimony on behalf of defendants concerning claimed lost profits and disgorgement of compensation and value of confidential information and trade secrets in government funded research related to laser vibrometry.

- *Michael Delzell v. Chris Reidel and Hunter Labortories.,* Superior Court of California, County of Sonoma (2014). Provided deposition testimony on behalf of defendants concerning claimed value of proceeds from *Qi Tam* suit related to improper medical lab billing practices.

- *Branovations, Inc. v. Ontel Products Corporation,* United States District Court, Middle District of Florida, Fort Meyers Division (2014). Provided trial testimony on behalf of defendant Ontel concerning lost profits and reasonable royalty related to alleged patent infringement involving women's clothing accessories.

- *Porto Technology Co., et al v. Cellco Partnership dba Verizon Wireless,* United States District Court, Eastern District of Virginia, Richmond Division (2014). Submitted an expert report on behalf of plaintiff concerning royalty damages related to alleged patent infringement involving vehicle navigation applications used in mobile devices.

- *Cellebrite Mobile Synchronozation, LTD., et al. v. Microsystemation AB et al.,* United States District Court, Eastern District of Virginia, Alexandria Division (2014). Submitted an expert report on behalf of defendants/counerclaimants concerning lost profits and disgorgement damages related to alleged copyright infringement, theft of trade secrets, and breach of contract relatd to electronic devices and software used to for mobile device data extraction.

## RESEARCH PAPERS AND PUBLICATIONS

- "FRAND Commitments and Royalties for Standard Essential Patents", with S. Bosworth and E. Matolo, in Complications and Quandaries in the ICT Sector, 2018, Bharadwaj, Gupta, and Devaiah eds., Ch. 2, Springer Open, ISBN 978-981-10-449570.

- "Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures" with S. Bosworth and E. Matolo, *The Trademark Reporter*, May-June Volume, 2017.

- "The Case for Admitting Settlement License Agreements in a Reasonable Royalty Analysis," with S. Conroy and R. Knudsen, 2011, *Les Nouvelles,* Volume XLVI No. 4, 2012.

- "Cost Analysis," with J. Kinrich and A. Meister, in *Intellectual Property Damages, Guidelines and Analysis,* 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, Wiley: New York.

- "Analysis and Measurement of Damages in Patent Infringement Actions," with J. Kinrich, 2003, proceedings of Practicing Law Institute.

## PROFESSIONAL MEMBERSHIPS

American Antitrust Institute, Advisory Board Member

American Bar Association

American Economic Association

Los Angeles County Bar Association

Los Angeles Intellectual Property Law Association

Orange County Bar Association

Orange County Patent Law Association

## EXHIBIT 2
## Documents Received

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| Complaint for Trademark Infringement, Trade Dress Infringement, False Designation of Origin, and Unfair Competition, March 22, 2017 | - | - | - |
| Applicant's (ISN) Answers and Objections to Opposer's (MEC) Second Set of Interrogatories (Nos. 37-43) - EXCERPT | - | - | - |
| Applicant's (ISN) Supplemental Answers AND Objections to Opposer's (MEC) First Set of Interrogatories (Nos. 1-36) - EXCERPT | - | - | - |
| Integrated Supply Network, LLC's Responses to First Set of Interrogatories, October 27, 2017 | - | - | - |
| ISN010451.pdf | ISN | 010451 | 010483 |
| Tech's Edge Plus Confidential Price List - March 1, 2017 to April 30, 2017 | ISN | 010513 | 010552 |
| ███████████████████ | ISN | 011116 | 011116 |
| ISN011117.pdf | ISN | 011117 | 011117 |
| ISN0011689.pdf | ISN | 0011689 | 0011711 |
| ISN0011712.pdf | ISN | 0011712 | 0011728 |
| ISN0011729.pdf | ISN | 0011729 | 0011753 |
| ISN0011754.pdf | ISN | 0011754 | 0011778 |
| ISN0011779.pdf | ISN | 0011779 | 0011803 |
| ISN0011804.pdf | ISN | 0011804 | 0011835 |
| ISN0011836.pdf | ISN | 0011836 | 0011854 |
| ISN0011855.pdf | ISN | 0011855 | 0011856 |
| ISN0011857.pdf | ISN | 0011857 | 0011858 |
| ISN0011859.pdf | ISN | 0011859 | 0011860 |
| ISN0011861.pdf | ISN | 0011861 | 0011888 |
| ISN0011889.pdf | ISN | 0011889 | 0011918 |
| ISN0011919.pdf | ISN | 0011919 | 0011950 |
| ISN0011951.pdf | ISN | 0011951 | 0011990 |
| ISN0011991.pdf | ISN | 0011991 | 0011996 |
| ISN0011997.pdf | ISN | 0011997 | 0012025 |
| ISN0012026.pdf | ISN | 0012026 | 0012029 |
| ISN0012030.pdf | ISN | 0012030 | 0012031 |
| ISN0012032.pdf | ISN | 0012032 | 0012033 |
| ISN0012034.pdf | ISN | 0012034 | 0012064 |
| ISN0012065.pdf | ISN | 0012065 | 0012093 |
| ISN0012094.pdf | ISN | 0012094 | 0012132 |
| ISN0012133.pdf | ISN | 0012133 | 0012146 |
| ISN0012147.pdf | ISN | 0012147 | 0012149 |
| ISN0012150.pdf | ISN | 0012150 | 0012177 |
| ISN0012178.pdf | ISN | 0012178 | 0012180 |
| ISN0012181.pdf | ISN | 0012181 | 0012184 |
| ISN0012185.pdf | ISN | 0012185 | 0012187 |
| ISN0012188.pdf | ISN | 0012188 | 0012221 |
| ISN0012222.pdf | ISN | 0012222 | 0012236 |
| ISN0012237.pdf | ISN | 0012237 | 0012268 |
| ISN0012269.pdf | ISN | 0012269 | 0012272 |
| ISN0012273.pdf | ISN | 0012273 | 0012288 |
| ISN0012289.pdf | ISN | 0012289 | 0012290 |
| ISN0012291.pdf | ISN | 0012291 | 0012293 |
| ISN0012294.pdf | ISN | 0012294 | 0012303 |
| ISN0012304.pdf | ISN | 0012304 | 0012342 |
| ISN0012343.pdf | ISN | 0012343 | 0012345 |
| ISN0012346.pdf | ISN | 0012346 | 0012354 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| ISN0012355.pdf | ISN | 0012355 | 0012366 |
| ISN0012367.pdf | ISN | 0012367 | 0012388 |
| ISN0012389.pdf | ISN | 0012389 | 0012398 |
| ISN0012399.pdf | ISN | 0012399 | 0012415 |
| ISN0012418-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012418 | 0012418 |
| ISN0012419-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012419 | 0012419 |
| ISN0012420-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012420 | 0012420 |
| ISN0012421-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012421 | 0012421 |
| ISN0012422-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012422 | 0012422 |
| ISN0012423-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012423 | 0012423 |
| ISN0012424-HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY.xls | ISN | 0012424 | 0012424 |
| Integrated Suuply Network, Summary of Financial Results - April 2011 | ISN | 0012425 | 0012532 |
| Integrated Supply Network, 8/31/11, Income Statements | ISN | 0012533 | 0012631 |
| Integrated Supply Network, 8/31/11, Consolidated Income Statement | ISN | 0012632 | 0012643 |
| Integrated Supply Network, Summary of Financial Results - February 2011 | ISN | 0012644 | 0012748 |
| Integrated Supply Network, Summary of Financial Results - January 2011 | ISN | 0012749 | 0012844 |
| Integrated Supply Network, 7/31/11, Consolidated Income Statement | ISN | 0012845 | 0012860 |
| Integrated Supply Network, Summary of Financial Results - June 2011 | ISN | 0012861 | 0012969 |
| Integrated Supply Network, Summary of Financial Results - March 2011 | ISN | 0012970 | 0013076 |
| Integrated Supply Network, Summary of Financial Results - May 2011 | ISN | 0013077 | 0013185 |
| Integrated Supply Network, 11/30/11, Consolidated Income Statement | ISN | 0013186 | 0013299 |
| Integrated Supply Network, 10/31/11, Consolidated Income Statement | ISN | 0013300 | 0013414 |
| Integrated Supply Network, Summary of Financial Results - September 2011 | ISN | 0013415 | 0013529 |
| Integrated Supply Network, 4/30/12, Consolidated Income Statement | ISN | 0013530 | 0013634 |
| Integrated Supply Network, 8/31/12, Consolidated Income Statement | ISN | 0013635 | 0013744 |
| Integrated Supply Network, 12/31/12, Consolidated Income Statement | ISN | 0013745 | 0013855 |
| Integrated Supply Network, 2/29/12, Consolidated Income Statement | ISN | 0013856 | 0013950 |
| Integrated Supply Network, 1/31/12, Consolidated Income Statement | ISN | 0013951 | 0014043 |
| Integrated Supply Network, 7/31/12, Consolidated Income Statement | ISN | 0014043 | 0014151 |
| Integrated Supply Network, 6/30/12, Consolidated Income Statement | ISN | 0014152 | 0014259 |
| Integrated Supply Network, 3/31/12, Consolidated Income Statement | ISN | 0014260 | 0014361 |
| Integrated Supply Network, 5/31/12, Consolidated Income Statement | ISN | 0014362 | 0014467 |
| Integrated Supply Network, 11/30/12, Consolidated Income Statement | ISN | 0014468 | 0014578 |
| Integrated Supply Network, 10/31/12, Consolidated Income Statement | ISN | 0014579 | 0014688 |
| Integrated Supply Network, 9/30/12, Consolidated Income Statement | ISN | 0014689 | 0014798 |
| ISN Monthly Package, December 2012 | ISN | 0014799 | 0014957 |
| Integrated Supply Network, 4/30/13, Consolidated Income Statement | ISN | 0014958 | 0015063 |
| Integrated Supply Network, 8/31/13, Consolidated Income Statement | ISN | 0015064 | 0015174 |
| Integrated Supply Network, 12/31/13, Consolidated Income Statement | ISN | 0015175 | 0015306 |
| Integrated Supply Network, 2/28/13, Consolidated Income Statement | ISN | 0015307 | 0015403 |
| Integrated Supply Network, 1/31/13, Consolidated Income Statement | ISN | 0015404 | 0015497 |
| Integrated Supply Network, 7/31/13, Consolidated Income Statement | ISN | 0015498 | 0015608 |
| Integrated Supply Network, 6/30/13, Consolidated Income Statement | ISN | 0015609 | 0015718 |
| Integrated Supply Network, 3/31/13, Consolidated Income Statement | ISN | 0015719 | 0015821 |
| Integrated Supply Network, 5/31/13, Consolidated Income Statement | ISN | 0015822 | 0015927 |
| Integrated Supply Network, 11/30/13, Consolidated Income Statement | ISN | 0015928 | 0016042 |
| Integrated Supply Network, 10/31/13, Consolidated Income Statement | ISN | 0016043 | 0016157 |
| Integrated Supply Network, 9/30/13, Consolidated Income Statement | ISN | 0016158 | 0016269 |
| ISN Monthly Package, December 2013 | ISN | 0016270 | 0016424 |
| Integrated Supply Network, 4/30/14, Consolidated Income Statement | ISN | 0016425 | 0016545 |
| Integrated Supply Network, 8/31/14, Consolidated Income Statement | ISN | 0016546 | 0016666 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| Integrated Supply Network, 12/31/14, Consolidated Income Statement | ISN | 0016667 | 0016791 |
| Integrated Supply Network, 2/28/14, Consolidated Income Statement | ISN | 0016792 | 0016896 |
| Integrated Supply Network, 1/31/14, Consolidated Income Statement | ISN | 0016897 | 0016990 |
| Integrated Supply Network, 7/31/14, Consolidated Income Statement | ISN | 0016991 | 0017111 |
| Integrated Supply Network, 6/30/14, Consolidated Income Statement | ISN | 0017112 | 0017232 |
| Integrated Supply Network, 3/31/14, Consolidated Income Statement | ISN | 0017233 | 0017352 |
| Integrated Supply Network, 5/31/14, Consolidated Income Statement | ISN | 0017353 | 0017473 |
| Integrated Supply Network, 11/30/14, Consolidated Income Statement | ISN | 0017474 | 0017598 |
| Integrated Supply Network, 10/31/14, Consolidated Income Statement | ISN | 0017599 | 0017721 |
| Integrated Supply Network, 9/30/14, Consolidated Income Statement | ISN | 0017722 | 0017840 |
| Integrated Suuply Network Monthly Report - December 2014 | ISN | 0017841 | 0018004 |
| Integrated Supply Network, 4/30/15, Consolidated Income Statement | ISN | 0018005 | 0018117 |
| Integrated Supply Network, 8/31/15, Consolidated Income Statement | ISN | 0018118 | 0018232 |
| Integrated Supply Network, 12/31/15, Consolidated Income Statement | ISN | 0018233 | 0018352 |
| Integrated Supply Network, 2/28/15, Consolidated Income Statement | ISN | 0018353 | 0018461 |
| Integrated Supply Network, 1/31/15, Consolidated Income Statement | ISN | 0018462 | 0018562 |
| Integrated Supply Network, 7/31/15, Consolidated Income Statement | ISN | 0018563 | 0018676 |
| Integrated Supply Network, 6/30/15, Consolidated Income Statement | ISN | 0018677 | 0018788 |
| Integrated Supply Network, 3/31/15, Consolidated Income Statement | ISN | 0018789 | 0018900 |
| Integrated Supply Network, 5/31/15, Consolidated Income Statement | ISN | 0018901 | 0019013 |
| Integrated Supply Network, 11/30/15, Consolidated Income Statement | ISN | 0019014 | 0019132 |
| Integrated Supply Network, 10/31/15, Consolidated Income Statement | ISN | 0019133 | 0019251 |
| Integrated Supply Network, 9/30/15, Consolidated Income Statement | ISN | 0019252 | 0019368 |
| Integrated Suuply Network Monthly Report - December 2015 | ISN | 0019369 | 0019554 |
| Integrated Supply Network, 4/30/16, Consolidated Income Statement | ISN | 0019555 | 0019662 |
| Integrated Supply Network, 8/31/16, Consolidated Income Statement | ISN | 0019663 | 0019777 |
| Integrated Supply Network, 12/31/16, Consolidated Income Statement | ISN | 0019778 | 0019892 |
| Integrated Supply Network, 2/29/16, Consolidated Income Statement | ISN | 0019893 | 0019997 |
| Integrated Supply Network, 1/31/16, Consolidated Income Statement | ISN | 0019998 | 0020100 |
| Integrated Supply Network, 7/31/16, Consolidated Income Statement | ISN | 0020101 | 0020211 |
| Integrated Supply Network, 6/30/16, Consolidated Income Statement | ISN | 0020212 | 0020310 |
| Integrated Supply Network, 6/30/16, Consolidated Income Statement | ISN | 0020311 | 0020421 |
| Integrated Supply Network, 3/31/16, Consolidated Income Statement | ISN | 0020422 | 0020529 |
| Integrated Supply Network, 5/31/16, Consolidated Income Statement | ISN | 0020530 | 0020638 |
| Integrated Supply Network, 11/30/16, Consolidated Income Statement | ISN | 0020639 | 0020759 |
| Integrated Supply Network, 10/31/16, Consolidated Income Statement | ISN | 0020760 | 0020879 |
| Integrated Supply Network, 9/30/16, Consolidated Income Statement | ISN | 0020880 | 0020994 |
| Integrated Suuply Network, Monthly Financial Report - December 2016 | ISN | 0020995 | 0021467 |
| Integrated Supply Network, 4/30/17, Consolidated Income Statement | ISN | 0021468 | 0021598 |
| Integrated Supply Network, 2/28/17, Consolidated Income Statement | ISN | 0021599 | 0021707 |
| Integrated Supply Network, 1/31/17, Consolidated Income Statement | ISN | 0021708 | 0021816 |
| Integrated Supply Network, 3/31/17, Consolidated Income Statement | ISN | 0021817 | 0021925 |
| Integrated Supply Network, 5/31/17, Consolidated Income Statement | ISN | 0021926 | 0022049 |
| ISN0022050.pdf | ISN | 0022050 | 0022290 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 12/31/2013 | ISN | 0022291 | 0022372 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 12/31/2015 | ISN | 0022373 | 0022494 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 12/31/2016 | ISN | 0022495 | 0022653 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 12/31/2014 | ISN | 0022654 | 0022750 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 3/31/2017 | ISN | 0022751 | 0022918 |
| ISN0022919.pdf | ISN | 0022919 | 0022938 |
| ADP Wage & Tax Register, Integrated Supply, Quarter Ending 12/31/2012 | ISN | 0022939 | 0023001 |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**EXHIBIT 2**
**Documents Received**

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| ISN0023002.pdf | ISN | 0023002 | 0023077 |
| ISN0023078.pdf | ISN | 0023078 | 0023125 |
| ISN0023126.pdf | ISN | 0023126 | 0023161 |
| ISN0023162.pdf | ISN | 0023162 | 0023250 |
| ISN0023251.pdf | ISN | 0023251 | 0023290 |
| ISN0023291.pdf | ISN | 0023291 | 0023410 |
| ISN0023411.pdf | ISN | 0023411 | 0023496 |
| ISN0023497.pdf | ISN | 0023497 | 0023828 |
| ISN0023829.pdf | ISN | 0023829 | 0023878 |
| Tech's Edge Plus Confidential Price List - July 1 to August 31, 2016 | ISN | 0026766 | 0026805 |
| Tech's Edge Plus Confidential Price List - March 1 to April 30, 2016 | ISN | 0026806 | 0026845 |
| Tech's Edge Plus Confidential Price List - January 1 to February 29, 2016 | ISN | 0026846 | 0026885 |
| Tech's Edge Plus Confidential Price List - September 1 to October 31, 2016 | ISN | 0026886 | 0026925 |
| Tech's Edge Plus Confidential Price List - January 1 to February 28, 2017 | ISN | 0026926 | 0026965 |
| Tech's Edge Plus Confidential Price List - July 1 to August 31, 2017 | ISN | 0026966 | 0027005 |
| Tech's Edge Plus Confidential Price List - March 1 to April 30, 2017 | ISN | 0027006 | 0027045 |
| ISN00051041.pdf | ISN | 00051041 | 00051041 |
| ISNE00000802.pdf | ISNE | 00000802 | 00000809 |
| ISNE00000810.xlsx | ISNE | 00000810 | 00000810 |
| ISNE00000811.xlsx | ISNE | 00000811 | 00000811 |
| ISNE00000812.xlsx | ISNE | 00000812 | 00000812 |
| ISNE00000813.xlsx | ISNE | 00000813 | 00000813 |
| ISNE00000814.xlsx | ISNE | 00000814 | 00000814 |
| ISNE00000815.xlsx | ISNE | 00000815 | 00000815 |
| ISNE00000816.xlsx | ISNE | 00000816 | 00000816 |
| ISNE00000817.xlsx | ISNE | 00000817 | 00000817 |
| ISNE00003824.xlsx | ISNE | 00003824 | 00003824 |
| ISNE00003878.pdf | ISNE | 00003878 | 00003878 |
| ISNE00003879.xlsx | ISNE | 00003879 | 00003879 |
| ISNE00003984.pdf | ISNE | 00003984 | 00003984 |
| 2016 Monster Growth Plan (Acrobat file) | ISNE | 00003986 | 00003999 |
| 2017 Monster Strategic Marketing Plan (Acrobat file) | ISNE | 00004110 | 00004177 |
| ISNE00007314.xlsx | ISNE | 00007314 | 00007314 |
| ISNE00008699.xlsx | ISNE | 00008699 | 00008699 |
| ISNE00030565.pdf | ISNE | 00030565 | 00030577 |
| ISNE00030745.pdf | ISNE | 00030745 | 00030745 |
| ISNE00030746.xlsx | ISNE | 00030746 | 00030746 |
| ISNE00031934.pdf | ISNE | 00031934 | 00031936 |
| ISNE00031937.xlsx | ISNE | 00031937 | 00031937 |
| ISNE00033724.pdf | ISNE | 00033724 | 00033724 |
| ISNE00033725.xlsx | ISNE | 00033725 | 00033725 |
| ISNE00048972.pdf | ISNE | 00048972 | 00048972 |
| ISNE00049156.pdf | ISNE | 00049156 | 00049156 |
| ISNE00049157.xlsx | ISNE | 00049157 | 00049157 |
| ISNE00051045.xlsx | ISNE | 00051045 | 00051045 |
| ISNE00052006.pdf | ISNE | 00052006 | 00052006 |
| ISNE00052007.xlsx | ISNE | 00052007 | 00052007 |
| ISNE00052053.pdf | ISNE | 00052053 | 00052053 |
| ISNE00052054.xlsx | ISNE | 00052054 | 00052054 |
| ISNE00052063.pdf | ISNE | 00052063 | 00052063 |
| ISNE00052064.xlsx | ISNE | 00052064 | 00052064 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | Bates Number | | |
| --- | --- | --- | --- |
| | Prefix | Beginning | Ending |
| ISNE00052065.pdf | ISNE | 00052065 | 00052066 |
| ISNE00052162.pdf | ISNE | 00052162 | 00052162 |
| ISNE00052163.xlsx | ISNE | 00052163 | 00052163 |
| ISNE00052530.pdf | ISNE | 00052530 | 00052531 |
| ISNE00052532.xlsx | ISNE | 00052532 | 00052532 |
| ISNE00052569.pdf | ISNE | 00052569 | 00052569 |
| ISNE00052570.xlsx | ISNE | 00052570 | 00052570 |
| ISNE00053051.pdf | ISNE | 00053051 | 00052572 |
| ISNE00053054.xlsx | ISNE | 00053054 | 00053054 |
| ISNE00053118.pdf | ISNE | 00053118 | 00053118 |
| ISNE00053119.xlsx | ISNE | 00053119 | 00053119 |
| ISNE00054063.pdf | ISNE | 00054063 | 00054063 |
| ISNE00054064.xlsx | ISNE | 00054064 | 00054064 |
| ISNE00054856.pdf | ISNE | 00054856 | 00054856 |
| ISNE00054857.xlsx | ISNE | 00054857 | 00054857 |
| ISNE00055813.pdf | ISNE | 00055813 | 00055814 |
| ISNE00055815.xlsx | ISNE | 00055815 | 00055815 |
| ISNE00055816.pdf | ISNE | 00055816 | 00055816 |
| ISNE00055817.xlsx | ISNE | 00055817 | 00055817 |
| ISNE00058172.pdf | ISNE | 00058172 | 00058172 |
| ISNE00058173.xlsx | ISNE | 00058173 | 00058173 |
| ISNE00058174.xlsx | ISNE | 00058174 | 00058174 |
| ISNE00061339.pdf | ISNE | 00061339 | 00061339 |
| ISNE00061340.xlsx | ISNE | 00061340 | 00061340 |
| ISNE00061343.pdf | ISNE | 00061343 | 00061345 |
| ISNE00061345.xlsx | ISNE | 00061345 | 00061345 |
| ISNE00061945.pdf | ISNE | 00061945 | 00061946 |
| ISNE00061947.xlsx | ISNE | 00061947 | 00061947 |
| ISNE00065678.pdf | ISNE | 00065678 | 00065679 |
| ISNE00066220.pdf | ISNE | 00066220 | 00066220 |
| ISNE00066221.xlsx | ISNE | 00066221 | 00066221 |
| ISNE00068183.pdf | ISNE | 00068183 | 00068184 |
| ISNE00068185.xlsx | ISNE | 00068185 | 00068185 |
| ISNE00069890.xlsx | ISNE | 00069890 | 00069890 |
| 2010 Premiums Shipments | MEC | 047150 | 047501 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2009 | MEC | 047134 | 047149 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2008 | MEC | 046666 | 046677 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2007 | MEC | 046307 | 046309 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2006 | MEC | 045810 | 045812 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2005 | MEC | 045509 | 045510 |
| Monster Energy Company: Support for Monster Trademark - Apparel - Inventory Detail Transaction Report 2005 | MEC | 045267 | 045508 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2004 | MEC | 045265 | 045266 |
| Monster Energy Company: Support for Monster Trademark - Apparel - Inventory Detail Transaction Report 2004 | MEC | 045165 | 045264 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | | Bates Number | |
|---|---|---|---|
| | Prefix | Beginning | Ending |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2003 | MEC | 045164 | 045164 |
| Monster Energy Company: Support for Monster Trademark - Apparel - Inventory Detail Transaction Report 2003 | MEC | 045136 | 045163 |
| Monster Energy Company: Support for Monster Trademark - Apparel -Summary of Key Inventory Transactions 2002 | MEC | 045135 | 045135 |
| Monster Energy Company: Support for Monster Trademark - Apparel - Inventory Detail Transaction Report 2002 | MEC | 045111 | 045134 |
| 2011 Premiums Shipments | MEC | 045100 | 045110 |
| 2011 Premiums Shipments | MEC | 044741 | 045099 |
| 2010 Premiums Shipments | MEC | 044732 | 044740 |
| MEC042507 List of Invoices and Items | MEC | 042507 | 044158 |
| Trademark Licensing Royalties - Royalties Received/Invoiced | MEC | 039684 | 039684 |
| Licensed Product Submission Forms | MEC | 028977 | 029436 |
| Licensed Products, Forms and Agreements | MEC | 026598 | 026953 |
| | MEC | 026151 | 026166 |
| | MEC | 026108 | 026150 |
| | MEC | 026080 | 026107 |
| | MEC | 026072 | 026079 |
| | MEC | 026048 | 026071 |
| | MEC | 026021 | 026047 |
| | MEC | 025996 | 026020 |
| | MEC | 025982 | 025995 |
| | MEC | 025955 | 025981 |
| | MEC | 023752 | 023775 |
| | MEC | 023701 | 023727 |
| | MEC | 023667 | 023700 |
| | MEC | 023633 | 023666 |
| | MEC | 023617 | 023632 |
| | MEC | 023542 | 023616 |
| | MEC | 023515 | 023541 |
| | MEC | 023488 | 023514 |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**EXHIBIT 2**
**Documents Received**

| Description/Title | | Bates Number | |
| --- | --- | --- | --- |
| | Prefix | Beginning | Ending |
| | MEC | 023458 | 023487 |
| | MEC | 022454 | 022486 |
| | MEC | 022427 | 022453 |
| | MEC | 022363 | 022386 |
| | MEC | 022339 | 022362 |
| | MEC | 022327 | 022338 |
| | MEC | 022308 | 022326 |
| | MEC | 022297 | 022307 |
| | MEC | 022288 | 022296 |
| | MEC | 022271 | 022287 |
| | MEC | 022252 | 022270 |
| | MEC | 022231 | 022251 |
| | MEC | 022223 | 022230 |
| | MEC | 022214 | 022222 |
| | MEC | 022206 | 022213 |
| | MEC | 022196 | 022205 |
| | MEC | 022185 | 022195 |
| | MEC | 022163 | 022184 |
| | MEC | 022135 | 022162 |
| | MEC | 017974 | 018008 |
| | MEC | 017966 | 017973 |
| | MEC | 017887 | 017894 |
| ISNE00076698.xlsx | ISNE | 00076698 | 00076698 |
| Monster 2016 Strategic Plan (April 4, 2016 Thru June 30, 2017) | ISNE | 00076669 | 00076697 |
| ISNE00076668.pdf | ISNE | 00076668 | 00076668 |
| ISNE00075781.pdf | ISNE | 00075781 | 00075781 |
| ISNE00075780.pdf | ISNE | 00075780 | 00075780 |
| ISNE00075779.pdf | ISNE | 00075779 | 00075779 |
| ISNE00075778.pdf | ISNE | 00075778 | 00075778 |
| ISNE00075777.pdf | ISNE | 00075777 | 00075777 |
| ISNE00075776.pdf | ISNE | 00075776 | 00075776 |
| ISNE00075775.xlsx | ISNE | 00075775 | 00075775 |
| ISNE00075774.pdf | ISNE | 00075774 | 00075774 |
| ISNE00075773.pdf | ISNE | 00075773 | 00075773 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | Bates Number | | |
| --- | --- | --- | --- |
| | Prefix | Beginning | Ending |
| Commercial Group Board Meeting - October 2016 | ISNE | 00075708 | 00075772 |
| Integrated Supply Network, LLC, Monthly Operating Review Narrative & Strategic Priorities Review, September, 2016 | ISNE | 00075641 | 00075707 |
| ISNE00075639.pdf | ISNE | 00075639 | 00075640 |
| ISNE00070857.xlsx | ISNE | 00070857 | 00070857 |
| ISNE00070853.pdf | ISNE | 00070853 | 00070856 |
| ISNE00069890.xlsx | ISNE | 00069890 | 00069890 |
| 1_ISNE00015465_image.pdf | ISNE | 00015465 | 00015465 |
| 2_ISNE00015466_image.pdf | ISNE | 00015466 | 00015475 |
| 3_ISNE00063130_image.pdf | ISNE | 00063130 | 00063132 |
| MEC060155 [HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY] Royalties receive....xls | MEC | 060155 | 060155 |
| Deposition of Rodney Sacks, 2/5/2018 (Rough Draft) | - | - | - |
| Excerpt of Inventory Transaction Report January 2011 - January 2018, United States and Canada | - | - | - |
| Inventory Transaction Report January 2011 - January 2018, United States and Canada | - | - | - |
| ISNE00075774.xlsx | ISNE | 00075774 | 00075774 |
| ISNE00075776.xlsx | ISNE | 00075776 | 00075776 |
| ISNE00075777.xlsx | ISNE | 00075777 | 00075777 |
| ISNE00075778.xlsx | ISNE | 00075778 | 00075778 |
| ISNE00075779.xlsx | ISNE | 00075779 | 00075779 |
| ISNE00075780.xlsx | ISNE | 00075780 | 00075780 |
| ISNE00075781.xlsx | ISNE | 00075781 | 00075781 |
| KMOBPROCESSED00072554.xlsx | MEC | 060109 | 060109 |
| Monster Army Apparel 2016-current.xlsx | - | - | - |
| Integrated Supply Network Detailed Income Statement - 7/31/16 | ISN | 0068669 | 0068677 |
| Integrated Supply Network Detailed Income Statement - 8/31/16 | ISN | 0068678 | 0068686 |
| Integrated Supply Network Detailed Income Statement - 9/30/16 | ISN | 0068687 | 0068696 |
| Integrated Supply Network Detailed Income Statement - 10/31/16 | ISN | 0068697 | 0068706 |
| Integrated Supply Network Detailed Income Statement - 11/30/16 | ISN | 0068707 | 0068716 |
| Integrated Supply Network Detailed Income Statement - 12/31/16 | ISN | 0068717 | 0068726 |
| Integrated Supply Network Detailed Income Statement - 1/31/17 | ISN | 0068727 | 0068735 |
| Integrated Supply Network Detailed Income Statement - 2/28/17 | ISN | 0068736 | 0068744 |
| Integrated Supply Network Detailed Income Statement - 3/31/17 | ISN | 0068745 | 0068753 |
| Integrated Supply Network Detailed Income Statement - 4/30/17 | ISN | 0068754 | 0068762 |
| Integrated Supply Network Detailed Income Statement - 5/31/17 | ISN | 0068763 | 0068771 |
| Integrated Supply Network Detailed Income Statement - 6/30/17 | ISN | 0068772 | 0068780 |
| Integrated Supply Network Detailed Income Statement - 7/31/17 | ISN | 0068781 | 0068790 |
| Integrated Supply Network Detailed Income Statement - 8/31/17 | ISN | 0068791 | 0068800 |
| Integrated Supply Network Detailed Income Statement - 9/30/17 | ISN | 0068801 | 0068810 |
| Integrated Supply Network Detailed Income Statement - 10/31/17 | ISN | 0068811 | 0068820 |
| Integrated Supply Network Detailed Income Statement - 11/30/17 | ISN | 0068821 | 0068830 |
| Integrated Supply Network Detailed Income Statement - 12/31/17 | ISN | 0068831 | 0068840 |
| Integrated Supply Network Sales Division Income Statement - 01/31/14 | ISN | 0068841 | 0068842 |
| Integrated Supply Network Sales Division Income Statement - 02/28/14 | ISN | 0068843 | 0068844 |
| Integrated Supply Network Sales Division Income Statement - 03/31/14 | ISN | 0068845 | 0068846 |
| Integrated Supply Network Sales Division Income Statement - 04/30/14 | ISN | 0068847 | 0068848 |
| Integrated Supply Network Sales Division Income Statement - 05/31/14 | ISN | 0068849 | 0068850 |
| Integrated Supply Network Sales Division Income Statement - 06/30/14 | ISN | 0068851 | 0068852 |
| Integrated Supply Network Sales Division Income Statement - 07/31/14 | ISN | 0068853 | 0068854 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | | Bates Number | |
| --- | --- | --- | --- |
| | Prefix | Beginning | Ending |
| Integrated Supply Network Sales Division Income Statement - 08/31/14 | ISN | 0068855 | 0068856 |
| Integrated Supply Network Sales Division Income Statement - 09/30/14 | ISN | 0068857 | 0068858 |
| Integrated Supply Network Sales Division Income Statement - 10/31/14 | ISN | 0068859 | 0068860 |
| Integrated Supply Network Sales Division Income Statement - 11/30/14 | ISN | 0068861 | 0068862 |
| Integrated Supply Network Sales Division Income Statement - 12/31/14 | ISN | 0068863 | 0068864 |
| Integrated Supply Network Sales Division Income Statement - 01/31/15 | ISN | 0068865 | 0068866 |
| Integrated Supply Network Sales Division Income Statement - 02/28/15 | ISN | 0068867 | 0068868 |
| Integrated Supply Network Sales Division Income Statement - 03/31/15 | ISN | 0068869 | 0068870 |
| Integrated Supply Network Sales Division Income Statement - 04/30/15 | ISN | 0068871 | 0068872 |
| Integrated Supply Network Sales Division Income Statement - 05/31/15 | ISN | 0068873 | 0068874 |
| Integrated Supply Network Sales Division Income Statement - 06/30/15 | ISN | 0068875 | 0068876 |
| Integrated Supply Network Sales Division Income Statement - 07/31/15 | ISN | 0068877 | 0068878 |
| Integrated Supply Network Sales Division Income Statement - 08/31/15 | ISN | 0068879 | 0068880 |
| Integrated Supply Network Sales Division Income Statement - 09/30/15 | ISN | 0068881 | 0068882 |
| Integrated Supply Network Sales Division Income Statement - 10/31/15 | ISN | 0068883 | 0068884 |
| Integrated Supply Network Sales Division Income Statement - 11/30/15 | ISN | 0068885 | 0068886 |
| Integrated Supply Network Sales Division Income Statement - 12/31/15 | ISN | 0068887 | 0068888 |
| Integrated Supply Network Sales Division Income Statement - 01/31/16 | ISN | 0068889 | 0068890 |
| Integrated Supply Network Sales Division Income Statement - 02/29/16 | ISN | 0068891 | 0068892 |
| Integrated Supply Network Sales Division Income Statement - 03/31/16 | ISN | 0068893 | 0068894 |
| Integrated Supply Network Sales Division Income Statement - 04/30/16 | ISN | 0068895 | 0068896 |
| Integrated Supply Network Sales Division Income Statement - 05/31/16 | ISN | 0068897 | 0068898 |
| Integrated Supply Network Sales Division Income Statement - 06/30/16 | ISN | 0068899 | 0068900 |
| Integrated Supply Network Sales Division Income Statement - 07/31/16 | ISN | 0068901 | 0068902 |
| Integrated Supply Network Sales Division Income Statement - 08/31/16 | ISN | 0068903 | 0068904 |
| Integrated Supply Network Sales Division Income Statement - 09/30/16 | ISN | 0068905 | 0068906 |
| Integrated Supply Network Sales Division Income Statement - 10/31/16 | ISN | 0068907 | 0068908 |
| Integrated Supply Network Sales Division Income Statement - 11/30/16 | ISN | 0068909 | 0068910 |
| Integrated Supply Network Sales Division Income Statement - 12/31/16 | ISN | 0068911 | 00689812 |
| Integrated Supply Network Sales Division Income Statement - 01/31/17 | ISN | 0068913 | 0068914 |
| Integrated Supply Network Sales Division Income Statement - 02/28/17 | ISN | 0068915 | 0068916 |
| Integrated Supply Network Sales Division Income Statement - 03/31/17 | ISN | 0068917 | 0068918 |
| Integrated Supply Network Sales Division Income Statement - 04/30/17 | ISN | 0068919 | 0068920 |
| Integrated Supply Network Sales Division Income Statement - 05/31/17 | ISN | 0068921 | 0068922 |
| Integrated Supply Network Sales Division Income Statement - 06/30/17 | ISN | 0068923 | 0068924 |
| Integrated Supply Network Sales Division Income Statement - 07/31/17 | ISN | 0068925 | 0068926 |
| Integrated Supply Network Sales Division Income Statement - 08/31/17 | ISN | 0068927 | 0068928 |
| Integrated Supply Network Sales Division Income Statement - 09/30/17 | ISN | 0068929 | 0068930 |
| Integrated Supply Network Sales Division Income Statement - 10/31/17 | ISN | 0068931 | 0068932 |
| Integrated Supply Network Sales Division Income Statement - 11/30/17 | ISN | 0068933 | 0068934 |
| Integrated Supply Network Sales Division Income Statement - 12/31/17 | ISN | 0068935 | 0068936 |
| ISN0068590.xlsx | ISN | 0068590 | 0068590 |
| ISN0068591.xlsx | ISN | 0068591 | 0068591 |
| ISN0068592.xlsx | ISN | 0068592 | 0068592 |
| ISN0068593.xlsx | ISN | 0068593 | 0068593 |
| ISN0068594.xlsx | ISN | 0068594 | 0068594 |
| ISN0068595.xlsx | ISN | 0068595 | 0068595 |
| ISN0068596.xlsx | ISN | 0068596 | 0068596 |
| ISN0068597.xlsx | ISN | 0068597 | 0068597 |
| ISN0068598.xlsx | ISN | 0068598 | 0068598 |
| ISN0068599.xlsx | ISN | 0068599 | 0068599 |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**EXHIBIT 2**
**Documents Received**

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| ISN0068600.xlsx | ISN | 0068600 | 0068600 |
| ISN0068601.xlsx | ISN | 0068601 | 0068601 |
| ISN0068602.xlsx | ISN | 0068602 | 0068602 |
| ISN0068603.xlsx | ISN | 0068603 | 0068603 |
| ISN0068604.xlsx | ISN | 0068604 | 0068604 |
| ISN0068605.xlsx | ISN | 0068605 | 0068605 |
| ISN0068606.xlsx | ISN | 0068606 | 0068606 |
| ISN0068607.xlsx | ISN | 0068607 | 0068607 |
| ISN0068608.xlsx | ISN | 0068608 | 0068608 |
| ISN0068609.xlsx | ISN | 0068609 | 0068609 |
| ISN0068610.xlsx | ISN | 0068610 | 0068610 |
| ISN0068611.xlsx | ISN | 0068611 | 0068611 |
| ISN0068612.xlsx | ISN | 0068612 | 0068612 |
| ISN0068613.xlsx | ISN | 0068613 | 0068613 |
| ISN0068614.xlsx | ISN | 0068614 | 0068614 |
| ISN0068615.xlsx | ISN | 0068615 | 0068615 |
| ISN0068616.xlsx | ISN | 0068616 | 0068616 |
| ISN0068617.xlsx | ISN | 0068617 | 0068617 |
| ISN0068618.xlsx | ISN | 0068618 | 0068618 |
| ISN0068619.xlsx | ISN | 0068619 | 0068619 |
| ISN0068620.xlsx | ISN | 0068620 | 0068620 |
| ISN0068621.xlsx | ISN | 0068621 | 0068621 |
| ISN0068622.xlsx | ISN | 0068622 | 0068622 |
| ISN0068623.xlsx | ISN | 0068623 | 0068623 |
| ISN0068624.xlsx | ISN | 0068624 | 0068624 |
| ISN0068625.xlsx | ISN | 0068625 | 0068625 |
| ISN0068626.xlsx | ISN | 0068626 | 0068626 |
| ISN0068627.xlsx | ISN | 0068627 | 0068627 |
| ISN0068628.xlsx | ISN | 0068628 | 0068628 |
| ISN0068629.xlsx | ISN | 0068629 | 0068629 |
| ISN0068630.xlsx | ISN | 0068630 | 0068630 |
| ISN0068631.xlsx | ISN | 0068631 | 0068631 |
| ISN0068632.xlsx | ISN | 0068632 | 0068632 |
| ISN0068633.xlsx | ISN | 0068633 | 0068633 |
| ISN0068634.xlsx | ISN | 0068634 | 0068634 |
| ISN0068635.xlsx | ISN | 0068635 | 0068635 |
| ISN0068636.xlsx | ISN | 0068636 | 0068636 |
| ISN0068637.xlsx | ISN | 0068637 | 0068637 |
| ISN0068638.xlsx | ISN | 0068638 | 0068638 |
| ISN0068639.xlsx | ISN | 0068639 | 0068639 |
| ISN0068640.xlsx | ISN | 0068640 | 0068640 |
| ISN0068641.xlsx | ISN | 0068641 | 0068641 |
| ISN0068642.xlsx | ISN | 0068642 | 0068642 |
| ISN0068643.xlsx | ISN | 0068643 | 0068643 |
| ISN0068644.xlsx | ISN | 0068644 | 0068644 |
| ISN0068645.xlsx | ISN | 0068645 | 0068645 |
| ISN0068646.xlsx | ISN | 0068646 | 0068646 |
| ISN0068647.xlsx | ISN | 0068647 | 0068647 |
| ISN0068648.xlsx | ISN | 0068648 | 0068648 |
| ISN0068649.xlsx | ISN | 0068649 | 0068649 |
| ISN0068650.xlsx | ISN | 0068650 | 0068650 |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

## EXHIBIT 2
## Documents Received

| Description/Title | Bates Number | | |
|---|---|---|---|
| | Prefix | Beginning | Ending |
| ISN0068651.xlsx | ISN | 0068651 | 0068651 |
| ISN0068652.xlsx | ISN | 0068652 | 0068652 |
| ISN0068653.xlsx | ISN | 0068653 | 0068653 |
| ISN0068654.xlsx | ISN | 0068654 | 0068654 |
| ISN0068655.xlsx | ISN | 0068655 | 0068655 |
| ISN0068656.xlsx | ISN | 0068656 | 0068656 |
| ISN0068657.xlsx | ISN | 0068657 | 0068657 |
| ISN0068658.xlsx | ISN | 0068658 | 0068658 |
| ISN0068659.xlsx | ISN | 0068659 | 0068659 |
| ISN0068660.xlsx | ISN | 0068660 | 0068660 |
| ISN0068661.xlsx | ISN | 0068661 | 0068661 |
| ISN0068662.xlsx | ISN | 0068662 | 0068662 |
| ISN0068663.xlsx | ISN | 0068663 | 0068663 |
| ISN0068664.xlsx | ISN | 0068664 | 0068664 |
| ISN0068665.xlsx | ISN | 0068665 | 0068665 |
| ISN0068666.xlsx | ISN | 0068666 | 0068666 |
| ISN0068667.xlsx | ISN | 0068667 | 0068667 |
| ISN0068668.xlsx | ISN | 0068668 | 0068668 |
| ISN0068937.xlsx | ISN | 0068937 | 0068937 |
| ISN0068938.xlsx | ISN | 0068938 | 0068938 |
| ISN0068939.xlsx | ISN | 0068939 | 0068939 |
| ISN0068940.xlsx | ISN | 0068940 | 0068940 |
| ISN0068941.xlsx | ISN | 0068941 | 0068941 |
| ISN0068942.xlsx | ISN | 0068942 | 0068942 |
| ISN0068943.xlsx | ISN | 0068943 | 0068943 |
| ISN0068944.xlsx | ISN | 0068944 | 0068944 |
| ISN0068945.xlsx | ISN | 0068945 | 0068945 |
| ISN0068946.xlsx | ISN | 0068946 | 0068946 |
| ISN0068947.xlsx | ISN | 0068947 | 0068947 |
| ISN0068948.xlsx | ISN | 0068948 | 0068948 |
| ISN0068949.xlsx | ISN | 0068949 | 0068949 |
| ISN0068950.xlsx | ISN | 0068950 | 0068950 |
| ISN0068951.xlsx | ISN | 0068951 | 0068951 |
| ISN0068952.xlsx | ISN | 0068952 | 0068952 |
| ISN0068953.xlsx | ISN | 0068953 | 0068953 |
| ISN0068954.xlsx | ISN | 0068954 | 0068954 |
| ISN0068955.xlsx | ISN | 0068955 | 0068955 |
| ISN0068956.xlsx | ISN | 0068956 | 0068956 |
| ISN0068957.xlsx | ISN | 0068957 | 0068957 |
| ISN0068958.xlsx | ISN | 0068958 | 0068958 |
| ISN0068959.xlsx | ISN | 0068959 | 0068959 |
| ISN0068960.xlsx | ISN | 0068960 | 0068960 |
| ISN0068961.xlsx | ISN | 0068961 | 0068961 |
| ISN0068962.xlsx | ISN | 0068962 | 0068962 |
| ISN0068963.xlsx | ISN | 0068963 | 0068963 |
| ISN0068964.xlsx | ISN | 0068964 | 0068964 |
| ISN0068965.xlsx | ISN | 0068965 | 0068965 |
| ISN0068966.xlsx | ISN | 0068966 | 0068966 |
| ISN0068967.xlsx | ISN | 0068967 | 0068967 |
| ISN0068968.xlsx | ISN | 0068968 | 0068968 |
| ISN0068969.xlsx | ISN | 0068969 | 0068969 |

**EXHIBIT 2**
**Documents Received**

| Description/Title | Prefix | Bates Number Beginning | Ending |
|---|---|---|---|
| ISN0068970.xlsx | ISN | 0068970 | 0068970 |
| ISN0068971.xlsx | ISN | 0068971 | 0068971 |
| ISN0068972.xlsx | ISN | 0068972 | 0068972 |
| ISN0068973.xlsx | ISN | 0068973 | 0068973 |
| ISN0068974.xlsx | ISN | 0068974 | 0068974 |
| ISN0068975.xlsx | ISN | 0068975 | 0068975 |
| ISN0068976.xlsx | ISN | 0068976 | 0068976 |
| ISN0068977.xlsx | ISN | 0068977 | 0068977 |
| ISN0068978.xlsx | ISN | 0068978 | 0068978 |
| ISN0068979.xlsx | ISN | 0068979 | 0068979 |
| ISN0068980.xlsx | ISN | 0068980 | 0068980 |
| ISN0068981.xlsx | ISN | 0068981 | 0068981 |
| ISN0068982.xlsx | ISN | 0068982 | 0068982 |
| ISN0068983.xlsx | ISN | 0068983 | 0068983 |
| ISN0068984.xlsx | ISN | 0068984 | 0068984 |
| Deposition of Darlene Lott, November 17, 2017 | - | - | - |
| Exhibit 123 to Deposition of Darlene Lott, November 17, 2017 | SE | 00001398 | 00001427 |
| ISN0035520.pdf | ISN | 0035520 | 0035542 |
| Integrated Supply Network LLC's Supplemental Responses to Interrogatories Nos. 1, 2, 3, 5, 6, 7, and 8, February 20, 2018 | - | - | - |
| Deposition of Thomas Kelly, 30(b)(6), February 15, 2018 | - | - | - |
| Deposition of Thomas Kelly, February 15, 2018 | - | - | - |
| ISN0038150.xlsx | ISN | 0038150 | 0038150 |
| ISN0072269.pdf | ISN | 0072269 | 0072269 |
| ISNE00046818.xlsx | ISNE | 00046818 | 00046818 |
| Deposition of Sarah Shelstrom (Part 1) (Rough Draft), February 21, 2018 | - | - | - |
| Deposition of Sarah Shelstrom (Part 2) (Rough Draft), February 21, 2018 | - | - | - |
| Exhibit 172.pdf | ISNE | 00021571 | 00021604 |
| Exhibit 175.pdf | MEC | 018380 | 018419 |
| Exhibit 176.pdf | MEC | 018528 | 018567 |
| Exhibit 177.pdf | MEC | 018476 | 018527 |
| Exhibit 214.pdf | MEC | 018568 | 018591 |
| Exhibit 269.pdf | ISN | 010304 | 010359 |
| Exhibit 270.pdf | ISN | 0024432 | 0024483 |
| Deposition of Don Barry (Rough Draft), February 16, 2018 | - | - | - |
| ISNE00049777_image.pdf | ISNE | 00049777 | 00049777 |
| ISNE00071872_image.pdf | ISNE | 00071872 | 00071872 |
| Overall NASCAR Spend Short Version.xlsx | MEC | 065119 | 065119 |

## EXHIBIT 3

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**EXHIBIT 4**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 5**
**Trademark License Agreements by Licensee**

| Entered Date | Effective Date | Licensee | Upfront Fee² | Minimum Royalty³ | Royalty Calculation⁴ | Royalty Rate (or Range) | Product Royalty Rate, Quantity | Geography | Term | Term Begin | Term End | Agreement Type | Signed? | Bates Reference | Bates Disposition Reference* | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 307-11 ; 167-25 ; 172-22 ; 177-5 | *Not obligated to pay Licensor a continuing royalty in respect to each of the Licensed Products sold by Licensee in... TrackLde Store. [ ] TrackLde Souvenir Rigs...[and] www.monitormyonlinebrain.com. |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



EXHIBIT 5
Trademark License Agreements by Licensee

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

EX1-41

Exhibit 5

Tradesecret

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

## EXHIBIT 6



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



**RoyaltySource® is a service provided by AUS Consultants**

02/21/2018

Jason Kubota
Gnarus Advisors
2029 Century Park E Ste 1080
Los Angeles California 90067

Dear Jason:

Thank you for contacting **RoyaltySource®**. Our specialists used your inquiry to guide our search for licensing related transactions in the following areas:

Trademark: Food Brand Related (beverage)
You reviewed all related results available at this time in our database, which contains a myriad of public IP data sources. Your selections are provided on the attached pages.

Once again, we appreciate the opportunity to provide you with the most up-to-date IP data and look forward to serving you again.

Sincerely,
The RoyaltySource Team

155 Gaither Drive ~ Suite A, Mount Laurel, New Jersey 08054
Telephone: 856-234-1199 ~ Fax: 856-234-8371
www.royaltysource.com

ROYALTYSOURCE                                                    OrderCenter

DS0220182821

## RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
Feb 22 2018

**1.** Licensed Property          *Royalty Base: net sales*
This Agreement is July 8, 1994.

The Company shall have the worldwide right, exclusively and in perpetuity, to commercially exploit the likeness of the Airship bearing one or more of Company's trademarks.

The Company's right includes, but is not limited to, the right to manufacture, market, sell, and distribute merchandise bearing a likeness of an airship and any of the Company's beer trademarks; provided that any such merchandise bearing the trademarks Budweiser, Bud (but not Bud Dry or Bud Light) or King of Beers shall be deemed to be "Airship Merchandise" for purposes of this Agreement.

The Company is the owner of a SKYSHIP 500-HL aircraft.
Throughout the term of this Agreement the Airship shall be operated exclusively for the following purposes:
(a) Advertising and promoting the products, goods,
Services or businesses of Company and/or any of its subsidiaries or other affiliates (as determined exclusively by Company) by over-flight of heavily populated areas, including stadiums, open-air theaters, outdoor concerts, sporting events, amusement parks, theme parks and other large public gatherings;
(b) Aerial filming of events for telecast and other uses, as and when directed by Company, and
(c) The carriage of passengers, subject to the following limitations:

(i) Only invited guests of Company may be carried as passengers on the Airship;
(ii) Passenger flights shall originate and terminate at the same point;
(iii) Passengers shall not pay for their
carriage, nor will payment be made or accepted on their behalf; and
(iv) The number of passenger flights per week
shall be determined by Company, subject to safety and weather conditions as determined by the Airship pilot and applicable FAA regulations, if any.

The initial term of this Agreement (the "Initial Period") shall be from September 1, 1994 (the "Effective Date") through December 31, 1996.

Operator shall use and operate the Airship at such locations within the contiguous 48 states of the United States of America as are designated by Company (the "Territory") exclusively

Source Document: Material Contract

---

**2.** Licensed Property        *Royalty Base: net sales*
The nonprofit group is licensing the use of its names for others (various undisclosed licensees) to place on consumer products. Next month it will start selling bottled water and designer watches stamped with its logo (Red Cross).

Red Cross logo
Licensor is a humanitarian organization that provides emergency assistance, disaster relief and education in the United States.

Source Document: Other

---

**3.** Licensed Property        *Royalty Base: net sales*
This Agreement was made and entered into on September 22, 2003.

The Company entered into a license agreement with the Foundation for the Visual Arts of a well known now-deceased artist to market an international collection of wines.

On March 7, 2006, the Foundation filed suit against the Company in U.S. District Court, Southern District of New York, for monies allegedly owed under the original contract. The Company answered the complaint denying all allegations by the plaintiff and filed counterclaims for breach of contract and breach of covenant of good faith and fair dealing. On August 9, 2006, the parties took part in a court-administered mediation conference, and subsequently agreed in principle to settle the case.

PROPERTY means the names, symbols, designs, logos: artwork, copyrights, trade dress and trademarks set forth in the agreement. PROPERTY is "General Warhol Artwork"

LICENSED ARTICLES: Fine wine to include artwork and quotations to be approved on a case-by-case basis.

The Company planned to launch an artist series of wines during the second half of 2006 using some of the artwork and quotations created by the artist on some of the wine products. Under the agreement, the Company was granted a non-exclusive license to use licensor's artwork throughout North America, in connection with the wine products. Specifically, the Company was entitled to use artwork and quotations created by the artist on the Company R17's wine labels. This transaction was in the news because of a suit brought against the company.

TERM: August 1, 2003 through December 31, 2006

LICENSED TERRITORY: North America

Source Document: Material Contract

---

**4.** Licensed Property     *Royalty Base: net sales*

This agreement is dated September 1, 1986.


The Company allows licensee to use certain beverage (beer, Anheuser-Busch) related trademarks owned by licensor on men's and women's jacquard knit sweaters.


The agreement lists more than 20 possible trademarks, from Budweiser to the Clydesdale Collection to King Cobra.

The Company is a beer brewing company.

<span style="color:green">Source Document:</span> Other

---

**5.** Licensed Property     *Royalty Base: Revenue*

The use of the brandname/trademarks for On the Border is licensed by a company that started out selling a mix to make frozen margaritas in a bucket.


On the Border brand
On The Border is casual Mexican restaurant chain.


Current offerings include tortilla chips and other food products. The license allows access to the brand name and the licensee then contracts out the manufacturing, transportation and distribution. The licensing agreement with the original company transferred to the new Dallas-based owner when it bought out the struggling licensor in 1994. Both companies have to sign off on any new product before it is released. The license appears to be between unrelated parties. The length of the agreement is not disclosed. Note the royalty rate is estimated based upon public statements.

<span style="color:green">Source Document:</span> Other

---

**6.** Licensed Property     *Royalty Base: sales*

The Company is a licensee that sells holiday paraphernalia adorned with the Coca-Cola logo and its polar bear; Coca-Cola-related ornaments, musicals, stocking holders.

<span style="color:green">Source Document:</span> Other

---

**7.** Licensed Property     *Royalty Base: gross sales revenue*

This Exclusive License Agreement dated November 1, 2002.


The Licensor, through its wholly-owned subsidiary entered into an Exclusive License Agreement the Licensor granting All-Star an exclusive license to make, use and sell the Cool Luc brand for all markets and industries except for the Chicago Metropolitan Area and Michigan.


Cool Luc brand

Cool Luc is extreme energy drink is primarily sold in the Midwest.

Term: 100 years

All markets and industries except for the Chicago Metropolitan Area and Michigan.

<span style="color:green">Source Document:</span> SEC Filing

---

**8.** Licensed Property        *Royalty Base: net sales*
This Agreement made and entered into as of September 24, 1999.

The Licensor granted the Licensee exclusive right and privilege to manufacture a sugar-free reduced calorie chocolate flavored syrup product.

"Licensed Trademark" shall mean the mark "SWEET'N LOW " used alone or in combination with the design of a musical bar and treble clef solely for use in connection with the manufacture and sale of the Licensed Product.

"Licensed Product", under the Licensed Trademark "Sweet 'n Low " and to promote, publicize, advertize, market, sell and distribute the Licensed Product under the Licensed Trademark in the United States of America and Canada in the Trade Class of food service and retail service.

"Licensed Product" shall mean the sugar-free, reduced calorie chocolate flavored syrup product.

The initial term of this Agreement shall expire on December 31, 2008 with an option for Licensee to renew for an additional seven (7) year period.

"Licensed Territory" shall initially mean the United States of America and Canada.

<span style="color:green">Source Document:</span> Material Contract

---

**9.** Licensed Property        *Royalty Base: net sales*
This Trademark License Agreement was made and entered into effective as of February 4, 2004.

Licensor hereby grants to Licensee an exclusive license to use the Marks solely in the United States and solely on and in connection with the production, manufacture, distribution and sale of roasted whole bean and ground coffee for distribution at the retail distribution level (the "Products").

Licensor is the owner of the trademarks S&W, IL CLASSICO and S&W. Licensor is a North American food production and distribution.

Licensed Trademarks

Mark Registration No. Registration Date
S&W and Design 338,457 September 8, 1936
S&W and Design 1,302,906 October 30, 1984
S&W and Design 1,810,987 December 14, 1993
IL CLASSICO 1,816,052 January 11, 1994

The license does not include the right to use the Marks on or in connection with any
other products or activity and does not include the right to use the Marks outside of
the United States.

Licensee acknowledges that use of the Marks by Licensor on a global Internet web
site or successor technology to identify Products sold outside the United States does
not violate this Agreement.

This license shall commence as of the date of this Agreement and continue for an
initial term of ten (10) years ending at the close of business on December 31, 2014.

Territory: United States

Source Document: Material Contract

---

**10.** Licensed Property          *Royalty Base: Gross Profit*
This Agreement is dated March, 2012 between the Licensee and the Licensor.

In this related party agreement, Licensor grants to Licensee, a subsidiary of Licensor,
the exclusive, worldwide right to use the Trademark in connection with the
manufacture and sale of Sports Performance or Energy Drinks.

The Licensor is the proprietor of the trademarks "Dethrone Royalty & Dethrone" a
composite mark, along with derivatives thereof, and Licensee and Licensor wish to
permit Licensee to use the Trademark and "Dethrone Beverages" worldwide.

The Licensor has given the Licensee the right to use the Dethrone Trademark
worldwide in connection with the manufacture and sale of sports performance or
energy drinks along with any other non-alcoholic beverage under the Trade Name,
Dethrone Beverages.

The License Agreement is for five years.

Territory: Worldwide

Source Document: Material Contract

---

**11.** Licensed Property          *Royalty Base: net sales*
In June 2005 the Licensee extended their licensing Agreement with the Licensor to
June 30, 2007.

We agreed to extend our licensing agreement with Licensor for a term beyond the original June 30, 2006 termination date.

Intellectual property consists of a logo plus design on the labels of our Slim Slammers(TM) product line.

We introduced Slim Slammers (R) Fortified Milk, a low calorie version of our Slammers (R) Fortified Reduced Fat Milk. Slim Slammers (R) Fortified Milk has no added sugar and is sweetened with sucralose, a natural sweetener made from sugar. Slim Slammers (R) Fortified Milk is made from 1% fat milk, is fortified with 11 essential vitamins and is available in the same flavors as our Slammers (R) brand.

Term: June 30, 2007

Source Document: SEC Filing

---

**12.** Licensed Property          *Royalty Base: sales*
This agreement dated March 31,2012.

The Licensee entered into a three-year licensing agreement with the Licensor.

The Licensing Agreement allows us to feature popular Disney characters on AquaBallTM Naturally Flavored Water, allowing AquaBallTM to stand out among other beverages marketed towards children.

Under the terms and conditions of the Licensing Agreements, the Licensee works with the Licensor team to create colorful, eye-catching labels that surround the entire spherical shape of each AquaBallTM. Once the label designs are approved, Licensee works with Licensor to set retail calendars, rotating the placement of different AquaBallTM designs over the course of the year.

The agreement which has a term ending date of March 31, 2015.

Source Document: SEC Filing

---

**13.** Licensed Property          *Royalty Base: sales*
License Agreement dated April 1, 2015.

The Licensor grants to Licensee a non-exclusive, non-transferable license, during the Term and at Licensee's sole expense, to design, develop, source and manufacture Licensed Products and Packaging Materials in any Permitted Sourcing Country and offer for sale, distribute and sell Licensed Products to Authorized Customers in the Territory.

Licensed Material means Creative Works, Trademarks and Licensor Design Elements. Creative Works means depictions of characters and such accompanying designs and artwork, as may be designated by the Licensor from the Properties

specified.

Characters from the animated motion picture BIG HERO 6
Characters from the animated television series CAPTAIN JAKE AND THE NEVER
LAND PIRATES (formerly known as JAKE AND THE NEVER LAND PIRATES), but
only such characters and depictions of such characters, and accompanying artwork,
designs, and/or other elements, as may be designated by Disney in a Style Guide(s)
or otherwise.

Jake and the Never Land Pirates (also known as Captain Jake and the Never Land
Pirates in the fourth season and associated merchandise) is an Annie Award-winning
musical and interactive animated television series shown on Disney Junior.

Licensed Products: Flavored/functional waters, as approved in writing in advance by
the Licensor.

Licensee agrees to actively market and sell Licensed Products and exercise the rights
granted to it under a License Agreement.

Effective Date of Term: April 1, 2015 End Date of Term: March 31, 2017.

Territory: The United States, United States military bases wherever located, and
United States territories and possessions, including Puerto Rico.

Source Document: Material Contract

---

**14.** Licensed Property          *Royalty Base: net sales*
This License Agreement is dated April 1, 2007.

Licensee shall have the nonexclusive license to use the Intellectual Property in the
territory solely upon and in connection with the manufacturing, distribution, marketing,
promotion, advertising and sale of the Licensed Products. The license granted under
this Agreement extends only to the geographic Territory set forth in the License.

Intellectual Property: ENTENMANN'S - including but not limited, to trademarks, trade
dress, names, logos, designs, slogans, copyrights and other proprietary materials set
forth in the agreement.

Licensed Products: ENTENMANN'S® brand ground and whole bean coffee.
Estimated retail price $1.99 to $3.99 (per 11.5 to 12 oz.). Channels of Distribution:
Supermarkets; Grocery Stores; Membership clubs; Specialty stores; Vending
machines.

This Agreement shall commence on the effective date and continue for three (3) years
and nine (9) months unless sooner terminated in accordance with the terms and
conditions of this Agreement ("Term").
Contract Year 1: 04/01/2007- 12/31/2008
Contract Year 2: 01/01/2009 - 12/31/2009
Contract Year 3: 01/01/2010 - 12/31/2010

Territory: United States of America, its territories and possessions including United States Military Exchanges worldwide.

**Source Document:** Material Contract

---

**15.** Licensed Property          *Royalty Base: net sales*
This License Agreement is entered into August 7, 2012.

Bahamian Licensor hereby grants to Licensee during the Term the exclusive, non-transferable, non-assignable, non-sublicensable, non-divisible right and license, to utilize the Licensed Property solely within the Territory and solely in connection with the manufacture, advertising, promotion, sale, offering for sale, and distribution of the Exclusive Licensed Products and in connection with the Licensed Services. Licensee may continue with sublicenses that were entered before June 1, 2012 (the "Sublicenses"), provided that (i) Licensee provides copies of all such Sublicenses to Licensor before execution of this Agreement; and (ii) the Sublicenses are not renewed and will expire on their own terms.

Those trademarks, trade names and logos: Each Licensed Product and all Packaging and Advertisements shall bear one or more of the following notices, as appropriate: BOB MARLEY, MARLEY COFFEE, MARLEY COFFEE STIR IT UP!, and the Lion Logo.

"Bob" Marley was a Jamaican singer, songwriter and musician who became an international icon, blending mostly reggae, ska and rocksteady in his compositions.

Exclusive Licensed Products: Coffee in all its forms and derivations, regardless of portions, sizes, or packaging.

Non-Exclusive Licensed Products: Coffee cups, coffee mugs, coffee glasses, saucers, milk steamers, machines for brewing coffee, espresso, and/or cappuccino, grinders, water treatment products, tea products, chocolate products, and ready-to-use (instant) coffee products

Licensed Products: Exclusive Licensed Products and Non-Exclusive Licensed Products

Licensed Services: Coffee roasting services, coffee production services, and coffee sales, supply, distribution and support services, excluding coffee houses. By way of clarity, Licensee may sell coffee to coffee houses, but may not open retail coffee houses under the licensed marks.

From the Effective Date for fifteen (15) years (the "Initial Term").

Territory: Worldwide.

**Source Document:** Material Contract

---

**16.** Licensed Property          *Royalty Base: sales*
As announced on February 17, 2016.

The FGCU Alumni Association is promoting a wine brand, featuring their schools names on bottles of wine. The collection has two wines a red and a chardonnay. The Alumni Relations office learned about the opportunity to promote a wine brand during a Council for Alumni Membership and Marketing Professionals conference last year.

The University's name on the University Wine Collection.

Source Document: Other

---

**17.** Licensed Property          *Royalty Base: net sales*
This Agreement was made effectiive as of April 26, 1996.

The Licensor granted the Licensee the exclusive worldwide right, license and privilege to use, the Trademark worldwide in conjunction with the manufacture, sale and distribution of fresh brewed coffee, coffee flavored drinks, coffee beans and/or ground coffee, food spreads, and baked goods ("Licensed Goods").

Trademark: Hansen's (hereinafter referred to as the "Trademark").

Licensee desires to use, and to obtain from Licensor the right, license and privilege to use, the Trademark worldwide in conjunction with the manufacture, sale and distribution of fresh brewed coffee, coffee flavored drinks, coffee beans and/or ground coffee, food spreads, and baked goods (all of such products are hereinafter sometimes referred to collectively as "Licensed Goods").

The license granted hereby shall continue in perpetuity.

Worldwide

Source Document: Material Contract

---

**18.** Licensed Property          *Royalty Base: net sales*
This Agreement became effective June 30, 1997.

Licensor hereby grants to Licensee the right and license to use the Licensed Marks solely in connection with the manufacture, distribution, advertising, promotion and sale of Licensed Products in the Territory.

"Licensed Marks" shall mean the names, logos, symbols, designs and/or identifications of Licensor, as set forth in the agreement.

Licensor owns and has the right to license the trademarks, "Cafe Godiva", etc. Licensor is a manufacturer of premium fine chocolates and related products. Godiva, founded in Belgium in 1926.

"Licensed Products" shall mean flavored syrup to be sold under the "Cafe Godiva"

label.

The term of this Agreement shall be for the period commencing on the date of this
Agreement and ending December 31, 1998.

"Territory" shall mean the fifty (50) States of the United States of America, including
the District of Columbia, and Canada.

Source Document: Material Contract

---

**19.** Licensed Property          *Royalty Base: net sales*
This Agreement effective dated March 1, 1999.

The Company hereby grants to the Licensee, during the Term, the nonexclusive right
to use the Trademarks in connection with the design, manufacture, marketing, sale at
wholesale, and distribution of the Products.

Trademark = Gold's Gym logos.

Products: Nutritional Supplements bearing the Trademark.

The period commencing on the Effective Date and continuing until June 1, 2002.

Territory: United States.

Source Document: Material Contract

---

**20.** Licensed Property          *Royalty Base: net sales*
This Agreement made as of April 26, 1996.

Licensor grants to Licensee an exclusive worldwide right and license to use the
Trademark, under the state and federal law and under the auspices and privileges
provided by any registration covering said Trademark, on the Licensed Goods.

Trademark: Hansen's (hereinafter referred to as the "Trademark").

Licensor is engaged in the business of marketing, selling and distributing so-called
"alternative" beverage category natural sodas, fruit juices, fruit juice Smoothies,
"functional drinks", non-carbonated ready-to-drink iced teas, lemonades and juice
cocktails, children's multi-vitamin juice drinks and still water under the Hansen's(R)
brand name as well as nutritional bars and cereals also under the Hansen's(R) brand
name.

Licensee desires to use, and to obtain from Licensor the right, license and privilege to
use, the Trademark worldwide in conjunction with the manufacture, sale and
distribution of fresh juices and fresh juice products, (all of such products are

hereinafter sometimes referred to collectively as "Licensed Goods").

The license granted hereby shall continue thereafter in perpetuity.

Territory: Worldwide

Source Document: Material Contract

---

**21.** Licensed Property          *Royalty Base: net sales*
This Short Term License Agreement is entered into as of June 27, 2016. This
Agreement replaces and supersedes the license agreement dated August 7, 2012.

Licensor hereby grants to Licensee during the Term the non-transferable, non-
assignable, non-sublicensable, non-divisible right and license, to utilize the Licensed
Property solely within the Territory and solely in connection with the manufacture,
advertising, promotion, sale, offering for sale, and distribution of the Licensed
Products. Licensee shall also have the non-exclusive right to use the Licensed
Property on advertising and promotional materials that pertain solely to the sale of
Licensed Products.

Licensed Property are those trademarks, trade names and logos:
Marley Coffee
Marley Coffee Stir It Up

Licensor is the worldwide property rights owner for cultural icon Bob Marley.

This agreement pertains to the food and beverage industry relating to coffee.

Licensed Products shall mean the Exclusive Licensed Products and the Non-
Exclusive Licensed Products

Exclusive Licensed Products shall mean coffee in all its forms and derivations,
regardless of portions, sizes or packaging, whether roasted or unroasted, ground or
not ground, in a bag or in a K-cup (Coffee). For clarity, Coffee as used herein shall
mean coffee beans and shall not mean brewed coffee.

Non-Exclusive Licensed Products shall mean coffee cups, coffee mugs, coffee
glasses, saucers, milk steamers, machines for brewing coffee, espresso, and/or
cappuccino, grinders, water treatment products, tea products, coffee-based chocolate
products, and ready-to-use (instant) coffee products.

By way of clarity, Licensee may sell Coffee to third party coffee houses, but may not
open retail coffee houses under the Licensed Property.

The term is from the Effective Date for six (6) months.

Territory: Worldwide

Source Document: Material Contract

**22.** Licensed Property          *Royalty Base: gross revenue*

This agreement dated October 25, 2010.

The Licensee, a subsidiary of a certain Company, entered into a trademark and License Agreement with the Licensor, a corporation organized under the laws of the country of Tajikistan and controlled and managed by a controlling stockholder of the Company. Under the Agreement, the Licensee has been granted an exclusive, sub-licensable, assignable, royalty-bearing License to use the Formula ROSS TJ 72 N00422 for the purpose of selling the Licensed products, throughout the world.

Formula "ROSS TJ 72 N00422"

This Formula is used in the marketing and distribution of Mineral Silver Water.

The term of the License is through December 31, 2020, unless terminated earlier.

Territory: Worldwide

Source Document: SEC Filing

---

**23.** Licensed Property          *Royalty Base: gross sales*

This Agreement became effective July 24, 2002.

Licensor grants an exclusive, royalty bearing or royalty-free (depending on the specific product) license to utilize trademarks in territory on all sizes and types of packaging and in all channels of trade in connection with the manufacture, marketing, promotion, distribution, and sale of Licensed Products.

The strategic alliance and licensing arrangement that will allow Licensee to use the Land O'Lakes brand name nationally on a broad range of value-added fluid milk and cultured dairy products, as well as on all basic fluid dairy products.

Cream Products - The term "Cream Products" shall mean only refrigerated or shelf-stable half & half as defined by 21 CFR Section 131.180; light cream as defined by 21 CFR Section 131.155; light whipping cream as defined by 21 CFR Section 131.157; heavy whipping cream as defined by 21 CFR Section 131.150; and whipping cream in aerosol form, flavored and unflavored, to the extent such products either (i) meet the standard of identity for such products (if applicable) as set forth in April 1998 edition of the CFR or as may be amended in the future or (ii) make any Content Claim; provided, however, Creamers, as defined herein, are expressly excluded from the definition of Cream Products.

Creamers -- The term "Creamers" shall mean only refrigerate or shelf-stable dairy or non-dairy, flavored or unflavored coffee creamers, with or without a fat reduction claim, packaged in single serving packages of four (4) ounces or less.

Grip 'N Go Intellectual Property -- The term "Grip 'n Go Intellectual Property" shall mean the patented bottle utilized to package Grip 'n Go(TM) beverage products (US Patent Number D428,813).

Hood Cream Products -- The term "Hood Cream Products" shall mean only half & half as defined by 21 CFR Section 131.180; fat-free half & half; heavy whipping cream as defined by 21 CFR Section 131.150; and whipping cream in aerosol form in regular and chocolate flavors, and in each case bearing a Trademark on the package. Hood Cream Products is defined to include all package sizes eight (8) ounces or greater; provided, however, DMA must approve in writing, which approval may be granted or withheld by DMA in its sole discretion, any package size before such size of Hood Cream Product is marketed or sold.

Hood Sour Cream Products -- The term "Hood Sour Cream Products" shall mean only sour cream as defined by 21 CFR Section 131.160, light sour cream, and no-fat sour cream, and in each case bearing a Trademark on the package. Hood Sour Cream Products is defined to include all package sizes; provided, however, DMA must approve in writing, which approval may be granted or withheld by DMA in its sole discretion, any package size before such size of Hood Sour Cream Products is marketed or sold.

The term "Infant Formula Products" shall mean only shelf-stable or refrigerated, liquid, cow's milk-based or soy-based replacement for human breast milk and which products comply with the requirements of 21 CFR Sections 106 and 107 and such other requirements as may be imposed from time to time by the US Food and Drug Administration.

Small Bottle Milk - The term "Small Bottle Milk" shall mean only milk (as defined in 21 Code of Federal Regulations Section 131.110, 1998 edition or as may be amended in the future), refrigerated, or shelf-stable, with or without a fat and/or lactose reduction claim, packaged in plastic packaging containing less than 40 fluid ounces.

Small Bottle Nutritional Milk -- The term "Small Bottle Nutritional Milk" shall mean only milk (as defined in 21 Code of Federal Regulations Section 131.110, 1998 edition or as may be amended in the future) refrigerated or shelf-stable packaged in plastic packaging containing less than 40 fluid ounces and containing any Content Claim in addition to or other than just fat and/or lactose reduction claims.

Sour Cream Products - The term "Sour Cream Products" shall mean only refrigerated or shelf-stable sour cream as defined by 21 CFR Section 131.160 and acidified sour cream as defined by 21 CFR Section 131.162 to the extent such products either (i) meet the standard of identity for such products as set forth in April 1998 edition of the CFR or as may be amended in the future or (ii) make any Content Claim .

Soy Beverage Products -- The term "Soy Beverage Products" shall mean only refrigerated or shelf-stable soy milk and other soy-based beverage products whether or not such soy milk or other soy-based beverage products make any Content Claims .

The initial term of this Agreement shall commence on the day and year first above written and shall continue in perpetuity.

The term "Territory" shall mean only the fifty states of the United States, Puerto Rico, and the country of Canada.

Source Document: Material Contract

---

**24.** Licensed Property          *Royalty Base: sales*
The Company has licensed the right to the actress's image on wine, red varietal wine named Marilyn Merlot, whose label is a portrait of the smoldering screen goddess

herself, enticing you to buy a bottle or two.

Marilyn Monroe was an American actress, model, and singer, who became a major sex symbol, starring in a number of commercially successful motion pictures during the 1950s and early 1960s.

Source Document: Other

---

**25.** Licensed Property          *Royalty Base: gross sales*
This Agreement entered into in December 1997.

Licensor hereby grants the non-transferable, non-sublicensable right to use the Andretti Rights in conjunction with the packaging and promotion of products (wine).

Andretti is an internationally recognized celebrity, race car driver, whose name, image, endorsement and services have taken on substantial goodwill and value.

Licensee is a company engaged in the worldwide distribution, marketing and sale of wines and other related products.

The license granted herein extends throughout the World ("Territory").

Source Document: Material Contract

---

**26.** Licensed Property          *Royalty Base: net sales*
This Agreement is dated as of the 1st day of December, 1996.

The Portuguese Company grants to the England Licensee an exclusive sublicense with respect to the Trademarks ("Weider, etc.") which grant shall consist of the exclusive right to distribute, advertise, promote and market the Products only in the Territories.

Weider name and trademarks

Products: Nutritional Supplement products such as drinks, powders, vitamins, tablets, sports nutrition products.

This Agreement shall continue until May 31, 2002. On June 1, 2002.

All countries of the world except Canada, the United States (and its possessions) Mexico, Spain and Portugal.

Source Document: Material Contract

---

**27.** Licensed Property      *Royalty Base: sales*
This agreement dated June 2012.

The Licensing Agreement allows the Licensee to feature popular characters on AquaBallTM Naturally Flavored Water, allowing AquaBallTM to stand out among other beverages marketed towards children.

AquaBall™ bottles will continue to be sold featuring Marvel's Avengers Assemble characters, including Iron Man, Hulk, Captain America and Thor.

Under the terms and conditions of the Licensing Agreement, the Licensee works with the Licensor team to create colorful, eye-catching labels that surround the entire spherical shape of each AquaBallTM.

Once the label designs are approved, the Licensee works with the Licensor to set retail calendars, rotating the placement of different AquaBallTM designs over the course of the year.

The rights granted apply to the beverage industry.

The Licensee entered into an 18-month Licensing Agreement with the Licensor. December 31, 2013.

Source Document: SEC Filing

---

**28.** Licensed Property      *Royalty Base: net sales*
This agreement dated January 2004.

Under the terms of the license agreement, Licensee has the right to use certain Marvel Super Heroes for the packaging and promotion of our flavored milk products.

Term: 1 year

Territory: United States and 9 countries in the Middle East.

Source Document: SEC Filing

---

**29.** Licensed Property      *Royalty Base: net sales*
This license agreement is effective January 1, 2005.

We entered into a two-year non-exclusive license agreement for the utilization of Marvel Heroes characters on our flavored milks in the United Kingdom and Ireland.

Marvel Heroes Classic Characters: Classic Marvel artwork for the co-mingled character program known as Marvel Heroes and taken only and exclusively from the dedicated Marvel Heroes Style Guide, as in effect from time to time during the Term of the Agreement, featuring the character families of Spider Man, X-Men, Hulk, Fantastic

Four, Silver Surfer, Captain America, Thor, Iron Man, Daredevil, Namor, Dr. Strange and Nick Fury as well as other character as may be added to this program and featured in its style guide from time to time. Marvel Heroes is specifically a co-mingled character program meaning that all Marvel Heroes licenses shall feature multiple characters in either of the two following ways: a) not less than three equally represented characters on a single SKU for example a bed duvet, T-shirt or play-tent) or, subject to Marvel approval in writing on a case-by-case basis, b) not less than four characters, one character per SKU, equally represented on a repeat purchase collectible SKU line (for example ballpoint pens, lollipops) whereby the product line is conceived, branded, marketed, packaged and merchandised as a collectible multiple character product line at all times.

Licensed Articles: Extended Shelf Life and Aseptic UHT Flavored Milk- limited to the following sizes: 8 oz., eleven 11.2 oz., and 16 oz.

Term: Commencement Date: December 1, 2004 and Expiration Date: December 31, 2006

Territory:United Kingdom and Ireland

Source Document: Material Contract

---

**30.** Licensed Property          *Royalty Base: Invoiced amount*
This agreement dated February 4, 2005.

The Licensee entered into an eighteen month License Agreement for the utilization of Marvel Heroes characters on our flavored milks in the Middle East in conjunction with our execution of third party production Agreements the manufacture and sale of our products Saudi Arabia and Oman.

Term: 18 months.

Territory: Middle East, Saudi Arabia and Oman.

Source Document: SEC Filing

---

**31.** Licensed Property          *Royalty Base: net sales*
This Agreement is made as of 1 July 2004.

The Company grants to Licensee a limited, nonexclusive, nontransferable license to use the Masterfoods Marks solely upon and in connection with the distribution and sale of the licensed products in licensed trade channels in the territory.

Marks (U.S.):
- MILKY WAY(R) Brand
- STARBURST(R) Brand
- 3 MUSKETEERS(R) Brand

Description of Licensed Products:
Milky Way® Brand Flavored Milk Drink - single serving
Starburst® Brand Flavored Milk Drink - single serving
3 Musketeers® Brand Flavored Milk Drink - single serving.


"Expiration Date" means 31 December 2007.


"Territory" means The United States and its territories and possessions, and U.S. military installations worldwide.

**Source Document:** Material Contract

---

**32.** Licensed Property        *Royalty Base: Net wholesale sales*
This agreement dated October 2003.


We commenced a two-year license agreement. Under the terms of the license agreement, we have the exclusive right to manufacture, distribute, market and sell Moon Pie® flavored milk products in the United States.


Term: 2 years


Territory: United States

**Source Document:** SEC Filing

---

**33.** Licensed Property        *Royalty Base: sales*
This Agreement is made effective October 30, 1996.


The Company granted a non-exclusive right to use the Licensed Trademarks: Miller Genuine Draft Beer, Miller Beer, Miller Lite Beer identifications, including their logos.


Licensed Trademarks means and shall be deemed to mean the MILLER GENUINE DRAFT Beer, MILLER Beer, MILLER LITE Beer identifications, including their logos, symbols, trademarks, copyrights, likenesses, depictions, sobriquets and photographs to the fullest extent that Miller has, or may hereafter obtain title or right thereto.

The Company is a beer brewing company.


Licensed Products: Property-identified 100% cotton T-shirts and cotton/poly sweatshirts in adult sizes M, L, XL, XXL, and boxer shorts.


This Agreement shall be effective as of the date first written above, and unless otherwise terminated earlier as provided below it shall run for a term of two (2) years and three (3) months (October 01, 1996 - December 31, 1998).

"Territory" shall be limited to the United States, its territories and possessions, and United
States Military PX's.

Source Document: Material Contract

---

**34.** Licensed Property          *Royalty Base: net sales*
This Agreement is made and entered into as of September 1, 2002. The parties
previously entered into the Trademark/Technology License Agreement dated October
8, 1999, as amended by the First Amendment to Trademark/Technology License
Agreement dated as of December 26, 2001.

The Switzerland's Licensor hereby grants to the Licensee, a related party, for the
Term of this Agreement the exclusive, non-transferable right to use the Nestle
Licensed Trademarks, solely in connection with the production, marketing,
distribution, promotion and sale of Frozen Dessert Products in the Territory (or
importation or exportation of Frozen Dessert Products from or to Affiliates of the
Licensor outside the Territory); provided, however, that Frosty Paws shall be the only
Licensed Trademark which may be used on Frozen Dessert Products for pets.

Trademark: FROSTY PAWS

"Frozen Dessert Products" means ice cream, sorbet, frozen yogurt, sherbet, frozen
mousse, ice milk, frozen juice bars, ice pops, water ice, ice cream cakes, frozen fudge
bars, soft serve (soft bodied, machine made) ice cream, frozen novelty dessert
products (such as bars, cones, sandwiches, smoothies and cup products based on or
primarily derived from any of the foregoing), frozen dessert products for pets and
other products based on or primarily derived from any of the foregoing that are
marketed and sold under Nestle Licensed Trademarks, the third party trademarks or
Pillsbury Licensed Trademarks, or that are unbranded.

The term of this Agreement shall commence as of the date of this Agreement and
shall continue until December 31, 2009.

"Territory" means the fifty (50) States and the District of Columbia currently forming
the United States of America.

Source Document: Material Contract

---

**35.** Licensed Property          *Royalty Base: sales*
This agreement dated October 2004.

A lawsuit revealed information on a proposed trademark license agreement between
a beer brewing company and a development group for the use of the name of a well-
known beer, Pabst.

Pabst beer brand
The Licensor crafts distinctive brews for true beer-lovers.

The developers purchased one of the breweries and are converting it into a regional entertainment and shopping complex in downtown Milwaukee. The company that owns the rights to the name filed a lawsuit preventing them from using the beer's name on the development. Filed with the court documents is a copy of the proposed license agreement that calls for an upfront payment to use the name for 25 years. The agreement could be renewed for additional 10-year terms. Royalties on sales on T-shirts or hats, bearing the licensed name and logo are also part of the agreement.

Term: 25 years

Source Document: Other

---

**36.** Licensed Property          *Royalty Base: net sales*
This Trademark License Agreement is effective on January 1, 2003.

The Mexican Licensor hereby grants to Mexican Licensee, a related party, an exclusive, transferable, sub-licensable right and license to fully use and exploit the Trademarks throughout the territory of the licensed territory of the Republic of Mexico in connection with the manufacturing, marketing and sale of Purified Water and Fruit Beverage.

Trademarks include: trademarks in the International Class 32 under the registration numbers 436643 Risco, 455234 Risco and Design, 458791 Water Container Design, and certain other trademarks.

The Parties have arranged and agreed to permit licensee to prepare, package and sell within the licensed territory, a purified water and a fruit flavored beverage under the Trademarks.

The term of this Agreement shall commence on the Effective date of January 1, 2003 and shall expire on December 31, 2012.

Licensed territory is the Golfo territory of the Republic of Mexico.

Source Document: Material Contract

---

**37.** Licensed Property          *Royalty Base: net sales*
This Trademark License Agreement is effective on January 1, 2003.

The Mexican Licensor hereby grants to Mexican Licensee, a related party, an exclusive, transferable, sub-licensable right and license to fully use and exploit the Trademarks throughout the territory of the licensed territory of the Republic of Mexico in connection with the manufacturing, marketing and sale of Purified Water and Fruit Beverage.

Trademarks include: trademarks in the International Class 32 under the registration numbers 436643 Risco, 455234 Risco and Design, 458791 Water Container Design,

and certain other trademarks.

The Parties have arranged and agreed to permit Licensee to prepare, package and sell within the Licensed Territory, a purified water and a fruit flavored beverage under the Trademarks.

The term of this Agreement shall commence on the Effective date of January 1, 2003 and shall expire on December 31, 2012.

Licensed territory is the Bajio territory of the Republic of Mexico.

Source Document: Material Contract

---

**38.** Licensed Property          *Royalty Base: Net wholesale price*
Merchandising License Agreement effective August 12, 2009.

The Licensee will be granted the non-exclusive License to use the theatrical motion picture entitled "The Godfather" only in connection with their Italian organic Vodka and Scotch whiskey which is sold in bottles in the United States.

PROPERTY: The theatrical motion picture entitled "THE GODFATHER" (the "Picture").

LICENSED ARTICLE(S): Italian organic Vodka and Scotch whiskey, sold in bottles.

The License Agreement has a term of five years which will end on June 30, 2014 and may be extended to June 30, 2019 upon certain conditions unless it is sooner terminated.

TERRITORY: United States.

Source Document: Material Contract

---

**39.** Licensed Property          *Royalty Base: net sales*
This Agreement was made and became effective on February 1, 1996.

Licensor hereby grants to Licensee, and Licensee hereby accepts upon the terms and conditions herein specified, the non-exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the Licensed Products.
No Right to Sub-License. Licensee has no right to sub-license the rights granted by this Agreement.

Property: trademarks, trade dress, logos, designs, slogans, copyrights and other similar materials used in connection with the brands.
Brands:

Pepsi
Pepsi-Cola
Diet Pepsi
Diet Pepsi-Cola
Mountain Dew
Slice

Licensed Products: Men's, Women's, Boys, Girls T-shirts and Fleece Women's Beach Cover-ups

The term of this Agreement shall be a period of two (2) years commencing on February 1, 1996, and terminating on January 31, 1998, unless sooner terminated in accordance with the provisions of this Agreement.

United States of America, its territories and possessions not including Puerto Rico.

Source Document: Material Contract

---

**40.** Licensed Property          *Royalty Base: net sales*
THIS AMENDED AND RESTATED AGREEMENT, is made and entered into this ___ day of _____, 2015.

Licensor grants to the Licensee, upon the terms and conditions set forth in this amended and restated License Agreement, the exclusive right and license to use the Trademark in connection with the manufacture, distribution, sale, and advertising of the Licensed Products in the Territory. Simultaneously herewith, Licensee has issued to Licensor 200,000 shares of Licensees common stock.

Trademark means Pocket Shot Energy®, a registered trademark.

The Licensor is engaged in the design, production, and distribution of hard liquors and other beverages in flexible single-serving pouches.

This agreement pertains to the food and beverage industry relating to energy drinks.

Licensed Products means an energy drink enhanced with vitamins, minerals, nutrients and caffeine and contained in a stand up plastic pouch approved by Licensor that conforms to the specifications for ingredients and the dimensions and appearance of the plastic pouch. Or any other nutritional drink that is non-alcoholic.

The period of this Agreement shall commence on the date hereof and be perpetual as long as the patents and copyrights are in good standing and at least minimum royalties are being made, (b) such date as this Agreement shall terminate .

Territory: Worldwide

Source Document: Material Contract

---

**41.** Licensed Property          *Royalty Base: sales*
This agreement dated August 2004.

A county in Korea, where over 65 percent of the land is hilly and the average altitude is 700 meters reports that it is licensing the trademark Happy 700 which stands for Health, Amusement, Peace, Party and Young in the area that is 700 meters above sea level. It is an ideal level because it is where high and low atmospheric pressures meet and is believed to be good for humans, animals, and plants. One of the South Korean licensees is a leading mineral water manufacturer and is producing Mineral Water from the region and selling it across the country with Happy 700 encrypted on its containers.

Source Document: Other

---

**42.** Licensed Property          *Royalty Base: sales*
This agreement dated July 1, 1995.

The UK Company was also granted the right to use the Licensee's family of trademarks in connection with its operation of the Licensee's business in the United Kingdom; products including nutritional supplements, weight control products, granola bars, sports drink mixes and a premium skin care line.

Territory: United Kingdom

Source Document: Other

---

**43.** Licensed Property          *Royalty Base: sales*
This Agreement is effective as of April 1, 2003 as part of a litigation settlement agreement over trademark violation.

Licensor grants to Licensee the exclusive, non-transferable license to use the Licensed Mark in the Territory on and in connection with the manufacture, marketing, sale and distribution of the Products, solely through the Distribution Channels.

Licensor is the owner of the Licensed Mark, as hereinafter defined, which trademark has been used and registered on the United States Principal Register of Trademarks in connection with sugar-free sports drinks and sugar-free non-carbonated soft drink.

"Licensed Mark" means the CHAMPIONLYTE trademark.

"Products" means sugar-free sports drinks and sugar-free non-carbonated soft drinks.

Agreement shall remain in full force and effect for fifty-seven (57) months following the effective date of this Agreement, through and including December 31, 2007 (the "Initial Term"), subject to the termination provisions hereof.

"Territory" means the United States of America, including its territories and possessions, Canada, and Mexico.

Source Document: Material Contract

_____

**44.** Licensed Property          *Royalty Base: sales*
License Agreement dated May 25, 2015.

The Licensor grants the Licensee an exclusive license to use "Lynus Viñedos y Bodegas" brand name, logo, and certain business process knowledge it possesses under this Agreement all of which together constitutes the "Lynus Viñedos y Bodegas Brand".

The Licensor is in the business of selling and distributing branded wines from Spain, specially the brands Alma, Lynus and Pagos del Infante from Lynus Viedos y Bodegas winery.

The Licensee will promote the products and brand name of Lynus Viedos y Bodegas in the North America and Asia Pacific marketplace in exchange for certain compensation.

This Agreement is for an initial period of two years from the date of first signing.

The Licensed territory means North America and Asia Pacific.

Source Document: Material Contract

_____

**45.** Licensed Property          *Royalty Base: net profit*
This License Agreement dated as of April 26, 2007.

The Licensor grants to the Licensee, for the term, a limited, exclusive, license for the beverage to utilize DeVito's name, approved likeness, and approved biographical material in connection with the name for, and advertising, publicity and promotion of, the beverage.

Danny DeVito is an American actor, producer and director.

The License will allow the use of Danny DeVito's name and likeness and obtain DeVito's endorsement in connection with the Company's manufacture, distribution and promotion of the Beverage.

With respect to the manufacture, distribution, and promotion of an alcoholic beverage (liqueur) which will be known as "Danny DeVito's Premium Limoncello".

The term of this agreement shall continue in perpetuity unless the parties either mutually agree to terminate this Agreement.

Company shall be entitled to utilize the Licensed Rights throughout the world.

Source Document: Material Contract

---

**46.** Licensed Property        *Royalty Base: sales*
The term of the license shall be 3 years starting from September 15, 2005.

The Licensee has a license agreement with the Chinese Licensor, the developer of the game, to use "The World of Legend" as the brand of our beverage.

"The World of Legend" is the brand name of a popular online game in China.

"The World of Legend" is a fruit juice beverage produced from apple juice and mainly sold in internet bars. The Licensee purchased the juice from third party vendors.

The term of the license shall be 3 years starting from September 15, 2005 to December 14, 2008; the period from September 15, 2005 to December 14, 2005 shall be the period of product planning.

Territory of License: within Mainland China (excluding Hong Kong, Macao and Taiwan)

Source Document: Material Contract

---

**47.** Licensed Property        *Royalty Base: Revenue*
This agreement dated December 2005.

The World of Legend is a fruit juice beverage produced from apple juice that the Licensee purchases from third party vendors and is mainly sold in Internet bars..

The World of Legend is the brand name of a popular online game in China. The Licensee has a three-year License Agreement with the Licensor, the developer of the game, to use The World of Legend as the brand of their beverage. Licensor and Licensee are Chinese companies

The term of the License Agreement expires on December 14, 2008.

Territory: China

Source Document: SEC Filing

---

**48.** Licensed Property        *Royalty Base: net sales*
Asset Purchase and License Agreement is dated March 28, 2016.

The Seller agrees to exclusively license to the Buyer title and interest in and to the Trademark, free and clear of any claims, liabilities, security interests, mortgages, liens, pledges, conditions, charges or encumbrances of any nature whatsoever. Trademarks are Kids 50 and the rights to the trademark YoGabbaGabba for use on a beverage for children.

The Seller owns the trademark Kids 50 and has licensed the rights to the trademark YoGabbaGabba under a separate License Agreement dated May 9, 2012.

Gabba Gabba! is an American live action/puppet children's television show starring five costumed toys-come-to-life and their friend DJ Lance Rock.

Kids 50 - Yo Gabba Gabba! is the fun, nutritious and delicious juice with half the sugar and calories of the standard children's juice.

Buyer desires to license to use with an option to buy, the Trademark and sublicense the Licensed Mark on the terms and conditions set forth in this Agreement. Kids 50 - Yo Gabba Gabba!, is a juice with 50 percent less sugar, for kids.

At the end of eight months, the License of the Trademark shall expire unless Buyer exercises its right to purchase the Trademark,

Source Document: Material Contract

---

**49.** Licensed Property          *Royalty Base: sales*
The UK Company entered into an agreement for licensing fee on the products sold under the Horlicks brand; nutritional healthcare products.

Horlicks brand
Horlicks is a malted milk hot drink brand.

Licensee is a leading player in the nutritional healthcare products business.

Source Document: Other

---

**50.** Licensed Property          *Royalty Base: net revenue*
This license agreement is dated September 27, 2012.

The Licenses granted to the Licensee, related party, shall be exclusive in the product category: single serve hot beverages and on-demand brewing systems.

The Licensor hereby grants to the Licensee a nontransferable License to use and display in the NA Countries (United States and Canada only) and the Caribbean Countries, the Licensor Trademarks in the same relative size or smaller on the principle display panel as used on the Distribution Date in connection with the Licensee "Tassimo" business.

Pursuant to the Distribution, a large food company is being separated into two publicly traded companies: the Licensee, which will own and conduct, directly and indirectly; and the Licensor, which will own and conduct, directly and indirectly.

European coffee and chocolate brands: "Café Hag," "Jacobs," "Kenco," "Mastro Lorenzo," "Milka" and "Suchard
European coffee and chocolate brands: "Carte Noire," "Cadbury" and "Cadbury Caramilk"; provided that the foregoing licenses to "Cadbury" and "Cadbury Caramilk" shall be limited to Canada

The Licensor is the third-largest food and beverage company in North America and the fifth-largest food and beverage company in the world.

The License includes such "Tassimo" Licensee Products that are sold in packaging sizes or flavors that are different from the packaging sizes or flavors used prior to the Distribution Date, and in connection with the production, manufacturing, advertising, promotion, marketing, distribution and sale thereof in the NA Countries and the Caribbean Countries.

Term: 2 years and 5 years depending on the specific product

Territory: Canada

Source Document: Material Contract

---

**51.** Licensed Property         *Royalty Base: net sales*
This Trademark Agreement was made and entered into on January 1, 2003.

The Licensee is granted rights to produce, market and sell on an exclusive basis in the U.S. and Canada items bearing the Hawaiian Tropic trademark for a period of three years and is for licensed goods of flavored bottled water only.

Hawaiian Tropic is a trademark used to identify sun-tanning oils and lotions, sun and wind screens, skin moisturizers and moisteners for tan preservation, sunburn ointments, shampoos, hair conditioners, hand and body lotions, lip balms, t-shirts, swimwear, and sportswear.

The Licensor produces sun care products. It offers tanning products, such as tanning oils, tanning lotions, and indoor tanning products.

LICENSED GOODS: Bottled Flavor Water

The beverages bearing the trademark are sugar free, no carb, caffeine free, sodium free tropical drinks. Flavors include Strawberry Kiwi, Lemon Lime, Orange Guava and Pineapple Grapefruit in United States and Canada.

The license shall remain in effect for a period of three (3) years from Januaary 1, 2003.

TERRITORY:
United States
Canada

Source Document: Material Contract

---

**52.** Licensed Property          *Royalty Base: net revenue*
This License Agreement is made effective this 10th day of October 2013.

Licensor hereby grants to Licensee the exclusive, non-sublicenseable, and non-assignable right, within the specified "Territory" to use the Trademarks and Other IP solely in connection with the development, manufacture, distribution, marketing and sale of one or more "Sports Performance Drinks" (the "License").

Licensor is the sole owner of all rights, title, and interest to the Licensor's trademark, trade name, copyright, and intellectual property listed, THROWDOWN®.

The Licensors principal business activity is the design, development, and worldwide marketing and selling of functional equipment, training gear, apparel, and accessories for the impact sports market and fitness industry.

"Sports Performance Drinks" shall be defined as follows: "All non-alcoholic beverages designed to give a consumer enhanced physiological and/or performance effects and containing, vitamins, herbal ingredients, and/or other similar ingredients."

The initial Term of this Agreement shall be three (3) years from the Effective Date of this Agreement, unless earlier terminated as provided herein (the "Term").

The "Territory" of the License shall be the United States and Canada, and no other areas are granted or guaranteed at this time or in the future.

Source Document: Material Contract

---

**53.** Licensed Property          *Royalty Base: net profit*
This license agreement is dated January 15, 2010.

The Licensee entered into an exclusive License Agreement with a Celebrity, pursuant to which we were granted a limited License to certain rights in and to Licensor's name, likeness and biography for use by us in connection with Licensor's Vodka.

Licensor agreed to use reasonable efforts to be available for a reasonable number of promotional appearances during each consecutive 12 months period, the duration of each will not exceed six days. A condition precedent to Licensor's performance under the Agreement is our applying for a trademark for the brand name "YO Vodka", with Licensor being designated as a 50% co-owner of such trademark.

The trademark was applied for on March 9, 2010 (trademark application number 77747523), which application is currently being reviewed by the U.S. Patent and Trademark Office.

Anthony "Tony" Siragusa, nicknamed "Goose", is a former National Football League defensive tackle.

Term: 4 years

Source Document: SEC Filing

---

**54.** Licensed Property        *Royalty Base: net profit*
The Company executed a long-term License Agreement as of November 2005.

Pursuant to which the Company has the right, on a worldwide basis to produce, market and sell superior quality vodka under the name Trump Vodka.

Trump Vodka was an American brand of produced by businessman and television personality, Donald Trump.

Territory: Worldwide

Source Document: SEC Filing

---

**55.** Licensed Property        *Royalty Base: wholesale price*
University will market Eagle Water, bottled water with the school logo on the label.

University of Southern Mississippi Logo

Source Document: Other

---

**56.** Licensed Property        *Royalty Base:*
License to use university logo on bottles of drinking water.

Arthur Arranaga says the venture recently obtained a permit from the Fiesta Commission to use the official Fiesta logo to sell water at Fiesta for LogoWaters.

The venture also obtained the rights from the Collegiate Licensing Company to use the University of Texas at Austin's logo and other Texas universities' logos, such as Texas Tech and Texas A&M.

Source Document: Other

---

**57.** Licensed Property        *Royalty Base: net sales*
Promotional License Agreement made July 21, 2000.

Licensor hereby grants to Licensee a license to utilize the Licensed Property throughout United States, Puerto Rico, and United States Virgin Islands, on a non-exclusive basis.

"Licensed Property": The fictional cartoon characters Bugs Bunny, Tweety, Tasmanian Devil, Road Runner,Wile E. Coyote, Lola Bunny, Marvin the Martian, Sylvester and Daffy Duck, which constitute "Looney Tunes", including the names of said characters and all trademarks, copyrights, environmental settings and artwork associated therewith. Licensee specifically understands and agrees that no rights are granted herein with respect to the Warner Bros. "Baby Looney Tunes" or "Baby Looney Tunes Classic Collection" properties, it being understood that all rights in and to said property are reserved exclusively to Licensor for use and/or licensing as it deems appropriate to third parties of its choice.


"Licensed Products": Branded Milk Products.


"Initial Term": January 1, 2000 through December 31, 2002.


"Territory": United States (fifty states), Puerto Rico, and United States Virgin Islands.

Source Document: Material Contract

---

**58.** Licensed Property          *Royalty Base: net sales*
The date of full execution of this Agreement is January 1, 1999.


Licensor grants to Licensee the non-exclusive right in the Territory to use and reproduce the Licensed Material only on and in connection with the manufacture, advertising, distribution and sale of the Licensed Articles. Licensee specifically understands and agrees that no rights are granted herein in respect of the Warner Bros. "shield" name or logo, the Warner Bros. Consumer Products name or logo, or the Warner Bros. Studio Store name or logo.


The representations, names, logos, movements, personalities, artwork, photographs and other material in connection with the following "LOONEY TUNES" characters: BUGS BUNNY, TWEETY, SYLVESTER DAFFY DUCK, TASMANIAN DEVIL, WILE E. COYOTE, ROAD RUNNER, LOLA BUNNY and MARVIN THE MARTIAN only. Licensee acknowledges that the rights granted herein are limited only to the cartoon characters set forth above and that any and all rights in, to or associated with the theatrical motion picture entitled "Space Jam", as well as with any sequels thereto or subsequently produced television series, are specifically excluded herefrom.

TRADEMARK REGISTRATIONS
(i) Trademark: Bugs Bunny name in Mandarin (Tu Ba Ge)
(ii) Trademark: Bugs Bunny name in Mandarin (Tu Ba Ge)
(iii) Trademark: Looney Tunes name in Mandarin (Le Yi Tong)
(iv) Trademark: Looney Tunes name in Mandarin (Le Yi Tong)
(v) Trademark: Tasmanian Devil name in Mandarin (Da Zui Guai)
(vi) Trademark: Tasmanian Devil name in Mandarin (Da Zui Guai)


Licensed Articles: Beverages branded using the Licensed Material as set forth.

Licensed Articles for distribution in Shanghai:
1. Fresh white milk packaged in gable top cartons (sizes 240, 500 and 950 ml).
2. Fresh flavoured milk packaged in gable top cartons (sizes 240, 500 and 950 ml).
Flavours: chocolate, vanilla, orange, pineapple and strawberry.

2/22/201... RoyaltySource® Final

3. Fresh flavoured yogurt drinks packaged in gable top cartons (sizes 500 and 950 ml). Flavours: vanilla, strawberry and orange; other flavours as approved by Licensor.
4. Aseptic (boxed) UHT treated white milk and flavoured milk in size 225 ml. Flavours: chocolate, vanilla, orange, pineapple and strawberry.
5. Reconstituted fruit flavoured juices/beverages packaged in gable top cartons (sizes 240, 500 and 950 ml) or aseptic packaging in 225 ml size. Fruit flavours: orange, apple, peach, pineapple, strawberry, grape, orange/banana blend and apple/grape blend.

Licensed Articles for distribution in Hangzhou:
1. Fresh white milk packaged in gable top cartons (sizes 250, 500 and 1000 ml) and baggies in size 200 ml. Baggies for distribution only through reserve system in Hangzhou.
2. Fresh flavoured milk packaged in gable top cartons (sizes 250, 500 and 1000 ml) and baggies in size 200 ml. Flavours: chocolate, vanilla, orange, pineapple and strawberry.
3. Fresh flavoured yogurt drinks packaged in gable top cartons (sizes 500 and 950 ml) and in glass bottles in size 350 ml. Flavours: vanilla, strawberry and orange; other flavours as approved by Licensor.
4. Aseptic (boxed) UHT treated white milk and flavoured milk in size 225 ml. Flavours: chocolate, vanilla, orange, pineapple and strawberry
5. Reconstituted fruit flavoured juices/beverages packaged in gable top cartons (sizes 250, 500 and 1000 ml) or aseptic packaging in 225 ml size. Fruit flavours: orange, apple, peach, pineapple, strawberry,grape, orange/banana blend and apple/grape blend.

Terms: January 1, 1999 to June 30, 2002.

Territory: Municipalities of Shanghai and Hangzhou in the People's Republic of China.

Source Document: Material Contract

---

**59.** Licensed Property          *Royalty Base: net sales*
Marketing Date: July 1, 1999. Initial marketing plan to be mutually agreed on or before March 31, 1999.

Licensor grants to Licensee a non-exclusive license to utilize the Licensed Material solely upon or in connection with the manufacture, distribution, and sale of Licensed Articles throughout the Territory, as defined and specified as follows.

Licensed Material: The representations, names, logos, movements, personalities, artwork, photographs and other material in connection with the following Looney Tunes characters: Bugs Bunny, Tweety, Sylvester, Daffy Duck, Tasmanian Devil, Wile E. Coyote, Road Runner, Lola Bunny and Marvin the Martian only. Licensee acknowledges that the rights granted herein are limited only to the cartoon characters set forth above and that any and all rights in, to or associated with the theatrical motion picture entitled Space Jam, as well as with any sequels thereto or subsequently produced television series, are specifically excluded here from.

1. Fresh white milk packaged in gable top cartons (sizes 240, 500 and 950 ml).
2. Fresh flavoured milk packaged in gable top cartons (sizes 240, 500 and 950 ml). Flavours: chocolate, vanilla, orange, pineapple and strawberry.
3. Fresh flavoured yogurt drinks packaged in gable top cartons (sizes 500 and 950

ml). Flavours: vanilla, strawberry and orange; other flavours as approved by Licensor.
4. Aseptic (boxed) UHT treated white milk and flavoured milk in size 225 ml. Flavours: chocolate, vanilla, orange, pineapple and strawberry.
5. Reconstituted fruit flavoured juices/beverages packaged in gable top cartons (sizes 240, 500 and 950 ml) or aseptic packaging in 225 ml size. Fruit flavours: orange, apple, peach, pineapple, strawberry, grape, orange/banana blend and apple/grape blend.

Terms: January 1, 1999 to June 30, 2002, of which January 1, 1999 to June 30, 2000 shall be Contract Year 1, July 1, 2000 to June 30, 2001 shall be Contract Year 2, and July 1, 2001 to June 30, 2002 shall be Contract Year 3.

Territory: Municipalities of Shanghai and Hangzhou in the People's Republic of China.

Source Document: Material Contract

---

**60.** Licensed Property          *Royalty Base:*
The Company has the license to use Will Rogers' name and a reproduction of one of his museum's paintings on the label of water bottled.

Will Rogers was an American cowboy, vaudeville performer, humorist, newspaper columnist, social commentator and stage and motion picture actor.

Source Document: Other

---

**61.** Licensed Property          *Royalty Base: net sales*
This related pary License Agreement was made and entered December 1, 1998.

The Company desires to grant to the Licensee the exclusive right and license to use the Names and Marks (as defined below), including but not limited to the right and license to manufacture and sell those beverages as described in the Agreement (the Products), and to grant an option to purchase the Names and Marks.

NAMES AND MARKS: McCoy's (ser. no. 75/316,497)

The Names and Marks shall mean the Company's general intangibles of any kind or nature whatsoever related to the mark "McCoy's" and the formulae, label and bottle designs and other packaging, and research and development related thereto, including but not limited to any and all names, insignias, labels, logos, commercial symbols, slogans and other identification schemes, patents, patent applications, copyrights, trademarks, service marks, trade names, trade secrets, customer or supplier lists, manuals, operating instructions, permits and franchises and/or applications that may be controlled from time to time by the Company for use in association with mark "McCoy's" and/or the Products, including but not limited to those listed on Schedule B of the license agreement.

Products means all beverages bearing the trade name McCoy's, including but not limited to lemonades, fruit drinks, and ready-to-drink iced teas.

This Agreement shall commence on the date first above written and shall remain in effect, subject to termination as provided herein, for an initial term beginning on the date first above written and continuing until December 31, 2001 (herein the "Term").

Source Document: Material Contract

---

**62.** Licensed Property          *Royalty Base: gross sales*
This License Agreement is dated April 23, 2009.

The Licensee executed an exclusive License Agreement with the Licensor for a trademark. The Licensor is a related party and is an entity that is owned and controlled by an officer, director and shareholder of the Licensee. The effective date of the Agreement will commence upon the receipt of financing totaling $1,000,000 which is needed to complete the manufacturing and distribution of the products.

The Licensee was formed to engage in the business of marketing, developing, and producing unique, proprietary water products, each which will have a health benefit to the consumer.

The term is for a period of 10 year and will renew for an additional period of 10 years. The Licensor may terminate this Agreement upon 30 days written notice to the Licensee.

Source Document: SEC Filing

---

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references, and also includes all of the Licensing Economics Review (LER) issues. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.*

# RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
*02/21/2018*

| | |
|---|---|
| Licensee: | **CLIFF ENGLE INC** |
| Licensor: | **ANHEUSER-BUSCH INC** |
| | ANHEUSER BUSCH COMPANIES INC; |
| | ANHEUSER-BUSCH COMPANIES, INC.; |
| | ANHEUSER-BUSCH COMPANIES, LLC |

Royalty Rate, % (low range):   **7**
Royalty Rate, % (high range):   **7**
Upfront Fee:

### *Licensed Property:*
This agreement is dated September 1, 1986.

The Company allows licensee to use certain beverage (beer, Anheuser-Busch) related trademarks owned by licensor on men's and women's jacquard knit sweaters.

The agreement lists more than 20 possible trademarks, from Budweiser to the Clydesdale Collection to King Cobra.

The Company is a beer brewing company.

### *Compensation Detail:*
Royalty: Engle was required to pay a royalty of 7 percent on net sales or a guaranteed minimum annual fee, whichever was greater.

Source: St. Louis Post-Dispatch SECTION: BUSINESS PLUS; Pg. 12 , 05/15/1989

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.    Copyright© AUS Consultants,Inc.*

# RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
*02/21/2018*

Licensee:                               **CAVANAGH GROUP INTERNATIONAL**

Licensor:                               **COCA COLA CO**

Royalty Rate, % (low range):      **10**
Royalty Rate, % (high range):     **10**
Upfront Fee:

### *Licensed Property:*
The Company is a licensee that sells holiday paraphernalia adorned with the Coca-Cola logo and its polar bear; Coca-Cola-related ornaments, musicals, stocking holders.

### *Compensation Detail:*
Royalty: Coca-Cola receives approximately 10 percent of all sales as a royalty fee, according to licensing experts

Source: The Atlanta Journal and Constitution November 29, 1996, Friday, ALL EDITIONS , 11/29/1996

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.    Copyright© AUS Consultants,Inc.*

EX1-80

# RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
*02/21/2018*

| | |
|---|---|
| Licensee: | **LITTLEFIELD ADAMS & CO** |
| Licensor: | **MILLER BREWING CO** |
| | SABMILLER PLC/FI; |
| | SOUTH AFRICAN BREWERIES PLC /FI |

| | |
|---|---|
| Royalty Rate, % (low range): | **10** |
| Royalty Rate, % (high range): | **10** |
| Upfront Fee: | $10,000 |

### *Licensed Property:*

This Agreement is made effective October 30, 1996.

The Company granted a non-exclusive right to use the Licensed Trademarks: Miller Genuine Draft Beer, Miller Beer, Miller Lite Beer identifications, including their logos.

Licensed Trademarks means and shall be deemed to mean the MILLER GENUINE DRAFT Beer, MILLER Beer, MILLER LITE Beer identifications, including their logos, symbols, trademarks, copyrights, likenesses, depictions, sobriquets and photographs to the fullest extent that Miller has, or may hereafter obtain title or right thereto.

The Company is a beer brewing company.

Licensed Products: Property-identified 100% cotton T-shirts and cotton/poly sweatshirts in adult sizes M, L, XL, XXL, and boxer shorts.

This Agreement shall be effective as of the date first written above, and unless otherwise terminated earlier as provided below it shall run for a term of two (2) years and three (3) months (October 01, 1996 - December 31, 1998).

"Territory" shall be limited to the United States, its territories and possessions, and United States Military PX's.

### *Compensation Detail:*

Upfront Fee: In consideration of the rights granted hereunder, Licensee agrees to pay a non-refundable advance against royalties of Ten Thousand Dollars $10,000.00, made payable to Miller's designee, Hamilton Projects, Inc.

Royalty: A royalty of ten percent (10%) of "Billings" for all sales or other commercialization of Licensed Products.

Source: Form 10-K LITTLEFIELD ADAMS & CO Exhibit 10.10, 03/31/1997
http://www.sec.gov/Archives/edgar/data/59870/000095013797001352/0000950137-97-001352.txt

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.    Copyright© AUS Consultants,Inc.*

# RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
*02/21/2018*

Licensee: **JUNEAU AVENUE PARTNERS LLC**
TODD SLATER

Licensor: **PABST BREWING CO.**

Royalty Rate, % (low range): **5**
Royalty Rate, % (high range): **5**
Upfront Fee: $250,000

### *Licensed Property:*
This agreement dated October 2004.

A lawsuit revealed information on a proposed trademark license agreement between a beer brewing company and a development group for the use of the name of a well-known beer, Pabst.

Pabst beer brand
The Licensor crafts distinctive brews for true beer-lovers.

The developers purchased one of the breweries and are converting it into a regional entertainment and shopping complex in downtown Milwaukee. The company that owns the rights to the name filed a lawsuit preventing them from using the beer's name on the development. Filed with the court documents is a copy of the proposed license agreement that calls for an upfront payment to use the name for 25 years. The agreement could be renewed for additional 10-year terms. Royalties on sales on T-shirts or hats, bearing the licensed name and logo are also part of the agreement.

Term: 25 years

### *Compensation Detail:*
Upfront Fee: According to documents filed with the lawsuit, the proposed agreement calls for a $250,000 payment to use the name for 25 years.

Royalty: In addition, Juneau Avenue Partners would pay Pabst Brewing royalties of up to 5 percent of sales from items, such as T-shirts or hats, bearing the PabstCity name and logo.

The agreement could be renewed for additional 10-year terms, with $100,000 for each term.

Source: Milwaukee Journal Sentinel (Wisconsin) SECTION: D Business; Pg. 1 , 10/01/2004

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.    Copyright© AUS Consultants,Inc.*

# RoyaltySource Intellectual Property Database

**Trademark: Food Brand Related (beverage)**
*02/21/2018*

| | |
|---|---|
| Licensee: | **LITTLEFIELD ADAMS & CO** |
| Licensor: | **PEPSICO INC** |
| Royalty Rate, % (low range): | **8** |
| Royalty Rate, % (high range): | **8** |
| Upfront Fee: | $5,000 |

### *Licensed Property:*
This Agreement was made and became effective on February 1, 1996.

Licensor hereby grants to Licensee, and Licensee hereby accepts upon the terms and conditions herein specified, the non-exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the Licensed Products. No Right to Sub-License. Licensee has no right to sub-license the rights granted by this Agreement.

Property: trademarks, trade dress, logos, designs, slogans, copyrights and other similar materials used in connection with the brands.
Brands:
Pepsi
Pepsi-Cola
Diet Pepsi
Diet Pepsi-Cola
Mountain Dew
Slice

Licensed Products: Men's, Women's, Boys, Girls T-shirts and Fleece Women's Beach Cover-ups

The term of this Agreement shall be a period of two (2) years commencing on February 1, 1996, and terminating on January 31, 1998, unless sooner terminated in accordance with the provisions of this Agreement.

United States of America, its territories and possessions not including Puerto Rico.

### *Compensation Detail:*
Upfront Fee: Licensee agrees to pay Licensor the sum of $5,000.00 upon execution of this Agreement which shall be deemed to be a non-refundable advance ("Advance") against Royalties

due.

Royalty: In consideration of the right and license herein granted, Licensee shall pay to Licensor a sum ("Royalties") equal to eight percent (8%) of all Net Sales (as defined below) by or on behalf of Licensee of the Licensed Products.

Source: Form 10-K LITTLEFIELD ADAMS & CO Exhibit 10.7, 04/01/1996
http://www.sec.gov/Archives/edgar/data/59870/000095012496001475/0000950124-96-001475.txt

*The source of information provided in this report has been gathered from public financial records, news releases, and other articles and references. While we believe the sources to be reliable, this does not guarantee the accuracy or completeness of the information provided.    Copyright© AUS Consultants,Inc.*



| Source: | ktMINE Royalty Rate Finder |
|---|---|
| Client: | [Blank] |
| Date: | 2/22/2018 |
| Project: | [Blank] |
| Description: | [Blank] |
| FYE Analysis: | [Blank] |
| Username: | wkwak@nathaninc.com |
| Total Agreements Reviewed: | 98 |

| SEARCH # | | | | | | |
|---|---|---|---|---|---|---|
| # | Filter | Filter Criteria | Step Results | Search Results | Operator | |
| 1 | Industry | ALCOHOLIC BEVERAGES AND TOBACCO, FOODS AND NONALCOHOLIC BEVERAGES | 1897 | 1897 | | |
| 2 | TerritoryName | U.S., U.S.A., UNITED  STATES, UNITED STATES, UNITED STATES OF AMERICA, USA | 3643 | 459 | and | |
| 3 | Keyword | TRADEMARKS, SERVICE MARKS, TRADE NAMES, TRADEMARK, LOGOS, MARKS, TRADE NAME, TRADENAMES, TRADENAME | 5084 | 264 | and | |
| 4 | EffectiveDate | GREATER THAN OR EQUAL, 8/1/2000 | 0 | 98 | AND | |
| | | | | | | |

**Copyright © 2018 ktMINE.  Usage of this data is governed by the terms and conditions accepted by user during initial log-in to ktMINE database**

kMINE Export (2018-02-21) Part I

| Agreement Serial | FilingCompany | License | Licensee | EffectiveDate | Term | AgreementType | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8701 | REDHOOK ALE BREWERY INC | Widmer Brothers Brewing Company | Redhook Ale Brewery Incorporated | 02/17/2003 | 1. The term of this Agreement shall commence on the date hereof first above and continue until the expiration of the fifth anniversary date thereof unless earlier terminated or extended as set forth herein. The term of this Agreement shall automatically renew for additional consecutive one year periods unless either party notifies the other of its desire to have the term expire at the end of the then existing term at least 150 days prior to such expiration. | Manufacturing/Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco | 2082 | United States, Maine, Vermont, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, Ohio, Maryland, New Jersey, Delaware, West Virginia, Virginia, North Carolina, South Carolina, Kentucky, Tennessee, Georgia, Alabama, Mississippi, Florida, Wisconsin, Michigan, Indiana, Illinois, Washington D.C. | Multi-Exclusivity | 1.00 USD | per case | Redhook will pay Widmer royalties (collectively "Royalties") as follows: (a) $1.00 per case for sales of up to 163,560 cases; and (b) $1.25 per case for sales in excess of 163,560 cases. | Per Unit | Licensee |
| 8701 | | | | | | | | | | | 1.25 USD | per case | Redhook will pay Widmer royalties (collectively "Royalties") as follows: (a) $1.00 per case for sales of up to 163,560 cases; and (b) $1.25 per case for sales in excess of 163,560 cases. | Per Unit | Licensee |
| 11109 | AMERICAN BEVERAGE CO AMBEV | Inbev S.A., Companhia de Bebidas das Américas de Bebidas das Américas - Ambev | Inbev S.A., Companhia de Bebidas das Américas de Bebidas das Américas - Ambev | 03/21/2005 | 1. Subject to Section 14.2, this License Agreement shall be effective from the date hereof, and shall remain in force for an initial term of ten (10) years. | Cross License, Distribution, Manufacturing/Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables | 2080 | Europe, Asia, Africa, Cuba, United States of America, Latin America | Multi-Exclusivity | 7% | Net Sales | Subject to Section 13.4, Licensee hereby agrees to pay to Licensor a royalty of 7% per calendar quarter of Net Sales. | Net Sales | Licensee |
| 11109 | | | | | | | | | | | 0% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i)0% for the first Budget Year (ii) 1.75% for the second Budget Year (iii) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth Budget Year | Net Sales | Licensee |
| 11109 | | | | | | | | | | | 1.75% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i)0% for the first Budget Year (ii) 1.75% for the second Budget Year (iii) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth Budget Year | Net Sales | Licensee |
| 11109 | | | | | | | | | | | 3.5% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i)0% for the first Budget Year (ii) 1.75% for the second Budget Year (iii) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth Budget Year | Net Sales | Licensee |
| 11109 | | | | | | | | | | | 5.25% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i)0% for the first Budget Year (ii) 1.75% for the second Budget Year (iii) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth Budget Year | Net Sales | Licensee |

| Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11121 1. Grant the right to use the StarCard (TM) Mark and/or the Star Card Mark in conjunction with the StarCard (TM) Inside Mark or to use the StarGard (TM) Mark and/or a StarCard Mark and/or the StarCard Inside (TM) Inside Mark in conjunction with each other mark in connection with the manufacturing, sub-contract manufacturing, production, marketing, promotion, distribution and sale of the Low TSNA Cigarette product. 2. Grant the right to use the StarCard (TM) Inside Mark in StarCard Mark in connection with the manufacturing, sub-contract manufacturing, production, marketing, promotion, distribution and sale of Airmase branded tobacco products. | STAR SCIENTIFIC, INC. | STAR SCIENTIFIC, INC. | BROWN & WILLIAMSON TOBACCO CORPORATION | 04/25/2001 | 1. This Agreement shall be effective on the Effective Date and continue in full force and effect until termination of the Restated Master Agreement (including any renewals thereof) (the "Term"). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables | 2111 | United States | Multi Exclusivity | 10.000 | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A. 2. for each of the two years thereafter, the royalty payment shall be ten (10) cents ($0.10) multiplied by the Base Carton Sales for such year, plus (ii) forty cents (0.40) multiplied by the Incremental Carton Sales for such year. For each year thereafter, the royalty payment shall be only Ten cents (S0.10) multiplied by the Base Carton Sales for such year. For each year, the "Base Carton Sales" means the number of cartons of Low TSNA Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TSNA Cigarettes actually sold by Licensee in the prior year. For each of the two years after the period including the first Market and the first year following the first Market, the "Incremental Carton Sales" equals the excess, if any, of the number of cartons of Low TSNA Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | Per Unit | License |
| 11121 | | | | | | | | | | | 40.000 | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A. 2. for each of the two years thereafter, the royalty payment shall be ten (10) cents ($0.10) multiplied by the Base Carton Sales for such year, plus (ii) forty cents (0.40) multiplied by the Incremental Carton Sales for such year. For each year thereafter, the royalty payment shall be only Ten cents (S0.10) multiplied by the Base Carton Sales for such year. For each year, the "Base Carton Sales" means the number of cartons of Low TSNA Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TSNA Cigarettes actually sold by Licensee in the prior year. For each of the two years after the period including the first Market and the first year following the first Market, the "Incremental Carton Sales" equals the excess, if any, of the number of cartons of Low TSNA Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | Per Unit | |
| 11121 | | | | | | | | | | | 10.000 | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A. 2. for each of the two years thereafter, the royalty payment shall be ten (10) cents ($0.10) multiplied by the Base Carton Sales for such year, plus (ii) forty cents (0.40) multiplied by the Incremental Carton Sales for such year. For each year thereafter, the royalty payment shall be only Ten cents (S0.10) multiplied by the Base Carton Sales for such year. For each year, the "Base Carton Sales" means the number of cartons of Low TSNA Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TSNA Cigarettes actually sold by Licensee in the prior year. For each of the two years after the period including the first Market and the first year following the first Market, the "Incremental Carton Sales" equals the excess, if any, of the number of cartons of Low TSNA Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | Per Unit | |

kMINE

| Agreement Synopsis | FilingCompany | Licensee | Licensor | License | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11121 | | | | | | | | | | | | 40.USD | Per Carton | Licensee agrees to pay Licensor the following royalties ("Royalties") for the Licensed Marks granted in Section I A-1. During the First Market of the Low (TMA Cigarette and during the first year following completion of the Test Market, the royalty payment equals forty cents ($0.40) per carton of the Low (TMA Cigarettes actually sold by Licensee in such period. | | License |
| 11121 | | | | | | | | | | | | 10.USD | per carton | Licensor acknowledge that the StarCom(TMA) inside License intends to promote the Licensed Marks in the event that for any period after the date which is one year after the First Market Test Period begins, for each such period, Ten Cents ($0.10) multiplied by the number of cartons of Low (TMA Cigarettes sold by the StarCom(TMA) inside License which do not make any claim in the packaging, marketing or promotional materials for such cigarettes that it is a new (TMA cigarette shall not be included in Incremental Licensed Branded Carton Sales. | | License |
| 8311 | REDHOOK ALE BREWERY INC | Widmer Brothers Brewing Company | Rathbone Ale Brewing Incorporated | | 03/01/2003 | 1. The term of this Agreement shall commence on the date first set forth above and continue until the expiration of the fiftieth anniversary (platform) unless earlier terminated or extended as set forth herein. The term offers Agreement will automatically renew for additional consecutive one-year periods unless either party notifies the other of its intent to have the term terminate at the end of the then-existing term at least 150 days prior to such expiration. | Manufacturing Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco | 2082 | United States of America, Maine, Vermont, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, Ohio, Maryland, New Jersey, Delaware, West Virginia, Virginia, North Carolina, South Carolina, Kentucky, Tennessee, Georgia, Alabama, Mississippi, Florida, Wisconsin, Michigan, Indiana, Illinois, Washington D.C. | Multi-Exclusivity | 1.00.USD | per case | For sales in excess of 143,500 cases of beer | | License |
| 11970 | SHELLS SEAFOOD RESTAURANTS INC | Shells Seafood Restaurants, Inc. | Best Clain, LLC | | 04/17/2001 | 1. Original Term: Twelve (12) months.<br>2. Renewal Term: Six (6) months.<br>3. The "Team" of this Agreement shall mean, the Original Term and any Renewal Term.<br>4. The Digital Form of this Agreement commenced on April 17, 2001 (the "Commencement Date"), and shall continue for the period set forth in Subsection 1.D(iii) hereof.<br>5. The Manager shall be entitled at its election to renew this Agreement for an additional Six (6) months upon written notice (the "Renewal Notice") to the Owner to that effect, such notice to Register at least three months prior to the expiration of the Original Term. | Franchise | Foods and Nonalcoholic Beverages, Restaurants, Alcoholic Beverages and Tobacco | 5412 | Kentucky, Ohio, Indiana, United States | EXCLUSIVE | 2% | Gross Sales | The License Fee shall equal two percent (2%) of Gross Sales | | Gross Sales |
| 11970 | | | | | | | | | | | | 2% | Gross Sales | of the restaurant | | Gross Sales |

EX1-91

KMINE

| Agreement Synopsis | Filing Company | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15071 1. Grant the right to be appointed as the exclusive importer and/or distributor of a premium brand of tequila called "Tierra Autentica de Jalisco", "Tierra Tequila" or "Tierra" in the Territory. 2. Grant the right to use the Trademark "Tierra Tequila". | Casta Brands Inc. | Autentica Tequilera S.A. de C.V., Casta Brands (USA) Corp. | Casta Brands (USA) Corp., Autentica Tequilera S.A. de C.V. | 02/4/2008 | 1. "Initial Term": From the date of execution of this Agreement until the fifth anniversary of the date hereof. 2. "Renewal Term": Any extended term following the Initial Term. 3. "Term": The Initial Term and any Renewal Term. 4. This Agreement shall come into effect upon the date of execution of this Agreement by both parties and shall remain in full force for the duration of the Initial Term, subject to the provisions of this Agreement and the renewal and/or termination provisions specified herein. 5. Subsequent Renewal Terms of five (5) years shall be automatically added to the Term of this Agreement if importer purchases the required aggregate minimum quantity of Product listed on Exhibit A by the end of the applicable Operational Year. | Distribution, Marketing Intangible | Alcoholic Beverages and Tobacco | 2080 | United States of America, District of Columbia, Puerto Rico | EXCLUSIVE | 10% | gross proceeds | In the event Producer should decide to sell any or all of the Products or Trademark(s), whether sold directly or indirectly through the sale of equity of Producer or otherwise to a third party (a "Sale Transaction"), then, (i) Producer shall promptly pay to Importer, in cash, an amount equal to the product obtained by multiplying the gross proceeds of any such sale, including, without limitation, the fair market value of any non-cash consideration received in any such transaction by (x) the "Earned Percentage," if aggregate number of cases of Product ordered by Importer from Producer during the Term of this Agreement, as of the date of the consummation of the Sale Transaction, is equal to or greater than "; the Earned Percentage shall equal ten percent (10%). | Gross Sales | Licensed |
| 15071 | | | | | | | | | | | 20% | gross proceeds | In the event Producer should decide to sell any or all of the Products or Trademark(s), whether sold directly or indirectly through the sale of equity of Producer or otherwise to a third party (a "Sale Transaction"), then, (i) Producer shall promptly pay to Importer, in cash, an amount equal to the product obtained by multiplying the gross proceeds of any such sale, including, without limitation, the fair market value of any non-cash consideration received in any such transaction by (x) the "Earned Percentage," if aggregate number of cases of Product ordered by Importer from Producer during the Term of this Agreement, as of the date of the consummation of the Sale Transaction, is equal to or greater than "; the Earned Percentage shall equal twenty percent (20%). | Gross Sales | Licensed |
| 15071 | | | | | | | | | | | 35% | gross proceeds | In the event Producer should decide to sell any or all of the Products or Trademark(s), whether sold directly or indirectly through the sale of equity of Producer or otherwise to a third party (a "Sale Transaction"), then, (i) Producer shall promptly pay to Importer, in cash, an amount equal to the product obtained by multiplying the gross proceeds of any such sale, including, without limitation, the fair market value of any non-cash consideration received in any such transaction by (x) the "Earned Percentage," if aggregate number of cases of Product ordered by Importer from Producer during the Term of this Agreement, as of the date of the consummation of the Sale Transaction, is equal to or greater than "; the Earned Percentage shall equal thirty-five percent (35%). | Gross Sales | Licensed |

EX1-92

kMINE Export (2018.02.21) Part I

| Agreement# | Synopsis | Licensor | Licensee | FilingCompany | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15851 | 1. Grant the right to develop and operate ten (10) Restaurants in the Territory pursuant to a unique, proprietary system developed and owned by TGI Friday's Inc. (which may be modified or further developed from time to time by TGI Friday's) for the establishment and operation of full service restaurants and restaurant kitchens under the Proprietary Marks including without limitation, "TGI Friday's™", "Friday's™" and "The American Bistro™", and a distinctive image consisting of exterior and interior design, decor, color scheme and furnishings, special recipes, menu items and full service bar, uniform standards, products, services and specifications, procedures with respect to operations, inventory and management control (including accounting procedures and policies), training and assistance, and advertising and promotional programs; | TGI Friday's Inc. | MAIN STREET RESTAURANT GROUP, INCORPORATED | MAIN STREET RESTAURANT GROUP, INC. | 03/12/2004 | 1. Term: the right to develop and operate the Restaurants and the Commencement Date and continuing until the date specified on the Development Schedule for the last restaurant to be opened. 2. Unless sooner terminated as provided herein, this Agreement shall commence on the Commencement Date and continue until the expiration of the Term. This Agreement shall automatically expire at 11:59 p.m. on the date specified in Section 3.A. as the opening date for the last restaurant to be opened; 3. Developer shall develop, open, commence operation of and continuously operate pursuant to the respective Franchise Agreements ten (10) Restaurants in the Territory pursuant to the Development Schedule as follows: | Franchise | Consumer Services, Restaurants, Alcoholic Beverages, Beverages, Alcoholic Beverages and Tobacco, Consumer Non-Durables | 5812 | Southern California, Imperial, Inyo, Kern, Los Angeles, Orange, Riverside, San Bernardino, San Diego, Santa Barbara, Ventura, United States | EXCLUSIVE | 10% | Franchise Fee | In consideration of the development rights granted herein, Developer shall pay to Friday's upon execution of this Agreement the Development Fee - a fee equal to the sum of ten percent (10%) of the Franchise Fee for each Restaurant to be developed pursuant to the Development Schedule | Net Sales | Licensor |
| 15851 | | | | | | Restaurant No. | | | | | | 50,000 USD | per Restaurant | The Franchise Fee to be paid by Developer for each new Restaurant to be developed under this Development Schedule shall be Fifty Thousand Dollars (50,000.00) for each Restaurant, payable upon execution of the Franchise Agreement for each Restaurant in accordance with the Development Schedule. Developer shall receive a credit of 50,000 against the payment of the Franchise Fee due for each Restaurant developed | Per Unit | Licensor |
| 15851 | 1. Grant the right to be provided with certain development incentives due to the unique economic circumstances in Southern California that have resulted in increased development and operating costs for ten T.G.I. Friday's Inc. Restaurants as compared to restaurants in other areas of the country. | TGI Friday's Inc. | Main St. California, Inc.; Main Street and Main Incorporated | MAIN STREET RESTAURANT GROUP, INC. | 03/12/2004 | 1. The term of this Agreement shall be from January 1, 2004 through December 31, 2009 (the "Term"), unless earlier terminated pursuant to the terms hereof. | Franchise, Other | Alcoholic Beverages and Tobacco, Foods and Nonalcoholic Beverages, Consumer Services, Restaurants, Consumer Non-Durables | 5812 | Southern California, Long Beach, San Diego, Costa Mesa, Santa Clarita, La Jolla, Palm Desert, West Covina, Orange, Ontario, Laguna Niguel, San Bernardino, Brea, Riverside, Rancho San Diego, City of Industry, Oxnard, Rancho Santa Margarita, Northridge, Cerritos, Temecula, Yorba Linda, Thousand Oaks, Simi Valley, Carlsbad, United States | N/A | 1.5% | Annual Gross Sales | | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 2% | Annual Gross Sales | for each Restaurant, $1.0 - $1.5 million, Royalty Fee (2004 only) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 2.5% | Annual Gross Sales | for each Restaurant, $2.5 - $3.0 million, Royalty Fee (2004 only) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 3% | Annual Gross Sales | for each Restaurant, $3.0 - $3.5 million, Royalty Fee (2004 only) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 4% | Annual Gross Sales | for each Restaurant, $3.5 million and over, Royalty Fee (2004 only) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 1.5% | Annual Gross Sales | for each Restaurant, Under $2.0 million, Royalty Fee (2005 - 2008) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 2% | Annual Gross Sales | for each Restaurant, $2.0 - $2.5 million, Royalty Fee (2005 - 2008) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 2.5% | Annual Gross Sales | for each Restaurant, $2.5 - $3.0 million, Royalty Fee (2005 - 2008) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 3% | Annual Gross Sales | for each Restaurant, $3.0 - $4.0 million, Royalty Fee (2005 - 2008) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 4% | Annual Gross Sales | for each Restaurant, $4.0 million and over, Royalty Fee (2005 - 2008) | Gross Sales | Licensor |
| 15851 | | | | | | | | | | | | 2% | annual gross sales | The Royalty Fee for New Restaurants shall be two percent (2%) for the first twelve months of operation, regardless of annual gross sales. Thereafter, for the term of this Agreement the Royalty Fee shall be as set forth above. | Gross Sales | Licensor |

EX1-93

kMINE

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditize | Lead/License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16653 | 1. Grant the right to develop and operate six (6) Restaurants in the Territory pursuant to a unique proprietary system developed and owned by TGI Friday's Inc., (which may be modified or further developed from time to time by Friday's) for the establishment and operation of full-service restaurants and restaurant/bars under the Proprietary Marks including without limitation, "TGI Friday's", "Friday's" and "The American Bistro" and a distinctive image consisting of exterior and interior design, decor, color scheme and furnishings, special recipes, menu items and service bar; uniform standards, products, services and specifications; procedures with respect to operations, inventory and management control (including accounting procedures and policies); training and assistance; and advertising and promotional programs. | MAIN STREET RESTAURANT GROUP, INC. | TGI Friday's Inc. | Connections Productions Inc, Main STREET AND MAIN INCORPORATED | | | 1. Term: the duration of this Agreement commencing on the Commencement Date and expiring until the date specified in the Development Schedule for the last restaurant to be opened. 2. Unless License terminated as provided herein, this Agreement shall commence on the Commencement Date and continue until the expiration of the Term. This Agreement shall automatically expire at 11:59 p.m. on the date specified in Section 3.A. as the expiring date for the last restaurant to be opened. 3. Developer shall develop, open, commence operation of and continuously operate pursuant to the respective Franchise Agreements, six (6) Restaurants in the Territory pursuant to the Development Schedule as follows: | Franchise | Alcoholic Beverages and Tobacco, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Consumer Non Durables | 5812 | Arcosia, Apache South, Gilbert, Pima, Apache North, La Paz, Pinal, Cochise, Maricopa, Santa Cruz, Coconino, Mohave, Yavapai, Gila, Navajo, Yuma, Graham, Nevada, Carson City, Eureka, Clark, Churchill, Humboldt, Pershing, Lander, Storey, Douglas, Lincoln, Washoe, Elko, Lyon, White Pine, Esmeralda, Mineral, New Mexico, Bernalillo, Harding, San Juan, Colfax, Hidalgo, San Miguel, Chavez, Lea North, Sandoval, Otero, Lincoln, Santa Fe, Colfax, Los Alamos, Sierra, De Baca, Luna, Socorro, Dona Ana, McKinley, Taos, Eddy, Mora, Torrance, Grant, Quay, Valencia, Guadalupe, Rio Arriba, Texas, Catheron, El Paso, Hudspeth, United States | | 25,000.00 | per Restaurant | Throughout the Term, the Franchise Fee, as that term is defined in the Development Agreement, for restaurants developed thereunder ("New Restaurants") shall be reduced from Fifty Thousand dollars (\$50,000) to Twenty Five Thousand dollars (\$25,000). | Per Unit | License |
| 16654 | | | | | 05/01/2004 | Restaurant No. | Franchise | Alcoholic Beverages and Tobacco, Consumer Services, Foods and Nonalcoholic Beverages | 5812 | | EXCLUSIVE | 10% | Franchise Fee | In consideration of the development rights granted herein, Developer shall pay to Friday's upon execution of this Agreement the Development Fee - a fee equal to the sum of ten percent (10%) of the Franchise Fee for each Restaurant to be developed pursuant to the Development Schedule. | Net Sales | |
| 16654 | | | | | | | | | | | | 50,000.00 | per Restaurant | The Franchise Fee to be paid by Developer for each new Restaurant to be developed under the Development Schedule shall be Fifty Thousand Dollars (\$50,000.00) for each Restaurant, payable upon execution of the Franchise Agreement for such Restaurant in accordance with the Development Schedule. Developer shall receive a credit of \$5,000 against the payment of the Franchise Fee due for each Restaurant developed pursuant to the Development Schedule. | | Per Unit | |
| 47379 | 1. Grant the right to use the StarCure[TM] Mark and/or the StarCured Mark in conjunction with the StarCure[TM] Mark and/or the StarCured[TM] Mark and/or to use the StarCure[TM] Mark and/or to use the StarCured[TM] Mark and/or the StarCured Mark in conjunction with any other mark in connection with the manufacturing, sub-contract manufacturing, production, marketing, promotion, distribution and sale of the new Tobacco product. 2. Grant the right to use the StarCure[TM] Mark and/or the StarCured Mark in conjunction with the StarCure[TM] Mark and/or the StarCured[TM] Mark and/or to use the StarCured Mark in connection with the manufacturing, sub-contract manufacturing, production, marketing, promotion, distribution and sale of Licensee branded Tobacco Products. | STAR SCIENTIFIC, INC. | STAR SCIENTIFIC, INC. | BROWN & WILLIAMSON TOBACCO CORPORATION | 04/25/2001 | 1. This Agreement shall be effective on the Effective Date and continue in full force and effect until termination of the Restated Master Agreement (including any renewals thereof) (the "Term"). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non Durables | 2111 | United States | Multi-Exclusivity | 40.00 | per carton | License agrees to pay Licensor the following royalty: ("Royalties") for the trademark license granted in Section A.1. During the Test Market of the Low TSNA Cigarette and for the first year following completion of the Test Market, the royalty payment equals forty cents (\$0.40) per carton of the Low TSNA Cigarettes actually sold by Licensee in such period. | Per Unit | License |

EX1-94

kMINE

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47379 | | | | | | | | | | | | 10.0/D | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A.2. for each of the two years thereafter, the royalty payment shall be calculated as follows: (i) Ten cents (\$0.10) multiplied by the Base Carton Sales for such year, plus (ii) Forty cents (\$0.40) multiplied by the Incremental Carton Sales for such year. For each such year, the royalty payment shall be only Ten cents (\$0.10) multiplied by the Base Carton Sales for such year. For each year the Base Carton Sales for such year means the number of cartons of Low TAR Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TAR Cigarettes actually sold in the prior year. For each of the two years after the prior and including the Test Market, and the first year following the Test Market, the Base or Incremental Carton Sales&quot;quot; equals the excess number of cartons of Low TAR Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | | License / Per Unit |
| 47379 | | | | | | | | | | | | 40.0/D | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A.2. for each of the two years thereafter, the royalty payment shall be calculated as follows: (i) Ten cents (\$0.10) multiplied by the Base Carton Sales for such year, plus (ii) Forty cents (\$0.40) multiplied by the Incremental Carton Sales for such year. For each such year, the royalty payment shall be only Ten cents (\$0.10) multiplied by the Base Carton Sales for such year. For each year the Base Carton Sales&quot;quot; means the number of cartons of Low TAR Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TAR Cigarettes actually sold in the prior year. For each of the two years after the period including the Test Market and the first year following the Test Market, the "Incremental Carton Sales" equals the excess number of cartons of Low TAR Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | | License / Per Unit |
| 47379 | | | | | | | | | | | | 10.0/D | per carton | Licensee agrees to pay Licensor the following royalties ("Royalties"): (i) the trademark license granted in Section I.A.2. for each of the two years thereafter, the royalty payment shall be calculated as follows: (i) Ten cents (\$0.10) multiplied by the Base Carton Sales for such year, plus (ii) Forty cents (\$0.40) multiplied by the Incremental Carton Sales for such year. For each such year, the royalty payment shall be only Ten cents (\$0.10) multiplied by the Base Carton Sales for such year. For each year the Base Carton Sales&quot;quot; means the number of cartons of Low TAR Cigarettes actually sold by Licensee in such year up to the total number of cartons of Low TAR Cigarettes actually sold in the prior year. For each of the two years after the period including the Test Market, the "Incremental Carton Sales" equals the excess number of cartons of Low TAR Cigarettes actually sold by Licensee in each such year over the Base Carton Sales. Only one (1) royalty payment shall be due on each carton sold hereunder. | | License / Per Unit |

kMINE Export (2016-02-21) Part 1

Page 7 of 63

EX1-95

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47379 | | | | | | | | | | | | 10.0.0 | per carton | Licensor acknowledges that the StarCom(TM) Inside License is royalty free; provided, however, that in the event that for any period after that date which is one year after the Market Test Period, unless Licensor is using commercially reasonable efforts to promote and actively sell the Low-TBAA Cigarette in at least seven states in the United States, Licensee shall then be obligated to pay Licensor royalties under the StarCom(TM) Inside License on the following basis: for each such period, Ten Cents ($0.10) multiplied by increment of Licensee Branded Carton Sales for such period. For purposes of this Section 8.4, "Incremental Licensee Branded Carton Sales" depicts the number of cartons of Tobacco Products sold in such period which exceed Licensee Branded Base Carton Sales. "Licensee Branded Base Carton Sales" means the number of cartons of Tobacco Products actually sold by Licensee in the twelve month period prior to the date on which Licensor ceases using commercially reasonable efforts to promote and actively sell the Low-TBAA Cigarette in at least seven states; provided, however, that cigarettes being sold by Licensee which do not utilize any of the marks granted by this StarCom Inside License and which do not make any claim in the packaging, marketing or promotional materials of it that the cigarette is a low-TBAA cigarette shall not be included in incremental Licensee Branded Carton Sales. | Per Unit | License |
| 36540 | 1. Grant the right to enter into a LICENSE AGREEMENT whereas Companhia de Bebidas das Américas - AmBev possesses AmBev Recipes relating to the brewing and production of the AmBev Product (also formulated AmBev) beverage and other malt based beverages) carrying one or more AmBev Marks) and Inbev S.A. possesses InBev Recipes relating to the brewing and production of the InBev Product (any fermented alcoholic beverage and other malt based beverages carrying one or more InBev Marks); Companhia de Bebidas das Américas - AmBev and/or its affiliates are the owners of the AmBev Marks; Inbev S.A. and/or its affiliates are the owners of the InBev Marks; (a) if trademark, service marks or trade names belonging or licensed to InBev S.A. and/or its affiliates in product (AP.TOS and AP.TOS); Companhia de Bebidas das Américas - AmBev and InBev S.A. desire to enter into this License Agreement for the production, sales and distribution (1) by InBev S.A. of the AmBev Products within the InBev Territory (the geographical area comprised by Europe, Asia, Africa, Cuba and the United States of America, including the duty free customers in such area), and (ii) by Companhia de Bebidas das Américas - AmBev of the InBev Products within the AmBev Territory (the geographical area of Latin America, including Argentina and Cuba, including the duty free customers in such area); Companhia de Bebidas das Américas - AmBev and InBev S.A. have the professional expertise and particular qualifications to produce, package, market and distribute, respectively, the InBev Products in the AmBev Territory and the AmBev Products in the InBev Territory; Companhia de Bebidas das Américas - AmBev wishes to appoint and InBev S.A. wishes to accept the appointment to produce, package, market and distribute the | AMERICAN BEVERAGE CO AMBEV | Inbev S.A., Companhia de Bebidas das Américas - AmBev | Inbev S.A., Companhia de Bebidas das Américas - AmBev | 03/21/2005 | 1. Subject to Section 14.2, this License Agreement shall be effective from the date hereof, and shall remain in force for an initial term of ten (10) years. | Cross-License, Distribution, Manufacturing/Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables | 2080 | Latin America, Europe, Asia, Africa, Multi-Exclusivity | | 7% | Net Sales | Subject to Section 3.4, Licensee hereby agrees to pay to Licensor a royalty of 7% per calendar quarter of Net Sales. | Net Sales |
| 36540 | | | | | | | | | | | | 0% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i) 0% for the first Budget Year; (ii) 1.75% for the second Budget Year; (iii) 3.5% for the third Budget Year; and (iv) 5.25% for the fourth Budget Year. | | Net Sales |
| 36540 | | | | | | | | | | | | 1.75% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i) 0% for the first Budget Year; (ii) 1.75% for the second Budget Year; (iii) 3.5% for the third Budget Year; and (iv) 5.25% for the fourth Budget Year. | | Net Sales |
| 36540 | | | | | | | | | | | | 3.5% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i) 0% for the first Budget Year; (ii) 1.75% for the second Budget Year; (iii) 3.5% for the third Budget Year; and (iv) 5.25% for the fourth Budget Year. | | Net Sales |
| 36540 | | | | | | | | | | | | 5.25% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (i) 0% for the first Budget Year; (ii) 1.75% for the second Budget Year; (iii) 3.5% for the third Budget Year; and (iv) 5.25% for the fourth Budget Year. | | License |

kMINE Export (2018-02-21) Part 1

EX1-96

kMINE

kMINE Export (2018.02.21) Part I

Page 1 of 61

| Agreement Synopsis | Filing Company | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 41623 | GENESEE CORP | THE GENESEE BREWING COMPANY, INC.; MONROE BREWING CO., LLC | MONROE BREWING CO., LLC; THE GENESEE BREWING COMPANY, INC. | 06/29/2000 | 1. The parties will endeavor to consummate the transactions contemplated hereby (the "Closing") by October 27, 2000 and in any event on the date that is two (2) Business Days after the day on which each condition set forth in Articles VIII and IX has been satisfied or is waived by the party entitled to the benefit of such condition, or on such other place and on such other time and date as may be mutually agreed upon by the parties hereto. The date of the Closing is referred to in this Agreement as the "Closing Date." The Closing shall take place at the offices of Underberg & Kessler LLP, 1800 Chase Square, Rochester, New York 14604, or such other location as the parties may mutually agree, on the Closing Date. | Asset Purchase; Manufacturing Process Intangible; Marketing Intangible; Service | Alcoholic Beverages and Tobacco; Consumer Non-Durables; Business Services | 2082 | Rochester, New York, United States | EXCLUSIVE | 50% | amounts | In the event that Purchaser recovers more than $250,000 net proceeds after expenses from the sale, scrapping or disposal of cooper-age included in the Assets in the two years following the Closing Date, Purchaser shall pay Seller 50% of such amounts. | Net Sales | License |
| 41623 | | | | | | | | | | | 50% | amount | In the event that in the three (3) years following the Closing Date Purchaser recovers any amount from the disposal of any bottling lines which is not reinvested in the business within six (6) months or the time required to install the requisite new facility, whichever is later, Purchaser shall pay Seller 50% of such amount. | Net Sales | License |
| 41623 | | | | | | | | | | | 50% | excess | In the event that within one year after Closing Purchaser sells substantially all of the Assets acquired in this transaction and the proceeds net of due diligence and sale costs are greater than the Purchase Price offered in Section 11, the Purchaser and Seller shall share equally in the excess. | Net Sales | License |
| 41623 | | | | | | | | | | | 50% | excess | In the event that within one year after Closing Purchaser sells substantially all of the Assets acquired in this transaction and the proceeds net of due diligence and sale costs are greater than the Purchase Price offered in Section 11, the Purchaser and Seller shall share equally in the excess. | Net Sales | License |
| 41623 | | | | | | | | | | | 50% | benefit | In the event that prior to the fourth anniversary of the Closing Date Purchaser receives any tangible benefit of all or a portion of the excess assets (determined on a plan termination basis as of the Closing Date) from the over-funded pension plan which covers certain of Seller's employees, whether by "holiday" in making additional contributions, by reduction of contribution obligations over the next required six or pre-participant basis or of the Closing Date to increase in its benefits, which, absent the over-funding, would result in an increase in Purchaser's so-called "normal cost" for benefits, by receipt of a loan or equity investment in Purchaser (through reduction in employer contributions) or by receipt of or any means, or a device, including but not limited to an ESOP investment by plan participants by (as the case may be) exercise of excess assets to the Purchaser by the use of the assets to provide other benefits (e.g., health, disability or death benefits) or otherwise, then Purchaser shall pay Seller an amount equal to 50% of such benefit. | Net Sales | License |
| 41623 | | | | | | | | | | | $8,000,000 | per month | The parties agree to enter into a management agreement pursuant to the terms of Exhibit C (being the "Management Agreement") providing for (a) Purchaser's management of the assets and business of GC after Closing, (b) rental of space and use of equipment in connection with the management services being provided to GC by Purchaser, (c) ancillary costs of continued operation of GC, and (d) payment by GC to Purchaser of management fee of Thirty Thousand Dollars ($30,000) per month. | Per Unit | License |

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53764 | 1. Grant the right to support Fugiene Sprmnts Deltas El De Luz Antonio and Scala Antonio to manufacture the Product (a leisurely product bearing the Trademark and Trademark, Danny Deda's Premium Antonios) ... reasonable efforts to resell all of Harbree Imports Ltd.'s United States supply requirements for the Product, as well as all international markets at Harbree's direction. | Iconix Brands, Inc. | Fugiene Sprmnts Deltas El De Luz Antonio and Scala Antonio | Harbree Imports Ltd. | 08/24/2007 | 1. The term of the Agreement shall be ___ 5 years effective the first of each ... | Service | Alcoholic Beverages and Tobacco, Consumer Non Durables, Business Services, Entertainment | 3700 | United States, world | EXCLUSIVE | $1,000 | per case | | Per Unit |
| 53764 | | | | | | | | | | | | $3,000 | per case | | Per Unit |
| 53763 | 1. Grant the right to use the Property (the characters, characterizations, designs art or visual representations as they appear in the theatrical motion picture entitled "THE GODFATHER", including the names and likenesses, in connection with the Licensed Articles (Italian organic Vodka and South Americas) and in bottles), in the Channels of Distribution (airport and duty free stores, bars and taverns, club stores, grocery stores, restaurants, and specialty stores), in the Territory, and during the Term. | Iconix Brands, Inc. | PARAMOUNT LICENSING INC. | SUNDRY IMPORTS, LTD. | 06/12/2009 | 1. TERM ... Begins upon execution hereof by Licensee and PLI and ends June 30, 2014, unless sooner terminated as provided in Schedule "I" hereto. | Marketing Intangible | Entertainment, Alcoholic Beverages and Tobacco, Consumer Non Durables | 3700 | United States | Multi Exclusivity | 5% | Net Wholesale Price | | Net Sales |
| 53763 | | | | | | | | | | | | 35% | such or cash equivalents | | Net Sales |

kMINE Export [2018.02.21] Part 1

EX1-98

| Agreement# / Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit-ie | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45303 — 1. Grant the right to develop Restaurants (full service O'Charley's restaurants) solely within the State of Louisiana under the System (O'Charley's Inc., as a result of the expenditure of time, skill, effort and money, has developed and owns the right to develop and operate a unique system of full service varied menu casual dining restaurants which feature freshly prepared items such as hand-cut and aged steaks, fresh chicken, seafood, homemade yeast rolls and fresh-cut salads with special recipe dressings and which serve alcoholic beverages through a full-service bar all under the trademark O'Charley's). | O'CHARLEY'S INC. | O'Charley's Inc. | JKI Enterprises, LLC, Garr [?] Dong | 06/01/2004 | 1. Unless Licensor terminated in accordance with this Agreement, the term of this Agreement and all rights granted by Licensor under this Agreement shall expire on the date on which Developer successfully and in a timely manner has exercised all of the development rights and completed the development obligations under this Agreement in accordance with the Development Schedule. (including, if applicable, any extension thereof under Section III(B)(3)). 2. Developer may request in writing that Licensor extend the Development Period if any one Restaurant to permit Developer to complete construction and begin operation of such Restaurant. If Licensor determines, in its sole discretion, to grant any such request, the applicable Development Period shall be extended for a period of thirty (30) days (such thirty 30-day period being referred to as an "Extension Period"). | Franchise | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Alcoholic Beverages and Tobacco | 5812 | Louisiana, United States | EXCLUSIVE | 10,000.00 | per Restaurant | Joint/Several with the execution of this Agreement, Developer shall pay Licensor an initial development fee of Ten Thousand Dollars ($10,000) for each Restaurant to be developed pursuant to this Agreement. | Per Unit | Licens... |
| 18146 — 1. Grant the right to develop the number of Restaurants (full service O'Charley's restaurants) described in the Development Schedule solely within the State of Michigan under the System (a unique system of full service varied menu casual dining restaurants which feature freshly prepared items such as hand-cut and aged steaks, fresh chicken, seafood, homemade yeast rolls and fresh-cut salads with special recipe dressings and which serve alcoholic beverages through a full service bar all under the trademark O'Charley's(R)). | MERIT-M2 HOSPITALITY GROUP INC. | O'Charley's Inc. | DOM Development Company, LLC; O'Charley's Development Company of Michigan; Meritage Hospitality Group Inc. | 12/2003 | 1. Unless Licensor terminated in accordance with this Agreement, the term of this Agreement and all rights granted by Licensor under this Agreement shall expire on the date on which Developer successfully and in a timely manner has exercised all of the development rights and completed the development obligations under this Agreement in accordance with the Development Schedule. (including, if applicable, any extension thereof under Section III(B)(3)). 2. Developer may request in writing that Licensor extend the Development Period if any one Restaurant to permit Developer to complete construction and begin operation of such Restaurant. If Licensor determines, in its sole discretion, to grant any such request, the applicable Development Period shall be extended for a period of thirty (30) days (such thirty 30-day period being referred to as an "Extension Period") if the end of the Development Period for that Restaurant, and such written request must include a description of the reasons for Developer's failure to develop in a timely manner and the plans Developer has to develop in the future. | Franchise | Alcoholic Beverages and Tobacco, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5812 | Michigan, United States | EXCLUSIVE | 25,000.00 | per Restaurant | Developer shall pay Licensor an initial license fee of Fifty Thousand Dollars ($50,000) for each of the first two (2) Restaurants developed pursuant to this Agreement and Twenty-five Thousand Dollars ($25,000) for each additional Restaurant developed pursuant to this Agreement. | Per Unit | Licens... |
| 11815 — 1. Grant the right to use the Marks ("Smith & Wollensky" or "Wollensky's Grill" and the goodwill associated therewith) the Assisted Rights, the goodwill associated with the Marks and all associated trade names, trade dress, plans, menus, concepts, or other marketing devices hereinbefore, currently or hereafter utilized in conjunction with the Marks and/or the operation of the NY Restaurant, including, without limitation, "Wollensky's Grill") throughout the Territory. | SMITH & WOLLENSKY RESTAURANT GROUP INC. | ST. JAMES ASSOCIATES, L.P. | THE SMITH & WOLLENSKY RESTAURANT GROUP INC. | 01/01/2006 | Marketing Intangible | execution of this Agreement (the "License Commencement Date") and shall be irrevocable and perpetual unless terminated in accordance with the terms of this Agreement. | Marketing Intangible | Consumer Services, Restaurants, Alcoholic Beverages and Tobacco, Foods and Nonalcoholic Beverages, Consumer Durables, Consumer Non-Durables, Retail | 5812 | United States, world | EXCLUSIVE | 2% | Restaurant Sales and Non-Restaurant Sales | Licensee shall pay to Licensor an annual royalty (the "Percentage Royalty") of two (2%) percent of the amount of Restaurant Sales and Non-Restaurant Sales made during any calendar year during which Restaurant Sales or Non-Restaurant Sales are made. As a credit against the Percentage Royalty, Licensee shall pay to Licensor a guaranteed minimum royalty (the "Minimum Royalty") in the amount of $300,000 regardless of the number of Restaurants that may be in operation during such calendar year. | Net Sales | Licens... |

kMINE Export (2018-02-21) Part I

EX1-99

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32825 | | | | | | | | | | | | | 1% | Restaurant Sales and Non-Restaurant Sales | If Licensee or any Affiliate thereof shall hereafter (i) be engaged as the manager of a new restaurant commonly identified or considered by the public as a steakhouse (hereinafter referred to as a "Manager" or "Management"), or (ii) purchase the right to utilize any steakhouse name such as Sizzler, The Palm, Morton's on Outback and thereafter shall open new steakhouse(s) utilizing such name, then only such new steakhouse(s) as are hereinafter opened and such new steakhouse(s) as come under such Management described in (i) above in this paragraph 5(b) shall be considered "Restaurants" solely for purposes of this subparagraph 5(b) and an annual Percentage Royalty of one (1%) percent (instead of two (2%) percent) shall be payable on Restaurant Sales and Non-Restaurant Sales of such new restaurant(s); provided, however, that no Percentage Royalty or fee or other compensation shall be payable by Licensee to Licensor in respect of any such steakhouse restaurant(s) as are in existence at the time of such acquisition or at the commencement of such Management by Licensee or any Affiliate thereof so long as such restaurants do not utilize the Marks. | Net Sales | Licensee |
| 32825 | | | | | | | | | | | | | 1% | Grill Sales and Non-Grill Sales | Licensee shall pay to Licensor an annual royalty (the "Grill Percentage Royalty") of one (1%) percent of the amount of Grill Sales and Non-Grill Sales made during any calendar year during which Grill Sales (or Non-Grill Sales are being made); provided, however, (i) if the average per person check during any six month period is equal to or in excess of $44.00 (or $54.00 if each Grill serves both lunch and dinner), as increased by percentage increase of the Consumer Price Index at the time of such calculation over the Consumer Price Index on the date hereof, but is less than $51.00, the Grill Percentage Royalty for such Grill during the balance of the term of this Agreement for such Grill, be 1.5% of Grill Sales and Non-Grill Sales for such Grill; and (ii) if the average per person check during any six month period is equal to or in excess of $51.00 (or $61.00 if each Grill serves both lunch and dinner), as increased by percentage increase over the Consumer Price Index at the time of such calculation over the Consumer Price Index on the date hereof, the Grill Percentage Royalty shall, for such period and during the balance of the term of this Agreement, be 2% of Grill Restaurant Sales and Non-Grill Restaurant Sales for such Grill Restaurant. | Net Sales | Licensee |

kMINE

k MINE Export (2018.02.21) Part 1

Page 12 of 63

EX1-100

kMINE Export (2018-02-21) Part 1

| Agreement# / Synopsis | Filing Category | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32825 | | | | | | | | | | | 1.5% | Grill Sales and Non-Grill Sales | Licensee shall pay to Licensor an annual royalty [the "Grill Percentage Royalty"] of one [1%] percent of the amount of Grill Sales and Non-Grill Sales made during any calendar year during which Grill Sales or Non-Grill Sales are being made; provided, however, [i] if the average per-person check during any six-month period is equal to or in excess of $48.00 [in $60.00 if such Grill serves both lunch and dinner], as increased by percentage increase of the Consumer Price Index to the time of such calculation over the Consumer Price Index on the date hereof, but is less than $52.00, the Grill Percentage Royalty shall, for such period and during the balance of the term of this Agreement for such Grill, be 1.5% of Grill Sales and Non-Grill Sales for such Grill and [ii] if the average per-person check during any six-month period is equal to or in excess of $56.00 [in $52.00 if such Grill serves both lunch and dinner], as increased by percentage increase Consumer Price Index at the time of such calculation over the Consumer Price Index on the date hereof, the Grill Percentage Royalty shall, for such period and during the balance of the term of this Agreement for such Grill Restaurant, be 2% of Grill Restaurant Sales and Non-Grill Restaurant Sales for such Grill Restaurant. | Net Sales | License |
| 32825 | | | | | | | | | | | 2% | Grill Restaurant Sales and Non-Grill Restaurant Sales | Licensee shall pay to Licensor an annual royalty [the "Grill Percentage Royalty"] of one [1%] percent of the amount of Grill Sales and Non-Grill Sales made during any calendar year during which Grill Sales or Non-Grill Sales are being made; provided, however, [i] if the average per-person check during any six-month period is equal to or in excess of $48.00 [in $60.00 if such Grill serves both lunch and dinner], as increased by percentage increase of the Consumer Price Index to the time of such calculation over the Consumer Price Index on the date hereof, but is less than $52.00, the Grill Percentage Royalty shall, for such period and during the balance of the term of this Agreement for such Grill, be 1.5% of Grill Sales and Non-Grill Sales for such Grill and [ii] if the average per-person check during any six-month period is equal to or in excess of $56.00 [in $52.00 if such Grill serves both lunch and dinner], as increased by percentage increase Consumer Price Index at the time of such calculation over the Consumer Price Index on the date hereof, the Grill Percentage Royalty shall, for such period and during the balance of the term of this Agreement for such Grill Restaurant, be 2% of Grill Restaurant Sales and Non-Grill Restaurant Sales for such Grill Restaurant. | Net Sales | License |
| 32825 | | | | | | | | | | | 200,000 USD | per Restaurant | As additional consideration for the sale and License granted hereby, Licensee shall make a one-time payment to Licensor upon the opening of each new Restaurant [the "Additional Sale Price Payment"], from the License Commencement Date, equal to $200,000 [Two Hundred Thousand Dollars]. | Per Unit | License |
| 32825 | | | | | | | | | | | 50,000 USD | per Grill | As a credit against the Grill Percentage Royalty, Licensee shall pay to Licensor a guaranteed minimum royalty [the "Minimum Grill Royalty"] in an amount equal to $50,000 for each Grill that may be in operation during such year provided, however, if the opening of a Grill does not occur in January of such year, the Minimum Grill Royalty for the period in such Grill opens shall be pro-rated only for the period of such calendar year beginning with the first day of the month in which such Grill opens through December 31 of such year. | Per Unit | License |

EX1-101

kMINE

kMINE Export (2018.02.21) Part 1

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81728 | 1. Grant the right to acquire all legal and registered title in and to the Technology (beverage formulas for each beverage product in the USA under various trade names, marks and art work employing the Vampt name, has developed bottling, distribution and retail networks and relationships). | Vampt America, Inc. | VAMPT BEVERAGE USA Corp | VAMPT BEVERAGE USA CORP | 11/25/2011 | 1. The purchase and sale of the Undertaking shall be closed on the date (the "Closing Date") which is the later of the date set forth in the Offer or the 60th day after the expiration of such sixty-day Offer acceptance period provided that if such day is a Saturday, Sunday or legal holiday then on the next following Business day. | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables | 8000 | USA | EXCLUSIVE | 10% | before tax profit | The purchase price ("Purchase Price") for the purchase of the Technology shall be paid by the Purchaser as soon as reasonably possible following execution hereof, or within 30 days of demand by the Owner, as follows: (a)750,000 common shares of the Purchaser; and (b) An aggregate of $750,000 payable to the Owner as a royalty and payable only as to 10% of before tax profit of the Purchaser. | Operating Profit | License |
| 41217 | 1. Grant the right to purchase the assets relating to THE Kerzu Operation (the business of Prospector Gaming Enterprises, Inc., a Nevada corporation doing business as Gold Ranch Casino & RV Resort, including the gaming, restaurant and bar, Lekko smoke, convenience store and ARCO gas station, and related activities and operations conducted by Prospector Gaming Enterprises, Inc. on the Premises under the name and style of Gold Ranch Casino and RV Resort). | LAROS REGENT | PROSPECTOR GAMING ENTERPRISES, INC., Gold Ranch Casino & RV Resort | | 12/27/2001 | 1. Subject to the satisfaction of all terms and conditions set forth in this Agreement, and unless extended pursuant to Section 10 below, the Closing of the sale and purchase hereon contemplated (the "Closing") shall occur at the Closing Date, at the offices of Blake, Gibson, Trucks, 201 West Liberty Street, Third Floor, Reno, Nevada. 2. "Closing Date" shall mean the last day of the month in which all conditions precedent set forth in this Agreement and the other integrated Agreements have occurred. | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible | Gaming, Consumer Services, Entertainment, Travel and Recreation, Restaurants, Retail, Alcoholic Beverages and Tobacco, Consumer Durables, Consumer Non-Durables, Foods and Nondiscretes, Beverages, Oil and Gas | 7990 | Verdi, Nevada, United States | Multi-Exclusivity | 625% | EBITDA | The Purchase Price for the Acquired Assets, calculated as of the Closing Date, shall be that amount equal to the product of (x) EBITDA for the twelve (12) months prior to the Closing Date, as calculated on Exhibit 3.4, less $375,000, multiplied by (B) 6.25; less (C) the amount of Debt assumed or refinanced by Laos and/or any credited to Buyer hereunder, plus Laos Premium Amount, as defined in Section 3.4 below, and (E) any amount payable to ARCO upon transfer of the ARCO Retirement Agreements, plus (ii) PG's Working Capital. | Operating Profit | License |
| 100399 | 1. Grant the right to acquire all legal and registered title in and to the Technology (beverage formulas for each beverage product in the USA under various trade names, marks and art work employing the Vampt name, has developed bottling, distribution and retail networks and relationships). | Vampt America, Inc. | Vampt Beverage Corp, Vampt Brewing Company Limited | | 11/25/2011 | 1. N/A | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables | | USA | | 10% | before tax profit | The purchase price ("Purchase Price") for the purchase of the Technology shall be paid by the Purchaser as soon as reasonably possible following execution hereof, or within 30 days of demand by the Owner, as follows: (a) 750,000 common shares of the Purchaser; and (b) An aggregate of $750,000 payable to the Owner as a royalty and payable only as to 10% of before tax profit of the Purchaser. | Operating Profit | License |
| 101624 | 1. Grant the right to enter into a LICENSE AGREEMENT whereas Companhia de Bebidas das Americas - Ambev, grants Ambev Peru, relating to the brewing and production of the Ambev Products (any or more brands of beer and/or other malt based beverages carrying one or more Index MKS), beverage and other malt based beverages carrying one or more Index Marks) and Index IL.A. and other Index Products in the territory of production of the Ambev Products (any licensed alcoholic beverage and other malt based beverages carrying one or more malt based beverages carrying one or more Index MKS and other beverages carrying the Index marks), Companhia de Bebidas das Americas - Ambev and/or its Affiliates in the owners of the Ambev Marks (all trademarks, service marks or trade names belonging or licensed to Companhia de Bebidas das Americas - Ambev and/or its Affiliates, service marks or trade names belonging or licensed to Index I.A. and/or its Affiliates, including CEULA), AB FOS and BECK'S; Companhia de Bebidas das Americas - Ambev and Index I.A. the rights to enter into this License Agreement for the production, sales and distribution (I) by Index IL.A. of the Ambev Products within the territory of Latin America, including processing if necessary in such Latin America, excluding the United States of America, including the duty free customers in such area; and (II) by Companhia de Bebidas das Americas - Ambev in the territory (the geographical area of Latin America, excluding Argentina and Cuba, including the duty free customers in such area) or the professional expertise and specific qualifications to produce, package, market and distribute within the Ambev Territory and the Ambev Products in the Index Territory, Companhia de Bebidas das Americas - Ambev wishes to appoint and License Index IL.A. to accept the appointment to produce, package, market and distribute the | Index Corporate Holdings Inc. | Companhia de Bebidas das Americas - Ambev, Index S.A. | Index S.A., Companhia de Bebidas das Americas - Ambev | 03/21/2005 | 1. Subject to Section 14.2, this License Agreement shall be effective from the date hereof, and shall remain in force for an initial term of ten (10) years. | Cross-License, Distribution, Manufacturing/Process Intangible, Marketing Intangible | Consumer Non-Durables, Alcoholic Beverages and Tobacco | 2080 | Latin America, Europe, Asia, Africa, Cuba, United States of America | Multi-Exclusivity | 7% | Net Sales | Subject to Section 13.4, Licensee hereby agrees to pay to Licensor a royalty of 7% per calendar quarter of Net Sales. | Net Sales | License |
| 101624 | | | | | | | | | | | | 0% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to 0.0% for the first budget Year, 0.1.17% for the second budget Year and 0.3.1% for the third budget Year, and (iv) 5.25% for the fourth Budget Year. | Net Sales | License |
| 101624 | | | | | | | | | | | | 1.75% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to 0.0% for the first budget Year, (II) 1.17% for the second budget Year (III) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth Budget Year. | Net Sales | License |
| 101624 | | | | | | | | | | | | 3.5% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to 0.0% for the first budget Year, (II) 1.17% for the second budget Year, (III) 3.5% for the third Budget Year, and (iv) 5.25% for the fourth | Net Sales | License |

Page 14 of 63

EX1-102

| Agreement Id | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Lead Commodit... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101624 | 1. Grant the right to obtain, market, use, sell, and offer for sale, the Naltrexone Implants that have been designed to treat alcoholism. | FRESH START PRIVATE MANAGEMENT, INC. | FRESH START PRIVATE MANAGEMENT, INC. | JPL, LLC | | 1. This Agreement shall remain in effect for a period of ten (10) years from the Effective Date (the "Initial Term"). If at the expiration of the Initial Term, there is no LICENSEE uncured default then existing, LICENSEE shall be granted the option to extend the Term of this Agreement for an additional five (5) year period upon such favorable terms... | | | | | | 5.25% | Net Sales | Notwithstanding anything to the contrary herein, royalties shall correspond to (10% for the first budget Year; (2) 1.75% for the second Budget Year; (4)2.5.5% for the third Budget Year; and 3.5-5.25% for the Fourth Budget Year | Net Sales |
| 102074 | 2. Grant the right to obtain, market, use, sell and offer for sale the Counseling Program and utilize the Know-How, which shall specifically include, but not be limited to, the logo and certain marketing materials currently utilized by Fresh Start Private Management, as well as the characteristics of the compound formula of the Implant solely for the purposes described herein. | FRESH START PRIVATE MANAGEMENT, INC. | | | 12/13/2013 | | Manufacturing/Process Intangible  Marketing Intangible | Alcoholic Beverages and Tobacco, Healthcare Pharmaceutical, Healthcare Products and Supplies | 8093 | Connecticut, USA, United States | EXCLUSIVE | 10% | Revenue | Furthermore, during the term, LICENSEE agrees to pay to LICENSOR on a monthly basis, as consideration for the grant of the sub-license and the licenses contained herein, ten percent (10%) of the revenue generated by LICENSEE or any entity (a "Third Party Seller") it distributes the implant and/or Counseling Program to, pursuant to the sale of an Implant or the Counseling Program by LICENSEE or any Third Party Seller during any month of the Term (the "Fees"). | Net Sales |
| 117036 | 1. Grant the right to use the Patent (patent for flexible fluid container) and the Trademarks (Pocket Shot™ and Pocketshot™)in connection with manufacturing, filling and packaging the Pouches with alcohol and the distribution, sale and advertising of the Products (Vodka, Gin, Whiskey, Tequila, and Rum) in the Territory under the Brand. | Pocket Shot LLC | Pocket Shot LLC | FRANK UN DISTILLERS PRODUCTS, LTD. | 02/26/2007 | 1. Except as otherwise provided herein, the term of this Agreement shall be the term of this Agreement shall endure five (5) years from the date of this Agreement. | Manufacturing/Process Intangible  Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non Durables | 2080 | United States of America | EXCLUSIVE | $3.33 USD | Per Unit | Per ONE Vodka per case | Per Unit |
| 117036 | | | | | | | | | | | | $3.33 USD | Per Case | Per Gin per case | Per Case |
| 117036 | | | | | | | | | | | | $5.18 USD | Per Case | For Whiskey (598.4 case) | Per Case |
| 117036 | | | | | | | | | | | | $4.55 USD | Per Case | For Tequila (USD-57/per White) | Per Case |
| 117036 | | | | | | | | | | | | $3.33 USD | Per Case | Per Rum per case | Per Case |
| 117036 | | | | | | | | | | | | 3 USD | Per Case | Marketing Reimbursement: Licensor agrees to reimburse Licensee for any funds expended by Licensee pursuant to any subdistribution agreement in reaching funds for marketing purpose up to a maximum of $3 per case in the first year, $2 per case in the second year and $1 per case in the third year | Per Case |
| 117036 | | FABIOUS FIRMS | | | | | | | | | | 2 USD | Per Case | Marketing Reimbursement: Licensor agrees to reimburse Licensee for any funds expended by Licensee pursuant to any subdistribution agreement in reaching funds for marketing purpose up to a maximum of $3 per case in the first year, $2 per case in the second year and $1 per case in the third year | Per Case |
| 117036 | | | | | | | | | | | | 1 USD | Per Case | Marketing Reimbursement: Licensor agrees to reimburse Licensee for any funds expended by Licensee pursuant to any subdistribution agreement in reaching funds for marketing purpose up to a maximum of $3 per case in the first year, $2 per case in the second year and $1 per case in the third year | Per Case |
| 7200 | 1. Grant the right to utilize the Property (the names, symbols, trademarks and associated trade dress colors, copyrighted material and logos "SOLD-DRY" and/or "SOLD-FRANCHISE") in connection with the manufacture, distribution and Retail Sale only upon the Licensed Articles (of BRAUM). | WARNING MANAGEMENT SERVICES INC. | WEIGHTS FOODS CORPORATION | | 6/1/2001 | 1. Both Licensor and Licensee shall have the option, by written notice to the other thirty (30) days prior to 13-  expiration, to renew this Agreement for an additional period of twelve (12) months from the date of expiration of the then term will provided this Agreement has not been terminated as provided herein and Licensor has met the Minimum Royalty Payment for the term just ended. If the party receiving notice shall fail to renew, such renewal by written notice within thirty (30) days of mailing, this Agreement will be renewed, subject to all of the terms and conditions expressed in this Agreement.  2. TERM — June 1, 2001 TO May 31, 2003 | Marketing Intangible | Foods and Nondurable, Beverages, Consumer Non Durables | 5140 | United States | EXCLUSIVE | 7% | Net Sales | Licensee agrees that it will also pay to Licensor a royalty sum equal to the percentage listed on Schedule 1 attached hereto of all Net Sales of all Licensed Articles (hereinafter referred to as the "Royalty Payment"). RATE --- SEVEN PERCENT (7%) | Net Sales |

KMINE Export (2018.02.21) Part I

EX1-103

kMINE Export [2018.02.21] Part I

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7778 | 1. Grant the right to use the licensed names and marks to manufacture and market royalty bearing products through designated distribution channels. 2. Grant the right to use Royalty Bearing Products outside the territory, but only to a United States based company, or its direct subsidiary, with which Norm's is then doing business in the United States. | NXP-II ELDS HOLDING CO INC | THE NORM FIELDS BRAND, INC | NORM'S FOOD COMPANY, INC. | 02/21/2001 | 1. Term. The initial term of this Agreement shall begin upon the execution hereof. 11 ... and shall continue for a period of thirty-six (36) months. ("Initial Term") 2. So long as Norm's is not in material default, this Agreement would then automatically renew for successive five year terms ("Option Periods"), until such time as either party terminates the ... Agreement at the... | Manufacturing/Process intangible Marketing intangible | Foods and Nonalcoholic Beverages | 2052 | United States, Canada, Mexico | Multi Exclusivity | 5% | Net Sales | Throughout the term (including Option Periods) of this Agreement the Running Royalty shall be 5% of Net Sales of Royalty Bearing Products. | Net Sales | License |
| 7779 | 1. Grant the right to use the licensed names and marks to market royalty bearing products through designated distribution channels. 2. Grant the right to sell royalty bearing products outside the territory, but only to a United States based company, or its direct subsidiary, with which Norm's is then doing business in the United States. | NXP-II ELDS HOLDING CO INC | THE NORM FIELDS BRAND, INC | Norm's Food Company, Inc. | 02/21/2002 | 1. The initial term of this Agreement shall begin upon the execution hereof and shall continue for a period of thirty six months ("Initial Term") 2. So long as Norm's is not in material default, this Agreement would then automatically renew for successive five year terms ("Option Periods"), until such time as either party... will be nonrenewal to the other party no more than 90 days ... nonrenewal to the other party twenty (20) days before the conclusion of an Option Period. | Marketing intangible | Foods and Nonalcoholic Beverages | 2052 | United States, Canada, Mexico | Multi Exclusivity | 5% | Net Sales | Throughout the term of this Agreement the Running Royalty shall be 5% of Net Sales of Royalty Bearing Products. | Net Sales | License |
| 7905 | 1. Grant the right to use the trademark "Derricos". | YOCREAM INTERNATIONAL INC | The Derricos Company, Inc. | YoCream International, Inc. | 09/4/2001 | 1. The initial Term of this Agreement shall be for a period of four (4) years commencing as of the Effective Date and ending as of September 4, 2006. At the request of either party, one prior to the end of the initial (ten) renewal term(s) period, the parties shall meet to discuss extending the Term. The Term of this Agreement may be extended only ... agreement of the parties. However, the Agreement shall expire at the end of ... the initial or then current renewal Term if the parties have not agreed to an extension or on or prior to close of business on such date as is 180 days prior to the end thereof (with respect to the initial Term, March 10... | Marketing intangible | Foods and Nonalcoholic Beverages | 2024 | United States | Multi Exclusivity | 4% | Net Sales | "Royalty" means the royalty of four percent (4%) on Net Sales of Product to any customer of YoCream. | Net Sales | License |
| 8918 | 1. Grant the right to utilize Trademarks on all uses and types of packaging and in all manners of trade in connection with the manufacture, marketing, promotion, distribution, and sale of dairy and soy products. 2. Grant the right to utilize Trademarks in connection with the manufacture, marketing, promotion, distribution, and sale of Sour Cream Products. 3. Grant the right to utilize Trademarks in connection with the manufacture, marketing, promotion, distribution, and sale of trademark. | LAND O LAKES INC | Land O'Lakes, Inc. | Dean Foods Company, Morningstar Foods, Inc. | 07/24/2002 | 1. The initial term of this Agreement shall commence on the Effective Date of this Agreement and shall continue in perpetuity unless terminated ... first shown written and shall continue in perpetuity by either party as provided for in Section 11. | Marketing intangible | Foods and Nonalcoholic Beverages | 2020 | United States, Puerto Rico, Canada | EXCLUSIVE | 1.5% | Gross Sales | Value Added Dairy Products in refrigerated form: 1.5% of Gross Sales; provided, however, the parties agree that milk which has been fortified with the addition of vitamins, minerals, calcium and/or protein, flavored or unflavored and packaged so as to constitute greater than fill fluid ounces and/or without any fat reduction claim shall be royalty free: royalties for use of trademark | Gross Sales | License |
| 8918 | | | | | | | | | | | | 3% | Gross Sales | Value Added Dairy Products in shelf stable form - 3% of Gross Sales; provided, however, the parties agree that milk which has been fortified with the addition of vitamins, minerals, calcium and/or protein, flavored or unflavored and packaged so as to constitute greater than fill fluid ounces and/or without any fat reduction claim shall be royalty free: royalties for use of trademark | Gross Sales | License |
| 8918 | | | | | | | | | | | | 1.5% | Gross Sales | Cream Product in refrigerated form - 1.5% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8918 | | | | | | | | | | | | 3% | Gross Sales | Cream Product in shelf stable form - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8918 | | | | | | | | | | | | 1.5% | Gross Sales | Sour Cream Products in refrigerated form - 1.5% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8918 | | | | | | | | | | | | 3% | Gross Sales | Sour Cream Products in shelf stable form - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |

EX1-104

ktMINE

| Agreement ID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | LeadIn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8938 | | | | | | | | | | | | 3% | Gross Sales | Licensee is being paid in chief of debt… 3% of Gross Sales; provided, however, the parties agree that to the extent DrCMorningglan converts sales of its international (non) Licensee utilizing Trademarks, the first twenty five million dollars ($25,000,000.00) of such conversion sales each calendar year shall by royalty free. The parties acknowledge and agree that a royalty-free sale shall mean a sale utilizing Trademarks prior to the Effective Date and that the conversion of such sales following the Effective Date shall not constitute conversion sales and shall bear a royalty; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 1.5% | Gross Sales | Combination Products in refrigerated form - 1.5% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 3% | Gross Sales | Combination Products in shelf stable form - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 3% | Gross Sales | Small Bottle Nutritional Milk in shelf stable form - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 3% | Gross Sales | Infant Formula Products in refrigerated form - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 1.5% | Gross Sales | Soy Beverage Products in refrigerated form - 1.5% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 3% | Gross Sales | All Licensed Products regardless of type or form (and regardless if royalty rates are both above and below)... Canada or Puerto Rico - 3% of Gross Sales; royalties for use of trademark | Gross Sales | License |
| 8938 | | | | | | | | | | | | 1.5% | Gross Sales | All Licensed Products sold in packages utilizing Grip n Go Intellectual Property - 1.5% of Gross Sales with respect to the sale of royalty-free Licensed Products and the applicable royalty rate with respect to sale of royalty bearing Licensed Products; royalties for use of trademark | Gross Sales | License |
| 7781 | 1. Grant the right to use the licensed names and marks to manufacture and market royalty bearing products through designated distribution channels. 2. Grant the right to sell Royalty Bearing Products outside the territory, but only to a United States based company, or its direct subsidiary, on which Nvoni's then doing business in the United States. | MRS FIELDS ORIGINAL COOKIES INC. | THE MRS. FIELDS BRAND, INC. | NVONI'S FOOD COMPANY, INC. | 02/21/2001 | 1. The initial term of this Agreement shall begin upon the execution hereof [...] 11 [...] and shall continue for a period of thirty-six (36) months ("Initial Term"). 2. So long as Nvoni's is not in material default, this Agreement would then automatically renew for successive five year terms ("Option Periods") until such time as either party terminates the Agreement upon no more than twenty (20) days prior written notice to the other party. | Manufacturing Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages | 2052 | United States, Canada, Mexico | Multi-Exclusivity | 5% | Net Sales | Throughout the term of this Agreement the Running Royalty shall be 5% of Net Sales of Royalty Bearing Products. | Net Sales | License |
| 7782 | 1. Grant the right to use the licensed names and marks to market royalty bearing products through designated distribution channels. 2. Grant the right to sell Royalty Bearing Products outside the territory, but only to a United States based company, or its direct subsidiary, on which Nvoni's then doing business in the United States. | MRS FIELDS ORIGINAL COOKIES INC. | THE MRS. FIELDS BRAND, INC. | Nvoni's Food Company, Inc. | 01/2/2002 | 1. The initial term of this Agreement shall begin upon the execution hereof and shall continue for a period of three and a half (3.5) years. 2. So long as Nvoni's is not in material default, this Agreement would then automatically renew for successive five year terms ("Option Periods") until such time as either party provides a written notice of nonrenewal to the other party no more than 90 days and no less than twenty (20) days before the conclusion of an Option Period. | Marketing Intangible | Foods and Nonalcoholic Beverages | 2052 | United States, Canada, Mexico | Multi-Exclusivity | 5% | Net Sales | Throughout the term of this Agreement the Running Royalty shall be 5% of Net Sales of Royalty Bearing Products. | Net Sales | License |

ktMINE Export (2018-02-21) Part 1

EX1-105

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8920 | 1. Grant the right to amend and extend that certain sublicense Agreement for Pillsbury Trademarks and Technology, dated as of December 26, 2001. 2. Grant the right to use the Pillsbury Licensed Technology (the inventions claimed in the Patents, all trade secrets, intellectual property and other proprietary information (including, without limitation, product specifications, product formulas, ingredient listings, recipes, olde techniques, know-how, formulas, compositions, processes and plans and current research and development relating to the production and content of Frozen Dessert Products) to manufacture Frozen Dessert Products (ice cream, sorbet, frozen yogurt, sherbet, frozen mousse, ice milk, frozen juice bars, ice pops, water ices, ice cream cakes, soft serve (soft molded) machine made) ice cream, frozen fudge bars, frozen novelty dessert products (such as bars, slices, sandwiches, smoothies and related products based on or primarily derived from any of the foregoing), frozen dessert product (for sale in the Territory for the marketing, distribution, promotion and sale in the Territory and (a) to the extent requested by The Pillsbury Company (b) to co-pack Frozen Dessert Products for sale to Pillsbury for delivery to Pillsbury's joint venture in Japan for resale in Japan pursuant to the terms of the Haagen-Dazs International Co-Pack Agreement, (b) if requested by Nestle USA - Prepared Foods Division, Inc. or an affiliate thereof, for delivery of Pillsbury Improved Product to the Nestle International Business pursuant to the terms of the Nestle International Co-Pack Agreement (but only to the extent such Pillsbury ... | NEW (DECEMBER INC.) | SOCIETE DES PRODUITS NESTLE S.A.; NESTEC LTD.; The Pillsbury Company, HDIP, Inc. | NESTLE ICE CREAM COMPANY, LLC; Ice Cream Partners USA, LLC. | 09/21/2002 | 1. Subject to the provisions of Section 9.3 hereof, this Agreement shall become effective as of the date of this Agreement and shall remain in full force and effect through December 31, 2009 (the "Term"). | Manufacturing Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables, Retail | 2024 | District of Columbia, United States of America | EXCLUSIVE | 4% | Net Sales | In consideration of the sublicense granted or to be granted hereunder by SOCIEDADE, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (x) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Trademarks but incorporating Pillsbury Licensed Technology | Net Sales |
| 8920 | | | | | | 1. Subject to the provisions of Section 9.3 hereof, this Agreement shall become effective as of the date of this Agreement and shall remain in full force and effect through December 31, 2009 (the "Term"). | Manufacturing Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables, Retail | | District of Columbia, United States of America | EXCLUSIVE | 1% | Net Sales | In consideration of the sublicense granted or to be granted hereunder by SOCIEDADE, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (x) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Trademarks but incorporating Pillsbury Licensed Technology | Net Sales |
| 8930 | 1. Grant the right to amend and extend that certain sublicense Agreement for Pillsbury Trademarks and Technology, dated as of December 26, 2001. 2. Grant the right to use the Pillsbury Licensed Technology (the inventions claimed in the Patents, all trade secrets, intellectual property and other proprietary information (including, without limitation, product specifications, product formulas, ingredient listings, recipes, olde techniques, know-how, formulas, compositions, processes and plans and current research and development relating to the production and content of Frozen Dessert Products) to manufacture Frozen Dessert Products (ice cream, sorbet, frozen yogurt, sherbet, frozen mousse, ice milk, frozen juice bars, ice pops, water ices, ice cream cakes, soft serve (soft molded) machine made) ice cream, frozen fudge bars, frozen novelty dessert products (such as bars, slices, sandwiches, smoothies and related products based on or primarily derived from any of the foregoing), frozen dessert product (for sale in the Territory for the marketing, distribution, promotion and sale in the Territory and (a) to the extent requested by The Pillsbury Company (b) to co-pack Frozen Dessert Products for sale to Pillsbury for delivery to Pillsbury's joint venture in Japan for resale in Japan pursuant to the terms of the Haagen-Dazs International Co-Pack Agreement, (b) if requested by Nestle USA - Prepared Foods Division, Inc. or an affiliate thereof, for delivery of Pillsbury Improved Product to the Nestle International Business pursuant to the terms of the Nestle International Co-Pack Agreement (but only to the extent such Pillsbury ... | NEW (DECEMBER INC.) | SOCIETE DES PRODUITS NESTLE S.A.; NESTEC LTD.; The Pillsbury Company, HDIP, Inc. | NESTLE ICE CREAM COMPANY, LLC; Ice Cream Partners USA, LLC. | 09/21/2002 | 1. Subject to the provisions of Section 9.3 hereof, this Agreement shall become effective as of the date of this Agreement and shall remain in full force and effect through December 31, 2009 (the "Term"). | Manufacturing Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables, Retail | 2024 | District of Columbia, United States of America | EXCLUSIVE | 4% | Net Sales | In consideration of the sublicense granted or to be granted hereunder by SOCIEDADE, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (x) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Trademarks but incorporating Pillsbury Licensed Technology | Net Sales |

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8920 | | | MTV Networks, a Viacom International, Inc.; Tues Continental Television Productions, Inc.; Tues Continental Records, Inc.; Signatures Network, Inc.; Famous Fare | Famous Fare, MTV Networks, a Viacom International, Inc.; Tues Continental Television Productions, Inc.; Tues Continental Records, Inc.; Signatures Network, Inc.; Famous Fare | | 1. The "T-Rex" Payments/this Agreement/a/its/commencement (until, 2001, and expiration May 31,2003. | Marketing Intangible | Foods and Nonalcoholic Beverages, Entertainment, Consumer Non-Durables, Broadcast and Cable | 5140 | United States | Multi-Exclusivity | 125% | direct manufacturing cost | | | Net Sales |
| 8341 | | CELESTIAL DELIGHTS USA CORP. | Celestial Delights, Norma Lasham | CELESTIAL DELIGHTS USA CORP. | 03/25/2001 | 1. This Agreement shall take effect July 1, 2008 and remain in effect through July 1, 2010. At the sole option of LICENSOR this Agreement may be extended for two additional 1 year periods upon 30 days written notice. This Agreement may be further extended upon mutual Agreement between the parties. | Manufacturing Process Intangible, Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables | | United States of America | EXCLUSIVE | 10% | net sales | | | Net Sales |
| 8341 | | | | | 07/2/2008 | | | | | | | 10% | gross sales | | | Gross Sales |
| 8645 | | GREAT AMERICAN COOKIE CO./DOMO CO FRANCHISING LLC | TCBY SYSTEMS, LLC | GREAT AMERICAN COOKIE CO./DOMO CO FRANCHISING LLC | 03/26/2004 | 1. COMPANY hereby grants to FRANCHISEE, and FRANCHISEE hereby accepts the obligation, to own and operate at "TCBY" store at, and only at, the location at the address set forth in exhibit "A" hereto attached, to be modified and installed from time to time by the parties, as otherwise so attached or modified hereto (made a part, and "operate" in conjunction with locations operated by FRANCHISEE known as "M.V. Field "Original Cookie," "Cookie Company," or other trade name of FRANCHISEE or its affiliates, and to use the Marks in the operation thereof, at each location listed in exhibit "A" hereto for a period of ten (10) years, commencing on the date the location is added to this Agreement. The Franchise Agreement is hereby terminated, and FRANCHISEE shall continue to operate the store developed hereunder pursuant to the rights and obligation set forth in this Agreement. | Franchise | Restaurants, Retail, Foods and Nonalcoholic Beverages | | Stockton, CA, New York, NY; Mountaintop, AL; Austin TX; Baton Rouge, LA; Atlanta, GA; Victoria, TX; California, GA; Mesa, AZ; Joplin, MO; Champaign, IL; Davenport, IA; Lake Charles, Charlotte, SC; Corn River, SC; Honolulu, HI; Charlotte, VA; Oakmont, MD; Amherst, SC; Paris, MO; San Antonio, Orleans, UT; Fairview Heights, Eau Clair, WI; Buffalo, Douglasville, Baton Rouge, Greenville, Phoenix, Store, Co; Honolulu, HI; Little Rock, Mobile, AL; Pensacola, St. Augustine, Portage, Muskegon, San Francisco, Port Myers, Lawrenceville, Fort St. Charles, Jackson, TN, New Iraus, Aura, NC, Pittsburgh, PA, United States | EXCLUSIVE | 4% | net revenues | weekly royalty and service fee payable by way of a percentage on the sales of franchise business fees or sale, or other discount products, which surcharge shall be imputed from a reasonable and assumed systemwide average retail selling price of products to be offered among those products and which equates to four percent (4%) of the net Gross Revenues therein derived, under no circumstance shall the royalty and service fee exceed four percent (4%) of the actual Gross Revenues of FRANCHISEE; and FRANCHISEE may at any time request a credit due to a development work that is posted by the COMPANY upon FRANCHISEE's presentation of proof satisfactory to the COMPANY, that a credit is due. | | Net Sales |

ktMINE

ktMINE Export (2018-02-21) Part I

kMINE

| Agreement ID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit | Le... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11111 | 1. Grant the right to use "Mrs. Fields" and "Mrs. Fields Cookies" to market frozen cookie dough products through limited-service restaurants, full-service restaurants, convenience stores, food service outlets including hospitals, nursing homes and casinos, food service clubs in carry-out/carry, food service distribution, bars and taverns, correctional facilities, recreational facilities (stadiums, business/industry dining), independent and operations run by food service management firms), primary/secondary schools, college/universities, healthcare, and other similar food-away-from-home distribution channels. 2. Grant the right to have the first right of offer to sell frozen cookie dough products through retail outlets in the Territory and/or through the Designated Distribution Channels, for countries outside the Territory. | | Noni's Food Company, Inc. | THE MRS. FIELDS' BRAND, INC. | 7/12/2002 | 1. "Initial Term" shall have the meaning set forth in Section 16 hereof. 2. The initial term of this Agreement shall begin upon the execution hereof and shall continue for a period of sixty-six months ("Initial Term"). 3. So long as Noni's is not in material default, this Agreement would then automatically renew for successive five-year terms ("Option Periods"), until such time as either party provides a written notice of termination to the other party no less than 90 days and no less than twenty (20) days before the conclusion of an Option Period. Notwithstanding the above, if during the 5th year of an Option Period, Noni's has achieved or paid a minimum of a 2% growth of Running Royalties as compared to the fourth year of the Option Period, then Noni's shall not exercise its right to renew rights under this paragraph 3(a). | Marketing Intangible | Foods and Nonalcoholic Beverages | 2052 | United States, Canada, Mexico, U.S. military installations | Multi-Exclusivity | 5% | Net Sales | of Royalty Bearing Products | Net Sales | License |
| 8639 | 1. Grant the right to search for potential Burger King Restaurant sites within the Development Area and to develop and be franchised to operate a Burger King Restaurant at limited approved sites within the Development Area upon the terms and conditions of this Agreement and the franchise agreements which shall be entered into for each Burger King Restaurant. | | BURGER KING CORPORATION | BANGKOLD, INC., QUALITY DINING, INC. | 3/21/2000 | 1. The term of this Agreement (the "Term") shall commence upon October 1, 2000. Unless terminated earlier as provided in Article IX hereof, the Term and all of the rights granted by this Agreement shall expire on JUNE 30, 2010. The Developer has no right to any extension or renewal to the Term. | Franchise | Restaurants, Foods and Nonalcoholic Beverages, Consumer Services, Consumer Non-Durables | | Benton County, Michigan; Cass County, Michigan; Van Buren County, Michigan; St. Joseph County, Indiana; St. Joseph County, Indiana; Elkhart County, Indiana; La Grange County, Indiana; Marshall County, Indiana; Kosciusko County, Indiana; Fulton County, Indiana; Fulton County, Indiana; Steuben County, Indiana; Noble County, Indiana; De Kalb County, Indiana; Whitley County, Indiana; Allen County, Indiana; Wabash County, Indiana; Huntington County, Indiana; Kosciusko County, Indiana; Adams County, Indiana; Jay County, Indiana; Paulding County, Ohio, Van Wert County, Ohio, Winchester, Indiana, United States | Multi-Exclusivity | 4% | gross sales | Upon the occurrence of an Event of Default under Section 7.1(b), Developer shall have thirty (30) days from receipt of notice from BKC to cure each Event of Default by agreeing to pay Additional Royalties (as defined below) with respect to any Burger King Restaurant that Developer fails to open in accordance with the Development Schedule (the "Unopened Restaurant") until the opening of the Unopened Restaurant; provided, however, that if Developer fails to develop and open the Unopened Restaurant within six (6) months after the applicable date set forth in the Development Schedule (the "Scheduled Opening Date"), BKC may, at its option, terminate this Agreement upon written notice to Developer, and Developer shall have no further opportunity to cure. "Additional Royalties" shall mean an amount equal to 50% of the average per restaurant Gross Sales of Burger King Restaurants in the Chicago ADI for the 12-month period ending on the Scheduled Opening Date, divided by 365 and multiplied by the number of days calculated from the Scheduled Opening Date until the actual Opening Date, payable monthly in arrears by the 10th day of each month. | Gross Sales | License |
| 8639 | | | | | | | | | | | | 5% | Gross Sales | During the Term, Developer agrees to expend a minimum of one-half of one percent (0.5%) of the Gross Sales of each Burger King Restaurant located within the Development Area on local marketing initiatives approved by BKC's local marketing manager. Developer further agrees that it shall spend and/or be applied toward the purchase of branded media and point-of-purchase materials in support of localized media. | Gross Sales | License |
| 8639 | | | | | | | | | | | | 5,000 USD | per Development Unit | The Developer shall be required to pay to BKC an amount equal to Five Thousand and no/100 Dollars ($5,000.00), multiplied by the number of Development Units ("the Franchise Fee Deposit"). The aggregate amount of the Franchise Fee Deposit shall be equal to Sixty Thousand and no/100 Dollars ($60,000.00), and said aggregate amount shall be paid by the Developer to BKC upon execution of the Agreement. | Per Unit | License |

KM/MINE Export (2018.02.21) Part 1

EX1-108

kMINE

| Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity/Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12184 — 1. Grant the right to utilize Land (i) Lease Trademarks on all uses and types of packaging such as all channels of sale in connection with the manufacture, marketing, promotion, distribution, and sale of Basic Dairy Products, Value Added Dairy Products, Cream Products, Sour Cream Products, Small Bottle Milk, Small Bottle Nutritional Milk, Infant Formula Products, and Soy Beverage Products. 2. Grant the right to use the formula owned by LDL for the first half and half half 3. Grant the right to use the patented bottle utilized to package Grip 'n Go (TM) beverage products (Grip 'n Go Intellectual Property) in connection with any of the Licensed Products. | LAND O LAKES INC | Land O'Lakes, Inc.; Dairy Marketing Alliance, LLC; Dean Holding Company, Dean Foods Company, Landero, LLC; Moonragon Foods, Inc. | Dean Foods Company, Moonragon Foods, Inc., Dean Holding Company, Dairy Marketing Alliance, LLC; Landero, LLC; Land O'Lakes, Inc. | 07/31/2002 | 1. The initial term of this Agreement shall commence on the day and part the above written and shall continue in perpetuity unless terminated by either party as provided for in Section 11. | Manufacturing/Process intangible; Marketing Intangible | Foods and Nonalcoholic Beverages, Healthcare Pharmaceutical | 2020 | United States, Puerto Rico, Canada | EXCLUSIVE | 1.5% | Gross Sales | for use of trademark on Value Added Dairy Products in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Value Added Dairy Products in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | for use of trademark on Cream Products in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Cream Products in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | for use of trademark on Sour Cream Products in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Sour Cream Products in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | for use of trademark on Creamers in refrigerated or shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Combination Products in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Soy Beverage Products in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | for use of trademark on Small Bottle Nutritional Milk in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Small Bottle Nutritional Milk in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Infant Formula Products (refrigerated or shelf stable) | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | for use of trademark on Soy Beverage Products in refrigerated form | Gross Sales |
| 12184 | | | | | | | | | | | 3% | Gross Sales | for use of trademark on Soy Beverage Products in shelf stable form | Gross Sales |
| 12184 | | | | | | | | | | | 1.5% | Gross Sales | with respect to sales of royalty-free Licensed Products regardless of type or form (and regardless of country and forth above) sold in Canada or Puerto Rico | Gross Sales |
| 12195 — 1. Grant the right to manufacture, have manufactured for it, assemble, use, offer for sale and/or sell the Inventions related to the Process and Apparatus for Preparing Extracts and Oils from Natural Plants and Other Matter, and the Process for Extracting Fixed and Mineral Oils and Refining of Crude Extracts employing mPEG(s) covered by the Licensed Patents together with the right to sublicense others. 2. Grant the right to use the Licensed Trademark "Naturol" and the good will related thereto. | INTEGRATED ENVIRONMENTAL TECHNOLOGIES, LTD. | Naturol Limited, Peter Wilde | Naturol, Inc | 08/20/2001 | 1. If not terminated sooner pursuant to section 8B below, the license to the Licensed Patent shall last until the expiration date of that last Licensed Patent covering Licensed Products or Licensed Services in a declaration by the Court, not overturned in any timely filed appeals, that the Licensed Patent is invalid. The License to the Licensed Trademark shall last as long as the Licensee or any Sublicensee continues to use the Licensed Trademark in accordance herewith. | Manufacturing/Process Intangible; Marketing Intangible | Biotechnology, Foods and Nonalcoholic Beverages, Healthcare Pharmaceutical, Consumer Non-Durables | 1400 | United States, Canada, Mexico | EXCLUSIVE | 8% | Net Sales | of the Licensed Products or Licensed Services made, used, sold or offered for sale by Licensee or any Sublicensee in a country where Licensed Patents covering said Licensed Products or Licensed Services are still pending or in effect | Net Sales |
| 12195 | | | | | | | | | | | 2% | Net Sales | In addition, a two percent (2.0%) Royalty shall be paid based on the sale by Licensee or any Sublicensee of the Licensed Products... | Net Sales |

EX1-109

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8906 | 1. Grant the right to manufacture, have manufactured for it, assemble, use, offer for sale, and/or sell the process and apparatus for preparing extracts and oils from natural plants and other biomass and a process for extracting food and minerals oils and refining of crude extracts. | NATUROL HOLDINGS LTD | NAtural Holdings Inc. | Naturol Limited | 06/15/2002 | 1. If not terminated sooner pursuant to section 8B below, the license (unless)exceptExpand shall last until the expiration date thereof, LicensedPatentsviewingLicensedProductsUnlicensedexpressly waive to declaratively the Court, not overturned in any timely thesUppercLtd Undeceived Patent is invalid. The License to the Licensed Trademark shall last until,exceptthe Licensee continues to use the Licensed Trademark in accordance herewith. | Manufacturing/Process Intangible; Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages; Biotechnology; Healthcare; Pharmaceutical | 1400 | United States, Mexico, Canada | Multi-Exclusivity | 8% | Net Sales | For as long as Licensee has granted no other licenses in the Territory, Licensee will pay Licensor an eight percent (8.0%) Royalty based on Net Sales of the Licensed Products or Licensed Services made, sold or offered for sale by Licensee in a country where Licensed Patents covering said Licensed Products or Licensed Services are still pending or in effect. | Net Sales |
| 8906 | | | | | | | | | | | | 2% | Net Sales | In addition, a two percent (2.0%) Royalty shall be paid based on the sale by Licensee of the Licensed Trademark. | Net Sales |
| 12051 | 1. Grant the right to operate the following STEAK N SHAKE Restaurants: 310 [Knox Road, Knoxville, Tennessee and 500 East Emory Road, Powell, Tennessee] to use certain proprietary trademarks, service marks, trade dress and other commercial symbols, including "STEAK N SHAKE", the "WINGED LOGO", "TAKHOMASAK", "IN SIGHT IT MUST BE RIGHT", "FAMOUS FOR STEAKBURGERS", and related logos licensed to the Company as one now or may hereafter be specifically designated by the Company in writing for use only with the System (a unique restaurant concept, including buildings with a distinctive architectural design, decorative color scheme and trade dress, and standardized methods of preparing and serving certain food products designated for use at the point-and-only-and-only-food-and-beverage products designated by the Company and sold thereat (as they may be changed, improved, and further developed from time to time), and to the public that Franchisee that Franchisee shall be use the System and takes it as the Restaurant for one additional term equal to that term in the Company's standard form of Unit Franchise Agreement as it exists on the renewal date | STEAK N SHAKE CO | STEAK N SHAKE OPERATIONS, INC. | Kelmwald Enterprises Emory, LLC; Kelmwald Enterprises Wild Geneva, LLC | 09/21/2005 | 1. Unless sooner terminated as hereinafter provided, this franchise Agreement shall extend for a term commencing (the) [30] days from the date of this Agreement, but no later than September 28, 2005 ("Franchise Date") and ending on the twentieth (20th) anniversary of such date. If the premises of the Restaurant are leased by Franchisee, the term of the agreement shall be co-terminus with the lease of (i) the initial term of the lease or (ii) the term as hereinabove set forth. 2. Franchisee may renew this Franchise to use the System and takes it as the Restaurant for one additional term equal to that term in the Company's standard form of Unit Franchise Agreement as it exists on the renewal date | Franchise | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5812 | Knoxville, Tennessee, Powell, Tennessee, United States | Multi-Exclusivity | 4.0% | Net actual weekly payroll and benefits charges | In consideration for the Company's agreement to lease Temporary Employees to Franchisee, Franchisee agrees to pay to the Company a fee equal to the actual weekly payroll and benefits charges incurred by the Company for the service of the Temporary Employees plus an administrative fee of one percent (1%) of the actual weekly payroll and benefits charges incurred by the Company for the services of the Temporary Employees (RoyalEmployee Feebase1). | Costs |
| 12051 | | | | | | | | | | | | 4% | Franchisee's "Gross Receipts" | From the operation of each Restaurant, payable by the seventh (7th) day after the end of each four-week accounting period (i.e. at the Company's option, by the seventh (7th) day after the end of each week for the four accounting period. | Gross Sales |
| 12051 | | | | | | | | | | | | 1% | Gross Receipts | Included in the required advertising and marketing expenditures will be a payment to the Company of one percent (1%) of Gross Receipts which will be used by the Company, at its sole discretion, for expenditures reasonably related to the creation, development, administration and supervision of marketing and advertising programs and menu development for all STEAK N SHAKE restaurants. | Gross Sales |

| Agreement# | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11228 | [Grant of rights to use the Pillsbury Licensed Technology and Frozen Dessert Products...] | DREYER'S GRANDE ICE CREAM HOLDINGS INC | SOCIETE DES PRODUITS NESTLE S.A.; NESTEC LTD.; The Pillsbury Company, WDIP, Inc. | NESTLE ICE CREAM COMPANY LLC; Ice Cream Partners USA, LLC. | 09/1/2002 | Subject to the provisions of Section 9 hereof, this Agreement shall become effective as of the date of this Agreement and shall remain in full force and effect through November 31, 2000 (the "Term"). | Manufacturing; Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables, Retail | 2024 | United States of America, District of Columbia | EXCLUSIVE | 4% | net sales | In consideration of the sublicense granted or to be granted hereunder by SUBLICENSOR, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (i) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Trademarks but incorporating Pillsbury Licensed Technology | Net Sales |
| 11228 | | | | | | | | | | | | 1% | net sales | In consideration of the sublicense granted or to be granted hereunder by SUBLICENSOR, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (i) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Trademarks but incorporating Pillsbury Licensed Technology | Net Sales |
| 12055 | [Grant of right to establish and operate a retail Restaurant identified by the BUFFALO WILD WINGS Trademarks...] | DIVERSIFIED RESTAURANT HOLDINGS, INC. | BUFFALO WILD WINGS INTERNATIONAL, INC. | | 05/2008 | 1. The initial term of this Agreement is 20 years, unless this Agreement is sooner terminated in accordance with Paragraph 11.1. The initial term commences on the Effective Date (as defined in subparagraph 15.11 of this Agreement). You may extend this initial term in writing for a limited period of time not to exceed 6 months to take into account the term of any applicable lease for the Authorized Location. | Franchise | Foods and Nonalcoholic Beverages, Restaurants, Consumer Services, Retail; Consumer Durables, Consumer Non Durables | 5812 | West Michigan, United States of America | Multi Exclusivity | 5% | Gross Sales | for the first half of the initial term of this Agreement | Gross Sales |
| 12055 | | | | | | | | | | | | 5% | Gross Sales | for the second half of the initial term of this Agreement, shall be an amount equal to the greater of (5) % of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us during the second half of the initial term of the Agreement | Gross Sales |
| 12055 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales | Gross Sales |
| 12055 | | | | | | | | | | | | 4% | Gross Sales | We reserve the right to increase this percentage upon 60 days written notice to you, provided, however that the Advertising Fee will not exceed 4% for the initial term of this agreement. | Gross Sales |

ktMINE

| Agreement Synopsis | FilingCompany | Licensor | Licensee | Term | EffectiveDate | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.Grant the right to establish and operate a retail Restaurant identified by the BUFFALO WILD WINGS trademarks or such other marks as we may direct using a unique system for video entertainment oriented, casual/fast service restaurant that features distinctive wings, sandwiches, unique food service and other products, beverages and services using certain standards and specifications, to be located in the area of Port Huron, Michigan. 2.Grant the right to participate in the gift card marketing program. 3.Grant the right to access, use and display the Products (portis or software and online products, including the Portal available through web sites owned or controlled by guidsoul pod content and the materials thereon which provide franchisees with a preliminary real estate analysis of a proposed location. 4.Grant the right to acquire the tenth option under the Area Development Agreement to establish and operate one Restaurant in the area of Port Huron, Michigan. | DEVELOPED RESTAURANT HOLDINGS, INC. | Buffalo Wild Wings International, Inc.; Blazin Wings, Inc.; Buffalo Wild Wings, Inc.; Blazin Wings, Inc./Red Wing, Inc.; Gprz Inc.; AWC Wings, Inc. | AWC Port Huron, Inc.; Diversified Restaurant Holdings, Inc., T. Michael Ansley; AWC Wings II, Inc. | 1. The initial term of this Agreement is 20 years, unless this Agreement is sooner terminated in accordance with Paragraph 15.The initial term commences upon the Effective Date (as defined in subparagraph 3.51 of this Agreement. We may extend this initial term in writing for a limited period of time not to exceed six months to take into account the term of any applicable lease for the Authorized Location. 2. You may renew your license for two renewal terms, (the first renewal term is 10 years; the second renewal term is 5 years) 3. This Agreement will continue until the expiration of the Gift Card Agreement between GCS and Buffalo Wild Wings, Blazin Wings, Buffalo Wild Wings International, and Red Wing, Inc. (dated August 12, 2002 (35) may otherwise terminate this Agreement if franchisee ceases to operate outlets pursuant to a franchise agreement with any of the above referenced entities or, with the closest of the respective franchise franchisee has defaulted under the terms of this Agreement. | 7/7/2008 | Franchise, Marketing Intangible, Service, Software | Consumer Services, Foods and Food products, Beverages, Restaurants, Retail, Business Services, Computers: Hardware and Software, Internet, Consumer Durables, Consumer Non Durables | 8741 | Port Huron, Michigan, United States | Multi Exclusivity | 5% | Gross Sales | The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to the greater of (1) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us in any time during the second half of the initial term of the Agreement (or, if no form of franchise agreement is being used by us in such date, the Royalty Fee being charged by us under our latest form of franchise agreement). | Gross Sales | License |
| 12036 | | | | | | | | | | | 5% | Gross Sales | The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us in any time during the second half of the initial term of the Agreement (or, if no form of franchise agreement is being used by us in such date, the Royalty Fee being charged by us under our latest form of franchise agreement). | Gross Sales | License |
| 12036 | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. | Gross Sales | License |
| 12036 | | | | | | | | | | | 4% | Gross Sales | We may increase the Advertising Fee upon 60 days written notice to you, provided, however, that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | License |
| 12036 | | | | | | | | | | | 225.000 | per package | If a Verifone Terminal/Printer package is to be supplied by US to Franchisee, US shall list the Purchase $225.00 for each such package. | Per Unit | License |
| 12036 | | | | | | | | | | | 19.500 | per transaction | There will be a transaction fee for each transaction which is performed with respect to a Gift Card based as part of the Program. The transaction fee shall be $.195 per transaction, and shall be charged for each transaction performed by the Franchisee. | Per Unit | License |
| 12036 | | | | | | | | | | | 04 USD | per transaction | In addition to the transaction fee, a fee of $.04 per transaction will be charged, and this amount will be added to an insurance account established by the payment of delinquent franchise payments. | Per Unit | License |
| 12036 | | | | | | | | | | | 120 USD | per Gift Card | Each Gift Card which is purchased as part of this program and which is not completed or until the date which is the one of three (1) year from the last purchase of the Gift Card or one (1) year from the last day of the calendar quarter in which the Gift card shall be assessed a fee of $2.00 on each date which shall be debited against the remaining balance of the Gift Card (s) $2.00 monthly fee shall be credited to the franchisee if the Gift Card was purchased at a franchisee's store. | Per Unit | License |
| 12036 | | | | | | | | | | | 400 USD | per package | Each package is $400, available in blocks of three (3) for five (5) Five Packages or a total of $1,200. Enclosed is a check for $1,200 made payable to ganizar, Inc. for the Packages | Per Unit | License |

EX1-112

| Agreement ID | Filing Company | License | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Size | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15677 | Purple Beverage Company, Inc. | PURPLE BEVERAGE COMPANY, Inc.; Big Geyser, Inc. | Big Geyser, Inc.; PURPLE BEVERAGE COMPANY, Inc. | 02/26/2008 | 1. This Agreement shall be for a term of five (5) years commencing on the date set forth above and terminating on February 26, 2013 (the "Initial Term"). The Initial Term shall be automatically renewed for successive terms of five (5) years each unless either Supplier or Distributor notifies the other in writing (the "Notice of Termination") not less than one hundred twenty (120) days prior to the expiration of the Initial Term or any subsequent term of its intent not to renew the date of receipt of such notice, the "Notice Date") In the event of timely notification of the Notice of Termination, the termination shall be effective as of the end of the then-existing five (5) year term. | Distribution, Marketing Intangible | Foods and Nonalcoholic Beverages | 2080 | Manhattan, Brooklyn, Queens, Staten Island, Bronx, Nassau, Suffolk, Westchester, New York Counties, New York, United States | Multi Exclusivity | 1 USD | per case | Licensor, Per Unit |
| 15678 | Purple Beverage Company, Inc. | PURPLE BEVERAGE COMPANY, Inc.; B & J Juice Co. | B & J Juice Co.; PURPLE BEVERAGE COMPANY, Inc. | 02/26/2008 | 1. This Agreement shall be for a term of five (5) years commencing on the date set forth above and terminating on March 26th, 2013 (the "Initial Term"). The Initial Term shall be automatically renewed for successive terms of five (5) years each unless either Supplier or Distributor notifies the other in writing (the "Notice of Termination") not less than one hundred twenty (120) days prior to the expiration of the Initial Term or any subsequent term of its intent not to renew the date of receipt of such notice, the "Notice Date") In the event of timely notification of the Notice of Termination, the termination shall be effective as of the end of the then-existing five (5) year term. | Distribution, Marketing Intangible | Foods and Nonalcoholic Beverages | 2080 | Fairfield County, Connecticut, United States | Multi Exclusivity | 1 USD | per case | Licensor, Per Unit |
| 16018 | WASATCH FOOD SERVICES INC. | BAJIO, LLC; Bajio National, LLC; Bajio Franchising, LLC; Oregon, LLC, Duckies Bajio, LLC | Wasatch Food Services of Idaho, Inc.; Bajio National, LLC; Bajio Franchising, LLC; Oregon, LLC, Duckies Bajio, LLC | 10/11/2007 | 1. The term of this Agreement is twenty (20) years from the date of this Agreement, subject to earlier termination. If you are in substantial compliance with the Operations Manual and the terms of this Agreement, you may renew the franchise for additional consecutive twenty (20) year periods by giving us written notice not less than one (1) year, but no more than eighteen (18) months, before the expiration of the current term. | Franchise | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | | United States, Nevada, Idaho | Multi Exclusivity | 10% | monthly rent payment | Costs |
| 16018 | | | | | The Restaurant will be at a location found by you and approved by us. We or an Affiliate we designate will lease the premises and sublease them to you. We or our designee will attempt to secure a lease for the premises but we cannot represent it will be the best available rent in your area. We and/or our affiliate may charge a monthly fee, in addition to your monthly rent, of up to 15% of your monthly rent payment for compensated for administrative expenses or to serve as a profit. | | | | | | 2.5% | Gross Sales | Gross Sales |
| 16018 | | | | | You agree to pay us our designee an advertising fee equal to 3.5% of Gross Sales of the Restaurant until January 1, 2008 when the fee will increase by 25% (one half of a percent) on an annual basis up to 4.5%. | | | | | | 4.5% | Gross Sales | Gross Sales |
| 16018 | | | | | You agree to pay us our designee an advertising fee equal to 3.5% of Gross Sales of the Restaurant until January 1, 2008 when the fee will increase by 25% (one half of a percent) on an annual basis up to 4.5%. | | | | | | 8% | gross sales | Gross Sales |
| 16018 | | | | | You will pay us weekly a Royalty equal to eight percent (8%) of the gross sales from the Restaurant throughout the term of this Agreement. | | | | | | 6% | gross sale | Gross Sales |
| 16018 | | | | | Paragraph 21 is amended by deleting the reference to eight percent (8%) and replacing it with six percent (6%). | | | | | | 3% | Gross Sales | Gross Sales |
| 16018 | | | | | You agree to pay us our designee an advertising fee equal to 3.5% of Gross Sales of the Restaurant until January 1, 2008 when the fee will increase by 25% (one half of a percent) on an annual basis up to 4.5%. | | | | | | 4.5% | Gross Sales | Gross Sales |

| Agreement# | Agreement/Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | | Licensor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16111 | 1. Grant the right to use the Marks ("u-swirl FROZEN YOGURT and Design," "U and Design," and "Watch the Weight") and the System (intellectual property, including trade dress [which includes store layout and copyrighted materials], methods of operation, proprietary materials and information, and know-how used in connection with the operation of Licensor's U-Swirl Frozen Yogurt outlet) in and in connection with the operation of a U-Swirl Frozen Yogurt outlet located at 790 Coronado Center Drive, Henderson, Nevada 89052. | HEALTHY FAST FOOD, INC. | U-SWIRL YOGURT, INC.; U-SWIRL INTERNATIONAL, INC. | HEALTHY FAST FOOD, INC.; U-SWIRL INTERNATIONAL, INC.; U-SWIRL YOGURT, INC.; CREATE ENTERPRISES INCORPORATED | 09/20/2008 | 1. The closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Buyer, commencing at ___ a.m., local time, on September ___, 2008, or such other business day and/or time as agreed to by the parties (the "Closing Date"). 2. The term of this Agreement and the License will be ten years from the Effective Date, unless sooner superseded by another agreement between US and Licensee, or unless terminated as specified below in this Agreement. | Asset Purchase, Franchise, Manufacturing/Process Intangible, Marketing Intangible | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5812 | Nevada, United States, Henderson; Boulder City; Pahrump | Multi-exclusivity | 1% | gross sales | [see modifier text] | Gross Sales | | Licensor |
| 16861 | 1. Grant the right to use the Marks ("u-swirl FROZEN YOGURT and Design," "U and Design," and "Watch the Weight") and the System (intellectual property, including trade dress [which includes store layout and copyrighted materials], methods of operation, proprietary materials and information, and know-how used in connection with the operation of Licensor's U-Swirl Frozen Yogurt outlet) in and in connection with the operation of a U-Swirl Frozen Yogurt outlet located at 790 Coronado Center Drive, Henderson, Nevada 89052. | HEALTHY FAST FOOD, INC. | U-SWIRL YOGURT, INC.; U-SWIRL INTERNATIONAL, INC. | HEALTHY FAST FOOD, INC.; U-SWIRL INTERNATIONAL, INC.; U-SWIRL YOGURT, INC.; CREATE ENTERPRISES INCORPORATED | 09/20/2008 | 1. The closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Buyer, commencing at ___ a.m., local time, on September ___, 2008, or such other business day and/or time as agreed to by the parties (the "Closing Date"). 2. The term of this Agreement and the License will be ten years from the Effective Date, unless sooner superseded by another agreement between US and Licensee, or unless terminated as specified below in this Agreement. | Asset Purchase, Franchise, Manufacturing/Process Intangible, Marketing Intangible | Consumer Services, Restaurants, Foods and Nonalcoholic Beverages | 5812 | Nevada, United States, Henderson; Boulder City; Pahrump | Multi-exclusivity | 1% | gross sales | [see modifier text] | Gross Sales | | Licensor |

kMINE

kMINE Export (2018-02-21) Part I

| Agreement ID | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementLine | Modifier | Commercialize | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22294 | ... | BIOLARGO, INC. | KETTLE INC., Using IP Pty. Limited | BIOLARGO, INC., KETTLE INC. | 03/26/2010 | ... | Manufacturing/Process Intangible, Marketing Intangible | Environment and Waste Management, Agribusiness, Industrial Equipment and Machinery, Consumer Non-Durable, Biotechnology, Healthcare Products and Supplies, Foods and Nonalcoholic Beverages, Chemicals | 2800 | United States, Canada, Mexico, World | Multi-Exclusivity | 5% | net ex works price | ... | Net Sales | Licensor |
| 22294 | | | | | | | | | | | | 25% | net ex works price | ... | Net Sales | Licensor |
| 22294 | | | | | | | | | | | | 5% | net ex works price | ... | Net Sales | Licensor |
| 22294 | | | | | | | | | | | | 25% | net ex works price | ... | Net Sales | Licensor |
| 22294 | | | | | | | | | | | | 60% | all consideration | ... | Net Sales | Sublicensor |
| 22294 | | | | | | | | | | | | 30% | all consideration | ... | Net Sales | Sublicensor |

EX1-115

| Agreement # | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementUse | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22234 | | | | | | | | | | | 60% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensee has received cumulative payments under all IP license agreements totaling A$800,000, the Royalty percentage due Licensor pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | | Net Sales | Sublicense |
| 22234 | | | | | | | | | | | 30% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensee has received cumulative payments under all IP license agreements totaling A$800,000, the Royalty percentage due Licensor pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | | Net Sales | Sublicense |
| 22235 | BIOLAISSE, INC. | Biolaisse, Inc., Udaiy Inc., Gain USA, Inc., Biolaisse, Ninta (Pty Limited, Ium Inc., Ilday Inc., Ilday IP (Pty Limited | | 01/29/2010 | 1. Subject to early termination, the term of this Agreement (the "Term") will expire on the earlier of (i) the expiration of the last to expire of the Patent Rights, or (ii) on the tenth (10th) anniversary of the Effective Date; provided that for so long as the Patent Rights, or any of them, remain valid, and provided further that Licensee does not have any uncured Event of Default on Minimum Payment Defaults as of the date of such expiration, Licensee shall have the right, by written notice to Licensor, to extend the Term for six (6) additional periods of five (5) year each under the terms and conditions defined herein. 2. Subject to early termination pursuant to Section 10, the term of this Agreement (the "Term") will expire on the tenth (10th) anniversary of the Effective Date; provided that Licensee does not have any uncured Event of Default or Minimum Payment Defaults as of the date of each such expiration, Licensee shall have the right, by written notice to Licensor, to extend the Term for six (6) additional periods of five (5) years each under the terms and conditions defined herein. 3. Term notes the expiration of the last to expire of the Patent Rights. 4. The term (the "Term") of this Agreement shall | Manufacturing/Process Intangible; Marketing Intangible; Service | Business Services, Applications, Biotechnology, Consumer Non-Durables, Environment and Waste Management, Foods and Nonalcoholic Beverages, Healthcare Products and Supplies, Industrial Equipment and Machinery, Chemicals | 2000 | United States, Canada, Mexico, world | Multi-Exclusivity | 10% | Any net economic benefit | If Licensee enters into a Sublicense Agreement, Licensee (Group Profit shall pay Licensor a sublicense fee equal to fifty percent (50%) of any net economic benefit, including sublicense fees, royalties and other payments, less all direct expenses related to the sublicense, received by Licensee, or any affiliate of Licensee, from any party, arising out of or in connection with such Sublicense Agreement. | Group Profit | Sublicense |
| 22235 | | | | | | | | | | | 6% | Net Sales Revenue | Commencing upon the Effective Date and during the Term of this Agreement, Licensee shall pay to Licensor a portion of Licensee's Net Sales Revenue as an ongoing royalty fee: Up to $10,000,000 Annual Net Sales Revenue | | Net Sales Revenue |
| 22235 | | | | | | | | | | | 5% | Net Sales Revenue | Commencing upon the Effective Date and during the Term of this Agreement, Licensee shall pay to Licensor a portion of Licensee's Net Sales Revenue as an ongoing royalty fee; Greater than $10,000,000 to $15,000,000 Annual Net Sales Revenue | | Net Sales Revenue |
| 22235 | | | | | | | | | | | 6% | Net Sales Revenue | Commencing upon the Effective Date and during the Term of this Agreement, Licensee shall pay to Licensor a portion of Licensee's Net Sales Revenue as an ongoing royalty fee; Greater than $15,000,000 Annual Net Sales Revenue | | Net Sales Revenue |

For the row 22235 first data row, the Agreement Synopsis column contains:
1. Grant the right to use, exploit, develop and commercialize each and every element of the Intellectual Property related to the Iun System developed for the cleaning, sanitizing and delivery of Biowater Iodine technology-based disinfection by-products by Biotech ozon (i) to make, have made, use, sell, offer for sale, license, and sublicense Licensed Products; (ii) to export Licensed Product(s) to Canada and Mexico (iii) to practice Licensed Processes, and (iv) to use all or any portion of the Intellectual Property in the Fields of Use (ii) Licensee with respect to the Intellectual Property in the Fields of Use (iii) Dairy Ite, and (iv) Poultry Drinking Water) in the Territory.
2. Grant the right to conduct research, develop and make modifications and enhancements to the Intellectual Property, and to improve the Intellectual Property
3. Grant the right to use the word "Iun" in (i) its corporate name and in the name of any affiliated entities that Licensee may elect to form in connection with this License; (ii) the branding, marketing, sale and sublicensing of the Licensed Processes and/or Licensed Products, and (iii) in all other uses as Licensee may deem to be appropriate in connection with this License.
4. Grant the right to conduct research and development activities, and pursue regulatory approval, clinical trials, and all other work necessary to develop, improve, enhance and commercialize the Licensed Products and Licensed Processes within the Field of Use (i) Horticulture, (ii) Dairy Use, and (iii) Poultry Drinking

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22295 | | | | | | | | | | | | 5% | net as works price | In consideration for the grant of the License, Licensee shall pay to Licensor a royalty equal to five percent (5%) of the "net as works price" of all Licensed Products sold by the Licensee (minus product returns). The "net as works price" means the gross invoiced price of the Licensed Products sold, reduced by (i) usual arm's length trade discounts, (ii) customs duties, transportation, and insurance charges of these items are included in the gross invoiced price), and (iii) the portion of the price paid (if any) that is attributable to consulting and other special services provided by Licensee to its customers (determined in accordance with U.S. Generally Accepted Accounting principles applied on a consistent basis). | Net Sales | License |
| 22295 | | | | | | | | | | | | 2.5% | net as works price | After Licensor has received cumulative payments under all of Revenue agreements totaling A$800,000, the Royalty Percent shall be reduced from five percent to two and one-half percent (2-1/2%). | Net Sales | License |
| 22295 | | | | | | | | | | | | 5% | net as works price | In consideration for the grant of the License, Licensee shall pay to Licensor a royalty equal to five percent (5%) of the "net as works price" of all Licensed Products sold by the Licensee (minus product returns). The "net as works price" means the gross invoiced price of the Licensed Products sold, reduced by (i) usual arm's length trade discounts, (ii) customs duties, transportation, and insurance charges of these items are included in the gross invoiced price), and (iii) the portion of the price paid (if any) that is attributable to consulting and other special services provided by Licensee to its customers (determined in accordance with U.S. Generally Accepted Accounting principles applied on a consistent basis). | Net Sales | License |
| 22295 | | | | | | | | | | | | 2.5% | net as works price | After Licensor has received cumulative payments under all of Revenue agreements totaling A$800,000, the Royalty Percent shall be reduced from five percent to two and one-half percent (2-1/2%). | Net Sales | License |
| 22295 | | | | | | | | | | | | 7% | any net royalty or other net payment | For it affects in seeking, identifying, introducing and negotiating Business Opportunities, Licen USA shall pay a commission to BioLargo equal to seven percent (7%) of any net royalty or other net payment received by or paid to Licen USA, or some other percent as the parties may agree, whether or not such other royalty, license or other property, derived directly or indirectly from such Business Opportunity. | Net Sales | License |
| 22295 | | | | | | | | | | | | 15% | all royalties | Should Licensor enter into a sublicense agreement of the Intellectual Property in the Territory which are not in the Licensee's field of Use with a third party, which Licensor may at its sole and absolute discretion, and which Licensor shall have no obligation to do, Licensor shall pay to Licensee fifteen percent (15%) of all royalties received pursuant to the Third Party Sublicense agreement. | Net Sales | License |
| 22295 | | | | | | | | | | | | 60% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensor has received cumulative payments under of all licensee agreements totaling A$800,000, the Royalty percentage due from Licensee pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | Net Sales | Subli |

kMINE Export (2016.02.21) Part I

Page 29 of 63

EX1-117

kMINE Export (2016.02.21) Part 1

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commercialization | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22295 | | | | | | | | | | | | 30% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensee has received cumulative payments under all IP license agreements totaling A$800,000, the Royalty percentage due Licensor pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | Net Sales | Sublicense |
| 22295 | | | | | | | | | | | | 60% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensee has received cumulative payments under all IP license agreements totaling A$800,000, the Royalty percentage due Licensor pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | Net Sales | Sublicense |
| 22295 | | | | | | | | | | | | 30% | all consideration | If Licensee sub-licenses the IP or any portion of the IP to any other party, Licensee shall pay Licensor a Royalty equal to sixty percent (60%) of all consideration received by Licensee with regard to any such sub-license. After Licensee has received cumulative payments under all IP license agreements totaling A$800,000, the Royalty percentage due Licensor pursuant to this paragraph shall be reduced from sixty percent to thirty percent. | Net Sales | Sublicense |
| 22295 | | | | | | | | | | | | 75% | any such payments or royalties | for any party with whom Biocurgis has a written product evaluation agreement executed prior to the Effective Date of this Agreement, should Biocurgis propose a sublicense for the Intellectual Property with such entities in a field of use licensed to Ion USA pursuant to this Sublicense Agreement (including amendments, if any), Ion USA must choose one of the following alternatives: (i) accept the terms of the proposed sublicense, or (ii) elect to receive two times its development and commercialization expenses from Biocurgis related to the particular field of use in the proposed sublicense, and any surviving Agreement such field and field of use is removed from the field of use licensed to Ion USA... | Net Sales | Sublicense |

EX1-118

| Agreement ID | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22295 | | | | | | | | | | | | 50% | any such payments or royalties | for any party with whom Biocorp has a written product marketing agreement executed prior to the Effective Date of this Agreement, should Biocorp propose a sublicense for the Intellectual Property with such entity or a third of Use licensed to Ison USA pursuant to this Agreement (including amendments of this ... Ison USA must choose one of the following: (i) accept the terms of the proposed sublicense, or (ii) elect to receive two times the development and commercialization expenditures from Biocorp related to the particular field of use in the proposed sublicense and amend this Agreement such that said field of use is removed from the Field of Use licensed to the Sublicense Agreement. Should Ison USA accept the terms of the proposed sublicense, the fees due to Ison USA in lieu of royalties of any such payments or royalties received, if the agreement is executed thereafter, Ison USA shall pay to Biocorp 50% of any such payments or royalties received. | Net Sales | |
| 23830 | | Nanocator, Inc. | National Aeronautics and Space Administration, NASA, United States | Nanocator, Inc. | 04/27/2007 | 1. "LICENSE TERM" shall mean the period of time starting with the LICENSE COMMENCEMENT DATE and ending with the LICENSE EXPIRATION DATE. 2. "LICENSE COMMENCEMENT DATE" shall mean the date that the last PARTY has executed this AGREEMENT. 3. "LICENSE EXPIRATION DATE" shall mean the last day that this AGREEMENT is in effect. 4. Unless either PARTY terminates this AGREEMENT in accordance with ARTICLE XVIII at an earlier date, the license granted in ARTICLE X will be in effect for a LICENSE TERM that is equal to the unexpired term of the last patent to issue of the patent(s) encompassed under the definition of LICENSED PATENTS. Except as may be expressly provided otherwise herein or agreed to in writing by LICENSOR, the license shall expire automatically at the end of the LICENSE TERM without notice to LICENSEE. | Manufacturing/Process Intangible Marketing Intangible | Biotechnology, Alternative and Renewable Energy, Healthcare Pharmaceuticals, Semiconductors, Transportation Equipment and Parts, Consumer Durables, Environment and Waste Management, Applications, Foods and Foodstuffs Beverages, Industrial Equipment and Machinery, Consumer Non-Durable, Chemicals | 2890 | United States | Multi-Exclusivity | 7% | NET SALES | LICENSEE agrees to pay LICENSOR a running royalty of seven percent (7%) of the NET SALES of ROYALTY BASE PRODUCTS for each ACCOUNTING PERIOD. | Net Sales | |
| 21102 | | GALXI PHARMACEUTICALS LTD | Napo Pharmaceuticals, Inc., Napo Pharmaceuticals, Inc., University of Iowa Research Foundation | Salix Pharmaceuticals, Inc., Napo Pharmaceuticals, Inc., University of Iowa Research Foundation | 12/9/2008 | 1. Napo's right to receive royalties under Section 7.5 shall require on a country-by-country and Licensed Product-by-Licensed Product basis, upon the sooner of (a) the date of the first commercial sale (by a Person other than Salix or its Affiliates, Sublicensees or Distributors) in the country of a product that is covered by a Valid Claim constituting a Patent in Force or (b) the date of expiration Competitive Product in respect of such Licensed Product, and (b) the latest of (i) ten (10) Calendar Years from the date of first commercial sale of such Licensed Product in such country and (ii) the first date on which there is no longer (b) a Napo Patent that covers the commercial sale in such country, and (c) Non-Exclusivity with respect to such Licensed Product in such country (the "Royalty Term") ... (ii) the expiration of each such Royalty Term, on a country-by-country and Licensed Product-by-Licensed Product basis, the license set forth in Section 10.1 shall be fully paid-up and perpetual license with respect to such Licensed Product in such country 2. This Agreement shall become effective on the Effective Date and, unless earlier terminated pursuant to Section 13.1, 13.2 or 13.4 hereof, shall continue in full force and effect on a country-by-country and Licensed Product-by-Licensed Product basis until the expiration of the last Royalty Term for such Licensed Product in such country (the obligation with respect to such Licensed Product in such | Joint Development, Manufacturing/Process Intangible Marketing Intangible | Foods and Neutraceuticals Beverages, Healthcare Pharmaceutical, Biotechnology, Chemicals | 2834 | worldwide, United States of America, Puerto Rico, District of Columbia, Canada, Mexico, Japan, Australia, Czech Republic, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Italy, Latvia, Lithuania, Luxembourg, Malta, The Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, United Kingdom | Multi-Exclusivity | 5% | Net Sales | In the event that Salix terminates this Agreement pursuant to Section 13.3 as a result of a breach by Napo or pursuant to Section 13.4, Napo shall pay to Salix a royalty of five percent (5%) on Net Sales (calculating Napo for Sale in the definition hereof) of all Licensed Products (other than to Sale and its Affiliates and Sublicensees) from and after the effective date of such termination. | Net Sales | Subli... |

| AgreementID | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commensurate In | Lead License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23102 | | | | | | | | | | | | 7% | Net Sales | In partial consideration of the rights granted by Nopo to Sales hereunder and subject to the terms and conditions set forth in this Agreement, Sale shall pay to Nopo royalties on each Licensed Product in respect of each Annual Period as follows: After the (7) anniversary of the date of the first commercial sale of any Licensed Product by Sale or any of its Affiliates or Sublicensees, at all times when the Per Tablet Cost of Goods is equal to or greater than (*) United States Cents ($ 0.*) so long as Sale makes then-obtained and paid-this service a (*) at all times when the Per Tablet Cost of Goods is equal to or greater than (*) United States Cents ($ 0.*) but less than (*) United States Cents ($ 0.*), seven percent (7%) | Net Sales | License |
| 23976 | 1. Grant the right to establish and operate a retail Buffalo Wild Wings® Restaurant identified by the Buffalo Wild Wings® Trademarks in such other marks, to be located at (1301 N. Hghway 41 West, Marquette, Michigan 49855 or a location to be designated within 90 days from the date of this Agreement; according to the Buffalo Wild Wings® System, which consists of distinctive food and beverage products prepared according to special and confidential recipes and formulas with unique design, preparation, service and delivery procedures and techniques offered in a setting of distinctive interior and exterior layout, design and color scheme, signage, furnishings and materials and using certain distinctive types of facilities, equipment, supplies, ingredients, business techniques, methods and procedures together with sales promotion programs, all of which we may modify and change from time to time. 2. Grant the right to access, use and display the Products (portal or software and online products, including the Portal available through web sites owned or controlled by portal and Licensor and the materials licensor which provide functions with a preliminary internet analysis of a proposed location. | Diversified Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc., Glorise, Inc. | AMC Marquette, Inc. | 10/20/2009 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 19) and expires 20 years after the Required Open Date. The Required Open Date, which ever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 13. 2. You may renew your license for two renewal terms, (the first renewal term is 10 years; the second renewal term is 5 years). 3. If, as a condition of renewal, we require you to renew or if your Restaurant pursuant to subparagraph 4.B(6) above, you may renew your license for 20 years plus two renewal terms of 10 years and five years, respectively, provided that with respect to the renewal, you meet all condition stated in subparagraph 4.B. | Franchise, Marketing Intangible, Software | Consumer Services, Foods and Nondurables, Beverages, Restaurants, RUAG, Computers: Hardware and Software, Business Services, Internet, Consumer Durables, Consumer Non Durables | 8741 | United States, Marquette, MI | Multi-Exclusivity | 5% | Gross Sales | In addition to the Advertising Fee, you are required to spend 1.0% of your Gross Sales on approved local marketing and promotion. | Gross Sales | License |
| 23976 | | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and if designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If established, you must contribute no minimum of 2.0% of Gross Sales to the local cooperative, which satisfied the local marketing requirement described in subparagraph 8.B. | Gross Sales | License |
| 23976 | | | | | | | | | | | | 5% | Gross Sales | In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us on a weekly basis a continuing Royalty Fee. The Royalty Fee for the second half of the initial term of this Agreement (can be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of this Agreement (or, if in form of franchise agreement is being used by us on such date, the Royalty Fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1.0% at any time during the initial term of the Agreement. | Gross Sales | License |
| 23976 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1.0% per year and that the Advertising Fee will not exceed 4% for the initial term of the Agreement. | Gross Sales | License |

EX1-120

kMINE Export (2016.02.21) Part I

| Agreement# | Synopsis | FilingCompany | Licensee | Licensee | Licensor | Term | EffectiveDate | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodite | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23976 | | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 4% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you. In addition, however, that we may increase the Advertising Fee by more than 1.0% per year until that Advertising Fee will not exceed 4% for the initial term of this Agreement. | | Licensor |
| 23976 | | | | | | | | | | | | | 400 USD | per site | You are responsible for purchasing or leasing a site that meets our site selection criteria. You must obtain our written consent to the site. Prior to granting our consent, you must meet with a broker or other representative of the property site evaluator software that has been developed by Genesco, Inc. You must execute the Enrollment Form and Portal Terms and Conditions attached as Appendix F and pay Genesco, Inc. an evaluation fee of $400 per site evaluated, but you must pay for the rights to have at least 3 sites evaluated and these fees are non-refundable. | | Licensor |
| 23976 | | | | | | | | | | | | | 100 USD | per visit | If you fail an evaluation by us or by a mystery shopper or if we receive a specific customer complaint, you must pay for the mystery shopper(s) we send to your Restaurant until the issue is resolved to our satisfaction. The cost we charge for the mystery shopper(s) is approximately $100 fee per visit, which you must pay directly to the vendor. This cost does not includes the reimbursement of the tab paid by the mystery shopper for the items consumed at your Restaurant and, therefore, the actual fee for each visit will vary. | | Licensor |
| 23976 | | | | | | | | | | | | | 2,500 USD | per restaurant | You agree that the following provisions govern any transfer or proposed transfer. If the transfer is part of a simultaneous, multiple restaurant transfer, the transfer fee will be modified as follows: the transfer fee for the first restaurant is $12,500, the transfer fee for the second through ninth restaurants is $2,500 per restaurant, with no additional transfer fee beyond the ninth restaurant. | | Licensor |
| 23976 | | | | | | | | | | | | | 400 USD | per package | Each package is $400, available in blocks of three(3) for a total of $1,200. Enclosed is a check for $1,200 made payable to Buffalo Wild Wings Packages | | Licensor |
| 23977 | 1.Grant the right to establish and operate a single Buffalo Wild Wings® Restaurant identified by the Buffalo Wild Wings® Trademarks so such that the premises will be located at 21134 Celestial Avenue, Chesterfield Township, Michigan 48051 or a location to be designated within 90 days from the date of this Agreement, according to the terms of this Agreement. The System consists of distinctive food and beverage products prepared according to special and confidential recipes and formulas with unique design, preparation, service and delivery procedures and techniques, offered in a setting of distinctive exterior and interior layout, design and color scheme, signage, furnishing and materials and using certain distinctive types of facilities, equipment, supplies, ingredients, business techniques, methods and procedures together with sales promotion programs, all of which we may modify and change from time to time. 2.Grant the right to access, use and display the Products (genesist software and online products, including the Portal available through a web-based sitecontained by genVault) and content and the materials therein which we provide for otherwise with a preliminary real estate analysis of a proposed location. | Chesterfield Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc., Genesco, Inc. | AMC Chesterfield, Inc. | | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 19) and expires 20 years after the Restaurant opens for business or the Required Open Date, whichever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 18. 2.You may renew your license for two(2) renewal terms, the first renewal term is 10 years, the second renewal term is 5 years). 3.If, as a condition of renewal, we require you to relocate your Restaurant pursuant to subparagraph 4.B(6) above, you may renew your license for 20 years plus two renewal terms of 10 years and five years, respectively, provided that with respect to such renewal, you meet all condition stated in subpah 4.B. | 10/20/2008 | Franchise, Marketing, Intangible, Software | Business Services, Computers, Hardware and Software, Computer Services, Consumer Nondurables, Beverages, Internet, Restaurants, Retail, Consumer Durables, Consumer Non Durables | 6794 | Chesterfield Township, MI, United States | Multi Exclusivity | 5% | Gross Sales | In addition to the Advertising Fee, you are required to spend 1.0% of your Gross Sales on approved local marketing and promotion. | Gross Sales | Licensor |
| 23977 | | | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and if designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If established, you must contribute a minimum of 2.0% of Gross Sales to the local advertising cooperative, which will be the local marketing requirement described in subparagraph 6.B. | Gross Sales | Licensor |

EX1-121

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | Licensee | EffectiveDate | Term | Industry | AgreementType | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23977 | | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial franchise fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 3% of Gross Sales. For the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty the being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or if as franchise agreement is being used by us on such date, the Royalty fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of this Agreement. | Gross Sales | Licensor |
| 23977 | | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licensor |
| 23977 | | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licensor |
| 23977 | | | | | | | | | | | | | 400 USD | per site | You are responsible for purchasing or leasing a site that must meet our site selection criteria. You must obtain our written approval to the site. Prior to granting our consent to a site, you must have the site evaluated by the proprietary site evaluation software that has been developed by GeoScout, Inc. You must execute the Enrollment Form and Pyxol Terms and Conditions attached in Appendix F and pay GeoScout, Inc. an evaluation fee of $400 per site evaluated, but you must pay for the rights to have at least 3 sites evaluated and these costs are nonrefundable. | Per Unit | Licensor |
| 23977 | | | | | | | | | | | | | 100 USD | per unit | If you fail an evaluation by us or by a mystery shopper or if we receive a specific customer complaint, you must pay for the mystery shopper(s) we send to your Restaurant until the issue is resolved to our satisfaction. The current fee charged by the vendors is approximately $100 for each visit, which you must pay directly to the vendor. The fee per visit includes the reimbursement of the bill paid by the mystery shopper for the items consumed at your Restaurant and, therefore, the actual fee for each visit will vary. | Per Unit | Licensor |
| 23977 | | | | | | | | | | | | | 2,500 USD | per restaurant | You agree that the following provisions govern any transfer to a proposed transferee. If the transferee is part of a simultaneous, multiple restaurant transfer, the transfer fee will be modified as follows: (the transfer fee for the first restaurant is $12,500; the transfer fee for the second through ninth restaurant is $2,500 per restaurant, with no additional transfer fee beyond the ninth restaurant. | Per Unit | Licensor |
| 23977 | | | | | | | | | | | | | 400 USD | per package | Each package is $400 and available in blocks of three (3) for a total of $1,200 disclosed in a check for $1,200 made payable to geoxar, inc. For Site Packages | Per Unit | Licensor |

KMINE Export (2018.02.21) Part 1

Page 14 of 63

EX1-122

kMINE

| Agreement ID | Agreement Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26235 | 1 Grant the right to strike the the rights (scope) which the LICENSOR owns and controls, for the purpose of marketing and distributing the products of LICENSOR products free of glacé acids, vinegars, mustards, sugars, rubs, brews dipers, seasoning, dressing rubs, chutneys, fruit, cookie mixes, batters and antipastos. 2 Grant the right to use LICENSOR's name, likeness, identity, trademarks and trade symbols for the purpose of fulfilling this Agreement and in connection with the promotion, advertising, distribution, financing, marketing and production of the Products or derivatives there from, and for general or operational promotional purposes for the Territory. | Celestial Delights USA Corp | CELESTIAL DELIGHTS USA CORP | Celestial Delights, Yesenia LaRosal | 07/02/2008 | 1. This Agreement shall take effect July 2, 2008 and remain in effect through the July 2, 2010. At the sole option of LICENSOR this Agreement may be extended for two additional 2-year periods by providing written notice. This Agreement may be further extended upon mutual Agreement between the parties. | Manufacturing/Process Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables | | United States of America | EXCLUSIVE | 10% | gross sales | LICENSEE shall pay to LICENSOR, on his/her agent a royalty fee through July 2, 2010, at the sole option of LICENSOR a ten percent (10%) of all gross sales for Product's Licensed hereunder. | Gross Sales | License |
| 26250 | 1 Grant the right to practice, i.e., to make, have made, use, offer to sell, sell & confers, use dispose of the LICENSED INVENTION by the claims of the two United States patents: U.S. Patent No. 6,342,24 for an invention entitled "METHOD OF MANUFACTURING CARBON NANOTUBES" and U.S. Patent No. 7,008,605 for an invention entitled "METHOD OF MANUFACTURING HIGH-QUALITY CARBON NANOTUBES" as limited to the LICENSED AREA of the invention from the United States and may be limited to Carbon Nanotube Production. 2 Grant the right to use the name of LICENSOR, or the acronym "NASA," only in truthful statements concerning its relationship with LICENSOR. | Nanotailor, Inc. | Nanotailor, Inc. | National Aeronautics and Space Administration, NASA, United States | 04/27/2007 | 1. "LICENSE TERM" shall mean the period of time (starting with the LICENSE COMMENCEMENT DATE and ending with the LICENSE EXPIRATION DATE. 2. "LICENSE COMMENCEMENT DATE" shall mean the date that the last PARTY has executed this AGREEMENT. 3. "LICENSE EXPIRATION DATE" shall mean the last day that this AGREEMENT is in effect. 4. Unless other PARTY terminates this AGREEMENT in accordance with ARTICLE XVIII or an earlier date, the LICENSE TERM shall expire on the last day on which at least one of the licensed patents (in effect of the patents) LICENSE TERM that is equal to the unexpired term of the last patent to be in effect of the patent(s) encompassed under the definition of LICENSED PATENTS. Except as may be expressly provided otherwise herein or agreed to in writing by LICENSOR, the license shall expire on the last day at the end of the LICENSE TERM without notice to LICENSEE. | Manufacturing/Process Intangible, Marketing Intangible | Agriculture, Alternative and Renewable Energy, Biotechnology, Chemicals, Consumer Durables, Consumer Non-Durables, Environment and Waste Management, Foods and Nonalcoholic Beverages, Healthcare Pharmaceutical, Industrial Equipment and Machinery, Semiconductors, Transportation Equipment and Parts | | United States | Multi-Exclusivity | 7% | NET SALES | LICENSEE agrees to pay LICENSOR a running royalty of seven percent (7%) of the NET SALES of ROYALTY BASE PRODUCTS for each ACCOUNTING PERIOD. | Net Sales | License |
| 27842 | 1 Grant the right to utilize I all under a web-based application, which precludes the functionality of a career portal or job board and which allows employers to electronically reach specified candidates and job opportunities. In connection with the license (URL) (i.e. the License has established and developed software, websites, templates for the creation of candidate profiles and employer job opportunities, business methods, documentation, trademarks and other intellectual property and confidential information, all of which are collectively referred to as the "Software") for the purpose of creating a Job Board for the Hospitality and Food Services sectors in the Canadian and United States markets. | TALWARE NETWORK INC. | TALWARE NETWORK INC., HOTECH PUBLICATIONS LTD. | | 06/22/2005 | 1 The initial term of this Agreement will be 12 months from the date of this Agreement (the "Anniversary Date") and will automatically renew on each Anniversary Date for a further 12-month period on the same terms and conditions. | Manufacturing/Process Intangible, Marketing Intangible, Software | Consumer Services, Travel and Recreation, Business Services, Computers: Hardware and Software, Internet, Publishing, Restaurants, Foods and Nonalcoholic Beverages | | Canada, United States | Multi-Exclusivity | 13% | monthly gross sales revenues | The Licensee will pay the Licensor a License Fee equal to 13% (thirteen percent) of the monthly gross sales revenues generated by the Licensee from the operation of the Job Board using Software. | Gross Sales | License |
| 27842 | | | | | | | | | | | | 20% | first year's revenues | In the event that the Licensee introduces the Licensor to a business entity and as a result of such introduction, the Licensor enters into a license agreement or sale agreement with such business entity for any of the applications or products marketed by the Licensor, the Licensee will receive a referral fee as follows: A referral fee equal to 20% (twenty percent) of the first year's revenues generated by the Licensor from such license agreement or sale agreement. | Net Sales | Referral |
| 27842 | | | | | | | | | | | | 15% | second year's revenues | In the event that the Licensee introduces the Licensor to a business entity and as a result of such introduction, the Licensor enters into a license agreement or sale agreement with such business entity for any of the applications or products marketed by the Licensor, the Licensee will receive a referral fee as follows: A referral fee equal to 15% (fifteen percent) of the second year's revenues generated by the Licensor from such license agreement or sale agreement. | Net Sales | Referral |

kMINE

VMINE Export (2016.02.21) Part I

| Agreement ID | Synopsis | Filing Company | Licensee | Licensor | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commensurate to | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27842 | | | | | | | | | | | | 10% | Third and subsequent year's revenues | In the event that the Licensor introduces the Licensor to a business entity and as a result of such introduction, the Licensor enters into a license agreement or sale agreement with such business entity for any of the applications or products marketed by the Licensor, the Licensee will receive a referral bonus (follows: A referral fee equal to 10% (fifteen percent) of the third and subsequent year's revenue generated by the Licensor from such license agreement or sale agreement. | Net Sales | Referral |
| 27842 | | | | | | | | | | | | 15% | Third and subsequent year&#39;s revenues | In the event that the Licensor introduces the Licensor to a business entity and as a result of such introduction, the Licensor enters into a license agreement or sale agreement with such business entity for any of the applications or products marketed by the Licensor, the Licensee will receive a referral bonus (follows: A referral fee equal to 15% (fifteen percent) of the third and subsequent year&#39;s revenue generated by the Licensor from such license agreement or sale agreement. | Net Sales | Referral |
| 27248 | 1. Grant the right to purchase and pay for, at the Closing, all of Seller&#39;s right, title and interest in, to and under the assets of the business relating to proprietary technology and materials known as the high temperature liquid composting process ("HTLC Process") that processes various biodegradable waste products into liquid and solid organic based Fertilizer and feed products. | Converted Organics, Inc. | Waste Recovery Industries, LLC | Converted Organics, Inc. | 01/31/2008 | 1. The closing of the purchase and sale of the Assets (the "Closing"), shall be held at the offices of Seller located at 15671 Johnson Canyon Road, Gonzales, California 93926 at 10:00 a.m., local time, on or about January 31, 2008, except as may be extended by the mutual written agreement of Seller and Buyer. The date on which the Closing shall occur is hereinafter referred to as the "Closing Date." | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible | Agribusiness, Chemicals, Foods and Nondurables Beverages, Environment and Waste Management, Biotechnology, Consumer Non Durables | 2870 | Eureka, California, New Jersey, Rhode Island, Gonzales, California, Quebec, Ontario, Canada, United States | EXCLUSIVE | 50% | Sales | The aggregate purchase price for the Assets shall not exceed Seven Million Five Hundred Thousand Dollars ($7,500,000.00), and shall be made as follows: (A) Over a period commencing on the Closing Date and ending ten (10) years thereafter (the "Payment Term"), Buyer will pay Seller Four Thousand One Hundred Dollars ($4,100.00) for every additional one metric ton of capacity that is added to the current capacity available or planned for the production facilities in New Jersey, Rhode Island and Gonzales, California, and (B) the actual per gallon of production capacity for any new production facilities constructed and owned by Buyer either for itself or on behalf of BFO (including the New Jersey, Rhode Island and Gonzales, California plants and any HTLC production plants). Buyer will pay Seller fifty percent (50%) of the net sales from such new plants (not to exceed additional capacity for a new production plant in every case), and (c) the remaining one-half in the form of a fifty percent (50%) royalty payment from all product sales from the additional capacity of existing plants or any new production plants. | Net Sales | License |
| 27248 | | | | | | | | | | | | 50% | profits | The aggregate purchase price for the Assets shall not exceed Seven Million Five Hundred Thousand Dollars ($7,500,000.00), and shall be made as follows: (B) During the Payment Term, Buyer will pay Seller fifty percent (50%) of the profits Buyer receives from the Eureka Facility or any waste processing plant resulting from the applications of the HTLC to for-toxic waste processing. All amounts paid shall be credited toward the Purchase Price. | Operating Profit | License |
| 27248 | | | | | | | | | | | | 50% | profits | The aggregate purchase price for the Assets shall not exceed Seven Million Five Hundred Thousand Dollars ($7,500,000.00), and shall be made as follows: (B) During the Payment Term, Buyer shall pay Seller fifty percent (50%) of the profits that Buyer receives from Buyer&#39;s use or lease of any portable processing plants or facilities that utilize the HTLC Process to convert organic matter into liquid or pelletized fertilizer. All amounts paid shall be credited toward the Purchase Price. | Operating Profit | License |

Page 46 of 63

EX1-124

ktMINE Export (2018.02.21) Part I

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead (License) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27248 | | | | | | | | | | | | 5,500 USD | per ton | The aggregate purchase price for the Assets shall not exceed Seven Million Five Hundred Thousand Dollars ($7,500,000.00), and shall be made as follows: (b) Over a period of five years following the Closing Date and ending ten (10) years thereafter (the "Buyer Payment Term"), Buyer will pay Seller Two Thousand Five Hundred Dollars ($2,500.00) for (i) every additional ton per day of capacity that is added to the current capacity available or planned for the production facilities in New Jersey, Rhode Island and Colorado, California, and (ii) the actual ton per day of production capacity for any new production facilities constructed and owned by Buyer either for itself or on behalf of BSC (excluding the New Jersey, Rhode Island and Colorado, California plants and any RSC2 production plant). Buyer will pay Seller (i) within thirty (30) days after the end of each production plant comes online, and (ii) the remaining one-half in the form of fifty percent (50%) royalty payment from all product sales from the additional capacity of the new production plants. | Per Unit | License |
| 27754 | 1. Grant the right to purchase on the Closing Date, free and clear of all covenants, restrictions, liens, security interests, claims, pledges, assignments, software, options, rights of refusal, charges, leases, licenses, encumbrances and any other restriction of any kind or nature, all properties, assets, privileges, rights, interest and claims, real and personal, tangible and intangible, of every type and description, wherever located, including the Business as a going concern and goodwill, that are owned, used, or held for use by Seller and related to the Business (the business of selling coffees, teas, whole leaf teas and other beverages and select baked goods for purposes of operating and operating the Business at the store located at 8948 Santa Monica Boulevard, West Hollywood, CA 90069. 2. Grant the right to exercise an option to open and operate a Java Detour franchise store in the territory of Lebanon, such option to be available to Seller for a period of one (1) year following the Closing Date. | JAVA DETOUR INC. | Java Universe, LLC (the Seller), Joseph Merhi, JDCG, Inc., Java Universe Inc., Elia Lemaitre, Joseph Merhi | JDCG, Inc., Java Detour Inc., Java Universe, LLC, Joseph Merhi, JDCG, Inc., Java Detour, Inc. | 04/17/2008 | 1. The closing of the sale and transfer of the Assets (the "Closing") and the consummation of the other transactions contemplated by this Agreement shall take place on or before April 17, 2008 (the "Closing Date"). | Asset Purchase, Franchise, Manufacturing/Process Intangible, Marketing Intangible | Foods and Nonalcoholic Beverages, Retail, Restaurants, Consumer Services, Consumer Non-Durable | 5400 | West Hollywood, CA, United States, Lebanon | EXCLUSIVE | 115% | travel costs | Buyer shall grant an option to Seller or any of its affiliates or partners to open and operate a Java Detour franchise store in the territory of Lebanon, such option to be available to Seller for a period of one (1) year following the Closing Date. In the event that Seller or any of its affiliates or partners shall exercise its option to open up the Lebanon Store within the one (1) year period, Buyer shall (i) waive its standard franchise fee for such store, and (ii) charge ongoing franchise fees and payable in connection with the Lebanon Store at three percent (3%) of such store's gross revenues; provided, that the owner and operator of the Lebanon Store agrees to pay for all travel costs (at a minimum of fifteen percent (15%) incurred by Buyer's personnel in connection with the set-up, building, training and general support of the Lebanon Store; provided, further, that the waiver of the standard franchise fee and the ongoing franchise fees shall be limited to the Lebanon Store only and shall not be applicable to any subsequent Java Detour stores opened by Seller or any of its affiliates or partners. | Costs | License |
| 27754 | | | | | | | | | | | | 3% | gross revenues | Buyer shall grant an option to Seller or any of its affiliates or partners to open and operate a Java Detour franchise store in the territory of Lebanon, such option to be available to Seller for a period of one (1) year following the Closing Date. In the event that Seller or any of its affiliates or partners shall exercise its option to open up the Lebanon Store within the one (1) year period, Buyer shall (i) waive its standard franchise fee for such store, and (ii) charge ongoing franchise fees and payable in connection with the Lebanon Store at three percent (3%) of such store's gross revenues; provided, that the owner and operator of the Lebanon Store agrees to pay for all travel costs (at a minimum of fifteen percent (15%) incurred by Buyer's personnel in connection with the set-up, building, training and general support of the Lebanon Store; provided, further, that the waiver of the standard franchise fee and the ongoing franchise fees shall be limited to the Lebanon Store only and shall not be applicable to any subsequent Java Detour stores opened by Seller or any of its affiliates or partners. | Gross Sales | License |

Page 37 of 63

EX1-125

| Agreement# | Agreement Synopsis | Filing Company | License | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23387 | 1. We are the right to establish and operate a most Buffalo Wild Wings® Restaurant as described by the Buffalo Wild Wings® Trademarks and the System (the Buffalo Wild Wings® System, which consists of distinctive food and beverage products prepared according to special and confidential recipes and formulas with unique storage, preparation, service and delivery procedures and techniques, offered in a setting of distinctive exterior and interior layout, design and color schemes, signage, furnishings and materials and using certain distinctive types of facilities, equipment, supplies, ingredients, business techniques, methods and procedures together with sales promotion programs, all of which we may modify and change from time to time) to be located at 3720 Highway 98, Lakeland, Florida 33810 or a location to be designated within 90 days from the date of this Agreement. 

2. You may renew your license for two renewal terms, (the first renewal term is 10 years; the second renewal term is 5 years) 

3. If, as a condition of renewal, we require you to: relocate your Restaurant pursuant to subparagraph 4.B(iii) above; you may renew your license for 20 years | Diversified Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc. | AMC Lakeland, Inc. | 09/27/2012 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 3.3.6) and expires 20 years after the Restaurant opens for business or the Required Open Date, which ever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 13. | Franchise | Consumer Services, Restaurants, Foods and Nonalcoholic Beverages, Retail, Consumer Durables, Consumer Non Durables | 5741 | United States, Lakeland, Florida | EXCLUSIVE | 5% | Gross Sales | You must use your best efforts to promote and market the Restaurant and participate in any marketing and promotion programs we establish from time to time. In addition to the Royalty Fee, you are required to spend 1/2% of your Gross Sales on approved local marketing and promotion. | Gross Sales |
| 23387 | | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and if designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If established, you must contribute a minimum of 1/2% of Gross Sales to the local cooperative, which (and plus the local marketing requirement described in subparagraph 8.B. If, however, the cooperative votes to spend a percentage greater than 1/2% per location, you must contribute such amount. The contribution amount designated by the cooperative must be a percentage of Gross Sales basis and per Restaurant, and must be at least 1/2%. | Gross Sales |
| 23387 | | | | | | | | | | | | 5% | Gross Sales | In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged to us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or, if no form of franchise agreement is being used by us at such time, the Royalty Fee charged to us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales |
| 23387 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales |
| 23387 | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales |

kMINE Export [2016.02.21] Part 1

Page 38 of 63

EX1-126

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commercialie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23387 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial franchise fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (but, if our form of franchise agreement is being used by us on such date, the Royalty fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales | Licensor |
| 23387 | | | | | | | | | | | | 100/50 | per visit | We or our authorized representative have the right to enter your Restaurant at all reasonable times during the business day for the purpose of making periodic evaluations and to ensure that the provisions of this Agreement are being observed by you, to inspect and evaluate your building, test and equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, as well as the storage, preparation and formulation and the conditions of sanitation and cleanliness in the storage, production, handling and serving. Our inspection and evaluations may include a Quick Casino Shoppers Basket program from time to time throughout the term of this Agreement. We have various conduct shop visits of your Restaurant at any mystery shopper of their or various agreed Restaurant and, therefore, the actual fee for each visit will vary. | per visit | Licensor |
| 23387 | | | | | | | | | | | | 2,500 USD | per restaurant | Transfer Fee. The transfer fee is $12,500. If the transfer is part of a simultaneous, multiple restaurant transfer, the transfer fee will be reduced as follows: the transfer fee for the first restaurant is $12,500, the transfer fee for the second through tenth restaurant is $2,500 per restaurant, and with additional transfer fee beyond the tenth. | per restaurant | Licensor |
| 23207 | 1. Grant the right to establish and operate a new Buffalo Wild Wings® Restaurant identified by the Buffalo Wild Wings® Trademarks and the operate in accordance with the Buffalo Wild Wings® System, which consists of distinctive food and beverage products prepared according to special and confidential recipes and formulas with unique storage, preparation, service and delivery procedures and techniques, offered in a setting of distinctive exterior and interior layout, design and color scheme, signage, furnishings and materials and using certain distinctive types of facilities, equipment, supplies, ingredients, business techniques, methods and procedures together with sales promotion programs, all of which we may modify and change from time to time to be located at 9300 Dynasty Drive, Suite 100, Ft. Myers, FL 33905 or a location to be designated within 60 days from the date of this Agreement. | Diversified Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc. | AMC Ft. Myers, Inc. | 06/13/2010 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 13.9) and expires 20 years after the Restaurant opens for business or the Required Open Date, which ever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 13. 2. You may renew your license for two renewal terms. (the first renewal term is 10 years; the second renewal term is 5 years). 3. If, as a condition of renewal, we require you to relocate your Restaurant pursuant to subparagraph 4.B(5) above, you may renew your license for 20 years. | Franchise | Consumer Durables, Consumer Non-Durables, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Retail | 5741 | Ft. Myers, Florida, United States | EXCLUSIVE | 5% | Gross Sales | You must use your best efforts to promote and advertise the Restaurant and participate in any local advertising and promotional programs from time to time in time. In addition to the Advertising Fee, you are in Section 8 below must spend a minimum of 2% of your Gross Sales on approved local marketing and promotion. | Gross Sales | Licensor |

XMINE Export (2016.02.22) Part I

Page 28 of 43

EX1-127

KMINE Export [2018.02.21] Part 1

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | License | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28207 | | | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and, if requested, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local market. As established, you must contribute a minimum of 1/2% of Gross Sales to the local cooperative, which builds the local marketing requirement described in subparagraph 8.B.4; however, the cooperative contribution amount is a percentage greater than 1/2% per location, you must contribute such amount. The contribution amount designated by the cooperative must be on a percentage of Gross Sales basis and per Restaurant, and must be at least 1/2%. | Gross Sales | Licensee |
| 28207 | | | | | | | | | | | | | 5% | Gross Sales | In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement (shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or, if a new form of franchise agreement is being used by us on such date, the Royalty Fee being charged by us under such new form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales | Licensee |
| 28207 | | | | | | | | | | | | | 5% | Gross Sales | In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement (shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or, if a new form of franchise agreement is being used by us on such date, the Royalty Fee being charged by us under such new form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales | Licensee |
| 28207 | | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licensee |
| 28207 | | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licensee |

Page 40 of 63

EX1-128

| Agreement# | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28207 | | | | | | | | | | | 100/00 | per visit | We or our authorized representative have the right to enter your Restaurant at all reasonable times during the business day for the purpose of making periodic evaluations and to spend at the premises of this Agreement are being observed by you, to inspect and evaluate your building, land and equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, as well as the storage, preparation and formulation and the conditions of sanitation and cleanliness in the storage, production, handling and serving. Our inspection and evaluations may include a "mystery shopper" program from time to time throughout the term of this Agreement. We hire various vendors who send the "mystery shoppers" into the Buffalo Wild Wings' restaurants. If you fail an evaluation by us or any mystery shopper or if we receive a specific customer complaint, you must pay for the mystery shopper(s) we send to your Restaurant until the issue is resolved to our satisfaction. The current fee charged by the vendors is approximately $100 fee per visit, which you must pay directly to the vendor. The fee per visit includes the reimbursement of the vendor for the "mystery shopper" for the items consumed at your Restaurant and, therefore, the actual fee for each visit will vary. | Per Unit | Licensor |
| 28207 | | | | | | | | | | | 2,500 /00 | per restaurant | Transfer Fee. The transfer fee is $12,500. If the transfer is part of a franchisee, multiple restaurant transfer, the transfer fee will be modified as follows: the transfer fee for the first restaurant is $12,500; the transfer fee for the second through tenth restaurants is $5,000 per restaurant, with no additional transfer fee beyond the tenth restaurant. | Per Unit | Licensor |
| 28386 | Diversified Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc. | AMC Traverse City, Inc. | 09/07/2010 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 15.K) and expires 20 years after the Restaurant opens for business or the Required Open Date, which ever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 13.<br><br>2. You may renew your license for two renewal terms, [the first renewal term is 10 years, the second renewal term is 5 years].<br><br>3. If, as a condition of renewal, we require you to relocate your Restaurant pursuant to subparagraph 4.N(8) above, you may renew your license for 20 years | franchise | Consumer Durables, Consumer Non-Durables, Consumer Services, Restaurants, Retail, Foods and Nonalcoholic Beverages | 5741 | Traverse City, Michigan, United States | EXCLUSIVE | 5% | Gross Sales | You must use your best efforts to promote and advertise the Restaurant and participate in any local promotional program in your area from time to time. In addition to the advertising fee, you are required to spend a minimum of 2% of your Gross Sales on approved local marketing and promotion. | Gross Sales | Licensor |
| 28386 | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If established, you must contribute a minimum of 0.25% of Gross Sales to the local cooperative, which constitutes the local marketing requirement described in subparagraph 8.B. if an approved local cooperative votes to spend a percentage greater than 3.25% per location, you must contribute such amount to the cooperative. The designated by the cooperative must be on a percentage of Gross Sales basis and per Restaurant, and must be at least 0.25%. | Gross Sales | Licensor |

kMINE

EX1-129

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | License | EffectiveDate | Term | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead/License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28386 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty in the long charged by us under our form of Franchise agreement being used by us on such date, the Royalty Fee being charged to you under such form of Franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales | License |
| 28386 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty in the long charged by us under our form of Franchise agreement being used by us on such date, the Royalty Fee being charged to you under such form of Franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. | Gross Sales | License |
| 28386 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | License |
| 28386 | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | License |

kmine

kMINE Export (2018-02-23) Part I

EX1-130

kMINE

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28386 | | | | | | | | | | | | 100.00 | per visit | We or our authorized representative have the right to enter your Restaurant at all reasonable times during the business day for the purpose of making periodic evaluations and to ascertain if the provisions of this Agreement are being observed by you, to inspect and evaluate your building, land and equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, to evaluate the storage, preparation and formulation and the conditions of sanitation and cleanliness in the storage, production, handling and serving. Our inspection and evaluations may include a "mystery shopper" program from time to time throughout the term of this Agreement. We hire various vendors who send the "mystery shoppers" into the Buffalo Wild Wings® restaurants. If you fail an evaluation by the mystery shopper or if we receive a specific customer complaint, you must pay for the mystery shopper(s) we send to your Restaurant until the issue is resolved to our satisfaction. The current fee charged by the vendors is approximately $100 fee per visit, which you must pay directly to the vendor. The fee per visit includes the reimbursement of the tab paid by the mystery shopper for the items consumed at your Restaurant and, therefore, the actual fee for each visit and vary. | | Licensee |
| 28386 | | | | | | | | | | | | 2,500.00 | per restaurant | Transfer Fee. The transfer fee is $12,500. If the transfer is part of a simultaneous, multiple restaurant transfer, the transfer fee will be modified as follows: the transfer fee for the first restaurant is $12,500; the transfer fee for the second through tenth restaurant is $2,500 per restaurant, with no additional transfer fee beyond the tenth restaurant. | | Licensee |
| 12316 | 1.Grant the right to use the Trademarks, Trade Dress and Copyrights, including "Boston Market®" and relating to, restaurants that offer restaurant and related products (including chicken, turkey, and/or beef, meatloaf, pot pies, salads, soups, side items, dessert items and related foods in a distinctive setting. during this Agreement shall enter into this Agreement in the territory and solely in connection with the manufacturing, advertising, promotion, sale and distribution of the Licensed Products to the Authorized Retailers (those persons and entities having retail operations in within commercial channels consisting of grocery stores, supermarkets, super centers, mass merchandisers, retail clubs, drug stores, and retail stores on military bases). | BOSTON MARKET CORPORATION | OVERHILL FARMS, INC. | 07/1/2011 | 1. License Term shall mean the Initial Term, Renewal Term 1 and Renewal Form 2, if the Agreement is renewed; and the Sell-Off Period (as hereinafter defined), if any. 2. The Initial Term of this Agreement shall commence July 1, 2011, and extend through December 31, 2016, unless sooner terminated in accordance with the provisions hereof. Notwithstanding the start of the Initial Term on July 1, 2011, the parties acknowledge that they are far sharing certain information pertinent to this Agreement prior to July 1, 2011, and each party represents and warrants to the other that such sharing of information prior to the commencement of the Initial Term will not violate any agreement or covenants to which that party is subject. 3. This Agreement may be renewed by OFI for an additional period of sixty (60) months commencing January 1, 2017 ("Renewal Term 1") (unless sooner terminated in accordance with the provisions hereof), provided that: (1) OFI has performed all of its material obligations under this Agreement and is not in material default of this Agreement as of the last day of the Initial Term; (ii) OFI's Net Sales during the Contract Year ending immediately prior to January 1, 2017 equals or exceeds the Renewal Threshold; and (iii) OFI gives BMC | Marketing Intangible | Consumer Services, Restaurants, Retail Foods and Nonalcoholic Beverages | 2090 | United States of America | Multi-Exclusivity | 4.5% | Net Sales | In consideration of the license granted hereunder, OFI shall pay to BMC the Earned Royalty computed at the rate of four and one-half percent (4.5%) of all Net Sales of all Licensed Products shipped during the License Term, which shall be the Contract of Licensed Products by subbaremums of OFI. | | Net Sales |

EX1-131

kMINE

kMINE Export (2016.02.21) Part I

Page 46 of 63

| Agreement# | Agreement Synopsis | FilingCompany | Licensee | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12287 | 1. Grant the right to establish and operate a retail Buffalo Wild Wings® Restaurant under a unique system for sales, entertainment-oriented, casual/fast casual restaurant that feature chicken wings, sandwiches, unique food service and other products, beverages and services using certain standards and specifications, identified by the Buffalo Wild Wings® Trademarks in such other marks, to be located at 3190 Silver Lake Road, Fenton, Michigan 48430 or a location to be designated within 90 days from the date of this Agreement. | Diversified Restaurant Holdings, Inc. | Buffalo Wild Wings International, Inc. | Amaze, Inc. | 07/29/2010 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 15.9) and expires 20 years after the Restaurant opens for business or the Required Open Date, whichever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 15.\n\n2. You may renew your license for two renewal terms, (the first renewal term is 10 years; the second renewal term is 5 years)\n\n3. If, as a condition of renewal, we require you to: renovate your Restaurant pursuant to subparagraph 4.B(iii) above, you may renew your license for 20 years | Franchise | Consumer Services, Restaurants, Foods and Nondurable Beverages, Retail, Consumer Durables, Consumer Non Durables | 5741 | Fenton, Michigan, United States | EXCLUSIVE | 5% | Gross Sales | You must use your best efforts to promote and enhance the Restaurant and participate in any local marketing and promotional programs we establish from time to time. In addition to this marketing fee, you are required to spend 1/2% of your Gross Sales on approved local marketing and promotion. | Gross Sales | License |
| 12287 | | | | | | | | | | | | 5% | Gross Sales | We have the right to designate local advertising markets and if designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If not defined, you must contribute a minimum of 1/2% of Gross Sales to the local cooperative, which satisfies the local marketing requirement described in subparagraph 8.B. | Gross Sales | License |
| 12287 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or, if no form of franchise agreement is being used by us at such time, then the Royalty Fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. The amount of the Royalty Fee for any renewal term shall be that provided in the franchise agreement executed for such renewal term. | Gross Sales | License |
| 12287 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of franchise agreement being used by us at any time during the second half of the initial term of the Agreement (or, if no form of franchise agreement is being used by us at such time, then the Royalty Fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 1/2% at any time during the initial term of the Agreement. The amount of the Royalty Fee for any renewal term shall be that provided in the franchise agreement executed for such renewal term. | Gross Sales | License |

EX1-132

KMINE Export (2018-02-21) Part 1

| Agreement # | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementSize | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32287 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licenses |
| 32287 | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 1/2% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. | Gross Sales | Licenses |
| 32287 | | | | | | | | | | | | 100/150 | per visit | We or our authorized representative have the right to enter your Restaurant at all reasonable times during the business day for the purpose of making periodic evaluations and to ascertain if the provisions of this Agreement are being observed by you. To inspect and evaluate your building, land and equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, as well as the storage, preparation and formulation and the serving and cleanliness in the storage, production, handling and serving. In the event that a deficiency is found, the mystery shopper or if we receive a specific customer complaint, you must also submit to the mystery shopper(s) (we can require a specific number of visits). The number of mystery shoppers will be approximately $100 fee per visit, which you must pay directly to the vendor. The fee per visit of this kind is reached (if the issue is reached for our reimbursement of the fees paid by the mystery shopper for the items consumed at your Restaurant) and, therefore, the actual fee for each visit will vary. | Per Unit | Licenses |
| 32287 | | | | | | | | | | | | 2500/USD | per restaurant | The transfer fee is $2,500 if the transfer is part of a simultaneous, multiple restaurant transfer. The transfer fee will be modified as follows: The transfer fee for the first restaurant is $2,500, the transfer fee for the second through tenth restaurants is $1,500 per restaurant, with no additional transfer fee beyond the tenth. | Per Unit | Licenses |
| 34430 | 1. Grant the right to appoint VOLTA PRODUCTIONS INC. as the distributor of the Products (blends of tea and caffeine free drinks ready for retail sales and distribution sold under the name "Pulp Loaded by Spike Tea") to customers within the Market. 2. Grant the right to use the Trade Marks (the trademark "Pulp Loaded by Spike Tea", together with such other trademarks, service marks, trade dress, logos, brand names and/or trade dress symbols of Spike) within the Territory in connection with the Products (blends of tea and caffeine free drinks ready for retail sales and distribution) sold by VOLTA PRODUCTIONS INC. in the Territory. | Volta Productions Inc. | SPIKE TEA, INC., VOLTA PRODUCTIONS INC. | VOLTA PRODUCTIONS INC., SPIKE TEA, INC. | 07/10/2006 | 1. This Agreement shall be effective on the date first set forth above and shall continue in effect until the fifth anniversary of the date thereof, unless sooner terminated in accordance with the provisions of Section 20 hereof. The terms and conditions of this Agreement shall continue in supply to any purchase order issued under the normal course of business hereunder ("Purchase Order") until final delivery is made even if such delivery is made after this Agreement terminates. 2. This Agreement will be renewed automatically for the period of one year unless terminated by the parties. | Marketing/Intangible, Service | Foods and Nonalcoholic Beverages, Business Services | | United States of America, Canada | Multi-Exclusivity | 7.5% | Gross Sales | In consideration of the obligations undertaken by Volta hereunder, Spike shall pay Volta commission at the rate of 7.5% of gross sales resulting from the sale of the Products. | Gross Sales | Licenses |
| 33115 | 1. Grant the right to assume certain development rights to establish and operate 25 Stock Bars (Stewart's Restaurants in Wal-Mart stores) under the Proprietary Marks ("Stewart's"; "Stewart's Kool Bar"; and "The Original Drive-In") and the System. | ROCKVILLE CORP. | Rockville Corp., PROFIT3 MAG HOLDINGS, LLC | PROFIT3 MAG HOLDINGS, LLC, Rockville Corp. | 03/16/2006 | 1. Unless sooner terminated in accordance with the terms of this Agreement, the term of this Agreement and all rights granted hereunder shall expire on the earlier of: (A) failure of Developer to perform any obligation set forth in this or in any franchise agreement that may be executed for any particular unit developed hereunder; (B) upon failure to adhere to the requirements of the Wal-Mart Master Relationship Agreement. | Franchise, Service | Foods and Nonalcoholic Beverages, Consumer Services, Restaurants, Business Services | 5412 | Connecticut, PA, Kansas, FL, Utah, Oak, LL, Cambridge, MD, MY, Iowa, MD, New Jersey, MD, Glen Burnie, MD, Ogdensburg, NY, Wisconsin, OH, Van Wert, OH, United States | EXCLUSIVE | 12,500 USD | per Stock Bar | In consideration of the development rights granted herein, Developer shall pay to the Company, upon execution of this Agreement, a development fee equal to Twelve Thousand Five Hundred ($12,500.00) Dollars for each Stock Bar either under construction or for which a permit has been issued. | Per Unit | Licenses |

EX1-133

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33155 | 1. Grant the right to assume and be bound by all of Wilhelm Licnor's obligations under the Daywell Agreement pursuant to which Daywell GmbH acquired an exclusive right to manufacture and sell a system for processing and enriching water with oxygen in the United States, Puerto Rico and Canada and a right of first refusal to market and sell the Daywell System in Mexico. |  | Wilhelm Licnor, Daywell GmbH & Co. | TECHNOLOGY ACQUISITION CORP, Corporation | 11/28/2001 | 1. Unless otherwise terminated as hereinafter set forth, the initial term of this Agreement shall commence on the latest date of its execution by the parties thereto and will terminate on December 31, 2006 ("Initial Term"). ... Beginning on December 31, 2010, this Agreement shall automatically renew for one-year periods unless either party notifies the other in writing of its intent to terminate at least 85 days prior ... in which event this Agreement shall terminate on the last day provided for in the termination notice. |  |  |  |  |  | 4,000 USD | per unit | Except as otherwise provided herein, the Developer shall pay Four Thousand (4,000) Dollars per unit as a royalty to be charged to the Hot Man's net base developed hereunder. | Per Unit | Licensed |
| 33155 |  |  |  |  |  |  |  |  |  |  |  | 4,000 USD | per unit | In addition to the Development Fee set forth herein, upon execution of this Agreement the Developer shall pay Four Thousand Five Hundred ($4,500.00) Dollars in airboat fees for each unit ordered hereunder. | Per Unit | Licensed |
| 4321 |  |  |  |  |  |  | Manufacturing Intangible, Marketing Intangible | Consumer Durables, Foods and Nonalcoholic Beverages, Consumer Non-Durables |  | United States, Puerto Rico, Canada, Mexico | EXCLUSIVE | 2% | Net Selling Price | Licensee agrees to pay Licensor a royalty of two percent (2%) of the Net Selling Price for each Daywell Product sold by Licensor after the Effective date of this Agreement. | Net Sales | Licensed |
| 53324 | 1. Grant the right to use the Intellectual Property (ENTERAINMENT) in the Territory solely upon and in connection with the manufacturing, distribution, marketing, promotion, advertising and sale of ENTERAINMENT-brand ground and whole bean coffee. |  | Enterainment Products, Inc. | COFFEE HOLDING COMPANY, INC. | 04/1/2007 | 1. This Agreement shall commence on the Effective Date and continue for three (3) years and one (1) months unless sooner terminated in accordance with the terms and conditions of this Agreement ("Term"). The parties may extend the Term only upon written agreement and for not more than two (2) renewal terms each of three (3) years. | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables | 2080 | United States of America | Multi-Exclusivity | 25% | Advertising/Marketing Commitment | Notwithstanding the foregoing, Licensee may apply up to twenty-five percent (25%) of the Advertising/Marketing Commitment, capped at $100,000 in cost for each Contract Year, towards (starting Year Two) the Licensed Products. For the purpose of this Agreement, Sorting fees shall be defined as a fixed per-SKU one-time payment paid by the Licensee to a new retail account in exchange for shelf space for Licensed Products. | Costs | Licensed |
| 53324 |  |  |  |  |  |  |  |  |  |  |  | 110% | cost | Guaranty with the initial shipment of Licensed Products, Licensee shall furnish to Licensor (or its Representative) at no cost, 30 royalty-free samples of each "SKU" of the Licensed Products and thereafter shall furnish to Representative 25 samples of each SKU of the Licensed Products at the beginning of each subsequent year of the Term. In addition, upon Licensor's request, Licensee shall provide, at no cost, a reasonable number of royalty-free samples of the Licensed Products in each year of the Term for use by Licensor in connection with promotion, contest or sweepstakes not to exceed 25 samples per year. Any Licensed Products requested by Licensor in excess of the foregoing quantity shall be billed at Licensor's cost for the Licensed Product plus ten percent (10%). | Costs | Licensed |
| 53324 |  |  |  |  |  |  |  |  |  |  |  | 20% | gross sales | Licensee shall pay to Licensor (or its Representative) the royalty at the rates specified in Exhibit B ("Royalties") based upon all Net Sales of the Licensed Products. Notwithstanding the foregoing, 20% of gross sales of all Licensed Products bearing the Intellectual Property that have not been approved pursuant to the Agreement ... shall be subject to the Territory without Licensor's prior approval and all gross sales outside of the Territory ... such royalty may not be credited toward Minimum Guaranteed Royalty Payments due herein. | Gross Sales | Licensed |

| Agreement | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51824 | | | | | | | | | | | | 3% | Net Sales | Licensee agrees to spend no less than three percent (3%) of total annual Net Sales or total annual Minimum Net Sale Revenue, whichever is greater, each Contract Year to advertise and promote the Licensed Articles. | Net Sales |
| 51824 | | | | | | | | | | | | 3% | Minimum Net Sales Revenue | Licensee agrees to spend no less than three percent (3%) of total annual Net Sales or total annual Minimum Net Sale Revenue, whichever is greater, each Contract Year to advertise and promote the Licensed Articles. | Net Sales |
| 51824 | | | | | | | | | | | | 5% | Net Sales | Licensee shall pay to Licensor (or its Representative) the royalty at the rates specified in exhibit B ("Royalties") based upon all Net Sales by or on behalf of Licensee of the Licensed Products. Royalties: 5% of Net Sale | Net Sales |
| 51824 | | | | | | | | | | | | 1.99 USD | per unit | ENTENMANN'S brand ground and whole bean coffee: Estimated retail price $1.99 to $3.99 (pgs 11.5 to 12 oz) | Per Unit |
| 51824 | | | | | | | | | | | | 3.99 USD | per unit | ENTENMANN'S brand ground and whole bean coffee: Estimated retail price $1.99 to $3.99 (pgs 11.5 to 12 oz) | Per Unit |
| 52326 | 1. Grant the right to establish and operate a retail Buffalo Wild Wings® Restaurant as identified by the buffalo Wild Wings® Trademarks and the System (a unique system for video entertainment oriented, casual/fast casual restaurant that features chicken wings, sandwiches, unique food service and other products, beverages and services using certain standards and specifications, including food and beverage products prepared according to specified recipes and procedures, some of which include proprietary sauces and mixes), to be located in Sarasota, Florida within a four mile radius from the intersection of Honore Avenue and University Parkway. | Diversified Restaurant Holdings, Inc. | AMC Sarasota, Inc. | Buffalo Wild Wings International, Inc. | 03/25/2011 | 1. The initial term of this Agreement commences on the Effective Date (as defined in Section 13.9) and expires 20 years after the Restaurant opens for business or the Required Open Date, which ever happens first, unless this Agreement is sooner terminated in accordance with Paragraph 13. 2. You may renew your license for two renewal terms, (the first renewal term is 10 years; the second renewal term is 5 years). 3. If, as a condition of renewal, we require you to relocate your Restaurant pursuant to subparagraph 4.8(iii) above, you may renew your license for 20 years | Franchise | Consumer Durables, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Consumer Services, Restaurants, Retail | 8741 | Sarasota, Florida, United States | EXCLUSIVE | 5% | Gross Sales | We have the right to designate local advertising markets and if designated, you must participate in and contribute to the cooperative advertising and marketing programs in your designated local advertising market. If established, you must contribute a minimum of 0.5% of Gross Sales to the local cooperative, which subsidize the local marketing requirement described in subparagraph 8.8. | Gross Sales |
| 52326 | | | | | | | | | | | | 5% | Gross Sales | You must use your best efforts to promote and advertise the Restaurant and participate in and advertise the Restaurant... In addition to the advertising fee, you are required to spend 0.25% of your Gross Sales on approved local marketing and promotion. | Gross Sales |
| 52326 | | | | | | | | | | | | 5% | Gross Sales | | Gross Sales |
| 52326 | | | | | | | | | | | | 5% | Gross Sales | In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty Fee being charged by us under our form of Franchise Agreement, as revised from time to time. The Royalty Fee for any renewal term shall be that provided in the franchise agreement executed for such renewal term. | Gross Sales |

KMINE Export (2016.02.23) Part I

kMINE

EX1-135

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 52326 | | | | | | | | | | | | 5% | Gross Sales | In addition to the initial franchise fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us a weekly Royalty Fee. The Royalty Fee for the first half of the initial term of this Agreement shall be an amount equal to 5% of Gross Sales. The Royalty Fee for the second half of the initial term of this Agreement shall be an amount equal to the greater of (i) 5% of Gross Sales or (ii) the Royalty in the being charged by us under our form of Franchise Agreement being used by us at such time. During the second half of the initial term of the Agreement (or if a form of Franchise Agreement is being used by us on such date, the Royalty Fee being charged by us under our latest form of franchise agreement), provided that the Royalty Fee may not be increased by more than 12% at any time during the initial term of the Agreement. The amount of the Royalty Fee for any renewal term shall be that provided in the franchise agreement executed for such renewal term. |
| 52326 | | | | | | | | | | | | 3% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 12% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. |
| 52326 | | | | | | | | | | | | 4% | Gross Sales | You must pay to us a weekly Advertising Fee in an amount equal to 3% of Gross Sales. We reserve the right to increase this percentage upon 60 days written notice to you, provided, however, that we may not increase the Advertising Fee by more than 12% per year and that the Advertising Fee will not exceed 4% for the initial term of this Agreement. |
| 52326 | | | | | | | | | | | | 100 USD | per visit | We or our authorized representative have the right to enter your Restaurant at all reasonable times during the business day for the purpose of making periodic evaluations and to quantify of the products offered. Agreement are being observed by you, to inspect and evaluate your building, land and equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, as well as the cleanliness, preparation and formulation and the conditions of sanitation and cleanliness in the storage, production, handling and serving. If you fail an evaluation by us or any mystery shopper or if we receive a specific customer complaint, you must pay for the mystery shopper(s) we send to your Restaurant (and the cost is required to our satisfaction). The current fee charged by the vendor is approximately $100 fee per visit, which you must pay directly to the vendor. The fee per visit includes the reimbursement of the tab paid by the mystery shopper for the items consumed at your Restaurant and, therefore, the actual fee for each visit will vary. |
| 52326 | | | | | | | | | | | | 2,500 USD | per restaurant | The transfer fee is $12,500. If the transfer is part of a simultaneous, multiple restaurant transfer, the transfer fee will be modified as follows: the transfer fee for the first restaurant is $12,500, the transfer fee for the second through tenth restaurants is $2,500 per restaurant, with no additional transfer fee beyond the tenth restaurant. |

kMINE Export (2016-02-23) Part I

EX1-136

kfMINE Export (2018-02-21) Part I

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45447 | 1. Grant the right to to use the Proprietary Marks (trade marks, trade names, logos, designs, symbols, emblems, insignia, fascia, slogans and other identifying marks), Know-How/Technology (all information and data including formulations, technology, design specifications, techniques, procedures, plans, discoveries and inventions), Technical Information and Documentation as well as all Improvements thereon for the cultivation, manufacturing, production, marketing and/or sale of the Products involving Logs, Spawn, and Shiitake Mushrooms. | MYCO4BIOTECH LTD. | MYCO4BIOTECH LTD. | EVERBLOOM BIOTECHNOLOGY (CANADA) LTD. | 06/1/2001 | 1. This Agreement shall come into effect on the date of execution and shall continue in full force and effect for an indefinite period of time, unless terminated earlier in accordance with the terms set out below. | Manufacturing;Process Intangible;Marketing Intangible | Agribusiness, Biotechnology, Chemicals, Consumer Non-Durables, Foods and Nondurables; Beverages, Healthcare; Pharmaceutical | | United States, Mexico, Canada | Multi-Exclusivity | 10% | Sales | The Licensor agrees to use their best endeavors to assist the Licensee to market the Products. In consideration thereof, the Licensee agrees to pay to the Licensor a commission of 10% on the sales attributed solely or partially to the Licensor. | Net Sales |
| 45447 | | | | | | | | | | | | 3% | ex-farm value | As consideration for the continual transfer of the Know-how/Technology, the Licensee shall pay the Licensor a royalty equivalent to 3% of the ex-farm value of Shiitake mushrooms and other exotic mushrooms produced utilizing the Know-how/Technology in the Territory by the Licensee or Sub-Licensees. | Other |
| 44833 | 1. Grant the right to utilize the Property (the names, symbols, trademarks and associated trade dress colors, copyrighted material and logos "HERSHEY'S" and "JOLLY RANCHER") in connection with the manufacture, distribution and Retail Sale only upon the Licensed Articles LIP BALM. | AMCOL PARK INC. | HERSHEY FOODS CORPORATION | FAMOUS FIXINS | 06/1/2001 | 1. Both Licensor and Licensee shall have the option, by written notice to the other thirty (30) days prior to 11 ___ expiration, to renew this Agreement for an additional period of twelve (12) months from the date of expiration of the term hereof, provided this Agreement has not been terminated in accordance with the provisions hereof and Licensor shall have paid Licensor Royalty Payments equal to or greater than the Minimum Royalty Payment for the term just ended. If the party receiving notice of renewal does not reject such renewal by written notice within thirty (30) days of mailing, this Agreement will be renewed, subject to all the terms and conditions expressed in this Agreement. 2. TERM — June 1, 2001 TO May 31, 2003 | Marketing Intangible | Consumer Non-Durables, Foods and Nondurables; Beverages | 5140 | United States | EXCLUSIVE | 7% | Net Sales | | Net Sales |
| 43420 | 1. Grant the right to assume and be bound by all of Wilhelm Lenzer's obligations under the Oxywell Agreement pursuant to which Oxywell GmbH & Co. granted Wilhelm Lenzer the exclusive right to market and sell a system for processing and enriching water with oxygen in the United States, Puerto Rico and Canada and a right of first refusal to market and sell the Oxywell System in Mexico. | ELITE TECHNOLOGIES INC. | Wilhelm Lenzer, Oxywell GmbH & Co. | Technology Acquisition Corporation | 11/28/2001 | 1. Unless otherwise terminated as hereinafter set forth, the initial term of this Agreement shall commence on the last dated of the Agreement by the parties hereto and will terminate on December 31, 2006 (the "Initial Term"). If such initial default in the event, this Agreement may extend the term of this Agreement for two consecutive two year periods by delivering to Licensor written notice of such intent at least 45 days prior to the termination date thereof, at the initial term and the related two year period and at 45 days prior to the termination date of the initial term at least prior to the second two year period. Beginning on December 31, 2010, this Agreement shall automatically renew for one-year periods unless either party notifies the other in writing of its intent to terminate at least 45 days prior to December 31, 2010 or, to the initial annual renewal and thereafter at least 45 days prior to the end of any annual renewal date in which event this Agreement shall terminate on the last day provided for in the termination notice. | Manufacturing;Process Intangible;Marketing Intangible | Foods and Nondurables; Beverages, Consumer Durables; Consumer Non-Durables | 9770 | United States, Puerto Rico, Canada, Mexico | EXCLUSIVE | 2% | Net Selling Price | Licensee agrees to pay Licensor a royalty of two percent (2%) of the Net Selling Price for each Oxywell Product sold by Licensee after the effective date of this Agreement. | Net Sales |

EX1-137

| Agreement # | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SIC Code | Territory | Exclusivity | Value | AgreementFee | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48834 | 1. Grant the right to incorporate the "O' DOWA" name, trademark and logo in/on the Licensed Products [11] Up Spirit, produced in five (5) different flavors [one for each member of the Band], sold individually and in sets of five (5). [2] "Soul Spirit" and/or "Soul Drops" [i.e. non-alcoholic candy spray and liquid drops] produced in five (5) flavors [one for each member of the band] solely for the purpose of the manufacture, distribution, sale and advertisement of the Licensed Products through the Licensed Channels of Distribution in the Licensed Territory during the Term. 2. Grant the right to incorporate the names, images, likeness, symbols, and designs of musical group "O' Town [the "Band"] on the Licensed Products [11] Up Spirit, produced in five (5) different flavors [one for each member of the Band], sold individually and in sets of five (5). [2] "Soul Spirit" and/or "Soul Drops" [i.e. non-alcoholic candy spray and liquid drops] produced in five (5) flavors [one for each member of the band] solely for the purpose of the manufacture, distribution, sale and advertisement of the Licensed Products through the Licensed Channels of Distribution in the Licensed Territory during the Term. | FAMOUS FIXINS INC | MTV Networks, Viacom International, Inc., Trans Continental Television Productions, Inc., Trans Continental Records, Inc., Signature Network Inc., Famous Fixins Inc. | Famous Fixins, MTV Networks, Viacom International, Inc., Trans Continental Television Productions, Inc., Trans Continental Records, Inc., Signature Network Inc. | 01/31/2001 | 1. The "TERM" The term of this Agreement shall commence on June 1, 2001, and expire on May 31, 2003. | Marketing Intangible | Entertainment, Consumer Non-Durables, Broadcast and Cable, Foods and Nonalcoholic Beverages | 5140 | United States | Multi Exclusivity | 120% | direct manufacturing cost | Licensee shall sell to KTP and/or Signature such quantities of Licensed Products as KTP and/or Signature shall request of Licensee's direct manufacturing cost plus twenty-percent (20%) | Costs | Licensee |
| 48834 | | | | | | | | | | | | 10% | Net Sales | | Royalties shall be payable to Licensee at the Royalty Rate set forth in the Basic Processes on net sales of all Licensed Products. The "ROYALTY RATE" [10% of Net Sales | Net Sales | Licensee |
| 43966 | 1. Grant the right to operate the potential Burger King Restaurant sites within the Development Area and to develop and be franchised to operate Burger King Restaurants [limited menu, quick-service restaurants] within the Development Area upon the terms and conditions of this Agreement and the franchise agreements which shall be entered into for each Burger King Restaurant. | QUALITY DINING, INC | BURGER KING CORPORATION | BKW/DOLD, INC. QUALITY DINING, INC. | 10/21/2000 | 1. The term of this Agreement [the "Term"] shall commence upon October 3, 2000. Unless terminated earlier as provided in Article VI hereof, the Term and all of the rights granted by this Agreement shall expire on JUNE 30, 2004. The Developer has no right to any extension or renewal to the Term. | Franchise | Restaurants, Consumer Services, Foods and Nonalcoholic Beverages, Consumer Non-Durables | 5812 | Berrien County, Michigan, Cass County, Michigan, Van Buren County, Michigan, La Porte County, Indiana, St. Joseph County, Indiana, Elkhart County, Indiana, La Grange County, Indiana, Starke County, Indiana, Marshall County, Indiana, Kosciusko County, Indiana, Pulaski County, Indiana, Fulton County, Indiana, Steuben County, Indiana, Noble County, Indiana, DeKalb County, Indiana, Whitley County, Indiana, Allen County, Indiana, Wabash County, Indiana, Huntington County, Indiana, Wells County, Indiana, Adams County, Indiana, Jay County, Indiana, Paulding County, Ohio, Van Wert County, Ohio, Winchester, Indiana, United States | Multi Exclusivity | 5% | Gross Sales | | During the Term, Developer agrees to expend a minimum of one-half of one percent (0.5%) of the Gross Sales of each of Developer's Restaurants located within the Development Area on local marketing in Metros Approved by BKC's local marketing manager. Developer further agrees that it must funds shall be applied toward the purchase of broadcast media and point-of-purchase material in support of broadcast media. | Gross Sales | Licensee |
| 43966 | | | | | | | | | | | | 4% | Gross Sales | | Upon the occurrence of an Event of Default under Section 7.1(b), Developer shall have thirty (30) days from receipt of notice from BKC to cure such Event of Default by paying to BKC the then-present additional Royalties [as defined below] with respect to the Burger King Restaurant that Developer fails to open in accordance with the Development Schedule [the "Unopened Restaurant"] until the opening of the Unopened Restaurant, provided, however, that if Developer fails to develop and open the Unopened Restaurant within six (6) months of the applicable date set forth in the Development Schedule [the "Scheduled Opening Date"], then BKC may, at its option, terminate this Agreement upon written notice to Developer. "Additional Royalties" shall mean an amount equal to 4% of the average per restaurant Gross Sales of all Burger King Restaurants in the Metro Area, calculated from the Scheduled Opening Date, divided by 365 and multiplied by the number of days calculated from the Scheduled Opening Date until the actual Opening Date, payable monthly in arrears by the 10th day of each month. | Gross Sales | Licensee |

ktMINE

kMINE Export [2018-02-21] Part 1

EX1-138

kMINE Export (2018-02-21) Part I

| Agreement ID | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Item per Development Unit | Modifier | Commodity / Per Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45966 | | FAMOUS FIXINS INC. | Famous Fixins, Inc. | | | Marketing Intangible | Consumer Non-Durables, Foods and Restaurant; Broadcast and Cable; Publishing; Entertainment | | | | | 5,000 USD | per Development Unit | The Developer shall be required to pay to BIC an amount equal to Five Thousand and No/100 Dollars ($5,000.00), multiplied by the number of Development Units (the "Franchise Fee Deposit") ... | Per Unit |
| 48035 | MARVEL ENTERPRISES INC. | Marvel Enterprises Inc.; Marvel Characters, Inc. | Nestlé S.A., Société des Produits Nestlé S.A., The Pillsbury Company, HDIP, Inc. | 06/20/2001 | 1. Commencement Date: June 20, 2001 (upstream date December 31, 2005) 2. The license hereby granted shall commence on the Commencement Date and terminate automatically on the Expiration Date ... | Marketing Intangible | Consumer Non-Durables, Foods and Restaurant; Beverages, Broadcast and Cable; Publishing; Entertainment | 5140 | United States, Canada | Multi Exclusivity | 75% | Net Sales | Licensee agrees to pay Marvel royalties at the Royalty Rate. Royalty Rate: Seven and a half percent (7.5%) of Net Sales | Net Sales |
| 40915 | NEW KESTREBER INC. | Nestlé Ice Cream Company, LLC; Ice Cream Partners USA, LLC | | 05/01/2002 | 1. The term of this Agreement ("Term") shall commence as of the date of this Agreement and shall continue until December 31, 2009, unless sooner terminated as set forth herein. | Manufacturing Process Intangible; Marketing Intangible | Consumer Non-Durables, Foods and Restaurant; Beverages, Retail | 2024 | District of Columbia, United States of America | EXCLUSIVE | 41% | Trademark Net Sales | Royalties shall be payable monthly, within thirty (30) days following the end of each month, in the amount of (0.4)% of the Trademark Net Sales plus (0.1)% of the total Technology Net Sales | Net Sales |
| 48915 | | | | | | Marketing Intangible | Goods and Nondurable, Beverages; Consumer Non-Durables | | | | 10% | Technology Net Sales | Royalties shall be payable monthly, within thirty (30) days following the end of each month, in the amount of (0.4)% of the total Trademark Net Sales plus (0.1)% of the total Technology Net Sales | Net Sales |
| 35715 | BRANDS FOODS INTERNATIONAL CORP. | Nestlé Brands Food Company USA, Incorporated | | 07/01/2004 | 1. "Expiration Date" means 31 December 2007 2. This Agreement shall take effect on 1 July 2004 and expire on 31 December 2007, subject to earlier termination pursuant Paragraph 10.2 below. | Marketing Intangible | Goods and Nondurable, Beverages; Consumer Non-Durables | 2020 | United States | Multi Exclusivity | 0% | Total Net Sales Value | Licensee will pay a Marketing fee to Manufacturer USA with respect to each Contract Year, "Marketing fee" means, with respect to any Contract Year, an amount equal to zero percent (0%) of the Net Sales Value of Licensed Products sold or distributed by Licensee during such Contract Year. | Net Sales |

Page 15 of 43

EX1-139

| Agreement# | Synopsis | FilingCompany | Licensee | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commensurate | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35755 | | | | | | | | | | | | | 5% | Net Sales Value | Licensee will pay to MaterFoods USA royalties (for the benefit of the MaterFoods Parties) in an amount equal to a percentage of the Total Net Sales Value of Licensed Products sold, distributed or shipped by Licensee as follows: Contract Year 1: To Retailer in Territory 1: 5% | Net Sales | Licensee |
| 35755 | | | | | | | | | | | | | 5.5% | Net Sales Value | Licensee will pay to MaterFoods USA royalties (for the benefit of the MaterFoods Parties) in an amount equal to a percentage of the Total Net Sales Value of Licensed Products sold, distributed or shipped by Licensee as follows: Contract Year 2: To Retailer in Territory 1: 5.5% | Net Sales | Licensee |
| 35755 | | | | | | | | | | | | | 6% | Net Sales Value | Licensee will pay to MaterFoods USA royalties (for the benefit of the MaterFoods Parties) in an amount equal to a percentage of the Total Net Sales Value of Licensed Products sold, distributed or shipped by Licensee as follows: Contract Year 2: To Retailer in Territory 1: 6% | Net Sales | Licensee |
| 35755 | | | | | | | | | | | | | 7% | Net Sales Value | Licensee will pay to MaterFoods USA royalties (for the benefit of the MaterFoods Parties) in an amount equal to a percentage of the Total Net Sales Value of Licensed Products sold, distributed or shipped by Licensee as follows: On any date during the contract term when annualized gross sales reach $90 million for a minimum period of 6 months: To Retailer in Territory 1: 7% | Net Sales | Licensee |
| 52315 | 1. Grant the right to continuously operate the Franchised Restaurant (one number Restaurant, a certain restaurant) at the Franchised Location [10 East Admiral Doyle, New Iberia, LA 70560] and to use the Proprietary Marks (names, marks, logos, insignia, slogans, emblems, symbols, designs, words, devices, trade names, and service marks) in the operation of the Franchised Restaurant. | Blue Sky Hospitality Holdings, Inc. | Hubbard Food Systems, Inc., Carl Karcher Enterprises, Inc. | | HRS, LLC | 07/15/2010 | 1. The initial Term of this Agreement and the Franchise granted by this Agreement shall begin on the date of this agreement and terminate at midnight on the day preceding the 20th anniversary of the date the Franchised Restaurant first opened for business, unless this Agreement is terminated at an earlier date pursuant to Section 18. 2. At the expiration of the initial Term, Franchisee shall have an option to remain a Franchisee at the Franchised Location for a Renewal Term of 10 years or, at Franchisee's option, 5 years. | Franchise | Restaurants, Consumer Services, Foods and Nonalcoholic Beverages | 6532 | New Iberia, LA, United States | Multi Exclusivity | 4% | Gross Sales | In addition to all other amounts to be paid by Franchisee to HRS, Franchisee shall pay HRS a nonrefundable and continuing royalty fee in an amount set forth in Attachment A, which shall not exceed 4% of the Gross Sales of the Franchised Restaurant, for the right to use the System, the System at the Franchised Location, the Proprietary Marks at the Franchised Location. | Gross Sales | Franchisee |
| 52315 | | | | | | | | | | | | | 5% | Gross Sales | Franchisee also shall spend and/or contribute for advertising approved by HRS or its designee a minimum of 5% of the Gross Sales of the Franchised Restaurant. | Gross Sales | Franchisee |
| 52315 | | | | | | | | | | | | | 8% | Gross Sales | In addition, HRS may increase the APO (weekly advertising and promotion obligation) above 6% of Gross Sales to the extent, as required from time to time, to prevent the Franchised Restaurant&#39;s Regional Co-op from requiring a contribution, that when added to Franchisee&#39;s APO shall produce a total national advertising fund/contribution, results in a total APO in excess of 8% of Gross Sales. | Gross Sales | Franchisee |
| 52315 | | | | | | | | | | | | | 4% | Gross Sales | The weekly media fee as provided for in Section 3.B. of the Franchise Agreement is as follows: Initial Term, 4.0% of Gross Sales | Gross Sales | Franchisee |
| 52315 | | | | | | | | | | | | | 8% | Gross Sales | Franchisee&#39;s APO (weekly advertising and promotion obligation) under Sections 3.B. through 3.D. of the Franchise Agreement and its allocation shall be as set forth below, unless and until modified by HRS as provided in Section 3.5.: MAF (Nationwide)/HRS&#39; National Advertising Fund 0.5% of Gross Sales 1.5 Regional Co-op 30% of Gross Sales 3.0% (Local store marketing) Attributable to 3.0% of Gross Sales 4. TOTAL APO: 5.0% of Gross Sales | Gross Sales | Franchisee |

KtMINE Export (2018.02.21) Part 1

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Lead Commodities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 52155 | | | | | | | | | | | | 0% | Gross Sales | Franchisee's APO (weekly advertising and promotion obligation) under Sections 3A through 5.0 of the Franchise Agreement and its allocation shall be as set forth below, unless and until modified by eFi ss provided in Section 5.1...Advertising fund 0.8 % of Gross Sales 2 Regional Co-op 3.0% of Gross Sales 4 TOTAL APO 5.0% of Gross Sales | Gross Sales / License |
| 52155 | | | | | | | | | | | | 4.2% | Gross Sales | Franchisee's APO (weekly advertising and promotion obligation) under Sections 3A through 5.0 of the Franchise Agreement and its allocation shall be as set forth below...Advertising fund 0.8 % of Gross Sales 2 Regional Co-op 3.0% of Gross Sales 4 TOTAL APO 5.0% of Gross Sales | Gross Sales |
| 52155 | | | | | | | | | | | | 5% | Gross Sales | Franchisee's APO (weekly advertising and promotion obligation) under Sections 3A through 5.0 of the Franchise Agreement and its allocation shall be as set forth below...Advertising fund 0.8 % of Gross Sales 2 Regional Co-op 3.0% of Gross Sales 4 TOTAL APO 5.0% of Gross Sales | Gross Sales |
| 52155 | | | | | | | | | | | | 475 USD | per month | NOTE1: (a) While the MSAF (Hershee's National Advertising fund) payment rate is 0.8% of Gross Sales, the minimum monthly payment for the Franchised Restaurant is $475 and the maximum monthly payment for the Franchised Restaurant is $850 | Per Unit |
| 52155 | | | | | | | | | | | | 850 USD | per month | NOTE1: (a) While the MSAF (Hershee's National Advertising fund) payment rate is 0.8% of Gross Sales, the minimum monthly payment for the Franchised Restaurant is $475 and the maximum monthly payment for the Franchised Restaurant is $850 | Per Unit |
| 40913 | 1. Grant the right to amend and revalidate that certain sublicense Agreement for the Pillsbury Trademarks and Technology, dated as of December 26, 2001... | NEW DECEMBER INC | Societe des Produits Nestle S.A., Nestec Ltd, NESTLE S.A. | Nestle Ice Cream Company, LLC, Ice Cream Partners USA, LLC | 09/11/2002 | 1. Subject to the provisions of Section 9.3 hereof, this Agreement shall become effective as of the date of this Agreement and shall remain in full force and effect through December 31, 2009 (the "Term") | Manufacturing/Process Intangible | Consumer Non-Durables, Foods and Nondalcoholic Beverages, Retail | 2024 | United States of America, District of Columbia | EXCLUSIVE | 4% | Net Sales | In consideration of the sublicense granted in the preceding subsections, the SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, license fees at the rate of (i) four percent (4%) of the net sales of the Frozen Dessert Products sold or used by the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by utilizing the Pillsbury Licensed Trademarks not incorporating Pillsbury Licensed Technology | Net Sales |

kMINE Export (2018-02-21) Part I

EX1-141

| Agreement ID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40913 | | | | | | | | | | | | 1% | Net sales | In consideration of the sublicense granted in the grant hereunder by SUBLICENSOR, SUBLICENSEE shall pay to SUBLICENSOR on a monthly basis, within thirty (30) days following the end of each month, a license fee at the end of (i) four percent (4%) of the net sales of the Frozen Dessert Products sold by SUBLICENSEE bearing the Pillsbury Licensed Trademarks and (ii) one percent (1%) of the net sales of the Frozen Dessert Products sold by Licensee not bearing the Pillsbury Licensed Technology | Net Sales | License |
| 75167 | 1. Grant the right to operate a single Ragin' Slaw's legendary Burger Town™ Restaurant at a single location using the System (a unique, proprietary system developed and owned by us (which may be modified or further developed from time to time in our sole discretion) for the establishment and operation of full service restaurants under the Trademarks, which includes, without limitation, a distinctive image consisting of exterior and interior design, decor, color scheme and furnishings; special recipes, Menu Items and full service bar; uniform standards, products and specifications; operations, procedures with respect to operations, inventory and management control (including accounting procedures and policies); training and assistance; and advertising and promotional programs and the Trademarks (trademarks, trade names, trade dress, service marks, symbols and indicia of origin designated by us from time to time for use in connection with the operation of the Restaurant, including, without limitation, "Ragin' Slaw's Legendary Burger Town™" or "Ragin' Slaw's™") within a geographic area | Diversified Restaurant Holdings, Inc. | RAGGED MARY'S FRANCHISING CORPORATION | 80'S RESTAURANT GROUP, LLC | 11/17/2011 | 1. Unless sooner terminated as provided herein, this Agreement shall be effective on the date hereof, but no sooner than the last date on which a party has executed this Agreement and shall continue for a term of fifteen (15) years (the "Initial Term"). 2. This Agreement shall not automatically renew upon the expiration of the Term. You shall have the option to renew this Term of this Agreement for a renewal term of ten (10) years if, and only if, each of the following terms and conditions has been fully met to our satisfaction. | Franchise | Restaurants, Consumer Services, Foods and Nonalcoholic Beverages, Consumer Non-Durables | 8741 | Cape Girardeau County, MO, United States | Multi Exclusivity | 5% | Gross Sales | You shall pay to us a weekly royalty fee equal to five percent (5%) of the Restaurant's Gross Sales without offset, credit or deduction of any nature. | Gross Sales | License |
| 75167 | | | | | | | | | | | | 1% | Gross Sales | You shall expend not less than one percent (1%) of Gross Sales per month for local advertising. Your local advertising expenditures include those we have granted consent including: (1) Newspapers, magazines and other periodicals; (2) Radio/television; (3) Outdoor advertising (e.g., billboards or signs); (4) Transit advertising and direct mail; and (5) such other media to which we consent. On a monthly basis, you will report to us your local advertising in a form we require. If you fail to spend one percent (1%) of Gross Sales per month on local advertising, you shall pay the difference to us as additional Royalty. | Gross Sales | License |
| 75167 | | | | | | | | | | | | 3% | Gross Sales | You shall pay us on a weekly basis, in addition to any Payments required under this Advertising Section of this Agreement and other fees required to be paid to us under this Agreement, a fee for the National Advertising Fund in an amount determined by us, which sum for any Advertising Fee shall not exceed three percent (3%) of weekly Gross Sales. At this time, the Advertising Fee is equal to two percent (2%) of weekly Gross Sales. | Gross Sales | License |
| 75167 | | | | | | | | | | | | 2% | Gross Sales | You shall pay us on a weekly basis, in addition to any Payments required under this Advertising Section of this Agreement and other fees required to be paid to us under this Agreement, a fee for the National Advertising Fund in an amount determined by us, which sum for any Advertising Fee shall not exceed three percent (3%) of weekly Gross Sales. At this time, the Advertising Fee is equal to two percent (2%) of weekly Gross Sales. | Gross Sales | License |

kMINE Export (2018-02-21) Part 1

EX1-142

kMINE

kMINE Export (2018.02.21) Part 1

| Agreement ID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75167 | | | | AMERICAN WATER STAR, INC. | | | | | | | | 100.00 | per day per trainer | We may in our discretion require you, your Control Person, your Franchisee Designate, your Managers, and/or employees to attend additional training programs and seminars during the term of this Agreement. We may charge you for such additional training. We may require you or your Control person, your Franchisee Designate, Managers and/or employees to attend such additional training programs and seminars. You will be responsible for paying travel and living expenses for you, your Control Person, your Franchisee Designate, Manager, and/or employees to attend such additional training programs and seminars including employee wages, in addition to training expenses and our trainer expenses. Our costs will range from $100 - $1,000 per day per trainer plus expenses. | | License |
| 75167 | | | | | | | | | | | | 1,000.00 | per day per trainer | We may in our discretion require you, your Control Person, your Franchisee Designate, your Managers, and/or employees to attend additional training programs and seminars during the term of this Agreement. We may charge you for such additional training. We may require you or your Control person, your Franchisee Designate, Managers and/or employees to attend such additional training programs and seminars. You will be responsible for paying travel and living expenses for you, your Control Person, your Franchisee Designate, Manager, and/or employees to attend such additional training programs and seminars including employee wages, in addition to training expenses and our trainer expenses. Our costs will range from $100 - $1,000 per day per trainer plus expenses. | | License |
| 75167 | | | | | | | | | | | | 100.00 | per day per trainer | If you request additional assistance from us, we reserve the right to provide such assistance or not, in our discretion. If, for example, the proper assistant is not available. You shall pay to us a fee for this additional assistance that will range from $100 - $1,000 per day, per out-of-pocket. We have the right in our discretion to require our additional assistance and charge you for such assistance. You shall also conduct such continuing training programs for your employees as we may reasonably require. | | License |
| 75167 | | | | | | | | | | | | 1,000.00 | per day per trainer | If you request additional assistance from us, we reserve the right to provide such assistance or not, in our discretion. If, for example, the proper assistant is not available. You shall pay to us a fee for this additional assistance that will range from $100 - $1,000 per day, per out-of-pocket. We have the right in our discretion to require our additional assistance and charge you for such assistance. You shall also conduct such continuing training programs for your employees as we may reasonably require. | | License |
| 170 | 1. Grant the right to produce, market and sell items (bottled flavor Water) bearing the HAWAIIAN TROPIC trademark. | AMERICAN WATER STAR INC. | DAMING RESEARCH LABORATORIES, INC. | AMERICAN WATER STAR, INC. | 01/1/2003 | 1. The license shall remain in effect for a period of three (3) years from January 1, 2003, only if each of the guaranteed royalties of Exhibit "C" per year is paid (LAMING). | Marketing Intangible | Consumer Non Durables, Foods and Nonalcoholic Beverages | 2020 | United States, Canada | EXCLUSIVE | 6% | Invoice sales | Net of shipping and sales tax(es) of the LICENSED GOODS | Net Sales | License |
| 171 | 1. Grant the right to produce, market and sell items (bottled flavor Water) bearing the HAWAIIAN TROPIC trademark. | AMERICAN WATER STAR INC. | DAMING RESEARCH LABORATORIES, INC. | AMERICAN WATER STAR, INC. | 01/1/2003 | 1. The license shall remain in effect for a period of three (3) years from January 1, 2003, only if each of the guaranteed royalties of Exhibit "C" per year is paid (LAMING). | Marketing Intangible | Consumer Non Durables, Foods and Nonalcoholic Beverages | 2020 | United States, Canada | EXCLUSIVE | 6% | Invoice sales | Net of shipping and sales tax(es) of the LICENSED GOODS | Net Sales | License |

Page 55 of 63

EX1-143

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99956 | 1.(i) set the right to enter into a MASTER OWNERSHIP AND LICENSE PROPERTY, whereas, Kraft Foods Inc., a Virginia corporation ("Kraft Foods Inc." or "SnackCo") and Kraft Foods Group, Inc., a Virginia corporation ("GroceryCo") have entered into the Separation and Distribution Agreement (the "Separation Agreement"), dated as of September 27, 2012, under which Kraft Foods Inc. will distribute to the Record Holders, on a pro rata basis, all the outstanding shares of GroceryCo Common Stock (as defined in the Separation Agreement) owned by Kraft Foods Inc. on the Distribution Date (the "Distribution"); whereas, prior to the Distribution, Kraft Foods Inc., acting through itself and its direct and indirect Subsidiaries, has conducted the GroceryCo Business and the SnackCo Business; Pursuant to the Distribution, Kraft Foods Inc. is being separated into two publicly traded companies: (i) GroceryCo, which will own and conduct, directly and indirectly, the GroceryCo Business; and (ii) SnackCo, which will own and conduct, directly and indirectly, the SnackCo Business, whereas, in furtherance of the separation of Kraft Foods Inc. into two publicly traded companies pursuant to the Separation Agreement, Section 2.2(b) of the Separation Agreement requires GroceryCo and SnackCo, and their respective Subsidiaries, (A) to transfer to one or more members of their respective Group as of the right, title and interest of the GroceryCo Group defined in the Separation Agreement) in and to all GroceryCo Assets and (B) transfer to one or more members of the SnackCo Group all of the right, title and interest of the GroceryCo Group in and to all SnackCo Assets; whereas, in addition, certain Intellectual Property Assets and SnackCo Assets, the parties desire to license to each other certain Trademarks on both a short term and long term basis, taking into consideration their historic joint | Kraft Foods Group, Inc. | KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, KRAFT Foods, Inc. | Kraft Foods Inc., KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Canada Inc. | 09/27/2012 | 1. This Agreement shall terminate automatically upon any termination of the Separation Agreement by the Kraft Foods Inc. Based at any time prior to the Distribution. | Cross License, Marketing Intangible | Consumer Non-Durables, Foods and Nondurables Beverages | 2000 | New Zealand, Australia, New Zealand, Mauritius, Mexico, Venezuela, Malaysia, Singapore, Philippines, European Union, Central America, South America, Costa Rica, Philippines, Hong Kong, United Kingdom, Republic of Ireland, Colombia, Ecuador, Peru, Panama, Virgin Islands, Puerto Rico, United States, Canada, Virgin Islands, Caribbean, Germany, Spain, Asia Pacific, Iceland, Liechtenstein, Norway, Switzerland, Latin America, Republic of Yemen, Republic of Iraq, Hashemite Kingdom of Jordan, Syrian Arab Republic, Lebanese Republic, Palestine, Israel, The Cooperation Council for the Arab States of the Gulf, United Arab Emirates, Abu Dhabi, Ajman, Dubai, Fujairah, Ras al Khaimah, Sharjah, Umm al Qaiwain, Kingdom of Bahrain, Kingdom of Saudi Arabia, Sultanate of Oman, State of Qatar, State of Kuwait, American Samoa, Guam | Non-Exclusivity | 100% | Fully allocated costs | Transitional services as reasonable needed by the Infrapdf Party for up to six (6) months after the effective date of the Buy-Back at fully allocated costs plus a 6% markup. | Costs |
| 99956 | | | | | | | | | | | | 25% | net revenues | GroceryCo Canada shall pay to SnackCo IPCo or one of its Affiliates (as designated by SnackCo IPCo) a royalty of two and a half percent (2.5%) of all net revenues of the GroceryCo Entities for sales in Canada of GroceryCo Products bearing the SnackCo Marks licensed under this Section 3.2(b). | Net Sales |
| 99947 | 1.(i) set the right to enter into a MASTER OWNERSHIP AND LICENSE PROPERTY, whereas, Kraft Foods Inc., a Virginia corporation ("Kraft Foods Inc." or "SnackCo") and Kraft Foods Group, Inc., a Virginia corporation ("GroceryCo") have entered into the Separation and Distribution Agreement (the "Separation Agreement"), dated as of September 27, 2012, under which Kraft Foods Inc. will distribute to the Record Holders, on a pro rata basis, all the outstanding shares of GroceryCo Common Stock (as defined in the Separation Agreement) owned by Kraft Foods Inc. on the Distribution Date (the "Distribution"); whereas, prior to the Distribution, Kraft Foods Inc., acting through itself and its direct and indirect Subsidiaries, has conducted the GroceryCo Business and the SnackCo Business; Pursuant to the Distribution, Kraft Foods Inc. is being separated into two publicly traded companies: (i) GroceryCo, which will own and conduct, directly and indirectly, the GroceryCo Business; and (ii) SnackCo, which will own and conduct, directly and indirectly, the SnackCo Business, whereas, in furtherance of the separation of Kraft Foods Inc. into two publicly traded companies pursuant to the Separation Agreement, Section 2.2(b) of the Separation Agreement requires GroceryCo and SnackCo, and their respective Subsidiaries, (A) to transfer to one or more members of their respective Group as of the right, title and interest of the GroceryCo Group defined in the Separation Agreement) in and to all GroceryCo Assets and (B) transfer to one or more members of the SnackCo Group all of the right, title and interest of the GroceryCo Group in and to all SnackCo Assets; whereas, in addition, certain Intellectual Property Assets and SnackCo Assets, the parties desire to license to each other certain Trademarks on both a short term and long term basis, taking into consideration their historic joint | Mondelez International, Inc. | KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, KRAFT Foods, Inc. | Kraft Foods Inc., KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Canada Inc. | 09/27/2012 | 1. This Agreement shall terminate automatically upon any termination of the Separation Agreement by the Kraft Foods Inc. Based at any time prior to the Distribution. | Cross License, Marketing Intangible | Consumer Non-Durables, Foods and Nondurables Beverages | 2000 | New Zealand, Australia, New Zealand, Mauritius, Mexico, Venezuela, Malaysia, Singapore, Philippines, European Union, Central America, South America, Costa Rica, Philippines, Hong Kong, United Kingdom, Republic of Ireland, Colombia, Ecuador, Peru, Panama, Virgin Islands, Puerto Rico, United States, Canada, Virgin Islands, Caribbean, Germany, Spain, Asia Pacific, Iceland, Liechtenstein, Norway, Switzerland, Latin America, Republic of Yemen, Republic of Iraq, Hashemite Kingdom of Jordan, Syrian Arab Republic, Lebanese Republic, Palestine, Israel, The Cooperation Council for the Arab States of the Gulf, United Arab Emirates, Abu Dhabi, Ajman, Dubai, Fujairah, Ras al Khaimah, Sharjah, Umm al Qaiwain, Kingdom of Bahrain, Kingdom of Saudi Arabia, Sultanate of Oman, State of Qatar, State of Kuwait, American Samoa, Guam | Non-Exclusivity | 100% | Fully allocated costs | Transitional services as reasonable needed by the Infrapdf Party for up to six (6) months after the effective date of the Buy-Back at fully allocated costs plus a 6% markup. | Costs |
| 99947 | | | | | | | | | | | | 25% | net revenues | GroceryCo Canada shall pay to SnackCo IPCo or one of its Affiliates (as designated by SnackCo IPCo) a royalty of two and a half percent (2.5%) of all net revenues of the GroceryCo Entities for sales in Canada of GroceryCo Products bearing the SnackCo Marks licensed under this Section 3.2(b). | Net Sales |

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99054 | 1. (i) set the right to enter into a MASTER OWNERSHIP AND LICENSE AGREEMENT REGARDING TRADEMARKS AND RELATED PROPERTY, whereas, Kraft Foods Inc., a Virginia corporation ("Kraft Foods Inc." or "KraftCo") and Kraft Foods Group, Inc., a Virginia corporation which Kraft Foods Inc. will distribute to the Record Holders, on a pro rata basis, all the outstanding shares of GroceryCo Common Stock (as defined in the Separation Agreement) owned by Kraft Foods Inc. on the Distribution Date (the "Distribution"), whereas, prior to the Distribution, Kraft Foods Inc., acting through itself and its direct and indirect Subsidiaries, has conducted the GroceryCo Business and the SnackCo Business. Pursuant to the Distribution, Kraft Foods Inc. is being separated into two publicly traded companies: (i) GroceryCo, which will own and conduct, directly and indirectly, the GroceryCo Business, and (ii) SnackCo, which will own and conduct, directly and indirectly, the SnackCo Business; whereas, in furtherance of the separation of Kraft Foods Inc. into two publicly traded companies pursuant to the Separation Agreement, Section 2.1(b) of the Separation Agreement requires GroceryCo and SnackCo, and to cause their respective Subsidiaries to, (A) transfer to one or more members of the GroceryCo Group as of the right time, and with the effect provided in the Separation Agreement, all of GroceryCo's right, title and interest of the GroceryCo Group in and to all GroceryCo Assets, whereas, in addition to the transfer of the GroceryCo Assets and SnackCo Assets, the parties desire to license to each other certain Trademarks on both a short-term and long-term basis, taking into consideration what the historic (cont.) | Kraft Foods Group, Inc. | KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Foods Inc. | Kraft Canada Inc., KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Foods Inc. | 09/27/2012 | 1. This Agreement shall terminate automatically upon any termination of the Separation Agreement by the Kraft Foods Inc. Based at any time prior to the Distribution. | Cross License, Marketing Intangible | Consumer Non Durables, Foods and Nonalcoholic Beverages | 2000 | New Zealand, Australia, New Zealand, Mauritius, Africa, Venezuela, Malaysia, Singapore, Philippines, European Union, Central America, South America, Costa Rica, Philippines, Hong Kong, United Kingdom, Republic of Ireland, Colombia, Ecuador, Peru, Panama, Virgin Islands, Puerto Rico, United States, Canada, Bahamas, Caribbean, Germany, Spain, Asia Pacific, Ireland, Liechtenstein, Norway, Switzerland, Latin America, Republic of Yemen, Republic of Iraq, Hashemite Kingdom of Jordan, Syrian Arab Republic, Lebanese Republic, Palestine, Israel, The Cooperation Council for the Arab States of the Gulf, United Arab Emirates, Abu Dhabi, Ajman, Dubai, Fujairah, Ras al Khaimah, Sharjah, Umm al Quwain, Kingdom of Bahrain, Kingdom of Saudi Arabia, Sultanate of Oman, State of Qatar, State of Kuwait, American Samoa, Guam | Multi Exclusivity | 100% | Fully allocated costs | Transitional services as reasonably needed by the infringed Party for out six (6) months after the effective date of the Buy-Back at fully allocated costs plus a 5% markup. | Costs | License |
| 99054 | | | | | | | | Consumer Non Durables, Foods and Nonalcoholic Beverages | | | Multi Exclusivity | 25% | net revenues | GroceryCo Canada shall pay to SnackCo IPCo or one of its Affiliates (as designated by SnackCo IPCo) a royalty of two and a half percent (2.5%) of all net revenues of the GroceryCo Entities for sales in Canada of GroceryCo Products bearing the SnackCo Marks licensed under this Section 3.2(b). | Net Sales | License |
| 99053 | 1. (i) set the right to enter into a MASTER OWNERSHIP AND LICENSE AGREEMENT REGARDING TRADEMARKS AND RELATED PROPERTY, whereas, Kraft Foods Inc., a Virginia corporation ("Kraft Foods Inc." or "KraftCo") and Kraft Foods Group, Inc., a Virginia corporation which Kraft Foods Inc. will distribute to the Record Holders, on a pro rata basis, all the outstanding shares of GroceryCo Common Stock (as defined in the Separation Agreement) owned by Kraft Foods Inc. on the Distribution Date (the "Distribution"), whereas, prior to the Distribution, Kraft Foods Inc., acting through itself and its direct and indirect Subsidiaries, has conducted the GroceryCo Business and the SnackCo Business. Pursuant to the Distribution, Kraft Foods Inc. is being separated into two publicly traded companies: (i) GroceryCo, which will own and conduct, directly and indirectly, the GroceryCo Business, and (ii) SnackCo, which will own and conduct, directly and indirectly, the SnackCo Business; whereas, in furtherance of the separation of Kraft Foods Inc. into two publicly traded companies pursuant to the Separation Agreement, Section 2.1(b) of the Separation Agreement requires GroceryCo and SnackCo, and to cause their respective Subsidiaries to, (A) transfer to one or more members of the GroceryCo Group as of the right time, and with the effect provided in the Separation Agreement, all of GroceryCo's right, title and interest of the GroceryCo Group in and to all GroceryCo Assets, whereas, in addition to the transfer of the GroceryCo Assets and SnackCo Assets, the parties desire to license to each other certain Trademarks on both a short-term and long-term basis, taking into consideration what the historic (cont.) | Kraft Foods Group, Inc. | KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Foods Inc. | Kraft Canada Inc., KRAFT FOODS GLOBAL BRANDS LLC, KRAFT FOODS GROUP BRANDS LLC, Kraft Foods Inc. | 09/27/2012 | 1. This Agreement shall terminate automatically upon any termination of the Separation Agreement by the Kraft Foods Inc. Based at any time prior to the Distribution. | Cross License, Marketing Intangible | Consumer Non Durables, Foods and Nonalcoholic Beverages | 2000 | New Zealand, Australia, New Zealand, Mauritius, Africa, Venezuela, Malaysia, Singapore, Philippines, European Union, Central America, South America, Costa Rica, Philippines, Hong Kong, United Kingdom, Republic of Ireland, Colombia, Ecuador, Peru, Panama, Virgin Islands, Puerto Rico, United States, Canada, Bahamas, Caribbean, Germany, Spain, Asia Pacific, Ireland, Liechtenstein, Norway, Switzerland, Latin America, Republic of Yemen, Republic of Iraq, Hashemite Kingdom of Jordan, Syrian Arab Republic, Lebanese Republic, Palestine, Israel, The Cooperation Council for the Arab States of the Gulf, United Arab Emirates, Abu Dhabi, Ajman, Dubai, Fujairah, Ras al Khaimah, Sharjah, Umm al Quwain, Kingdom of Bahrain, Kingdom of Saudi Arabia, Sultanate of Oman, State of Qatar, State of Kuwait, American Samoa, Guam | Multi Exclusivity | 100% | Fully allocated costs | Transitional services as reasonably needed by the infringed Party for out six (6) months after the effective date of the Buy-Back at fully allocated costs plus a 5% markup. | Costs | License |
| 99053 | | | | | | | | Consumer Non Durables, Foods and Nonalcoholic Beverages | | | Multi Exclusivity | 25% | net revenues | GroceryCo Canada shall pay to SnackCo IPCo or one of its Affiliates (as designated by SnackCo IPCo) a royalty of two and a half percent (2.5%) of all net revenues of the GroceryCo Entities for sales in Canada of GroceryCo Products bearing the SnackCo Marks licensed under this Section 3.2(b). | Net Sales | License |

kmMINE Export [2018.02.21] Part 1

EX1-145

| Agreement # | Agreement Synopsis | Filing Company | Licensee | Licensor | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81026 | 1. Grant the right to enter into a MASTER OWNERSHIP AND LICENSE AGREEMENT, whereby, Kraft Foods Inc., a Virginia corporation ("Kraft Foods Inc." or "KFI"), Kraft Foods Group, Inc., a Virginia corporation ("GroceryCo"), and Kraft Foods Global Brands LLC, a Delaware limited liability company ("GroceryCo") have entered into this Separation and Distribution Agreement (the "Agreement"), pursuant to which Kraft Foods Inc. will distribute to the Record Holders, on a pro rata basis, all of the issued and outstanding shares of GroceryCo Common Stock ... | Kraft Foods Group, Inc. | KRAFT FOODS GLOBAL BRANDS LLC; KRAFT FOODS GROUP BRANDS LLC; Kraft Foods Inc. | KRAFT Canada Inc.; KRAFT FOODS INC.; KRAFT FOODS GROUP BRANDS LLC; Kraft Foods Inc. | 2012 | 1. This Agreement shall terminate automatically upon any termination of the Separation Agreement by the Kraft Foods Inc. Board at any time prior to the Distribution. | Cross License, Marketing Intangible | Consumer Non-Durables, Foods and Nondurables Beverages | 2000 | New Zealand, Australia, New Zealand, Mauritius, Mexico, Venezuela, Malaysia, Singapore, Philippines, European Union, Germany, Indonesia, South America, Costa Rica, Philippines, Hong Kong, United Kingdom, Republic of Ireland, Caribbean, Germany, Spain, Asia Pacific, Ireland, Liechtenstein, Norway, Switzerland, Latin America, Republic of Yemen, Republic of Iraq, Hashemite Kingdom of Jordan, Syrian Arab Republic, Lebanese Republic, Palestine, Israel, The Cooperation Council for the Arab States of the Gulf, United Arab Emirates, Abu Dhabi, Ajman, Dubai, Fujairah, Ras al Khaimah, Sharjah, Umm al Quwain, Kingdom of Bahrain, Kingdom of Saudi Arabia, Sultanate of Oman, State of Qatar, State of Kuwait, American Samoa, Guam | Multi Authority Non Exclusivity | 100% | Fully allocated costs | To enter into or transfer services as reasonable models the licensee is in part and receives a bill of months after the effective date of the Buy-Back at fully allocated costs plus a bill markup. | Costs |
| 89603 | 1. Grant the right to sell, distribute, advertise, promote and market the PRODUCTS and use the trade name or trademark for SOURCES SAINTE LOUIS, INC. and LES SOURCES SAINTE ELIE INC. or any of its affiliates and shall include any trade name or trademark through the process of purification or otherwise in the Territories. 2. Grant the right to the use of the Intellectual Property (acronyms, designs, logos, trademarks, service marks, brand names, copyrights, symbols, pictograms, slogans, signs, patents, labels, forms, stationery and other identification items, any information or intangible property normally considered proprietary)... | Nestlé Waters Collection, Inc. | 3000 RES CLUDEC INC.; LES SOURCES SAINTE ELIE COLLECTION INC. | BORÉAL Water Collection Inc. | 06/26/2009 | 1. This Agreement will be effective as of the date of execution by the parties and shall continue in full force and effect for a period of two (2) years thereafter; provided, renewable at the end of this period and at the end of each subsequent renewal period for another year on the same terms and conditions as contained in this Agreement (the "Term"). This agreement will be automatically renewed unless a party gives the other party thirty (30) days written notice. | Manufacturing Process Intangible, Marketing Intangible | Foods and Nondurable Beverage, Consumer Non-Durables | 5140 | United States of America | EXCLUSIVE | 5% | License fees | The Licensee, by its signature to this agreement, agrees to pay the License fee per cent (5%) of License fees paid by Sub-Licensee to the Licensor for the acquisition of subzones. | Net Sales |
| 99578 | 1. Grant the right in the Territory for negotiating and, if requested by Hickory Farms, Inc., executing agreements that are in the best interests of the Parties with respect to the commercial exploitation of the Property (Hickory Farms shall have a reasonable opportunity to assist AvonCorp in connection with the Articles) items of merchandise, publications, products, services and the like utilizing all or any part of the Property in the Territory... | AvonCorp | AvonCorporation | Hickory Farms, Inc. | 03/12/2012 | 1. Unless earlier terminated pursuant to Section 2.2, the term of this Agreement shall be for a period of one (1) year commencing upon the Effective Date (the "Term"), and unless otherwise agreed to by the Parties in writing, shall bear thirty (30) days prior to the expiration of the Term, shall automatically terminate on the first anniversary of the Effective Date. | Service | Branches Services, Consumer Non-Durables, Foods and Nondurable Beverages | 5794 | North America, Canada, United States, Mexico | Multi Exclusivity | 20% | Net Revenues | In exchange for the Services, PRINCIPAL shall pay to AGENT the following commission: (a) 20% percent of Net Revenues received by PRINCIPAL during the initial term of any executed License Agreements entered into from the effective date of each such License Agreement. (b) 20% percent of Net Revenues received by PRINCIPAL during the first renewal term of any such executed License Agreements from the effective date of each such License Agreement. | Net Sales |

ktMINE Export (2018.02.21) Part 1

EX1-146

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead Licensor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99578 | | | | | | | | | | | | 20% | Net Revenues | In exchange for the Services, PRINCIPAL shall pay to AGENT the following commission (a) 25% percent of Net Revenues received by PRINCIPAL during the initial term of any executed License Agreements entered into from the effective date of each such License Agreement; (b) 20% percent of Net Revenues received by PRINCIPAL during the first renewal term (if any) of any such executed License Agreement from the effective date of each such License Agreement; | Net Sales | Licensor |
| 24848 | 1. Grant the right to use the Popeye cartoon character and related characters in conjunction with the operation of the Popeyes Chicken franchised restaurant chain. 2. Grant the right to operate the Croutons, Popeyes and Church's franchise restaurants 3. Grant to the Popeyes juicy fried chicken recipe and certain other ingredients used in Popeyes products | AFC ENTERPRISES INC. | AFC Enterprises, Inc.; King Features Syndicate Division; Hearst Holdings, Inc.; A 3-E C C Copeland | N/A; AFC Enterprises, Inc. | 2004 | 1. King Features Agreements. The Company has several agreements with the King Features Syndicate Division ("King Features") of Hearst Holdings, Inc. Prior to 2002, the Company had the exclusive right to use the image and likeness of the cartoon character "Popeye" (and certain comparison characters such as "Olive Oyl") in connection with the operations of Popeyes restaurants worldwide. The Company was obligated to pay King Features a royalty of one and one-half percent (0.5%) on the first $1.0 billion of Popeyes cumulative annual system-wide sales and one and three-fourths percent (0.05%) on the next $2.0 billion of such annual sales. Under the agreement, total annual royalties were capped at $2.0 million per year. On January 1, 2002, an amendment was made to these agreements limiting the exclusive right to use the image and likeness of the cartoon character "Popeye" in the United States. Popeyes located outside the United States continue to have the exclusive use of the image and likeness of the cartoon character "Popeye" (and certain comparison characters such as "Olive Oyl"). Under the amendment, the Company is obligated to pay King Features a royalty of one and one-half percent (0.5%) on the first $1.0 billion of Popeyes cumulative annual system-wide sales and one and three-fourths percent (0.05%) on the next $2.0 billion of such annual sales, plus twenty percent of Net Company gross revenues from the sales of the "Popeye" products sold through | Franchise, Marketing Intangible, Other | Entertainment, Restaurants, Consumer Services, Consumer Non-durable, Foods and Non-alcoholic Beverages | 5812 | United States, worldwide | EXCLUSIVE | 20% | Gross Revenues | from sales of "Popeye" products sold through retail outlets outside of the Popeyes restaurant system | Gross Sales | Licensor |
| 24848 | | | | | | | | | | | | 5% | Net QSR Sales | Royalty for Popeyes, Church's Land Cinnabon franchises | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 1% | Net QSR Sales | for advertising for Popeyes franchise | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 4% | Net QSR Sales | for advertising for Church's franchise | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 1% | Net QSR Sales | for advertising for Church's franchise: reduced to a maximum of 3/4 a local advertising co-operative is formed | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 1% | Net QSR Sales | for advertising for Cinnabon franchise | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 1% | system-wide sales | from use of the image and likeness of the cartoon character "Popeye" (and certain comparison characters such as Olive Oyl) in connection with the operation of Popeyes restaurants worldwide: on the first $1.0 billion of Popeyes cumulative annual system-wide sales | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 05% | system-wide sales | from use of the image and likeness of the cartoon character "Popeye" (and certain comparison characters such as "Olive Oyl") in connection with the operation of Popeyes restaurants worldwide: on the next $2.0 billion of such annual sale | Net Sales | Licensor |
| 24848 | | | | | | | | | | | | 500000 USD per year | | from use of the image and likeness of the cartoon character "Popeye" in connection with the operation of Popeyes restaurants in the United States | Per Unit | Licensor |
| 103772 | 1. Grant the right to support Avenue Sale and Distribution, LLC as its exclusive distributor for the Distribution of the Products (Arizona beverage products and other consumer products, including LS ROCK, LS SCARVES, LS distribution channels) in the Territory. 2. Grant the right to use within the Territory (i) the name of Level 5 Beverage Company and (ii) the trademarks, service marks or any other intellectual property of Level 5 Beverage Company or any of its affiliates relating to the Products. | Minerva Resources, Inc. | Level 5 Beverage Company, Avenue Sales and Distribution, LLC | Avenue Sales and Company; Avenue Sales and Distribution, LLC; Level 5 Beverage Company | 07/26/2013 | 1. Subject to earlier termination in accordance with paragraph 5 of this Agreement, the term of this Agreement shall be for a three (3) year period commencing on the Effective Date ("Initial Term"). Upon the terms and conditions herein, upon the expiration of the Initial Term, the term of this Agreement shall automatically be renewed for successive one (1) year periods. | Distribution, Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages | 1381 | Los Angeles County, Riverside County, San Bernardino County, Orange County, San Diego County, California, United States, Maricopa County, Pinal County, Pima County, State of Arizona | Multi-Exclusivity | | Per Unit | Sales of the Products by Supplier to Distributor shall be at such prices as set forth in Schedule A attached hereto, which may be changed by Supplier in its annual basis during the term of the Agreement upon thirty (30) days' prior written notice to Distributor. Product - LS ROSE, Purchase Price - $12 - 24 per Case | Per Unit | Licensor |

kmine

kMINE Export [2018.02.21] Part 1

Page 60 of 63

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101772 | | | | | | | | | | | | 14 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 ROE, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 12 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 CURVES, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 14 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 CURVES, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 12 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 ARMOR, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 14 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 ARMOR, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 12 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 FLEX, Purchase Price - $12 - 14 per Case | | Per Unit |
| 101772 | | | | | | | | | | | | 14 USD | per Case | Sales of the Products by Supplier to Distributor shall be at such prices as set forth on Schedule A attached hereto, which may be changed by Supplier on an annual basis during the term of this Agreement upon thirty (30) days' prior written notice to Distributor. Product - 15 FLEX, Purchase Price - $12 - 14 per Case | | Per Unit |

KTMINE

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity ie | Lead Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102398 | 1.0 set the right to use the Trademarks and Other IP (Thorndown Industries Holdings, LLC) trademarks, trade name, copyright and intellectual property including THRENDOWN® solely in connection with development, manufacture, distribution, marketing and sale of one or more Sports Performance Drinks (all non-alcoholic beverages designed to give a consumer enhanced physiological and/or performance effects and containing vitamins, herbal ingredients, and/or other similar ingredients). | DETHRONE ROYALTY HOLDINGS, INC. | Thorndown Industries Holdings, LLC; Dethrone Royalty Holding, Inc.; Thorndown Industries Holdings, Inc. | Dethrone Royalty Holding, Inc. | 10/10/2013 | 1. The initial Term of this Agreement shall be three (3) years from the Effective Date of this Agreement, unless earlier terminated as provided herein (the "Term"). 2. Subject to the provisions of this Agreement (including without limitation the termination provisions), and provided Licensee is not in default under this Agreement, the Term shall be automatically extended for one (1) additional three (3) year period upon mutually agreeable terms, unless either party notifies the other party in writing at least ninety (90) days prior to the then-scheduled expiration of the Term that such party elects not to amend the Term, in which event the Term shall expire at the end of the then-current Term (each such extension is referred to herein as an "Extension Term"). There may be a maximum of one (1) Extension Term. The Term and any Extension Term may be collectively referred to as the Term. | Marketing Intangible, Service | Consumer Non-Durables, Foods and Nondurables Beverages, Biotechnology, Healthcare Pharmaceutical, Entertainment, Business Services | 7342 | United States, Canada | Multi Exclusivity | 100% | actual cost | All of the following rights and obligations shall apply upon any termination of this Agreement, whether by expiration of the term hereof or by earlier termination pursuant to the provisions of this Agreement: Subject to the Inventory Sale Period, Licensee shall deliver to Licensor (a) all packing, marketing, advertising, display and other materials (other than the Licensed Products) bearing the Trademarks and Other IP, and (b) ingredients which are unique to the Licensed Products, at a price of actual cost plus four percent (4%). | Costs | License |
| 102398 | | | | | | | | | | | | 100% | actual cost | All of the following rights and obligations shall apply upon any termination of this Agreement, whether by expiration of the term hereof or by earlier termination pursuant to the provisions of this Agreement: Subject to the Inventory Sale Period, Licensee shall deliver to Licensor (a) all packing, marketing, advertising, display and other materials (other than the Licensed Products) bearing the Trademarks and Other IP, and (b) ingredients which are unique to the Licensed Products, at a price of actual cost plus four percent (4%). | Costs | License |
| 102398 | | | | | | | | | | | | 10% | Net Revenue | During the Term, and in accordance with Section 4.4, Licensor shall cause Licensee Royalties in the amount of ten percent (10%) of Net Revenue generated by all sales and other transfer of the Licensed Products. | Net Sales | License |
| 102398 | | | | | | | | | | | | 25% | any compensation | In the event Licensor creates an independent and formal relationship with one of the Licensee's athlete endorsers, the Licensor agrees to pay Licensee twenty five percent (25%) of any compensation paid to the athlete endorser for athlete endorser participation. | Net Sales | License |
| 102398 | | | | | | | | | | | | 10% | Net Revenues | Each year during the Term, Licensee agrees to spend at least ten percent (10%) of Net Revenues per month on marketing the Licensed Products throughout the Territory ("Marketing Spend"). | Net Sales | License |
| 102398 | | | | | | | | | | | | 37,500 USD | per quarter | Licensor is dependent upon the efforts of Licensee to maximize Net Revenue through use of the Exclusive License. To have the right to continue the replacement throughout the Term, Licensee must pay Licensor the minimum Royalties set forth below (the "Minimum Royalties"). All Royalties paid by Licensee to Licensor during the Term shall be applied toward the minimum Royalties. Royalties paid during any annual period shall be credited toward the total Minimum Royalties. Royalties paid during a period would be credited between the combined two combined periods. Time Period: 01/01/14 through 12/31/14; Minimum Quarterly Payments: 37,500.00 | Per Unit | License |

EX1-149

kMINE

kMINE Export (2016.02.21) Part 1

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodit ie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102395 | 1. Grant the right to use the Trademarks SMART COFFEE and SMART COFFEE STIR IT UP to manufacture, create, develop, process, package, label, distribute, market and directly or indirectly sell the Product (Single serve hot espresso). | | | | | 1. The terms ("Term") of this Agreement shall commence on the date first written above and, unless terminated earlier pursuant to the provisions of this Agreement, shall continue for a period of five (5) years. The Term of this Agreement shall automatically renew for successive one (1) year periods subject to termination provisions contained herein. | | | | | | 50,000 USD | per quarter | License is dependent on the efforts of Licensee to maximize Net Revenue through use of the exclusive License. To have the right to continue the Agreement throughout the Term, Licensee must pay Licensor the minimum Royalties set forth below (the "Minimum Royalties"). If all Royalties paid by Licensee to Licensor during the applicable period listed below shall be credited toward the listed Minimum Royalties. Royalties paid during one period cannot be combined between periods. | Time Period: 01/01/15 through 12/31/15; Minimum Quarterly Payments: 50,000.00 | Per Unit | Licensor |
| 102399 | | | | | | | | | | | | 75,000 USD | per quarter | Licensor is dependent on the efforts of Licensee to maximize Net Revenue through use of the exclusive License. To have the right to continue the Agreement throughout the Term, Licensee must pay Licensor the minimum Royalties set forth below (the "Minimum Royalties"). If all Royalties paid by Licensee to Licensor during the applicable period listed below shall be credited toward the listed Minimum Royalties. Royalties paid during one period cannot be combined between periods. | Time Period: 01/01/16 through 12/31/16; Minimum Quarterly Payments: 75,000.00 | Per Unit | Licensor |
| 104941 | | JAMMIN JAVA CORP | MOTHER PARKERS TEA & COFFEE INC. | Nuke's Pancakes, Inc. | 05/20/2014 | 1. The term ("Term") of this Agreement shall commence on the date first written above, unless terminated earlier pursuant to the provisions of this Agreement, shall continue for a period of five(5) years. The Term of this Agreement shall automatically renew for successive one (1) year periods subject to termination provisions contained herein. | Marketing Intangible | Consumer Non-Durables, Foods and Nondurable; Beverages, Entertainment | 2080 | Canada, United States of America, Mexico | Multi-Exclusivity | 0.06 USD | per capsule | There shall be no License Fee for Product sold by MP to JJ and its Affiliates. MP shall pay to JJ a License Fee for Products sold to parties other than JJ or its Affiliates ("Non JJ Customers"). For these products, and (b) $0.04 per capsule for all other products. | | Per Unit | Licensor |
| 104941 | | | | | | | | | | | | 0.045 | per capsule | There shall be no License Fee for Product sold by MP to JJ and its Affiliates. MP shall pay to JJ a License Fee for Products sold to parties other than JJ or its Affiliates ("Non JJ Customers"). For these products, and (b) $0.04 per capsule for all other products. | | Per Unit | Licensor |
| 106196 | 1. Grant the right to utilize the Licensed Patents to make, have made, offer for sale, sell, use, import and export products and services. 2. Grant the right to use the Licensed Trademarks (Registration Number: 86090721) on or in connection with goods and services related to the food service industry. 3. Grant the right to use the Other Licensed Intellectual Property, including but not limited to the right to: reproduce, distribute, offer for sale, sell, display and prepare derivative works based on the Other Licensed Intellectual Property, or in connection with the manufacture, marketing, distribution and sale of products and services. | Nuke's Food Co. | Innovative Product Consulting, Inc. | Nuke's Pancakes, Inc. | 05/12/2013 | 1. This license shall commence on the Effective Date of this Agreement and, unless terminated by mutual consent or pursuant to Section 12.01 below, shall continue for a period of 20 years. This Agreement may be extended for additional 10 year terms at the mutual consent of both parties. | Manufacturing/Process Intangible, Marketing Intangible | Foods and Nondurable; Beverages, Consumer Non-Durables | 2040 | United States | Multi-Exclusivity | 7.5% | Net Revenues | During the Term of this Agreement, Company shall pay Licensor a royalty of 7.5% of monthly Net Revenues. Such royalties shall be paid within 30 calendar days from the end of each month. | | Net Sales | Licensor |
| 106651 | 1. Grant the right to use the trademark, trade name, copyright, and intellectual property solely in connection with the development, manufacture, distribution, marketing and sale of one or more "Tigers Performance Drinks". 2. Grant the right to distribute the Licensed Products for use in the manufacture, production and sale of the Licensed Products only within the Territory. | HMC BRANDS, INC | Throwdown Industries Holdings, LLC | Definitive Royalty Holding, Inc. | 10/02/2013 | 1. The initial Term of this Agreement shall be three (3) years from the Effective Date of this Agreement, unless earlier terminated as provided herein (the "Term"). 2. Subject to the provisions of this Agreement (including without limitation the termination provisions), and provided Licensee is not in default under this Agreement, the Term shall be automatically extended for one (1) additional three (3) year period upon mutually agreeable terms, unless either party notifies the other party in writing at least ninety (90) days prior to the then-scheduled expiration of the Term that such party does not wish to extend the Term (each such extension is referred to herein as an "Extension Term"). There may be a total of one (1) successive Extension Term. The Term and any Extension Term may be collectively referred to as the Term. | Distribution, Marketing Intangible | Foods and Nondurable; Beverages, Consumer Non-Durables | | United States, Canada | Multi-Exclusivity | 10% | Net Revenue | During the Term, and in accordance with Section 4.4 below, Licensee shall pay Licensor Royalties in the amount of ten percent (10%) of Net Revenue generated by all sales and other transfers of the Licensed Products. | | Net Sales | Licensor |

EX1-150

kMINE

kMINE Export [2018-02-21] Part 1

| AgreementID | Symbol | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 131513 | Gross Sales | True Drinks Holdings, Inc. | DISNEY CONSUMER PRODUCTS, INC. | TRUE DRINKS HOLDING, INC. | 04/01/2011 | 1. The period commencing on the Effective Date of a Schedule, and ending upon the first Date of March 31, 2017, or upon the earlier termination of a License Agreement including such Schedule. | Marketing Intangible | Consumer Non Durable, Foods and Nondurable, Beverages | 2833 | United States, Puerto Rico | Multi Exclusivity | 5% | Gross Sales | For all Landed/N Sales | Gross Sales License |
| 131513 | | | | | | | | | | | | 7% | Gross Sales | For all FOB/Out Sales | Gross Sales License |
| 131513 | | | | | | | | | | | | 11% | Gross Sales | FOB/Out Sales through Wholesalers (if applicable): An additional five percent (5%) shall be added to the Royalty Rate for all FOB/Out Sales through Wholesalers if authorized | Gross Sales License |
| 3587 | Net Sales | INVENTURE GROUP INC. | POORE BROTHERS, INC. | WARNERBROS. | 11/20/2002 | 1. August 2, 2002 through August 31, 2006 | Distribution, Marketing Intangible | Foods and Nonalcoholic Beverages, Entertainment | 2096 | United States, Puerto Rico, United States Virgin Islands, United States Military Bases | Multi Exclusivity | 5% | Net Sales | All Licensed Products | Net Sales License |
| 3587 | | | | | | | | | | | | 10% | Net Purchase Price | Net Purchase Price of all Licensed Premiums distributed by Licensee hereunder. The term "Net Purchase Price" herein shall mean the price actually paid by Licensee for any Licensed Premium(s) authorized and distributed hereunder. It is understood and agreed that any Royalties paid to Licensor on Net Purchase Price of Premiums shall be in addition to and shall not affect the Guaranteed Consideration hereunder. | Net Sales License |

Page 160 of 463

Copyright © 2018 kMINE. Usage of this data is governed by the terms and conditions accepted by user during initial log-in to kMINE database.



| Source: | ktMINE Royalty Rate Finder |
|---|---|
| Client: | [Blank] |
| Date: | 2/22/2018 |
| Project: | [Blank] |
| Description: | [Blank] |
| FYE Analysis: | [Blank] |
| Username: | wkwak@nathaninc.com |
| Total Agreements Reviewed: | 99 |

**SEARCH #**

| # | Filter | Filter Criteria | Step Results | Search Results | Operator |
|---|---|---|---|---|---|
| 1 | Industry | ALCOHOLIC BEVERAGES AND TOBACCO, FOODS AND NONALCOHOLIC BEVERAGES | 1897 | 1897 | |
| 2 | TerritoryName | U.S., U.S.A., UNITED STATES, UNITED STATES, UNITED STATES OF AMERICA, USA | 3643 | 459 | and |
| 3 | Keyword | TRADEMARKS, SERVICE MARKS, TRADE NAMES, TRADEMARK, LOGOS, MARKS, TRADE NAME, TRADENAMES, TRADENAME | 5084 | 264 | and |
| 4 | EffectiveDate | BETWEEN, 3/1/1996&8/2/2000 | 0 | 99 | AND |
| | | | | | |

Copyright © 2018 ktMINE.  Usage of this data is governed by the terms and conditions accepted by user during initial log-in to ktMINE database

| Agreement Synopsis | Agreement Id | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity Id |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Grant the right to use the Trademarks (all of the interest of Trademarks LLC in all trademarks, trade names, trade dress, service marks, registrations and applications for registrations therefor, in each case relating to "LsLA," "CharterHeli" and "S&M" brands, including any variation or product line extension thereof and any derivative pertaining thereto) upon and in connection with the manufacture, marketing distribution and sale of the Licensed Product (cigarettes) in the United States. | 11120 | RELIC INC | Trademarkz LLC | Philip Morris Incorporated | 06/04/1999 | 1. This Agreement shall continue in effect through May 24, 2010, unless earlier terminated pursuant to the provisions of this Agreement, provided that, this Agreement will renew automatically for successive one year periods unless one party hereto gives written notice of its desire to terminate at least 60 days prior to the date on which the Agreement would otherwise be renewed. | Marketing Intangible | Alcoholic Beverages and Tobacco | 2111 | United States of America, District of Columbia | Multi-Exclusivity | 4.5% | Net Sales Value | In consideration of the right and license granted to Licensee to use the Trademarks pursuant to this Agreement, Licensee shall pay to Licensor a royalty at the rate of four and one-half percent (4.5%) of the Licensed's Net Sales Value of Licensed Products during each Royalty Month (as defined below) or portion thereof that this Agreement is in effect, but in no event shall such royalty for any such Royalty Month (or portion thereof) in which this Agreement is in effect be less than the Minimum Royalty. | Net Sales |
| 1. Grant the right to use the Trademarks ("LsLA" brands) upon and in connection with the manufacture, marketing distribution and sale of the Licensed Products (cigarettes) in the United States. | 11285 | VECTOR GROUP LTD | Brands LLC | Philip Morris Incorporated | 03/22/1999 | 1. This Agreement shall continue in effect through ___, 2010, unless earlier terminated pursuant to the provisions of this Agreement, provided that, this Agreement will renew automatically for successive one year periods unless one party hereto gives written notice of its desire to terminate at least 60 days prior to the date on which the Agreement would otherwise be renewed. | Marketing Intangible | Alcoholic Beverages and Tobacco | 2111 | United States, District of Columbia | Multi-Exclusivity | 4.5% | Net Sales Value | Of Licensed Products during each calendar year (or portion thereof) that this Agreement is in effect, but in no event shall such royalty for any such calendar year (or portion thereof) in which this Agreement is in effect be less than the Minimum Royalty. | Net Sales |
| 1. Grant the right to engage NATIONAL TOBACCO CO., L.P. to serve as its exclusive sales representative to solicit, on behalf of NAOC, orders for certain tob-pa-own cigarette papers and related products, including Zig Zag products. 2. Grant the right to use the trademarks owned or licensed by NAOC and used in connection with the promotion and advertising of the Products. | 20104 | NORTH ATLANTIC TRADING CO INC | NATIONAL TOBACCO CO., L.P., NORTH ATLANTIC OPERATING COMPANY, INC., NATIONAL TOBACCO COMPANY, L.P. | | 03/13/1998 | 1. The term of this Agreement shall commence on the date hereof and expire on the first anniversary of such date, unless terminated sooner as provided in this Agreement (the "Initial Term"). This Agreement shall be renewed automatically for additional one year periods each ("Successive Terms"), unless either party has terminated this Agreement pursuant to the provisions of Section 6.2, or unless sooner terminated as provided in this Agreement. For the purpose of this Agreement, the term "Term" shall mean the Initial Term and each Successive Term for which this Agreement is renewed. | Marketing Intangible, Service | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Paper and Forest Products, Business Services | 2200 | United States, Canada, Hong Kong, Singapore, Dubai, Qatar, Oman, Jordan | Multi-Exclusivity | 16.7% | net sales | Representatives shall be entitled to receive a sales commission equal to 16.7% of NAOC's net sales to a customer (i) whose order was solicited by Representatives; (ii) whose address (or location of its offices) is within the Territory; and (iii) who took shipment at a location or address within the Territory. | Net Sales |
| 1. Grant the right to use the Marks ("Smith & Wollensky" or any variations thereof herein) and Associated Rights (the goodwill associated with the Marks and all associated trade names, trade dress, logos, menus, concepts, or other marketing devices heretofore, currently or hereafter utilized in conjunction with the Marks and/or the operation of the restaurant currently located at 797 Third Avenue, New York, New York which are operated under the name "Smith & Wollensky" and "Wollensky's Grill") throughout the Territory. | 55029 | NEW YORK RESTAURANT GROUP INC | THE NEW YORK RESTAURANT GROUP, LLC | ST. JAMES ASSOCIATES | 08/16/1996 | 1. The License granted herein shall commence upon the execution of this Agreement (the "License Commencement Date") and ... 6 ... shall be irrevocable and perpetual unless terminated in accordance with the terms of this Agreement. | Marketing Intangible | Restaurants, Consumer Services, Consumer Non-Durables, Food and Nondurables Beverages, Alcoholic Beverages and Tobacco, Consumer Durables, Retail | | United States, world | EXCLUSIVE | 2% | Restaurant Sales and Non-Restaurant Sales | Except as provided in subparagraph 5(b), Licensee shall pay to Licensor an annual royalty (the Royalty Percentage Royalty Base) of two (2%) percent of the amount of Restaurant Sales and Non-Restaurant Sales made during the calendar year in which the Percentage Royalty is being calculated. | Net Sales |
| | 55029 | | | | | | Marketing Intangible | | | | | 1% | Restaurant Sales and Non-Restaurant Sales | If Licensee or any Affiliate thereof shall hereafter (1) be engaged as the manager of a new restaurant commonly identified or considered by the public as a steakhouse (hereinafter referred to as a "New Steakhouse") or Licensed Management Report), or (1) purchase the right to utilize any steakhouse name such as Sparks, The Palm, Victoria & Co or Licensor shall have the right to open new steakhouse(s) utilizing such names, then only such new steakhouse(s) as are thereafter opened and such new steakhouse(s) so come under such Management described in (1) above in this paragraph 5(b) shall be considered Board Restaurants", solely for purposes of this subparagraph (b) and an annual Percentage Royalty of one (1%) percent (instead of two (2%) percent) shall be payable on the Restaurant Sales and Non-Restaurant Sales of such new steakhouse(s); provided, however, that no Percentage Royalty or fee or other compensation shall be payable by Licensee to Licensor in respect of any such steakhouse restaurant(s) as are in existence at the time of such future date or at the commencement of such Management by Licensee or any Affiliate thereof so long as such restaurants do not utilize the Marks. | Net Sales |

ktMINE

| Agreement# | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1738 — 1. Grant the right to use the Marks ("Smith & Wednesday" or any variations thereof thereto) and associated rights (the goodwill associated with the Marks and all associated trade names, trade dress, decor, menus, concepts or other marketing devices heretofore, currently or hereafter utilized in conjunction with the Marks and/or the operation of the restaurant (than currently located at 797 Third Avenue, New York, New York which are operated under the marks "Smith & Wednesday" and "Wednesday's Grill") throughout the Territory. | SMITH & WOLLENSKY RESTAURANT GROUP INC | ST. JAMES ASSOCIATES | THE NEW YORK RESTAURANT GROUP, LLC | 08/16/1996 | 1. The License granted herein shall commence upon the execution of this Agreement (the "License Commencement Date") and ... shall be irrevocable and perpetual unless terminated in accordance with the terms of this Agreement. | Marketing Intangible | Restaurants, Consumer Services, Alcoholic Beverages and Tobacco, Foods and Nonalcoholic Beverages, Consumer Durables, Consumer Non-Durables, Retail | | world, United States | EXCLUSIVE | 2% | Restaurant Sales and Non-Restaurant Sales | | Net Sales |
| 1738 | | | | | | | | | | | 1% | Restaurant Sales and Non-Restaurant Sales | If Licensee or any Affiliate thereof shall hereafter (i) be engaged as the manager of a new restaurant commonly identified or considered by the public as a steakhouse (hereinafter referred to as a "Manager" or "Management"), or (ii) purchase the right to utilize any steakhouse name such as Sparks, The Palm, Morton's or Outback and thereafter (itself open new steakhouse(s)) utilizing such name, then only each new steakhouse(s) as or thereafter opened and such new steakhouse(s) as (come under such management described in (i) above in this paragraph 5(b) shall be considered "Restaurants" solely for purpose of this subparagraph 5(b) and an annual Percentage Royalty of one (1%) percent (instead of two (2%) percent) shall be payable on the Restaurant Sales and Non-Restaurant Sales of such new restaurant(s). Such Percentage Royalty or fee or other compensation shall be payable by Licensee to Licensor in respect of any such steakhouse restaurant(s) as are in existence at the time of such acquisition and at the commencement of each Management by Licensee or any Affiliate thereof so long as such restaurants do not utilize the Marks. | Net Sales |
| 24983 — 1. Grant the right to develop Restaurant(s) (T.G.I. Friday's/PP Restaurant(s)) under the System (a unique, proprietary system developed and owned by Friday's which may consist of or further developed from time to time in which is discretion) for the establishment and operation of full-service restaurants and businesses under the name Friday's which includes, without limitation, a distinctive image consisting of exterior and interior design, decor, color scheme and furnishings, special recipes, menu items and full service bar, uniform standards, products, services and specifications, operational with respect to operations, inventory and management control (including accounting procedures and policies), training and assistance, and advertising and promotional programs) in the Territory. | MAIN STREET RESTAURANT GROUP, INC. | TGI Friday's Inc. | Main St. California, Inc. | 04/22/1998 | 1. The duration of this Agreement commencing on the Commencement Date and continuing until the date specified on the Development Schedule for the last restaurant to be opened. | Franchise, Service | Consumer Services, Restaurants, Alcoholic Beverages and Tobacco, Consumer Non-Durables, Nonalcoholic Beverages | 5812 | California, United States | EXCLUSIVE | 10% | Franchise Fee | In consideration of the development rights granted herein, Developer shall pay to Friday's upon execution of this Agreement, a Development Fee for the first hundred percent (100%) of the Franchise Fee for the first Restaurant to be developed under the first Restaurant to be developed under the Development Schedule, plus twenty percent (20%) of the Franchise Fee for each of the second through fifth Restaurants to be developed pursuant to the Development Schedule, and ten percent (10%) of the Franchise Fee for each additional Restaurant to be developed thereafter pursuant to the Development Schedule | Net Sales |
| 24983 | | | | | | | | | | | 10% | Franchise Fee | In consideration of the development rights granted herein, Developer shall pay to Friday's upon execution of this Agreement the Development Fee (DEVELOPMENT FEE) = the equal to the sum of one hundred percent (100%) of the Franchise Fee for the first Restaurant to be developed under the Development Schedule, plus twenty percent (20%) of the Franchise Fee for each of the second through fifth Restaurants to be developed pursuant to the Development Schedule, and ten percent (10%) of the Franchise Fee for each additional Restaurant to be developed thereafter pursuant to the Development Schedule | Other |

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead Licensor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24983 | | | | | | | | | | | | 100% | Franchise Fee | In consideration of the development rights granted herein, Developer shall pay to Franchisor upon execution of this Agreement the Development Fee. DEVELOPMENT FEE = a fee equal to the sum of one hundred percent (100%) of the Franchise Fee for the first Restaurant to be developed under the Development Schedule, plus twenty percent (20%) of the Franchise Fee for each of the second through fifth Restaurants to be developed pursuant to the Development Schedule, and ten percent (10%) of the Franchise Fee for each additional Restaurant to be developed thereafter pursuant to the Development Schedule | Other | Lucille |
| 24983 | | | | | | | | | | | | 50000 USD | per restaurant | The Franchise Fee to be paid by Developer for each new Restaurant to be developed under this Development Schedule set forth in Section 3.A hereof shall be Fifty Thousand Dollars (\$50,000.00) for the first Restaurant to be developed, Fifty Thousand Dollars (\$50,000.00) for the second Restaurant to be developed, and Fifty Thousand Dollars (\$50,000.00) for each additional Restaurant, payable upon execution of the Franchise Agreement for each Restaurant in accordance with the Development Schedule | Per Unit | Lucille |
| 53618 | 1.Grant the right to use the Trademarks ("Lark," "DownUnder" and "SAM" brands) upon and in connection with the manufacture, marketing, distribution and sale of the Licensed Products (cigarettes) in the United States. | BROOKE GROUP LTD | Brands LLC | Philip Morris Incorporated | 03/01/1999 | 1. This Agreement shall continue in effect through __, 2010, unless earlier terminated pursuant to the provisions of this Agreement, PROVIDED that, this Agreement will renew automatically for successive one year periods unless one party hereto gives written notice of its desire to terminate at least 60 days prior to the date on which the Agreement would otherwise be renewed. | Marketing Intangible | Alcoholic, Beverages and Tobacco | | United States of America, District of Columbia | Multi-Exclusivity | 4.5% | Net Sales Value | In consideration of the right and license granted to Licensee to use the Trademarks pursuant to this Agreement, Licensee shall pay to Licensor a royalty at the rate of four and one-half percent (4.5%) of the Licensor's Net Sales Value of Licensed Products during each calendar year (or portion thereof) that this Agreement is in effect, but in no event shall such royalty for any such calendar year (or portion thereof) in which this Agreement is in effect be less than the Minimum Royalty | Net Sales | Lucille |
| 53618 | 1.Grant the right to use the Trademarks ("Lark," "DownUnder" and "SAM" brands) upon and in connection with the manufacture, marketing, distribution and sale of the Licensed Products (cigarettes) in the United States. | BROOKE GROUP LTD | Brands LLC | Philip Morris Incorporated | 03/01/1999 | 1. This Agreement shall continue in effect through __, 2010, unless earlier terminated pursuant to the provisions of this Agreement, PROVIDED that, this Agreement will renew automatically for successive one year periods unless one party hereto gives written notice of its desire to terminate at least 60 days prior to the date on which the Agreement would otherwise be renewed. | Marketing Intangible | Alcoholic, Beverages and Tobacco | | United States of America, District of Columbia | Multi-Exclusivity | 4.5% | Net Sales Value | In consideration of the right and license granted to Licensee to use the Trademarks pursuant to this Agreement, Licensee shall pay to Licensor a royalty at the rate of four and one-half percent (4.5%) of the Licensor's Net Sales Value of Licensed Products during each calendar year (or portion thereof) that this Agreement is in effect, but in no event shall such royalty for any such calendar year (or portion thereof) in which this Agreement is in effect be less than the Minimum Royalty | Net Sales | Lucille |
| 8151 | 1.Grant the right to purchase the assets belonging to the Business (SILVERADO FOODS, INC.'s bagel and bagel bun production business located in Santa Ana, California). | SILVERADO FOODS INC. | SILVERADO FOODS, INC. | GOURMET SPECIALTY BAKERS, INC. | 08/22/1998 | 1. The closing of the transactions provided for in this Agreement (the "Closing") shall take place at 10:00 a.m. at Seller's office in Tulsa, Oklahoma, on June 11, 1998, or at such other date, time, or place as Buyer and Seller shall mutually agree upon. The date and time at which the Closing takes place is referred to herein as the "Closing Date." | Asset Purchase, Marketing Intangible | Foods and Nonalcoholic, Beverages, Consumer Non-Durables | 2052 | United States, Santa Ana, California | EXCLUSIVE | 2.5% | net sales | If, after December 31, 1998, Buyer receives orders from one or more customers for the purchase of its Frozen Bagel Products in an aggregate amount of \$25,000 or more, and prior to March 31, 1999, Buyer receives two subsequent orders for such products from the same buyer or buyers, Buyer shall pay to Seller (i) \$45,000 in cash within 30 days after receipt of the third order; and (ii) a royalty on sales of Frozen Bagel Products in the amount of 2.5% of net sales, which royalty shall commence on January 1, 1999 and continue for a period of five years or until \$250,000 is paid to Seller pursuant to such royalty, whichever first occurs. | Net Sales | Lucille |

kMINE

kMINE Export (2018.02.21) Part 2

EX1-155

ktMINE

| Agreement # | Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodit ie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8965 | 1. Grant the right to utilize the Licensed Technology (the Licensed Patents and the Trade Secrets) to make, use, sell, offer to sell and otherwise commercialize the Products (certain longest sandwich container products for McDonald's Corporation) solely within the Territory. 2. Grant the right to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate any of the Licensed Technology (the Licensed Patents and the Trade Secrets), with EARTHSHELL CONTAINER CORPORATION having the right to sublicense Sweetheart Improvements to third parties. 3. Grant the right to utilize joint Improvements in connection with the manufacture, use, sale and other commercialization of products inside or outside the Territory and for Sweetheart's Traditional Field of Use (hamburger/disposable products and packaging products for frozen desert, dairy products and beverages). 4. Grant the right to utilize, in connection with the marketing, distribution and sale of the Products (certain longest sandwich container products for McDonald's Corporation) in the Territory, the trademarks and service marks. | EARTHSHELL CONTAINER CORP | EARTHSHELL CONTAINER CORPORATION; SWEETHEART CUP COMPANY INC. | SWEETHEART CUP COMPANY INC.; EARTHSHELL CONTAINER CORPORATION | 10/16/1997 | 1. The term of this Agreement shall commence upon the date hereof. Unless sooner terminated as hereinafter provided, this Agreement shall continue in full force and effect until the termination of the Operating Agreement, provided that if the Operating Agreement terminates pursuant to the provisions of Section 11.6(c) of the Operating Agreement, the term of this Agreement shall continue in full force and effect until the expiration of the last-to-issue patent included in the Licensed Patents. | Manufacturing/Process Intangible; Marketing Intangible; Software | Foods and Nonalcoholic Beverages; Consumer Non-Durables, Restaurants | | United States of America, Canada | Multi Exclusivity | 20% | Net Sales | In consideration for the grant of the Sublicense, Sweetheart shall pay to ECC a royalty (the "Royalty") of twenty percent (20%) of the Net Sales of Products by Sweetheart after the first Date it being agreed and acknowledged that Royalties shall be payable in respect of all Net Sales during the term of this Agreement to other than Net Sales attributable to Products invoiced and shipped by Sweetheart prior to the first Date in accordance with the delivery instructions provided by McDonald (Corporation). | Net Sales | License |
| 8966 | | | | | | | | | | | | 10% | Incremental economic value | Subject to Sweetheart's right to do so, Sweetheart hereby grants to ECC an irrevocable non-exclusive license to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate any of the Licensed Technology, with ECC having the right to sublicense Sweetheart Improvements to third parties. In consideration of Sweetheart Improvements that is a sublicense of such sublicense to an Affiliate of ECC shall be required, as a condition to such sublicense, to pay royalty payments to Sweetheart based on net revenues earned from the sale of products that utilize or incorporate such Sweetheart Improvements and which are reasonably calculated in relation to the incremental economic value of such Sweetheart Improvements to ECC's sublicense; provided, however, that the annual royalty rate shall not exceed ten percent (10%) of such incremental economic value; and the annual royalty rate shall equal one percent (1%) of such net revenues if the parties are unable to agree upon the amount of such royalty rate based on such incremental economic value. | Net Sales | License |

EX1-156

kMINE

kMINE Export (2018.02.22) Part 2

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | License | EffectiveDate | Term | AgreementType | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8965 | | | | | | | | | | | | | 1% | net revenues | Subject to Sweetheart's right to do so, Sweetheart hereby grants to ECC an irrevocable, non-exclusive license to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate one of the Licensed Technology, with ECC having the right to sublicense Sweetheart Improvements to third parties. Each ECC sublicensee of Sweetheart Improvements that is not an Affiliate of ECC shall be required, as a condition to such sublicense, to pay royalty payments to Sweetheart based on net revenues generated from the sale of products that utilize or incorporate such Sweetheart Improvement and which are reasonably calculated in relation to the incremental economic value of such Sweetheart Improvement to ECC's sublicensee, provided, however, that (i) the annual royalty rate shall not exceed one percent (1%) of such incremental economic value; and (ii) the annual royalty rate shall equal one percent (1%) of such net revenues if the parties are unable to agree upon the amount of such royalty rate based on such incremental economic value | Net Sales | Licensor |
| 8965 | | | | | | | | | | | | | 10% | incremental economic value | Improvements developed jointly by ECC and Sweetheart ("Joint Improvement") shall be owned by ECC, provided that all Joint Improvements shall be included in the Licensed Technology licensed hereunder to Sweetheart without additional royalty or other obligation being imposed on Sweetheart. In addition, ECC hereby grants to Sweetheart an irrevocable non-exclusive license to utilize such Improvements in connection with the manufacture, use, sale and other commercialization of products inside or outside the Territory within Sweetheart's Traditional Field of Use. ECC shall have the right to license Joint Improvements to third parties in which case the ECC licensee shall pay to ECC and Sweetheart a royalty based on net revenues earned from the sale of products that utilize or incorporate such Joint Improvements and which is reasonably calculated in relation to each party's contribution to the incremental economic value of Joint Improvements, provided, however, that (i) the annual royalty rate to be paid by any such ECC licensee shall not exceed ten percent (10%) of such incremental economic value and (ii) the annual royalty rate shall equal ten percent (10%) of such net revenues if the parties are unable to agree upon the amount of such royalty rate based on such incremental economic value. | Net Sales | Licensor |

EX1-157

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8945 | | | | | | | | | | | | 1% | net revenues | | Net Sales | License |
| 11081 | | DELICIOUS FOODS CO | EXAMINE CORPORATION | The DELICIOUS FOODIE Company, Inc. | 05/17/96 | 1. This Agreement shall commence on the Effective Date and, unless… | Manufacturing/Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables | | United States, Canada | Multi-Exclusivity | 3.5% | Net Wholesale Sales | Subject to the provisions of Section 7(d) below, shall pay Examine Licensed Royalty for the use of the Trademarks hereunder… | Net Sales | License |
| 11083 | | DELICIOUS FOODS CO | EXAMINE CORPORATION | The Delicious Foodie Company, Inc. | 05/17/96 | | | | | | | | | | Net Sales | License |
| 11082 | | DELICIOUS FOODS CO | Nagling Bros. and Barnum & Bailey Combined Shows | The Delicious Foodie Company, Inc. | 05/17/96 | 1. The term of this Agreement shall commence on the day and year first above written and shall continue for a period of five (5) years. | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables; Beverages | 5140 | United States, Canada | EXCLUSIVE | 4% | per lb. | Best Prices During the Pre-Blend Powder for Chocolate / Cocoa… | Net Sales | License |
| 11080 | | | BARNUM BROS. / TIME ENTERTAINMENT COMPANY 1,2 ; Warner Bros. Consumer Products | | | | Marketing Intangible | | | | | 3% | Net sales | The parties agree that during all terms of this Agreement DFC shall pay its NSBB a royalty on Net Sales in the following amounts: Four (4%) on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) thereafter. | Net Sales | License |
| 11087 | | CHINA PREMIUM FOOD CORP | Brand / Foods, Inc., China Premium Food Corporation | 07/07/2000 | 1. "Initial Term": January 1, 2000 through December 31, … 2. "Renewal Term": License shall have the option to renew this Agreement for up to one (1) two-year period, provided that License gives written notice to Licensor no later than sixty (60) days before the end of the Initial Term (the "Decision Due Date")… | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables; Entertainment | 2020 | United States, Puerto Rico, United States Virgin Islands | Multi-Exclusivity | 5% | Net Sales | "Royalty Rate": Licensee shall pay for the use of all Licensed Products, and (i) Ten Percent (10%) of Net Purchase Price on the Licensed Products distributed by the Licensor hereunder… | Net Sales | License |

KMINE Export (2018-02-22) Part 2

| Agreement Symbol | Agreement Synopsis | FilingCompany | Licensor | Licensee | Term | EffectiveDate | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11087 | | | | | | | | | | | | 10% | Net Purchase Price | | Net Sales | License |
| 11091 | | DELICIOUS FOODS CO INC | Showbiz Pizza Time, Inc. | The Delicious Foodie Company, Inc. | | 05/3/1996 | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable, Restaurants, Entertainment, Consumer Services | | United States, Canada | Multi-Exclusivity | 8% | Net Sales | | Net Sales | License |
| 11095 | | | | | | | | | | | | 8% | Net Sales | | Net Sales | License |
| 11096 | | DELICIOUS FOODS CO INC | CHIQUITA BRANDS, INC. | DELICIOUS COOKIE COMPANY, INC | | 12/26/1996 | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable | 5140 | United States, Canada | Multi-Exclusivity | 3% | net sales | | | License |
| 11113 | | STEARNS & LEHMAN INC | Godiva Chocolatier, Inc. | Stearns & Lehman, Inc. | | 06/20/1997 | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable | 2086 | United States of America, Canada, District of Columbia | EXCLUSIVE | 10% | Net Sales | | | License |
| 11118 | | SPARTA FOODS INC | Mexican International food and Equipment Company, Inc., and Mexican Foods, Inc. | Sparta Foods, Inc. | | 02/1/1999 | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable | 2090 | worldwide, United States of America | Multi-Exclusivity | 3% | Gross Sales | | Gross Sales | License |

kMINE

kMINE Export (2018.02.22) Part 2

| Agreement | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead Licensee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11118 | | | Colligan International Company | Packaged Ice, Inc. | 10/31/1997 | 1. The "Term" of this Agreement shall commence on the Effective Date hereof (the date hereof through December 31, 1997 constituting the "Initial Term") and, subject to earlier termination as provided herein, shall automatically renew for successive one year terms beginning on January 1 and ending on December 31 of each subsequent calendar year (the "Renewal Term"). | | | | | 25% | Gross Sales | As full consideration for the right and license granted to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty based upon LICENSEE's "Gross Sales," which for the purpose of this Agreement shall mean the gross amount received by LICENSEE in a calendar year from all sales of the Products calculated on an accrual basis, of accounting, less any allowances for cash discounts and other trade and quantity discounts, credits under warranty, credits for returns, sales, use and excise taxes, insurance, and freight and other transportation costs. The amount of the royalty due shall be calculated as follows: three percent (3%) on the first three million dollars ($3,000,000) of Gross Sales and two-and-one-half percent (2.5%) on the amount of Gross Sales between five million one dollars ($5,000,001) and ten million dollars ($10,000,000) and two percent (2%) on the amount of Gross Sales over ten million dollars ($10,000,000) | Gross Sales | Licensee |
| 11118 | | | | | | | | | | | | 2% | Gross Sales | As full consideration for the right and license granted to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty based upon LICENSEE's "Gross Sales," which for the purpose of this Agreement shall mean the gross amount received by LICENSEE in a calendar year from all sales of the Products calculated on an accrual basis, of accounting, less any allowances for cash discounts and other trade and quantity discounts, credits under warranty, credits for returns, sales, use and excise taxes, insurance, and freight and other transportation costs. The amount of the royalty due shall be calculated as follows: three percent (3%) on the first three million dollars ($3,000,000) of Gross Sales and two-and-one-half percent (2.5%) on the amount of Gross Sales between five million one dollars ($5,000,001) and ten million dollars ($10,000,000) and two percent (2%) on the amount of Gross Sales over ten million dollars ($10,000,000) | Gross Sales | Licensee |
| 11119 | 1. Grant the right to use the Mark (The trademark "Colligan" used solely in the phrase "Water by Colligan" and "Ice by Colligan") and only in the accompanying logo) in connection with the advertising, promotion, distribution, and sale of Products (all non-alcoholic beverages that make and package and merchandise ice that are located in retail outlets where ice is sold to consumers) in the Territory during the Term. | PACKAGED ICE INC | | NUTRA VINE | 12/31/1997 | | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durable, Retail | | | Multi-Exclusivity | 25% | Revenue | The Company further agrees to pay to the Licensor one-fourth (1/4) of any "Deemed Royalties" in an amount in cash equal to 2.5% of all Revenues. | Net Sales | |
| 11248 | 1. Grant the right to use the Mark (the trademark ManaplanID) in connection with the labeling, advertising and sale of Manufactured Products (CARAVUE, INC. desires to sell its NUTRA VINE and NUTRA VINE desires to purchase from CARAVUE, INC. bulk aloe vera mucilaginous polysaccharide, referred to under the product name of "ManaplanID Powder" that is of suitable for use in pharmaceutical and beverage formulations, to be used in product or products manufactured by NUTRA VINE) manufactured and sold by NUTRA VINE in the United States during the term of this Agreement. | CARRINGTON LABORATORIES INC | CARACUE, INC. / Carrington Laboratories, Inc. | | 06/11/1999 | 1. Term unless immediate upon agreed-to terms, this Agreement shall ensure shall for a period of ten (10) years from the date first written above and shall end at midnight prior to such date and renew for one year terms at the request of this Licensee, provided that each term is granted a price at least six (6) days prior to the expiration of the then-current term or of the agreement and provided that the Licensee hereof made valid the then-current written statement of this Agreement as provided for in Paragraph 7.2. | Distribution, Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durable, Healthcare, Pharmaceutical, Biotechnology | 2834 | United States | Multi-Exclusivity | 0.15 USD | per unit | Licensee agrees to pay to Licensor a royalty of $0.15 per unit of Manufactured Products produced by or for the Licensee. | | Per Unit |
| 11248 | | | | | | | | | | | | 1,600 USD | per kg | Pricing Schedule for ManaplanID Powder: Quantity Per Order 1 to 25 kg Price $1,600.00 / kg | | Per Unit |
| 11248 | | | | | | | | | | | | 1,500 USD | per kg | Pricing Schedule for ManaplanID Powder: Quantity Per Order 26 to 50 kg Price $1,500.00 / kg | | Per Unit |
| 11248 | | | | | | | | | | | | 1,400 USD | per kg | Pricing Schedule for ManaplanID Powder: Quantity Per Order 51 to 300 kg Price $1,400.00 / kg | | Per Unit |

Page 8 of 54

EX1-160

kMINE

| Agreement# | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8508 | LOGAN'S ROADHOUSE, INC. | | CBRL INC/INCORPORATED, INC. | 03/17/1997 | 1. for a period to develop and open for business, and have in operation, a total of up to fifteen (15) Restaurants under the name Logan's Roadhouse franchised by LOGAN'S ROADHOUSE, INC. in the Territory. 2. This Agreement shall expire on March 31, 2007, unless sooner terminated pursuant to the terms hereof. | Franchise, Service | Restaurants, Foods and Nondurable Beverages, Consumer Non-Durables, Consumer Services, Retail, Business Services | 5812 | Greenville, South Carolina, Charleston, South Carolina, Charlotte, North Carolina, Raleigh-Durham, North Carolina, United States | EXCLUSIVE | 3% | Developer's monthly gross sales | Developer shall notify Franchisor in writing promptly after closing on the acquisition of a leasehold or fee interest in a Restaurant site. Provided Franchisee has granted site, operational, financial and legal approval in accordance with the terms of subsections 4.1 and 4.2 hereof, then Franchisor shall deliver to Developer a Franchise Agreement substantially in the form which is attached hereto as Appendix B; provided however that the Franchise Agreement which Franchisor delivers to Developer shall require Developer to make advertising expenditures at the sites then established by Franchisor with respect to new Restaurants, except that in no event shall such rates exceed three percent (3%) of a Restaurant's gross sales (as defined in that Form of Franchise Agreement which is attached hereto as Appendix A). | Gross Sales | License |
| 8508 | | | | | | | | | | | 3% | Restaurant's gross sales | | Gross Sales | License |
| 8240 | GALAZEN INC | Nutrition Medical, Inc. | Galazen Inc. | 09/21/1998 | 1. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Faegre & Benson LLP, Minneapolis, Minnesota, at 10:00 a.m. on the seventh business day following fulfillment or appropriate waiver of all of the conditions specified in Sections 10 and 11 hereof, or such other date as Buyer and Seller may mutually agree the "Closing Date"). | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible, Service | Foods and Nondurable Beverages, Healthcare, Pharmaceutical, Biotechnology, Consumer Non-Durables, Business Services, Healthcare Facilities | 2086 | Minneapolis, Minnesota, United States | EXCLUSIVE | 3% | Net Sales | Buyer will pay Seller a royalty of nine percent (9%) of net sales, reduced by uncollectible accounts, of the Products in excess of $15,000,000 during the year ending December 31, 2000, (ii) $4,000,000 during the year ending December 31, 2001, and (iii) $2,500,000 during the year ending December 31, 2002. | Net Sales | License |
| 8240 | | | | | | | | 2086 | | | 1,000 USD | per month | Promptly after the Closing Date, Seller shall make the tangible Assets available to Buyer at Seller's facilities at Suite 110, 9850 51st Avenue North, Minneapolis, Minnesota and shall cooperate with Buyer's personnel in arranging for the orderly packing and shipment which shall be at Buyer's expense of all tangible Assets to such locations as Buyer shall specify; provided, however, that (a) machinery, equipment and tooling, if any, in Seller's possession for the purpose of production purposes shall be left in their possession and Seller shall have full responsibility to comply with the applicable third parties that Buyer has purchased such assets from Seller. (b) Buyer shall pay to Seller a monthly rental equal to 1/12th of the fair market rental value of the Products at the facilities of the Seller through November 30, 1998 and (c) Buyer will with Seller's assistance, identify, the books and records the original of which should remain in the possession of Seller. In consideration of the use of the Seller's facilities to store inventory of the Products, Buyer agrees to pay Seller a rental of 1,000 per month during the period of time the Assets are stored at the facilities of the Seller. | Per Unit | License |

Page 6 of 54

kMINE Export (2018.02.22) Part 2

EX1-161

kMINE

kMINE Export (2018.02.22) Part 2

| Agreement# Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11477 1. Grant the right to manufacture, market and deliver all Licensed Products [all recipes and formulae for products made using ice cream, yogurt, sherbet, brickle and broken nut in the Licensed Territory and to use the Licensed Trademarks and Licensed Technology that the MAN DESIGN] to identify Licensed Products in the Licensed Territory. | TERRACE HOLDINGS INC. | FRANCHISE ASSOCIATES, INC. | DOWNEAST FROZEN DESSERTS, LLC | 12/27/99 | 1. This Agreement and the License herein granted shall continue for a term of four (4) years from the date when all conditions specified in Paragraph 22 have been satisfied | Manufacturing Process Intangible, Marketing Intangible | Restaurants, Foods and Nonalcoholic Beverages, Consumer Non-Durables | | United States | Multi-Industry | 4% | Sales | Licensee agrees to pay to the Licensor a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products of all built ice cream products (e.g. pay to Licensor Two Percent (2%) of all "Sales" (as hereinafter defined) of products other than Licensed Products) Then Licensed Products") made by Licensee, its Affiliate or Sublicensee and to [i] #4 and its Affiliates and [ii] its Franchisees of this "Sales" as used herein shall mean the gross invoice price less "bill backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales | Licensed |
| 11477 | | | | | | | | | | | 2% | Sales | Licensee agrees to pay to HAI a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products of all built ice cream products (e.g. Three (3) gallon containers) and Two Percent (2%) of all non-bulk ice cream products. Licensee further agrees to pay to HAI a Royalty of Two Percent (2%) of all "Sales" (as hereinafter defined) of products other than Licensed Products (Then Licensed Products") made by Licensee, its Affiliate or Sublicensee and to [i] #4 and its Affiliates and [ii] its Franchisees of this "Sales" as used herein shall mean the gross invoice price less "bill backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales | Licensed |
| 11477 | | | | | | | | | | | 2% | Sales | Licensee agrees to pay to HAI a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products of all built ice cream products (e.g. Three (3) gallon containers) and Two Percent (2%) of all non-bulk ice cream products. Licensee further agrees to pay to HAI a Royalty of Two Percent (2%) of all "Sales" (as hereinafter defined) of products other than Licensed Products (Then Licensed Products") made by Licensee, its Affiliate or Sublicensee and to [i] #4 and its Affiliates and [ii] its Franchisees of this "Sales" as used herein shall mean the gross invoice price less "bill backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales | Licensed |
| 11479 1. Grant the right to use, the Intellectual Property [(1) certain secret recipe and secret formulas for baking gourmet cinnamon rolls and other bakery products; (ii) recipes and proprietary plans relating to the preparation, packaging, use and marketing of the gourmet cinnamon rolls utilizing the Secret Recipes and, (iii) various trade names, trademarks, service marks, logos, signs, and emblems, including, without limitation the mark "T.J. CINNAMONS," relating to the products prepared utilizing the Proprietary Information, and other goods and services offered in retail stores, bakeries, and other locations, that offer the products made utilizing the Proprietary Information, to prepare and sell TJC Products (bakery products) from one (1) TJC Bakery, or (iii) at wholesale.  2. Grant the right to use, the Intellectual Property to fulfil Licensee's obligations under TJC License Agreements, and to continue to permit TJC Licensees to prepare and sell TJC Products, and to use the Intellectual Property in connection therewith. | PARAMARK ENTERPRISES INC. | ARBY'S, INC., TRIARC RESTAURANT GROUP, T.J. CINNAMONS, INC. | T.J.CINNAMONS, INC., TRIARC RESTAURANT GROUP, ARBY'S, INC. | 08/25/1996 | 1. The term of this Agreement shall begin on the date first written above, and, unless sooner terminated in accordance with the terms herein, shall expire twenty (20) years from the date of this Agreement.  2. Licensee may renew this Agreement four (4) times, for three (3) additional terms of twenty (20) years each upon the expiration of the initial term or the preceding renewal term, and for one (1) additional period of nineteen (19) years upon the expiration of the third renewal term; provided that Licensee has complied with the following conditions prior to the expiration of the initial term, or the applicable renewal term | Franchise | Foods and Nonalcoholic Beverages, Consumer Non-Durables, Consumer Services, Restaurants, Retail | | United States | Multi-Industry | 2% | gross sales | If Licensee desires to sell a New TJC Product, or to pay Licensor a New Product Royalty fee equal to two percent (2%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for two (2) years following Licensee's notice to Licensor of Licensee's agreement to sell the New TJC product, and three percent (3%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for the remaining term of this Agreement. | Gross Sales | Licensed |

Page 10 of 54

EX1-162

kMINE

XMINE Export (2018.02.22) Part 2

Page 11 of 54

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity/e | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11479 | | | | | | | | | | | | 3% | gross sale | | Gross Sales | License |
| 11479 | | | | | | | | | | | | 20% | revenue | | Net Sales | License |
| 11479 | | | | | | | | | | | | 2% | revenues | | Net Sales | License |
| 11479 | | | | | | | | | | | | 20% | royalties | | Net Sales | License |

EX1-163

| Agreement# | Agreement Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementFee | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8602 | 1. Grant the right to use the Licensed Property (Licensed Names and Marks and the Licensed Images, including the likenesses of Debra Fields) in connection with the production, marketing, sale, and distribution of Licensed Product (i) fresh baked bakery products, and (ii) any other items which MRS. FIELDS' ORIGINAL COOKIES, INC. and THE MRS. FIELDS' BRANDS, INC. agree to designate as Licensed Products) by Mrs. Fields Stores or by a mail order system operated by MRS. FIELDS' ORIGINAL COOKIES, INC. or its subsidiaries (A) in the United States through Mrs. Fields Stores on an exclusive and perpetual basis, (B) in the United States through Mrs. Fields Stores on an exclusive basis until the third anniversary of the date hereof, and thereafter on a non-exclusive basis, and (C) in respect of the mail order system, on an exclusive basis (though the production and sale of Licensed Product using the Licensed Property, in each case as and in the 2. Grant the right to use the Licensed Names and Marks (names, trade names, trademarks, service marks and logos) as part of its trade name for so long as it sells or franchises Licensed Products. | MRS FIELDS ORIGINAL COOKIES, INC. THE MRS FIELDS BRANDS INC. | THE MRS. FIELDS' BRANDS, INC. a/k/a MRS. FIELDS' ORIGINAL COOKIES, INC. | MRS. FIELDS' ORIGINAL COOKIES, INC.; THE MRS. FIELDS' BRANDS, INC.; MRS. FIELDS' ORIGINAL COOKIES INC. | 09/30/1996 | 1: perpetual | Manufacturing/Process Intangible; Marketing Intangible | Restaurants, Foods and Nondurable Beverages; Retail, Consumer Non-Durables, Consumer Services | | United States, worldwide | Multi-Exclusivity | 4.5% | gross revenue | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ended March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter, and (b) 15% of any Franchise Cash Flow in excess of the Base Franchise Cash Flow for such quarter. "Base Gross Revenue" means $20,000,000 for each of the first three calendar quarters in 1997 and $30,000,000 for each of the first three calendar quarters in 1998 and for the last calendar quarter of each year thereafter. | Gross Sales | Licensee |
| 8602 | | | | | | | | | | | | 3.5% | Franchise Cash Flow | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ended March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter and (b) 15% of any Franchise Cash Flow in excess of the Base Franchise Cash Flow for such quarter. "Base Franchise Cash Flow" means royalties, fees and other revenues received during a given calendar quarter by Licensor and its subsidiaries (whether domestic or international) from franchisees and sub-franchisees of Licensor and its subsidiaries during such quarter. Base Base Franchise Cash Flow means $41,560,000 for each of the first three calendar quarters in 1997 and $2,320,000 for the last calendar quarter in 1997; $2,260,000 for each of the first three calendar quarters in 1998 and $2,300,000 for each of the first three calendar quarters in 1999 and the first three calendar quarters in 1999 and the last calendar quarter of each year thereafter. | Net Sales | |
| 12116 | 1. Grant the right to use the trademarks Planters, Mr. Peanut and the Representation of Mr. Peanut, together with associated logos, tradedress, packaging appearance and claims, colors and copyrights associated therewith in connection with the production, packaging, promotion, sale and exploitation of their rights to sell salted nuts, without ..., and peanut product, with or without nuts, sold under Licensee's Nabob/Planters trademark, so long as Licensee produces the Products solely in accordance with the provisions of the Lincoln Operating Procedures and as long as the Products are manufactured and sold at the License Facility in Lincoln, Nebraska, or such other plant as Licensor shall approve in writing. | LINCOLN SNACKS CO | Nabisco Brands Company | Lincoln Snacks Company | 02/1/1998 | 1. The "Term" of this Agreement is for an initial period of four (4) years commencing January 1, 1998, Nabisco and Licensee may mutually agree to renew for a period of one year and thereafter continue for the initial five year period (or extended period), at the conclusion of the initial period, as the Licensee fee would otherwise expire. 2. The Term shall commence as of January 1, 1998 and shall continue for a period of five years thereafter unless sooner terminated or extended as set forth hereinbelow. | Manufacturing/Process Intangible; Marketing Intangible | Foods and Nondurable Beverages | 2060 | United States, Puerto Rico | Multi-Exclusivity | 1% | annual Net Sales | Of Products in the Distribution Channels in the Territory with respect to sales of up to 2,250,000 Equivalent Cases of Product in any such License Year, in the Third through Fifth License Years. | Net Sales | |
| 12116 | | | | | | | | | | | | 2% | annual Net Sales | Of Products in the Distribution Channels in the Territory with respect to sales in excess of 2,250,000 Equivalent Cases of Product in any such License Year, in the Third through Fifth License Years. | Net Sales | |

KMINE Export (2018-02-22) Part 2

EX1-164

kMINE

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodia/Le... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13153 | 1. Grant the right to manufacture itself or have manufactured on its behalf the Licensed Product... | MERIDIAN HOLDINGS INC | CUMBERLAND PACKING CORP | OLD FASHIONED SYRUP COMPANY, INC / MERIDIAN HOLDINGS, INC (Invalid) | 05/24/1999 | 1. Unless otherwise terminated as provided herein, the initial term of this Agreement shall expire on December 31, 2008 with option to renew... | Manufacturing;Process Intangible; Marketing Intangible | Consumer Non-Durables, Food and Nondurables Beverages, Restaurant, Retail | | United States of America, Canada | Multi-Exclusivity | 7% | Net Sales | In consideration of the License granted herein, Licensee shall pay Cumberland an earned Royalty of seven percent (7%) of Net Sales... | Net Sales |
| 13153 | 1. Grant the right to use the Licensed Marks (names, logos, symbols, designs and/or trademarks of sole)... | | Stearns & Lehman, Inc. | The Delicious Frookie Company, Inc. | 06/20/1997 | 1. The term of this Agreement shall be for the period commencing on the date of the Agreement and ending on December 31, 1998. | Marketing Intangible | Foods and Nondurables, Beverages, Consumer Non-Durables | 2086 | United States of America, District of Columbia, Canada | EXCLUSIVE | 10% | Net Sales | Royalty Rate. During the term of this Agreement and during any period of disposal allowed thereafter, LICENSEE shall pay LICENSOR an amount equal to ten percent (10%) of the Net Sales. | Net Sales |
| 12148 | 1. Grant the right to use the Licensed Marks (names, logos, symbols, designs and/or trademarks of the brand sole)... | NEXT GENERATION TECHNOLOGY HOLDINGS INC | Showbiz Pizza Time, Inc. | The Delicious Frookie Company, Inc. | 05/31/1996 | 1. The term of this Agreement shall commence on the date and the Agreement term shall continue for a period of five years ("Initial Term")... | Marketing Intangible | Foods and Nondurables, Beverages, Entertainment, Restaurants, Consumer Services | 5140 | United States, Canada | Multi-Exclusivity | 4% | Net Sales | The parties agree that during all terms of this Agreement CPK shall pay to PIZZA TIME a royalty on net sales in the amount of four (4%) percent on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) percent thereafter. | Net Sales |
| 13151 | | | | | | | | | | | | 3% | Net Sales | The parties agree that during all terms of this Agreement CPK shall pay to PIZZA TIME a royalty on net sales in the amount of four (4%) percent on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) percent thereafter. | Net Sales |
| 13151 | 1. Grant the right to use the Trademarks (SEAMS PB and the associated pictorial representations, SUGAR FREEDOM and any designs or depictions thereunder including but not limited to)... | NEXT GENERATION TECHNOLOGY HOLDINGS INC | SEAMED PK CORPORATION | | | 1. This Agreement shall commence on the Effective Date and, unless earlier terminated as hereinafter provided, shall continue in effect for three (3) years ending December 31, 2000; it shall automatically renew... | Manufacturing;Process Intangible; Marketing Intangible | Foods and Nondurables, Beverages, Consumer Non-Durables | | United States, Canada | Multi-Exclusivity | 3.5% | Net Wholesale Sales | Subject to the provisions of Section 7(b) below, shall pay Estema an Earned Royalty for the use of the Trademarks hereunder equal to 3.5% of net Wholesale Sales ("Earned Royalty"). | Net Sales |
| 12163 | | | THE DELICIOUS FROOKIE COMPANY, INC. | | | | | | | | | .85 USD | per lb | Base Price, Estima Pre-Fried Powder for Chocolate Chip Cookie, $0.85 Per lb. | per lb |
| 12163 | | | | | | | | | | | | | | | | |

kMINE Export (2018-02-22) Part 2

EX1-165

kMINE

KMINE Export (2018.02.22) Part 2

| Agreement Number | FilingCompany | Licensor | Licensee | Products That Produce | Agreement Type | Industry | SIC Code | Territory | EffectiveDate | Term | Exclusivity | Value | AgreementSize | AgreementType | Modifier | Commodite |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11131 | CONSUMER/MEDICAL DIAGNOSTICS GROUP INC | COMPREHENSIVE MEDICAL DIAGNOSTICS PRODUCTS THAT PRODUCE, INC | | | Marketing Intangible, Service | Advertising, Foods and Nondurable Beverages, Entertainment, Consumer Non Durables, Broadcast and Cable, Consumer Services, Internet, Retail, Business Services | 7363 | United States, Canada | 05/01/1996 | | EXCLUSIVE | 15% | 15% | Gross Retail Sales | | Gross Sales |
| 11191 | | | The Delicious Frookie Company, Inc. | | Marketing Intangible | | | | 05/01/1996 | | | 5% | 5% | Gross Retail Sales | | Net Sales |
| 11193 | | | Ringling Bros. and Barnum & Bailey Combined Shows | | Marketing Intangible | | | | | | | 2,000 USD | 2,000 USD | per diem | | Per Unit |
| 11206 | NEXT GENERATION TECHNOLOGY HOLDINGS INC | | | | Marketing Intangible | Foods and Nondurable, Beverages, Entertainment, Consumer Non Durables | 5140 | United States, Canada | 05/01/1996 | | EXCLUSIVE | 4% | 4% | Net Sales | | Net Sales |
| 11206 | | | | | Marketing Intangible | | | | | | | 3% | 3% | Net Sales | | Net Sales |
| 11226 | NEW YORKER MARKETING CORP | | VeryFine Products, Inc. | | Marketing Intangible | Foods and Nondurable, Beverages, Consumer Non Durable | 2024 | United States, New York City, Nassau, Suffolk, Westchester, Putnam, Rockland, New Jersey, Bergen, Essex, Hudson Union, Middlesex, Monmouth, Connecticut, N.Y., New York | | | EXCLUSIVE | 1 USD | 1 USD | per case | | Per Unit |
| 11226 | | | New Yorker Frozen Desserts, Inc. | | | | | | | | | 0.50 USD | 0.50 USD | per case | | Per Unit |

Page 64 of 54

EX1-166

kMINE

kMINE Export (2016.02.22) Part 2

| Agreement Number | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11843 | NUTRI/SYSTEM INC, DE | NUTRI/SYSTEM U.S.A., Michael J Heisley, NSI Acquisition Limited Partnership, NSI Holdings, Inc., NSF Corp. | N/A, NUTRI/SYSTEM U.S.A., Michael J Heisley, NSI Acquisition Limited Partnership, NSI Holdings, Inc., NSF Corp. | 06/29/1996 | 1. We grant you the right, and you assume the obligation to offer and sell the Nutri/Re Programs at your Center(s) using the term of that Franchise Agreement strictly in accordance with its terms and conditions.

2. That the term of the Agreement shall commence and end expire. Provided franchisee continues in substantial compliance with this Agreement, this Agreement shall be renewable for an additional

ten (10) years at the option of the Franchisee, on economic terms and conditions provided the Franchisee a reasonable opportunity to earn renewal hereduceless and/or a "ten" renewal fee. | Franchise, Other | Education, Foods and Nonalcoholic Beverages, Consumer Services, Healthcare & allied, Healthcare Pharmaceutical | | Augusta County, Texas, United States | EXCLUSIVE | 4% | Net Receipts | For the period from March 1, 1995 through February 28, 1997, Franchise hereby agrees to deduct Franchisee's Royalty due and owing under the Franchise Agreement by the following amounts: for 5% from 5% to 4.4%, depending on the royalty currently due thereunder. | Net Sales | License |
| 11843 | | | | | | | | | | | 3.4% | Net Receipts | For the period from March 1, 1995 through February 28, 1997 Franchisee hereby agrees to deduct Franchisee's Royalty due and owing under the Franchise Agreement by 4% (i.e. from 7% to 3% or from 6% to 3.4%, depending on the royalty currently due thereunder) | Net Sales | License |
| 11843 | | | | | | | | | | | 5% | Net Receipts | from the sale of the Company's products and services during each month during the following period: February 1, 1994 through December 31, 1994, until such time as aggregate Net Receipts for a center during the Period equal $100,000 | Net Sales | License |
| 11843 | | | | | | | | | | | 7% | Net Receipts | from the sale of the Company's products and services during each month during the following period February 1, 1994 through December 31, 1994, after aggregate Net Receipts for a center during the Period equal $100,000 | Net Sales | License |
| 11843 | | | | | | | | | | | 7% | Net Receipts | from the use of the Company's products and services during each month during the following period: January 1, 1995 through December 31, 1995 and each calendar year thereafter | Net Sales | License |
| 11843 | | | | | | | | | | | 7% | net receipts | In addition to paying a fee for the Territory, the Franchisee will pay to the Company by the fifteenth (15) day of the following month a royalty fee of seven percent (7%) on all net receipts from the previous month's products and services | Net Sales | License |
| 12170 | DASAN TECHNOLOGIES INC | Fountain Fresh International | Kaiser Consultants, Ltd | 04/17/1997 | 1. The initial term of this Agreement shall be for five (5) year commencing on the date of execution of this Agreement.

2. Licensor will have the option to renew this License Agreement at the expiration of its initial term hereof for an additional five (5) year term at the end of each subsequent renewal period for a term of thirty years provided that, at the time of each renewal (1) Licensee's net is not in material default of this Agreement, (3) Licensee has paid for all Products ordered, has satisfactorily complied with the provisions of this Agreement during the term hereof and agrees to execute the then standard form of Agreement of the Company. Any changes that occur in future Agreements will be commercially reasonable (2) and not meet the requirements described above, or if Licensee does not wish to renew this Agreement, this Agreement shall expire at the end of the initial term or the applicable renewal term. | Distribution, Marketing Intangible Service | Business Services, Foods and Nonalcoholic Beverages, Industrial Equipment and Machinery, Consumer Non-Durables, Consumer Services, Retail | | United States of America, Washington, D.C. | EXCLUSIVE | 1% | Gross Receipts | Licensee agrees to advertise and promote the Products in the Territory. Licensee agrees to spend on advertising and promotional expenses, in a manner approved for Fountain Fresh in the Marketing Plan which amount will not be less than one percent (1%) of its monthly Gross Receipts from the sale or lease of the Products, unless otherwise agreed upon by Licensor. Company, after delivering its Licensee shall be conducted in a dignified manner, shall conform to the standards established from time to time by the Company and shall display the Trademark only in the manner approved by the Company. In addition, all Licensee's advertisements must conform to the advertising guidelines published in the Company and must be pre-approved by the Company. | Gross Sales | License |

Page 16 of 54

EX1-167

kMINE Export (2016.02.22) Part 2

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12170 | | | | | | | | | | | | 10% | Sub-license or Dealer Fee | In addition to its other duties and responsibilities set forth in this agreement, Licensee shall, in good faith, perform the following duties and obligations: 8. Pay an additional license fee equal to 25% of each sub-license or Dealer Fee for each Dealer or Licensee sold or established in the Territory. This fee shall be paid within twenty (20) days of such sale or establishment. | Sub-license | Net Sales |
| 12170 | | | | | | | | | | | | .01 USD | per liter of Beverage | In addition, Licensee shall pay to the Company a continuing monthly royalty fee in an amount equal to one cent (0.01) per liter of Beverage sold in the Territory through the Beverage Centers, Remote Centers, Optional Equipment or other Beverage Dispenser Equipment (exclusive of Water) and three cents (0.03) (USD) per liter of Water sold in the Territory through the Optional Equipment, Beverage Center, Remote Center or other Beverage Dispenser Equipment. | | Per Unit |
| 12170 | | | | | | | | | | | | .03 USD | per liter of Water | In addition, Licensee shall pay to the Company a continuing monthly royalty fee in an amount equal to one cent (0.01) per liter of Beverage sold in the Territory through the Beverage Centers, Remote Centers, Optional Equipment or other Beverage Dispenser Equipment (exclusive of Water) and three cents (0.03) (USD) per liter of Water sold in the Territory through the Optional Equipment, Beverage Center, Remote Center or other Beverage Dispenser Equipment. | | Per Unit |
| 12170 | | | | | | | | | | | | 50 USD | per day | Upon reasonable prior written request from the Licensee, the Company will, during the term of this Agreement, make available its personnel available at Salt Lake City, Utah, U.S.A. or such other location as the Company shall designate, for consultation with representatives of Licensee's staff on matters concerning the Company's Products in per them rate as agreed, but not less than U.S. $50.00 per day. Licensee shall also pay all transportation, lodging, food and other travel and lodging costs of the Company in connection with such consultation. | | Per Unit |
| 12170 | | | | | | | | | | | | 50 USD | per day | The Company will provide drawings and specifications for assistance and an initial system engineer manual (upon written request, the Company will provide, its Licensee qualified technicians familiar with the Products for reasonable periods during the term of this Agreement, but such periods and for such periods not to interfere unduly with the Company's business, at per them rate as agreed but not less than U.S $50.00 per day. Licensee shall also pay all transportation, lodging, food and other travel and lodging costs of the Company in connection with such consultation. | | Per Unit |

EX1-168

KMINE Export [2018.02.22] Part 2

| Agreement# | Agreement Synopsis | Licensee | Licensor | FilingCompany | EffectiveDate | Term | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | AgreementFee | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12048 | 1.Grant the right to be appointed as the exclusive development agent during the term of this Agreement within Imperial County and Riverside County, San Diego for the Mountain Mike's Pizza Restaurants franchise, a pizza restaurant concept offering pizza, sandwiches, salads and other related products and services operated under the "Mountain Mike's Pizza" name utilizing distinctive business formats, methods, procedures, designs, layouts, standards and specifications. 2.Grant the right to be appointed in the inclusive development agent during the term of this Agreement within the counties of Jackson, Ingham, Hillsdale, Eaton and Clinton in the state of Michigan for the Mountain Mike's Pizza Restaurants franchise, a pizza restaurant concept offering pizza, sandwiches, salads and other related products and services operated under the "Mountain Mike's Pizza" name utilizing distinctive business formats, methods, procedures, designs, layouts, standards and specifications. 3.Grant the right to have the right of first refusal on the remainder of those Designated Market Areas which are presently located in Michigan's lower peninsula. 4.Grant the right to establish Mountain Mike's Pizza restaurants in the county of Santa Clara, California. | MMI Holdings LLC; QUALITY FRANCHISE SYSTEMS, INC.; Michael J. Feinstein, J. D. Hude, Katherine K. Feinstein, Master Franchising and Development Systems, Inc.; Q & S Management; Alex Golovana | QUALITY FRANCHISE SYSTEMS, INC.; OHO Holdings LLC; Michael J. Feinstein, J. D. Hude, Katherine K. Feinstein, Master Franchising and Development Systems, Inc.; Q & S Management; Alex Golovana a | ULTIMATE FRANCHISE SYSTEMS INC | 06/02/1996 | 1. The term of this Agreement is fifteen (15) years from the date it is signed, unless Licensor terminated under Section 8. 2. If you (and your owners) have complied with this Agreement and all other agreements between you (or your owners) and us and have fulfilled all of your obligations hereunder, and if you represent as an development agent within the Territory for a residual ten (10) year term on the condition that you (and your owners) sign our then current form of development agreement and you and we agree on the minimum number of new Mountain Mike's Pizza Restaurants to be opened within the Territory during the additional term. 3. The term of this Agreement is fifteen (15) years from the date it is signed, unless Licensor terminated under Section 8. 4. If you (and your owners) have complied with this Agreement and all other agreements between you (or your owners) and us and have fulfilled all of your obligations hereunder, we will allow you to operate as a development agent within the Territory for an additional ten (10) year term on the condition that you (and your owners) sign our then | Franchise, Service | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5794 | Imperial County, San Diego, Riverside County, San Diego, United States, Ingham County, Michigan, Jackson County, Michigan, Hillsdale County, Michigan, Eaton County, Michigan, Clinton County, Michigan, Santa Clara County, California | Multi Exclusivity | 40% | purchase price | If Master Franchising Development Systems, Inc. exercises its right of first refusal, the amount of those Designated Market Areas previously located in Michigan's lower peninsula shall be paid to the franchisee for each franchise sells to the same candidate, or to an entity in which the candidate is a material participant, within its Quality Franchise Systems, Inc. on a amount equal to 40% of the purchase price in compensation for its efforts. | Costs | License |
| 12048 | | | | | | | | | | | | 2.5% | gross sales | Alex Golchanian shall pay 2.5% Two and one-half percent of gross sales as royalty for the period it owns the location, regardless of the number of stores. To the franchisee for each franchise agreement for each location. | Gross Sales | License |
| 12048 | | | | | | | | | | | | 50% | initial franchise fees | QUALITY FRANCHISE SYSTEMS, INC. will pay MMI Holdings LLC fifty percent (50%) of the initial franchise fees actually collected (not accrued) during the term of this Agreement from selling franchises in the Territory. To be paid within thirty (30) days after each franchised location opens. | Net Sales | License |
| 12048 | | | | | | | | | | | | 40% | Royalties | QUALITY FRANCHISE SYSTEMS, INC. will pay MMI Holdings LLC forty percent (40%) of the Royalties, as defined in the franchise agreement (not including marketing or advertising fees), actually collected (not accrued) during the term of this Agreement from Mountain Mike's Pizza Restaurants opened in the Territory during the term of this Agreement. To be paid by the fifteenth (15th) day of each month following the month during which the Royalties are collected. | Net Sales | License |
| 12048 | | | | | | | | | | | | 50% | transfer fees | QUALITY FRANCHISE SYSTEMS, INC. will pay MMI Holdings fifty percent (50%) of any transfer fees actually collected (not accrued) due to any Agreement, occurring during the term of this Agreement with respect to any franchise he has sold within the Territory during the term of this Agreement. To be paid within thirty (30) days after the collection of the transfer fees. | Net Sales | License |
| 12048 | | | | | | | | | | | | 50% | renewal of successor franchise fees | QUALITY FRANCHISE SYSTEMS, INC. will pay MMI Holdings fifty percent (50%) of any renewal or successor franchise fees actually collected (not accrued) during the term of this Agreement with respect to renewal or successor franchises that it grants within the Territory during the term of this Agreement. To be paid within thirty (30) days after the collection of the renewal or successor franchise fees. | Net Sales | License |
| 12048 | | | | | | | | | | | | 50% | initial franchise fees | QUALITY FRANCHISE SYSTEMS, INC. will pay Master Franchising and Development Systems, Inc. fifty percent (50%) of the initial franchise fees actually collected (not accrued) during the term of this Agreement from selling franchises in the Territory. To be paid within thirty (30) days after each franchised Restaurant opens. | Net Sales | License |

EX1-169

kMINE

kMINE Export (2016.02.22) Part 2

| Agreement ID | Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities IP | Lead IP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11048 | | | | | | | | | | | | 40% | Royalties | QUALITY FRANCHISE SYSTEMS, INC. will pay Master Franchising and Development Systems, Inc. forty percent (40%) of the Royalties, as defined in the Franchise Agreement (not including marketing or advertising fees), actually collected (not accrued) during the term of the Franchise Agreement from Mountain Mike's Pizza Restaurants opened in the Territory during the term of this Agreement. To be paid on the fifteenth (15th) day of each month following the month during which the Royalties are collected. | Net Sales | License |
| 11048 | | | | | | | | | | | | 50% | transfer fees | QUALITY FRANCHISE SYSTEMS, INC. will pay Master Franchising and Development Systems, Inc. fifty percent (50%) of any transfer fees actually collected (not accrued) due to any "transfers," as defined in the Franchise Agreement, occurring during the term of this Agreement with respect to any franchisees located in the Territory during the term of this Agreement. To be paid within thirty (30) days after the renewal or successor franchise fees are collected. | Net Sales | License |
| 11048 | | | | | | | | | | | | 50% | renewal or successor franchise fees | QUALITY FRANCHISE SYSTEMS, INC. will pay Master Franchising and Development Systems, Inc. fifty percent (50%) of any renewal or successor franchise fees actually collected (not accrued) during the term of this Agreement with respect to renewal or successor franchises that it grants within the Territory during the term of this Agreement. To be paid within thirty (30) days after the renewal or successor franchise fees are collected. | Net Sales | License |
| 11048 | | | | | | | | | | | | 75% | marketing funds | Quality Franchise Systems, Inc. shall remit 75% of all marketing funds actually collected from Mountain Mike's franchises in the Territory to Master Franchising Development Systems, Inc. for the purpose of expending those funds under Quality Franchise Systems, Inc.&#39;s direction in the Territory. | Net Sales | License |
| 11048 | | | | | | | | | | | | 50% | fees | Alex Golshanara shall be entitled to fifty percent (50%) of the initial franchise fees renewal fees and transfer fee collected by QSI in connection with the granting of a franchise in the Exclusive Territory or the resale of the existing franchised units. To be paid within ten (10) days from the date of opening of each franchised location. | Net Sales | License |
| 11048 | | | | | | | | | | | | 20% | Collected Royalty Proceeds | Alex Golshanara shall receive a portion of the Collected Royalty Proceeds for each individual location that it established under this Agreement. Payable Twenty (20) months after the opening date | Net Sales | License |
| 11048 | | | | | | | | | | | | 30% | Collected Royalty Proceeds | Alex Golshanara shall receive a portion of the Collected Royalty Proceeds for each individual location that it established under this Agreement. Payable Thirteen (13) to twenty four (24) months after the opening date | Net Sales | License |
| 11048 | | | | | | | | | | | | 40% | Collected Royalty Proceeds | Alex Golshanara shall receive a portion of the Collected Royalty Proceeds for each individual location that it established under this Agreement. Payable after the opening date | Net Sales | License |

Page 18 of 54

| Agreement Number | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit ie | Lea |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20077 | NOREBAN USA HOLDINGS INC | CUMBERLAND PACKING CORP | DGI HOLDINGS INC, MERIDIAN HOLDINGS, INC., Alan Rosner, Mark (Unsiklled) | 05/24/1999 | 1. Licensee shall be entitled to terminate this Agreement on one (1) year prior written notice to Licensor... | Manufacturing Process Intangible, Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables, Restaurants, Retail | 3770 | United States of America, Canada | Multi-Exclusivity | 7% | Net Sales | In consideration of the License granted herein, Licensee shall pay Cumberland an annual Royalty of seven percent (7%) of Net Sales, pursuant to the terms and conditions of this Agreement. In addition, the Licensee percent (7%) Royalty must be paid on (i) all "Pass-goods" given to others in lieu of anything being sold or otherwise based upon the Net Sale price which otherwise would have been charged, and (ii) all "private label" sales of the Licensed Product permitted to be sold pursuant to Section 11 herein. | Net Sale | Licens |
| 20077 | | | | | | | | | | | 10% | Net Sales | For each Agreement Year after the Third Agreement Year, Licensee shall expend a Minimum Capital Commitment of the lesser of (i) $500,000 (adjusted each year for increases in the consumer price index), or (ii) 10% of the Net Sales of the Licensed Product. | Net Sales | Licens |
| 22630 | CALIFORNIA PIZZA KITCHEN, INC. | CALIFORNIA PIZZA KITCHEN, INC. | KRAFT PIZZA COMPANY, KRAFT FOODS, INC. | 10/20/1997 | 1. This Agreement shall commence as of the Effective Date and continue until terminated pursuant to the terms of this Agreement. | Marketing Intangible | Foods and Nonalcoholic Beverages, Retail, Restaurants | 5412 | United States, Canada | EXCLUSIVE | 2% | Net Sales | Licensee shall pay to Licensor royalties in an amount equal to the Net Sales of Licensed Products in each Year of this Agreement multiplied by the royalty rate set forth below: Two Percent (2%) of Net Sales up to and including Twenty-five Million Dollars ($25,000,000) | Net Sales | Licens |
| 22630 | | | | | | | | | | | 3% | Net Sales | Licensee shall pay to Licensor royalties in an amount equal to the Net Sales of Licensed Products in each Year of this Agreement multiplied by the royalty rate set forth below: Three Percent (3%) of Net Sales over Twenty-five Million Dollars ($25,000,000) up to and including Fifty Million Dollars ($50,000,000) | Net Sales | Licens |
| 22630 | | | | | | | | | | | 4% | Net Sales | Licensee shall pay to Licensor royalties in an amount equal to the Net Sales of Licensed Products in each Year of this Agreement multiplied by the royalty rate set forth below: Four Percent (4%) of Net Sales over Fifty Million Dollars ($50,000,000) up to and including One Hundred Million Dollars ($100,000,000) | Net Sales | Licens |
| 22630 | | | | | | | | | | | 5% | Net Sales | Licensee shall pay to Licensor royalties in an amount equal to the Net Sales of Licensed Products in each Year of this Agreement multiplied by the royalty rate set forth below: Five Percent (5%) of Net Sales over One Hundred Million Dollars ($100,000,000) | Net Sales | Licens |
| 22630 | | | | | | | | | | | 5% | Net Sales | Each Year during the term of this Agreement, Licensee shall spend an amount equal to 5% of Net Sales on Advertising and Promotion; or (b) pay to Licensor the amount by which "Minimum A&P" shall be defined as 5 or 5 and for each succeeding Year. Five Percent (5%) of Net Sales of Licensed Products. | Net Sales | Licens |

kMINE Export (2018-02-21) Part 2

EX1-171

kMINE

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementUse | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25336 | 1.Grant the right to use the Rights (the names, nicknames, likenesses, signatures, pictures, numbers, playing records, and/or biographical data of those active baseball players in the National League and the American League who have entered into a Commercial Authorization Agreement with the MLBPA, including Cal Ripken, Jr., Sammy Sosa, Alex Rodriguez, Barry Bonds, Ken Camniti, Jeff Bagwell, and Craig Biggio) and Trademarks (the logo, name and symbol of MLBPA including MLBPA, Major League Baseball Players Association, and MLB Players Choice Logo) solely in connection with the sale of cereal products. | WARNING MANAGEMENT SERVICES INC | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | 1. This Agreement shall be effective and shall continue for the License Period set forth on Schedule B, unless sooner terminated pursuant to a provision of this Agreement. 2. LICENSE PERIOD June 1, 1999 to April 14, 2000. | Marketing Intangible | Entertainment, Foods and Nondurables; Consumer Non-Durables; Consumer Non-Durables Beverages | 5140 | United States, Canada, Caribbean | Multi Exclusivity | 13.5% | total cost | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Costs | License |
| 25336 | | | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | | Marketing Intangible | | | | | 10% | total cost | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Costs | License |
| 25336 | 1.Grant the right to use the Rights (the names, nicknames, likenesses, signatures, pictures, numbers, playing records, and/or biographical data of those active baseball players in the National League and the American League who have entered into a Commercial Authorization Agreement with the MLBPA, including Cal Ripken, Jr., Sammy Sosa, Alex Rodriguez, Barry Bonds, Ken Camniti, Jeff Bagwell, and Craig Biggio) and Trademarks (the logo, name and symbol of MLBPA including MLBPA, Major League Baseball Players Association, and MLB Players Choice Logo) solely in connection with the sale of cereal products. | WARNING MANAGEMENT SERVICES INC | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | 1. This Agreement shall be effective and shall continue for the License Period set forth on Schedule B, unless sooner terminated pursuant to a provision of this Agreement. 2. LICENSE PERIOD June 1, 1999 to April 14, 2000. | Marketing Intangible | Consumer Non-Durables; Entertainment, Foods and Nondurables Beverages | 5140 | United States, Canada, Caribbean | Multi Exclusivity | 13.5% | total cost | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Costs | License |
| 25336 | | | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | | Marketing Intangible | | | | | 10% | total cost | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Costs | License |
| 25326 | 1.Grant the right to use the Rights (the names, nicknames, likenesses, signatures, pictures, numbers, playing records, and/or biographical data of those active baseball players in the National League and the American League who have entered into a Commercial Authorization Agreement with the MLBPA, including Cal Ripken, Jr., Sammy Sosa, Alex Rodriguez, Barry Bonds, Ken Camniti, Jeff Bagwell, and Craig Biggio) and Trademarks (the logo, name and symbol of MLBPA including MLBPA, Major League Baseball Players Association, and MLB Players Choice Logo) solely in connection with the sale of cereal products. | WARNING MANAGEMENT SERVICES INC | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | 1. This Agreement shall be effective and shall continue for the License Period set forth on Schedule B, unless sooner terminated pursuant to a provision of this Agreement. 2. LICENSE PERIOD June 1, 1999 to April 14, 2000. | Marketing Intangible | Consumer Non-Durables, Entertainment, Foods and Nondurables Beverages | 5140 | United States, Canada, Caribbean | Multi Exclusivity | 13.5% | total cost | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Costs | License |
| 25326 | | | Major League Baseball Players Association | Famous Fixins, Inc. | 06/21/1999 | | Marketing Intangible | | | | | 10% | net sales | Licensee will pay a 13.5% royalty on the total cost of all trading cards, and 20% on the total cost of all other premium items utilizing the granted rights. | Net Sales | License |
| 25327 | 1.Grant the right to utilize the names, word marks, logos, uniform designs, likenesses, visual representations and such other similar or related trademarks of (1) Major League Baseball Properties, Inc. (2) Baltimore Orioles, (3) Chicago Cubs, (3) Houston Astros, (4) San Francisco Giants, and (5) Seattle Mariners to be used solely in connection with the manufacture, distribution, promotion, advertisement and sale of: 1. Cereal boxes referred to by Licensee as "Cereal CD's," measuring 14 oz. in size, and featuring Cal Ripken, Jr. in a uniform bearing the Logos of the Baltimore Orioles, 2. Cereal boxes measuring 14 oz. in size, featuring Barry Bonds in a uniform bearing the Logos of the San Francisco Giants, and a sample package 2. Cereal boxes referred to by Licensee as "Cereal CD's," measuring 14 oz. in size, featuring Ken Griffey, Jr. in a uniform bearing the Logos of the Seattle Mariners, and packaged with limited edition baseball trading cards (limited to 700 units produced) in wax boxes. 3. Cereal boxes referred to by Licensee as "Cereal CD's," measuring 14 oz. in size, featuring Sammy Sosa in a uniform bearing the Logos of the Chicago Cubs, and packaged with limited edition baseball trading cards (limited to 66 units produced) in wax boxes. | WARNING MANAGEMENT SERVICES INC | Major League Baseball Properties, Inc.; Major League Baseball Clubs | Famous Fixins, Inc. | 06/21/1999 | 1. The License grant hereunder shall be effective and terminate as of the dates specified in Schedule C attached hereto, unless sooner terminated or renewed in accordance with the terms and conditions hereof. 1. LICENSE PERIOD For Licensed Product No. 1: April 1, 1999 -December 31, 1999 For Licensed Product Nos. 2-4: May 15, 1999 - December 31, 1999 For Licensed Product No. 5: May 15, 1999 - April 30, 2000 | Marketing Intangible | Entertainment, Foods and Nondurables; Consumer Non-Durables; Consumer Non-Durables Beverages | 5140 | Maryland, Virginia, North Carolina, South Carolina, North Carolina, Florida, Philadelphia, PA, District of Columbia, Texas, Florida, New Orleans, LA, Arizona, California, Washington, Miami, FL, United States of America | Multi Exclusivity | 5% | net sales | PERCENTAGE COMPENSATION: For Licensed Product No. 1: Five percent (5%) of net sales, or $0.03-5 per unit sold, whichever is greater. | Net Sales | License |
| 25327 | | | | | | | | | | | | 2% | net sales | PERCENTAGE COMPENSATION: For Licensed Product Nos. 2-4: Two percent (2%) of net sales | Net Sales | License |
| 25327 | | | | | | | | | | | | 2.5% | net sales | PERCENTAGE COMPENSATION: For Licensed Product No. 5: Two and one-half percent (2½%) of net sales, or $0.0645 per unit sold, whichever is greater. | Net Sales | License |

| Agreement Symbol | Lead Company | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23327 | Licensor | | | | | | | | | | | 0258,USD | per unit | PERCENTAGE COMPENSATION: For Licensed Product No. 1: One percent (1%) of net sales, or $0.0258 per unit sold, whichever is greater. | Per Unit |
| 23327 | Licensor | | | | | | | | | | | 0645,USD | per unit | PERCENTAGE COMPENSATION: For Licensed Product No. 5: Two-and-one-half percent (2.5%) of net sales, or $0.0645 per unit sold, whichever is greater. | Per Unit |
| 23327 | Licensor | RAWLINGS MANAGEMENT SERVICES INC. | Major League Baseball Properties, Inc., Major League Baseball Clubs | Famous Fixins, Inc. | 04/1/1999 | 1. The license granted hereunder shall be effective and terminate as of the dates specified in Schedule D attached hereto, unless sooner terminated or renewed in accordance with the terms and conditions hereof.<br><br>2. LICENSE PERIOD<br><br>For Licensed Product No. 1:<br><br>April 1, 1999 - December 31, 1999<br><br>For Licensed Product Nos. 2-4:<br><br>May 15, 1999 - December 31, 1999<br><br>For Licensed Product No. 5:<br><br>May 15, 1999 - April 30, 2000 | Marketing Intangible | Consumer Non-Durables, Entertainment, Foods and Nonalcoholic Beverages | 5140 | Maryland, Virginia, North Carolina, South Carolina, Florida, Philadelphia, PA, District of Columbia, Texas, Florida, New Orleans, LA, Arizona, California, Washington, Miami, FL, United States of America | Multi-exclusivity | 1% | net sales | PERCENTAGE COMPENSATION: For Licensed Product No. 1: One percent (1%) of net sales, or $0.0258 per unit sold, whichever is greater. | Net Sales |
| 23327 | Licensor | | | | | | | | | | | 2% | net sales | PERCENTAGE COMPENSATION: For Licensed Products Nos. 2-4: Two percent (2%) of net sales. | Net Sales |
| 23327 | Licensor | | | | | | | | | | | 2.5% | net sales | PERCENTAGE COMPENSATION: For Licensed Product No. 5: Two-and-one-half percent (2.5%) of net sales, or $0.0645 per unit sold, whichever is greater. | Net Sales |
| 23327 | Licensor | | | | | | | | | | | 0258,USD | per unit | PERCENTAGE COMPENSATION: For Licensed Product No. 1: One percent (1%) of net sales, or $0.0258 per unit sold, whichever is greater. | Per Unit |
| 23327 | Licensor | | | | | | | | | | | 0645,USD | per unit | PERCENTAGE COMPENSATION: For Licensed Product No. 5: Two-and-one-half percent (2.5%) of net sales, or $0.0645 per unit sold, whichever is greater. | Per Unit |
| 23327 | Licensor | RAWLINGS MANAGEMENT SERVICES INC. | Major League Baseball Properties, Inc., Major League Baseball Clubs | Famous Fixins, Inc. | 04/1/1999 | 1. The license granted hereunder shall be effective and terminate as of the dates specified in Schedule D attached hereto, unless sooner terminated or renewed in accordance with the terms and conditions hereof.<br><br>2. LICENSE PERIOD<br><br>For Licensed Product No. 1:<br><br>April 1, 1999 - December 31, 1999<br><br>For Licensed Product Nos. 2-4:<br><br>May 15, 1999 - December 31, 1999<br><br>For Licensed Product No. 5:<br><br>May 15, 1999 - April 30, 2000 | Marketing Intangible | Consumer Non-Durables, Entertainment, Foods and Nonalcoholic Beverages | 5140 | Maryland, Virginia, North Carolina, South Carolina, Florida, Philadelphia, PA, District of Columbia, Texas, Florida, New Orleans, LA, Arizona, California, Washington, Miami, FL, United States of America | Multi-exclusivity | 1% | net sales | PERCENTAGE COMPENSATION: For Licensed Product No. 1: One percent (1%) of net sales, or $0.0258 per unit sold, whichever is greater. | Net Sales |
| 23327 | Licensor | | | | | | | | | | | 2% | net sales | PERCENTAGE COMPENSATION: For Licensed Products Nos. 2-4: Two percent (2%) of net sales. | Net Sales |

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25337 | | | | | | | | | | | | 25% | Net Sales | PERCENT-AGE COMPENSATION. For Licensed Product No. 1, Two-and-one-half percent (2.5%) of net sales, or \$0.0645 per unit cost, whichever is greater. | Net Sales | Licensee |
| 25337 | | | | | | | | | | | | \$0.0645 USD | per unit | PERCENT-AGE COMPENSATION. For Licensed Product No. 1. Two-and-one-half percent (2.5%) of net sales, or \$0.0645 per unit cost, whichever is greater. | Per Unit | Licensee |
| 25337 | | | | | | | | | | | | \$0.0645 USD | per unit | PERCENT-AGE COMPENSATION. For Licensed Product No. 1. Two-and-one-half percent (2.5%) of net sales, or \$0.0645 per unit cost, whichever is greater. | Per Unit | Licensee |
| 25099 | 1. Grant the right to use the Licensed Property (Licensed Names and Marks and the Licensed Images, including the likeness of Debbie Fields) in connection with the production, marketing, sale, and distribution of Licensed Product (i) fresh baked cookies, brownies, muffins and croissants and any other fresh baked bakery products... | MRS. FIELDS ORIGINAL COOKIES, INC. | THE MRS. FIELDS' BRAND, INC.; MRS. FIELDS ORIGINAL COOKIES, INC. | MRS. FIELDS' ORIGINAL COOKIES, INC.; THE MRS. FIELDS' ORIGINAL COOKIES, INC. | 09/30/1996 | 1. perpetual | Manufacturing/Process Intangible; Marketing Intangible | Consumer Services, Retail; Foods and Nondurables: Beverages, Consumer Non-Durables, Restaurants | | worldwide, United States | Multi-Exclusivity | 4.5% | Gross Revenue | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ended March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter... | Gross Sales | Licensee |
| 25099 | | | | | | | | | | | | 5% | Franchisé Cash Flow | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ended March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter and (b) 5% of any Franchise Cash Flow in excess of the Base Franchise Cash Flow for such quarter... | Net Sales | Sublicensee |
| 52367 | 1. Grant the right to use the Licensed Marks (the trademark "PETER PAN" and "NUTTY'S BERRY FARM" and the logos associated with such trademarks, as such trademarks and logos may now exist or as they may be amended or revised hereafter) solely to identify the use of Go4ageNutrients in connection with the production, marketing, sale and distribution of Licensed Products (individual food products packaged and sold to parents for use in the school lunch program or in other institutional feeding programs) to school districts... | TOPPS FOODS INC. | Goodga Brands, Inc., Hunt Wesson, Inc. | Topps Foods, Inc. | 05/19/1999 | 1. The term of this Agreement shall commence upon execution of this Agreement and shall continue until December 31, 2004 unless sooner terminated in accordance with the terms of this Agreement (the "Term"). | Distribution, Marketing Intangible | Consumer Non-Durables, Foods and Nondurables: Beverages, Public Safety, Education | 2000 | | United States of America | EXCLUSIVE | \$12.50 USD | per Product | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the manufacture of Licensed Products, from Licensor at the price of \$12.50/case for peanut butter and the prices set out on Exhibit A hereto, FRUIT FILLING: Apple Cherry Chunk \$10.50 | Per Unit | Licensee |

| Agreement ID | Agreement Synopsis | FilingCompany | Licensor | Licensee | Term | EffectiveDate | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commercialize | License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51067 | | | | | | | | | | | | 332.50 (US) | per Product | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. PEAT FILLING: Apple Blossom NL#105 | Per Unit | Licensee |
| 51067 | | | | | | | | | | | | 127.75 (US) | per Product | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. PEAT FILLING: Pineapple Apple NL#105-13 | Per Unit | Licensee |
| 51067 | | | | | | | | | | | | 442.00 (US) | per Product | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. PEANUT BUTTER: Creamy Reduced Fat UN#175-1644.50. | Per Unit | Licensee |
| 46283 | 1. Grant the right to be designated as a Private Label distributor for the marketing of the Products (The product Illustration) in the sole product included in this Agreement subject to provisions of this Agreement. The product below is included herein only if a license is granted for the Product is granted to Licensee in the District of Washington and Oregon for agriculture, mariculture, fish farming, and the like, or for use in aquariums, exclusive of remediation of petroleum-based hydrocarbon contamination. 2. Grant the right to manufacture the product "Biocatalyst" after the Licensee has purchased a minimum of 3,000 gallons of Product each month for a minimum period of six (6) consecutive months. | ITERMONY INC. | David A. Martensson & Associates, NW Technologies, Inc. | Teracont, Inc. | 1. The term of this Agreement shall be three (3) years from the Effective Date as terminated earlier as herein provided. This Agreement may be renewed by Licensee for additional three (3) year periods if no event of default exists and all other provisions of this Agreement are in full force and effect. | 05/28/1999 | Distribution, Manufacturing/Process Intangible, Service | Agribusiness, Environments and Waste Management, Business Services, Biotechnology, Foods and Nondurable Beverages, Consumer Non Durables | 2000 | Washington, Oregon, United States | Multi-Exclusivity | 8% | % | At the time if Issuance of the subject License to Produce a one-time payment of $10,000.00 will be made to Licensor by Licensee to reimburse Licensor for unqualified expenses. A monthly royalty of 8% (eight percent) of Licensee will be paid to Licensor by Licensee within 30 days of the end of each month. | Other | Licensee |
| 46283 | | | | | | | | | | | | 500 (US) | per day | Grantor agrees to make available to Licensee Grantor's trained technical personnel for consultation from time to time, at Grantor's sole discretion, as any such consultation may be by telephone or in person. If Licensee requests the personal assistance of an on-site technical personnel, then Licensee will pay actual travel and living expenses for such personnel in an amount between Grantor and Licensee and an additional fee (per diem) of $500.00 per day for each technical person requested. | Per Unit | Licensee |
| 46283 | | | | | | | | | | | | 3 (US) | per gallon | The initial price to Licensee for the Product Biocatalyst is $2.00 per gallon in 2,000 gallon quantities to be packaged in bulk containers furnished by Licensee. | Per Unit | Licensee |
| 48160 | 1. Grant the right to establish and develop a Treats National Franchise Network. 2. Grant the right to adapt the Marks (trademarks, trade names, designs, copyrights and logos) and its System (standards, unique and uniform system) in the prevailing market conditions of the Exclusive Territory, and to establish and implement a similar Trade Agreement to its Area Developers, and to own and operate corporate-owned STORES in the Exclusive Territory, utilizing the Marks and System developed by LICENSEE/TREATS CANADA CORPORATION. 3. Grant the right to sell, develop and grant Area Development Agreements and franchises for the operation of STORES within the Exclusive Territory under the Marks (trademarks, trade names, designs, copyrights and logos). | SMC GROUP INC. | TREATS CANADA CORPORATION | SMC GROUP INC. | 1. Subject to the provisions contained herein, the term of this Agreement and the rights granted hereunder shall be twenty (20) years commencing on the date of this Agreement, ("Term"). Provided the LICENSEE is substantially in compliance with the terms of this Agreement, LICENSEE will have the right to renew this Agreement for a further term of two (2) years, based on the LICENSOR's then current form of National License Agreement ("Renewal"). | 12/21/1997 | Franchise, Service | Consumer Services, Business Services, Restaurants, Foods and Nondurable Beverages, Consumer Non-Durables, Retail | 6770 | United States of America | EXCLUSIVE | 10% | Regional Franchise Development Fee | LICENSEE agrees to pay LICENSOR a non-refundable Area Development Service Fee in an amount equal to ten percent (10%) of the Regional Franchise Development Fee being charged AREA DEVELOPERS by LICENSEE, for every Area in the Exclusive Territory payable to LICENSOR forthwith upon the execution of each Area Development Agreement. | Net Sales | Licensee |
| 48160 | | | | | | | | | | | | 10% | Franchise Development Fee | LICENSEE agrees to pay LICENSOR a non-refundable STORE Development Service Fee in an amount equal to ten percent (10%) of the Franchise Development Fee being charged AREA DEVELOPERS by LICENSEE, for every Area in the Exclusive Territory upon the execution of each TREATS Franchise Agreement, whether such Franchise(s) be corporately operated. | Net Sales | Licensee |

kMINE

EX1-175

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48160 | | | | | | | | | | | | 10% | STORE franchise fee | LICENSEE agrees to pay LICENSOR a STORE Development Service Fee in an amount equal to ten percent (10%) of the STORE franchise fee being charged FRANCHISEE by LICENSEE, for every STORE in the Exclusive Territory payable to LICENSOR and non-refundable upon the execution of the "FRANCHISE Agreement" for each STORE | Net Sales | License |
| 48160 | | | | | | | | | | | | 10% | STORE franchise fee | In the event that LICENSEE operates a CORPORATE STORE, LICENSEE agrees to pay LICENSOR an amount equal to ten percent (10%) of the highest STORE franchise fee charged in the calendar year during which the STORE opens in the event that LICENSEE operates a CORPORATE STORE, LICENSEE agrees to pay to LICENSOR an amount equal to ten percent (10%) of the highest STORE franchise fee charged in the calendar year during which the STORE opens. | Net Sales | License |
| 48160 | | | | | | | | | | | | 1% | net sales | LICENSEE agrees to pay LICENSOR an operations service fee for each STORE in the Exclusive Territory in an amount equal to one percent (1%) of the net sales of each STORE and/or CORPORATE STORE, and one percent (1%) of the net sales for STORES operating under an Area Development Agreement. | Net Sales | License |
| 48160 | | | | | | | | | | | | 1% | net sales | LICENSEE agrees to pay to LICENSOR an operations service fee for each STORE in the Exclusive Territory in an amount equal to one percent (1%) of the net sales of each STORE and/or CORPORATE STORE, and one percent (1%) of the net sales for STORES operating under an Area Development Agreement. | Net Sales | License |
| 8239 | 1. Grant the right to purchase the assets relating to the Business (Nutrition Medical, Inc. owns the rights to the manufacturing, marketing and distributing the Products: 1. Fiber PRO 2. Glutasorb Ready-to-Use 3. Glucofliz (vanilla 4. L-Emental Hepatic 5. L-Emental Pediatric 6. L-Emental 7. NitroPRO 8. Pro Peptide for Kids 9. Pro Peptide (unflavored 10. Pro Peptide VHN 11. Pro Peptide Vanilla 12. Nutrition Liquid 13. Nutrition Plus Liquid 14. Instant Nutrition 15. Instant Nutrition (Lactose Free) 16. ISO-PRO 17. ISO-LAN 18. ULTRA-LAN 19. ULTRA-LAN 20. NUTRA-LAN) | GALAGEN INC. | Nutrition Medical, Inc. | GalaGen Inc. | 09/15/1998 | 1. The Closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Fregni & Reeson LLP, Minneapolis, Minnesota, at 10:00 a.m. on the seventh business day following fulfillment or appropriate waiver of all of the conditions specified in Sections 10 and 11 hereof, or such other date as Buyer and Seller may mutually agree (the "Closing Date "). | Asset Purchase, Manufacturing/Process Intangible, Marketing Intangible, Service | Healthcare, Pharmaceutical, Foods and Nutraceuticals (Beverages, Consumer Non-Durables, Biotechnology, Healthcare Facilities, Business Services | 2836 | Minneapolis, Minnesota, United States | EXCLUSIVE | 9% | Net Sales | Buyer will pay Seller a royalty of nine percent (9%) of net sales, reduced by certain deductions, of the Products during the term of this Agreement and for the one-year period ending December 31, 2000, (US $6,000,000) during the year ending December 31, 2001, and ten (10) percent (10%) of net sales for (US $500,000) during the year ending December 31, 2002. | Net Sales | License |
| 8239 | | | | | | | | | | | | 1,000 USD | per month | Promptly after the Closing Date, Seller shall make the tangible Assets available to Buyer at Seller's facilities at Suite 110, 9909 514 Avenue North, Minneapolis, Minnesota and shall cooperate with Buyer in an orderly transfer and removal thereof. In arranging for such removal, Seller shall specify in the possession of Seller. In consideration of the use of the Seller's facilities to store inventory of the Products, Buyer agrees to pay Seller 1,000 per month pro-rated on a daily basis from the Closing Date through the last date upon which any inventory of the Products is stored at the facilities of the Seller. | Per Unit | License |

kMINE Export (2018.02.22) Part 2

EX1-176

kMINE

XMINE Export (2016.02.22) Part 2

| Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Fee | Modifier | Commodit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Grant the right to use the Mark (the trademark Manaplex(R)) and associated product (Manaplex(R)) products in connection with the labeling, advertising and sale of the (i) Manufactured Products or products (...). Also sets miscellaneous policies/role during the term of this Agreement. 2. Unless terminated earlier as provided herein, this Agreement shall remain in full force and effect for a six (6) year period ending at midnight on December 2, 2005. This Agreement may be extended or renewed as provided in Section 1.2, or otherwise by the written agreement of the parties. | CARRINGTON LABORATORIES, INC. | CARACOL, INC.; Carrington Laboratories, Inc. | EVENTUS INTERNATIONAL, INC. | 12/3/1998 | 1. The license granted by this Agreement shall run commensurate with the Supply Agreement, and any actions or events which shall operate to extend or terminate the Supply Agreement shall automatically extend or terminate this Agreement simultaneously. 2. Unless terminated earlier as provided herein, this Agreement shall remain in full force and effect for a six (6) year period ending at midnight on December 2, 2005. This Agreement may be extended or renewed as provided in Section 1.2, or otherwise by the written agreement of the parties. | Marketing Intangible | Biotechnology, Consumer Non-Durable, Foods and Nondurable, Beverages, Healthcare, Pharmaceutical | 2834 | U.S. | Multi-Exclusivity | 10.00 | per bottle or container | Licensee agrees to pay to Licensor a royalty of ten cents ($0.10) per bottle or container of product. | Per Unit |
| | | | | | | | | | | | 10.00 | per unit | Licensee guarantees to a minimum of X million units over thirty to six months from the initial date of this agreement which will be invoiced at $0.10 per unit. The next one million units will be invoiced at $0.09 per unit and all additional units over that will be invoiced at $0.08 per unit. | Per Unit |
| | | | | | | | | | | | 09.00 | per unit | Licensee guarantees to a minimum of X million units over thirty to six months from the initial date of this agreement which will be invoiced at $0.10 per unit. The next one million units will be invoiced at $0.09 per unit and all additional units over that will be invoiced at $0.08 per unit. | Per Unit |
| | | | | | | | | | | | 09.00 | per unit | Licensee guarantees to a minimum of X million units over thirty to six months from the initial date of this agreement which will be invoiced at $0.10 per unit. The next one million units will be invoiced at $0.09 per unit and all additional units over that will be invoiced at $0.08 per unit. | Per Unit |
| 1. Grant the right to market, sell and distribute, at prices and upon terms to be determined by GLAUGEN, the Products (known as "GlaGate Ready to Use" in the United States, Japan, France, England, Scotland, Belgium, Holland, Switzerland, Denmark, Sweden, Norway and Finland). 2. Grant the right to use any trademark, trade name, or identifying slogan of NMI which are affixed to the Products or any accompanying labels, containers, cartons, or technical or promotional literature and used in connection with the marketing, sale, distribution, or service of the Products (service of the Products and products). 3. Grant the right to market, sell and distribute, at prices and upon terms to be determined by GLAUGEN, in the United States all Product (other than "GlaGate Ready to Use". 4. Grant the right to engage Nutrition Medical, Inc. to provide services related to computer system and databases of customers and prospects, customer records and account information; order processing; and accounts receivable processing. | GLAUGEN, INC. | Nutrition Medical, Inc. | GlaGate Inc. | 09/1/1998 | 1. The term of this Agreement (the "Term") shall be from the Effective Date and December 31, 1998, unless terminated sooner pursuant to SECTION 10 herein. | Distribution, Marketing Intangible, Service | Foods and Nondurable, Beverages, Healthcare, Pharmaceutical | 2836 | United States, Japan, France, England, Scotland, Belgium, Holland, Switzerland, Denmark, Sweden, Norway and Finland | EXCLUSIVE | 15% | price | In consideration for the services to be provided by NMI hereunder, GlaGate will pay to NMI an administrative charge equal to 15% of the price charged by GLAUGEN from its customers for Products sold during the Term. The Administrative Charge will cover, without limitation, warehouse rent, warehouse support services (i.e., insurance, personnel, depreciation, etc.), invoicing services and collection services. | Other |
| 1. Grant the right to market, sell and distribute, at prices and upon terms to be determined by GLAUGEN, the Products (known as "GlaGate Ready to Use" in the United States, Japan, France, England, Scotland, Belgium, Holland, Switzerland, Denmark, Sweden, Norway and Finland). 2. Grant the right to use any trademark, trade name, or identifying slogan of NMI which are affixed to the Products or any accompanying labels, containers, cartons, or technical or promotional literature and used in connection with the marketing, sale, distribution, or service of the Products (service of the Products and products). 3. Grant the right to market, sell and distribute, at prices and upon terms to be determined by GLAUGEN, in the United States all Product (other than "GlaGate Ready to Use". 4. Grant the right to engage Nutrition Medical, Inc. to provide services related to computer system and databases of customers and prospects, customer records and account information; order processing; and accounts receivable processing. | NUTRITION MEDICAL, INC. | Nutrition Medical, Inc. | GlaGate Inc. | 09/1/1998 | 1. The term of this Agreement (the "Term") shall be from the Effective Date and December 31, 1998, unless terminated sooner pursuant to SECTION 10 herein. | Distribution, Marketing Intangible, Service | Foods and Nondurable, Beverages, Healthcare, Pharmaceutical | 5122 | Japan, United States, France, England, Scotland, Belgium, Holland, Switzerland, Denmark, Sweden, Norway and Finland | EXCLUSIVE | 15% | price | In consideration for the services to be provided by NMI hereunder, GlaGate will pay to NMI an administrative charge equal to 15% of the price charged by GLAUGEN from its customers for Products sold during the Term. The Administrative Charge will cover, without limitation, warehouse rent, warehouse support services (i.e., insurance, personnel, depreciation, etc.), invoicing services and collection services. | Other |

EX1-177

kMINE

kMINE Export (2018.02.22) Part 2

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit...e | Lice... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55088 | 1. Grant the right to use the trademarks "La Campesina Provolone" and "Provolino" and the trade name "Passaic" in connection with the manufacture and/or sale of tortillas (corn and flour) and fried chips, and in connection with the manufacture and/or sale of burritos, chips, salsa and other "Mexican foods" (which for the purposes of the Agreement shall mean foods associated with the Mexican culture), all for retail distribution. | SPARTA FOODS INC | Atrio International Food and Equipment Company, Inc., Mexican Foods, Inc. | Sparta Foods, Inc., La Campesina of Minnesota, Inc. | 01/1/1999 | 1. The license granted under this Agreement shall be from the date hereof and shall terminate on December 31, 2014 | Marketing Intangible | Consumer Non-Durables, Food and Nondurables Beverages | 2090 | United States of America, worldwide | Multi-Exclusivity | 3% | Gross Sales | At full consideration for the right and license granted to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty based upon LICENSEE&#39;s Gross Sales. &quot;Gross Sales,&quot; which for the purposes of this Agreement shall mean the gross amount received by LICENSEE in a calendar year from all sales of the Products calculated on an accrual basis of accounting, less any allowances for cash discounts, credits under warranty, credits for returns, safe, and other transportation costs. The amount of the royalty due shall be calculated as follows: three percent (3%) on the first five million dollars ($5,000,000) of Gross Sales on and one half million dollar ($5,500,000) of Gross Sales and less one-half percent (2.5%) on the amount of Gross Sales between five million one dollars ($5,000,000) and ten million dollars ($10,000,000) and two and one-half percent (2%) on the amount of Gross Sales over ten million dollars ($10,000,000). | Gross Sales | License |
| 55088 | | | | | | | | | | | | 2.5% | Gross Sales | At full consideration for the right and license granted to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty based upon LICENSEE&#39;s Gross Sales,&quot; which for the purposes of this Agreement shall mean the gross amount received by LICENSEE in a calendar year from all sales of the Products calculated on an accrual basis of accounting, less any allowances for cash discounts and other trade and quantity discounts, credits under warranty, credits for returns, safe, and other transportation costs. The amount of the royalty due shall be calculated as follows: three percent (3%) on the first five million dollars ($5,000,000) of Gross Sales and one-half million dollar ($5,500,000) of Gross Sales and less one-half percent (2.5%) on the amount of Gross Sales between five million one dollars ($5,000,000) and ten million dollars ($10,000,000) and two and one-half percent (2%) on the amount of Gross Sales over ten million dollars ($10,000,000). | Gross Sales | License |
| 55088 | | | | | | | | | | | | 2% | Gross Sales | At full consideration for the right and license granted to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty based upon LICENSEE&#39;s Gross Sales,&quot; which for the purposes of this Agreement shall mean the gross amount received by LICENSEE in a calendar year from all sales of the Products calculated on an accrual basis of accounting, less any allowances for cash discounts and other trade and quantity discounts, credits under warranty, credits for returns, safe, and other transportation costs. The amount of the royalty due shall be calculated as follows: three percent (3%) on the first five million dollars ($5,000,000) of Gross Sales and one-half million dollar ($5,500,000) of Gross Sales and less one-half percent (2.5%) on the amount of Gross Sales between five million one dollars ($5,000,000) and ten million dollars ($10,000,000) and two and one-half percent (2%) on the amount of Gross Sales over ten million dollars ($10,000,000). | Gross Sales | License |
| 54155 | 1. Grant the right to use the Mark (the trademark KAWAIHOUSE Powder) in connection with the labeling, advertising and sale of Manufactured Products manufactured and sold by FOR YOUR HEALTH, INC. relating to both aloe vera mucilaginous polysaccharide during the term of this Agreement. | CARRINGTON LABORATORIES INC | CARRINGTON LABORATORIES INC | FOR YOUR HEALTH, INC. | 03/1/1999 | 1. The license granted under this Agreement shall commence with the Supply Agreement, and any actions or events which shall operate to extend or terminate the Supply Agreement shall automatically extend or terminate this Agreement simultaneously.

2. Unless terminated earlier as provided for herein, this Agreement shall remain in full force and effect for a three (3) year period ending at midnight on March 9, 2002. This Agreement may be extended or renewed as provided in Section 3.2, or otherwise by the written agreement of the parties. | Marketing Intangible | Biotechnology, Consumer Non Durables, Healthcare Beverages, Healthcare Pharmaceutical | 2834 | United States | Multi-Exclusivity | 15 USD | per unit | Licensee agrees to pay to Licensor a royalty of $0.15 per unit of Manufactured Product produced by or for the Licensee. | Per Unit | License |

Page 16 of 54

EX1-178

ktMINE

ktMINE Export (2016-02-22) Part 2

| Agreement ID | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58553 | 1. Grant the right to use the Trademarks (Great Little Burger, Stuf and Cooking Staff and those transmitting from the Flavors, Back Yard Burgers, and BYBurgers) in Burger's corporate name and in connection with packaging, selling, marketing, operating and distributing the Licensed Products within the Territory. | BACK YARD BURGERS INC | BYB Properties, Inc. | Back Yard Burgers, Inc. | 10/10/1997 | 1. This Agreement will remain in force and effect for a period of one year from the effective date of this Agreement, and shall thereafter automatically for successive yearly periods until either party provides written notice to terminate the Agreement within forty-five (45) days before the expiration date of the then current term. | Marketing Intangible | Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5812 | United States of America | NON-EXCLUSIVE | 3.5% | gross sales | In consideration of the rights granted herein, burgers shall pay to BYB a royalty equivalent to a percentage of all gross sales (less sales tax) of the Licensed products and/or Burgers and its affiliates, such percentage currently being three and one-half percent. | Gross Sales |
| 52515 | 1. Grant the right to manufacture and sell frozen yard bars in the flavors, sizes and packaging for sale solely in the territory using the trademarks (VineVine and VineVine logo) | NYE'S ORIGINAL INC | VineVine Products, Inc. | New Yorker Frozen Desserts, Inc. | 04/21/1998 | 1. The term of this Agreement shall begin on the date hereof and continue for two years unless terminated by either party in accordance with the provisions specified in the Agreement. | Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages | 2024 | New York City, Nassau, Suffolk, Westchester, Putnam, Rockland, New Jersey, Bergen, Essex, Hudson, Union, Middlesex, Monmouth, Connecticut, United States, N.Y., New York | EXCLUSIVE | 1.00 USD | per case | New Yorker shall pay to VineVine a royalty fixed if one dollar ($1.00) per case ($4 individual prize bar) of the Licensed Products sold by New Yorker | Per Unit |
| 52515 | | | | | | | | | | | | 0.10 USD | per case | New Yorker shall pay VineVine zero and fifty cents ($0.50) for each case of Licensed Products sold, which shall equate into a marketing fund. Such funds shall be used by New Yorker exclusively for promotional activities, to support the sale of the Licensed Products. | Per Unit |
| 24909 | 1. Grant the right to develop and operate dual Concept Restaurants utilizing the Green Burrito Dual Concept System and to license existing and prospective Carl's Jr. and Hardee's franchisees | CKE RESTAURANTS INC | CKE Restaurants, Inc., CarlsJunior Enterprises, Inc., Hardee's Food Systems, Inc., GB Franchise Corporation, Santa Barbara Restaurant Group, Inc. | Hardee's Food Systems, Inc., CarlsJunior Enterprises, Inc., CKE Restaurants, Inc., GB Franchise Corporation, Santa Barbara Restaurant Group, Inc. | 07/15/2000 | 1. With respect to each Existing Dual Concept Restaurant, the initial operating term of the license to use the GB Dual Concept System with operate the restaurant as a Dual Concept Restaurant pursuant to this Agreement shall begin on the date on which the existing franchise Agreement between GB&F and the CKE Companies for that Existing Dual Concept Restaurant would have expired (as identified in Appendix C).

2. The initial term of the rights granted to the CKE Companies pursuant to this Agreement to develop and sublicense the development of Dual Concept Restaurants shall begin as of the Effective Date and terminate on December 31, 2004 ("Development Term") | Franchise, Service | Restaurants, Consumer Services, Foods and Nonalcoholic Beverages | 5812 | United States | EXCLUSIVE | 3% | Gross Sales | Hardee fee for each Green Burrito Grill franchise | Gross Sales |
| 24909 | | | | | | | | | | | | 40% | All Fees excluding royalty fees and advertising contributions | Development Fee for dual concept restaurants | Other |
| 24909 | | | | | | | | | | | | 40% | All royalty fees | | Other |
| 46221 | 1. Grant the right to utilize the Licensed Property (The fictional cartoon characters BUGS BUNNY, TWEETY, TASMANIAN DEVIL, ROAD RUNNER, WILE E. COYOTE, ELMER FUDD, DAFFY DUCK, and all other Looney Tunes characters (the "LOONEY TUNES", including the names of said characters and all statements, copyrights, environmental settings and artwork associated therewith) solely on or in connection with the Licensed Promotion and the Licensed Products (Branded Milk Products) and/or Licensed Premiums throughout the Territory. | CHINA PREMIUM FOOD CORP | WARNER BROS, TIME WARNER ENTERTAINMENT COMPANY L.P., Warner Bros. Consumer Products | Brand Foods, Inc., China Premium Food Corporation | 07/17/2000 | 1. "Initial Term" : January 1, 2000 through December 31, 2002.

2. "Renewal Term" : Licensee shall have the option to renew this Agreement for up to one (1) two-year period, provided that Licensee gives written notice to Licensor no later than sixty (60) days before the end of the Initial Term (the "Decision Out Date") | Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages, Entertainment | 2020 | United States, Puerto Rico, United States Virgin Islands | Multi-Exclusivity | 5% | Net Sales | Per all Franchised Dual Concept Restaurants "Royalty Rate" Licensee shall pay to Licensor the following sums: i) five Percent (5%) of Net Sales of all Licensed Products and/or ii) Five Percent (5%) of Net Purchase Price of all Licensed Premiums distributed by Licensee hereunder. | Net Sales |
| 46221 | | | | | | | | | | | | 10% | Not Purchase Price | "Royalty Rate" Licensee shall pay to Licensor the following sums: i) Five Percent (5%) of Net Sales of all Licensed Products and/or ii) Ten Percent (10%) of Net Purchase Price of all Licensed Premiums distributed by Licensee hereunder. | Net Sales |
| 51370 | 1. Grant the right to utilize the Licensed Elements (only the names and artwork of each character in the specific parts Wizard and the specific parts Wizard character) in connection with the Authorized Articles (Fruitoz Energy Bars in 9 flavors; Cereal of each of the specific parts Wizard within the Licensed Territory for the purpose of the manufacture, distribution, advertising, promotion and sale of the Authorized Articles within the Licensed Territory during the License Period | THINKFAST GROUP INC | WORLD CHAMPIONSHIP WRESTLING, INC. | | 06/12/1999 | 1.4. License Period: June 1, 1999-December 31,2002 | Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages, Entertainment | | U.S. | Multi-Exclusivity | 6% | Net Sales | Licensee shall pay to WCW's Agent a royalty as specified in the following Section equal to six percent (6%) of Net Sales of Authorized Articles. Royalty Rate: 6% - net sales. | Net Sales |

Page 22 of 54

EX1-179

kMINE Export (2018.02.22) Part 2

| Agreement # | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity/Lot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 56582 | 1. Grant the right to use the Mark (the trademark NutraSweet) in connection with the labeling, advertising, sale and distribution of the Products (CARAUSE, INC. desires to sell to NUTRA-VINE and NUTRA-VINE desires to purchase from CARAUSE, INC. bulk low calorie high intensity polysaccharide, referred to under the product name of "Manya[8]" Powder and suitable for use in pharmaceutical and nutraceutical formulations, to be used in product or products manufactured by NUTRA-VINE) manufactured and supplied by NUTRA-VINE in the United States during the term of this Agreement. | CARRINGTON LABORATORIES INC. | CARAUSE, INC. Carrington Laboratories, Inc. | NUTRA-VINE | 06/21/1999 | 1. Unless terminated earlier as provided for herein, this Agreement shall remain in full force and effect for one year commencing on date first written above and shall end at midnight one year from the date of this Agreement. This Agreement shall be renewed for one year terms at the request of the Licensee, provided that such notice is given to Licensor at least sixty (60) days prior to the expiration of the then current term of the agreement and provided that the Licensor has not made substantial and uncommercial violations of this Agreement as provided for in Paragraph 7.2. | Distribution, Marketing Intangible | Biotechnology, Foods and Nonalcoholic Beverages, Consumer Non Durables, Healthcare Pharmaceutical | 2834 | United States | Multi Exclusivity | 15 USD | per unit | Licensee agrees to pay to Licensor a royalty of $0.15 per unit calculated on a net sale basis produced by or for the Licensee. | Per Unit |
| 56582 | | | | | | | | | | | | 1,600 USD | per kg | Pricing Schedule for Manya[8]Y Powder: Quantity Per Order 1 to -25 kg; Price $1,600.00/ kg | Per Unit |
| 56582 | | | | | | | | | | | | 1,500 USD | per kg | Pricing Schedule for Manya[8]Y Powder: Quantity Per Order 26 to -50 kg; Price $1,500.00/ kg | Per Unit |
| 56582 | | | | | | | | | | | | 1,400 USD | per kg | Pricing Schedule for Manya[8]Y Powder: Quantity Per Order 51 to -100 kg; Price $1,400.00/ kg | Per Unit |
| 58976 | 1. Grant the right to use the Trademarks (the trade name "SODEXHO" and a logo associated therewith, including, but not limited to, all trademarks, service marks, commercial symbols, insignia, and designs and among these, the name owned by SODEXHO ALLIANCE, S.A., as the same may be amended, modified, revised or otherwise transferred in the Territory in connection with the SMS Business (i) the business of providing food and facilities management services and operations, including with respect to food (including catering), beverages, housekeeping, laundry, vending, plant and equipment operations and maintenance, grounds care, conservation, stores, and gift or merchandise shops, located in hospitals, nursing homes and other health care facilities, schools, colleges, universities, academies and other educational facilities, corporate headquarters and office buildings, manufacturing or industrial facilities, municipal, state or federal government offices and courthouses, airports and other transportation facilities, correctional facilities and other related facilities (ii) the event not included in the preceding clause (i), such other business activities conducted in the Territory from time to time by the Marriott Management Services Corp., Marriott Corporation of Canada, Ltd., International Catering Corporation, Sodexho Financial du Canada, Inc. and their respective subsidiaries; and (iii) to the extent not included in the preceding clauses (i) or (ii), such other business activities as are approved in writing by SODEXHO ALLIANCE, S.A.) | SODEXHO MARRIOTT SERVICES INC | SODEXHO ALLIANCE, S.A. | SODEXHO MARRIOTT INTERNATIONAL, INC., Sodexho Marriott Services, Inc. | 03/27/1998 | 1. The License to use the Trademarks will extend from the Distribution Date until the tenth anniversary of the Distribution Date, unless earlier terminated as provided in Section 12. | Marketing Intangible | Business Services, Foods and Nonalcoholic Beverages | 5812 | United States, Canada | Multi Exclusivity | 05% | gross sales | During the term hereof, SMS hereby agrees to pay to Sodexho a license fee (the "Royalty Fee") as follows: (a) for the period from the date hereof until March 27, 2001 (the "Initial Period"), the Royalty Fee shall equal 0.05% of the gross sales of SMS and its consolidated subsidiaries, determined in accordance with generally accepted accounting principles in the United States. During the Initial Period, the Royalty Fee shall be payable as follows, (i) On five Distribution Dates, SMS shall pay to Sodexho an amount equal to 0.05% of its gross sales for the prior fiscal quarter. From and after the current fiscal quarter until the end of the ninth quarter (the "Increased Period")... shall pay to Sodexho an amount equal to 0.05% of SMS's projected gross sales for such fiscal quarter. | Gross Sales |
| 58900 | 1. Grant the right to manufacture, sell and distribute in Canada and the United States and its territories and military bases (the Product) (i) a nutra-diet coke beverage under a budget catalog and containing Chiquita banana ingredients (the "Banana Cooler"), and (ii) a No-Treat Sun consisting of a Lake-type water cooling surrounded by a banana flavoring (filling in jam form and made with Chiquita banana ingredients) (the "Banana Strawberry Fruit Bar") (bearing the Trademarks & CHIQUITA Logo) (as shown, sold in proper form and yellow colors), and CHIQUITA Banana Shape Trademark (three dimensional shape of a banana) and/or any brightness, which Product shall meet the quality characteristics, and packaging requirements of CHIQUITA BRANDS, INC. as licensed by CHIQUITA BRANDS, INC.) to DELICIOUS COOKIE COMPANY, INC from time to time. | DELICIOUS FOODS CO | CHIQUITA BRANDS, INC | DELICIOUS COOKIE COMPANY, INC. | 11/26/1996 | 1. The term of this Agreement (the "Term") shall commence on the date of this Agreement and expire on September 15, 1998, unless earlier terminated hereunder. | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durables | | Canada, United States | Multi Exclusivity | 3% | net sales | In further consideration of the License granted hereunder, Licensee shall pay to Licensor a running royalty equal to three percent (3%) of the value of Products hereby (the (3%) data after the calendar year end or twenty-five (25) days before termination for any reason, whichever is applicable. As used herein, "Net Sales" shall mean sales less such discounts and merchandising allowances, but in no case shall Net Sales price for the purpose of royalty calculation, fall below Thirteen Dollars and Fifteen cents ($13.15) per case of Banana Coolers, which is for units (1) of this Agreement shall be defined as Twelve (12) boxes of 10.0 fl. oz. (approximate) weight Banana Coolers Fruit Bar packages ("Banana Strawberry Fruit Bar Case"). | Net Sales |

| Agreement ID | Agreement Synopsis | Filing Company | Licensee | Licensor | Term | Effective Date | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55674 | Licensee shall have the right to use the Licensed Marks (the trademark "PETER PAN" and peanut brands, logos, symbols, designs, trademarks, as such trademarks and logos now exist or as they may be amended or revised hereinafter) solely to identify the use of Conagra Brands, Inc. and Peart Weston, Inc.'s products in connection with the production, marketing, sale and distribution of Licensed Products (individual food trays containing half filling and peanut butter for use in the school lunch program or such institutional feeding program(s) to school districts, prisons or other institutions within the Territory. 2. Grant the right to purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products. | CONTINUOUS INC | Glippy Foods, Inc. | | 1. The term of this Agreement shall commence upon execution of this Agreement and shall continue until December 31, 2008 unless sooner terminated in accordance with the terms of this Agreement (the "Term"). | 05/31/1999 | Distribution, Marketing Intangible | Consumer Non-Durables, Foods and Nondurables: Beverages, Education, Public Safety | 2000 | United States of America | EXCLUSIVE | 332.50 USD | per Unit | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor until the production of such Exhibit A hereto. FRUIT FILLING: Apple Cherry EUROPE, $332.50 | Per Unit | License |
| 55674 | | | | | | | | | | | | 332.50 USD | per Product | Licensee shall purchase its total requirements for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. FRUIT FILLING: Apple Raspberry EUROPE, $332.50 | Per Unit | License |
| 55674 | | | | | | | | | | | | 327.75 USD | per Product | Licensee shall purchase its total requirement for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. FRUIT FILLING: Pineapple Apple FLAVOR: $327.75 | Per Unit | License |
| 55674 | | | | | | | | | | | | 442.50 USD | per Product | Licensee shall purchase its total requirement for peanut butter and fruit filling, whether or not intended for use in the Licensed Products, from Licensor at the prices set out on Exhibit A hereto. PEANUT BUTTER: Creamy Reduced Fat VARIETY, $442.50 | Per Unit | License |
| 60113 | 1. Grant the right to utilize the Trademarks (CHUCKLE: CHEESE and Associated characters, including but not limited to: Charlie Rocket, Pasqually: The Pizza Bear, Munch, Helen Henry and the LB Band and 3) in the Territory in connection with the manufacture, marketing and sale of Licensed Product (ice candies, cracker, freeze pop tape, ice cream cones, popcorn, packaged snacks and snack mix). | DELICIOUS BRANDS INC | Showbiz Pizza Time, Inc. | The Delicious Brands Company, Inc. | 1. The term of this Agreement shall commence on the day and year first above written and shall continue for a period of five years ("Initial Term"). If neither party has terminated the Agreement upon the expiration of the initial term, the parties agree that, commencing upon the conclusion of the initial term, the Agreement shall be automatically renewed for successive five (5) year terms unless earlier terminated as provided for in this Agreement has occurred. | 05/19/1996 | Marketing Intangible | Consumer Non-Durables, Foods and Nondurables: Beverages, Entertainment, Restaurants, Consumer Services | 5140 | United States, Canada | Multi-Exclusivity | 4% | Net Sales | The parties agree that during all terms of this Agreement DRC shall pay to PIZZA TIME a royalty on net sales in the amount of Four (4%) percent on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) percent thereafter. | Net Sales | License |
| 60113 | | | | | | | | | | | | 3% | Net Sales | The parties agree that during all terms of this Agreement DRC shall pay to PIZZA TIME a royalty on net sales in the amount of Four (4%) percent on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) percent thereafter. | Net Sales | License |
| 60114 | 1. Grant the right to utilize the trademarks DRAGLINE BROS. AND BARNUM & BAILEY PRESENTS BROS. BARNUM & BAILEY, THE GREATEST SHOW ON EARTH, CHICAGO KIDD, AMERICA'S LIVING NATIONAL TREASURE, and RINGLING BROS. AND BARNUM & BAILEY CLOWN COLLEGE in the Territory in connection with the manufacture, marketing and sale of Licensed Products (ice candy cracker, freeze pop tape, ice cream cone and pop corn, and the right of first approval for packaged salty snacks and candy snack mix). | DELICIOUS BRANDS INC | Ringling Bros. and Barnum & Bailey Combined Shows | The Delicious Brands Company, Inc. | 1. The term of this Agreement shall commence on the day and year first above written and shall continue for a period of five (5) years ("Initial Term"). Such Initial Term may be extended for additional periods of two (2) years may be granted for a period of additional three (3) year terms, each such extension in writing at least sixty (60) days prior to the expiration of the Initial Term or any extension period. | 05/21/1996 | Marketing Intangible | Consumer Non-Durables, Entertainment, Foods and Nondurables: Beverages | 5140 | United States, Canada | EXCLUSIVE | 4% | Net Sales | The parties agree that during all terms of this Agreement DRC shall pay to RBBB a royalty on Net Sales in the following amounts: Four (4%) on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) thereafter. | Net Sales | License |
| 60114 | | | | | | | | | | | | 3% | Net Sales | The parties agree that during all terms of this Agreement DRC shall pay to RBBB a royalty on Net Sales in the following amounts: Four (4%) on the first three and one-half million ($3,500,000) dollars of Net Sales; and three (3%) thereafter. | Net Sales | License |
| 64506 | 1. Grant the right to use the Licensed Marks (names, logos, symbols, designs) and/or identification of Godiva Chocolatier, Inc.) solely in connection with the manufacture, distribution, marketing and sale of Licensed Products (flavored syrup to be sold under the "Café Godiva" label) in the Territory. | TEAMS & LEMANN INC | Godiva Chocolatier, Inc. | Stearns & Lehman, Inc. | 1. The term of this Agreement shall be for the period commencing on the date of this Agreement and ending December 31, 1998. | 06/30/1997 | Marketing Intangible | Consumer Non-Durables, Foods and Nondurables: Beverages | 2086 | United States of America, District of Columbia, Canada | EXCLUSIVE | 10% | Gross Sales | Royalties. Licensee shall pay to Licensor during the term of this Agreement and during any period of disposal allowed hereunder, a royalty of Ten (10%) percent of Gross Sales. | Gross Sales | License |
| 55476 | 1. Grant the right to use the Name (the service mark, tradename and sign "Mark's Grille", including proprietary trade dress and the tradename System, methods, recipes, service, procedures, standards, techniques, trade secrets and other proprietary information) in the operation of a "Mark's Grille" restaurant located in the space in which it is presently located at Beach Place, Fort Lauderdale, Florida. | UNIQUE RESTAURANT BRANDS, INC. | MARK SMILOWITZ, LTD., Mark's Beach Grill, Inc. | UNIQUE RESTAURANT CONCEPTS, INC. | 1. The term of this Agreement ("Term") shall commence on the date the service mark, trade name and sign "Mark's Grille", including proprietary trade dress and the System (certain products, recipes, services, procedures, standards, techniques, trade secrets, and other proprietary information) in the operation of a restaurant located in the space in which it is presently located at Beach Place, Fort Lauderdale, Florida. | 08/01/1999 | Reactive | Consumer Services, Consumer Non-Durables, Foods and Nondurables: Beverages, Restaurants | 5812 | Fort Lauderdale, Florida, United States, Florida | Multi-Exclusivity | 3.75% | Gross Revenue | The License Fee for the Term shall be an amount equal to 3.75% of Gross Revenue for the first month of the Term and 3.80% of Gross Revenue for the balance of the Term. | Gross Sales | License |

kMINE

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | CommodityBase | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55476 | 1. Grant the right to purchase Java Centrale, Inc.'s entire right, title, and interest in the contracts, properties and assets, and to assume all the obligations and duties of the franchisee with respect to such contracts, properties and assets relating to the Cafes (Java Centrale, Inc. is in the business of franchising gourmet coffee and espresso based retail outlets and operating one such outlet, at such outlets being known as Java Centrale Coffee Cafes). | JAVA CENTRALE INC | Java Centrale, Inc. | Massimo da Milano, Inc. | 12/31/1997 | 1. The Closing shall take place at the offices of the Seller, located at 1610 Arden Way, Suite 145, Sacramento, California 95815, at 2p.m. on January 9, 1998, (the "Closing Date"), or at such other time, date, and place as the parties hereto shall mutually agree upon in writing. | Asset Purchase, Franchise | Consumer Non-Durables, Foods and Nondurables Beverages, Restaurants, Consumer Services, Retail | 5812 | Reno, Nevada, United States | N/A | 1.00% | Gross Revenue | The License Fee for the Term shall bear an amount equal to 1% of Gross Revenue for the first six (6) months of the Term and 1.00% of Gross Revenue for the balance of the Term. | | Gross Sales | License |
| 57153 | | | | | | | | | | | | 50% | purchase prices | The Purchase Price shall be $1,500,000 payable as follows: Product Sales. Buyer will pay to Seller (owned or franchised operation) bakery products at wholesale pricing, less the reasonable margin of comparable wholesale pricing and terms. The component of the purchase price shall be broken into two segments: (a) Purchases by Paradise Bakery and Café Company owned stores and (b) Purchases by Franchised Paradise Bakery and Cafes. a) Purchases by Seller's company owned stores will receive a 50% credit against invoices, for example, if purchases at the mutually agreed upon pricing of $100,000 were paid to the Seller, the Seller will receive a $50,000 credit against the purchases for the month b) The Seller will receive payments equal to 50% of purchases prices paid by others for franchised operations to the Buyer, for example, if purchases at the mutually agreed upon pricing totaled $100,000 for a month, the Seller would receive a $50,000 payment from the Buyer. | | Net Sales | |
| 57153 | | | | | | | | | | | | 50% | cash receipts | The Purchase Price shall be $1,500,000 payable as follows: Product Sales. Buyer will pay to Seller receives $500,000 $1,000,000. In the event the Seller receives $500,000 from cash receipts, Buyer does not require $500,000 in product sales during the same time period, the Buyer shall continue to pay to the Seller 50% of the cash receipts set forth in paragraph 1.2.1 until the Seller receives a total of $1,500,000. | | Net Sales | |
| 57153 | | | | | | | | | | | | 25% | any royalties | The Purchase Price shall be $1,500,000 payable as follows: $1,000,000 related to Accounts Receivable and Product Sales. (The Receivables) Receivables shall be receivable as assigned as the amounts are collected or in connection with any franchise agreements assigned, including Royalty and Service Fee payments, other payments under the franchise agreements and payment from purchases made from Seller or Seller's approved suppliers, Buyer will pay fifty percent (50%) of all Receivables until said Receivables received by the Buyer after December 31, 1997. For example if such payments totaled $40,000 per month then $20,000 a month would go to the Seller resulting in approximately a two year pay out. c) The payments to be owed by the Buyer to the Seller shall consist of the net receipt from the Receivables collected during that month by the Buyer from each franchisee and others, that the Buyer receives as received during the month following the month for each month the month shall be signed by the Buyer after the closing, the Buyer will pay the Seller 25% of any royalties paid to the Buyer by such future franchisees. In the event the Seller does not receive $1,000,000 within three (3) years from the date of closing, the monthly payments under this subparagraph (b) paid by the Buyer to the Seller shall be increased | | Net Sales | |

EX1-182

kMINE

kMINE Export (2018.02.22) Part 2

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57353 | | | | | | | | | | | | 50% | any royalties | The Purchase Price shall be $1,500,000 payable as follows: $1,000,000 related to Account Receivable and Product Sales. (The Receivables) Receivables shall consist of receivables assigned, as well as any items paid under or in connection with any franchise agreement to be assigned, including Royalty and Service Fee payments, other payments under franchise agreements and payments for items purchased from Seller or Seller's approved suppliers. buyer will pay fifty percent (50%) of all Receivables and future Receivables received by the Buyer after December 31, 1997. For example, if such payments equal $40,000 per month then $20,000 a month would go to the Seller resulting in approximately a two-year pay out. ii.The payments to be owed by the Buyer to the Seller shall consist of the income from the Receivables actually received each month on the cash receipts or received by the Buyer. iii. With respect to any future franchises originated by the Buyer after the closing, the Buyer will pay the Seller 25% of any royalties paid to the Buyer by such future franchisees in the event the Seller does not receive $1,000,000 within three (3) years from the date of closing, the royalty payments under this subparagraph (iii) paid by the Buyer to the Seller shall be increased | | Net Sales |
| 57353 | | | | | | | | | | | | 50% | Receivables | The Purchase Price shall be $1,500,000 payable as follows: $1,000,000 related to Account Receivable and Product Sales. (The Receivables) Receivables shall consist of receivables assigned, as well as any items paid under or in connection with any franchise agreement to be assigned, including Royalty and Service Fee payments, other payments under franchise agreements and payments for items purchased from Seller or Seller's approved suppliers. buyer will pay fifty percent (50%) of all Receivables and future Receivables received by the Buyer after December 31, 1997. For example, if such payments equal $40,000 per month then $20,000 a month would go to the Seller resulting in approximately a two-year pay out. ii.The payments to be owed by the Buyer to the Seller shall be made on or before the 10th day of the month following the month in which such payments are received by the Buyer. iii. With respect to any future franchises originated by the Buyer after the closing, the Buyer will pay the Seller 25% of any royalties paid to the Buyer by such future franchisees in the event the Seller does not receive $1,000,000 within three (3) years from the date of closing, the royalty payments under this subparagraph (iii) paid by the Buyer to the Seller shall be increased | | Net Sales |
| 57353 | | | | | | | | | | | | 50% | cash receipts | The Purchase Price shall be $1,500,000 payable as follows: Continuing Payments until Seller receives $1,000,000. in the event the Seller receives $500,000 from Receivables, but does not receive $500,000 in product sales during the same time period, the Buyer shall continue to make payments to the Seller 50% of the cash receipts set forth in paragraph 1.2.1 until the Seller receives a total of $1,000,000. | | Net Sales |

EX1-183

| Agreement # | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57353 | 1. Grant the right to use the Mark [the trademark "Collagen" used solely in accompanying logos] in connection with the advertising, promotion, distribution, and sale of Product(s) [consumable ice cold from ice cream machines that make and package and merchandise in that are located in retail outlets where ice is sold to consumers] in the Territory during the Term. | | | | | | Marketing/Intangible | | | | | 50% | Receivables | The Purchase Price shall be $1,500,000 payable as follows: $1,000,000 related to Account's Receivable and Product Sales. [The Receivables] Receivables shall consist of receivables assigned, as well as any items paid under or in connection with any franchise agreement to be assigned, including Royalty and Service Fee payments, other payments under franchise agreements and payments for items received from Seller or Seller's approved suppliers. Buyer will pay fifty percent (50%) of all Receivables collected Receivables received by the Buyer after December 31, 1997. For example, if the Buyer receives equal to $40,000 in one month then $20,000 a month would go to the Seller requiring in the event the amount is more per month... Payments owed by the Buyer to the Seller shall be made on or before the 10th day of the month following the month the cash receipts are received by the Buyer. (c) With respect to any future sale of ice by the Buyer after the closing, the Buyer will pay the Seller 25% of any (amount paid to the Buyer for such future ice purchases in the event the Seller does not receive $1,000,000 within three (3) years after the date of closing, the royalty payments under this subparagraph (b) paid by the Buyer to the Seller shall be increased. | Other | Licensee |
| 65722 | 1. Grant the right to use the Mark [the trademark "Collagen", and "Ice by Colligan" and solely in the accompanying logos] in connection with the advertising, promotion, distribution, and sale of Product(s) [consumable ice cold from ice cream machines that make and package and merchandise in that are located in retail outlets where ice is sold to consumers] in the Territory during the Term. | PACKAGED ICE INC | Colligan International Company | Packaged Ice, Inc. | 10/31/1997 | 1. The "Term" of this Agreement shall commence on the Effective date hereof [the date hereof through December 31, 1997] constituting the "Initial Term") and, subject to earlier termination as provided below, shall automatically renew for successive one-year terms beginning on January 1 and ending on December 31 of each subsequent calendar year (the "Renewal Term"). | Marketing/Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages, Retail | 2092 | Illinois, United States of America | EXCLUSIVE | 2.5% | Revenues | The Company further agrees to pay to the Licensor earned royalty ("Earned Royalties") in an amount in cash equal to 2.5% of all Revenues. | Net Sales | Licensor |
| 55474 | 1. Grant the right to use the Name ["UR's"] and the System [certain products, recipes, services, procedures, standards, techniques, trade dress and other proprietary information] in the operation of a restaurant concept known as "Max's Grille" located in the space in which it is presently located at [at Olas Riverfront, Fort Lauderdale, Florida. | UNIQUE ENTERPRISES INC | UNIQUE BRICKELL, LTD | | 08/5/1998 | 1. The term of this Agreement ("the Term") shall commence as on the date hereof and continue in perpetuity unless terminated as hereinafter provided. | Franchise | Consumer Services, Consumer Non-SIC Durable, Foods and Nonalcoholic Beverages, Restaurants | 5812 | Riverfront, Fort Lauderdale, Florida, United States | Multi-exclusivity | 1.75% | Gross Revenue | The License Fee for the period commencing on the date hereof and ending on the first anniversary of the date hereof shall be an amount equal to 1.75% of Gross Revenue during that period. After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12-month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of Gross Revenue for the first $3,500,000 of Gross Revenue, (ii) 1.25% of Gross Revenue in excess of $3,500,000 up to $3,800,000 and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | Licensee |
| 55474 | | | | | | | | | | | | 1.50% | Gross Revenue | The License Fee for the period commencing on the date hereof and ending on the first anniversary of the date hereof shall be an amount equal to 1.75% of Gross Revenue during that period. After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12-month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of Gross Revenue for the first $3,500,000 of Gross Revenue, (ii) 1.25% of Gross Revenue in excess of $3,500,000 up to $3,800,000 and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | Licensee |
| 55474 | | | | | | | | | | | | 1.25% | Gross Revenue | The License Fee for the period commencing on the date hereof and ending on the first anniversary of the date hereof shall be an amount equal to 1.75% of Gross Revenue during that period. After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12-month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of Gross Revenue for the first $3,500,000 of Gross Revenue, (ii) 1.25% of Gross Revenue in excess of $3,500,000 up to $3,800,000 and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | Licensee |

kMINE Export [2018.02.22] Part 2

EX1-184

kMINE Export (2018-02-22) Part 2

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55474 | 1. Grant the right to use the Nano's "Nano Cuisine" and the System (just as products, recipes, services, procedures, standards, techniques, trade dress and other proprietary information) in the operation of a restaurant concept known as "Nano Grille" located in the space in which it is presently located at The Waterway Shoppes of Weston in Weston, Florida | UNIQUE ENTERPRISES, INC. | UNIQUE RESTAURANT CONCEPTS, INC. |  | 08/3/1999 | 1. The term of this Agreement ("Term") shall commence on the date hereof and continue in perpetuity unless terminated as hereinafter provided. | Franchise |  |  |  |  | 1% | Gross Revenue | The License Fee for the period commencing on the date hereof and ending on the first anniversary of the date hereof shall be an amount equal to 1.25% of Gross Revenue during that period. After the first anniversary date hereof, the License Fee for the immediately succeeding 12 month period and for each subsequent 12 month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.25% of Gross Revenue (ii) 1.25% of Gross Revenue in excess of $3,600,000, and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | License |
| 55475 |  |  |  |  |  | 1. The term of this Agreement ("Term") shall commence on the date hereof and continue in perpetuity unless terminated as hereinafter provided. | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | 5812 | Weston, Florida, United States | Multi-Exclusivity | 1.75% | Gross Revenue | The License Fee for the period commencing on the date hereof and ending on the first anniversary of the date hereof shall be an amount equal to 1.75% of Gross Revenue during that period. | Gross Sales | License |
| 55475 |  |  |  |  |  |  |  |  |  |  |  | 1.50% |  | After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12 month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of the first $3,100,000 of Gross Revenue (ii) 1.25% of Gross Revenue in excess of $3,100,000, up to $3,800,000, and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | License |
| 55475 |  |  |  |  |  |  |  |  |  |  |  | 1.25% | Gross Revenue | After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12 month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of the first $3,100,000 of Gross Revenue (ii) 1.25% of Gross Revenue in excess of $3,100,000, up to $3,800,000, and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | License |
| 55475 |  |  |  |  |  |  |  |  |  |  |  | 1% | Gross Revenue | After the first anniversary date hereof, the License Fee for the immediately succeeding 12 months and for each subsequent 12 month period thereafter (or earlier termination of this License) shall be an amount equal to (i) 1.50% of the first $3,100,000 of Gross Revenue (ii) 1.25% of Gross Revenue in excess of $3,100,000, up to $3,800,000, and (iii) 1% of Gross Revenue in excess of $3,800,000. | Gross Sales | License |
| 9230 | 1. Grant the right to utilize the Patent Rights relating to a method for the identification, characterization and regulation of the amounts of bioactive components in herbal products to use the Herbal Products (a dietary supplement derived from botanical/herbal extracts), including the Licensed Products, in the OTC Market within the Territory other than those requiring a physician's prescription in the Territory. 2. Grant the right to utilize the Patent Rights relating to a method for the identification, characterization and regulation of the amounts of bioactive components in herbal products to use the Herbal Products (a dietary supplement derived from botanical/herbal extracts), including the Licensed Products, in the OTC Market/sales to the general public other than those requiring a physician's prescription in the Territory. 3. Grant the right to utilize the Trademark "PHARMANPRINT" for use in conjunction with the marketing and/or sale of the Licensed Product/s in the OTC Market within the Territory. 4. Grant the right to utilize rights to Additional Products (herbal products) other than the initial Herbal products). | PHARMANPRINT INC. | PharmaPrint B.V., PharmaPrint Inc. | American Home Products Corporation | 10/6/1997 | 1. This Agreement shall continue in full force and effect, unless earlier terminated by either party pursuant to the provisions set forth in this Article XII, or until expiration of the last to expire patent within the Patent Rights in the Territory following expiration of the Agreement, the licenses granted hereunder to AHP with respect to the Patent Rights shall be fully paid-up and irrevocable. | Manufacturing/Process Intangible, Marketing Intangible | Healthcare: Pharmaceutical, Biotechnology, Foods and Nonalcoholic Beverages, Consumer Non-Durables |  | United States, Commonwealth of Puerto Rico | Multi-Exclusivity | 4% | Net Sales | During the term of this Agreement, as royalty for the license granted to PharmaPrint a running royalty as set forth below on the Net Actual Net Sales of Licensed Products sold by AHP and AHP Affiliates in the Territory ("Earned Royalties"), for the period commencing on the National Launch Date and ending one year thereafter; for Licensed Products covered by a Patent which contains a process or production claim and/or at least is blocked is one of those verified in Schedule 4b. | Net Sales | License |

EX1-185

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | Licensee | Term | EffectiveDate | SICCode | Industry | AgreementType | Territory | Exclusivity | Value | AgreementBase | Modifier | Commercialize |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5230 | | | | | | | | | | | | | 6% | Net Sales | During the term of this Agreement, as royalty for the license granted under Paragraph 3.1, shall PharmaPrint pay to PharmaPrint a running royalty as set forth below on the total Net Sales of Licensed Products sold by itself and AHP Affiliates in the Territory ("Earned Royalties"). Subsequent to one year after the Intellectual Lunch Stone through expiration or termination of this Agreement, for Licensed Product it covered buy a product which contains a process or product claim at least on broad one of those contained in Schedule D, Ri. | Net Sales |
| 52798 | 1. Grant the right to establish 30 Papa John's restaurant(s) (PAPA JOHN'S INTERNATIONAL, INC.) as expanded store, money and effort to develop a concept system for operating retail restaurants devoted primarily to carry-out and delivery of pizza and other food items. The Chain is characterized by a unique system which includes special sauce and various items, distinctive design, décor, color scheme and furnishings, software and programs, standards, specification and procedures for operations, procedures for quality control, training assistance, advertising and promotional programs. It identifies its goods and services with certain service marks, trade names and trademarks, including but not limited to, "Papa John's", "Papa John's Pizza," "Pizza Papa John's Delivering the Perfect Pizza", and "Better Ingredients, Better Pizza," as well as certain other trademarks, service marks, logos, logos and emblems that have been and may be designated for use in connection with the System from time to time) in North Portland, East Portland, West Portland and Salem, Oregon. | JV AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | JV America, Inc. | | 1. Unless Licensee terminated as provided in this Agreement, this Agreement shall expire on the earlier to occur of: (a) the date on which all the Restaurants have been developed, or (b) 1,120 midnight on the last date set forth on the Development Schedule in the "Term"). Upon the termination or expiration of this Agreement, all unexercised development rights shall expire.<br><br>2. DEVELOPMENT SCHEDULE ————— Dates on Which Each Cumulative Number of Restaurants Restaurant (Shall be Open to be open and operating" ————— December 15, 1998 1 December 15, 1998 2 March 15, 1999 3 June 15, 1999 4 September 15, 1999 5 December 15, 1999 6 February 1, 2000 7 March 15, 2000 8 June 15, 2000 9<br><br>August 1, 2000 10 September 15, 2000 11<br><br>Cumulative Number of States in Which Each Restaurant to be Open Restaurant (Shall be Open and operating" November 1, 2000 12 December 15, 2000 13 February | 11/2/1998 | 5812 | Consumer Non Durables, Consumer Services, Foods and Restaurants, Retail | Franchise | Salem, Oregon, United States, North Portland, East Portland, West Portland | EXCLUSIVE | 5,000 USD | per Restaurant | You have paid to us a development fee of One Hundred Eighty Thousand Dollars ($180,000) ("Development Fee") (i.e. an aggregate of Five Thousand Dollars ($5,000) we acknowledge. The Development Fee was fully earned by us when paid, is non-refundable and is not contingent upon our rendering any further performance. The Development Fee is to consideration of, among other things, the development rights granted to you, the reservation of the Development Area, the development opportunities list or deferred as a result of this right granted to you under this Agreement and the administrative and other expenses that we have incurred. However, $5,000 of the Development Fee will be credited against each Initial Franchise Fee at the time it is paid, as provided in Section 3 (f). | Per-Unit |
| 52798 | | | | | | | | | | | | | 20,000 USD | per Restaurant | The Initial Franchise Fee to be paid by you for each Restaurant shall be $20,000, provided that $5,000 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each franchise Agreement is executed. | Per-Unit |
| 52798 | | | | | | | | | | | | | 15,000 USD | per Restaurant | The Initial Franchise Fee to be paid by you for each Restaurant shall be $20,000, provided that $5,000 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each franchise Agreement is executed. | Per-Unit |

| Agreement Number | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57422 | 1. Grant the right to use the Licensed Property (Licensed Names and Marks and the Licensed Images, including the likeness of Debbi Fields) in connection with the production, marketing, sale, and distribution of Licensed Product (i) Fresh Baked cookies, brownies, muffins and doughnuts and any other fresh baked bakery products, and (ii) any other items which MRS. FIELD'S ORIGINAL COOKIES, INC. and THE MRS. FIELDS' BRAND, INC. agree to designate as Licensed Products by Mrs. Fields Stores or by a mail order system operated by MRS. FIELDS' ORIGINAL COOKIES, INC. or its subsidiaries (iii) in the United States through Mrs. Fields Stores (on an exclusive and non-exclusive basis), (iv) outside the United States through Mrs. Fields Stores on an exclusive basis until the third anniversary of the date hereof, and thereafter on a non-exclusive basis, and (v) in respect of the mail order system, on an exclusive basis through the second anniversary of the date hereof.  2. License the right to use the Licensed Names and Marks (names, trade names, trademarks, service marks and logos) as a part of its trade name for so long as it sells or franchises Licensed Products.  3. Grant the right to use and sublicense the Licensed Trade Secrets (all recipes, techniques, processes, methods of production and commercialization and other know-how and/or improvements thereto acquired or reduced to practice after the date hereof by THE MRS. FIELDS' BRAND, INC. or MRS. FIELDS ORIGINAL COOKIES, INC. which are necessary or useful for the formulation, composition, production and sale of Licensed Product) of the other Party in connection with the production and sale of Licensed Product using the Licensed Property, in each case as and to the | FIELDS MRS ORIGINAL COOKIES INC | THE MRS. FIELDS' ORIGINAL COOKIES, INC.; THE MRS. FIELDS' BRAND, INC.; MRS. FIELDS' ORIGINAL COOKIES, INC. | MRS. FIELDS' ORIGINAL COOKIES, INC. | 09/30/1996 | 1; perpetual | Manufacturing; Process Intangible; Marketing Intangible | Consumer Non-Durables; Foods and Nondurables; Beverages; Restaurants, Retail, Consumer Services | | United States, worldwide | Multi Exclusivity | 4.5% | Gross Revenue | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ending March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter and (b) 35% of any Incentive Cash Flow in excess of the Base Franchise Cash Flow for such quarter. "Base Gross Revenue" means $20,000,000 for each of the first three calendar quarters in 1997 and $30,000,000 for each of the first three calendar quarters in 1998 and for the last calendar quarter of each year thereafter.  | Gross Sales; License... |
| 57422 | | | | | | | | | | | | 35% | Franchise Cash Flow | Licensee shall pay Licensor a royalty for each calendar quarter beginning with the quarter ending March 31, 1997 equal to the sum of (a) 4.5% of any Gross Revenue in excess of the Base Gross Revenue for such quarter and (b) 35% of any Incentive Cash Flow in excess of the Base Franchise Cash Flow for such quarter. "Franchise Cash Flow" means royalties and license fees received during a given calendar quarter by Licensee and its subsidiaries, whether domestic or international, from franchisees and sub-franchisees of Licensee and its subsidiaries during such quarter. "Base Franchise Cash Flow" means $1,500,000 for each of the first three calendar quarters in 1997 and $1,250,000 for each of the first three calendar quarters in 1998 and $2,000,000 for the last calendar quarter of each year thereafter and $2,000,000 for the last calendar quarter in 1999 and the last calendar quarter of each year thereafter. | Net Sales |
| 63179 | 1. Grant the right to manufacture, market and deliver all Licensed Products (all recipes and formulae for products made using ice cream, yogurt, sherbet, liquid nitro, mousse and frozen icers using the Licensed Trademarks (a. HOWARD JOHNSON'S and b. SIMPLE SIMON PIE MAN ESIGN) to identify Licensed Products in the Licensed Territory. | TERRACE HOLDINGS INC; FRANCHISE HOLDINGS INC.; FRANCHISE ASSOCIATES; DOWNEAST FROZEN DESSERTS, L.L.C. | | 11/21/1996 | 1. This Agreement and the license herein granted shall continue for a Term of Four (4) years from the date when all conditions specified in Paragraph 23 have been satisfied ("Term") | Manufacturing; Process Intangible; Marketing Intangible | Consumer Non-Durables; Foods and Nondurables; Beverages; Retail | 5812 | United States | Multi Exclusivity | 4% | Sales | Licensee agrees to pay to the a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products (a) at all such Ice cream/dairy products. Three (3) gallon containers) and Two Percent (2%) of all non-bulk ice cream products. Licensee further agrees to pay to HJ a Royalty of Two Percent (2%) of all "Sales" (as hereinafter defined) of pie products other than Licensed Products) Plain - Licensed Products") made by Licensee, its affiliates or Sub-licensees (b), d) (1) d) and its affiliates from its franchisees of the "Sales", as used herein shall mean the gross invoice price less, "bill-backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales |

KMINE Export (2016.02.22) Part 2

EX1-187

| Agreement ID | Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities | Lead Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63179 | | | | | | | | | | | | 2% | Sales | Licensee agrees to pay to IHI a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products of all such ice cream products (e.g., Three (3) gallon containers) and Two Percent (2%) of all non-bulk ice cream products. Licensee further agrees to pay to IHI a Royalty of Two Percent (2%) of all "Sales" (as hereinafter defined) of products other than Licensed Products ("Non-Licensed Products") made by Licensee, its Affiliates or Subcontractors by (i) IHI and its Affiliates and (ii) its franchisees of this. "Sales" as used herein shall mean the gross invoice prices less "bill backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales | Licensee |
| 63179 | | | | | | | | | | | | 2% | Sales | Licensee agrees to pay to IHI a royalty ("Royalty") of Four Percent (4%) of all "Sales" (as herein defined) of all Licensed Products of all such ice cream products (e.g., Three (3) gallon containers) and Two Percent (2%) of all non-bulk ice cream products. Licensee further agrees to pay to IHI a Royalty of Two Percent (2%) of all "Sales" (as hereinafter defined) of products other than Licensed Products ("Non-Licensed Products") made by Licensee, its Affiliates or Subcontractors by (i) IHI and its Affiliates and (ii) its franchisees of this. "Sales" as used herein shall mean the gross invoice prices less "bill backs" (as known in the ice cream industry) and returns. A sale shall be deemed to be made when the amount of the Sale is collected by Licensee. | Net Sales | Licensee |
| 25031 | 1. Grant the right to establish and operate 15 On The Border Restaurants with rights for 45 additional units pursuant to the renewal option, for the New England Territory. 2. Grant the right to use the On The Border System solely in connection therewith. 3. Grant the right to establish and operate 6 On The Border Restaurants, and to use the On The Border System solely in connection therewith, for the Upstate New York Territory. | BERTUCCI INC | V BRINKER INTERNATIONAL, INC. | N. E. RESTAURANT COMPANY, INC. | 08/23/1997 | 1. TERM. Unless sooner terminated or renewed in accordance with the provisions of this Agreement, the term of this Agreement and all rights granted by Brinker hereunder shall expire thirty (30) days after the date on which Developer successfully and in a timely manner has completed the Development Schedule set forth in SECTION 1.2 hereof. 2. The term of this Agreement shall commence on the Effective Date and shall expire twenty (20) years (the "Term") after the date the Franchised Restaurant opens for business ("Royalty Commencement Date") unless sooner terminated in accordance with the provisions of this Agreement. | Franchise, Service | Restaurants, Consumer Services, Consumer Non-Durables, Foods and Nondurable Beverages | | New England, United States, Upstate New York, Connecticut, New Hampshire, Maine, Massachusetts, Rhode Island, Vermont, County of Westchester in the State of New York, New York | EXCLUSIVE | 4% | Gross Sales | For the period that the On The Border System and the On The Border Marks. | Gross Sales | Licensee |
| 25031 | | | | | | | | | | | | 5% | Gross Sales | expenditure to be used for the purpose of maintaining, administering, directing and preparing advertising, sales promotions and public relations for the benefit of the On The Border System, including creative, production, media, and clearance costs of advertising and sales promotion materials and those market research expenditures directly related to the development and evaluation of the effectiveness of advertising and sales promotion. | Gross Sales | Licensee |

| Agreement ID | Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53943 | 1. Grant the right to utilize the Licensed Technology (the Licensed Patents and the Trade Secrets) to make, use, sell, offer to sell and otherwise commercialize the Products (certain hinged sandwich container products for McDonald's Corporation) solely within the Territory.<br><br>2. Grant the right to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate any of the Licensed Technology (the Licensed Patents and the Trade Secrets), with EARTHSHELL CONTAINER CORPORATION having the right to sublicense Sweetheart Improvements to third parties.<br><br>3. Grant the right to utilize joint Improvements in connection with the manufacture, use, sale and other commercialization of products inside or outside the Territory and for Sweetheart's Traditional Field of Use (foodservice disposable products and packaging products for frozen desert, dairy products and beverages).<br><br>4. Grant the right to utilize, in connection with the marketing, distribution and sale of the Products (certain hinged sandwich container products for McDonald's Corporation) in the Territory, the trademarks and service marks. | EARTHSHELL CONTAINER CORP | EARTHSHELL CONTAINER CORPORATION, SWEETHEART CUP COMPANY INC. | SWEETHEART CUP COMPANY INC., EARTHSHELL CONTAINER CORPORATION | 10/16/1997 | 1. The term of this Agreement shall commence upon the date hereof. Unless sooner terminated or hereinafter provided, this Agreement shall continue in full force and effect until the termination of the Operating Agreement, provided that if the Operating Agreement terminates pursuant to the provisions of Section 11.4(c) of the Operating Agreement, the term of this Agreement shall continue in full force and effect until the expiration of the last to issue patent included in the Licensed Patents. | Manufacturing/Process Intangible, Marketing Intangible | Consumer, Non-Durables, Restaurants, Foods and Nonalcoholic Beverages, Computers: Hardware and Software | 3550 | United States of America, Canada | Multi Exclusivity | 20% | Net Sales | | Net Sales License |
| 53943 | | | | | | | | | | | | 10% | Incremental economic value | Subject to Sweetheart's right to do so, Sweetheart hereby grants to ECC an irrevocable non-exclusive license to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate any of the Licensed Technology, with ECC having the right to sublicense Sweetheart Improvements to third parties. Each ECC sublicensee that makes use of such Sweetheart Improvements shall be required to remit to ECC all revenues earned from the sale of all products that utilize or incorporate such Sweetheart Improvements and which are reasonably calculated in relation to the incremental economic value of such Sweetheart Improvements to ECC's sublicensee; provided, however, that (i) the annual royalty rate shall not exceed ten percent (10%) of such incremental economic value; and (ii) the annual royalty rate shall equal one percent (1%) of such net revenues if the parties are unable to agree upon the amount of such royalty rate based on such incremental economic value. | Net Sales License |

kMINE Export (2018-02-22) Part 2

EX1-189

kMINE

kMINE Export (2018.02.22) Part 2

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57643 | | | | | | | | | | | | 1% | net revenues | Subject to Sweetheart's right to do so, Sweetheart hereby grants to ECC an irrevocable non-exclusive license to utilize all Sweetheart Improvements inside and outside the Territory, solely in connection with the manufacture, use, sale and other commercialization of products that utilize or incorporate any of the Licensed Technology, with ECC having the right to sublicense Sweetheart Improvements to third parties. Each ECC sublicensee of Sweetheart Improvements that is not an Affiliate of ECC shall be required, as a condition to such sublicense, to pay royalty payments to Sweetheart based on net revenues earned from the sale of products that utilize or incorporate such Sweetheart Improvements and which are reasonably calculated in relation to the incremental economic value of such Sweetheart Improvements to ECC's sublicensee, provided, however, that (i) the annual royalty rate shall not exceed one percent (1%) of such incremental economic value; and (ii) the annual royalty shall equal one percent (1%) of such net revenues if the parties are unable to agree upon the amount of such royalty based on such incremental economic value | Net Sales | License |
| 57643 | | | | | | | | | | | | 10% | incremental economic value | improvements developed jointly by ECC and Sweetheart ("Joint Improvement") shall be owned by ECC, provided that such Joint Improvement is also formulated in the Licensed Technology licensed hereunder to Sweetheart without any additional royalty or other obligation being imposed on Sweetheart. In addition, ECC hereby grants to Sweetheart an irrevocable non-exclusive license to utilize Joint Improvements in connection with the manufacture, use, sale and other commercialization of products inside or outside the Territory within Sweetheart's Traditional Field of Use. ECC shall have the right to license Joint Improvements to third parties in which case the ECC licensee shall pay to ECC and Sweetheart a royalty based on net revenues earned from the sale of products that utilize or incorporate such Joint Improvements and which is reasonably calculated in relation to each party's contribution to the incremental economic value of Joint Improvements, provided, however, that (i) the annual royalty rate payable by such ECC licensee shall not exceed ten percent (10%) of such incremental economic value and (ii) the annual royalty rate shall equal ten percent (10%) of such net revenues if the parties are unable to agree upon the amount of such royalty as based on such incremental economic value. | Net Sales | License |

EX1-190

| Agreement ID | Synopsis | FilingCompany | Licensor | Licensee | License | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commentable | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17443 | | | | | | | | | | | | | 1% | net revenues | improvements developed jointly by ECC and Sweetheart ("Joint Improvements") shall be owned by ECC, provided that all Joint Improvements shall be included in the Licensed Technology licensed hereunder to Sweetheart without additional royalty or other obligation during the term of this Agreement. In addition, ECC hereby grants to Sweetheart an irrevocable non-exclusive license to utilize Joint Improvements in connection with the manufacture, use, sale and other commercial action of products inside or outside the Territory within Sweetheart's Traditional Field of Use. ECC shall have the right to license Joint Improvements to third parties in which case the ECC licensee shall pay to ECC and Sweetheart a royalty based on net revenues earned from the sale of products that utilize or incorporate Joint Improvements and which is reasonably calculated in relation to each party's contribution to the incremental economic value of such improvements, provided, however, that (i) the annual royalty rate to be paid by each ECC licensee shall not exceed five percent (5%) of such incremental economic value and (ii) the annual royalty rate shall equal one percent (1%) of such net revenues if the parties are unable to agree upon the amount of such royalty rate based on such incremental economic value. | Net Sales | Licensor |
| 60084 | 1. Grant the right to develop Franchised Restaurants (Champps Entertainment, Inc. has developed and owns a unique and distinctive system relating to the development, establishment and operation of parts theme restaurants that provide the public with high-quality food and beverages in the Development Territory during the Development Term. | UNIQUE CASUAL RESTAURANTS INC | Champps Entertainment, Dean P. Vlahos Inc. | | | 02/21/1998 | 1. The Development Term begins on the date this Agreement is signed by Champps and expires on the number of (25) the date Developer opens the last Franchised Restaurant it is permitted to develop pursuant to this Agreement or (B) the date that the last Franchised Restaurant is required to be opened pursuant to the attached Appendix A. There is no renewal term for this Agreement. 2. Subject to the restrictions set forth in Appendix A, Developer shall have the right to develop and operate five (5) Champps Restaurants anywhere in the United States; provided that each such Champps Restaurant be developed within eight (8) years of the date hereof. If on the eighth anniversary of the date hereof Developer has Developed fewer than five (5) Champps Restaurants (excluding the three (3) Champps and any other restaurants) pursuant to this paragraph 2, Developer shall have no further rights to develop or operate any additional Champps Restaurants under this Agreement. | Franchise | Entertainment, Restaurants, Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages | 5810 | United States of America | Multi-faculty | 1.25% | * | Developer may not commence construction of a Franchised Restaurant at an Authorized Site until Developer and Champps have fully executed the then-current form of Champps Restaurant Franchise Agreement for the authorized Site, modified, however, to provide that: (1) Developer shall pay no franchise fee with respect to such Franchised Restaurant, (2) Developer shall pay a royalty with respect to such Champps Restaurant equal to 1.25%, subject to increase to 3.75% as provided in Set forth of that certain Separation Agreement by and between Unique Casual Restaurants, Inc., Champps and the Developer dated as of the date hereof in the event of a change of control of the applicable Franchised Restaurant., (3) Developer shall promptly contribute Champps for all costs and expenses incurred by Champps in connection with providing pre-opening support to Champps with respect to any Champps Restaurant developed by Developer pursuant to this Agreement, and (4) subject to clause (3) above, Champps agrees to provide pre-opening support to Developer with respect to the first three Champps Restaurants developed by Developer pursuant to this Agreement. | Other | Licensee |

EX1-191

ktMINE

ktMINE Export (2018.02.22) Part 2

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | SICCode | Industry | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60084 | | DELICIOUS PRODUCE CO INC | SIEMENS EYE CORPORATION | THE DELICIOUS FROZEN PRODUCE COMPANY, INC. | 05/13/1996 | This Agreement shall commence on the Effective Date and, unless earlier terminated as hereinafter provided, shall continue in effect for an initial term ending December 31, 2000. It shall automatically be extended upon the expiration of the initial term unless (i) this Agreement is terminated as provided in this Agreement, (ii) either party gives to the other notice at least 60 days prior to the end of initial term of its intent to renew this Agreement for a one-year renewal term. | Manufacturing/Process Intangible, Marketing Intangible | | Foods and Nonalcoholic Beverages, Consumer Non-Durables | United States, Canada | Multi-Exclusivity | 15% | Net Wholesale Sales | Subject to the provisions of Section 7(d) below, shall pay Edema an Earned Royalty for the use of the Trademarks hereunder equal to 15% of net Wholesales (Buyer/Earned Royalty/Buyer). | Net Sales |
| 58901 | | WORKFORCE SYSTEMS CORP | ENTERPRISES INCORPORATED | PRODUCTS THAT PRODUCE, INC. | 01/01/1996 | 1. The term of this License and of associated rights granted hereby (the "Term") shall begin on the Effective Date and shall end and automatically terminate on the date which is the second anniversary of the Effective Date, unless sooner terminated or extended in accordance with the provisions hereof, for purposes of this Agreement, the "Term" shall include all extensions and renewals. 2. Notwithstanding Section 3(a), the Term shall, unless otherwise terminated pursuant to this Agreement, be automatically renewed for successive two-year periods subject, however, to either party's rights to terminate by giving notice of non-renewal at least sixty (60) days prior to the expiration date of any such renewal period. | Marketing Intangible, Service | 7343 | Broadcast and Cable Entertainment, Foods and Nonalcoholic Beverages, Business Services, Consumer Services, Consumer Durables, Consumer Non-Durables, Advertising, Retail, Internet | United States, Canada | EXCLUSIVE | .85 USD | per lb | Base Prices, During the Pre-Blend Powder for Chocolate Per Unit: Flavoring 31/88 Records. | Per Unit |
| 58901 | | | | | | | | | | | | | | | |
| 64590 | | | | | | | | | | | | 15% | Gross Sales | Licensee shall pay to Licensor a royalty of fifteen percent (15%) on any and all Gross Retail Sales of the Product in its sold immediately. | Gross Sales |

EX1-192

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commensurate | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68590 | | | | | | | | | | | | 5% | Gross Retail Sales | Throughout the term of this Agreement, subject to the advance paid pursuant to Section 5(a), Licensee agrees to pay Licensor a royalty of five percent (5%) of the total dollar amount attributable to sales of the Product, which such amount shall not include any amounts added by line item to the invoices for the sale of the Product, which represent applicable taxes and shipping costs to be paid by the purchaser of the Product (the "Gross Retail Sales"). | Gross Sales | License |
| 68590 | | | | | | | | | | | | 2,000 USD | per diem | Talent agrees to consider being available for no more than two days per year for additional appearances if, in the sole discretion of Licensor, such additional appearances are deemed to benefit Licensor. If Talent agrees to be available for such additional appearances, Licensee agrees to pay Licensor two thousand (S2,000) dollar a per diem as well as Talent's first class travel and accommodation expenses in consideration for the additional appearances. | Per Unit | License |
| 11321 | 1. Grant the rights to use the Marks & the marks (i) "Mr. Food", used in connection with entertainment services, namely, production of television programs dealing with culinary topics, and specifically including, without limitation, U.S. Service Mark Registration No. 1,339,656 dated June 4, 1985, from the United States Patent and Trademark Office; (ii) "Mr. Food" together with a caricature of the Ginsburg as television personality Mr. Food ("Talent"), used in connection with entertainment services, namely, production of television programs dealing with culinary topics, and specifically including, without limitation, U.S. Service Mark Registration No. 1,341,086, dated September 17, 1985, from the United States Patent and Trademark Office; (iii) a caricature of the Talent, as televised personality Mr. Food used in connection with printed advertisements containing food recipes, and specifically including, without limitation, U.S. Trademark Registration No. 1,610,561, dated August 21, 1990, from the United States Patent and Trademark Office; and (iv) the words "OOH IT's So GooD!!" used in connection with entertainment services, namely production of television programs dealing with culinary topics, and specifically including, without limitation, U.S. Service Mark Registration No. 1,955,180, dated February 6, 1996, from the United States Patent and Trademark Office, as well as the mark & bull mark and common law rights in Talent's likeness in connection with the sale of the Product within the Territory and solely in connection with the marketing, sale and distribution of the Product. | GINSBURG ENTERPRISES PRODUCTS THAT PRODUCE, INC. | WORKHORSE SYSTEMS CORP | | 05/31/1996 | 1. The term of the License and all associated rights hereby granted (the "Term") shall begin on the Effective Date and shall end and automatically terminate on the date which is the second anniversary of the Effective Date, unless sooner terminated or extended in accordance with the provisions hereof (for purpose of this Agreement, the "Term" shall include all extensions and renewals). 2. Notwithstanding Section 1 (a), the Term shall, unless otherwise terminated pursuant to this Agreement, be automatically renewed for successive two year periods subject, however, to either party's right to terminate by giving notice of non-renewal at least sixty (60) days prior to the expiration date of any such renewal period. | Marketing Intangible, Service | Consumer Durables, Advertising, Business Service, Consumer Services, Consumer Non-Durables, Retail, Broadcast and Cable, Entertainment, Internet, Kiosks and Nostalshotic Beverages | | United States, Canada | EXCLUSIVE | 5% | Gross Retail Sales | Throughout the term of this Agreement, subject to the advance paid pursuant to Section 5(a), Licensee agrees to pay Licensor a royalty of five percent (5%) of the total dollar amount attributable to sales of the Product, which such amount shall not include any amounts added by line item to the invoices for the sale of the Product, which represent applicable taxes and shipping costs to be paid by the purchaser of the Product (the "Gross Retail Sales"). | Gross Sales | License |
| 11321 | | | | | | | | | | | | 15% | Gross Retail Sales | Licensee shall pay to Licensor a royalty of fifteen percent (15%) on any and all Gross Retail Sales of the Products sold and distributed... | Gross Sales | License |
| 11321 | | | | | | | | | | | | 2,000 USD | per diem | Talent agrees to consider being available for no more than two days per year for additional appearances if, in the sole discretion of Licensor, such additional appearances are deemed to benefit Licensor. If Talent agrees to be available for such additional appearances, Licensee agrees to pay Licensor two thousand (S2,000) dollar a per diem as well as Talent's first class travel and accommodation expenses in consideration for the additional appearances. | Per Unit | License |

kMINE

KMINE Export (2016.02.22) Part 2

| Agreement# | FilingCompany | Licensor | Licensee | Products That Product, Inc. | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit le | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11522 | WORLDFLIX SYSTEMS INCORPORATED | WORLDFLIX ENTERPRISES INCORPORATED | PRODUCTS THAT PRODUCE, INC. | | 05/01/1996 | 1. The term of this License and all associated rights hereby grantedlife- Term' ) shall begin on the Effective Date and shall end and automatically terminate on the date which is the second anniversary of the Effective Date, unless sooner terminated or extended in accordance with the provisions hereof for purpose of this Agreement, the "Term" shall include all extensions and renewals 2. Notwithstanding Section 4 (a) , the Term shall, unless otherwise terminated pursuant to this Agreement, be automatically renewed for successive ten-year periods subject, however, to either party' s right to terminate by giving notice of non-renewal at least sixty (60) days prior to the expiration date of any such renewal period. | Marketing Intangible, Service | Consumer Durable, Advertising, Broadcast and Cable, Entertainment, Consumer Non-Durables, Consumer Services, Retail, Internet, Business Services, Foods and Nonalcoholic Beverages | | United States, Canada | EXCLUSIVE | 15% | Gross Retail Sales | Licensee shall pay to Licensor a royalty of fifteen percent (15%) on any and all Gross Retail Sales of the Product via said commercials. | Gross Sales | Licensor |
| 11522 | | | | | | Throughout the term of this Agreement, subject to the advance paid pursuant to Section 5(c), Licensee agrees to pay Licensor a royalty of five percent (5%) of the total dollar amount invoiced to sold of the Product, which such amount shall not include any amounts added by the item to the invoices for resale of the Product, which represent applicable taxes and shipping costs to be paid by the purchaser of the Product (the "Gross Retail Sales"). | | Gross Retail Sales | | 5% | Gross Retail Sales | | Gross Sales | Licensor |
| 11522 | | | | | | Talent agrees to consider being available for no more than two days per year for additional appearances if, in the sole discretion of Licensor, such additional appearances are deemed to benefit Licensor. If Talent agrees to be available for such additional appearances, Licensor agrees to pay Licensor two Thousand ($2,000) dollars per diem as well as Talent's first class travel and accommodation expenses in consideration for the additional appearances. | | | | 2,000 USD | per diem | | Per Unit | Licensor |
| 61269 | NEW YORK BAGEL ENTERPRISES, INC. | NEW YORK BAGEL ENTERPRISES, INC. and WESTERN COUNTRY CLUBS, INC., Atomic Burrito, Inc. | NEW YORK BAGEL ENTERPRISES, INC., and WESTERN COUNTRY CLUBS, INC., Atomic Burrito, Inc. | | 02/27/1998 | 1. "Development Term" means the twenty (12) month period commencing on December 1, 1998. However, either party may terminate this Agreement upon written notice of the Development Term immediately upon written notice if the other party materially fails to perform its duties hereunder. Providing, such termination shall not affect the obligation of WCCI and WRE to complete the conversion of any facilities then under construction. | Joint Development, Service | Business Services, Consumer Services, Consumer Non-Durables, Restaurants, Financial Services, Foods and Nonalcoholic Beverages | 5812 | Tulsa, Oklahoma, Manhattan, Kansas, Wichita, Kansas, Lubbock, Texas, Waco, Texas, Austin, Texas, Midland, Texas, Temple, Texas, San Antonio, Texas, Springfield, Missouri, Nashville, Tennessee, United States | EXCLUSIVE | 1% | Net Sales | WRE RESPONSIBILITIES SCHEDULE. Perform all accounting functions for the Project Entity, including, without limitation, cash management, bank account reconciliation and preparation of monthly financial statements. In consideration for performing these services, the Project Entity shall be paid a fee of one percent (1%) of Net Sales to WRE, up to a maximum of One Thousand Dollars ($1,000.00) per facility, per month. | Net Sales | Licensor |
| 61269 | | | | | | | | | | | | 2,500 USD | per facility | In the event WCCI elects not to develop the facilities identified in 2(a) and (b), WCCI shall pay to WRE the sum of Two Thousand Five Hundred Dollars ($2,500.00) per facility. Until WCCI shall thereafter be released from its obligation to convert these facilities. | Per Unit | Licensor |
| 61269 | | | | | | | | | | | | 1,000 USD | per facility per month | WRE RESPONSIBILITIES SCHEDULE. Perform all accounting functions for the Project Entity, including, without limitation, cash management, bank account reconciliation and preparation of monthly financial statements. In consideration for performing these services, the Project Entity shall be paid a fee of one percent (1%) of Net Sales to WRE, up to a maximum of One Thousand Dollars ($1,000.00) per facility, per month. | Per Unit | Licensor |

Page 62 of 94

EX1-194

kMINE

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commentable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 65775 | 1. Grant the right to utilize the Patent Rights relating to a method for the identification, characterization and regulation of the amounts of bioactive components in herbal products to market and sell herbal Products (a dietary supplement derived from historical herbal extracts), including the Licensed Products, in the OTC Market (sales to the general public other than those requiring a physician's prescription) in the Territory. 2. Grant the right to utilize the Patent Rights relating to a method for the identification, characterization and regulation of the amounts of bioactive components in herbal products to use the herbal Products (a dietary supplement derived from historical herbal extracts), including the Licensed Products, in the OTC Market (sales to the general public other than those requiring a physician's prescription) in the Territory. 3. Grant the right to utilize the Trademark "PHARMAPRINT" for use in conjunction with the marketing and/or sale of the Licensed Products in the OTC Market in the Territory. 4. Grant the right to utilize rights to Additional Products (herbal products other than the initial herbal products). | PHARMAPRINT INC | Pharmaprint Inc., Pharmaprint Inc. | American Home Products Corporation | 10/6/1997 | 1. This Agreement shall continue in full force and effect, unless sooner terminated by either party pursuant to the provisions set forth in this Article XII, or until expiration of the last to expire patent within the Patent Rights in the Territory, following expiration of the Agreement, the Licensee... 14. ...permitted hereunder to AHP with respect to the Patent Rights shall be fully paid-up and irrevocable. | Manufacturing; Process intangible; Marketing intangible | Healthcare; Pharmaceutical; Biotechnology; Consumer Non-Durable; Foods and Nondiabolic Beverages | 2834 | United States, Commonwealth of Puerto Rico | Multi-Exclusivity | 4% | Net Sales | During the term of this Agreement, as royalty for the license granted under Paragraph 2.1, AHP shall pay to Pharmaprint a running royalty as set forth below on the total Net Sales of Licensed Products sold by AHP and AHP affiliates in the Territory ("Earned Royalties"). Subsequent to one year after the National Launch Date for product... | Net Sales |
| 65775 | | | | | | | | | | | | 6% | Net Sales | During the term of this Agreement, as royalty for the license granted under Paragraph 2.1, AHP shall pay to Pharmaprint a running royalty as set forth below on the total Net Sales of Licensed Products sold by AHP and AHP affiliates in the Territory ("Earned Royalties"). Subsequent to one year after the National Launch Date through expiration or termination of this Agreement, for Licensed Products covered by a Patent which contains a process or composition claim in at least one of those market in Schedule D, 6%. | Net Sales |
| 24467 | 1. Grant the right to operate and/or to authorize the operation of International House of Pancakes restaurants (INTERNATIONAL HOUSE OF PANCAKES, INC. has developed and is continuing to develop certain unique systems, products, methods, techniques and other trade secrets for operating its chain of eating parlors and a system of how these products are prepared and served), under the names "The International House of Pancakes", and "International House of Pancakes Restaurant". 2. Grant the right to use and display IHOP service marks, Trademarks, trade names and insignia and the labels and designs pertaining thereto, and to use INTERNATIONAL HOUSE OF PANCAKES, INC.'s trade secrets, formulas, processes, methods of operation and goodwill, but only in connection with the retail sale of IHOP restaurants on the standard menu of IHOP restaurants as established in the Operations Bulletin from time to time. | IHOP CORP | INTERNATIONAL HOUSE OF PANCAKES, INC., INTERNATIONAL HOUSE OF PANCAKES CORPORATION | IHOP MANAGEMENT SYSTEMS, INC., ARE FAMILY, CAYMAN FAMILY, A.L.A. CORPORATION | 05/5/1998 | 1. The term of this Agreement shall commence on the date hereof and shall terminate on June 30, 2010, unless otherwise terminated pursuant to the provisions of this Agreement, but shall be subject to extension or reduction of the term as provided in Section IV termination. 2. For each International House of Pancakes Restaurant... 3. Franchisee shall commence and complete construction of the restaurant through June 30, 1993, two (2) years shall be added to the term hereof for each such restaurant opened for operation, directly or through a subfranchise, by Franchisee from and after the applicable year (1 year) shall be added to the term hereof for each such sub-franchise, by Franchisee from and after July 1, 1993 and ending June 30, 2000, a period of one (1) year shall be added to the term hereof for each such unit opened for operation, directly or through a sub-franchise, by Franchisee from and after July 1, 2000, a period of six (6) months shall be added to the term hereof. Additionally, in respect of a net of five (5) units which were added to the | Franchise | Restaurants, Consumer Services, Consumer Non-Durable, Foods and Nondiabolic Beverages | 5794 | Florida, Georgia, United States, Glynn County, Wayne County, Camden County, Charlton County, Appling County, Pierce County, Miller County, Bacon County, Thomas County, Berrien County, Brooks County, Cook County, Echols County, Lanier County, Lowndes County, Atkinson County, Bacon County, Brantley County, Clinch County, Coffee County, Jeff Davis County, Pierce County, Ware County | EXCLUSIVE | 1% | Gross Sales | For and in consideration of Franchisee's execution and performance of this Agreement, Franchisee shall pay in United States Dollars to Franchisor a Continuing Royalty equal to one percent (1%) of all Franchisee's monthly Gross Sales. | Gross Sales |
| 24467 | | | | | | | | | | | | 25% | Gross Sales | In addition to Franchisee's obligation to pay a Continuing Royalty as set forth above, Franchisee shall pay to Franchisor, for national advertising and for the promotion and advertising of the franchise of all franchises and goodwill attached thereto, a sum equal to one quarter of one percent (25%) of Franchisee's monthly Gross Sales. | Gross Sales |

kMINE Export (2016.02.22) Part 2

| Agreement# | Synopsis | Filing Company | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie/Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58865 | 1. Grant the right to utilize the LICENSED MARKS (i) "Seven Select" (name and logo) (ii) "Seven Select Fresh" (iii) "7 Eleven" (iv) "100% Natural" (logo) (v) "County Fair" (vi) "Seven Select") solely upon and in connection with the growing, harvesting, advertising, marketing, sale and distribution of Licensed Products (Sweet Corn if and only by the extent that (1) such corn is "fresh and un-husked", and (2) no of the LICENSED MARKS are used in connection with the advertising, marketing, sale or distribution thereof). | DTS TECHNOLOGIES INC | THE SHELL GROUP II, INC., the Pillsbury Company | FRESHCORN LLC; NEWCORN2005 LLC | 04/15/1998 | 1. The initial term of this Sublicense shall commence as of the Effective Date and, subject to the termination provisions of Sections 10, 11 and 12 below, shall continue until December 31, 2010 and shall thereafter be renewed for successive periods of one (1) year each, unless either party gives the other party written notice prior to the expiration of the initial term or any renewal term of its election not to renew this Sublicense. Such notice of non-renewal may be given at any time commencing three (3) years prior to the expiration of the initial term of the Sublicense. In the event the LICENSOR provides written notice electing not to renew the Sublicense under this section 5(d), the Sublicense shall continue for a period of three (3) years after the date of notice at which time the Sublicense shall terminate. | Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durable, Agribusiness | 2092 | United States of America, Mexico, Canada, world | Multi-Exclusivity | 25% | Net Sales | The joint Venture shall retain 25% of the fees paid to it each calendar year derived from the "Marketing Fund") and shall spend the Marketing Fund in the two succeeding calendar year for the marketing of fresh and perishable corn products. The manner in which the marketing fund is utilized shall be determined by the Managers of the Joint Venture. | Net Sales |
| 58865 | | | | | | | | | | | | 1% | Revenue | If the Average Price is less than $14.12 USD Per Case, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |
| 58865 | | | | | | | | | | | | 4% | Revenue | If the Average Price is more than $14.12 USD Per Case but less than $14.50 USD, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |
| 58865 | | | | | | | | | | | | 5% | Revenue | If the Average Price is more than $14.50 USD Per Case but less than $14.87 USD, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |
| 58865 | | | | | | | | | | | | 6% | Revenue | If the Average Price is more than $14.87 USD Per Case but less than $15.25 USD, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |
| 58865 | | | | | | | | | | | | 7% | Revenue | If the Average Price is more than $15.25 USD Per Case but less than $15.63 USD, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |
| 58865 | | | | | | | | | | | | 8% | Revenue | If the Average Price is more than $15.63 USD Per Case but less than $16.00 USD, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all corn products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales |

KMINE Export (2016.02.22) Part 2

| Agreement | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodits | LeadSale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58865 | | | | | | | | | | | | 9% | Revenue | If the Average Price is more than \$16.80 USD Per Case, Licensee shall pay the Joint Venture a fee in an amount equal to a percentage of all revenues of Licensee for each calendar year derived from the sale of all such products by Licensee, including, but not limited to, Licensed Product and products sold under trademarks other than the Licensed Marks and whether sold at retail or to food service. | Net Sales | License |
| 58865 | | | | | | | | | | | | 0.04 USD | Per Case | Licensee shall pay its Licensor a royalty of \$0.06 USD per Case of Licensed Product "Sold" during the term of the Sublicense | Per Unit | Subs |
| 62944 | 1. Grant the right to use the Logan's Roadhouse System LOGAN'S ROADHOUSE, INC. is engaged in the business of owning, operating, and granting to franchises with respect to certain restaurants serving meat products and other dishes, which restaurants do business under the trade name "Logan's Roadhouse" ("Logan's Roadhouse Outlet" or "Outlet"). In connection with its business, LOGAN'S ROADHOUSE, INC. has developed certain recipes and seasonings for meats with distinctive flavor and unsurpassed quality and consumer recognition, and is the owner of good and valuable trademarks, trade names, service marks, certification marks, logos, signs, designs, emblems, color and patterns, and other distinctive features that identify the Logan's Roadhouse System to be located on the operation of a Logan's Roadhouse Outlet at the premises to be located on Beacon Drive, Greenville, South Carolina. | LOGAN'S ROADHOUSE INC. | LOGAN'S ROADHOUSE, INC. | DAOC Incorporated, Charles F. McWhorter, Jr. | 1997 | 1. The term of this franchise shall commence on the date hereof, and shall end twenty (20) years thereafter unless this Agreement is terminated prior to that date in accordance with its provisions or unless renewed as provided in the following paragraph (E).<br><br>2. At the expiration of the term hereof, Franchisee shall have an option to operate the Logan's Roadhouse Outlet for up to two additional terms of five (5) years each (unless this Agreement is sooner terminated in accordance with its provisions), provided that: (a) Franchisee satisfies the requirements which franchisor then imposes on its new franchises; (b) all other outlets within the System which franchisee then operates comply with Franchisor's then current standards, specifications, requirements and instructions; and (c) Franchisee<br><br>14<br><br>15<br><br>executes the form of franchise agreement which | Franchise | Restaurants, Consumer Services, Consumer Non Durables, Foods and Nondurables, Beverages, Retail | 5812 | Greenville, South Carolina, United States | EXCLUSIVE | 1% | gross sales | ADVERTISING FUND. Franchisee, as his contribution towards an advertising fund, shall pay Franchisor up to one (1%) percent of Franchisee's gross sales per month, calculated as set forth in this Agreement at the end (6). Such funds shall become the property of Franchisor, to be maintained in a separate "advertising account" established by Franchisor. Franchisor shall use such funds for marketing studies or services, the payroll expenses relative to any employee of Franchisor responsible for coordination of merchant's advertising and for the purchase of advertising time, space or materials in national, regional or other advertising media, or in a manner determined by Franchisor in its sole discretion. | Gross Sales | License |
| 62944 | | | | | | | | | | | | 3% | gross sales | LOCAL ADVERTISING. Franchisor may require, at its sole discretion, Franchisee to expend on an annual basis an amount up to three percent (3%) of Franchisee's total gross sales, calculated as set forth in this Agreement at Part E(3)(a), for local promotional activities. All of the Franchisee's local promotional activities shall utilize approved advertising media. Approved advertising promotional media shall be limited to the following: (a) Newspapers, magazines and other such periodicals; (b) Radio and television; (c) Outdoor advertising by signs displayed on billboards or buildings; and (d) Handbills, flyers and direct mail. | Gross Sales | License |
| 62944 | | | | | | | | | | | | 3% | Gross Sales | CONSIDERATION. Franchisee shall pay Franchisor the initial sum of \$30,000 upon signing this Agreement, and after Franchisee opens its Outlet, shall also pay no later than ten (10) days from the end of each calendar month a sum equal to three percent (3%) of "Gross Sales" as royalties from the Logan's Roadhouse Outlet operated and under the franchise granted by user under this Agreement. | Gross Sales | License |

kMINE

kMINE Export (2018.02.22) Part 2

Page 48 of 54

EX1-197

kMINE

| Agreement ID | Agreement Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 56586 | 1. Grant the right to market, distribute, use and sell the Licensed Products Exerted top cooking used in an exclusive basis in the Territory to commercial foodservice establishments, including, but not limited to, commercial food service businesses, restaurants, hotels and lodging businesses, supermarkets and convenience stores. 2. Grant the right to use the Trademark (TurboChef(t)) in the Licensed Products manufactured or assembled in the Territory and use in connection with marketing, selling and distributing the Licensed Products (counter top cooking unit). 3. Grant the right to manufacture and assemble, and to have manufactured and assembled, the Licensed Products on a non-exclusive basis in the Territory according to the Intellectual Property and Licensed Patents and the Intellectual Property furnished by Licensor. 4. Grant the right to manufacture and assemble, and to have manufactured and assembled, the Licensed Products on a non-exclusive basis in the Territory according to the Licensed Patents and Patents of the U.S. No. 5,254,823 entitled QUICK COOKING OVEN, issued October 19, 1993; U.S. Patent No. 5,434,389 entitled QUICK COOKING OVEN, issued July 18, 1995; U.S. Patent No. 5,539,758 entitled QUICK COOKING OVEN, issued September 24, 1996; U.S. Patent No. 5,927,265 entitled RECYCLING COOKING OVEN WITH CATALYTIC CONVERTER, issued July 27, 1999; U.S. Patent Application No. 09/353,000 entitled APPARATUS FOR SUPPLYING MICROWAVE ENERGY TO A CAVITY, filed April 2, 1998, now allowed; and U.S. Patent Application No. 09/084,588 entitled SYSTEM FOR RAPID AIR | TURBOCHEF TECHNOLOGIES, INC. | TURBOCHEF TECHNOLOGIES INC | MARITAL CORPORATION | 10/26/1999 | 1. Unless earlier terminated as provided herein, this Agreement shall remain in full force and effect until the expiration or termination of the last to expire of the Licensed Patents. | Manufacturing/Process Intangible, Marketing Intangible, Software | Consumer Durables, Restaurants, Foods and Nondurable, Beverages, Retail, Travel and Leisure, Computers: Hardware and Software | 3569 | United States of America, Canada, Mexico, the Caribbean Islands | Multi-Exclusivity | 500 USD | per unit | In consideration of the license granted pursuant to this Agreement, Licensee shall pay Licensor the following royalties: A. Single Cavity Counter Top Cooking Unit. Subject to an adjustment as provided hereinbelow, Licensee shall pay Licensor a minimum royalty equal to five hundred Dollars (U.S. \$500) per unit sold by Licensee for each single Cavity Counter Top Cooking Unit... | Per Unit | License |
| 56586 | In consideration and assemble, and to have manufactured and assembled, the Licensed Products on a non-exclusive basis in the Territory according to the Licensed Patents... | | | | | | | | | | Per Unit | 800 USD | per unit | In consideration of the license granted pursuant to this Agreement, Licensee shall pay Licensor the following royalties: B. Dual Cavity or * subject to adjustment as provided hereinbelow, Licensee shall pay Licensor a minimum royalty equal to eight hundred Dollars (U.S. \$800) per unit sold by Licensee for installation anywhere other than the United Kingdom and a minimum royalty equal to One Thousand Dollars (U.S. \$1,000) per unit sold by Licensee for installation in the United Kingdom, based upon * | Per Unit | License |
| 56586 | | | | | | | | | | | | 1,000 USD | per unit | In consideration of the license granted pursuant to this Agreement, Licensee shall pay Licensor the following royalties: Agreement, Licensee shall pay Licensor the following royalties: B. Dual Cavity or * subject to adjustment as provided hereinbelow, Licensee shall pay Licensor a minimum royalty equal to eight hundred Dollars (U.S. \$800) per unit sold by Licensee for installation anywhere other than the United Kingdom and a minimum royalty equal to One Thousand Dollars (U.S. \$1,000) per unit sold by Licensee for installation in the United Kingdom, based upon * | Per Unit | License |
| 62843 | 1. Grant the right to develop and open for business, and have in operation, a total of up to fifteen (15) Restaurants under the name Logan's Roadhouse franchised by LOGAN'S ROADHOUSE, INC. in the Territory. | LOGAN'S ROADHOUSE, INC. | LOGAN'S ROADHOUSE INC | CMAC INCORPORATED, CHARLES E. McNAMORE III, JR. | 03/17/1997 | 1. This Agreement shall expire on March 31, 2007, unless sooner terminated pursuant to the terms hereof. 2. for a period commencing on the date hereof and ending on March 31, 2002, unless sooner terminated as hereinafter provided. | Franchise, Service | Consumers' Services, Consumer Non-Durables, Foods and Nondurable, Beverages, Restaurants, Business Services, Retail | 5812 | Greenville, South Carolina, Charleston, South Carolina, Charlotte, North Carolina, Raleigh-Durham, North Carolina, United States | EXCLUSIVE | 3% | Developer's monthly gross sales | Developer's net income statement at reflect Developer's royalty fee of three percent (3%) of Developer's monthly gross sales as a separate line item. | Gross Sales | License |
| 62843 | | | | | | | | | | | | 3% | Restaurant's gross sales | Developer shall notify Franchisor in writing promptly after closing on the acquisition of a leasehold or fee interest in the Restaurant site. Provided Franchisor has granted site operational, financial and legal approval to the location and has provided Developer with its standard form of Franchise Agreement (a copy of the form which is attached hereto as Appendix B), provided however that the Franchise Agreement which Franchisor delivers to Developer shall require Developer to make advertising expenditures at the rates then established by Franchisor with respect to other Restaurants, except that in no event shall such rates exceed three percent (3%) of a Restaurant's gross sales (as defined in that form of the Franchise Agreement which is attached hereto as Appendix B) | Gross Sales | License |

EX1-198

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity/Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55729 | 1. Grant the right to market, sell, distribute, install and maintain the Products (the Fountain Fresh Beverages, Syrups, Waters, Beverage Center Equipment, Optional Equipment and spare parts and accessories) of Fountain Fresh International. 2. Grant the right to use the Fountain Fresh International's Trademarks. ("Fountain Fresh" and "BetterStuff") in marketing the Products to the extent permitted in the Territory. | DRKAN TECHNOLOGIES INC | Fountain Fresh International | Kolen Consultants, Ltd. | 04/17/1997 | 1. The initial term of this Agreement shall be for five (5) years commencing on the date of execution of this Agreement. 2. Licensee will have the option to renew this License Agreement at the expiration of the initial term hereof for an additional five (5) year term and for up to a total of five (5) additional five (5) year successive terms at the end of each subsequent renewal period for a total of thirty years, provided that, at the time of each renewal: (1) Licensee is not in material default of this Agreement, has timely paid for all Products ordered, has substantially complied with the provisions of this Agreement during the term hereof and agrees to execute the then standard form of Agreement of the Company. Any changes that occur in future Agreements will be commercially reasonable. (2) If Licensee does not meet the requirements described above, or if Licensee does not desire to renew this Agreement, this | Distribution, Marketing Intangible Service | Foods and Nonalcoholic Beverages, Consumer Non Durable, Business Services, Consumer Services, Metal, Industrial Equipment and Machinery | | United States of America, Washington, D.C. | EXCLUSIVE | 1% | Gross Receipts | Licensee agrees to advertise and promote the Products in the Territory. Licensee agrees to participate in advertising and promotional programs in the Territory the amount approved by Fountain Fresh in the Marketing Plan which amount will be not less than one percent (1%) of its monthly Gross Receipts from the sale or lease of the Products unless otherwise agreed in writing by the Company. All advertising by Licensee shall be conducted in a dignified manner, shall conform to the standards established from time to time by the Company and shall display the Trademarks only in the manner approved by the Company. In addition, all Licensee's advertisements must conform to the advertising guidelines published by the Company and must be pre-approved by the Company. | Gross Sales |
| 55729 | | | | | | | | | | | | 10% | Sub-license or Dealer Fee | In addition to its other duties and responsibilities set forth in this Agreement, Licensee shall, in good faith, perform the following duties and obligations: 8.if.w an additional license fee of 10% of each sub-license or Dealer fee for each Dealer or Licensee sold or established in the Territory. This fee shall be paid within twenty (20) days of such sale or establishment. | Net Sales |
| 55729 | | | | | | | | | | | | .01 USD | per liter of Beverage | In addition, Licensee shall pay to the Company a continuing monthly royalty fee in an amount equal to one cent (.01) per liter of Beverage sold in the Territory through the Beverage Centers, Remote Centers, Optional Equipment or other Beverage Dispenser Equipment (exclusive of Water) and three cents (.03) per liter of Water sold in the Territory through the Optional Equipment, Beverage Center, Remote Center or other Beverage Dispenser Equipment. | Per Unit |
| 55729 | | | | | | | | | | | | .03 USD | per liter of Water | In addition, Licensee shall pay to the Company a continuing monthly royalty fee in an amount equal to one cent (.01) per liter of Beverage sold in the Territory through the Beverage Centers, Remote Centers, Optional Equipment or other Beverage Dispenser Equipment (exclusive of Water) and three cents (.03) per liter of Water sold in the Territory through the Optional Equipment, Beverage Center, Remote Center or other Beverage Dispenser Equipment. | Per Unit |
| 55729 | | | | | | | | | | | | $10 USD | per day | Upon reasonable prior written request from the Licensee, the Company will, during the term of this Agreement, make its staff and departments available at Salt Lake City, U.S.A. or such other location as the Company shall designate, for consultation with representatives of Licensee's staff on matters concerning the Company's Products at a per diem rate expense; but not less than U.S. $200.00 per day. Licensee shall also pay all reasonable hourly charges, food and other travel and lodging costs of the Company in connection with such consultation. | Per Unit |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55729 | | | | | | | | | | | | 350.00 | per day | The Company will provide drawings and specifications for accessories and an installation manual and operating manual. Upon written request, the Company will provide its technicians familiar with the Products for reasonable periods during the term of this Agreement, but not more often and for such periods as not to interfere unduly with the Company's business, at a per-day rate as is agreed, but not less than U.S. $350.00 per day. Licensee shall also pay all transportation, lodging, food and other travel and lodging costs of the Company in connection with such consultation. | Per Unit | Licensee |
| 59802 | 1. Grant the right to purchase the asset relating to the business (SILVERADO FOODS, INC.'s bagel and bagel bar production business located in Santa Ana, California). | | SILVERADO FOODS, INC. | GOURMET SPECIALTY BAKERS, INC. | 06/22/1998 | 1. The closing of the transactions provided for in this Agreement (the "Closing") shall take place at 10:00 a.m. at Seller's office in Tulsa, Oklahoma on June 22, 1998, or at such other date, time, or place as Buyer and Seller shall mutually agree upon. The date and time at which the Closing takes place is referred to herein as the "Closing Date." | Asset Purchase, Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages | 2052 | Santa Ana, California, United States | EXCLUSIVE | 2.5% | net sales | If prior to December 31, 1998, Buyer receives orders from one or more of its customers for the purchase of its Frozen filled products in a cumulative amount of $25,000 or more, and prior to March 31, 1999, Buyer received two subsequent orders for such products from the same Buyer or buyers, Buyer shall pay to Seller (i) $45,000 in cash within 30 days after receipt of the third order, and (ii) a royalty on sales of frozen filled products in the amount of 2.5% of net sales, which royalty shall commence on January 1, 1999, and continue for a period of five years or until the earlier of $150,000 paid to Seller pursuant to such royalty, whichever first occurs. | Net Sales | Licensor |
| 62736 | 1. Grant the right to use the Intellectual Property: (i) to the extent not reciprocal and secret formulae for baking gourmet cinnamon rolls and other bakery products; (ii) to the secret and proprietary information relating to the preparation, baking, and merchandising of the gourmet cinnamon rolls utilizing the Secret Recipes and (iii) certain trade names, trademarks, service marks, logos, signs, and emblems, including, without limitation the mark "T.J. CINNAMONS," relating to the products prepared using the Proprietary Information, and certain goods and services offered in connection with real stores, bakeries, and other locations, that offer the products made utilizing the Proprietary Information to prepare and sell TJC Products (bakery products) (a) from one (1) TJC Bakery, or (b) at wholesale. 2. Grant the right to use the Intellectual Property to fulfill Licensee's obligations under TJC Contract Agreements, and to continue to permit TJC Licensees to prepare and sell TJC Products, and to use the Intellectual Property in connection therewith. | PARAGON ENTERPRISES INC | Arby's, Inc.; T.J. Cinnamons, Inc.; Triarc Restaurant Group, T.J. Cinnamons, Inc. | T.J. Cinnamons, Inc.; Triarc Restaurant Group, Arby's, Inc. | 08/29/1996 | 1. The term of this Agreement shall begin on the date first written above, and, unless sooner terminated in accordance with its terms herein, shall expire twenty (20) years from the date of this Agreement. 2. Licensee may renew this Agreement four (4) times; for three (3) additional periods of twenty (20) years each upon the expiration of the initial term or the preceding renewal term, and for one (1) additional period of nineteen (19) years upon the expiration of the final renewal term, provided that Licensee has complied with the following conditions to be completed within the initial term, or the applicable renewal term. | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Retail | 0794 | United States | Multi-Exclusivity | 2% | gross sales | If Licensee desires to sell a New TJC Product, or to license or franchise others to do so, Licensee agrees to pay Licensor a New Product Royalty the equal to two percent (2%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for two (2) years following Licensee's notice to Licensor of Licensee's agreement to sell the New TJC products, and three percent (3%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for the remaining term of this Agreement. | Gross Sales | Licensee |
| 62736 | | | | | | | | | | | | 3% | gross sales | If Licensee desires to sell a New TJC Product, or to license or franchise others to do so, Licensee agrees to pay Licensor a New Product Royalty the equal to two percent (2%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for two (2) years following Licensee's notice to Licensor of Licensee's agreement to sell the New TJC products, and three percent (3%) of gross sales of the New TJC Product by Licensee and all TJC Licensees for the remaining term of this Agreement. | Gross Sales | Licensee |

| Agreement# | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase revenue and other compensation | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 62736 | | | | | | | | | | | | 20% | revenue and other compensation | From the date of this Agreement, Licensee may not open or operate, nor grant new or additional licenses to others to open or operate, any additional T/C Retail Locations... | Net Sales | |
| 62736 | | | | | | | | | | | | 2% | revenues | During the three-year and nine-month period commencing on the date of this Agreement (the "Wholesale Rights Period"), Licensor shall not sell any Approved T/C Wholesale Products at wholesale... | Net Sales | |
| 62736 | | | | | | | | | | | | 20% | royalties | During the three-year and nine-month period commencing on the date of this Agreement (the "Wholesale Rights Period"), Licensor shall not sell any Approved T/C Wholesale Products at wholesale... | Net Sales | |

kMINE

kMINE Export (2018.02.22) Part 2

EX1-201

kMINE Export (2018.02.22) Part 2

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodite | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61251 | 1. Grant the right to use the Trademarks (WELCH'S, WELCH'S [Design] and WELCHADE and certain Trade Dress), whereas, Welch Foods Inc. is engaged, inter alia, in the business of manufacturing and distributing frozen juice bars used in the manufacture of frozen juice bars sold under the Trademarks and Trade Dress; whereas, The formula for the manufacture of the Bars are confidential and proprietary trade secrets owned by Welch Foods Inc.; whereas, Edamo Pie Corporation and Edamo Inc. are engaged, inter alia, in the business of manufacturing and/or and frozen dessert products; whereas, Welch Foods Inc. and Edamo Pie Corporation are parties to a Trademark License Agreement dated as of August 31, 1992 pursuant to which Edamo Pie Corporation uses and licenses others to use the Trademarks and Trade Dress on and in connection with frozen fruit juice bars is more particularly described in the 1992 Agreement; whereas, Welch Foods Inc., Edamo Inc. and Edamo Pie Corporation desire to terminate the 1992 Agreement and to enter into this Agreement; and whereas, Edamo Inc. desires to use and license others to use the Trademarks and Trade Dress on and in connection with the Licensed Products (as the Fruit flavored frozen Novelty bars) (ii) any other newly developed products in the frozen dessert category, described herein and Welch Foods Inc is willing to authorize Edamo Inc.'s use and sublicense subject to the terms and conditions of this Agreement. 2. Grant the right to use the Trademarks (WELCH'S, WELCH'S [Design] and WELCHADE) in the Territory on or use in connection with the manufacture, distribution, promotion and sale of the Licensed Product(s) (i) | OSKAND PIE CORP | Welch Foods Inc., Edamo Inc., Edamo Pie Corporation | Welch Foods Inc., Edamo Inc., Edamo Pie Corporation | 08/31/1998 | 1. Unless owner terminated in accordance with the provisions hereof, the term of the Agreement shall commence on the Effective Date and end on December 31, 2038 (the "Term"). | Marketing Intangible | Consumer Non-Durable, Foods and Nondurable Beverages | 2024 | United States of America, Puerto Rico | Multi-Exclusivity | 40% | profits | The parties shall establish a mutually acceptable annual business plan for each Agreement Year ("Annual Business Plan") by October 31 of the preceding year, to be approved in writing by the President of Welch's and the President of Edamo or their respective designees. The first Annual Business Plan shall be established for the Agreement Year commencing on January 1, 1999. In structuring the Annual Business Plan, it is the parties' intention to achieve a plan which results in the profits derived from the business contemplated under this Agreement being split 60% to Licensee and 40% to Welch's (on a net contribution post-royalty basis calculated under the sublicensing method of product manufacturing). The Annual Business Plan shall include agreement with respect to: (i) the Annual Minimum to: (1) volume for each Licensed Product and the associated revenue, (2) pricing issues, (3) projected gross margins, (4) marketing plan and related spending, (5) packaging issues, (6) all particulars of New Products and (7) consideration of the cost of the License Fee. The formula for calculating the net contribution post-royalty is set forth on Schedule H. | Operating Profit | Licens... |
| 61251 | | | | | | | | | | | | 40% | profits | The parties shall establish a mutually acceptable annual business plan for each Agreement Year ("Annual Business Plan") by October 31 of the preceding year, to be approved in writing by the President of Welch's and the President of Edamo or their respective designees. The first Annual Business Plan shall be established for the Agreement Year commencing on January 1, 1999. In structuring the Annual Business Plan, it is the parties' intention to achieve a plan which results in the profits derived from the business contemplated under this Agreement being split 60% to Licensee and 40% to Welch's (on a net contribution post-royalty basis calculated under the sublicensing method of product manufacturing). The Annual Business Plan shall include agreement with respect to all Licensed Products as to: (1) volume for each Licensed Product and the associated revenue, (2) pricing issues, (3) projected gross margins, (4) marketing plan and related spending, (5) packaging issues, (6) all particulars of New Products and (7) consideration of the cost of the License Fee. The formula for calculating the net contribution post-royalty is set forth on Schedule H. | Operating Profit | Licens... |
| 53312 | 1. Grant the right to use the Trademarks (trademarks, service marks, trade names, trade dress, designs, including product package designs, symbols, emblems, logos, insignias, decor and internal building designs and architectural features and combinations of the foregoing) solely in direct connection with the sale of the food, beverage and other products from the TACO BELL RESTAURANT (a distinctive concept for the marketing, preparation and sale of certain Mexican style food products) in accordance with the provisions of this Universal Unit. As part of the consideration of this Universal Unit, the Company and its affiliates agrees to be established pursuant to this Agreement. | MORGANS FOODS INC | TACO BELL CORP | N/A | 2000 | 1. This Agreement shall continue for a term of twenty (20) years, unless earlier terminated in accordance with the conditions and provisions hereof, commencing with the date on which the Restaurant is opened for business to the public or forty-five days from _____ (the "Term"). The opening date will be confirmed by a writing signed by the parties and attached hereto, whichever is earlier. | Franchise | Restaurants, Consumer Services, Consumer Non-Durable, Foods and Nondurable Beverages | 5812 | United States | Multi-Exclusivity | 4.5% | Gross Sales | The Company will also contribute each five weeks for the weekly accounting period to, at its election, either a national marketing fund or a local marketing fund, an amount equal to four and one-half percent (4 1/2%) of the Gross Sales for such Company generated from the TACO BELL RESTAURANT in the United States. As part of the administration of the Universal Unit, the Company and/or its affiliates are also assisting in the operation of the Universal Unit to (Buyout/FRANCHISE/point.) | Gross Sales | |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51532 | | | | | | | | | | | | 1.5% | Gross Sales | | Gross Sales | License |
| 51532 | | | | | | | | | | | | 3% | Gross Sales | | Gross Sales | License |
| 51532 | | | | | | | | | | | | 5.5% | Gross Sales | | Gross Sales | License |
| 51532 | | | | | | | | | | | | 4.5% | Gross Sales | | Gross Sales | License |

kMINE

kMINE Export (2018.02.22) Part 2

EX1-203

kt MINE

| Agreement# | Agreement Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51532 | | | | | | | | | | | | 33.33% | all marketing fees | The Company has and will in consultation with ARAMARK develop, publish and modify from time to time as necessary a Marketing Fund Policy which will set forth procedures and guidelines for disbursements and expenditures from both the Marketing Fund and the Universal Fund and become part of the Manual. All monies in the Universal Fund, including any interest or other income earned from the investment of such monies must be spent and disbursed only in accordance with this Agreement and the Marketing Fund Policy. Although such Policy may be modified from time to time, the parties specifically agree that of the marketing fees paid into the Universal Fund: (i) Amounts equaling at least one-half one percent (1/2%) of Gross Sales from all those Taco Bell franchise and Company Restaurants which both contribute to the Universal Fund and are in the association (the Association) of all Taco Bell operators which the Company has approved for advertising TACO BELL RESTAURANTS in the marketing area in which the franchise/BELL Restaurants located (as specified by the Marketing Fund Policy) will be designated as Association and Media fundraisers designated from the Local Association. If no such Local Association exists, at least one-and-one-half percent (1.5%) of those franchise/BELL Gross Sales will be refunded to those franchise in the manner as otherwise provided in writing, and | Net Sales | License |
| 49404 | 1. Grant the right to manufacture itself or have manufactured on its behalf the Licensed Product (the right, power, and formulation of which already has been approved by CUMBERLAND PACKING CORP., as the same may be amended pursuant to the terms of this Agreement under the Licensed Trademark the mark "SWEET'N LOW" used alone or in combination with the design of a muscular bee and in bold outline for use in connection with the manufacture and sale of the Licensed Product) in the Licensed Territory for the Trade Classes (such as the "food service" Trade Class, for example, restaurants, institutional users, and the "retail" Trade Class, for example, supermarkets, drug stores, club stores, box stores). 2. Grant the right to promote, publicize, advertise, market, sell and distribute the Licensed Product (the sugar-free, reduced-calorie chocolate flavored syrup product, a sample of the formulation of which already has been approved by CUMBERLAND PACKING CORP., as the same may be amended pursuant to the terms of this Agreement) under the Licensed Trademark (the mark "SWEET'N LOW" used alone or in combination with the design of a muscular bee and in bold outline for use in connection with the manufacture and sale of the Licensed Product) in the Licensed Territory for the Trade Classes (such as the "food service" Trade Class, for example, restaurants, institutional users, and the "retail" Trade Class, for example, supermarkets, drug stores, club stores, box stores). | NATRESOURCE USA HOLDINGS INC. | CUMBERLAND PACKING CORP. | OLD FASHIONED SYRUP COMPANY, INC.; MERIDIAN HOLDINGS, INC.; Alan Posner, Mark Unruckled | 06/24/1998 | 1. Unless otherwise terminated as provided herein, the initial term of this Agreement shall expire on December 31, 2008 with an option for Licensee to renew for an additional seven (7) year period upon providing Cumberland with not less than ninety (90) days and not more than one hundred eighty (180) days written notice prior to the end of the initial term, provided that Licensee is not then in default of this Agreement. Any extension or renewal of this Agreement shall be subject to the increase in Minimum Royalties as set forth in Section 5(b), following the expiration of any renewal term, either party may terminate this Agreement at any time upon ninety (90) days prior written notice to the other of its intention to terminate this agreement. | Manufacturing/Process Intangible; Marketing Intangible | Consumer Non-Durables, Foods and Nondurables Beverages, Restaurants, Retail | 0770 | United States of America, Canada | Multi-Exclusivity | 7% | Net Sales | In consideration of the License granted herein, Licensee shall pay Cumberland an annual Royalty of seven percent (7%) of Net Sales pursuant to the terms and conditions of this Agreement. In addition, the full seven percent (7%) Royalty must be paid on (a) all "free goods" given to retailers (in lieu of slotting fees or otherwise) based upon the Net Sales price which would otherwise have been charged, and (b) all "private label" sales of the Licensed Product permitted to be sold pursuant to Section 13 herein. | Net Sales | License |
| 49404 | | | | | | | | | | | | 10% | Net Sales | For each Agreement Year after the Third Agreement Year, Licensee shall expend a Minimum Capital Commitment of the greater of (i) \$500,000 (adjusted each year for increases in the consumer price index), or (ii) 10% of the Net Sales of the Licensed Product. | Net Sales | License |

EX1-204

kMINE

XMINE Export [2018-02-22] Part 2

| Agreement# | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lev... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57135 | 1.Grant the right to manufacture itself or have manufactured on its behalf the Licensed Product ("the sugar free, reduced calorie chocolate flavored syrup product, a sample of the formulation of which already has been approved by CUMBERLAND PACKING CORP., as the same may be amended pursuant to the terms of this Agreement) under the trademark "SWEET N LOW" and/or in combination with the design of a musical bar and treble clef solely for use in connection with the manufacture and sale of the Licensed Product) in the Licensed Territory for the Trade Classes (each of, the "food service" Trade Class, for example, restaurants, institutional users, and the "retail" Trade Class, for example, supermarkets, drug stores, club stores, Wal-Marts). 2.Grant the right to promote, publicize, advertise, market, sell and distribute the Licensed Product (the sugar free, reduced calorie chocolate flavored syrup product, a sample of the formulation of which already has been approved by CUMBERLAND PACKING CORP., as the same may be amended pursuant to the terms of this Agreement) under the Licensed Trademark (the mark "SWEET N LOW" and/or in combination with the design of a musical bar and treble clef solely for use in connection with the manufacture and sale of the Licensed Product) in the Licensed Territory for the Trade Classes (each of, the "food service" Trade Class, for example, restaurants, institutional users, and the "retail" Trade Class, for example, supermarkets, drug stores, club stores, Wal-Marts). | MERISANT HOLDINGS INC | CUMBERLAND PACKING CORP | OLD FASHIONED SYRUP COMPANY INC; MERISANT HOLDINGS INC; Alan Kramer; Max J. Stratford | 09/01/1999 | 1. Unless otherwise terminated as provided herein, the initial term of this Agreement shall expire on December 31, 2008 with an option for Licensee to renew for an additional seven (7) year period upon providing Cumberland with not less than ninety (90) days and not more than one hundred eighty (180) days written notice prior to the expiration of the initial term, provided that Licensee is not in default of this Agreement. Any extension or renewal of this Agreement shall be subject to the increase in Minimum Royalties as set forth in Section 5(b), following the expiration of the prior seven (7) year term... terminate this Agreement at any time upon ninety (90) days prior written notice to the other of its intention to terminate this Agreement. | Manufacturing/Process Intangible; Marketing Intangible | Consumer Non Durables, Food and Nondurables, Beverages, Restaurant, Retail | 3770 | United States of America, Canada | Multi Exclusivity | 10% | Net Sales | For each Agreement Year after the first Agreement Year, an amount equal to either (a) the Commitment of the lesser of (i) $50,000 (adjusted each Agreement Year for increases in the Producer Price Index, or (ii) 10% of the Net Sales of the Licensed Product. | Net Sales | Lic... |
| 57135 | | | | | | | | | | | | 7% | Net Sales | In consideration of the License granted herein, Licensee shall pay Cumberland an amount Royalty of seven percent (7%) of Net Sales, pursuant to the terms and conditions of this Agreement. In addition, the first seven percent (7%) Royalty must be paid on (i) all "free goods" given as samples (in lieu of nothing being sold), based upon the Net Sales price which otherwise would have been charged; and (ii) all "private label" sales of the Licensed Product were paid to be sold pursuant to Section 5.b herein. | Net Sales | Lic... |
| 61320 | 1.Grant the right to purchase the assets relating to the Business (Nutrition NUTRITION MEDICAL INC) and distributing the Products. | NUTRITION MEDICAL INC | Nutrition Medical, Inc. | Galatam Inc. | 09/01/1998 | 1. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Fragro & Benson LLP, Minneapolis, Minnesota, at 10:00 a.m. on the second business day following fulfillment or appropriate waiver of all of the conditions specified in Sections 10 and 11 hereof, or such other date as Buyer and Seller may mutually agree (the "Closing Date"). | Asset Purchase; Manufacturing/Process Intangible; Marketing Intangible; Service | Business Services, Healthcare Pharmaceuticals, Healthcare Facilities, Biotechnology, Consumer Non Durables, Food and Nondurables Beverages | 3122 | Minneapolis, Minnesota, United States | EXCLUSIVE | 9% | net sales | Buyer will pay Seller a royalty of nine percent (9%) of net sales, reduced by the unsalable balance of the Products in excess of (i) $5,000,000 during the year ending December 31, 2000, (ii) $6,000,000 during the year ending December 31, 2001, and (iii) $7,500,000 during the year ending December 31, 2002. | Net Sales | Lic... |
| 61320 | | | | | | | | | | | | 1,000,000 | per month | Promptly after the Closing Date, Seller shall make the tangible assets available to Buyer at Seller's facilities at Suite 110, 9850 51st Avenue North, Minneapolis, Minnesota and shall cooperate with Buyer's personnel in assembling for shipment, in accordance with Buyer's instructions, all tangible assets (including inventory, books and records) of which Buyer shall take possession. All tangible assets shall be at Buyer's expense of all tangible assets to be held at Buyer's facilities and shall be shipped to each such location as Buyer shall specify, provided, however, that all machinery, equipment and tooling, if any, in the possession of the parties for manufacture of the Products shall remain in the possession of Seller and Buyer shall jointly notify and confirm to such parties that Buyer has purchased such assets from Seller. Buyer shall be entitled if it so elects to continue to store inventory of the Products at the facilities of the Seller through November 30, 1998 and (ii) Buyer shall, with Seller's consent, identify and ship inventory to the region of which should remain in the possession of Seller and its facilities to store inventory of the Products. Buyer agrees to pay to Seller $1,000 per month until Buyer ships on a daily basis from the Closing Date through the last date of which all such inventory of the Products is stored at the facilities of the Seller. | Per Unit | Lic... |

EX1-205

kMINE

KMINE Export (2018.02.22 Part 2)

| Agreement# | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commentable/Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61314 | LEXAEON INC | Nutrition Medical, Inc. | Gantzen Inc. | 00/01/1998 | 1. The timing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Hogan & Benson LLP, Minneapolis, Minnesota, at 10:00 a.m. on the second business day following fulfillment in appropriate waiver of all of the conditions specified in Sections 10 and 11 hereof, or such other date as Buyer and Seller may mutually agree (the "Closing Date"). | Asset Purchase, Manufacturing Process and Facility, Marketing Intangible, Service | Biotechnology, Business Services, Consumer Non-Durables, Foods and Kindred Goods, Beverages, Healthcare Facilities, Healthcare, Pharmaceutical | 2836 | Minneapolis, Minnesota, United States | EXCLUSIVE | 9% | net sales | Buyer will pay Seller a royalty of nine percent (9%) of net sales, reduced by any royalties Seller accounts, of the Products in excess of $15,000,000 during the year ending December 31, 2000, (ii) $2,000,000 during the year ending December 31, 2001, and (iii) $7,500,000 during the year ending December 31, 2002. | Net Sales / Licensor |
| 61314 | | | | | | | | | | | | | Promptly after the Closing Date, Seller shall make the tangible Assets available to Buyer at Seller's facilities at Suite 110, 9850 51st Avenue North, Minneapolis, Minnesota and shall cooperate with Buyer's personnel in arranging for the orderly assembly, packing and shipment of the tangible Assets to such location. From and after the Closing, Seller shall, at Buyer's cost and expense, provide, however, that (a) machinery, equipment and tooling, if any, in the possession of third parties for production purposes shall be left in their possession and Seller and Buyer shall jointly notify and confirm to such third parties that Buyer has purchased such assets from Seller; (b) Buyer shall be entitled if it so desires to continue to store inventory of the Products at the facilities of the Seller through November 30, 1998 and (c) Buyer shall, with Seller's assistance, identify any books and records that may be used to identify that the Products. In consideration of Seller. In consideration of the cost of the Seller shall reimburse Buyer for the cost of the Seller's facilities to store inventory of the Products, Buyer agrees to pay Seller $3,000 per month pro-rated on a daily basis from the Closing Date through the last date upon which any inventory of the Products is stored at the facilities of the Seller. | Per Unit | $3,000 USD | per month | | |
| 64670 | AMERICAN CRYSTAL SUGAR CO | Pillsbury Company | AMERICAN CRYSTAL SUGAR CO (NN) | 04/20/1997 | 1. This Agreement shall be effective as of the Effective Date and shall continue until September 30, 2002, unless sooner terminated or extended as set forth herein below. | Marketing Intangible | Foods and Nonalcoholic Beverages | 2060 | United States | EXCLUSIVE | 2% | | Gross Revenue | In consideration of the license granted by Pillsbury to Licensee pursuant to this Agreement, Licensee agrees to pay Pillsbury a royalty of 2% of Gross Revenue Delivered. | Gross Revenue / Licensor |
| 64679 | JPS TECHNOLOGIES INC | JPS Produce, Inc./JPS TECHNOLOGIES, INC. | JPS Produce, Inc. LLC | 09/22/1997 | 1. The term of this Sublicense granted hereunder shall commence on the Effective Date and, unless sooner terminated as otherwise provided for herein, shall continue until August 31, 2007 and shall continue thereafter until terminated by either LICENSOR or LICENSEE providing the other party not less than 180 days written notice of its election to terminate. | Marketing Intangible | Foods and Nonalcoholic Beverages, Retail | 2890 | United States, Canada | Multi Exclusivity | 0.04 USD | | Per Pound | For each subsequent year of the term of this Sublicense, the Licensee shall pay a royalty in the amount to the numerator is the Consumer Price Index for all Urban Consumers, published by the U.S. Department of Labor Statistics ("CPI") at the end of the preceding ("CPI") and the denominator is the CPI at the Effective Date but in no event shall such fee be less than ($0.04 USD per pound) nor more than ($0.04 USD per pound). | Per Pound |
| 64679 | | | | | | | | | | | 0.03 USD | Per Pound | | |
| 64679 | | | | | | | | | | | 0.04 USD | Per Pound | | |

Copyright © 2018 KMINE. Usage of this data is governed by the terms and conditions accepted by user during initial log-in to KMINE database.

Page 48 of 54

EX1-206



| Source: | ktMINE Royalty Rate Finder |
|---|---|
| Client: | [Blank] |
| Date: | 2/23/2018 |
| Project: | [Blank] |
| Description: | [Blank] |
| FYE Analysis: | [Blank] |
| Username: | wkwak@nathaninc.com |
| Total Agreements Reviewed: | 62 |

| SEARCH # | | | | | | |
|---|---|---|---|---|---|---|
| # | Filter | Filter Criteria | Step Results | Search Results | Operator |
| 1 | Industry | ALCOHOLIC BEVERAGES AND TOBACCO, FOODS AND NONALCOHOLIC BEVERAGES | 1897 | 1897 | |
| 2 | TerritoryName | U.S., U.S.A., UNITED STATES, UNITED STATES, UNITED STATES OF AMERICA, USA | 3643 | 459 | and |
| 3 | Keyword | TRADEMARKS, SERVICE MARKS, TRADE NAMES, TRADEMARK, LOGOS, MARKS, TRADE NAME, TRADENAMES, TRADENAME | 5084 | 264 | and |
| 4 | EffectiveDate | BETWEEN, 1/1/1950&3/1/1996 | 0 | 62 | AND |
| | | | | | |

Copyright © 2018 ktMINE.  Usage of this data is governed by the terms and conditions accepted by user during initial log-in to ktMINE database

kMINE Export [2018.02.23] Part 3

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementValue | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12178 | 1. Grant the right to use of the TRADEMARK (the tradename, trademark, trademark and/or logos of HUDSON'S BREWING) in the manufacture, distribution and marketing of beer. 2. Grant the right to manufacture, distribute and market clothing and merchandise using or bearing the TRADEMARK (the trademarks, trademark and logos of HUDSON'S BREWING) for promotional purposes related to the sale of beer only. | HERITAGE WORKS INC | C. H. SKYLIGHT & ASSOCIATES, Housing Family Mexico, Ricardo Housing | HERITAGE BREWING COMPANY INC | 1996 | 1. The initial term of this License Agreement shall be for one (1) year, commencing on the date of this LICENSE so long as LICENSEE is not in material breach of the terms of this License Agreement and has met the annual minimum sales quotas set forth in sub-section 4(b). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Durables | | California, Oregon, Washington, Arizona, Nevada, Montana, Utah, New Mexico, Hawaii, Idaho, Mexico, United States, worldwide | EXCLUSIVE | 10% | gross profit | LICENSEE shall pay to LICENSOR a royalty of 10% of the gross profit from the sale of any clothing or merchandise bearing the TRADEMARK. | Gross Profit | License |
| 12178 | | | | | | | | | | | | 20.000 | per gallon | LICENSEE shall pay to LICENSOR a royalty of $.020 per gallon on beer sold under the TRADEMARK during the first five (5) years of this License agreement. | Per Unit | License |
| 1881 | 1. Grant the right to use the Technology relating to containers made from inexpensively filled moldable compounds for manufacturing, finished products, storing, performing, cleansing, preserving, serving and consuming food or beverages to be used in, served and otherwise commercialized the Products (i. Commercially i. Sandwich containers). 1. Breakfast partners, ii. Trays, i. Plates, and ii. Bowls) solely within the Territory and solely within the field of use (i) the use and sale of Products in the food service and restaurant industry, (ii) the use and sale of Products in other retail establishments (selling Products EG, grocery stores, convenience stores, food warehouses, and the like), but only with respect to Products that have been introduced into the food service and restaurant industry. 1. For customer of an EARTHSHELL CONTAINER CORPORATION sublicensee [including any Affiliate] that operates retail outlets in the food service and restaurant industry or at least one or as sub locations, (iii) the incidental use and sale in any other of those Products as are manufactured by GENPAK CORPORATION hereunder where the predominant use is within the food service and restaurant industry, and (iv) the sale of Products to distributors and wholesalers for resale and use in retail outlets in the food service and restaurant industry, subject to at least (ii) above, in retail establishments). 2. Grant the right to sub-license and sell the Products, the EARTHSHELL[TM] trademark, distribution and sale of the Products, the EARTHSHELL[TM] trademark and such other trade names, trademarks, service marks, slogans and logos back as may be designated in writing by EARTHSHELL CONTAINER CORPORATION as the EARTHSHELL CONTAINER CORPORATION or from time to time thereafter. | EARTHSHELL CORPORATION | EARTHSHELL CONTAINER CORPORATION | GENPAK CORPORATION | 11/8/1994 | 1. The term of this Agreement shall commence upon the effective date hereof. Unless sooner terminated as hereinafter provided, this Agreement shall continue in full force and effect until the expiration of the last material patent included in the Technology. Subicensee produces and sells Products which incorporate material and/or proprietary proprietary information (or a component of) thereunder (until) Frozen ECC provided, however, that upon the expiration of the last aforementioned patent, if Sublicensee desires to continue the Agreement in force, it will be subject to use appropriate registered adjustments to the Royalty. Payments on license fee. Any dispute as to the term of this Agreement shall be resolved [application as provided under this Agreement. | Manufacturing/Process Intangible, Marketing Intangible, Software | Alcoholic Beverages and Tobacco, Foods and Nonalcoholic Beverages, Restaurants, Retail, Consumer Non-Durables, Computers/ Hardware and Software, Consumer Services | | United States of America, Canada, Mexico, Central America, Caribbean Islands and nations | Multi-Exclusivity | 25% | Net Sales Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to ECC a royalty (the "Royalty") of twenty-two percent (22%) of the Net Sales Price for each Product sold by Sublicensee during the term of this Agreement. | Net Sales | License |
| 1881 | | | | | | | | | | | | 2% | Net Sales Price | To the extent Sublicensee elects to use the Trademarks on or in connection with the manufacture, marketing, distribution, use and/or sale of Products hereunder, Sublicensee shall be entitled to receive an advertising allowance credit equal to two percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, Sublicensee shall submit to ECC written documentation, reasonably satisfactory to ECC, of sales by Sublicensee of Products bearing the Trademarks, and ECC shall credit the appropriate amount against future royalties payable by Sublicensee hereunder. | Net Sales | License |
| 25249 | 1. Grant the right to the Trademark 2. Grant the right to sub-license said rights to franchisees, such franchisees and sub-licensees | INTERFOODS OF AMERICA INC | Schlotzsky's Sandwich Shops, Inc., 1360 Franchise Systems, Inc. | George A. Simmons, James S. Byrd, Kilburn Jr | 10/1/1993 | 1. This Agreement shall commence on March 9, 1995, and shall continue for a period of ten (5) years (the "Initial Term") | Franchise, Marketing Intangible | Restaurants, Consumer Services, Alcoholic Beverages and Tobacco | | Florida, United States | Multi-Exclusivity | 4% | Gross Sales | Royalty from the opening of Franchisee's Subli's Sub Shop and throughout the remainder of the Term of this Franchise Agreement | Gross Sales | License |
| 25249 | | | | | | | | | | | | 4% | Gross Sales | Advertising (agreement) | Gross Sales | License |
| 25249 | | | | | | | | | | | | 1% | Gross Sales | Advertising payment, local and regional advertising and promotional program | Gross Sales | License |
| 25249 | | | | | | | | | | | | 5% | Gross Sales Price | Transfer of Franchise payment, $2,500 or 5% of gross sales price, whichever is greater | Gross Sales | License |
| 25249 | | | | | | | | | | | | 25% | Revenues | Royalty to be paid to Licensor throughout the Initial Term, even after the Purchase Date, at the rate of 25%, with no renewals. | Revenues | License |
| 25249 | | | | | | | | | | | | 25% | Revenues | Non-sublicensing or other similar usage of the Trademark | Net Sales | License |

Page 1 of 47

EX1-208

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | Licenses | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15249 | 1. Licensee has the right to use the TRADEMARK (the trademark, tradename and/or the logo of HUDSON'S BEER) for the manufacture, distribution and marketing of beer. 2. Grant the right to manufacture, distribute and market clothing and merchandise using or bearing the TRADEMARK (the tradename, trademark and logo of HUDSON'S BEER) for promotional purpose related to the sale of beer only. | | | C.A. NETTAVER & ASSOCIATES, Ricardo Fleuring, Fleuring Family Mexico | HERITAGE BREWING COMPANY INC. | 1996 | 1. The initial term of this License Agreement shall be for one (1) year, renewable annually at the option of LICENSEE so long as LICENSEE is not in material breach of the terms of this License Agreement and has met the annual minimum sales quotas set forth in subsection 4(b). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Durables | | California, Oregon, Washington, Arizona, Nevada, Montana, Utah, New Mexico, Hawaii, Idaho, Mexico, United States, worldwide | EXCLUSIVE | 3% | current annual franchise fee | LICENSEE shall pay to LICENSOR a royalty of 10% of the gross profit from the sale of any clothing or merchandise bearing the TRADEMARK | Other |
| 20249 | | | | | | | | | | | | | 2% | current annual franchise fee | for purchase of the trademark, Purchase Price shall be the base price of $300,000.00 plus an additional 3% of the then current annual franchise revenues collected through the Purchase Date under Licensor's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 3% of such amount if during year four. | Other |
| 20249 | | | | | | | | | | | | | 3% | current annual franchise fee | for purchase of the trademark, Purchase Price shall be the base price of $300,000.00 plus an additional 3% of the then current annual franchise revenues collected through the Purchase Date under Licensor's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 3% of such amount if during year four. | Other |
| 68531 | 1. The antiseptic products is patented: anti-smoking device, an anti-smoking kit/program and complemental consumable products, including personal care/hygiene products, vitamins/supplements and vitamin products(s) to the Integrity International Inc. under the labels and trade names agreed to between the parties. | | I.A. NETTAVER & ASSOCIATES, Phase Out of America, Inc., Integrity International, Inc. | Integrity International, Inc., Phase Out of America, Inc. | | 1996 | 1. The initial term of this License Agreement shall be for one (1) year, renewable annually at the option of LICENSEE so long as LICENSEE is not in material breach of this License Agreement and has met the annual minimum sales quotas set forth in subsection 4(b). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Durables | | California, Oregon, Washington, Arizona, Nevada, Montana, Utah, New Mexico, Hawaii, Idaho, Mexico, United States, worldwide | EXCLUSIVE | 10% | gross profit | LICENSEE shall pay to LICENSOR a royalty of 10% of the gross profit from the sale of any clothing or merchandise bearing the TRADEMARK | Gross Profit |
| 68531 | | | | | | | | | | | | | 20 USD | per gallon | LICENSEE shall pay to LICENSOR a royalty of $.20 per gallon on all beer sold under the TRADEMARK during the term of this Agreement | Per Unit |
| 67933 | 1. Grant the right to sell its products is patented: anti-smoking device, an anti-smoking kit/program and complemental consumable products, including personal care/hygiene products, vitamins/supplements and vitamin products(s) to the Integrity International, Inc. under the labels and trade names agreed to between the parties. 2. Grant the right to market its product to exclusively market the modified version of the anti-smoking device by whatever channel of distribution in the United States and its territories and in Canada. 3. Grant the right to have the right of first refusal to exclusively market the modified version of the anti-smoking device anywhere in the world through network marketing, direct sales or multilevel distribution. 4. Grant the right to have the right of first refusal to exclusively market any additional products acquired, created, formulated or licensed by Manufacturer in accordance with the channels of distribution. 5. Grant the right to become an independent distributor of the Products (PhaseOut Anti-Smoking Device, Phase Out Anti-Smoking Kit/Program, Phase Out Complementary Products) marketed by the Phase Out of America, Inc. and to participate in its Compensation Plan. 6. Grant the right to use the Phase Out of America, Inc.'s trademark, Contrac | | PHASE OUT OF AMERICA, INC. | Integrity International, Inc., Integrity International, Inc. | | 00/02/1995 | 1. This Agreement shall commence upon execution hereof and shall continue for a term of (10) years unless sooner terminated in accordance with Section 7(b). After the tenth year anniversary of execution, this Agreement may be renewed for successive one (1) year periods subject to either party's written notice of intention to terminate which must be delivered no less than one (1) month prior to the date of expiration. | Distribution, Marketing Intangible, Service | Business Services, Consumer Services, Consumer Non-Durables, Healthcare Pharmaceutical, Healthcare Products and Supplies, Alcohol, Beverages and Tobacco, Consumer Durables, Biotechnology | 5190 | world, United States, Canada | Multi Exclusivity | 120% | costs | Upon request from the Company, Manufacturer agrees to provide all of its marketing materials for the Product to the Company at Manufacturer's cost plus twenty percent. The Company agrees to pay for all new duplication of such materials that the Company elects to use. If the Company desires to purchase any marketing materials from Manufacturer, the price shall be at Manufacturer's cost plus twenty percent (20%). | Costs |
| 67933 | | | | | | | | | | | | | 120% | costs | Upon request from the Company, Manufacturer agrees to provide all of its marketing materials for the Product to the Company at Manufacturer's cost plus twenty percent. The Company agrees to pay for all new duplication of such materials that the Company elects to use. If the Company desires to purchase any marketing materials from Manufacturer, the price shall be at Manufacturer's cost plus twenty percent (20%). | Costs |

EX1-209

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | Licenses | Term | EffectiveDate | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity/Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 67533 | | | | | | | | | | | | | | Wholesale Volume of Manufacturer's sales organization | in addition to the compensation earned by Manufacturer through his Company's Compensation Plan, for its efforts and performance hereunder, the Company shall also pay to manufacturer a royalty equal to 5 % of the Wholesale Volume of Manufacturer's sales organization, which is calculated on a points per product basis. | Gross Sales |
| 67533 | | | | | | | | | | | | | | 50.000 | per bottle | Manufacturer agrees that the Company's formula for its dietary supplement, InShape, shall be used instead of Manufacturer's product, iControl. The Company shall pay a per bottle fee cost of Manufacturer in trademark, iControl, of $1.50 per bottle for all sales of such product by the Company | Per Unit |
| 67533 | | | | | | | | | | | | | | 9.00.00 | per Device | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 as I Heart-Out Anti-Smoking Device - $9.00 per Device | Per Unit |
| 67533 | | | | | | | | | | | | | | 11.60.00 | per Kit/Program | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-11 Phase-Out Anti-Smoking Kit/Program 1 $11.60 per Kit/Program | Per Unit |
| 67533 | | | | | | | | | | | | | | 250.000 | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 Phase-Out Complementary Products: 1) BreathSweet  $2.50 per bottle, ii) Inflow 1 $3.50 per bottle, iii) Heflow 1 $3.50 per bottle, iv) Inflow - $3.65 per bottle, v) Heargard - $2.50 per bottle | Per Unit |
| 67533 | | | | | | | | | | | | | | 3.50.00 | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 Phase-Out Complementary Products: 1) BreathSweet - $2.50 per bottle, ii) Inflow - $3.50 per bottle iii) Identity 1 $4.50 per bottle, iv) Inflow - $3.50 per bottle, v) Heargard - $2.50 per bottle | Per Unit |
| 67533 | | | | | | | | | | | | | | 4.50.00 | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 Phase-Out Complementary Products: 1) BreathSweet - $2.50 per bottle, ii) Inflow - $3.50 per bottle iii) Identity 1 $4.50 per bottle, iv) Inflow - $3.50 per bottle, v) Heargard - $2.50 per bottle | Per Unit |
| 67533 | | | | | | | | | | | | | | 3.50.00 | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 Phase-Out Complementary Products: 1) BreathSweet - $2.50 per bottle, ii) Inflow - $3.50 per bottle iii) Identity 1 $4.50 per bottle, iv) Inflow - $3.50 per bottle, v) Heargard - $2.50 per bottle | Per Unit |
| 67533 | | | | | | | | | | | | | | 2.50.00 | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A-1 Phase-Out Complementary Products: 1) BreathSweet - $2.50 per bottle, ii) Inflow - $3.50 per bottle iii) Identity 1 $4.50 per bottle, iv) Inflow - $3.50 per bottle, v) Heargard - $2.50 per bottle | Per Unit |

kMINE Export (2018.02.23) Part 3

Page 1 of 47

EX1-210

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | License | Term | EffectiveDate | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | CommodityIs | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G7533 | | | | | | | | | | | | | 3.65 USD | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A: c1Prod:Co1:Complementary Products: i.1 BreathSweet - 1 2.50 per bottle; ii.1 ReNove - 1 5.50 per bottle; iii.1Derillo - 1 6.50 per bottle; iv.1 ReNeue1-5 3.50 per bottle; v.1 1Maniac - 1 2.65 per bottle; vi.1 HeartGard -5 2.50 per bottle | Per Unit | License |
| G7533 | | | | | | | | | | | | | 2.50 USD | per bottle | The price for the products available for purchase from Manufacturer by the Company shall be identified on Exhibit A: c1Prod:Co1:Complementary Products: i.1 BreathSweet - 1 2.50 per bottle; ii.1 ReNove - 1 5.50 per bottle; iii.1Derillo - 1 6.50 per bottle; iv.1 ReNeue1-5 3.50 per bottle; v.1 1Maniac - 1 2.65 per bottle; vi.1 HeartGard -5 2.50 per bottle | Per Unit | License |
| G7533 | | | | | | | | | | | | | 1.50 USD | per device | It is acknowledged and agreed that the price of the anti-smoking device will be increase approximately $1.50 per device as a result of the modifications thereto. | Per Unit | License |
| G8427 | 1.Grant the right to use the Technology relating to containers made from resignods filled moldable composites and components for packaging, storing, dispensing, displaying, serving, presenting, cooling and consuming food or beverages to make, use, sell and otherwise commercialize the Product (ii.1.C onverted t:1.Sandwich containers; 2.Board lid packers; 3.Trays; 5.Plates; and 4.Bowls) solely within the Territory and solely within the food or beverage (for sale and use and sale of Products in other retail establishments selling Products (E.G., grocery stores, convenience stores, food warehouses, and the like), but only with respect to Products that have been introduced into the food service and restaurant industry by a customer of an EARTHSHELL CONTAINER CORPORATION sublicensee (including an Affiliate) that operates retail outlets in the food service and restaurant industry or at least six locations; b) the commercial production of Products in or for use in or sale to any owner of those Products which are manufactured by GEMPAK CORPORATION hereunder where the production or use is within the food service and restaurant industry; and (iii) the sale of Products to distributors and wholesalers for resale and use within the food service and restaurant industry and, subject to a.sea (ii) above, in retail | EARTHSHELL CONTAINER CORP | EARTHSHELL CONTAINER CORPORATION | GEMPAK CORPORATION | 11/9/1994 | | | The term of this Agreement shall commence upon the effective date hereof. Unless sooner terminated as hereinafter provided, this Agreement shall continue in full force and effect until the expiration of the last material and substantial patent covering the Technology which is utilized by Sublicensee, or for so long as Sublicensee produces the Products which are material and substantial proprietary information (or a material and substantial Trade Secret of EICC; provided, however, that upon the expiration of the last aforementioned patent, if Sublicensee desires to continue the Agreement in force, it will be subject to an appropriate negotiated adjustment to the Royalty Payments or License Fee, Any dispute as to the term of this Agreement shall be resolved by arbitration as provided under this Agreement. | Manufacturing/Process Intangible; Marketing Intangible; Software | Restaurants, Consumer Services, Retail, Consumer Non-Durables, Foods and Non-Alcoholic Beverages, Computers / Hardware and Software, Alcoholic Beverages and Tobacco | | United States of America, Canada, Mexico, Central America, Caribbean Islands and nations | Multi-Exclusivity | 22% | Net Sales Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to EICC a royalty (the "Royalty") of twenty-two percent (22%) of the Net Sale Price for each Product sold by Sublicensee during the term of this Agreement. | Net Sales | License |
| G8427 | 2.Grant the right to utilize in connection with the manufacture, marketing, distribution and sale of the Products, the EARTHSHELL (TM) trademark and such other trade names, trademarks, service marks, slogans and logos marks that may be designated in writing by EARTHSHELL CONTAINER CORPORATION to GEMPAK CORPORATION solely in connection with the production and sale of the Products by GEMPAK CORPORATION as from time to time thereafter | | | | | | | To the extent Sublicensee elects to use the Trademarks (or in connection with manufacture, marketing, distribution, use and/or sale of Products hereunder, Sublicensee shall be entitled to receive an advertising allowance credit equal to Two Percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, Sublicensee must submit to EICC written documentation, reasonably satisfactory to EICC, of sales by Sublicensee of Products that bear the Trademarks, and EICC shall credit the appropriate amount against future royalties payable by Sublicensee hereunder. | 2% | Net Sale Price | | Net Sales | License |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25299 | 1. Grant the right to develop Applebee's Restaurants. | MARCUS CORP | APPLEBEE'S INTERNATIONAL, INC. | MARCUS RESTAURANTS, INC. | 06/8/1994 | 1. Franchisor grants Developer the exclusive right to develop Restaurants only in the Territory for a period commencing on the date hereof and expiring on November 27, 2009, unless sooner terminated as hereinafter provided. Developer has no right under this Agreement to develop Restaurants outside of the Territory. | Franchise | Restaurants, Consumer Services, Consumer Non-Durables, Alcoholic Beverages and Tobacco, Foods and Nonalcoholic Beverages | | Chicago, Illinois, Kenosha County, Wisconsin, McHenry County, Illinois, Kane County, Illinois, Cook County, Illinois, Kendall County, Illinois, Grundy County, Illinois, De Kalb County, Illinois, Kankakee County, Illinois, DuPage County, Illinois, Will County, Illinois, Livingston County, Illinois, Iroquois County, Illinois, Ford County, Illinois, United States, Schaumburg, Illinois, Bloomingdale, Illinois, Deerfield, Illinois, McHenry, Illinois, Streamwood, Illinois, Hodgkins, Illinois, Naperville, Illinois, Crystal Lake, Illinois | Multi-Exclusivity | 5% | Gross Sales | Royalty Fee for continuing right to operate the Restaurant as part of the system. | Gross Sales | Licensee |
| 25299 | | | | | | | | | | | | 4% | Gross Sales | Advertising Fee. If royalty fee is equal to 5% of gross sales. | Gross Sales | Licensee |
| 25299 | | | | | | | | | | | | 4% | Gross Sales | Royalty Fee. 4% of gross sale or 5% after January 1, 2000. | Gross Sales | Licensee |
| 25299 | | | | | | | | | | | | 5% | Gross Sales | Royalty Fee. 4% of gross sales or 5% after January 1, 2000. | Gross Sales | Licensee |
| 25299 | | | | | | | | | | | | $500 / $100 | per restaurant | Royalty Fee for development of restaurants. | Per Unit | |
| 63001 | 1. Grant the right to operate a Hooters Restaurant and to use solely in connection therewith the Proprietary Marks (trade names, service marks, trademarks, logos, emblems, trade dress and other indicia of origin, including but not limited to the mark "Hooters" and such other trade names, service marks, trademarks and trade dress) and the Hooters System. | BUTTERWINGS ENTERTAINMENT GROUP INC | HOOTERS OF AMERICA, INC., Neighborhood Restaurants of America, Inc., Hooters, Inc. | BUTTERWINGS OF WISCONSIN, INC. | 02/31/1993 | 1. Except as otherwise provided herein, the term of this Agreement shall commence on the date of execution and acceptance of this Franchise Agreement by Hooters of America and shall expire twenty (20) years from such date. There are no renewal rights, options or obligations in ... the part of either party. | Franchise | Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Restaurants, Alcoholic Beverages and Tobacco | | Madison, Wisconsin, Milwaukee, Wisconsin, United States | Multi-Exclusivity | 6% | Gross Sales | | Gross Sales | Licensee |
| 63001 | | | | | | | | | | | | 3% | Gross Sales | During the term of this Agreement, Franchisee shall spend a minimum of three percent (3%) of the Gross Sales of the Restaurant on local advertising and promotion; provided, however, that Franchisee shall have the right to approve or disapprove any advertising prepared for use by Franchisee. | Gross Sales | Licensee |
| 63001 | | | | | | | | | | | | 3% | Gross Sales | In the event Hooters of America establishes a Local Advertising Cooperative within Franchisee's Area of Dominant Influence (as defined by Arbitron Corporation, or such other entity as shall be designated by Hooters of America, from time to time), Franchisee shall be obligated to contribute a minimum of up to one (1) out of each three percent (3%) [one percent (1%) of Gross Sales] for local advertising and promotion expenditures described above. Such Cooperative, to be actually received within ten (10) days from the end of each four-week accounting period. Such percentage contribution to such Cooperative shall be designated by Hooters of America from time to time. | Gross Sales | Licensee |
| 63001 | | | | | | | | | | | | 3% | Gross Sales | In the event Hooters of America establishes a Local Advertising Cooperative within Franchisee's Area of Dominant Influence (as defined by Arbitron Corporation, or such other entity as shall be designated by Hooters of America, from time to time), Franchisee shall be obligated to contribute a minimum of up to one (1) out of each three percent (3%) [one percent (1%) of Gross Sales] for local advertising and promotion expenditures described above. Such Cooperative, to be actually received within ten (10) days from the end of each four-week accounting period. Such percentage contribution to such Cooperative shall be designated by Hooters of America from time to time. | Gross Sales | Licensee |
| 63001 | | | | | | | | | | | | 1% | Gross Sales | In the event Hooters of America establishes a Local Advertising Cooperative within Franchisee's Area of Dominant Influence (as defined by Arbitron Corporation, or such other entity as shall be designated by Hooters of America, from time to time), Franchisee shall be obligated to contribute a minimum of up to one (1) out of each three percent (3%) [one percent (1%) of Gross Sales] for local advertising and promotion expenditures described above. Such Cooperative, to be actually received within ten (10) days from the end of each four-week accounting period. Such percentage contribution to such Cooperative shall be designated by Hooters of America from time to time. | Gross Sales | Licensee |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | License | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity (Lead) | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G-001 | 1-Grant the right to operate a Hooters Restaurant and to use solely in connection therewith the Proprietary Marks (trade names, service marks, trademarks, logos, emblems, trade dress and other indicia of origin, including but not limited to the mark "Hooters" and such other trade names, service marks, trademarks and trade dress) and the Hooters System | BUTTERWING ENTERTAINMENT GROUP INC | HOOTERS OF AMERICA INC., Neighborhood Restaurants of America, Inc., Hooters, Inc. | BUTTERWING OF WISCONSIN, INC. | | 10/21/1993 | 1-Except as otherwise provided herein, the term of this Agreement shall commence as the date of execution and acceptance of this Franchise Agreement by Hooters of America and shall expire twenty (20) years from such date. There is no renewal rights, options or obligations on the part of either party. | Franchise | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants | | Milwaukee, Wisconsin, Madison, Wisconsin, United States | Multi Exclusivity | 6% | Gross Sales | During the term of this Agreement, Franchisee shall pay to Hooters, on a continuing monthly basis, a continuing royalty fee which shall be equal to six percent (6%) of the Gross Sales of the Restaurant, without counterclaim or set-off. | Gross Sales | Licensee |
| G-001 | | | | | | | | | | | | | 1% | Gross Sales | Franchisee shall pay to Hooters of America, to be actually received within ten (10) days from the end of each four-week accounting period, a National Advertising fund equal to one percent (1%) of Franchisee's Gross Sales of the Restaurant. | Gross Sales | Licensee |
| G-001 | | | | | | | | | | | | | 3% | Gross Sales | Franchisee shall spend a minimum of three percent (3%) of Franchisee's Gross Sales, on local advertising and promotion annually. | Gross Sales | Licensee |
| G-001 | | | | | | | | | | | | | 1% | Gross Sales | Franchisee agrees to make continuing monthly contributions to the National Advertising fund as required by the Hooters of America in an amount equal to one percent (1%) of Franchisee's Gross Sales. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 6% | Gross Sales | During the term of this Agreement, Franchisee shall pay to Hooters, on a continuing monthly basis, a continuing royalty fee which shall be equal to six percent (6%) of the Gross Sales of the Restaurant, without counterclaim or set-off. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 3% | Gross Sales | During the term of this Agreement, Franchisee shall spend a minimum of three percent (3%) of the Gross Sales of the Restaurant on local advertising and promotion; provided, however, that Franchisor shall have the right to approve or disapprove any advertising prepared for use by Franchisee. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 3% | Gross Sales | In the event Hooters of America establishes a Local Advertising Cooperative within Franchisee's Area of Dominant Influence (as defined by the Arbitron Corporation, or such other entity as shall be designated by Hooters of America), then from time to time, Franchisee shall be obligated to contribute a minimum of up to one-third of such three percent (3%) [one percent (1%) of Gross Sales] for local advertising and promotion expenditure described above to such Cooperative, to be actually received within ten (10) days from the end of each four-week accounting period. Such percentage contribution to such Cooperative shall be designated by Hooters of America from time to time. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 1% | Gross Sales | In the event Hooters of America establishes a Local Advertising Cooperative within Franchisee's Area of Dominant Influence (as defined by the Arbitron Corporation, or such other entity as shall be designated by Hooters of America), then from time to time, Franchisee shall be obligated to contribute a minimum of up to one-third of such three percent (3%) [one percent (1%) of Gross Sales] for local advertising and promotion expenditure described above to such Cooperative, to be actually received within ten (10) days from the end of each four-week accounting period. Such percentage contribution to such Cooperative shall be designated by Hooters of America from time to time. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 1% | Gross Sales | Franchisee shall pay to Hooters of America, to be actually received within ten (10) days from the end of each four-week accounting period, a National Advertising fund equal to one percent (1%) of Franchisee's Gross Sales of the Restaurant. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 1% | Gross Sales | Franchisee shall pay to Hooters of America, to be actually received within ten (10) days from the end of each four-week accounting period, a National Advertising fund equal to one percent (1%) of Franchisee's Gross Sales of the Restaurant. | Gross Sales | Licensee |
| G-099 | | | | | | | | | | | | | 1% | Gross Sales | Franchisee agrees to make continuing monthly contributions to the National Advertising fund as required by the Hooters of America in an amount equal to one percent (1%) of Franchisee's Gross Sales. | Gross Sales | Licensee |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | CommercialLevel |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8964 | 1. Grant the right to use the Technology [EAR Technology - confidential, secret or proprietary technology involving the Compound and the Products, which are described or claimed in patents. Moldable Compound Technology - confidential, secret or proprietary technology involving the Moldable Compound Technology and the Products... | EARTHSHELL CONTAINER CORP | EARTHSHELL CONTAINER CORPORATION | DOPACO, INC. | 06/30/1995 | Unless sooner terminated as hereinafter provided, this Agreement shall continue in full force and effect until the expiration of the last material and substantial patent covering the Technology which is utilized by Sublicensee, or for so long as Sublicensee produces the Products which utilize material and substantial proprietary information (in a material and substantial Trade Secret of ECC) provided, however, that upon the expiration of the last aforementioned patent, if Sublicensee desires to continue the Agreement in force, it will be subject to re-appropriate negotiated adjustment to the Royalty Payments or License Fee. | Manufacturing Process Intangible; Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables; Consumer Durables; Consumer Services, Restaurants, Retail | | United States of America, Canada, Mexico, Central America, Caribbean Islands and nations | North America only | 22% | Net Sales Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to ECC a royalty ("Royalty") of twenty-two percent (22%) of the Net Sales Price for Products sold by Sublicensee during the term of this Agreement. | Net Sales |
| 8964 | 2. Grant the right to utilize, in connection with the manufacture, marketing, | | | | | | | | | | | | | | |
| 8964 | | | | | | | | | | | | 2% | Net Sale Price | To the extent Sublicensee elects to use the Trademarks on or in connection with manufacture, marketing, distribution, use and/or sale of Products hereunder, Sublicensee shall be entitled to receive an advertising allowance credit equal to Two Percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, Sublicensee shall submit to ECC written documentation, reasonably satisfactory to ECC, of sales by Sublicensee of Products that bear the Trademarks, and ECC shall credit the appropriate amount against future royalties payable by Sublicensee hereunder. | Net Sales Price |
| 1997 | 1. Grant the right to utilize Trademarks & Land O'Lakes Names logos & form factory in connection with the manufacture, marketing and sale of Licensed Products & provides all specification approval of Licensed Products, Inc. The parties agree that Licensed Products shall contain butter and/or butter/margarine blend that shall be Land O'Lakes, Inc. | DELICIOUS FOODS CO LLC INC | Land O'Lakes, Inc. | Delicious Cookie Company, Inc. | 09/25/1991 | 1. The term of this Agreement shall commence on the day and year first above written and shall continue for a period of ten (10) months (hereinafter "Development Term"). If neither party has terminated this Agreement upon the expiration of the Development Term, the parties agree this Agreement shall continue for successive terms (hereinafter the "Expansion Term"). If neither party has terminated this Agreement upon the expiration of the Expansion Term, the Agreement shall be automatically renewed for successive one (1) year terms unless terminated as provided for in Section 8. | Marketing Intangible | Foods and Nonalcoholic Beverages; Consumer Non Durables | | United States, U.S. military bases | EXCLUSIVE | 7% | gross sales | LICC agrees to spend at least Seven (7) percent of its gross sales dollars from Licensed Products advertising and/or promoting Licensed Products each year during the term(s) of this Agreement. | Gross Sales |
| 1997 | | | | | | | | | | | | 1% | Net Sales | The parties agree that during all terms of this Agreement DCC shall pay to LOL a royalty in the amount of One (1) percent of Net Sales of Licensed Products provided, however, the parties agree that the price for a case of Licensed Products shall be at least $11.25 per twelve unit case of Licensed Products or other case as may bear a reasonable relation to the price of the twelve (12) unit case. | Net Sales |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1097 | 1. Grant the right to use, in any lawful manner whatsoever, the TRADEMARKS (the trademarks and/or trade names ARMOUR STAR, ARMOUR STAR, ARMOUR'S, ARMOUR [logotype design], and all ARMOUR) but solely in connection with the SHELF-STABLE PRODUCTS (any and all food products sold and/or in connection with the TRADEMARK(s) which under normal conditions do not need to be refrigerated eighty (180) days after being transported, inventoried, warehoused, stored, distributed and/or sold) in the TERRITORY. | PINNACLE FOODS GROUP INC | CONAGRA, INC. | THE DIAL CORP | 07/13/1995 | 1. Subject to the termination provisions set out below and unless the parties agree in writing otherwise in a writing signed by both parties, and obligations set out in this Agreement shall extend in perpetuity, provided, however, that Dial may terminate this Agreement at any time effective one hundred eighty (180) days after giving ConAgra written notice of such termination. | Marketing/Intangible | Foods and Nondurable Beverages, Consumer Non Durables | 2000 | United States of America | EXCLUSIVE | 15.25 USD | per twelve unit case | The parties agree that during all terms of this Agreement ConAgra shall pay to Dial a royalty in the amount of Three (3) percent of Net Sales; provided, however, the parties agree that the price for a case of Licensed Products shall be at least 15.25 per twelve unit case of Licensed Products, Other units shall bear the price in reasonable relation to the price of the twelve (12) unit case. | Per Unit | License |
| 1153 | | | | | | | | | | | | 0% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1999 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $0-$500,000,000; The Percentage of Annual NET SALES is 0%. | | Net Sales |
| 1153 | | | | | | | | | | | | 0.5% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1999 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $0-$500,000,000; The Percentage of Annual NET SALES is .5%. | | Net Sales |
| 1153 | | | | | | | | | | | | 1% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1999 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $0-$500,000,000; The Percentage of Annual NET SALES is 1%. | | Net Sales |
| 1153 | | | | | | | | | | | | 1.5% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1999 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of Over $500,000,000; The Percentage of Annual NET SALES is 1.5%. | | Net Sales |
| 1153 | | | | | | | | | | | | 0% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra the greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $0-$500,000,000; The Percentage of Annual NET SALES is 0%. | | Net Sales |
| 1153 | | | | | | | | | | | | 0.7% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra the greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $500,000,000-$500,000,000; The Percentage of Annual NET SALES is 7%. | | Net Sales |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11253 | | | | | | | | | | | | 1.25% | net sales | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Clair shall pay to ConAgra that greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES OF SHELF-STABLE PRODUCT as follows: For Annual NET SALES OF SHELF-STABLE PRODUCT of: Over $500,000.00; The Percentage of Annual NET SALES is: 1.25% | | Net Sales |
| 1353 | 1. Grant the right to use the name CREATIVAONE BAGELS and DELI, and other trademarks, service marks, copyrights, interior and exterior building designs... under the Marks for existing and prospective airport, travel plaza, stadium, or hotel locations. | BAB HOLDINGS INC. | Bruegger's Bagels Franchise Corp. | Host International, Inc. | 12/30/1995 | 1. The term of this MOU shall commence effective as of the date herein above written and shall terminate on November 30, 2005. The term/agreement shall continue in full force and effect for their individual terms notwithstanding any termination of this MOU. | Franchise | Restaurants, Foods and Nonalcoholic Beverages | 5412 | United States | EXCLUSIVE | 3% | sales | The Form Agreement shall provide that Operator's cost of purchasing product shall be $2.05 per dozen bagels, with a royalty of three percent (3%) on certain products. | | Net Sales |
| 1352 | | | | | | | | | | | | 2% | sales | Prior to 12/1/95, to be paid on the following menu items for all existing Brueggers units: Bagel, Plain Bagel, Butter Bagel, Cream Cheese (any variety) Bagel, Dozen Bagel Sandwich (any combination of deli meats, cheese, wet salads, condiments produced on a bagel); For Kennedy (1), Newark (1), Joyce Kilmer (1), Hartford (1), Raleigh Durham (1), Detroit (1), New Jersey Turnpike Display Cases Only (9), Atlantic City (1) locations. | | Net Sales |
| 1352 | | | | | | | | | | | | 3% | sales | Effective 12/1/95, to be paid on the following menu items for all existing Brueggers units: Bagel, Plain Bagel, Butter Bagel, Cream Cheese (any variety) Bagel, Dozen Bagel Sandwich (any combination of deli meats, cheese, wet salads, condiments produced on a bagel); For Kennedy (1), Newark (1), Joyce Kilmer (1), Hartford (1), Raleigh Durham (1), Detroit (1), New Jersey Turnpike Display Cases Only (9), Atlantic City (1) locations. | | Net Sales |
| 1352 | | | | | | | | | | | | 3% | sales | to be paid on the following menu items for all units developed after 12/1/95: Bagel, Plain Bagel, Butter Bagel, Cream Cheese (any variety) Bagel, Dozen Bagel Sandwich (any combination of deli meats, choice, wet salads, condiments produced on a bagel) which includes other than Kennedy (1), Newark (1), Joyce Kilmer (1), Hartford (1), Raleigh Durham (1), Detroit (1), New Jersey Turnpike Display Cases Only (9), Atlantic City (1) | | Net Sales |
| 1352 | | | | | | | | | | | | 2.05 USD | per dozen bagels | The Form Agreement shall provide that Operator's cost of purchasing product shall be $2.05 per dozen bagels, with a royalty of three percent (3%) on certain products. | | Per Unit |

EX1-216

ktMINE

kMINE Export [2018.02.23] Part 1

| Agreement ID | Synopsis | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SIC Code | Territory | Exclusivity | Value | Agreement Base | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8862 | 1.to use the right to operate the Licensed Store (a retail snack, dessert, and beverage outlet selling specialty snacks and other bakery items, desserts, and beverages, such as cookies, brownies, cakes, muffins, bagels, croissants, cinnamon rolls, sticky buns, coffee, and other items and products) at the Premises (Geneva Valley Mall, 1133 Linden Road, Flint, MI 48507) and to use the Mrs. Fields System (business formats, signs, equipment, methods, procedures, designs, layouts, and specifications, including the use of any trade names, trademarks, service marks and other commercial symbols, including the trade and service marks 'MRS. FIELDS' and 'MRS. FIELDS COOKIES' and associated logos) in the operation of the Licensed Store. | BUTTERWING ENTERTAINMENT GROUP INC | MRS. FIELDS DEVELOPMENT CORPORATION | BUTTERWING ENG, INC. | 12/21/1995 | 1. The initial term of this Agreement is seven (7) years, commencing on the date of this Agreement. This Agreement may be renewed as provided in Section 2.2 of this Agreement and may be terminated prior to expiration... (term text) ... Agreement is in use by us at the time the renewal option | Franchise | Retail Foods and Nonalcoholic Beverages, Consumer Non-Durable, Consumer Services, Restaurants | | United States, Flint, MI | Multi-Exclusivity | 6% | gross revenues | You agree to pay us a monthly royalty fee of 6% of the Licensed Store's Gross Revenues payable monthly for the 16th day of the month following the month for which the royalty fee is due. | Gross Sales | Licensor |
| 8862 | | | | | | Recognizing the value of marketing to be goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a 'Marketing Fund'). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require... then 1% per year. Marketing Fund contribution will be payable monthly together with the royalty fees. | | | | | 2% | Gross Revenues | Recognizing the value of marketing to be goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a 'Marketing Fund'). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require... then 1% per year. Marketing Fund contribution will be payable monthly together with the royalty fees. | Gross Sales | Licensor |
| 8862 | | | | | | | | | | | | 1% | Gross Revenues | Recognizing the value of marketing to be goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a 'Marketing Fund'). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require... then 1% per year. Marketing Fund contribution will be payable monthly together with the royalty fees. | Gross Sales | Licensor |

Page 10 of 47

EX1-217

ktMINE

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6982 | 1.Grant the right to operate and/or to sublicense the operation of International House of Pancakes restaurants (INTERNATIONAL HOUSE OF PANCAKES, INC. has developed and is continuing to develop certain unique systems, products, methods, techniques and other trade secrets for operating restaurants selling pancakes and various other food products under the name: "The International House of Pancakes" and "International House of Pancakes Restaurant"). 2.Grant the right to use and display IHOP service marks, Trademarks, trade names and other indicia of the origin, designs pertaining thereto, and to use INTERNATIONAL HOUSE OF PANCAKES, INC.'s trade secrets, formulas, processes, methods of operation and goodwill, but only in connection with the initial sale of IHOP restaurants in the franchised Area of these items contained in the standard menu of IHOP restaurants as established in the Operations Bulletin from time to time. | | INTERNATIONAL HOUSE OF PANCAKES, INC.; THE INTERNATIONAL HOUSE OF PANCAKES COMMISSARY | FMS MANAGEMENT SYSTEMS, INC. AND FIMCO, CORINNE FINELLI, A.I.A. CORPORATION | 05/31/1988 | 1.The term of this Agreement shall commence on the date hereof and shall terminate on June 30, 2010, unless otherwise terminated pursuant to the provisions of this Agreement, but shall be subject to extension or reduction of the term as provided in Section IV hereinbelow. 2.For each International House of Pancakes Restaurant in excess of the eighty-eight (88) International House of Pancakes Restaurants opened or authorized by Franchisee as of December 31, 1987 ( opened for operation, directly or through a sublicensee, by Franchisee from and after the date of execution hereof through June 30, 1993, two (2) years shall be added to the term hereof: for each such restaurant opened for operation, directly by franchisee or through a sublicensee, by franchisee from and after the date of execution hereof through July 1, 1993, and ending June 30, 2000, a period of one (1) year shall be added to the term hereof: for each such restaurant opened for operation, directly or through a sublicensee, by Franchisee from and after July 1, 2000, a period of six (6) months shall be added to the term hereof. Additionally, in respect of each of five (5) units which were added to the term... | Franchise | Restaurants, Foods and Nonalcoholic Beverages, Consumer Services | | | | | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of the IHOP's trade / marks and agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice, require you to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts and on the terms specified. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues during each calendar year's 1997 and succeeding years) an increase in the year over year percent of Gross Revenues to be paid to the Marketing Fund will be limited to no more than 1/2 of one percent (.5%) of the Licensed Store's monthly Gross Revenues and the amount of such contribution will be payable monthly with the royalty fee. | Gross Sales | License |
| 6983 | | HOP CORP | | | | | | | | | | | 10% | Gross Revenues | If we exercise the option to purchase the Licensed Store, pending the closing of such purchase, we may appoint a manager to maintain the operation of the Licensed Store or, at our option, require you to close the Licensed Store during such time period without removing any assets. If we appoint a manager to maintain the operation of the Licensed Store pending closing of such purchase, we will charge you a fee for the operation of the Licensed Store including compensation, other costs and expenses of the manager, plus an amount equal to 10% of the Gross Revenues of the Licensed Store during the period of our management. | Gross Sales | License |
| 6986 | | | | | | International House of Pancakes Restaurants operated | Franchise | Restaurants, Foods and Nonalcoholic Beverages, Consumer Services | 5794 | Florida, Glynn County, Wayne County, Camden County, Charlton County, Decatur County, Grady County, McIntosh County, Seminole County, Thomas County, Berrien County, Brantly County, Brooks County, Echols County, Lanier County, Lowndes County, Appling County, Atkinson County, Bacon County, Bryan County, Clinch County, Coffee County, Jeff Davis County, Pierce County, Ware County, Georgia, United States | EXCLUSIVE | 1% | Gross Sales | For and in consideration of Franchisee's execution and performance of this Agreement. Franchisee shall pay to United States (Action to Franchisor a Continuing Royalty equal to one percent (1%) of all Franchisee's monthly Gross Sales. | Gross Sales | License |
| 6986 | | | | | | | | | | | | 25% | Gross Sales | In addition to Franchisee's obligation to pay a Continuing Royalty as set forth above, Franchisee shall pay to Franchisor, for national advertising and for the promotion, development and enhancement of the value of all franchised and company owned Pancakes, a sum equal to one-quarter of one percent (25%) of Franchisee's monthly Gross Sales. | Gross Sales | License |

kMINE Export (2018-02-23) Part 3

EX1-218

kMINE

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commentable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6429 | | BONUIN TRAVEL CENTERS INC | DAIRY QUEEN OF ARIZONA, INC., DAIRY QUEEN OF SOUTHERN ARIZONA, INC., AMERICAN DAIRY QUEEN CORPORATION, DAIRY QUEEN OF SO. AZ., INC., Dairy Queen of Northern Arizona, Inc. | BONUIN'S INCORPORATED, BONUIN'S, BONUIN'S CORPORATION, BONUIN'S INC. | 02/1/1984 | 1. This license agreement shall be for a term of twenty (20) years, unless sooner terminated in accordance with the provisions hereof | Franchise | Restaurants, Foods and Nonalcoholic Beverages | | Phoenix, Arizona, Tucson, United States | EXCLUSIVE | 29 USD | per gallon | for each gallon of liquid &quot;product&quot; used in the preparation of the frozen liquid Dairy Queen&reg; product sold under the trademark and trade name &quot;Dairy Queen&quot; | Per Unit |
| 6430 | | BONUIN OUTDOOR ADVERTISING/NAV CTRS INC | DAIRY QUEEN OF ARIZONA, INC., DAIRY QUEEN OF SOUTHERN ARIZONA, INC., AMERICAN DAIRY QUEEN CORPORATION, Dairy Queen of Northern Arizona, Inc., DAIRY QUEEN OF SO. AZ., INC. | BONUIN'S INCORPORATED, BONUIN'S, BONUIN'S CORPORATION, BONUIN'S INC. | 02/1/1984 | 1. The license grant herein shall be for a term of twenty (20) years, unless sooner terminated in accordance with the provisions hereof. | Franchise | Restaurants, Foods and Nonalcoholic Beverages | | Phoenix, Arizona, Tucson, United States | EXCLUSIVE | 29 USD | per gallon | for each gallon of liquid &quot;product&quot; used in the preparation of the frozen liquid Dairy Queen&reg; product sold under the trademark and trade name &quot;Dairy Queen&quot; | Per Unit |
| 6431 | | BONUIN OUTDOOR ADVERTISING/NAV CTRS INC | DAIRY QUEEN OF ARIZONA, INC., DAIRY QUEEN OF SOUTHERN ARIZONA, INC., AMERICAN DAIRY QUEEN CORPORATION, Dairy Queen of Northern Arizona, Inc., DAIRY QUEEN OF SO. AZ., INC. | BONUIN'S, BONUIN'S CORPORATION, BONUIN'S INCORPORATED, BONUIN'S INC. | 02/1/1984 | 1. The license grant herein shall be for a term of twenty (20) years, unless sooner terminated in accordance with the provisions hereof. | Franchise | Restaurants, Foods and Nonalcoholic Beverages | | Phoenix, Tucson, Arizona, United States | EXCLUSIVE | 29 USD | per gallon | for each gallon of liquid &quot;product&quot; used in the preparation of the frozen liquid Dairy Queen&reg; product sold under the trademark and trade name &quot;Dairy Queen&quot; | Per Unit |
| 12344 | | KEEBLER FOODS CO | UNITED BISCUITS (UK) LIMITED | SHAFFER, CLARKE &amp; CO., INC., PMO (PMO) Holdings Corporation | 02/26/1996 | 1. Except as provided in Section 11(c) hereof, the initial term of this License Agreement shall commence as of the date hereof and shall expire on the 20th anniversary of such date, provided that the term of this License Agreement shall be automatically extended for successive 20 year periods at the option of the Licensee, unless the Licensee gives to the Licensor written notice of termination at least 180 days prior to the scheduled expiration of the then current term. | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable | | United States of America, Puerto Rico | Multi Exclusivity | 5% | Net Sales | The royalty as a fee on Products relates to this License Agreement (except for The Co-Pack Products) will be 5% of the Licensee's net sales. As used herein, &quot;net sales&quot; means the invoice price of the Licensee's products at time of sale, less any returns, credits, discounts actually taken and allowances actually given. Royalties will be payable annually within 90 days after the end of each calendar year. Each royalty payment shall be accompanied by a statement setting forth in reasonable detail the computation of the royalty. | Net Sales |
| 12236 | | NEXT GENERATION TECHNOLOGY HOLDINGS INC | CPC INTERNATIONAL, INC. | Delicious Cookie Company, Inc. | 03/31/1991 | 1. The term of the Agreement shall be five (5) years commencing on the date hereof, unless otherwise terminated in accordance with the terms hereof.After such five year period, this Agreement shall renew automatically for successive one year periods unless and until terminated by either party prior to the end of the then term upon 30 days' prior written notice, unless otherwise terminated in accordance with the terms hereof. | Manufacturing/Process Intangible, Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non Durable | 1140 | United States of America, Canada | EXCLUSIVE | 5% | Net Sales | for sales which take place between the date of first shipment in 1991 and for one year thereafter | Net Sales |
| 12236 | | | | | | | | | | | | 4% | Net Sales | for sales which take place during the second year after the first shipment date | Net Sales |
| 12236 | | | | | | | | | | | | 5% | Net Sales | for sales which take place after the two years from the first shipment date | Net Sales |
| 12236 | | | | | | | | | | | | 3% | Net Sales | for sales which take place between the date of first shipment in 1991 and for one year thereafter | Net Sales |
| 12236 | | | | | | | | | | | | 4% | Net Sales | for sales which take place during the first year after the first shipment date | Net Sales |
| 12236 | | | | | | | | | | | | 5% | Net Sales | for sales which take place after two years from the first shipment date | Net Sales |
| 12236 | | | | | | | | | | | | 2% | Net Sales | for SKIPPY &amp; WELCH'S peanut butter and jelly sandwich cookies | Net Sales |

EX1-219

kMINE

| AgreementID | Synopsis | FilingCategory | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12236 | | | | | | | | | | | | 1.04 USD | per pound | DCC retail purchase Period Butter from DFC on shipment through December 31, 1994 at not more than $1.04 per pound of Skippy Peanut Butter, f.o.b. OKC&J's Little Rock facility, after December 31, 1993, at such price as DFC may determine, and from such location or locations as the parties may agree | Per Unit | License... |
| 1861 | 1. Grant the right to use the Technology (any technical or business information, any invention, equipment or apparatus, method or process, technology, know-how, trade secret, drawing, data, evaluation, specifications, quality and inspection standards, sales literature, report, business plan, exemplar item, model study, customer lists, training materials, computer program or software (including both source and object code) or any other item of know-how which is owned or used, in whole or in part in confidential, proprietary, or secret related to the patents) to make, use, sell and otherwise dispose of the Product(s) (1. Grid Logic – 4 to 3; 2 to 2; 2. Hot-cups – 4 to 1; to 52 1/2; and 3. Sandwich containers (solely within the territory and solely within the field of use (1) the use and sale of Products in the food service and restaurant industry, (2) the use and sale of Products in other retail establishments selling Products (e.g. grocery stores, convenience stores, hotel warehouse, etc.), that is, sales with respect to Products that have been introduced into the food service and restaurant industry by a customer of an LCC sublicensee (including any affiliates) that operates retail outlets in the food service and restaurant industry in at least two locations, (ii) the incidental use and sale in any manner of those Products which are manufactured by Sublicensee hereunder where the predominant use is within the food service and restaurant industry, and (iv) the sale of Products to distributors and wholesalers for resale and use in retail outlets in the food service and restaurant and industry units, subject to clause (ii) above, in retail establishments. | EARTHSHELL CORP | EARTHSHELL CONTAINER CORPORATION | SWEETHEART CUP COMPANY INC | 10/7/1994 | 1. The term of this Agreement shall commence upon the effective dateheard. Unless sooner terminated as hereunder provided, this Agreement (referred to in full force and effect until the expiration of the last material antibacterial patent covering the Technology which is utilized by Sublicensee, or for so long as Sublicensee produces the Products which utilizes material antibacterial proprietary information or a material antibacterial Trade Secret of LCC. -2B- provided, however, that upon the expiration of the last aforementioned patent if Sublicensee desires to continue the Agreement in force, it will be subject to an appropriate adjustment to the Royalty appropriate registered adjustment to the Royalty Payments or License Fee to any dispute as to the term of this Agreement shall be resolved by arbitration as provided under this Agreement. | Manufacturing/Process Intangible, Marketing Intangible, Software | Foods and Nonalcoholic Beverages, Restaurants, Retail, Consumer Non Durables | | United States of America, Canada | Multi-Exclusivity | 22% | Net Sales Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to ECC a royalty (the "Royalty") of twenty-two percent (22%) of the Net Sale Price for each Product sold by Sublicensee during the term of this Agreement. | Net Sales | License... |
| 1861 | | | | | | | | | | | | 2% | Net Sale Price | To the extent Sublicensee elects to use the Trademarks on or in connection with manufacture, marketing, distribution, use and/or sale of Products hereunder, Sublicensee shall be entitled to receive an advertising allowance credit equal to two percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, Sublicensee shall provide ECC with written documentation, reasonably satisfactory to ECC, of sales by Sublicensee of Products that bear the Trademarks, and ECC shall credit the appropriate amount against future royalties payable by Sublicensee hereunder. | Net Sales | |
| 1863 | 1. Grant the right to use the Technology (confidential, secret, or proprietary technology involving inorganic ally filled compositions which are comprised of a cementitious material, inorganic aggregate material or fiber) and methods for manufacturing, confidential, secret, or proprietary technology involving inorganically filled (composites, including moldable compounds, both foam and non-foam applications, articles manufactured from inorganically filled composites, the compositions and articles and natural gas to any gas substrate (to make, use, sell and otherwise commercialize the Products (Beverage containers, Beverage Container Lids, Bowls, Cutlery (Food Containers, Food Containers (w/wo Lids, Hinged Lid Containers, Plates/Platters, Plates/Platters Lids, and Serving Dishes made from Inorganically Filled Compositions that incorporate or utilize the Technology in whole or in part) solely within the Territory and solely within the field of use (1) the use and sale of Product in other retail establishments selling Products (E.G. grocery stores, convenience stores, hotel warehouses, and the like) but only with respect to Products that have been introduced into the food service and Products in the food service and restaurant industry, (2) the use and sale of Products which are manufactured by DOPACO, INC. hereunder where the predominant use is within the food service and restaurant industry, and (3) the sale of Products to distributors and wholesalers for resale and use in retail outlets in the food service and restaurant and industry units, subject to clause (ii) above, in retail establishments. | EARTHSHELL CORP | EARTHSHELL CONTAINER CORPORATION | DOPACO, INC. | 06/20/1995 | 1. _____ Unless sooner terminated as hereinafter provided, this Agreement (referred to in full force and effect until the expiration of the last material antibacterial patent covering the Technology which is utilized by Sublicensee, or for so long as Sublicensee produces the Products which utilizes material antibacterial proprietary information or a material antibacterial Trade Secret of ECC, provided, however, that upon the expiration of the last aforementioned patent, if Sublicensee desires to continue the Agreement in force, it will be subject to an appropriate required adjustment to the Royalty Payments or License Fee. | Manufacturing/Process Intangible, Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Durables, Consumer Non Durables, Retail, Restaurants, Consumer Services | | United States of America, Canada, Mexico, Central America, Caribbean islands and nations | Multi-Exclusivity | 22% | Net Sales Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to ECC a royalty (the "Royalty") of twenty-two percent (22%) of the Net Sale Price for each Product sold by Sublicensee during the term of this Agreement. | Net Sales | License... |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | SICCode | Industry | AgreementType | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11863 | | | | | | | | | | | | 2% | Net Sale Price | To the extent SubGrantee elects to use the Trademarks on or in connection with manufacture, marketing, distribution, and/or sale of Products hereunder, SubGrantee shall be entitled to receive an advertising allowance credit equal to Two Percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, SubGrantee shall submit to LCC written documentation, reasonably satisfactory to LCC, of sales by SubGrantee of Products that bear the Trademarks, and LCC shall credit the appropriate amount against future royalties payable by SubGrantee hereunder. | | Net Sales |
| 12032 | 1. Grant the right to use the Marks (the various trademarks and service marks employed in LA SALSA Restaurants, including the federally registered mark "LA SALSA") and the Operating System (the recipes, procedures and other techniques relating to direct connection with the sale of LA SALSA food, beverage and other products from its co-branded outlets having a distinctive concept and type of fresh Mexican grill restaurant featuring Mexican style food and related items and menu under the name "LA SALSA" (identified and mutually agreed upon between La Salsa Franchise, Inc. and franchisees, Inc.) | SAKA INTERNATIONAL INC. | La Salsa Franchise, Inc., La Salsa Holding Co. | Foodlockers, Inc., DAKA International, Inc. | 02/14/1996 | 1. This Agreement will be effective as of the Effective Date set forth above and continue in effect for an initial term ending one year after the Effective Date (the "Initial Term"), subject to earlier termination as provided in this Agreement. Unless Foodlockers gives written notice of cancellation to LSF on or before thirty (30) days prior to the end of the Initial Term, this Agreement will automatically continue after the Initial Term for a period ending on the tenth of the Effective Date. 2. Each Grill opened by Foodlockers during such calendar year may operate under the terms of this Agreement until December 31 of the calendar year set forth in the following table: Calendar Operation Year of Opening of Grill License December 31, 1996 December 31, 1997 December 31, 2007 1998 December 31, 2008 1999 December 31, 1, 2000 2000 December 31, 2002 2001 December 31, 2002 2002 December 31, 2003 2003 December 31, 2004 2004 December 31, 2005 2005 December 31, 2006 2006 3. Prior to the end of the ten year terms of this Agreement, the parties may enter into an additional ten-year License Agreement regarding Grills upon terms and | 5812 | Restaurants, Consumer Services, Beverages, Consumer Non-Durables | Franchise | Chula Vista, CA, La Mesa, CA, Pasadena, CA, Lakewood, CA, United States, Santa Barbara, CA, Torrance, CA, Atlanta, GA, Norcross, GA, Tucker, GA, Athens, GA, Duluth, GA, Kennesaw, GA, Alpharetta, GA, Downers Grove, IL, IL, Downers Grove, IL, Addison, IL, Aurora, IL, Highland Park, IL, Matteson, IL, Calumet City, IL, Palatine, IL, Orland Park, IL, Schaumburg, IL, Northlake, IN, Waterloo, IA, Florence, KY, Annapolis, MD, Baltimore, MD, Rockville, MD, Gaithersburg, MD, Pikesville, MD, Boston, MA, Saugus, MA, Kenmore, MA, Bloomington, MN, Roseville, MN, St. Louis Park, MN, Coon Rapids, MN, Brooklyn Center, MN, St. Louis, MO, Maryland Heights, MO, Concord, OH, Forest Park, OH, Miami, OH, Cincinnati, OH, Norwood, OH, Columbus, OH, Houston, TX, San Antonio, TX, Austin, TX, Charlotte, NC, Irving, TX, Plano, TX, Dallas, TX, | EXCLUSIVE | 5% | Gross Sales | As partial consideration for the rights granted by LSF, Foodlockers will pay LSF (6.0 month, a "License Fee" equal to Five percent (5%) of Gross Sales (as defined below) as payment to LSF for the continuing right to use the LA SALSA Operating System and Marks. | | Gross Sales |
| 12032 | | | | | | | | | | | | 1% | Gross Sales | In addition to the spending required by Section 7.2 above, Foodlockers agrees to pay LSF a Marketing Fund Fee of one percent (1%) of Gross Sales in operating the Grills for each payment period as set forth above in Sections 7.1. | | Gross Sales |
| 12032 | | | | | | | | | | | | 2% | Gross Sales | LSF, at its sole discretion, may at any time increase the Marketing Fund Fee in any increments so long as the total Marketing Fund Fee does not exceed a maximum of two percent (2%) of Gross Sales. | | Gross Sales |
| 12032 | | | | | | | | | | | | 2% | Gross Sales | Foodlockers agrees to spend on a quarterly basis a minimum dollar amount equal to two percent (2%) of its Gross Sales from the Grills in conducting direct advertising and sales promotion programs for the Grills. | | Gross Sales |
| 12032 | | | | | | | | | | | | 2500 USD | per employee and Manager | Foodlockers employee who enrolls in the LA SALSA initial Restaurant Operation Training Course and for each Certified Training Manager trained by LSF or trained by LSF or pay LSF's then-current fee of Two Thousand Five Hundred Dollars ($2,500.00) for each of the first twenty or which is operated by Foodlockers after the first twenty of which is operated by Foodlockers after the | | Per Unit |
| 12032 | | | | | | | | | | | | 6275 USD | per Grill | As partial consideration for the rights granted by LSF, Foodlockers will pay LSF (a)(i) for each of the first twenty Grills opened on or before the twentieth Grill "initial" fee for each Grill in the total amount of $6,275.00 due to on or before the opening of such Grill. | | Per Unit |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Lead Licens... | Commodit le (Per Unit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13032 | | | | | | | | | | | | 3600.00 | per Unit | As per last order plus for the rights granted by LSF, Hublicensee shall pay LSF (a) LSF fee each of the first twenty Restaurants at which a Grill is opened, an "initial" fee for each Grill in the amount of $4,275.00 due on or before the opening of such Grill | | Per Unit |
| 13032 | | | | | | | | | | | | 1,000.00 | per grill | In light of the limited menu to be served at the Grills and their location within IUDBUCK'BS Restaurants, the parties agree that: (1) during the initial Term Hublicensee will not be required to make any expenditure of more than $1,000.00 per Grill to comply with changes to the Manuals; and (2) after the initial Term, Hublicensee will not more than once during any twelve (12) month period be obligated to make expenditures of more than $5,000.00 per Grill to comply with changes in the Manuals or to make any such change? If sublicensors and LSF agree in the reasonable exercise of their business judgment that the expenditures would not be commercially reasonable in light of the remaining term of this Agreement, | | Per Unit |
| 13032 | | | | | | | | | | | | 5,000.00 | per grill | In light of the limited menu to be served at the Grills and their location within IUDBUCK'BS Restaurants, the parties agree that: (1) during the initial Term Hublicensee will not be required to make any expenditure of more than $1,000.00 per Grill to comply with changes to the Manuals; and (2) after the initial Term, Hublicensee will not more than once during any twelve (12) month period be obligated to make expenditures of more than $5,000.00 per Grill to comply with changes in the Manuals or to make any such change? If sublicensors and LSF agree in the reasonable exercise of their business judgment that the expenditures would not be commercially reasonable in light of the remaining term of this Agreement, | | Per Unit |
| 13032 | | | | | | | | | | | | 15,000.00 | per grill | In light of the limited menu to be served at the Grills and their location within IUDBUCK'BS Restaurants, the parties agree that: (1) during the initial Term Hublicensee will not be required to make any expenditure of more than $1,000.00 per Grill to comply with changes to the Manuals; and (2) after the initial Term, Hublicensee will not more than once during any twelve (12) month period be obligated to make expenditures of more than $5,000.00 per Grill to comply with changes in the Manuals or to make any such change? If sublicensors and LSF agree in the reasonable exercise of their business judgment that the expenditures would not be commercially reasonable in light of the remaining term of this Agreement, | | Per Unit |
| 15100 | 1. Grant the right to employ the Licensed Trade Secrets (all trade mark techniques, processes, methods of production and commercialization, training methods, and knowledge and the Licensed Names and Marks (the trademarks, trademarks and service marks) during the Term to produce and sell the Licensed Products (the items, articles, or food products or any other bakery goods or cookies) from Mrs. Fields Stores (the Mrs. Fields In-Line Display Cases, Mrs. Fields Store Fronts, Mrs. Fields Traditional Cookie Stores and at other sections or areas of licensed locations) at Licensed Locations in the Licensed Territory (the Individual or airport locations and such future limited-access individual locations and airport locations. | MRS FIELDS ORIGINAL COOKIES INC. | MRS. FIELDS DEVELOPMENT CORPORATION, Mrs. Fields Inc., MARRIOTT CORPORATION | MARRIOTT CORPORATION, MRS. FIELDS DEVELOPMENT CORPORATION, Mrs. Fields Inc. | 01/01/1992 | 1. The initial term of this Agreement shall commence on the date hereof and continue through December 31, 1996. The term of this Agreement shall be extended and will automatically renew for one three (3) year term on December 31, 1996 and three (3) consecutive five (5) year terms thereafter upon ninety (90) days written notice to Licensor if it is not in restriction to renew Agreement, unless Licensee is not in compliance with its Development Obligation at the time of renewal of this Agreement, otherwise terminated as provided below | Franchise | Consumer Services, Foods and Nonalcoholic Beverages, Retail, Consumer, Non Durables, Restaurants, Transportation Equipment and Parts | | United States, Canada, Mexico | EXCLUSIVE | 7.50% | Gross Sales | Commencing with the date hereof and continuing throughout the Term of this Agreement, Licensee shall pay Licensor a royalty for the "Royalty Amount"). Determined separately with respect to each Mrs. Fields Store equal to three and three quarters percent (3.75%) of all Gross Sales derived from each Mrs. Fields Store opened and operated by Licensee hereunder. | | Gross Sales |

ktMINE

kiMINE Export (2016.02.23) Part 3

EX1-222

KMINE Export (2018.02.23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodite | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23100 | | | | | | | | | | | | 0.1% | gross sale | Licensor agrees that each Mrs. Fields Store shall participate in promotional activities designated by Licensor and relating to the sale of the Licensed Products and the promotion of the Licensed Names and Marks which promotions require Licensee to provide Licensed Products to customers at no charge in exchange for a coupon, card or other voucher (e.g., cookie cards). Licensor shall reimburse Licensee the direct costs of goods sold by Licensee in connection with such promotional activities up to one-tenth of one percent (0.1%) of gross sales of each Mrs. Fields Store which participates in such promotional activities and shall reimburse Licensee for the retail value for goods sold above such amount, provided that Licensee complies with the reasonable request of Licensor to document Licensee's request for reimbursement (e.g., furnishing to Licensor of the cookie cards redeemed by Licensee at each Mrs. Fields Store for which reimbursement is requested). Licensor may, in Licensor's sole discretion, exempt from participation in the above-described promotional activities one or more Mrs. Fields Stores. Other than as provided in this paragraph, Licensor shall have no obligation to expend monies for advertising or promotional activities with respect to the Mrs. Fields Stores. | Gross Sales | License |
| 23100 | | | | | | | | | | | | 2,500 USD | per Store Unit | If Licensee fails to meet its Development Obligation for 1991, Licensee shall pay to Licensor a fee ("Development Fee") of $2,500 for each Store Unit not opened pursuant to its Development Obligation. Payment of such fee shall be made to Licensor no later than January 31, 1993, and such payment shall be deemed to cure Licensee's failure to meet its Development Obligation for 1992; however, it shall not relieve Licensee of its obligation under the Development Obligation to have open and operating by the end of calendar year 1993, one hundred eight (108) Store Units. | Per Unit | |
| 23100 | | | | | | | | | | | | 786.50 USD | per month | If Licensee is in default of its Development Obligation under paragraph 6(c) at the end of calendar year 1993, or at any time thereafter, it may elect to pay a monthly Fee ("Premium Payment") for each unopened Store Unit equal to $786.50, on or before the first day of each month, commencing on the first day of the month following the date on which such Store Unit was required to be opened pursuant to the Development Obligation and continuing each month thereafter during the remainder of the Development Period, until Licensee complies with the Development Obligation. | Per Unit | |
| 23100 | | | | | | | | | | | | 8,333 USD | per Store Unit | For each Store Unit opened by Licensee after the initial 13.5 Store Units, Licensee shall pay to Licensor an additional setup license fee of $8,333 per Store Unit, payable upon the opening of the Mrs. Fields Store for which such Store Unit is allocated, provided that a Mrs. Fields Store which is opened within the joint airport terminal or in the same railroad plaza within two (2) months of the closure of a Mrs. Fields Store at such airport or railroad plaza shall not be deemed the opening of a new Mrs. Fields Store hereunder. | Per Unit | |
| 23101 | 1. Grant the right to employ the Licensed Trade Secrets and the Licensed Names and Marks during the Term to produce and sell the Licensed Products from Mrs. Fields Stores. | MRS FIELDS ORIGINAL COOKIES INC | MRS. FIELDS DEVELOPMENT CORPORATION | MARRIOTT MANAGEMENT SERVICES CORP | 10/26/1993 | 1. TERM AND TERMINATION (a) The initial term of this Agreement shall commence on the date hereof and continue through December 31, 1996. The term of this Agreement shall be extended and will automatically renew for one three (3) year term on December 31, 1996 and three (3) consecutive five (5) year terms thereafter | Marketing Intangible | Business Services, Consumer Services, Hotels, Healthcare Facilities, Foods and Nonalcoholic Beverages, Restaurants | | United States | | 10% | Gross Sales | From all Gross Sales derived from each Mrs. Fields Store opened and operated by | Gross Sales | License |

EX1-223

kMINE

kMINE Export (2016.02.23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodit | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25195 | 1.Grant the right to operate the Licensed Store at retail location, and beverage outlet selling specialty snacks and other bakery items, desserts, and beverages such as cookies, brownies, cakes, muffins, bagels, croissants, cinnamon rolls, sticky buns, and coffee and other items and services at the Premises Geneva Valley Mall, 1133 Linden Road, Flint, MI 48021 and to use the Mrs. Fields System (business formats, signs, equipment, methods, procedures, designs, layouts, and specifications, including the use of any trade names, trademarks, service marks and other commercial symbols, including the trade and service marks 'MRS. FIELDS' and 'MRS. FIELDS COOKIES' and associated logos) in the operation of the Licensed Store. | BUTTERWINGS ENTERTAINMENT GROUP INC | MRS. FIELDS DEVELOPMENT CORPORATION | BUTTERWINGS, INC. | 12/21/1995 | 1. The initial term of this Agreement will be 7 years, commencing on the date of this Agreement. This Agreement may be renewed as provided in Section 2.3 of this Agreement and may be terminated prior to expiration of its term in accordance with Article 22 of this Agreement. Reference in this Agreement to the term of this Agreement mean the initial term and any renewal term. Following the expiration of the initial term and any renewal terms, you may have the opportunity to initiate a successor franchise Agreement in accordance with the provisions of Section 22.6 of this Agreement.  2. If you are not in default at the time of exercise of a renewal option and at the time the prior term expires, you may renew this Agreement for 2 successive 5-year terms, upon giving us written notice of your intention to renew at least 180 days prior to expiration of the then current term. The renewal will be upon the terms and conditions contained in the form of franchise Agreement in use by us at the time the renewal option is exercised. That form of franchise Agreement may include different royalty fees and marketing fund fees, other fees and charges, and changes in performance criteria and conditions and, in connection with any renewal, we may also require you to refurbish, remodel, redecorate, and renovate the Licensed Store | | Franchise | Retail, Foods and Nonalcoholic Beverages, Consumer Services, Consumer Non-Durables, Restaurants | | United States, Flint, MI | Multi Exclusivity | 6% | Gross Revenues | You agree to pay us a monthly royalty fee of 6% of the Licensed Store's Gross Revenues, payable by the 10th day of the month following the month for which the royalty fee is due. | Gross Sales | Licensor |
| 25195 | | | | | | | | | | | | 2% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues during the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the per-store year amount of Gross Revenues to be paid to the Marketing Fund will be limited to no more than 1% per year. Marketing Fund contribution will be payable monthly together with the royalty fees. | Gross Sales | Licensor |
| 25195 | | | | | | | | | | | | 3% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues during the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the per-store year amount of Gross Revenues to be paid to the Marketing Fund will be limited to no more than 1% per year. Marketing Fund contribution will be payable monthly together with the royalty fees. | Gross Sales | Licensor |

EX1-224

kMINE

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities / Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23195 | | | | | | | | | | | | 4% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of the V. Holds Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996 and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing fund will be limited to no more than 1% per year. Marketing Fund contributions will be payable monthly together with the royalty fees. | Gross Sales / License |
| 23195 | | | | | | | | | | | | 10% | Gross Revenues | If we exercise the option to purchase the Licensed Store, pending the listing of such purchase, we may appoint a manager to maintain the operation of the Licensed Store or, at our option, require you to close the Licensed Store during such time period without removing any assets. If we appoint a manager to maintain the operation of the Licensed Store pending closing of such purchase, all funds from the operation of the Licensed Store during the period of management by our appointed manager will be kept in a separate fund, and all expenses of the Licensed Store, including compensation, other costs, and travel and living expenses of our appointed manager, will be charged to such fund. As compensation for such management services, we will charge such fund 10% of the Gross Revenues of the Licensed Store during the period of our management. | Gross Sales / License |
| 23219 | 1. Grant the right to operate a STUCKEY'S PECAN SHOPPE STUCKEY'S, INC. has created and developed a chain of distinctive style and type of stores in collection and gift stores operated under the name STUCKEY'S PECAN SHOPPE in which it distributes and sells pecans, pecan products, candies, jams, preserves, foods and confections, souvenirs, gifts and novelties, petroleum products, and other approved commodities; and wherein it also provides a fast food service with distinguishing characteristics, all of which, in part or otherwise, may be changed, added to, improved and further developed from time to time) and to use in connection therewith the trade names, trademarks and service marks, including, (1) Registered Trademarks & STUCKEY'S, STUCKEY'S with signage and use Designs - STUCKEY'S & STUCKEY'S GASOLINE (2) Registered Service Mark STUCKEY'S PECAN SHOPPE (Unregistered Service Mark STUCKEY'S PECAN SHOPPE, | BOWLIN OUTDOOR ADVERTISING & TRAVEL CENTERS INC. | STUCKEY'S INC. | BOWLIN VMC | 02/22/1982 | 1. Unless terminated as otherwise herein provided, the term of this Agreement shall be for ten (10) years from the date hereof, and may be extended thereafter at the option of the Franchisee for successive terms of five (5) years upon franchisee giving at least ninety (90) days' written notice of extension prior to the end of the term of this Agreement or the end of any extended term hereof, provided that Franchisee shall not be in default of any provision of this Agreement, and provided, further, that Franchisee shall execute Company's then current standard form franchise agreement, which may include higher percentage royalty and advertising fees than provided for herein. | Franchise | Consumer Services, Oil and Gas, Retail, Foods and Nondurables: Beverages, Consumer Durables, Consumer Non-Durables, Restaurants, Transportation Equipment and Parts | 5399 | Deming, New Mexico, United States | Multi-Exclusivity | 4% | Sales | Dealer shall pay to Company with each billing an amount equal to 4% of the products sold through the warehouse with respect to which the company customarily assesses an advertising fee on sales in transfers to franchisee and company owned pecan shoppes. These monies shall be placed in a special fund, which shall consist of contributions of all STUCKEY'S DEALERS (STUCKEY'S DEALERS, including Company owned shoppes) and, shall be used in the advertising of STUCKEY'S products or STUCKEY'S services. Such advertising and promotion shall be created and executed by the Company and the time, the methods of and extent of all such programs shall be determined solely by the Company. | Net Sales / License |

EX1-225

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | CommodityLevel |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24239 | 1. Grant the right to acquire all ownership, right, title and interest in and to the License (the Licensor) holds CJ of trade-mark concept and system and all elements, characteristics and properties thereof, including, without limitation, recipes and menu items, motif, design, décor and furnishings, trade dress and the Proprietary Marks, trade secrets, know-how and other intellectual property, uniform standards, specifications and procedures for the operations, quality and uniformity of products and services offered; procedure for inventory and management control; training and assistance; employee training programs; marketing, advertising and promotional programs together with all goodwill associated therewith; and the Proprietary Marks (Carrabba's with design; Carrabba's with Pizza Chef Design; Pizza Chef Design; Carrabba Italian Grill Stylized; and all other copyrights, trademarks, trade names, service marks, logos, emblems and other indicia of origin used to identify the System, together with all goodwill associated with all of the foregoing) and all elements, characteristics and properties thereof, and any other element associated therewith. Fees and class of any fees, claim, circumstance or retained interest whatsoever. 2. Grant the right to a license under the License Agreement and to assume the obligations of Licensor under the License Agreement, the OKJ License Agreement, the Florida License Agreement and the Joint Venture License Agreement. 3. Grant the right to further amend that certain Royalty Agreement dated April 1, 1995 as amended by that certain First Amendment to Royalty | DARDEN RESTAURANT PARTNERS, LLC | MANGIA BEVI, INC., CARRABBA, INC., CARRABBA WOODWAY, INC., OSMC, CARRABBA, JR., MANGIA PARTNERS, LLC, OSI, C. ALABODA, ADRIAK C. GRILL, LLC, OSI RESTAURANT PARTNERS, INC., VOSS, INC. | CARRABBA'S ITALIAN GRILL, INC., OUTBACK STEAKHOUSE, INC., CARRABBA'S ITALIAN GRILL, LLC, OSI RESTAURANT PARTNERS, LLC | 04/21/1995 | 1. The term of this Agreement shall commence upon execution of this Agreement and shall continue in full force and effect until termination. This Agreement shall terminate upon the first to occur of (i) agreement of CIGI and MBI (in their respective successor in interest) to terminate this Agreement or (ii) conversion of MBI's royalty rights pursuant to Section 3.1. Upon termination of this Agreement as a result of conversion of MBI's royalty rights pursuant to Section 3.2, Outback shall reach all ownership rights to the System, and all other obligations of the parties under this Agreement shall terminate (including all | Franchise, Other | (Consumer Services, Restaurants, Foods and Nonalcoholic Beverages) | 5812 | Florida, Texas, United States | EXCLUSIVE | 1% | Net Restaurant Sales | For each Restaurant owned by CIGI or a franchisee/licensee of CIGI (other than the Joint Venture, CJ or OKK) which Restaurant first opens to the public after January 1, 1995, CIGI shall pay to MBI an annual royalty fee during the term of this Agreement as follows: (a) For Restaurants whose annual Net Restaurant Sales are Two Million Seven Hundred Thousand Dollars ($2,700,000) but less than Three Million Dollars ($3,000,000), a royalty fee of one percent (1%) of Net Restaurant Sales | Net Sales |
| 24239 | | | | | | | | | | | | 1.25% | Net Restaurant Sales | For each Restaurant owned by CIGI or a franchisee/licensee of CIGI (other than the Joint Venture, CJ or OKK) which Restaurant first opens to the public after January 1, 1995, CIGI shall pay to MBI an annual royalty fee during the term of this Agreement as follows: (b) For Restaurants whose annual Net Restaurant Sales are Three Million Dollars ($3,000,000) but less than Three Million Three Hundred Thousand Dollars ($3,300,000), a royalty fee of one and one-quarter percent (1.25%) of Net Restaurant Sales | Net Sales |
| 24239 | | | | | | | | | | | | 1.5% | Net Restaurant Sales | For each Restaurant owned by CIGI or a franchisee/licensee of CIGI (other than the Joint Venture, CJ or OKK) which Restaurant first opens to the public after January 1, 1995, CIGI shall pay to MBI an annual royalty fee during the term of this Agreement as follows: (c) For Restaurants whose annual Net Restaurant Sales exceed Three Million Three Hundred Thousand Dollars ($3,300,000), a royalty fee of one and one-half percent (1.5%) of Net Restaurant Sales | Net Sales |
| 24239 | | | | | | | | | | | | 1% | Net Product Sales | Product Royalties: For each calendar year during the term of this Agreement beginning with 1995 CIGI shall pay to MBI a monthly royalty fee of one percent (1%) of Net Product Sales, payable as provided in Section 3.4. No royalty shall be paid on Net Product Sales which occur after expiration or termination of this Agreement. | Net Sales |
| 24239 | | | | | | | | | | | | 1% | Net Restaurant Sales | For each Restaurant CIGI shall pay to MBI a monthly royalty fee in the rate of one percent (1%) of Net Restaurant Sales for each of the first six months of each Restaurant's operation, after the first six months of operation such Net Restaurant Sales shall be annualized and the royalty fee shall be paid for the remainder of the calendar year based on annualized Net Restaurant Sales. No royalty shall be paid on Net Restaurant Sales during the first December 31 after the Restaurant has completed its first six months of operation ("Initial Calendar Year"). For each calendar year after the Initial Calendar Year, such royalty fee shall be paid a monthly royalty fee based on Net Restaurant Sales of the preceding calendar year, and such monthly royalty payments less than twelve months in the previous calendar year. | Net Sales |

KMINE Export [2018.02.23] Part 2

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commensurate In | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18239 | | | | | | | | | | | | 3,750 USD | per month | | Per Unit | License |
| 25267 | 1. Grant the right to enter into and operate dual concept restaurants | CKE RESTAURANTS, INC. | CARL KARCHER ENTERPRISES, INC. | CKE RESTAURANTS, INC. | 05/1995 | 1. INITIAL TERM. The initial term of the Franchise will begin on the Commencement Date and will continue for a period of fifteen (15) years, or the term of your lease, whichever is shorter. | Franchise, Joint Development | Restaurants, Consumer Services, Foods and Nondurable Beverages, Consumer Non Durable | 0000 | California, United States, Arizona, San Diego, California | EXCLUSIVE | 4% | Gross Revenue | Royalty Fee | Gross Sales | License |
| 4812 | 1. Grant the right to use the Longhorn Names (the trademarks, service marks, tradenames, names), and any variant thereof... | WATERMARK FOOD MANAGEMENT CO | WATERMARK FOOD MANAGEMENT CO | WATERMARK FOOD MANAGEMENT CO | 02/21/1996 | 1. The initial term of this License shall be fifteen (15) years from the date of this License Agreement. The term of this License may be extended at the option of Licensee for an additional period of ten (10) years... | Manufacturing, Process Intangible, Marketing Intangible | Consumer Services, Restaurants, Foods and Nondurable Beverages | 5412 | Houston, Texas, United States | N/A | 1 USD | per year | Licensee shall pay to Licensor the sum of ONE DOLLAR ($1.00) per year, payable in advance, for the initial term of this License. | Per Unit | License |
| 67685 | 1. Grant the right to utilize the Trademark (Sobik's Subs) related to the franchise. 2. Grant the right to exercise an option purchase the Trademark (Sobik's Subs). | SOBIK'S SUBS INC. | SBM Franchise Systems, Inc., George A. Sorrosa, James G. Beryl Jr., Andre M. Kibler Jr. | Sobik's Sandwich Shops, Inc. | 02/01/1993 | 1. This Agreement shall commence on March 5, 1993, and shall continue for a period of five (5) years (the "Initial Term"). Licensee shall have the unilateral right to renew this Agreement for five (5) additional periods of one year each... | Asset Purchase, Marketing Intangible, Other | Restaurants, Foods and Nondurable Beverages, Consumer Services | | Eustis, FL, Winter Park, FL, Orlando, FL, Longwood, FL, Cocoa Beach, FL, Sanford, FL, Titusville, FL, Fern Park, FL, Winter Garden, FL, Lake Mary, FL, Leesburg, FL, Orange City, FL, Inverness, FL, Kissimmee, FL, Lakeland, FL, Casselberry, FL, Brooksville, FL, Gainesville, FL, Brandon, FL, Ocoee, FL, Apopka, FL, United States | EXCLUSIVE | 3% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Price" shall be the base price of $100,000,000 PLUS an additional 3% of the then current annual franchise revenues collected through the Purchase Date under Licensee's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales | License |
| 67685 | | | | | | | | | | | EXCLUSIVE | 3% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Price" shall be the base price of $100,000,000 PLUS an additional 3% of the then current annual franchise revenues collected through the Purchase Date under Licensee's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales | License |
| 67685 | | | | | | | | | | | | 2% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Price" shall be the base price of $100,000,000 PLUS an additional 2% of the then current annual franchise revenues collected through the Purchase Date under Licensee's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales | License |
| 67685 | | | | | | | | | | | | 1% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Price" shall be the base price of $100,000,000 PLUS an additional 1% of the then current annual franchise revenues collected through the Purchase Date under Licensee's rights in the Assignment, if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales | License |
| 67685 | | | | | | | | | | | | 25% | revenues | In exchange for this License rights granted hereby, Licensee does hereby agree to pay to Licensor the following sums: a 25% of all revenues collected by Licensee as a result of the sublicensing of any and all usage of the Trademark inclusive of all rights in addition to any revenue and payment in accordance with the terms of the Assignment. | Net Sales | License |

EX1-227

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57565 | | | | | | | | | | | | 25% | | Royalties shall continue to be paid to Licensor throughout the initial Term, even after the Purchase Date, at the rate of 25%, with no change. | Net Sales |
| 23247 | 1. Grant the right to utilize the Trademark 5obbi's Early related to the franchise. 2. Grant the right to exercise an option purchase the Trademark 5obbi's 5obi. | INTERFOODS OF AMERICA INC | 5obbi's Sandwich Shops, Inc. | George A. Samsons, James S. Byrd, Anthony E. Kilcan, Jr., 5&M Franchise Systems, Inc. | 03/5/1993 | 1. This Agreement shall commence on March 5, 1993, and shall continue for a period of five (5) years (the "Initial Term"). Licensee shall have the unilateral right to review this Agreement for ten (5) additional periods of one year each, provided that Licensee has given written notice of renewal to Licensor no less than 90 days prior to the expiration of the then-current term, and is not in default or an error under this Agreement in the Assignment at the time of said notice. | Asset Purchase, Marketing Intangible, Other | Restaurants, Consumer Services, Foods and Nonalcoholic Beverages | | United States, Euclis FL, Winter Park FL, Orlando, FL, Longwood, FL, Cocoa Beach, FL, Sanford, FL, Titusville, FL, Fern Park, FL, Winter Garden, FL, Lake Mary, FL, Leesburg, FL, Orange City, FL, Inverness, FL, Kissimmee, FL, Lakeland, FL, Altamonte Springs, FL, Brooksville, FL, Gainesville, FL, Brandon, FL, Ocoee, FL, Apopka, FL | EXCLUSIVE | 3% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Date", the Purchase Price shall be the base price of $100,000,000 PLUS an additional 3% of the then-current annual franchise revenues collected through the Purchase Date under Licensor's rights in the Assignment; if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales |
| 23247 | | | | | | | | | | | | 2% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Date", the Purchase Price shall be the base price of $100,000,000 PLUS an additional 3% of the then-current annual franchise revenues collected through the Purchase Date under Licensor's rights in the Assignment; if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales |
| 23247 | | | | | | | | | | | | 1% | annual franchise revenues | On the date of said purchase and sale, the "Purchase Date", the Purchase Price shall be the base price of $100,000,000 PLUS an additional 3% of the then-current annual franchise revenues collected through the Purchase Date under Licensor's rights in the Assignment; if during year two of this Agreement, 2% of such amount if during year three, and 1% of such amount if during year four. | Net Sales |
| 23247 | | | | | | | | | | | | 25% | Revenues | In exchange for the License rights granted hereby, Licensee shall hereby agree to pay to Licensor the following sums: a. 25% of all revenues collected by Licensee as a result of the sublicensing or other similar usage of the Trademark and to any other similar usage of the Trademark exclusive of any such revenues to any amount due Licensor in accordance with the terms of the Assignment. | Net Sales |
| 23247 | | | | | | | | | | | | 25% | revenues | Royalties shall continue to be paid to Licensor throughout the initial Term, even after the Purchase Date at the rate of 25%, with no change. | Net Sales |
| 68843 | 1. Grant the right to engage Roadhouse Grill, Inc. as Manager of the Restaurant to in restaurant to be known as Roadhouse Grill, located at 21212 St. Andrews Boulevard, Suites 22A and 23B, Boca Raton, Florida 33434, which consists of approximately seven thousand two hundred thirty-five (7,235) square feet of space, all of which complete with the lease, equipment, furnishings, inventory and trademarks and all other food and beverage services to be provided in the Restaurant. | ROADHOUSE GRILL, INC. | Roadhouse Grill, Inc. | Boca Roadhouse, Inc. | 11/8/1994 | 1. The term of this Agreement shall commence on ___ and continue for a term of five (5) years from such date and may be terminated as for the reason of any of the provisions contained hereinafter. 2. The Owner shall have the right and option to renew this Agreement for three (3) successive five (5) year periods. In the event that the Owner chooses to renew this Management Agreement or any subsequent option period for an additional period of five (5) years, it shall so notify Manager in writing no later than ninety (90) days prior to the expiration of the then-current term, and in such event, the Manager shall be obligated to maintain the management of the Restaurant for an additional five (5) year period of time. Failure of the Owner to exercise any one of these options shall cause any remaining options to be void. | Service | Business Services, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Consumer Non-Durables | | Boca Raton, Florida, United States | N/A | 4% | gross receipts less sales tax and refunds | Manager shall be entitled to receive four percent (4%) of the gross receipts less sales tax and refunds monthly as its fee for all services performed hereunder, such amount to be paid from the first dollar available. | Net Sales |

| Agreement# | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58898 | DELICIOUS FOODS CO INC | Nestle Food Company, Societe des Produits Nestle S.A. | Delicious Cookie Company, Inc. | 12/16/1993 | (Term provision re BUTTERFINGER and NESTLE trademarks) | Marketing Intangible | Consumer Non-Durable, Foods and Nondurables Beverages | | United States | NON-EXCLUSIVE | 2% | Net Sales | The parties agree that during all terms of this Agreement DCC shall pay to Nestle a royalty in the amount of two (2) percent of Net Sales. | Net Sales | |
| 58899 | DELICIOUS FOODS CO INC | Delicious Cookie Company, Inc. | Land O'Lakes, Inc. | 09/20/1991 | (Term provision) | Marketing Intangible | Consumer Non-Durable, Foods and Nondurables Beverages | | United States, U.S. military bases | EXCLUSIVE | 7% | gross sales | DCC agrees to pay at least Seven (7) percent of its gross sales dollars from Licensed Products advertising and/or promoting Licensed Products each year during the term(s) of this Agreement. | Gross Sales | |
| 58899 | | | | | | | | | | | 3% | Net Sales | | Net Sales | |
| 58899 | | | | | | | | | | | 15-25 USD | per twelve unit case | | Per Unit | |
| 68717 | PAPA JOHN'S INTERNATIONAL, INC. | TEXTRA CHEESE CORP. | PAPA JOHN'S INTERNATIONAL, INC. | 06/2/1994 | (franchise term; DEVELOPMENT SCHEDULE) | franchise | Consumer Service, Retail, Restaurants, Consumer Non-Durable, Foods and Nondurables Beverages | | Longview, Lufkin, Nacogdoches, Tyler, Texas, United States | EXCLUSIVE | 18,500 USD | per Outlet | | Per Unit | |

ktMINE Export (2018.02.23) Part 3

EX1-229

ktMINE

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities to | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68072 | | | | | | | | | | | | 3,500 USD | per Outlet | Developer has paid to Franchisor a development fee of Seventeen Thousand Five Hundred Dollars ($17,500) ("Development Fee") (i.e. Three Thousand Five Hundred Dollars ($3,500) for each Outlet to be developed), receipt of which is hereby acknowledged and which Development Fee has been fully earned by Franchisor, is non-refundable and is not contingent upon the rendering of any further performance by Franchisor. The Development Fee is in consideration of, among other things, the development rights granted herein, the reservation of the Development Area, the development opportunities lost or deferred as a result of the rights granted Developer herein and the administrative and other expenses incurred by Franchisor. However, $3,500 of the Development Fee will be credited against the Initial Franchise Fee at the time it is paid, as provided in Section 3(f). | Per Unit | Licensor |
| 68072 | | | | | | | | | | | | 15,000 USD | per Outlet | The Initial Franchise Fee to be paid by Developer for each Outlet shall be $15,000, provided that $3,500 of the Development Fee shall be credited against the initial Franchise Fee. The net amount of the Initial Franchise Fee ($11,500) shall be paid at the time each Franchise Agreement is executed. | Per Unit | Licensor |
| 25234 | I, Grant the right to operate one retail outlet under the System (the name "Papa John's," special recipes for the making of pizza and other foods, unique interior and exterior building design and appearance, the use of only high-quality ingredients, and consistency and uniformity of products and services) and the Marks (service marks, trade names and trademarks, including, but not limited to, "Papa John's," "Papa John's Pizza," and "Pizza Papa John's Delivering the Perfect Pizza"), which shall be located at: 2702 North Street, Nacogdoches, Texas 75961. | PJ AMERICA, INC. | TEXTAS CHEESE CORP. | PAPA JOHN'S INTERNATIONAL, INC. | 09/20/94 | 1. The Franchise shall be for a term of ten (10) years from the date of this Agreement, unless sooner terminated as provided herein (the "Initial Term"). 2. This Agreement shall not automatically renew upon the expiration of the Initial Term. Franchisee may, however, renew this Agreement for one additional ten (5) year term ("Renewal Term"). | Franchise | Restaurants, Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Retail | | Nacogdoches, Texas, United States | Multi-Exclusivity | 4% | Net Sales | A continuing royalty (the "Royalty") of four percent (4.0%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 15); provided that any time after the fifth (5th) anniversary date of this Agreement, Franchisor may increase the Royalty by as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | Licensor |
| 25234 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of four percent (4.0%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 15); provided that any time after the fifth (5th) anniversary date of this Agreement, Franchisor may increase the Royalty by as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | |
| 25234 | | | | | | | | | | | | 1.5% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 8(b), such amounts as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1 1/2%) of the monthly Net Sales of the Outlet, except as set forth in 8(b) below. | Net Sales | |
| 25234 | | | | | | | | | | | | 2.5% | Net Sales | Franchisee shall contribute to the "Cooperative," as defined in Section 8(c), such amounts as the governing body of the Cooperative may designate from time to time, which amount shall not exceed one and one-half percent (2 1/2%) of the monthly Net Sales of the Outlet, except as set forth in 8(c) below. | Net Sales | |
| 25234 | | | | | | | | | | | | 2% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund to two percent (2%) of Net Sales, provided such increase is approved by the owners of not less than sixty percent (60%) of the outlets required to contribute to the Marketing Fund (including both Franchise-owned and franchised outlets). | Net Sales | |

kMINE

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | License | Term | EffectiveDate | SICCode | Territory | Industry | AgreementType | Exclusivity | Value | AgreementBase | Modifier | Commercialize | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23234 | | | | | | | | | | | | | 2.5% | Net Sales | The governing body of the Cooperative may increase the maximum required contribution to the Cooperative to a percentage of Net Sales in excess of two and one-half percent (2 1/2%), provided that any such increase is approved by Franchisor and is also approved by not less than two-thirds (2/3) of the outlets required to contribute to the Cooperative (including both Franchisor-owned and Franchised outlets). Franchisor's decision on any proposed increase above two and one-half percent of Net Sales shall be final. | Net Sales | Licensor |
| 23234 | | | | | | | | | | | | | 4% | Net Sales | Franchisee shall expend such amounts on a franchise may designate from time to time for local advertising as provided in Section 8.d1; provided, that the aggregate amount that Franchisee may be required to spend on such advertising together with the amount Marketing Fund contributions will not exceed four percent (4%) of the Net Sales of the Outlet, and provided further that Franchisee's expenditures for grand-opening advertising under 11 above, shall be credited against Franchisee's local advertising obligations. | Net Sales | Licensor |
| 23233 | 1. Grant the right to establish five Papa John's Restaurants (PAPA JOHN'S INTERNATIONAL, INC.) has expended time, effort and money to develop a unique system for the operation of retail outlets specializing in carry-out and delivery of pizza and other food items. The System includes the trade name and trademark "Papa John's" as well as the trademark "Papa John's Pizza" and certain other trademarks, service marks, slogans, logos and emblems owned by PAPA JOHN'S INTERNATIONAL, INC.] in Longview, Lufkin, Nacogdoches and Tyler, Texas. | PJ AMERICA INC | PAPA JOHN'S INTERNATIONAL, INC. | TX STAR WHEELS CORP | 06/1994 | 1. Unless sooner terminated as provided herein, this Agreement shall expire on the earlier to occur of: (i) the date on which all the Outlets have been developed, or (ii) 1,200 midnight on the last date set forth on the Development Schedule (the "Term"). Upon the termination or expiration of this Agreement, all unexercised development rights shall expire.  2. DEVELOPMENT SCHEDULE  Dates on Which Each Cumulative Number of Outlets Outlet Shall be Open To be Open and Operating --- October 10, 1994 1 March 1, 1995 2 July 1, 1995 3 November 1, 1995 4 March 1, 1995 5 | | | Texas, United States, Longview, Lufkin, Nacogdoches, Tyler | Restaurants, Consumer Services, Consumer Non-Durables, Foods and NonAlcoholic Beverages, Retail | Franchise | EXCLUSIVE | | | | Licensor |
| 23233 | | | | | | | | | | | | | $500.00 | per outlet | Developer has paid to Franchisor a development fee of Seventeen Thousand Five Hundred Dollars ($17,500) ("Development Fee") (i.e. three thousand five hundred Dollars ($3,500) for each Outlet to be developed), receipt of which is hereby acknowledged and which development of the has been fully earned by Franchisor, is non-refundable and is not contingent upon the rendering of any further performance by Franchisor. The Development Fee is in consideration of, among other things, the development rights granted herein, the reservation of the Development Area, the development opportunities lost or deferred as a result of the rights granted Developer herein and the administrative and other expenses incurred by Franchisor. However, $3,500 of the Development Fee will be credited against each Initial Franchise Fee at the time it is paid, as provided in Section 3.0f). | per Outlet | Licensor |
| 23233 | | | | | | | | | | | | | 18,500.00 | per Outlet | The Initial Franchise Fee to be paid by Developer for each Outlet shall be $18,500, provided that $3,500 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each Franchise Agreement is executed. | per Outlet | Licensor |
| 23233 | | | | | | | | | | | | | 15,000.00 | per Outlet | The Initial Franchise Fee to be paid by Developer for each Outlet shall be $18,500, provided that $3,500 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each Franchise Agreement is executed. | per Outlet | Licensor |

| AgreementID | FlagGroup | Licensor | Licensee | AgreementType | EffectiveDate | Term | SICCode | Industry | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodite / Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68070 | PP AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | Extra Dough, Inc. | Franchise | 04/19% | 1. Unless sooner terminated as provided in this Agreement, this Agreement shall expire on the earlier to occur of: (i) the date on which all the Restaurants have been developed, or (ii) 11:59 p.m. midnight on the last date set forth on the Development Schedule (the "Term"). Upon the termination or expiration of this Agreement, all unexercised development rights shall expire. 2. DEVELOPMENT SCHEDULE. States in Which Such Cumulative Number of Restaurant Restaurant Shall be Open to be Open and Operating. August 31, 1995 1 February 28, 1996 2 August 31, 1996 3 February 28, 1997 4 | | Retail, Restaurants, Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages | United States, Cullman, Jasper, Sylacauga, Talladega, Alabama | EXCLUSIVE | 3,500 USD | per Restaurant | You have paid to us a development fee of fourteen thousand dollars ($14,000) ("the Development Fee"). Three Thousand Five Hundred Dollars ($3,500) for each Restaurant to be developed … | Per Unit |
| 68070 | | | | | | | | | | | 18,500 USD | per Restaurant | The Initial Franchise Fee to be paid by you for each Restaurant shall be $18,500, provided that $3,500 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each Franchise Agreement is executed. | Per Unit |
| 68070 | | | | | | | | | | | 15,000 USD | per Restaurant | The Initial Franchise Fee to be paid by you for each Restaurant shall be $18,500, provided that $3,500 of the Development Fee shall be credited against the Initial Franchise Fee. The net amount of the Initial Franchise Fee ($15,000) shall be paid at the time each Franchise Agreement is executed. | Per Unit |
| 25231 | PP AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | EXTRA CHEESE, INC. | Franchise | 01/1992 | 1. new Franchise Agreement shall provide for an initial term of not less than ten (10) years and for renewal terms aggregating not less than twenty (20) years. | | Restaurants, Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Retail | West Northport, Alabama, United States | Multi Exclusivity | 5% | Net Sales | A continuing monthly royalty (the "Royalty") of four percent (4%) of the monthly "Net Sales" of the Outlet. In the event this Agreement is renewed pursuant to Section 2.D) the Royalty during the Subsequent Renewal Term shall be the lesser of (A) the Royalty provided in franchisor's then Franchise Agreement being offered to new Papa John's franchisees … | Net Sales |
| 25231 | | | | | | | | | | | 4% | Net Sales | A continuing monthly royalty (the "Royalty") of four percent (4%) of the monthly "Net Sales" of the Outlet. In the event this Agreement is renewed pursuant to Section 2.D), the Royalty during the Subsequent Renewal Term shall be the lesser of … | Net Sales |
| 25231 | | | | | | | | | | | 2.5% | Net Sales | Franchisee shall contribute to the "Cooperative," if defined in Section 6.(c), such amount as the governing body of the Cooperative may designate from time to time, which amount shall not exceed two and one-half percent (2-1/2%) of the monthly Net Sales of the Outlet … | Net Sales |

kMINE Export (2018-02-23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | License | EffectiveDate | Term | Territory | SICCode | Industry | AgreementType | Exclusivity | Value | AgreementBase | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23231 | | | | | | | | | | | Net Sales | | 1% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 3.6(i), such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (ii) below. Provided, however, that the required contribution may not exceed one percent (1%) of the Net Sales until such time as there are 100 or more Papa John's Pizza outlets open and operating (including both franchisor-owned and franchised outlets). | Net Sales | License |
| 23231 | | | | | | | | | | | Net Sales | | 1.5% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 3.6(i), such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (ii) below. Provided, however, that the required contribution may not exceed one percent (1%) of the Net Sales until such time as there are 100 or more Papa John's Pizza outlets open and operating (including both franchisor-owned and franchised outlets). | Net Sales | License |
| 23231 | | | | | | | | | | | Net Sales | | 4% | Net Sales | Franchisee shall expend such amounts as Franchisor may designate from time to time for local advertising as provided in Section 8.6(i), provided, that the aggregate amount that Franchisee may be required to spend on local advertising together with Franchisee's Marketing Fund contributions will not exceed four percent (4%) of the Net Sales of the Outlet, and provided further that Franchisee's expenditures for grand opening advertising under (i) above, shall be credited against Franchisee's local advertising obligations. | Net Sales | License |
| 23231 | | | | | | | | | | | Net Sales | | 2% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund to two percent (2%) of Net Sales, provided such increase is approved by the majority of Net Sales then only percent (60%) of the outlet required to contribute to the Marketing fund (including both franchisor-owned and franchised outlets). Any increase in the required contribution to the Marketing Fund in excess of two percent (2%) of Net Sales must be approved by not less than two-thirds (2/3) of the outlets required to contribute to the Marketing Fund (including both franchisor-owned and franchised outlets). | Net Sales | License |
| 23231 | | | | | | | | | | | Net Sales | | 2.5% | Net Sales | The governing body of the Cooperative may increase the maximum required contribution to the Cooperative to a percentage of Net Sales in excess of two and one-half percent (2-1/2%), provided that any such increase is approved by Franchisor and is also approved by not less than two-thirds (2/3) of the outlets required to contribute to the Cooperative (including both franchisor-owned and franchised outlets). | Net Sales | License |

kmMINE Export (2018-02-23) Part 3

EX1-233

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25232 | 1. Grant the right to operate a retail restaurant under the System (a unique system which includes special recipes and menu items, distinctive design, decor, color scheme and furnishings, software and programs, standards, specifications and procedures for operations, procedures for quality control, training assistance and advertising and promotional programs all of which we may improve, amend and further develop from time to time) and the Marks (service marks, trade names and trademarks, including, but not limited to, "Papa John's," "Papa John's Pizza," and "Pizza Papa John's Delivering the Perfect Pizza!") to be located at: 680 Highway 78 West Jasper, Alabama 35501. | PJ AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | EXTRA CHEESE, INC. | 08/1995 | 1. The franchise shall be for a term of 10 years from ——— the date of this Agreement, unless terminated earlier as provided in this Agreement (the "Initial Term"). 2. As used in this Agreement, "Term" shall mean the initial — Term and the Renewal Term, as the case may be. 3. This Agreement shall not automatically ——— renew upon the expiration of the Initial Term. You shall, however, have an option to renew this Agreement upon the expiration of the Initial Term. You may renew this franchise for one additional 10 year term (the "Renewal Term"). | Franchise | Restaurants, Consumer Services, Retail, Consumer Non Durables, Foods and Nonalcoholic Beverages | | United States, Jasper, Alabama | Multi Exclusivity | 4% | Net Sales | A continuing royalty (the "Royalty") of 4% of the "Net Sales" of the Restaurant for each "Period" (as defined in Section 13), provided that any time after the 3rd anniversary date of this Agreement we may increase the Royalty to as much as 5% of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | License |
| 25232 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of 4% of the "Net Sales" of the Restaurant for each "Period" (as defined in Section 13), provided that any time after the 3rd anniversary date of this Agreement we may increase the Royalty to as much as 5% of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | License |
| 25232 | | | | | | | | | | | | 1.5% | Net Sales | You shall contribute to the "Marketing Fund," as defined below, such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed 1 1/2% of the monthly Net Sales of the Restaurant, except as set forth in (iii), below. | Net Sales | License |
| 25232 | | | | | | | | | | | | 2% | Net Sales | You shall contribute to the "Cooperative" (defined below) that percentage of Net Sales which the governing body of the Cooperative may designate from time to time, which amount shall not be less than 2% nor more than 5% of the monthly Net Sales of the Restaurant, except as set forth in (iii), below. | Net Sales | License |
| 25232 | | | | | | | | | | | | 5% | Net Sales | You shall contribute to the "Cooperative" (defined below) that percentage of Net Sales which the governing body of the Cooperative may designate from time to time, which amount shall not be less than 2% nor more than 5% of the monthly Net Sales of the Restaurant, except as set forth in (iii), below. | Net Sales | License |
| 25232 | | | | | | | | | | | | 4% | Net Sales | You shall expend such amounts as we may designate from time to time for local advertising as provided below; provided, that the aggregate amount that you may be required to spend on local advertising (together with your Marketing Fund contributions and not exceed 4% of the Net Sales of the Restaurant. | Net Sales | License |
| 25232 | | | | | | | | | | | | 2.5% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund by 1/2% of Net Sales, provided such increase is approved by the owners of not less than 66% of the restaurants required to contribute to the Marketing Fund (including both franchise-owned and franchisor-owned restaurants). Any increase in the required contribution to the Marketing Fund in excess of 1 1/2% of Net Sales must be approved by not less than 2/3 of the restaurants required to contribute to the Marketing Fund (including both restaurants we own and franchise). | Net Sales | License |

ktMINE

kMINE Export (2016.02.23) Part 1

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | CommentsIndustrie | LeadLicense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25242 | | | | | | | | | | | | 5% | Net Sales | The governing body of the Cooperative may increase the required contribution to the Cooperative to a percentage of Net Sales in excess of 5%, provided that any such increase is approved by not less than two-thirds of the restaurants required to contribute to the Cooperative and including both franchisor-owned and franchisee restaurants). We also have the right to authorize any Cooperative to determine contributions on a different basis (that amount, geographic location, etc.). Our decision on any issue concerning Cooperative contributions shall be final. | Net Sales | License |
| 25242 | | | | | | | | | | | | 20% | Income Fees | You agree to pay us a software maintenance fee which shall not be more than 20% of the license fees of the Designated Software as published by us twelve or by us once a year ("Software Maintenance Fee"). This fee shall be paid in semi-annual installments. This Software Maintenance Fee includes software maintenance, research and development, upgrades and enhancements and installation media. If any, which we adapt, require or provide. Installation on the Point data's Profit System ("M"), if required, will be charged as defined in Section 30.12(iv). | Per Unit | License |
| 25242 | | | | | | | | | | | | 70 USD | per Period | You agree to pay us a recurring software support service fee ("Software Support Fee") in the amount of 70 per Period. | Per Unit | License |
| 25235 | 1. G ant the right to establish 47 Papa John's Pizza outlets in Virginia | PJ AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | PJ/VA, INC. | 01/15/1992 | 1. DEVELOPMENT SCHEDULE Three Outlets must be opened in the first year of the Term; Five Outlets must be opened in the second year of the Term; Six Outlets must be opened in the third year of the Term; Seven Outlets must be opened in the fourth year of the Term; Eight Outlets must be opened in the fifth year of the Term; Nine Outlets must be opened in the sixth year of the Term; and Nine Outlets must be opened in the seventh year of the Term. 2. Unless sooner terminated as provided herein, this Agreement — shall expire at 11:59 midnight on the last date set forth on the Development Schedule (the "Term"). | Franchise, Service | Restaurants, Consumer Services, Retail, Consumer Non Durables, Foods and Nondurable Beverages | | Virginia, United States | EXCLUSIVE | 3500 USD | per outlet | Development Fee. 27,000 or 3,500 for each of the 23 outlets developed | | License |
| 25236 | 1.G ant the right to operate one  Papa John's Pizza retail outlet under the System and the Marks | PJ AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | PJ/VA, INC. | 08/2/91 | 1. INITIAL TERM. The franchise shall be for a term of ten (10) —— years from the date of this Agreement, unless sooner terminated as provided herein (the "Initial Term"). 2. RENEWAL OF AGREEMENT. This Agreement shall not automatically —— renew upon the expiration of the Initial Term. Franchisee may, however, renew this Agreement for one additional five (5) year term ("Renewal Term"). | Franchise | Restaurants, Consumer Services, Foods and Nondurables, Beverages, Consumer Non Durables, Retail | | Richmond, Virginia, United States | Multi-industry | 5% | Net Sales | Royalty fee, for renewal terms | Net Sales | License |
| 25236 | | | | | | | | | | | | 4% | Net Sales | Continuing Royalty, 4% and might increase up to 5% | Net Sales | License |
| 25236 | | | | | | | | | | | | 5% | Net Sales | Continuing Royalty, 4% and might increase up to 5% | Net Sales | License |
| 25236 | | | | | | | | | | | | 1.5% | Net Sales | Marketing Fund | Net Sales | License |
| 25236 | | | | | | | | | | | | 2.5% | | Cooperative contribution, not to exceed 2.5% | Net Sales | License |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25236 | | | | | | | | | | | | 4% | Net Sales | Local Advertising expenditure. Franchisee may be required to spend on local advertising together with Franchisee's Marketing Fund contributions and not exceed four percent (4%) of the Net Sales of the Outlet | | Net Sales |
| 25236 | | | | | | | | | | | | 2% | Net Sales | Marketing Fund Contributions; potential increase amount | | Net Sales |
| 25236 | | | | | | | | | | | | 2.5% | Net Sales | Cooperative Advertising contribution; potential increased amount | | Net Sales |
| 65658 | 1. Grant the right to utilize the Property (trademarks, trade dress, logos, designs, slogans, copyrights and other similar materials, including PEPSI, PEPSI-COLA, DIET PEPSI, DIET PEPSI-COLA MOUNTAIN DEW, and SLICE) in the Territory solely upon and in connection with the manufacture, distribution and sale of the products, including the Men's, Women's, Boys, Girls T-shirts and Fleece, and Women's Beach Cover-ups. | LITTLEFIELD ADAMS & CO | Pepsico, Inc. | Littlefield Adams & Co. | 01/21/1996 | 1. The term ("Term") of this Agreement shall be a period of two (2) years commencing on February 1, 1996, and terminating on January 31, 1998, unless sooner terminated in accordance with the provisions of this Agreement. 2. In the event this Agreement has not been terminated and LICENSEE has faithfully performed each and every obligation of this Agreement during the Term referred to in 5.1, LICENSEE agrees to negotiate in good faith with LICENSEE with respect to a renewal period of the Term for such period of time and upon such terms and conditions as the parties may mutually agree. (The defined term "Term" as used herein shall include any renewals thereof.) | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durable | 5130 | United States of America | Non-Exclusivity | 8% | Net Sales | In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum equal to eight percent (8%) of all Net Sales by or on behalf of LICENSEE of the Licensed Products. | | Net Sales |
| 68695 | 1. Grant the right to operate a STOCKEY'S PECAN SHOPPE (STOCKEY'S, INC. has created and developed a system of distinctive style and type of dine-in confection and gift stores operated under the name STOCKEY'S PECAN SHOPPE, in which it distributes and sells pecans, pecan products, jams, preserves, foods and confections, souvenirs, gifts and novelties, petroleum products, and other related services) STOCKEY'S PECAN SHOPPE also provides a fast food service with distinguishing characteristics, all of which, in part or otherwise, may be changed, added to, improved and further developed from time to time as STOCKEY'S may prescribe. The marks, trademarks, service marks, including: (1) Registered names, trademarks, STOCKEY'S & STOCKEY'S PECAN SHOPPE (2) Copyrights and Design i.e. STUART'S & STOCKEY'S GASOLINE (3) Registered Service Mark STUART'S PECAN SHOPPE | BON APPETIT INC | STOCKEY'S INC. | BON APPETIT INC. | 02/22/1982 | 1. Unless terminated at otherwise herein provided, the term of this Agreement shall be for ten (10) years from the date hereof, and may be extended thereafter at the option of the Franchisee for successive terms of two (2) years upon franchisee giving at least ninety (90) days' written notice of extension prior to the termination of this Agreement or the end of any extended term hereof, provided that Franchisee shall not be in default of any provision of this Agreement, and provided, further, that Franchisee shall execute the Company's then current standard form franchise agreement, which may include higher percentage royalty and advertising fees than provided for herein. | Franchise | Retail, Consumer Services, Restaurants, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Consumer Durables, Oil and Gas, Transportation Equipment and Parts | 5399 | GENERAL, NEW MEXICO, United States | Multi-Exclusivity | 4% | Sales | Dealer shall pay to Company with each billing an amount equal to 4% of the products sold through the warehouse with respect to which the company normally provides an advertising service, and transfers to franchisee and company owned pecan shoppes. These monies shall be used in a special fund, which shall consist of contributions of all STOCKEY'S PECAN SHOPPES (including Company owned shoppes) and, shall be used in the advertising and promotion of STOCKEY'S PECAN SHOPPES. Such advertising and promotion shall be installed and executed by the Company and the time, methods of, and extent of all such Programs shall be determined solely by the Company | | Net Sales |
| 66814 | 1. Grant the right to enter into a JOINT VENTURE AGREEMENT to form a Joint Venture for the purpose of (i) growing, developing, harvesting, packing, shipping, marketing, distributing and selling the Products (any or all of the following products: (i) Jalapeño and red peppers, (ii) non-red bell peppers, (iii) green chiles, (iv) red chile peppers, and (v) such other products as the parties may from time to time in writing agree) from Mexico, Canada and the United States, and (ii) marketing, distributing and selling the Additional Products (any or all of the following: (i) tomatillos, (ii) raspberries, (iii) blueberries (any items limited to the Mexico, Canada and the United States, and any) and (iv) such other products as the parties mutually agree from time to time) in Mexico. 2. Grant the right to use names and trademarks (including but not limited to "Mi Casita" and "Casita Grande"). 2. Grant the right to use names and trademarks (including but not limited to "Big Fresh" and "Fresh Casa") in connection with the distribution, marketing and sale of the Products and the Additional Products. | CALGENE INC | Ntiagapia Mexico, L.L.C., Hermonca Dry Agricola Industrial de Rio Campo N'tiagapia, Calsun S.A. de C.V., R.L. Comercial de Insumos y Abastos de Campo Supremo, Inc., A.B.A. | Asociacion en Participacion, Dist. Agricola Industrial de Rio Campo N'tiagapia, Calsun S.A. de C.V., R.L. Comercial de Insumos y Abastos de Campo Supremo, Inc., A.B.A., Ntiagapia Mexico, L.L.C., N'tiAGRICOLO S.A. de C.V., R.L. Comercial de Insumos y Abastos de Campo Supremo, Inc., A.B.A. | 10/31/1994 | 1._____ Unless renewed or extended by mutual agreement of the Parties, the Joint Venture shall terminate one year from the date of this Agreement. 2. This Agreement shall not be automatically -- -- -- renewable, but shall require the prior written approval of both Parties to renew or renew this Agreement prior to its expiration. | Joint Development, Marketing Intangible | Agribusiness, Foods and Nonalcoholic Beverages, Consumer Non-Durables | 2070 | Mexico, Canada, United States | Multi-Exclusivity | 10% | net f.o.b. price | NTIG shall be entitled to receive a usual and standard fee from itself in the amount of ten percent (10%) of the net f.o.b. price of the Products, in connection with distribution, marketing and sale of the Products. | | Net Sales |
| 66814 | | | | | | | | | | | | 10% | net f.o.b. price | MEXCO shall be entitled to receive a usual and standard fee from itself in the amount of ten percent (10%) of the net f.o.b. price of the Products, in connection with the distribution, marketing and sale of the Products. | | Net Sales |
| 66814 | | | | | | | | | | | | 70% | profits or losses | AIRC shall be entitled to receive seventy percent (70%) of the profits or losses of itself, as adjusted as provided in Section 11.3, of this Agreement. | | Operating Profit |
| 66814 | | | | | | | | | | | | 30% | profits or losses | NTIGM shall be entitled to receive thirty percent (30%) of the profits or losses of itself, as adjusted as provided in Section 11.3, of this Agreement. | | Operating Profit |

kMINE

kMINE Export (2018.02.23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie s | Lead/Licensor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66014 | | | | | | | | | | 50% | Net Profits and Losses | The Net Profits and Losses of all NTGL and MEXCO shall be allocated among their respective equity owners in accordance with their respective equity ownership of the interests thereof. COMERCIAL shall own fifty percent (50%) of all the equity interests in MEXCO; NTGM shall own fifty percent (50%) of all the equity interests of MEXCO. NTGM shall own fifty percent (50%) of all the equity interests in NTGL; Del Campo shall own fifty percent (50%) of all the equity interests in NTGL. | Operating Profit | Licensor |
| 66014 | | | | | | | | | | 50% | Net Profits and Losses | The Net Profits and Losses of all NTGL and MEXCO shall be allocated among their respective equity owners in accordance with their respective equity ownership of the interests thereof. COMERCIAL shall own fifty percent (50%) of all the equity interests in MEXCO; NTGM shall own fifty percent (50%) of all the equity interests of MEXCO. NTGM shall own fifty percent (50%) of all the equity interests in NTGL; Del Campo shall own fifty percent (50%) of all the equity interests in NTGL. | Operating Profit | Licensor |
| 66014 | | | | | | | | | | 50% | Net Profits and Losses | The Net Profits and Losses of all NTGL and MEXCO shall be allocated among their respective equity owners in accordance with their respective equity ownership of the interests thereof. COMERCIAL shall own fifty percent (50%) of all the equity interests in MEXCO; NTGM shall own fifty percent (50%) of all the equity interests of MEXCO. NTGM shall own fifty percent (50%) of all the equity interests in NTGL; Del Campo shall own fifty percent (50%) of all the equity interests in NTGL. | Operating Profit | Licensor |
| 66014 | | | | | | | | | | 50% | Net Profits and Losses | The Net Profits and Losses of all NTGL and MEXCO shall be allocated among their respective equity owners in accordance with their respective equity ownership of the interests thereof. COMERCIAL shall own fifty percent (50%) of all the equity interests in MEXCO; NTGM shall own fifty percent (50%) of all the equity interests of MEXCO. NTGM shall own fifty percent (50%) of all the equity interests in NTGL; Del Campo shall own fifty percent (50%) of all the equity interests in NTGL. | Operating Profit | Licensor |
| 66014 | | | | | | | | | | 30% | Net Profits | In consideration for its contributions to AoeP, NTGM shall be given an undivided thirty percent (30%) interest, subject to year-end adjustment of its Percentage Share, in the Net Profits of AoeP, as adjusted below (the "Adjusted Net Profit"). Adjusted Net Profits shall be defined as the Net Profits of AoeP, provided, however, that for this purpose the Expenses and Deductions of AoeP shall not include (i) any depreciation or similar expense associated with any new ship ingestion equipment acquired by AoeP with all or part of the proceeds of the interest contributed to NTGM for such equipment, and (ii) any interest payable by AoeP in any related or unrelated party on account of any credit extended to or otherwise obtained by AoeP. | Operating Profit | Licensor |

EX1-237

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementFee | Modifier | Commodities Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23237 | 1.(a) are the right to engage ELYXR CONCEPS, INC. to serve as (is) AMERICAN FOOD GROUP, INC.'s exclusive developer within the Territory, (iv) develop such Territory through the ownership and operation of franchised Units owned by ELYXR CONCEPS, INC. and through the development of stores owned and operated by sub-franchisee of ELYXR CONCEPS, INC. (ALL AMERICAN FOOD GROUP, INC.), have been certain cluster system, known as Goldberg's Bagels units, and Sammy's New York Bagels, which sell and serve a variety of freshly baked bagels, served plain or with various toppings, sandwiches also served on bagels, soups, salads, and other luncheon items, and a variety of soft drinks and other beverages. The Units operate with and under uniform formats, designs, systems, methods, specifications, standards and procedures, all which may be improved, further developed or otherwise modified from time to time by the Company. Such units as operated under or associated with certain trademarks, service marks, logos, and other commercial symbols which the Company may modify from time to time, and operated pursuant to certain proprietary and confidential information and trade secrets, in addition to granting franchise Agreements to own and operate units offering the Company's formats, designs, methods, systems, standards, operating procedures, and the Marks, to persons who meet the Company's qualifications and who agree in writing to undertake the investment and effort to establish and develop bagel stores, the Company also grants to certain individuals or other entities the exclusive higher financial and other criteria, the right to operate an exclusive Area Developer of this Company's qualification, subject to the terms and conditions survived herein). | ALL AMERICAN FOOD GROUP, INC. | ELYXR CONCEPS, INC., GOLDBERG'S NEW YORK BAGELS, ALL AMERICAN FOOD GROUP, INC. | ELYXR CONCEPS, INC., GOLDBERG'S NEW YORK BAGELS, ALL AMERICAN FOOD GROUP, INC. | Franchise, Service | Restaurant, Retail, Consumer Services, Business Services, Consumer Non-Durables, Foods and Nondomestic Beverages | 5794 | Nassau County, Suffolk County, Westchester County, State of New York, United States | EXCLUSIVE | 50% | Franchise Fees | During the term of this Agreement, and provided Area Developer is in compliance with this Agreement and all other Franchise, Development, and other Agreements with the Company, then a full compensation for providing the services described in this Agreement, Area Developer shall receive as compensation, the following percentage of the fees received by the Company in the Territory: Franchise Fees 50%, Royalties 50%. | Other |
| 23237 | 1.(a) are the right to renew this Agreement for two successive five (5) year terms, if ELYXR CONCEPS, INC. is upon expiration of the initial or first renewal term of the Area Development Agreement. Area Developer is (1) in compliance with all aspects of this Area Development Agreement, specifically including the Development Schedule contained herein; (2) in compliance with all Store Franchise Agreements and other Agreements between the Company and the Area Developer and its Affiliates; (3) able to demonstrate to the satisfaction of the Company that it has the ability to continue to discharge its responsibilities under the Area Development Agreement; If the foregoing provisions have been met, then Area Development shall, upon the terms and conditions herein contained, have the right to renew the Area Development for two (2) successive five (5) year terms, without the payment of any renewal fee. | | | | | | | | | | | | |
| 57941 | 1. Grant the right to operate and/or to authorize the operation of International House of Pancakes restaurants (INTERNATIONAL HOUSE OF PANCAKES, INC.), which includes, techniques and other trade secrets for establishment and operation and goodwill, but limited to the use INTERNATIONAL HOUSE OF PANCAKES, INC.'s trade secrets, formulas, processes, methods of operation and goodwill, but only in connection with the retail sale at IHOP restaurants in the franchised area of those items contained on the standard menu of IHOP restaurants as established in the Operations Bulletins from time to time. | IHOP | INTERNATIONAL HOUSE OF PANCAKES, INC., THE SYSTEMS, INC. ARE INTERNATIONAL HOUSE OF PANCAKES COMMISSARY | THE MANAGEMENT SYSTEMS, INC. ARE CORNAT FIMRS, A U.S. CORPORATION | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nondomestic Beverages, Restaurants | 5794 | United States, Florida, Georgia, Glynn County, Wayne County, Camden County, Charlton County, Decatur County, Grady County, Mitchell County, Thomas County, Thomas County, Berrien County, Cook County, Tift County, Echols County, Lanier County, Ware County, Clinch County, Appling County, Atkinson County, Bacon County, Brantley County, Pierce County, Lowndes County, Colquitt County, Brooks County, Pierce County, Ware County | EXCLUSIVE | 1% | Gross Sales | For and in consideration of Franchisor's execution and performance of the Agreement, Franchisee shall pay in United States Dollars to Franchisor a continuing Royalty equal to one percent (1%) of all Franchisee's monthly Gross Sales. | Gross Sales |
| 57941 | 2. Can the right to use and display IHOP service marks, Trademarks, trade names are designated in writing on certain agreements, solely or in connection with the operation of the franchised House of Pancakes restaurant. | | | | | | | | | | | | |
| 57941 | 1. The term of this Agreement shall commence on the date — hereof and shall terminate on June 30, 2010, unless otherwise terminated pursuant to the provisions of this Agreement, but shall be subject to extension or reduction of the term as provided in Section IV hereinbelow. 2. For each International House of Pancakes — Restaurant (the franchised Restaurant) [#] international means of Pancakes Restaurant was operated on subfranchised by Franchisee as of December 31, 1987 ( opened for operation directly or through a subfranchisee, by Franchisee from and after the date of execution hereof through June 30, 1995, two (2) years shall be added to the term hereof. For each such restaurant opened for operation directly or through a subfranchisee, by Franchisee from and after the date of execution hereof through July 1, 1993, one (1) year shall be added to the term hereof. Additionally, for each full year in which (i) a period of one (1) year shall be added to the term hereof. Additionally, in respect of a set of five (5) units which were added to the term. | | | | | | | | | | | | |
| 57941 | | | | | | | | | | 25% | Gross Sales | In addition to Franchisee's obligation to pay a Continuing Royalty as set forth above, Franchisee shall pay to Franchisor, for national advertising and for the creation/promotion, production and distribution of the value of all Franchisee are goodwill attached thereto, a sum equal to one quarter of one percent (25%) of Franchisee's monthly Gross Sales. | Gross Sales |

EX1-238

| AgreementId | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25078 | 1. Grant the right to operate and/or to authorize the operation of International House of Pancakes restaurants (INTERNATIONAL HOUSE OF PANCAKES, INC. has developed and is continuing to develop certain unique systems, products, methods, techniques and other trade secrets for operating restaurants selling pancakes and various other food products under the name "The International House of Pancakes" and "International House of Pancakes Restaurant"). 2. Grant the right to use and display IHOP service marks, Trademarks, trade names and insignia and the dishes and designs pertaining thereto, and to use INTERNATIONAL HOUSE OF PANCAKES, INC.'s trade secrets, formulae, processes, methods, systems of operation and goodwill, only in connection with the retail sale of IHOP restaurants in the Franchised Area of those items included in the standard menu of IHOP restaurants as established in the Operations Bulletins from time to time. | IHOP CORP | INTERNATIONAL HOUSE OF PANCAKES, INC.; INTERNATIONAL HOUSE OF PANCAKES COMMISSARY | IHG MANAGEMENT, INC.; FMR SYSTEMS, INC.; FMR, LLC; CORNNE PANCAKE, U.S.A. CORPORATION | 05/6/1988 | 1. The term of this Agreement shall commence on the date... hereof and shall terminate on June 30, 2005, unless otherwise terminated pursuant to the provisions of this Agreement, but shall be subject to extension or reduction of the term as provided in Section IV. 2. For each International House of Pancakes -- Restaurant (in excess of the eighty-eight (88) International House of Pancakes Restaurant operated in or authorized by Franchisee as of December 31, 1997.) opened for operation directly or through a subfranchisee, by Franchisee from and after the date of execution hereof through and after the term hereof shall be added to the term hereof. For each such restaurant opened for operation directly or through a subfranchisee, by Franchisee from and after July 1, 2001, a period of six (6) months shall be added to the term hereof. Additionally, in respect of a and of five (5) units which were added to the | Franchise | Consumer Services, Restaurants, Consumer Non-Durables, Foods and Nonalcoholic Beverages | 5794 | United States, Florida, Georgia, Open County, Wayne County, Camden County, Charlton County, Decatur County, Grady County, Miller County, Seminole County, Thomas County, Brevard County, Brook County, Cook County, Lowndes County, Appling County, Atkinson County, Bacon County, Barnaby County, Clinch County, Coffee County, Jeff Davis County, Pierce County, Ware County | EXCLUSIVE | 1% | Gross Sales | for and in consideration of Franchisee's execution and performance of this Agreement, Franchisee shall pay to United States Section to Franchisor a Continuing Royalty equal to one percent (1%) of Franchisee's monthly Gross Sales. | Gross Sales | License |
| 25076 | | | | | | 1. Except as provided in Section 11(c) hereof, the initial term of this License Agreement shall commence as of the date first written above and continue for a period of such today, provided that the term of this License Agreement shall be terminated in accordance with the terms of this License Agreement and shall continue on 20 year periods at the option of the Licensee, unless the Licensor gives to the Licensee written notice of termination at least 360 days prior to the scheduled expiration of the then-current term. | Marketing Intangible | | | | | | 25% | Gross Sales | In addition to Franchisee's obligation to pay a Continuing Royalty as set forth above, Franchisee shall pay to Franchisor, for national advertising and for the presentation, promotion and enhancement of the value of all Franchises and goodwill attached thereto a sum equal to one-quarter of one percent (25%) of Franchisee's monthly Gross Sales. | Gross Sales | |
| 67512 | 1. Grant the right to use the Licensed Trademarks ("CA-w's") on each in connection with the development, production, manufacture, sale, marketing, promotion, advertising and distribution of the Products (biscuits, cookies, crackers and other bakery snacks) in the Territory. 2. Grant the right to use the Licensed Trademarks ("CA-w's") on each in connection with the manufacture, sale, marketing, promotion, advertising and distribution of the Co-Pack Products (supplied by Groupo Germanys and P.L. Foods Canada) in the Territory whether supplied by the current supplier or substitute suppliers. 3. Grant the right to use the name "Car's" as its corporate name or in any wholly owned subsidiary or business unit or division, provided that the corporate name includes the word "Distribution" or a similar word. | KEEBLER CORP | UNITED BISCUITS (UK) LIMITED | SHAFFER, CLARKE & CO.; SUNSHINE INC.; HKO HOLDINGS CORPORATION | 01/26/1996 | | Marketing Intangible | Consumer Non-Durables, Foods and Nonalcoholic Beverages | | United States of America, Puerto Rico | Multi-Exclusivity | 5% | Net Sales | The royalty rate for all Products subject to this License Agreement (except for The Co-Pack Products) will be 5% of the Licensee's net sales. As used herein "net sales" means the invoice price to the Licensee's customer less returns, discounts, actually taken and allowances actually given. Royalties will be payable annually within 90 days after the end of each calendar year. Each royalty payment will be accompanied by a statement setting forth in reasonable detail the computation of the royalty. | Net Sales | |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementFee | Modifier | Commodite |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U7906 | (See document) | ALL AMERICAN FOOD GROUP, INC. | ELEXTA CONCEIS, INC., ALL AMERICAN FOOD GROUP, INC. | ALL AMERICAN FOOD GROUP, INC., GOLDBERG'S NEW YORK BAGELS, GOLDBERG'S NEW YORK BAGELS | 02/29/1996 | (See document) | Franchise, Service | Business Service, Consumer Non-Durables, Foods and Nondurables, Beverages, Consumer Services, Restaurants, Retail | 3794 | Nassau County, Suffolk County, Westchester County, State of New York, United States | EXCLUSIVE | 50% | Franchise Fees | (See document) | Net Sales |
| U7906 | (See document) | | | | | | | | | | | 50% | Royalties | (See document) | Net Sales |
| U8578 | (See document) | SAXA INTERNATIONAL, INC. | La Salsa Franchise, Inc., LA SALSA HOLDING CO. | Fuddruckers, Inc., SAXA International, Inc. | 03/14/1996 | (See document) | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nondurables, Beverages, Restaurants | 5812 | Chula Vista, CA, La Mesa, CA, Pasadena, CA, Lakewood, CA, ... | EXCLUSIVE | 5% | Gross Sales | (See document) | Gross Sales |
| U8578 | | | | | | | | | | | | 2% | Gross Sales | (See document) | Gross Sales |
| U8578 | | | | | | | | | | | | 1% | Gross Sales | (See document) | Gross Sales |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Lead Commodit... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68573 | | | | | | | | | | | | 2% | Gross Sales | LR, at its sole discretion, may at any time increase the total Marketing Fund fee does not exceed a maximum of two percent (2%) of Gross Sales. | Gross Sales / Per Unit |
| 68573 | | | | | | | | | | | | 6,275 USD | per Grill | As partial consideration for the right granted by LR, Fuddruckers will pay LR: (a) (i) for each of the first twenty Restaurants at which a Grill is opened, an "Initial" fee for such Grill in the total amount of $6,275.00 due on or before the opening of such Grill; and (ii) for any Restaurants after the first twenty at which a Grill is opened, an "Initial" fee for such Grill in the total amount of $3,600.00 due on or before the opening of such Grill | Per Unit |
| 68573 | | | | | | | | | | | | 3,600 USD | per Grill | As partial consideration for the right granted by LR, Fuddruckers will pay LR: (a) (i) for each of the first twenty Restaurants at which a Grill is opened, an "Initial" fee for such Grill in the total amount of $6,275.00 due on or before the opening of such Grill; and (ii) for any Restaurants after the first twenty at which a Grill is opened, an "Initial" fee for such Grill in the total amount of $3,600.00 due on or before the opening of such Grill | Per Unit |
| 68573 | | | | | | | | | | | | 1,000 USD | per Grill | In light of the limited menu to be served at the Grills and their location within FUDDRUCKERS Restaurants, the parties agree that: (i) during the Initial Term Fuddruckers will not be required to make any expenditures of more than $1,000.00 per Grill to comply with changes to the Manuals; and (ii) after the Initial Term, Fuddruckers will not make more than once during any twelve (12) month period be obligated to make expenditures of more than $3,000.00 per Grill to comply with changes to the Manuals or to make any such change if Fuddruckers and LR agree in the reasonable exercise of their business judgment that the expenditure would not be commercially reasonable in light of the remaining term of this Agreement. | Per Unit |
| 68573 | | | | | | | | | | | | 3,000 USD | per grill | In light of the limited menu to be served at the Grills and their location within FUDDRUCKERS Restaurants, the parties agree that: (i) during the Initial Term Fuddruckers will not be required to make any expenditures of more than $1,000.00 per Grill to comply with changes to the Manuals; and (ii) after the Initial Term, Fuddruckers will not make more than once during any twelve (12) month period be obligated to make expenditures of more than $3,000.00 per Grill to comply with changes to the Manuals or to make any such change if Fuddruckers and LR agree in the reasonable exercise of their business judgment that the expenditure would not be commercially reasonable in light of the remaining term of this Agreement. | Per Unit |
| 68573 | | | | | | | | | | | | 15,000 USD | per Grill | In light of the limited menu to be served at the Grills and their location within Fuddruckers Restaurants, the parties agree that Fuddruckers will not more than once during any twelve (12) month period be obligated to make modernization expenditures of more than $15,000 per Grill or to make any such change if Fuddruckers and LR agree in the reasonable exercise of their business judgment that the expenditure would not be commercially reasonable in light of the remaining term of this Agreement, during the term hereof by an increase in the Cost of Living Index as determined by reference to nationwide United States governmental statistics as compared to those existing at the date of this Agreement. | Per Unit |

kMINE Export (2018.02.23) Part 3

Page 14 of 47

EX1-241

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G8573 | | | | | | | | | | | | 2,500 USD | per employee | Holders agrees to pass LIF $2,500.00 for each holder who agrees to attend a 2 or 3 day event which is intended to initiate Restaurant Operations Training Course and for each Certified Training Manager for each location | | Per Unit | License |
| G5347 | 1. Grant the right to use, in any lawful manner whatsoever, the TRADEMARKS (the trademarks and/or trade names ARMOUR STAR, ARMOUR STAR, ARMOUR'S, ARMOUR (logotype design), and BANNER) list solely in connection with the SHELF-STABLE PRODUCTS (any and all food products sold under or in connection with the TRADEMARKS which under normal conditions do not need to be refrigerated, canned, or frozen while being transported, inventoried, warehoused, stored, distributed and/or sold) in the TERRITORY. | DIAL CORP | CONAGRA, INC. | THE DIAL CORP | 01/31/1995 | 1. Subject to the termination provisions set out below and unless the parties agree to an earlier termination, the Agreement shall continue in perpetuity, provided, however, that Dial may terminate the Agreement at any time effective one hundred eighty (180) days after giving ConAgra written notice of such termination. | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durable | 2040 | United States of America | EXCLUSIVE | 0% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $ 1-$200,000,000; The Percentage of Annual NET SALES is: 0% | Net Sales | License |
| G5347 | | | | | | | | | | | | 5% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $200,000,001-$300,000,000; The Percentage of Annual NET SALES is: 5% | Net Sales | License |
| G5347 | | | | | | | | | | | | 1% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $300,000,001-$500,000,000; The Percentage of Annual NET SALES is: 1% | Net Sales | License |
| G5347 | | | | | | | | | | | | 1.5% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of Over $500,000,000; The Percentage of Annual NET SALES is 1.5% | Net Sales | License |
| G5347 | | | | | | | | | | | | 0% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra the greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $ 0 -$200,000,000; The Percentage of Annual NET SALES is 0% | Net Sales | License |
| G5347 | | | | | | | | | | | | 7% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra the greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $200,000,001-$300,000,000; The Percentage of Annual NET SALES is 7% | Net Sales | License |
| G5347 | | | | | | | | | | | | 1.25% | NET SALES | In addition to the amounts to be paid under Paragraph 2(a) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra the greater of (i) two hundred fifty thousand dollars ($250,000.00) annually, or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of Over $500,000,000; The Percentage of Annual NET SALES is 1.25% | Net Sales | License |

EX1-242

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6957 | 1. Grant the right to use, in any lawful manner whatsoever, the TRADEMARKS (the trademarks and/or trade names ARMOUR STAR, ARMOUR STAR, ARMOUR's, ARMOUR (logotype design), and BANNER but solely in connection with the SHELF-STABLE PRODUCTS) and all food products sold under or in connection with the TRADEMARKS which under normal conditions do not need to be refrigerated, cooled, or frozen while being transported, inventoried, warehoused, stored, distributed and/or sold in the TERRITORY. | PINNACLE FOODS GROUP INC | CONAGRA, INC. | THE DIAL CORP | 01/13/1995 | 1. Subject to the termination provisions set out below and unless the parties agree in writing otherwise in a shorter term, the rights and obligations set out in this Agreement shall remain in perpetuity, provided, however, that Dial may terminate this Agreement at any time effective one hundred eighty (180) days after giving ConAgra written notice of such termination. | Marketing Intangible | Consumer Non-Durables, Food and Nondurables Beverages | 2000 | United States of America | EXCLUSIVE | 0% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $100,000,000 - $200,000,000; The Percentage of Annual NET SALES is: 0% | | Net Sales |
| 6957 | | | | | | | | | | | | 0.5% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $100,000,000 - $200,000,000; The Percentage of Annual NET SALES is: .5% | | Net Sales |
| 6957 | | | | | | | | | | | | 1.0% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $100,000,000 - $200,000,000; The Percentage of Annual NET SALES is: 1% | | Net Sales |
| 6957 | | | | | | | | | | | | 1.5% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, during the period commencing effective January 1, 1995 through December 31, 1998, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS sold as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of Over $300,000,000; The Percentage of Annual NET SALES is: 1.5% | | Net Sales |
| 6957 | | | | | | | | | | | | 0% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of 0 - $200,000,000; The Percentage of Annual NET SALES is: 0% | | Net Sales |
| 6957 | | | | | | | | | | | | 0.7% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of two hundred million dollars ($200,000,000) or a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of $200,000,001 - $300,000,000; The Percentage of Annual NET SALES is: .7% | | Net Sales |
| 6957 | | | | | | | | | | | | 1.25% | Net Sales | In addition to the amounts to be paid under Paragraph 2(d) above, for all calendar year periods from and after January 1, 1999, during the term of this Agreement, Dial shall pay to ConAgra a percentage royalty based upon annual NET SALES of SHELF-STABLE PRODUCTS as follows: For Annual NET SALES of SHELF-STABLE PRODUCTS of Over $300,000,000; The Percentage of Annual NET SALES is: 1.25% | | Net Sales |

kMINE Export (2018-02-23) Part 3

Page 16 of 47

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodity | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57425 | 1. Grant the right to employ the Licensed Trade Secrets (all transferable techniques, processes, methods of production and commercialization, training methods, and know-how) and the Licensed Names and Marks (the trademarks, tradenames and service marks) during the Term to produce and sell the Licensed Products (the items, articles or food products or any other bakery goods or cookies) from Mrs. Fields Stores (the Mrs. Fields In-Use Display Cases, Mrs. Fields Mini Stores, Mrs. Fields Traditional Cookie Store and all other portions or area of Licensed Locations) at Licensed Locations in the Licensed Territory (the defined or airport locations and such future limited access railroad locations and airport locations). | FIELDS ORIGINAL COOKIES INC. | MRS. FIELDS DEVELOPMENT CORPORATION, Mrs. FIELDS DEVELOPMENT CORP., Mrs. FIELDS CORPORATION | MARRIOTT CORPORATION, MRS. FIELDS DEVELOPMENT CORPORATION, Mrs. Fields Inc. | 03/1/1992 | 1. The initial term of this Agreement shall commence on the date hereof and continue through December 31, 1996. The term of this Agreement shall be extended and will automatically renew for one (1) year term (consecutive five (5) year terms thereafter upon ninety... [90 days written notice by Licensee of its intent to so renew this Agreement, unless Licensee is not in compliance with its Development Obligation at the time of renewal or this Agreement is otherwise terminated as provided below.] | Franchise | Consumer Services, Consumer Non-Durables, Foods and Nonalcoholic Beverages, Restaurants, Retail, Transportation Equipment and Parts |  | United States, Canada, Mexico | EXCLUSIVE | 7.50% | Gross Sales | Commencing on the date hereof, and continuing throughout the Term of this Agreement, Licensee shall pay to Licensor a royalty fee (the "Royalty Payment"), equal to seven and one-half percent (7.50%) of all Gross Sales of each Mrs. Fields Store, payable to Licensor and derived from each Mrs. Fields Store opened and operated by Licensee hereunder. |  | Gross Sales; License |
| 57425 |  |  |  |  |  |  |  |  |  |  |  | 0.1% | gross sales | License agrees that each Mrs. Fields Store shall participate in promotional activities designated by Licensor and relating to the sale of the Licensed Products and the promotion of the Licensed Names and Marks which promotions require Licensee to provide Licensed Products to customers at no charge in exchange for coupons, cards or other vouchers (e.g., cookie cents). Licensor shall reimburse Licensee the direct costs of goods sold by Licensee in connection with such promotional activities up to (one-tenth of one percent (0.1%) of gross sales of each Mrs. Fields Store which participates in such promotional activities and shall reimburse Licensee for the retail value of such goods sold above such amount; provided that Licensor complies with the reasonable request of Licensor to document Licensee's request for reimbursement (e.g., furnishing Licensor of a percentage of the cookie cards received by Licensee at each Mrs. Fields Store for which reimbursement is requested). Licensor may, in Licensor's sole discretion, exempt from participation in the above described promotional activities (one or more Mrs. Fields Stores, Other than as provided in this paragraph, Licensee shall have no obligation to expend any monies for advertising or promotional activities with respect to the Mrs. Fields Stores. |  | gross sales |
| 57425 |  |  |  |  |  |  |  |  |  |  |  | 2,500 USD | per Store Unit | If Licensee fails to meet its Development Obligation for 1992, Licensee shall pay to Licensor a fee ("Development Fee") of $2,500 for each Store Unit not opened pursuant to its Development Obligation. Payment of such fee shall be made to Licensor no later than January 31, 1993, and such payment shall be deemed to cure Licensee's failure to meet its Development Obligation. In 1993, however, it shall not relieve Licensee of its obligation under the Development Obligation to open up stores and operating by the end of calendar year 1996, one hundred eighty (180) Store Units. |  | per Store Unit |
| 57425 |  |  |  |  |  |  |  |  |  |  |  | 786.50 USD | per month | If Licensee is in default of its Development Obligation under paragraph 6(c) at the end of calendar year 1993, or at the end of any subsequent year in which there was a monthly fee ("Transform Payment") for each unopened Store Unit equal to $786.50, on or before the first day of each month, commencing on the first day of the month following the date on which such Store Unit was required to be opened pursuant to the Development Obligation, and continuing each month thereafter during the time such Store Unit remains unopened until Licensee complies with the Development Obligation. |  | per month |

kMINE

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17425 | 1. Client (the right) to operate a retail restaurant under the System (a unique system which includes special recipes and menu items, distinctive design, decor, color scheme and furnishing, software and programs, standards, specifications and procedures for operations, procedures for quality control, training assistance, and advertising and promotional programs, all of which we may improve, amend and further develop from time to time) and the Marks (service marks, trade names and trademarks, including, but not limited to, "Papa John's," "Papa John's Pizza," and "Papa Papa John's Delivering the Perfect Pizza") to be located at 680 Highway 78 West Jasper, Alabama 35501. | 1FLAMEX, INC. | PAPA JOHN'S INTERNATIONAL, INC. | EXTRA CHEESE, INC. | 08/01/1995 | 1. The Franchise shall be for a term of 10 years from the date of this Agreement, unless terminated earlier as provided in this Agreement (the "Initial Term"). 2. As used in this Agreement, "Term" shall mean the Initial Term or the Renewal Term, as the case may be. 3. This Agreement shall not automatically renew upon the expiration of the Initial Term. You shall, however, have an option to renew this Agreement upon the expiration of the Initial Term. You may renew the Franchise for one additional 10 year term (the "Renewal Term"). | Franchise | Consumer Services, Consumer Non-Durable, Foods and Nonalcoholic Beverages, Restaurants, Retail | | Jasper, Alabama, United States | Multi-Exclusivity | 8,333 USD | per Store Unit | For each Store Unit opened by Licensee after the initial 103.6 Store Units, Licensee shall pay to Licensor an additional setup license fee of $8,333 per Store Unit, payable upon the opening of the Store, which in turn for which such Store Unit is discarded, provided that a Store Unit will not be deemed to be opened under this Agreement (i) if the same Store Unit is closed prior to the termination or the same Store closes within two (2) months of the closure of all ... such a Store Unit shall not be deemed the opening of a new ... per Unit | Per Unit | Licensor |
| 68371 | | | | | | | | | | | | 4% | Net Sales | A continuing royalty (the "Royalty") of 4% of the "Net Sales" of the Restaurant for each "Period" (as defined in Section 13) provided that any time after the 3rd anniversary date of this Agreement we may increase the Royalty to as much as 5% of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | | Net Sales | |
| 68371 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of 4% of the "Net Sales" of the Restaurant for each "Period" (as defined in Section 13), provided that any time after the 3rd anniversary date of this Agreement we may increase the Royalty to as much as 5% of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | | Net Sales | |
| 68371 | | | | | | | | | | | | 1.5% | Net Sales | You shall contribute to the "Marketing Fund," as defined below, an amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed 1 1/2% of the monthly Net Sales of the Restaurant, except as set forth in (b), below. | | Net Sales | |
| 68371 | | | | | | | | | | | | 2% | Net Sales | You shall contribute to the "Cooperative" (defined below) that percentage of Net Sales which the governing body of the Cooperative may designate from time to time, which amount shall not be less than 2% nor more than 5% of the monthly Net Sales of the Restaurant, except as set forth in (b), below. | | Net Sales | |
| 68371 | | | | | | | | | | | | 5% | Net Sales | You shall contribute to the "Cooperative" (defined below) that percentage of Net Sales which the governing body of the Cooperative may designate from time to time, which amount shall not be less than 2% nor more than 5% of the monthly Net Sales of the Restaurant, except as set forth in (b), below. | | Net Sales | |
| 68371 | | | | | | | | | | | | 4% | Net Sales | You shall expend such amounts as we may designate from time to time for local advertising as provided below, provided, the aggregate amount that you may be required to spend on local advertising (together with your Marketing Fund contributions) will not exceed 4% of the Net Sales of the Restaurant. | | Net Sales | |

EX1-245

kMINE

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68071 | | | | | | | | | | | | 2.5% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund by 2 1/2% of Net Sales, provided such increase is approved by the owners of not less than 60% of the restaurants required to contribute to the Marketing Fund (including both franchisor-owned and franchisee-owned restaurants). Any increase in the required contribution to the Marketing Fund in excess of 2 1/2% of Net Sales must be approved by not less than 2/3 of the restaurants required to contribute to the Marketing Fund (including both restaurants we own and franchise). | Net Sales | License |
| 68071 | | | | | | | | | | | | 5% | Net Sales | The governing body of the Cooperative may increase the required contribution to the Cooperative to a percentage of Net Sales in excess of 5%, provided that such an increase is approved by not less than two thirds of the restaurants required to contribute to the Cooperative (including both franchisor-owned and franchisee restaurants). We also have the right to authorize any Cooperative to determine contributions on a different basis (fixed amount, geographic location, etc.). Our decision on any issue concerning Cooperative contributions shall be final. | Net Sales | License |
| 68071 | | | | | | | | | | | | 20% | License Fees | You agree to pay us a software maintenance fee which shall not be more than 20% of the license fees of the Designated Software as published from time to time in any one 2 Software Maintenance Fee"). This fee shall be paid in semi-annual installments. This Software Maintenance Fee includes software maintenance, research and development, upgrades and enhancements and installation media, if any, which we adopt, require or provide. Installation on the Page Jockey Vinstll System™ that, if required, will be charged as defined in Section 10.G(iv). | Net Sales | License |
| 68071 | | | | | | | | | | | | 70 USD | per Period | You agree to pay to us a recurring software support fee equal to at least the then-current support fee ($70 per Period) | Per Unit | License |
| G3998 | 1.Grant the right to operate the Licensed Store to retail snack, dessert, and beverage sorbet selling specialty snacks and other bakery items, desserts, and beverages, such as cookies, brownies, cakes, muffins, bagels, croissants, cinnamon rolls, sticky buns, and coffee and other items and services) at the Premises (Building for at the described in Section 1.2 of this Agreement and to use the trade names, service marks and Field's System (business formats, signs, equipment, methods, procedures, designs, layouts, and specifications, including the various trade names, trademarks, service marks and other commercial symbols, including logos, KMFDC and Mrs. Fields' and MRS. FIELD'S and MRS. FIELDS COOKIES and associated logos) in the operation of the Licensed Store. | BUTTERWING'S ENTERTAINMENT GROUP INC. | MRS. FIELDS DEVELOPMENT CORPORATION | BUTTERWING'S, INC. | 12/23/1993 | 1. The initial term of this Agreement will be 7 years, commencing on the date of this Agreement. This Agreement may be renewed as provided in Section 2.3 of this Agreement and may be terminated prior to expiration of its term in accordance with Article 12 of this Agreement. References in this Agreement to the term of this Agreement mean the initial term and any renewal term. Following the expiration of the initial term and any renewal terms, you may have the opportunity to obtain a successor franchise agreement in accordance with the provisions of Section 12.6 of this Agreement. 2. If you are not in default at the time of exercise of a renewal option and at the time the prior term expires, you may renew this Agreement for 1 successive 5-year terms, upon giving us written notice of your intention to renew at least 180 days prior to expiration of the then-current term. The renewal will be upon the terms and conditions contained in the form of franchise Agreement in use by us at the time the renewal option is exercised. The form of franchise Agreement may include different royalty fees and marketing fees, other fees and charges, and changes in performance criteria and in other terms and conditions. In connection with any renewal, you will pay us a renewal fee, remodel, redecorate and renovate the Licensed Store. | Franchise | Consumer Non-Durables, Foods and Foodservice/Beverages, Consumer Services, Restaurants, Retail | | Flint, MI, United States | Multi-Industry | 6% | Gross Revenues | You agree to pay us a monthly royalty fee of 6% of the Licensed Store's Gross Revenues, payable on or before the 20th day of the month following the month for which the royalty fee is due. | Gross Sales | License |

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1998 | | | | | | | | | | | | 2% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing fund will be limited to no more than 1% per year. Marketing fund contributions will be payable monthly together with the royalty fees. | | Gross Sales / License... |
| 1/1998 | | | | | | | | | | | | 3% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing fund will be limited to no more than 1% per year. Marketing fund contributions will be payable monthly together with the royalty fees. | | Gross Sales / License... |
| 1/1998 | | | | | | | | | | | | 4% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing fund will be limited to no more than 1% per year. Marketing fund contributions will be payable monthly together with the royalty fees. | | Gross Sales / License... |

kMINE Export (2018.02.23) Part 3

Page 40 of 47

EX1-247

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 62000 | 1. Grant the right to operate the Licensed Store (a retail, dessert, and beverage outlet selling specialty snacks and other bakery items, desserts, and beverages, such as cookies, brownies, cakes, muffins, bagels, croissants, cinnamon rolls, sticky buns, and coffee and other items and services) at the Premises (Groovin Valley Mall, 1533 Linden Road, Flint, MI 48207) and to use the Mrs. Fields system (business formats, signs, equipment, methods, procedures, designs, layouts, and specifications, including the use of any trade names, trademarks, service marks and other commercial symbols, including the trade and service marks MRS. FIELDS and MRS. FIELDS COOKIES and associated logos) in the operation of the Licensed Store. | BUTTERWINGS DEVELOPMENT GROUP INC | MRS. FIELDS DEVELOPMENT CORPORATION | BUTTERWINGS, INC. | 12/20/1995 | 1. The initial term of this Agreement will be 7 years, commencing on the date of this Agreement. This Agreement may be renewed as provided in Section 2.3 of this Agreement and may be terminated prior to expiration of its term in accordance with Article 11 of this Agreement. Reference in this Agreement to the term of this Agreement mean the initial term and any renewal term. Following the expiration of the initial term and any renewal terms, you may have the opportunity to initiate a successor Franchise Agreement in accordance with the provisions of Section 11.6 of this Agreement. 2. If you are not in default at the time of exercise of a renewal option and at the time the prior term expires, you may renew this Agreement for 2 successive 5-year terms, upon giving us written notice of your intention to renew at least 180 days prior to expiration of the then current term. The renewal will be upon the terms and conditions contained in the form of Franchise Agreement in use by us at the time the renewal option is exercised. That form of Franchise Agreement may include different royalty fees and marketing fees, other fees and charges, and changes in performance criteria and in other terms and conditions. In connection with any renewal, we may also require you to refurbish, remodel, redecorate, and renovate the Licensed Store | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nonalcoholic Beverages, Restaurants, Retail | | Flint, MI, United States | Multi-Exclusivity | 6% | Gross Revenues | You agree to pay us a monthly royalty fee of 6 % of the Licensed Store's Gross Revenues, payable on or before the 10th day of the month following the month for which the royalty fee is due. | Gross Sales | License |
| 62000 | | | | | | | | | | | | 2% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of Mrs. Fields Cookies Stores, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, to establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amounts that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the marketing fund contributions above 2% will be limited to no more than 1% per year. Marketing Fund contributions will be payable monthly together with the royalty fees. | Gross Sales | License |

KMINE Export (2018.02.23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,000 | | | | | | | | | | | | | 3% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of the Hardee's brand, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amount that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing Fund will be limited to no more than 1% per year. Marketing Fund contributions will be payable monthly together with the royalty fees. | Gross Sales | Licensee |
| 4,000 | | | | | | | | | | | | | 4% | Gross Revenues | Recognizing the value of marketing to the goodwill and public image of the Hardee's brand, you agree that, although we are not obligated to do so, we may, upon 30 days' prior written notice to you, establish, maintain and administer one or more national or regional marketing funds (a "Marketing Fund"). If a Marketing Fund is established, you agree to contribute to the Marketing Fund the amount that we require. Marketing Fund contributions will not exceed 2% of the Licensed Store's monthly Gross Revenues through the end of 1995, 3% of the Licensed Store's monthly Gross Revenues during calendar year 1996, and 4% of the Licensed Store's monthly Gross Revenues during calendar year 1997 and thereafter. However, increases in the year-over-year percent of Gross Revenues to be paid to the Marketing Fund will be limited to no more than 1% per year. Marketing Fund contributions will be payable monthly together with the royalty fees. | Gross Sales | Licensee |
| 4,000 | | | | | | | | | | | | | 10% | Gross Revenues | If we exercise the option to purchase the Licensed Store, pending the closing of such purchase, we may appoint a manager to maintain the operation of the Licensed Store or, at our option, require you to close the Licensed Store during such time period without terminating the Agreement. If we appoint a manager to maintain the operation of the Licensed Store pending closing of such purchase, all funds from the operation of the Licensed Store during the period of management by our appointed manager will be kept in a separate fund, and at expense of the Licensed Store, including compensation, other costs, and travel and living expenses of our appointed manager, will be charged to such fund. As compensation for such management services, we will charge you a fee (10% of the Gross Revenues of the Licensed Store during the period of our management). | Gross Sales | Licensee |

Page 42 of 47

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6875 | 1. Grant the right to construct or remodel, and equip, staff, open and operate the Outlet (a unique system for operating retail outlets specializing in carry-out and delivery of pizza and other food items utilizing the name "Papa John's") at the Location. | FF AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | PJ UK, INC. | 08/01/1992 | 1. As used in this Agreement, "Term" shall mean the Initial Term or the Renewal Term, as the case may be. 2. This Agreement shall not automatically renew and Franchisee shall not have an option to renew this Agreement upon the expiration of the Renewal Term, if applicable. 3. Renewal of the Franchise after the Renewal Term — shall not constitute a renewal or extension of this Agreement, but shall be credit toward upon satisfaction of the conditions set forth under Section 2.B) above with respect to the renewal of the franchise. If Franchisee fails to meet any of the conditions under Section 2.B) above with respect to the renewal of the Agreement, or under Section 2.B) above with respect to renewal of the franchise, then the franchise shall automatically expire at the end of the Initial Term or the Renewal Term, as the case may be. | Franchise | Consumer Non-Durables, Consumer Services, Foods and Nondurables Beverages, Restaurants | | Richmond, Virginia, United States | Multi-Exclusivity | 4.0% | Net Sales | A continuing royalty (the "Royalty") of four percent (4.0%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 15), provided that any time after the Initial Term of this Agreement Franchisor may increase the Royalty to as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. However, Franchisor may increase the Royalty only if Franchisor's form of Franchise Agreement being offered to new Papa John's Pizza franchisees at the time of the increase provides for a Royalty equal to or greater than five percent (5%). | Net Sales | License |
| 6875 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of four percent (4.0%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 15), provided that any time after the Initial Term of this Agreement Franchisor may increase the Royalty to as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. However, Franchisor may increase the Royalty only if Franchisor's form of Franchise Agreement being offered to new Papa John's Pizza franchisees at the time of the increase provides for a Royalty equal to or greater than five percent (5%). | Net Sales | License |
| 6875 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of four percent (4.0%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 15), provided that any time after the Initial Term of this Agreement Franchisor may increase the Royalty to as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. However, Franchisor may increase the Royalty only if Franchisor's form of Franchise Agreement being offered to new Papa John's Pizza franchisees at the time of the increase provides for a Royalty equal to or greater than five percent (5%). | Net Sales | License |
| 6875 | | | | | | | | | | | | 1.5% | Net Sales | Purchase (not) contribute to the "Marketing Fund," as defined in Section 8.G), such amount as the governing body of the Cooperative may designate from time to time, which amount shall not exceed one and one-half percent (1-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (ii) below. | Net Sales | License |
| 6875 | | | | | | | | | | | | 2.5% | Net Sales | Franchisee shall contribute to the "Cooperative," as defined in Section 8.G), such amount as the governing body of the Cooperative may designate from time to time, which amount shall not exceed two and one-half percent (2-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (ii) below. | Net Sales | License |

kMINE Export (2018.02.23) Part 3

EX1-250

kiMINE

kMINE Export (2016.02.23) Part 3

Page 44 of 47

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68075 | | | | | | | | | | | | 4% | Net Sales | Franchisee shall expend such amounts as Franchisor may designate from time to time for local advertising provided in Section 8.b(1); provided, that the aggregate amount that Franchisee may be required to spend on local advertising together with Franchisee's Marketing Fund contribution will not exceed four percent (4%) of the Net Sales of the Outlet; and provided further, that in any lease's requirements for local opening advertising under (i), above, shall be credited against Franchisee's local advertising obligation. | Net Sales | Licensor |
| 68075 | | | | | | | | | | | | 2% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund to two percent (2%) of Net Sales, provided such increase is approved by the owners of not less than sixty percent (60%) of the outlets required to contribute to the Marketing Fund (including both franchisor-owned and franchised outlets). Any increase in the required contribution to the Marketing Fund in excess of two percent (2%) of Net Sales must be approved by not less than two-thirds (2/3) of the outlets required to contribute to the Marketing Fund (including both franchisor-owned and franchised outlets). | Net Sales | Licensor |
| 68075 | | | | | | | | | | | | 2.5% | Net Sales | The governing body of the Cooperative may increase the maximum required contribution to the Cooperative to a percentage of Net Sales in excess of two and one-half percent (2.5%), provided that any such increase is approved by franchisor and is/are approved by not less than two-thirds (2/3) of the outlets required to contribute to the Cooperative (including both franchisor-owned and franchised outlets). | Net Sales | Licensor |
| 68069 | 1. Grant the right to operate one retail outlet under the System and the Menu (the name "Papa John's," special recipes for the making of pizza and other foods, unique interior and exterior building design and appearance, the use of only high-quality ingredients, and consistency and uniformity of products and services). | PJ AMERICA, INC | PAPA JOHN'S INTERNATIONAL, INC. | EXTRA CHEESE, INC. | 01/01/1992 | 1. The Franchise shall be for a term of five (5) years from the date of this Agreement, unless sooner terminated as provided herein (the "Initial Term").<br><br>2. This Agreement shall automatically renew — upon the expiration of the Initial Term for one additional five year term (the "Renewal Term"). | Franchise | Consumer Non Durables, Consumer Services, Hotels and Restaurants, Retail | | United States, Hotel Nonsport, Alabama | Multi-Exclusivity | 4% | Net Sales | A continuing monthly royalty (the "Royalty") of four percent (4%) of the monthly "Net Sales" of the Outlet. In the event this Agreement is renewed pursuant to Section 2.b(2), the Royalty during the Renewal Term shall be the lesser of (A) the Royalty provided in Franchisor's then-current form of franchise agreement being offered to new Papa John's franchisees on the day this Franchise grew out of or (B) above. Renewal terms. "Net Sales," "Net Sales" shall mean the gross sales of the Outlet (whether such sales are evidenced by cash, check, credit, charge account or otherwise), less sales tax collected on such sales and paid to the State. The Royalty is due on the tenth (10th) day after the end of each month. | Net Sales | Licensor |
| 68069 | | | | | | | | | | | | 5% | Net Sales | A continuing monthly royalty (the "Royalty") of four percent (4%) of the monthly "Net Sales" of the Outlet. In the event this Agreement is renewed pursuant to Section 2.b(2), the Royalty during the Renewal Term shall be the lesser of (A) the Royalty provided in Franchisor's form of franchise agreement being offered to new Papa John's franchisees on the day this Franchise grew out of or (B) above. Renewal terms. "Net Sales," "Net Sales" shall mean the gross sales of the Outlet (whether such sales are evidenced by cash, check, credit, charge account or otherwise), less sales tax collected on such sales and paid to the State. The Royalty is due on the tenth (10th) day after the end of each month. | Net Sales | Licensor |

| AgreementID | Synopsis | FilingCompany | Licensee | Licensor | License | EffectiveDate | Term | Territory | SICCode | Industry | AgreementType | Exclusivity | Value | AgreementBase | Modifier | Commoditie n | Lead Licensee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G000 | | | | | | | | | | | | | 1.5% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 8.b), such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (b), below. Provided, however, that the required contribution may not exceed one percent (1%) of the Net Sales until such time as there are 100 or more Papa John's Pizza outlets open and operating (including both franchisee-owned and franchised outlets). | Net Sales | Licensee |
| G000 | | | | | | | | | | | | | 1% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 8.b), such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (b), below. Provided, however, that the required contribution may not exceed one percent (1%) of the Net Sales until such time as there are 100 or more Papa John's Pizza outlets open and operating (including both franchisee-owned and franchised outlets). | Net Sales | Licensee |
| G000 | | | | | | | | | | | | | 2.5% | Net Sales | Franchisee shall contribute to the "Cooperative," as defined in Section 8.(c), such amount in the governing body of the Cooperative may designate from time to time, which amount shall not exceed two and one-half percent (2-1/2%) of the monthly Net Sales of the Outlet, except as set forth in (b), below. | Net Sales | Licensee |
| G000 | | | | | | | | | | | | | 4% | Net Sales | Franchisee shall expend such amounts as Franchisor may designate from time to time for local advertising as provided in Section 8.(d), provided, that the aggregate amount that Franchisee may be required to spend on local advertising together with its required Marketing Fund contributions will not exceed four percent (4%) of the Net Sales of the Outlet, and provided further that Franchisee's expenditures for grand opening advertising under (i), above, shall be credited against Franchisee's local advertising obligations. | Net Sales | Licensee |
| G000 | | | | | | | | | | | | | 2% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund to two percent (2%) of Net Sales, provided such increase is approved by the owners of not less than sixty percent (60%) of the outlets required to contribute to the Marketing Fund (including both franchisee-owned and franchised outlets). Any increase in the required contribution to the Marketing Fund in excess of two percent (2%) of Net Sales must be approved by not less than two-thirds (2/3) of the outlets required to contribute to the Marketing Fund (including both franchisee-owned and franchised outlets). | Net Sales | Licensee |
| G000 | | | | | | | | | | | | | 2.5% | Net Sales | The governing body of the Cooperative may increase the maximum required contribution to the Cooperative to a percentage of Net Sales in excess of two and one-half percent (2-1/2%), provided that any such increase is approved by not less than the owners of not less than sixty percent (60%) of the outlets required to contribute to the Cooperative (including both franchisee-owned and franchised outlets). | Net Sales | Licensee |

kMINE Export (2016.02.23) Part 3

Page 45 of 47

EX1-252

| AgreementID | Synopsis | FilingCompany | Licensor | Licensee | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commodities | License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G8626 | 1. Grant the right to use the Technology (Core Technology, confidential, secret or proprietary technology involving Inorganic Compound Technology which are described or claimed in patents, Moldable Compound Technology) … | EARTHSHELL CONTAINER CORP | EARTHSHELL CONTAINER CORPORATION | E.KHASHOGGI INDUSTRIES | 06/30/1995 | Unless sooner terminated as hereinafter provided, this Agreement shall continue in full force and effect until the expiration of the last material and substantial patent covering the Technology which is utilized by Sublicensee, or for so long as Sublicensee produces Products which utilize material and substantial proprietary information (or a material and substantial Trade Secret) … | Manufacturing;Process Intangible;Marketing Intangible | Consumer Non-Durables; Food and Nondurables; Beverages; Restaurants; Retail; Consumer Durables; Consumer Services | | United States of America, Canada, Mexico, Central America, Caribbean Islands and nations | Multi-Exclusivity | 22% | Net Sale Price | As consideration for the grant of the Sublicense, Sublicensee shall pay to ECC a royalty (the "Royalty") of twenty-two percent (22%) of the Net Sale Price for each Product sold by Sublicensee during the term of this Agreement. | Net Sales | License |
| G8626 | 2. Grant the right to utilize, in connection with the manufacture, marketing, … | | | | | | | | | | | 2% | Net Sale Price | To the extent Sublicensee elects to use the Trademarks on or in connection with manufacture, marketing, distribution, use and/or sale of Products hereunder, Sublicensee shall be entitled to receive an advertising allowance credit equal to two percent (2%) of the Net Sale Price of such Products that bear the Trademarks. To qualify for the aforementioned advertising allowance credit, Sublicensee shall submit to ECC written documentation, reasonably satisfactory to ECC, of sales by Sublicensee of Products that bear the Trademarks, and ECC shall credit the appropriate amount against future royalties payable by Sublicensee hereunder. | Net Sales | License |
| G8673 | 1. Grant the right to operate one restaurant under the System (the name "Papa John's", special recipe for the making of pizza and other foods, … | PJ AMERICA, INC. | PAPA JOHN'S INTERNATIONAL, INC. | TEXTBA CHEESE CORP. | 05/01/1994 | 1. The Franchise shall be for a term of ten (10) years from the date of this Agreement, unless sooner terminated as provided herein (the "Initial Term"). 2. This Agreement shall not automatically … renew upon the expiration of the Initial Term. Franchisee may, however, renew this Agreement for one additional five (5) year term ("Renewal Term") … | Franchise | Consumer Non-Durables; Consumer Services; Foods and Nondurables; Restaurants; Retail | | Nacogdoches, Texas, United States | Multi-Exclusivity | 4% | Net Sales | A continuing royalty (the "Royalty") of four percent (4%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 13), provided that any time after the fifth (5th) anniversary date of this Agreement Franchisor may increase the Royalty by as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | License |
| G8673 | | | | | | | | | | | | 5% | Net Sales | A continuing royalty (the "Royalty") of four percent (4%) of the "Net Sales" of the Outlet for each "Period" (as defined in Section 13), provided that any time after the fifth (5th) anniversary date of this Agreement Franchisor may increase the Royalty by as much as five percent (5%) of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable. | Net Sales | License |
| G8673 | | | | | | | | | | | | 1.5% | Net Sales | Franchisee shall contribute to the "Marketing Fund," as defined in Section 9.1(b), an amount that the Board of Directors of the Marketing Fund (the "Board") may designate from time to time, which amount shall not exceed one and one-half percent (1.5%) of the monthly Net Sales of the Outlet, except as set forth in (b) below. | Net Sales | License |

kmMINE Export (2018.02.23) Part 3

EX1-253

kMINE Export (2018.02.23) Part 3

| AgreementID | Synopsis | FilingCompany | Licensee | Licensee | License | EffectiveDate | Term | AgreementType | Industry | SICCode | Territory | Exclusivity | Value | AgreementBase | Modifier | Commoditie | Lead |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68573 | | | | | | | | | | | | | 2.5% | Net Sales | Franchisee shall contribute to the "Cooperative," as defined in Section 4(c), such amount in the governing body of the Cooperative may designate from time to time, which amount shall not exceed two and one-half percent (2-1/2%) of the monthly Net Sales of the Outlet, except as set forth in 4(c) below. | Net Sales | Licensee |
| 68573 | | | | | | | | | | | | | 6% | Net Sales | Franchisee shall expend such amounts as Franchisor may designate from time to time for local advertising as provided in Section 4(d); provided, that the aggregate amount that Franchisee may be required to spend on local advertising together with the Franchisee's Marketing Fund contributions will not exceed four percent (4%) of the Net Sales of the Outlet, and provided further that Franchisee's expenditures for grand-opening advertising under (i) above, shall be credited against Franchisee's local advertising obligations. | Net Sales | Licensee |
| 68573 | | | | | | | | | | | | | 2% | Net Sales | The Board may increase the maximum required contribution to the Marketing Fund to two percent (2%) of Net Sales, provided such increase is approved by the owners of not less than sixty percent (60%) of the outlets required to contribute to the Marketing Fund (including both Franchisor-owned and franchised outlets). Any increase in the required contribution to the Marketing Fund in excess of two percent (2%) of Net Sales must be approved by not less than two-thirds (2/3) of the outlets required to contribute to the Marketing Fund (including both Franchisor-owned and franchised outlets). | Net Sales | Licensee |
| 68573 | | | | | | | | | | | | | 2.5% | Net Sales | The governing body of the Cooperative may increase the maximum required contribution to the Cooperative to a percentage of Net Sales in excess of two and one-half percent (2-1/2%); provided that any such increase is approved by Franchisor and is also approved by not less than two-thirds (2/3) of the outlets required to contribute to the Cooperative (including both Franchisor-owned and franchised outlets). Franchisor's decision on any proposed increase above two and one-half percent of Net Sales shall be final. | Net Sales | Licensee |

Page 43 of 47

Copyright © 2018 kMINE.  Usage of this data is governed by the terms and conditions accepted by user during initial log-in to kMINE database.

EX1-254

| AgreementID | Filing Company | Licensor | Licensee | Effective Date | Term | Agreement Type | Industry | SICCode | Territory | Exclusivity | Value | Agreement Base | Royalties | Commodities | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11174 | BEVERAGE WORKS INC | C. A. WITTAKER & ASSOCIATES, Housing Family Mexico, Ricardo Housing | HERITAGE BREWING COMPANY, INC. | 1996 | 1. The initial term of this License Agreement shall befor one (1) year, renewable annually at the option of LICENSEE so long as LICENSEE is not in default or in material breach of the terms of this License Agreement andhas met the annual minimum sales quotas set forth in subsection 4(b). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Durables | | California, Oregon, Washington, Arizona, Nevada, Montana, Utah, New Mexico, Hawaii, Idaho, Mexico, United States, worldwide | EXCLUSIVE | 10% | gross profit | LICENSEE shall pay to LICENSOR a royalty of 10% of the gross profit from the sale of any clothing or merchandise bearing the TRADEMARK. | Gross Profit | License |
| 11174 | | C. A. WITTAKER & ASSOCIATES, Housing Family Mexico, Ricardo Housing | HERITAGE BREWING COMPANY, INC. | | | | | | | | 20 USD | per gallon | LICENSEE shall pay to LICENSOR a royalty of 0.20 per gallon on all beer sold under the TRADEMARK during the first five (5) years of this license agreement. | Per Unit | License |
| 68151 | BEVERAGE WORKS INC | C. A. WITTAKER & ASSOCIATES, Housing Family Mexico, Ricardo Housing | HERITAGE BREWING COMPANY, INC. | 1996 | 1. The initial term of this License Agreement shall be for one (1) year', renewable annually at the option of LICENSEE so long as LICENSEE is not in material breach of the terms of this License Agreement and has met the annual minimum sales quotas set forth in subsection 4(b). | Marketing Intangible | Alcoholic Beverages and Tobacco, Consumer Non-Durables, Consumer Durable | | California, Oregon, Washington, Arizona, Nevada, Montana, Utah, New Mexico, Hawaii, Idaho, Mexico, United States, worldwide | EXCLUSIVE | 10% | gross profit | LICENSEE shall pay to LICENSOR a royalty of 10% of the gross profit from the sale of any clothing or merchandise bearing the TRADEMARK. | Gross Profit | License |
| 68151 | | | | | | | | | | | 20 USD | per gallon | LICENSEE shall pay to LICENSOR a royalty of 0.20 per gallon on all beer sold under the TRADEMARK during the first five (5) years of this license agreement. | Per Unit | License |
| 66568 | LITTLEFIELD ADAMS & CO | LITTLEFIELD ADAMS & CO | PepsiCo, Inc. | 02/21/1996 | 1. The term ("Term") of this Agreement shall be a period of two (2) years commencing on February 1, 1996, and terminating on January 31, 1998, unless sooner terminated in accordance with the provisions of this Agreement.<br><br>2. In the event this Agreement has not been terminated and LICENSEE has faithfully performed each and every obligation of this Agreement during the Term referred to in 3.1, LICENSOR agrees to negotiate in good faith with LICENSEE with respect to a renewal period of the Term for such period of time and upon such terms and conditions as the parties may mutually agree. (The defined term "Term",as used herein shall include any renewals thereof.) | Marketing Intangible | Foods and Nonalcoholic Beverages, Consumer Non-Durables | 5150 | United States of America | Multi-Exclusivity | 8% | Net Sales | In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum equal to eight per cent (8%) of all Net Sales by or on behalf of LICENSEE of the Licensed Product. | Net Sales | License |

Copyright © 2018 ktMINE. Usage of this data is governed by the terms and conditions accepted by user during initial log-in to ktMINE database.

EX1-255

## **CERTIFICATE OF SERVICE**

I am a citizen of the United States of America and I am employed in Irvine, California.  I am over the age of 18 and not a party to the within action.  My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On February 23, 2018, I served the foregoing: EXPERT REPORT OF RUSSELL W. MANGUM III, PhD on the parties or their counsel shown below, by transmitting it electronically to the addresses as follows:

***VIA ELECTRONIC MAIL:***

Douglas C. Smith
dsmith@smitlaw.com
SMITH LAW OFFICES, LLP
4204 Riverwalk Parkway, Suite 250
Riverside, California 92505

Jeffrey S. Standley
jstandley@standleyllp.com
Melissa A. Rogers Mccurdy
mmccurdy@standleyllp.com
F. Michael Speed
mspeed@standleyllp.com
Standley Law Group LLP
6300 Riverside Drive
Dublin, Ohio 43017

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 23, 2018, at Irvine, California.

_____
Claire A. Stoneman

EX1-256