Steven J. Nataupsky (SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (SBN 156511)
lynda.zadrasymes@knobbe.com
Marko R. Zoretic (SBN 233,952)
marko.zoretic@knobbe.com
Jason A. Champion (CA SBN 259207)
jason.champion@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Brian C. Horne (SBN 205621)
brian.horne@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 551-3450
Facsimile: (310) 601-1263

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation, | Case No. 5:17-CV-00548-CBM-RAO |
| Plaintiff, | **MONSTER ENERGY COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW PURSUANT TO LOCAL RULE 16-4** |
| v. | Pretrial Conference: Date: August 21, 2018 Time: 2:30 p.m. |
| INTEGRATED SUPPLY NETWORK, LLC, a Florida limited liability company, | |
| Defendant. | Trial: Date: September 25, 2018 Time: 10:00 a.m. Ctrm: 8B |
| | Hon. Consuelo B. Marshall |

# TABLE OF CONTENTS

**Page No.**

I. SUMMARY OF THE CASE ........................................................... 1

    A.    Monster, Its Trademarks, And Its Trade Dress............................ 1

    B.    ISN And Its Infringing Trademarks And Trade Dress ................... 3

II. PLAINTIFF'S SUMMARY STATEMENT OF  CLAIMS AND DEFENSES (L.R. 16-4.1) ...................................................... 6

    A.    Plaintiff Monster's Claims ......................................................... 6

    B.    Elements Required to Establish Monster's Claims ........................ 6

            Claim 1: Trademark Infringement, Trade Dress Infringement, and False Designation of Origin under 15 U.S.C. § 1125(a) ...................................................... 6

            Claim 2: Trademark Infringement under 15 U.S.C. § 1114............................................................................ 8

            Claim 3:  California Statutory Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200 *et seq.* ........................... 8

            Claim 4: Common Law Unfair Competition ................................ 9

    C.    Brief Description of Key Evidence Supporting Plaintiff Monster's Claims .................................................................... 9

            Claim 1:  ISN's Infringement of Monster's Trademarks and Trade Dress, and False Designation of Origin - 15 U.S.C. §1125 (a) ......................................................... 9

            a.    Validity of Monster's Marks and Trade Dress ..................... 9

            b.    ISN's Infringing Actions ..................................................... 10

                  i.    Monster's Marks and the MONSTER Trade Dress are Strong ........................................... 10

                  ii.    The parties' goods are related ................................ 11

                  iii.    The parties marks are similar .................................. 12

                  iv.    ISN's activities have resulted in actual confusion ................................................................ 12

## TABLE OF CONTENTS
### (*Cont'd*)

Page No.

v. The parties' goods move through the same marketing channels ..................................... 13

vi. The parties' goods are impulse purchases ................ 13

vii. ISN's infringement is willful ................................. 133

viii. The likelihood of expansion of the parties' product lines ........................................................ 15

Claim 2: ISN's infringement of Monster' Asserted Registrations 15 U.S.C. § 1114 ..................................... 15

Claim 3: California Statutory Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200 *et seq* ....................... 16

Claim 4: Common Law Unfair Competition ........................ 16

D. Defendant ISN's Affirmative Defenses ........................ 16

E. Elements Required To Establish ISN's Affirmative Defenses ...................................................................... 16

Affirmative Defenses ...................................................... 16

a. Affirmative Defense 1: No Likelihood of Confusion .................................................... 16

b. Affirmative Defense 2: Monster's Trademark Rights are Invalid and Unenforceable ................ 17

c. Affirmative Defense 5: The claims are barred in whole or in part by the Statute of Limitations ..... 17

d. Affirmative Defense 6: The claims are barred in whole or in part by the doctrine of Laches .......... 18

e. Affirmative Defense 9: Abandonment ................. 19

F. Brief Description of Key Evidence in Opposition to Defendant's Affirmative Defenses .................................. 19

Affirmative Defense 1: No likelihood of confusion ..................... 19

Affirmative Defense 2: Invalidity of certain of Monster's Marks ............................................................................. 19

# TABLE OF CONTENTS
## (*Cont'd*)

**Page No.**

Affirmative Defense 5: Statute of Limitations ..............................20

Affirmative Defense 6: The claims are barred in whole or in part by the doctrine of Laches ....................................21

Affirmative Defense 9: Abandonment...........................................22

G.   Anticipated Evidentiary Issues .......................................23

H.   Issues of Law .................................................................23

III.   BIFURCATION OF ISSUES (L.R. 16-4.3) ...........................................23

IV.   JURY TRIAL (L.R. 16-4.4) ....................................................23

A.   Jury Issues ....................................................................23

B.   Court Issues ..................................................................24

V.   ATTORNEY FEES (L.R. 16-4.5)..............................................24

VI.   PLAINTIFF MONSTER IS ENTITLED TO DAMAGES .....................25

VII.   ABANDONMENT OF ISSUES ...............................................25

# TABLE OF AUTHORITIES

**Page No(s).**

*America v. Skechers USA*,
   890 F.3d 747 (9th Cir. 2018)................................................................... 6

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979)....................................................... 6, 7, 10

*Bell v. Starbucks U.S. Brands Corp.*,
   389 F. Supp. 2d 766 (S.D. Tex. 2005) .................................... 12, 13

*Cacique, Inc. v. Reynaldo's Mexican Food Co., LLC*,
   No. 2:13-CV-1018-ODW, 2014 WL 537061
   (C.D. Cal. Feb. 10, 2014) ................................................................... 7

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) .......................................................... 8

*Cuong Nhut Chung v. L & R Fine Fashions, Inc.*,
   No. SACV1100712CJCANX, 2012 WL 12887559
   (C.D. Cal. Feb. 1, 2012) .................................................................. 18

*Farouk Sys., Inc. v. Chi Nail Franchises, LLC*,
   No. CV 13-7533 FMO (SHX), 2015 WL 11347663
   (C.D. Cal. Sept. 8, 2015) .................................................................. 18

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000)........................................................ 10

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*,
   559 F.3d 985 (9th Cir. 2009) .......................................................... 18

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002)........................................................... 17

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*,
   998 F. Supp. 2d 890 (C.D. Cal. 2014)............................................. 8

*Nat'l Lead Co. v. Wolfe*,
   223 F.2d 195 (9th Cir. 1955)........................................................... 19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014) ................................................................... 24

# TABLE OF AUTHORITIES
### (*Cont'd*)

**Page No(s).**

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
   894 F.3d 1015 (9th Cir. 2018) ......................................................... 17, 18, 19

*Suh v. Yang*,
   987 F. Supp. 783 (N.D. Cal. 1997) ................................................. 18

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
   839 F.3d 1179 (9th Cir. 2016) ......................................................... 24

*Thane Intern., Inc. v. Trek Bicycle Corp.*,
   305 F.3d 894 (9th Cir. 2002) ........................................................... 13, 17

*Toyo Tire & Rubber Co. v. CIA Wheel Grp.*,
   No. SACV150246DOCDFMX, 2016 WL 4992111 ......................... 7

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001) ............................................................................. 7

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ........................................................................... 7

*Wal-Mart Stores, Inc. v. Samara Bros.*,
   529 U.S. 205 (2000) ........................................................................... 7

*Warner Bros. Entertainment v. Global Asylum, Inc.*,
   107 U.S.P.Q.2d 1910, 2012 WL 6951315
   (C.D. Cal. 2012) ................................................................................. 12

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
   419 F.3d 925 (9th Cir. 2005) ........................................................... 17

## OTHER AUTHORITIES

15 U.S.C. § 1114 ................................................................................. 6, 8, 15

15 U.S.C. § 1115 ................................................................................. 9, 15

15 U.S.C. § 1117 ................................................................................. 24

15 U.S.C. § 1117 ................................................................................. 24, 25

15 U.S.C. § 1125 ................................................................................. 5, 6, 9

Cal. Bus. & Prof. Code § 14340 ....................................................... 25

# TABLE OF AUTHORITIES
## (*Cont'd*)

**Page No(s).**

Cal. Bus. & Prof. Code § 17200 ................................................................. 6, 8, 15

Cal. Civ. Code § 3294 ................................................................................. 25

Ninth Circuit Model Civil Jury Instructions § 15.6 (2017) ............................ 6, 8

Ninth Circuit Model Civil Jury Instructions § 15.7 (2017) ................................ 7

Ninth Circuit Model Civil Jury Instructions § 15.8 (2017) ......................... 15, 17

Ninth Circuit Model Civil Jury Instructions § 15.12 (2017) .............................. 8

Ninth Circuit Model Civil Jury Instructions § 15.18 (2017) .............................. 7

Ninth Circuit Model Civil Jury Instructions § 15.19 (2017) ............................ 10

Ninth Circuit Model Civil Jury Instructions § 15.22 (2017) ............................ 19

Ninth Circuit Model Civil Jury Instructions § 15.27 (2017) ............................ 25

Plaintiff Monster Energy Co. ("Monster") submits this Memorandum of Contentions of Fact and Law pursuant to Local Rule 16.4.

## I.  SUMMARY OF THE CASE

### A.  Monster, Its Trademarks, And Its Trade Dress

This is an action brought by Monster against Integrated Supply Network ("ISN") for trademark and trade dress infringement and related unfair competition.   Monster is the owner of the well-known trademarks MONSTER™, MONSTER ENERGY® (hereinafter the "MONSTER Marks"), and UNLEASH THE BEAST!® Monster is also the owner of a distinctive trade dress for its packaging and promotional materials, including the colors green and black, as shown below (the "MONSTER Trade Dress"):

  





Though founded as an energy drink company, Monster has been heavily involved in the motor sports industry since at least 2003. Monster has used or licensed the use of its MONSTER Marks and MONSTER Trade Dress in connection with numerous products used in connection with or associated with motorized vehicles and motorsports. Over the years, these products have included automotive wheels, motorcycles, replica cars, remote control cars, graphic kits for motorized vehicles, clothing, gloves, stickers, sports helmets, bags, backpacks, and other related accessories.

Monster's connection to motorsports and motor vehicles extends well beyond the marketing of tangible products bearing the MONSTER Marks and MONSTER Trade Dress. Since at least 2004, Monster has significantly featured its brand in connection with racing and motorsports. By 2010, when ISN began using a "Monster" mark, Monster had already established itself as a major name in motorsports. Monster sponsors a wide variety of motorsport athletes, teams, and activities, and has become closely associated with motorsports.

For example, since 2008, Monster has been the title sponsor of the MONSTER ENERGY AMA Supercross Series. Monster's MONSTER Marks and MONSTER Trade Dress receive tremendous exposure at these Supercross events, including MONSTER-branded signage at the start and finish lines,

banners bearing the MONSTER Marks lining nearly the entire track, MONSTER signage in the pit area, and Monster-sponsored riders wearing the MONSTER Marks and MONSTER Trade Dress on their uniforms.

For many years, Monster has sponsored automotive race car drivers. More recently, Monster has become the title sponsor of NASCAR's premier series (formerly called the NASCAR Sprint Cup Series), which is now called the Monster Energy® NASCAR Cup Series. Monster also became the official energy drink of NASCAR. NASCAR is the second most watched sport in the U.S., with over 5 million fans watching each of the 41 races. Below is the logo for the Monster Energy® NASCAR Cup Series:



## B.   ISN And Its Infringing Trademarks And Trade Dress

ISN is in the business of marketing and selling automotive tools and other products, such as beverage tumblers, t-shirts, sweatshirts, gloves, and snacks. In December 2010, ISN launched a line of automotive tools under the name MONSTER, and soon thereafter began using a green and black trade dress. There is overwhelming evidence that ISN developed its Monster mark and product line to deliberately trade off the goodwill Monster has developed in its trademarks and trade dress.

For example, when ISN selected its MONSTER mark, one of ISN's employees warned ISN's senior management that the mark and green trade dress might expose ISN to infringement liability. But ISN knowingly plowed ahead. Later, ISN told its attorney it had selected "MONSTER" as its trademark. ISN's attorney responded with caution, warning ISN that it could do

so only if it used "MONSTER" in conjunction with a second word.  But ISN ignored this advice, and moved ahead with its infringing "MONSTER" brand.  Eventually, ISN added the word "MOBILE" to its name, but deliberately displayed the word "MOBILE" only in a small, almost imperceptible font.  To this day, ISN often omits the word "MOBILE" altogether from its products and packaging despite its attorney's advice

In addition, ISN has selected a shade of green for its trade dress that is essentially identical to Monster's shade of green.  ISN chose the shade known as Pantone 376, while Monster has always used the almost indistinguishable Pantone 375.  This cannot be a coincidence.

In fact, ISN's own conduct establishes that it is not.  For example, until recently, ISN sold "Monster Snacks" under the trademark "Feed the Beast."  This was a clear play on Monster's UNLEASH THE BEAST!® trademark, and a clear attempt to associate ISN with Monster and trade off its goodwill.

Perhaps most revealing is ISN's reaction when it learned that Monster had been named the title sponsor of NASCAR's premier series.  In a series of internal emails, ISN's executives enthused that Monster's new sponsorship will be "good for our brand," and it "[c]ertainly creates awareness!"  This rejoicing unequivocally shows the willful attempt by ISN to trade off Monster's goodwill.

The results of ISN's intentional misconduct have been predictable, and precisely as ISN intended.  Actual consumer confusion has been widespread.  For example, after ISN posted a video of its "Monster Booth" at the Tool Dealer Expo, one consumer commented online that "monster is doing tools now, huh…don't like their energy drinks, but ill be happy to try their tools for free."

In addition, mechanics have been confused by ISN's use of the marks "Monster" and "Monster Mobile" and the green and black trade dress.  Chris Nalven, a mechanic in Florida, testified that when he first saw ISN's screwdriver and toolbox he "assumed there was some kind of connection.  I

1   mean, they have – you know, the green was the big thing, the green and the

2   word 'Monster.'  Monster is green, you know.  …  I just assumed there was a

3   connection because they had the cars; they had the motorsports."  Similarly,

4   Mike Beasley, a mechanic in Texas, testified that when he first saw ISN's

5   "Monster" tools he "absolutely did" think there was a connection to Monster.

6   When asked why, he explained "Just the colors and you hear Monster.  And

7   Monster Energy Drink was already a very well-known brand."  Likewise,

8   Andrew Markowski, an automotive technician in Florida, testified that he

9   believed there was a connection between ISN's "Monster" tools and Monster.

10   When asked why, he explained "Just the name, and I pretty sure they're using

11   the green color, which is very common for the Monster Energy drink to use."

12       Furthermore, Monster's survey expert, Dr. Bruce Isaacson, conducted a

13   survey of consumers who work in the automobile repair industry.  Each

14   participant in the survey test group was shown an ISN product.  Nearly a quarter

15   of the participants (24.5%) believed that the ISN "Monster" products they were

16   shown were put out by Monster, or endorsed by Monster.[1]  Thus, conservatively,

17   at least one quarter of consumers who are likely to purchase ISN's products

18   believe that those products are made by or affiliated with Monster.

19

20

21

22

23
_____

24   [1] This is a very conservative assessment of the amount of consumer confusion.  Many consumers responded that the displayed screwdriver, light, or

25   tumbler was made by "Monster," without further explanation.  Many of these consumers were likely referring to Plaintiff Monster Energy.  Nevertheless,

26   these consumers were not counted by Dr. Isaacson as confused, unless they

27   referred specifically to "Monster Energy," "a drink company," or something else that unambiguously referred to Plaintiff.

28

## II.  PLAINTIFF'S SUMMARY STATEMENT OF CLAIMS AND DEFENSES (L.R. 16-4.1)

**A.     Plaintiff Monster's Claims**

Claim I:  ISN has violated 15 U.S.C. § 1125(a) by willfully infringing Monster's trademarks, willfully infringing Monster's Trade Dress, and similarly willfully engaging in false designation of origin.

Claim II:  ISN has violated 15 U.S.C. § 1114 by willfully infringing Monster's registered trademarks.

Claim III:  ISN has violated Cal. Bus. Prof. Code §§ 17200, *et seq.* by committing acts of unfair competition.

Claim IV:  ISN has violated California common law by committing acts of unfair competition.

**B.     Elements Required to Establish Monster's Claims**

**Claim 1: Trademark Infringement, Trade Dress Infringement, and False Designation of Origin under 15 U.S.C. § 1125(a)**

For Monster's Trademark Infringement and False Designation of Origin claims, Monster must prove that:

1.     Monster's MONSTER Marks, BEAST Marks, and Monster's Asserted Registrations are valid and protectable trademarks;

2.     Monster owns the MONSTER Marks, BEAST Marks, and Monster's Asserted Registrations; and

3.     ISN is using marks similar to Monster's MONSTER Marks, BEAST Marks, and Monster's Asserted Registrations in a manner that is likely to cause confusion among ordinary consumers, or the relevant public, as to the source, sponsorship, affiliation, or approval of the parties' goods.

*See* Ninth Circuit Model Civil Jury Instructions § 15.6 (2017).

The Ninth Circuit has identified eight relevant factors for determining the likelihood of consumer confusion for trademark and trade dress infringement

-6-

claims: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-40 (9th Cir. 1979). *See also adidas America v. Skechers USA*, 890 F.3d 747, 755 (9th Cir. 2018) (*Sleekcraft* factors apply in trade dress cases). These factors are set forth in Ninth Circuit Model Civil Jury Instructions § 15.18.

For Monster's Trade Dress Claim, Monster must show:

1.      Monster's MONSTER Trade Dress is distinctive;

2.      Monster owns the trade dress;

3.      Monster's MONSTER Trade Dress is nonfunctional; and

4.      ISN used a trade dress similar to the MONSTER Trade Dress without the consent of Monster in a manner that is likely to cause confusion among ordinary consumers, or the relevant public, as to the source, sponsorship, affiliation, or approval of parties' goods.

*See* Ninth Circuit Model Civil Jury Instructions § 15.7 (2017); *Cacique, Inc. v. Reynaldo's Mexican Food Co., LLC*, No. 2:13-CV-1018-ODW, 2014 WL 537061, at *3 (C.D. Cal. Feb. 10, 2014).

Trade dress in product packaging can be inherently distinctive, and therefore does not require a showing of secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992). Furthermore, trade dress is inherently distinctive when the "predominant function remains source identification." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212 (2000). Trade dress is functional if "the exclusive use of [the design or feature] would put competitors at a significant non-reputation-related disadvantage." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 24 (2001). "The Ninth Circuit typically considers four factors in the functionality analysis:

(1) whether the design yields a utilitarian advantage, (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether alternative designs are available." *Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. SACV150246DOCDFMX, 2016 WL 4992111, at *4 (C.D. Cal. Sept. 15, 2016). These four factors are set forth in Ninth Circuit Model Civil Jury Instructions § 15.12.

### Claim 2: Trademark Infringement under 15 U.S.C. § 1114

For Monster's Trademark Infringement claim under 15 U.S.C. § 1114, Monster must prove that:

    1.    Monster's Asserted Registrations are valid and protectable;

    2.    Monster owns Monster's Asserted Registrations; and

    3.    ISN used the accused marks, which are similar to Monster's Asserted Registrations without the consent of Monster in a manner that is likely to cause confusion among ordinary purchasers, and the relevant public, as to the source, sponsorship, affiliation, or approval of the parties' goods.

*See* Ninth Circuit Model Civil Jury Instructions § 15.6 (2017)

### Claim 3: California Statutory Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

For Monster's statutory unfair competition claim under Cal. Bus. & Prof. Code § 17200 *et seq.*, Monster must prove that:

  1. ISN has engaged in an unlawful, unfair or fraudulent business act or practice, and/or any unfair, deceptive, untrue or misleading advertising.

*See* Cal. Bus. & Prof. Code § 17200; *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (citing to *New West Corp. v. NYM Co. of California*, 595 F.2d 1194, 1202 (9th Cir. 1979)) ("[t]he 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'").

**Claim 4: Common Law Unfair Competition**

For Monster's common law claim of unfair competition under California law, Monster must prove the same elements as listed in Claim 1 for trademark infringement. *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 897–98 (C.D. Cal. 2014) (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994)) (noting that the Ninth Circuit has consistently held that state common law unfair competition claims are "substantially congruent" to Lanham Act claims).

**C.    Brief Description of Key Evidence Supporting Monster's Claims**

**Claim 1:  ISN's Infringement of Monster's Trademarks and Trade Dress, and False Designation of Origin - 15 U.S.C. §1125 (a)**

**a.    Validity of Monster's Marks and Trade Dress**

The certificates of registration for Monster's Asserted Registrations[2] are proof of the validity of the marks, that Monster is the owner of the marks, and of Monster's exclusive right to use the marks on or in connection with the goods listed in the registrations. *See* 15 U.S.C. § 1115.  Furthermore, Monster's registration Nos. 3,044,314; 3,044,315; 3,057,061; 3,314,841; 3,134,842; 3,740,050; 3,908,600; 3,908,601; 3,914,828; 4,036,680; 4,036,681; and 2,769,364 are incontestable, and therefore provide conclusive proof of the validity of the marks.

The evidence further establishes that Monster's Marks, including the common law MONSTER™ mark, are valid and protectable by virtue of the overwhelming evidence of the fame and secondary meaning of Monster's Marks.   This evidence includes billions of dollars of sales of products

---

[2] The "Asserted Registrations" are U.S. Reg. Nos. 3,004,314, 3,004,315, 3,057,061, 3,134,842, 3,740,050, 3,908,600, 3,908,601, 3,914,828, 3,923,683, 4,036,680, 4,036,681, 4,234,456, 4,332,062, 4,660,598, 4,721,433, 4,865,702, 2,769,364, 4,394,044, and 4,975,822.

prominently bearing Monster's Marks, and billions of dollars spent promoting Monster's Marks.  As a result of these very successful efforts, Monster has become an extraordinarily well-known brand.

The evidence also establishes that the MONSTER Trade Dress is inherently distinctive.  The MONSTER Trade Dress is arbitrary when applied to Monster's goods and services because its predominant function is source identification and it immediately signals Monster as the single source.

The evidence also shows that the MONSTER Trade Dress is non-functional.  In fact, ISN cannot point to any contrary evidence.  The MONSTER Trade Dress is purely ornamental and does not provide a utilitarian advantage, it does not result from a simple or inexpensive method of manufacture, Monster does not tout utilitarian advantages of the design in advertising, and alternative designs are available.  Therefore, the evidence shows that Monster's MONSTER Trade Dress is inherently distinctive and non-functional.

### b.   ISN's Infringing Actions

The evidence establishes that each *Sleekcraft* factor favors a finding of likelihood of confusion.

### i.   Monster's Marks and the MONSTER Trade Dress are Strong

The strength of a trademark is measured both conceptually and commercially.  Ninth Circuit Model Civil Jury Instructions § 15.19; *see GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  Conceptually, Monster's Marks and the MONSTER Trade Dress are very strong.  Monster's MONSTER Marks, BEAST Marks, and MONSTER Trade Dress are all arbitrary when applied to Monster's goods and services.  Monster's MONSTER Marks and BEAST Marks do not describe or suggest the qualities or characteristics of the various goods and services sold by Monster.  Furthermore, the MONSTER Trade Dress is inherently distinctive, and non-

functional as described above.  Because Monster's MONSTER Marks, BEAST Marks, and MONSTER Trade Dress are inherently distinctive, they are afforded strong protection.

Commercially, there is overwhelming evidence of the strength of Monster's Marks and MONSTER Trade Dress.  Monster's family of marks are among the most widely recognized and heavily promoted marks in the United States.  Monster has spent over $4.6 **billion** in advertising, promoting, and marketing the Monster family of marks and the related Beast family of marks. Before ISN launched is "Monster" line of tools, Monster spent over a **billion** dollars in advertising, promoting, and marketing its brand, marks, and trade dress.  The MONSTER Marks, BEAST MARKS, and/or MONSTER Trade Dress are seen by the public on more than 3 **billion** cans of drinks per year, with estimated retail sales at approximately $6 **billion** per year.  The MONSTER brand has established itself as the best-selling energy drink brand in the United States by unit volume and dollar sales.  The evidence also shows that Monster is one of the most popular global brands.   Through its extensive sales and advertising, Monster has developed overwhelmingly strong rights in its MONSTER Marks, BEAST Marks, and MONSTER Trade Dress, and Monster's MONSTER Marks, BEAST Marks, and MONSTER trade dress have become famous identifiers of Monster's goods and services.

### ii.     The parties' goods are related

The evidence also establishes that the parties' goods are related.  For example, both parties sell t-shirts, sweatshirts, hats, and gloves under their respective "Monster" marks.  Moreover, both parties sell or license beverage tumblers, a product which is complementary to Monster's beverages.  Similarly, ISN sells can coolers bearing a "Monster" mark, which again are complementary to Monster's beverage cans.

The evidence also establishes that ISN's automotive tools and Monster's

1    goods and services are related.  As shown above, Monster uses its trademarks

2    on a variety of automotive products including motorcycles, motorcycle helmets,

3    replica cars, and automotive wheels.

4          Furthermore, Monster has specifically authorized the use of Monster's

5    Marks and MONSTER Trade Dress in connection with licensed tools, and tool

6    company promotions, including Snap-on's line of Ken Block signature tool

7    boxes, and the Makita Ultimate Truck Sweepstakes.  In addition, Monster has

8    long promoted automotive sports of all kinds, creating a strong association

9    between Monster and automobiles and motorsports.

10                  **iii.**   **The parties marks are similar**

11         ISN's marks and Monster's Marks are highly similar.  The evidence

12   establishes that Monster uses its Monster family of marks, all containing the

13   dominant term MONSTER in connection with Monster's MONSTER Trade

14   Dress.  Monster also uses its related Beast family of marks, which all contain

15   the dominant term BEAST.  ISN uses the marks MONSTER and MONSTER

16   MOBILE, which are highly similar to Monster's family of marks.   ISN

17   minimizes the size and usage of the term "MOBILE," thus increasing the

18   similarity of the parties' marks.  In addition, ISN uses its MONSTER and

19   MONSTER MOBILE marks in conjunction with green and black trade dress.

20   ISN also used a variant of Monster's BEAST Marks, namely the mark FEED

21   THE BEAST, to promote its "Monster Snacks" and Monster apparel.

22                  **iv.**   **ISN's activities have resulted in actual confusion**

23         Monster's survey expert, Dr. Bruce Isaacson, conducted a survey in

24   which 24.5% of surveyed consumers believed there was at least some affiliation

25   between Monster and ISN's products, including a tool, a flashlight, and tumbler.

26   This is a very significant amount of actual confusion.[3]   Furthermore, as

27   ───────────────

28         [3] For example, in *Warner Bros. Entertainment v. Global Asylum, Inc.*,
     107 U.S.P.Q.2d 1910, 2012 WL 6951315 at *9 (C.D. Cal. 2012), the court

discussed above, the evidence establishes that there has been actual confusion in the marketplace. Consumers have expressed confusion online to ISN, and Monster has identified several mechanics who were confused as to the source of ISN's goods.

### v. The parties' goods move through the same marketing channels

Monster Energy® drinks are often sold on the same tool trucks, side-by-side with ISN's "Monster" tools. Furthermore ISN also sells its tools on the internet. Monster likewise has extensive internet sales of Monster Energy® drinks and many other products.

### vi. The parties' goods are impulse purchases

The evidence establishes that ISN's goods and Monster's goods are both relatively inexpensive, and are often purchased on impulse. ISN's drill bits and screwdrivers may be purchased for $4.00 to $7.00. Monster's drinks sell individually for under $3.00. Moreover, the evidence establishes that tools are also purchased off of tool trucks on an impulse. In addition, ISN sells clothing, hats and beverage ware for comparable prices.

### vii. ISN's infringement is willful

ISN's selection of its MONSTER and MONSTER MOBILE marks and its use of a green and black trade dress is a deliberate attempt to trade off the goodwill developed in Monster's Marks and MONSTER Trade Dress. The

---

granted a temporary restraining order based upon survey evidence showing "a 16 to 24 percent confusion rate." Similarly, in *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 776 (S.D. Tex. 2005), the court found after a bench trial that a survey showing 25% consumer confusion showed "a significant level of actual confusion" and enjoined the defendant's conduct. The court also noted that a 15% association would be "significant." *Id.* And in *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902-03 (9th Cir. 2002), the Ninth Circuit relied upon a survey showing 27.7% confusion to reverse a lower court decision finding no likelihood of confusion.

-13-

evidence shows that ISN was aware of Monster and Monster's marks when it selected "Monster" as the name of its new line of tools.   The documentary evidence shows that ISN selected the "Monster" mark just weeks after attending the "SEMA" trade show, which Monster sponsored, and where Monster had a major visible presence.   ISN was then cautioned by its own employee that the "Monster" mark might cause consumer confusion.

Furthermore, ISN's intent can also be seen in its actions.   ISN did not merely choose the "Monster" name for its tools.   ISN chose to combine that name with green and black trade dress.   ISN chose Pantone 376 as its shade of green, just one shade away from Monster's Pantone 375.

The evidence further establishes that ISN continued its actions after being placed on notice of its infringement through letters from Monster.   Despite receiving a cease and desist letter from Monster in February 2014, ISN has continued to sell products under the MONSTER and MONSTER MOBILE Marks, and using the green and black trade dress.   Similarly, after receipt of Monster's first cease and desist letter, ISN began marketing "Monster snacks" with the tag line "Feed the Beast," an obvious play on Monster's famous Unleash the Beast!® trademark.   Furthermore, ISN is emphasizing its green and black trade dress much more in its most recent packaging, since receiving three cease and desist letters from Monster.

When Monster was named the title sponsor of NASCAR's races, ISN's executives enthused that "This could be good for our Monster brand" and it "Certainly creates awareness!"   ISN was not concerned about the confusion its use of MONSTER created – its executives celebrated it.   Shortly after this announcement, ISN filed three new trademark applications for the mark "Monster" alone, including one in the colors green and black: .   In the summer of 2017, ISN expanded its use of "Monster" to include water bottles in the color green, and in March 2018, ISN launched a public website at

<monster-tools.com> that prominently uses green and black.

### viii.   The likelihood of expansion of the parties' product lines

As discussed above, both parties sell or license t-shirts, sweatshirts, gloves, hats, stickers, and beverage tumblers under their respective Monster marks. Thus, the evidence establishes that ISN's goods and Monster's goods already overlap. The evidence also establishes that the amount of overlap is likely to increase in the future. As discussed above, ISN has been expanding its product line to include items such as beverage tumblers, t-shirts, hats, and gloves, all bringing ISN closer and closer to Monster. There is every reason to believe this trend will continue. This is especially so because ISN, as discussed above, is deliberately trying to associate itself with Monster.

### Claim 2: ISN's infringement of Monster' Asserted Registrations 15 U.S.C. § 1114

Plaintiff Monster claims that ISN has infringed Monster's Asserted Registrations. The certificates of registration for Monster's Asserted Registrations are proof of the validity of the marks, that Monster is the owner of the marks, and of Monster's exclusive right to use the marks on or in connection with the goods listed in the registrations. Ninth Circuit Model Civil Jury Instructions § 15.8. *See* 15 U.S.C. § 1115. Furthermore, Monster's registration Nos. 3,044,315; 3,057,061; 4,036,680; 4,036,681; 3,044,314; 3,134,842; ; 3,908,601; 3,914,828; 3,908,600; 3,314,841; 3,740,050; and 2,769,364 are incontestable, and therefore provide conclusive proof of the validity of the marks.

The evidence supporting the similarity of the marks and the likelihood of confusion are set forth in Claim 1 above.

### Claim 3: California Statutory Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200 *et seq*

ISN's use of the marks MONSTER and MONSTER MOBILE, and the green and black trade dress, is likely to cause confusion, mistake, or deception among consumers as to the source of ISN's goods.  For this claim, Monster will rely on the same evidence as described above in connection with Claim 1.

### Claim 4: Common Law Unfair Competition

For this claim, Monster will rely on the same evidence as described above in connection with Claim 1.

**D.**     **Defendant ISN's Affirmative Defenses**

Affirmative Defense I: There is no likelihood of confusion because Monster sells beverages not tools and accordingly, Monster and ISN are in two entirely different markets.

Affirmative Defense II:  The claims are barred because Monster's purported trademark rights are invalid and/or unenforceable

Affirmative Defense V:  The claims are barred, in whole or in part, by the applicable statutes of limitations.

Affirmative Defense VI:  The claims are barred, in whole or in part, by the doctrine of laches.

Affirmative Defense IX:  The claims are barred, in whole or in part, by the doctrine of abandonment.

**E.**     **Elements Required To Establish ISN's Affirmative Defenses**
    **Affirmative Defenses**

        **a.**     **Affirmative Defense 1: No Likelihood of Confusion**

This is not an affirmative defense, but rather an allegation that Monster has not carried its burden of showing that the accused marks and trade dress infringe Monster's trademarks and trade dress.  As discussed above, Monster has strong evidence of likelihood of confusion and will carry its burden.

**b.     Affirmative Defense 2: Monster's Trademark Rights are Invalid and Unenforceable[4]**

Because Registrations are presumed valid, *see* Ninth Circuit Model Civil Jury Instructions § 15.8, ISN must prove the following:

1. Monster's U.S. Registration Nos. 4,721,433 (MONSTER ENERGY); 4,234,456 (UBERMONSTER); 3,923,683 (  ); 4,332,062 (  ); 4,660,598 (  ); and 4,865,702 (  ), describe the attributes of Monster's products; and

2. The above listed marks have not acquired secondary meaning.

*See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

To the extent ISN is alleging that the common law mark MONSTER™ lacks secondary meaning, this is not an affirmative defense, but instead is an allegation that Monster will not meet its burden of proving secondary meaning. As discussed above, Monster will carry its burden of proof on this issue.

**c.     Affirmative Defense 5: The claims are barred in whole or in part by the Statute of Limitations**

This is not an affirmative defense against claims arising under the Lanham Act. The Lanham Act does not contain a statute of limitations. *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.,* 894 F.3d 1015, 1018 (9th Cir.

---

[4] In its interrogatory responses and motion for summary judgment ISN has identified a "lack of secondary meaning" as the only basis for its allegation that Monster's MONSTER Marks are invalid. *See* Dkt. 201. Per the Court's June 4, 2018 order on Monster's Motion for Partial Summary Judgment, ISN cannot challenge the validity of Monster's incontestable registrations, or Monster's BEAST Marks being asserted in this case. *Id.*

2018); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir. 2002); *Farouk Sys., Inc. v. Chi Nail Franchises, LLC*, No. CV 13-7533 FMO (SHX), 2015 WL 11347663, at *4 (C.D. Cal. Sept. 8, 2015) ("As violations of the Lanham Act may be 'continuing wrongs,' the statute of limitations does not bar the pending claims").

Furthermore, the statute of limitations is not an affirmative defense against Monster's Unfair Competition claims. *Cuong Nhut Chung v. L & R Fine Fashions, Inc.*, No. SACV1100712CJCANX, 2012 WL 12887559, at *6 (C.D. Cal. Feb. 1, 2012) (holding that where the unfair competition claim involves a continuing wrong the claim is not barred by the statute of limitations); *Suh v. Yang*, 987 F. Supp. 783, 796 (N.D. Cal. 1997) (noting that "each allegedly infringing display of Defendant's service name on products, advertisements, etc., could create a separate cause of action for unfair competition and trademark infringement" and therefore the unfair competition claim was not barred by the statute of limitations).

### d. <u>Affirmative Defense 6: The claims are barred in whole or in part by the doctrine of Laches</u>

As an equitable issue, laches should be decided by the Court. To establish this defense, ISN must prove the following:

1. Monster unreasonably delayed in bringing suit; and

2. ISN was prejudiced by the delay.

*See Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009). There is a presumption that laches does not bar a claim under the Lanham Act when relief is sought within the statute of limitations period from the most closely analogous State Law. *Pinkette Clothing, Inc.*, 2018 WL 3188328, at *7. The analogous statute of limitations period for Lanham Act claims is the four-year statutory period for California State Trademark Infringement. *Id.* at *8. In addition, laches runs from the time

the plaintiff "knew or should have known about its potential cause of action." *Id.* Laches is not an available defense when infringement is willful. *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955).

### e.   Affirmative Defense 9: Abandonment

To establish this defense, ISN must prove the following:

1.     Monster discontinued its use of its marks in the ordinary course of trade, intending not to resume use; or

2.     Through Monster' actions, or failure to act, the trademark's primary significance to prospective consumers has become the product or service itself and not the producer of the product or provider of the service; or

3.     Monster fails to exercise adequate quality control over the goods and services sold under the trademark by a licensee.

*See* Ninth Circuit Model Jury Instructions § 15.22.

### F.   Brief Description of Key Evidence in Opposition to Defendant's Affirmative Defenses

#### Affirmative Defense 1: No likelihood of confusion

Regarding ISN's claim of no likelihood of confusion, Monster's opposing evidence is set forth above in Section C with respect to Monster's claim that ISN infringes Monster's Marks and MONSTER Trade Dress.

#### Affirmative Defense 2: Invalidity of certain of Monster's Marks

Per the Court's June 4, 2018 order on Monster's Motion for Partial Summary Judgment, the validity of Monster's incontestable registrations for the MONSTER Marks and BEAST Marks is no longer at issue.  Therefore, ISN can assert this defense against only Monster's contestable MONSTER registrations (Registration Nos. 4,721,433; 4,234,456; 3,923,683; 4,332,062; 4,660,598; and 4,865,702).  ISN may also assert that Monster has not met its burden of proving common law rights in the mark MONSTER™.

Conceptually, the MONSTER Marks are strong.   The term "Monster"

does not in any way describe or suggest the qualities or characteristics of the beverages sold by Monster.  There is simply no connection between the term "Monster" and the product sold by Monster under that name.  Certainly, ISN has offered no evidence of any such connection.  Thus, the term "Monster" is arbitrary as applied to beverages and Monster's other products and services, and therefore evidence of secondary meaning is not required.  So, too, are Monster's registered marks that incorporate the term "Monster."

Furthermore, the evidence strongly establishes that Monster's Marks are commercially strong and acquired strong secondary meaning and fame long before ISN began its infringement.  As set forth above in Section C with respect to Monster's claim that ISN infringes Monster's Marks and MONSTER Trade Dress, the MONSTER Marks are seen by the public on more than 3 **billion** cans of drinks per year, with estimated retail sales at approximately $6 **billion** per year.  The MONSTER brand is the best-selling energy drink brand in the United States by unit volume and dollar sales.  Additionally, Monster has spent billions of dollars marketing and advertising its MONSTER Marks.

Monster also has extensive sales of non-beverage products bearing its MONSTER Marks, including but not limited to, helmets, bags, and stickers.  The evidence also shows that Monster extensively promotes the goods and services of others, and since at least as early as 2003 has developed a strong reputation and secondary meaning of its MONSTER Marks in connection with the promotion of goods and services of others in the sports, motorsports, electronic sports, and music industries.  Therefore, even if Monster were required to show secondary meaning, the evidence clearly establishes that the MONSTER Marks have become strong – indeed famous – identifiers of Monster's goods and services.

**Affirmative Defense 5: Statute of Limitations**

As stated above this is not a valid affirmative defense and ISN has

1   refused to withdraw it.  There is no statute of limitations defense to claims under

2   the Lanham Act.  Additionally, the evidence shows that ISN's infringement is

3   non-static, and therefore each instance of infringement constitutes a new cause

4   of action for infringement and unfair competition.   Thus, the statute of

5   limitations is not a valid defense against Monster's claims.

6       **Affirmative Defense 6: The claims are barred in whole or in part by**

7       **the doctrine of Laches**

8       The evidence shows that Monster's claims are not barred by the doctrine

9   of Laches.  Monster first learned of ISN's MONSTER MOBILE mark on or

10  about December 17, 2013, when ISN's federal trademark application published

11  for opposition.  Monster extended the time to oppose ISN's application, and sent

12  a letter to counsel for ISN on February 11, 2014.  On February 18, 2014 counsel

13  for ISN responded to Monster indicating that ISN's products did not bear the

14  MONSTER MOBILE mark, and that a restriction against ISN's use of black

15  and green should not be a problem.  Thus, Monster was not aware of ISN's use

16  of the mark on physical products, or use of its black and green trade dress in

17  February, 2014.  Monster was not made aware of such use until around October

18  2014, after ISN abandoned its initial trademark application no. 85/806,622 and

19  Monster conducted further investigation.

20      Therefore, at the earliest, the analogous statute of limitations period

21  would end four years after ISN's mark first published for opposition, i.e.

22  December 17, 2017.  Monster filed the present action on March 22, 2017.

23  Because Monster filed the lawsuit within the four-year period, Monster is

24  entitled to a strong presumption that laches does not bar its claims.  Moreover,

25  ISN's infringement has been non-static.  As noted above, ISN did not begin use

26  of its FEED THE BEAST mark until November 2014.  In 2016, ISN began

27  using a new stylized MONSTER mark, and in 2017, ISN began selling new

28  water bottles under its MONSTER mark.  Monster clearly did not delay in

1   bringing suit as it relates to ISN's infringement based upon these actions.

2   Furthermore, ISN was not prejudiced by any delay on the part of Monster.

3   Immediately upon learning of ISN's application, when it published for

4   opposition in December 2013, Monster filed an extension of time to oppose and

5   sent ISN a letter.  Once Monster learned of ISN's use of green and black, and

6   sale of goods bearing the MONSTER MOBILE mark, Monster immediately

7   sent a second cease and desist letter to ISN.  Monster again sent ISN a cease and

8   desist letter upon learning of ISN's sales of clothing and use of the mark

9   MONSTER on its own.  At each of these instances ISN could have ceased using

10  its mark.  However, ISN continued to infringe, and in fact, moved closer to

11  Monster's marks and goods and services.  Therefore, ISN, with full knowledge

12  of its wrongdoing, is in no position to claim it was prejudiced by any delay.

13  Lastly, the evidence shows that ISN's infringement has been willful.

14  Therefore the willful infringement exception applies, and laches does not bar

15  Monster's claims.

16  **Affirmative Defense 9: Abandonment**

17  As discussed above in Section C, with respect to Monster's Claim 1,

18  Monster's marks are valid and protectable.  Monster has continuously used

19  Monster's Marks, and Monster's Marks have strong secondary meaning and

20  fame.  Therefore, ISN cannot show that Monster's marks were abandoned.

21  Furthermore, Monster's Marks have not become generic for Monster's

22  goods or services.  In fact, the evidence shows that Monster's Marks are famous

23  identifiers of the source of Monster's goods and services, and do not refer to the

24  goods or services themselves.  The evidence also shows that Monster exercises

25  proper quality control over the goods and services sold under Monster's Marks

26  by licensees.  Monster approves the quality, quantity, and final products of its

27  licensed goods, among other methods of quality control.  Additionally, Monster

28  diligently polices its marks and trade dress.  Therefore, Monster's Marks have

-22-

1  not been abandoned.

2  **G.    Anticipated Evidentiary Issues**

3        The parties have set forth their evidentiary issues in their motions in

4  limine timely filed with this Court on July 24, 2018.  The parties' motions in

5  limine are still pending before the Court.

6  **H.    Issues of Law**

7        There are no issues of law for the Court to decide.

8          **III.  BIFURCATION OF ISSUES (L.R. 16-4.3)**

9        ISN has filed a Motion in Limine to bifurcate trial.  ISN seeks to have the

10  issues of infringement and willful infringement tried to the jury in a first trial,

11  and the issue of disgorgement of profits tried to the Court in a second trial.  As

12  Monster explains in its Opposition, the Motion in Limine should be denied.  All

13  evidence should be presented to the jury in a single trial, with the Court

14  reserving for itself the ultimate decision of whether to disgorge profits.

15            **IV.  JURY TRIAL (L.R. 16-4.4)**

16        The parties demanded a trial by jury on all issues triable to a jury.

17  **A.    Jury Issues**

18        The issues for the jury include:

19        1.    Whether ISN infringed the MONSTER Marks and MONSTER

20              Trade Dress;

21        2.    Whether ISN's infringement was willful;

22        3.    Whether Monster has established common law rights in the

23              MONSTER™ Mark and MONSTER Trade Dress;

24        4.    Whether ISN has established that Monster's contestable

25              MONSTER registrations (Registration Nos. 4,721,433; 4,234,456;

26              3,923,683; 4,332,062; 4,660,598; and 4,865,702) are invalid and

27              unenforceable;

28

5.      Whether ISN has established that Monster has abandoned any of its trademarks.

6.      The amount of damages incurred by Monster.

**B.      Court Issues**

The issues for the Court include:

1.      Whether Monster's claims are barred by laches;

2.      Whether to use its discretion to enhance damages up to three times for ISN's willful infringement of Monster's Marks and MONSTER Trade Dress as authorized by 15 U.S.C. § 1117(a);

3.      Whether to disgorge ISN's profits.

4.      Whether to permanently enjoin ISN from infringing Monster's Marks and MONSTER Trade Dress.

5.      Whether to award Monster attorneys' fees.

### V.  ATTORNEY FEES (L.R. 16-4.5)

Monster seeks reimbursement of its attorneys' fees pursuant to 15 U.S.C. § 1117, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."   A case is considered "exceptional" if it is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (adopting the rule set forth in *Octane Fitness* in the trademark context).

The overwhelming evidence of ISN's willful infringement of Monster's Marks and Trade Dress justifies an award of Monster's reasonable attorneys' fees.  Monster also seeks costs of suit and other costs incurred in connection with this action as a result of ISN's infringement and unfair competition.

-24-

## VI.  **PLAINTIFF MONSTER IS ENTITLED TO DAMAGES**

Plaintiff Monster is entitled to damages to compensate for ISN's trademark infringement, trade dress infringement, false designation of origin, and unfair competition.  For the federal claims, Monster is entitled to (1) ISN's profits on its sales of the infringing products; (2) Monster's damages, and (3) the costs of the actions.  *See* 15 U.S.C. § 1117(a).  Monster's damages include injury to reputation, injury to goodwill, and lost profits.  See Ninth Circuit Model Civil Jury Instructions § 15.27.  For the federal claims, the Court may award up to three times the damages amount assessed in cases of willful infringement.  *See* 15 U.S.C. § 1117(a).

Monster is also entitled to three times (1) ISN's profits and (2) Monster's damages pursuant to California state law.  *See* Cal. Bus. & Prof. Code § 14340(a).  The Court may also award exemplary damages of up to three times the damages amount for the state law claims.  *See* Cal. Civ. Code § 3294.

The overwhelming evidence of ISN's willful infringement, even with knowledge of Monster's objections, supports Monster's claim for damages.  Monster's damages expert, Dr. Russ Mangum, will testify regarding the damages to which Monster is entitled under the law.

## VII.  **ABANDONMENT OF ISSUES**

Monster has withdrawn reliance on the following trademark registrations: U.S. Registration Nos. 4,111,964; 3,959,457; 4,376,796; 4,129,288; 4,451,535; 4,716,750; 4,634,053; 4,604,556; 5,018,111; 5,041,267; 4,989,137; 5,013,706; 4,532,292; 4,534,414; 4,860,491; 4,856,373; 4,879,793; 3,924,797; 3,852,118; 4,336,329; 4,482,659; 4,482,660; 4,542,107; 4,546,402; 4,371,544; 4,292,502; and 4,953,200.  ISN has abandoned its Affirmative Defenses of Fair Use and Estoppel.  No additional issues have been abandoned, other than the issues which have become moot in light of the Court's June 4, 2018 Orders regarding the parties' Motions for Summary Judgment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  July 31, 2018          By:  /s/ *Lynda J. Zadra-Symes*
                                                 Steven J. Nataupsky
                                                 Lynda J. Zadra-Symes
                                                 Marko R. Zoretic
                                               Jason A. Champion

Attorneys for Plaintiff,
MONSTER ENERGY COMPANY

28415023