Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Steven J. Nataupsky (SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (SBN 156511)
lynda.zadrasymes@knobbe.com
Marko R. Zoretic (SBN 233,952)
marko.zoretic@knobbe.com
Jason A. Champion (CA SBN 259207)
jason.champion@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Brian C. Horne (SBN 205621)
brian.horne@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 551-3450
Facsimile:  (310) 601-1263

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> INTEGRATED SUPPLY NETWORK, LLC, a Florida limited liability company, <br><br> Defendant. | Case No. 5:17-CV-00548-CBM-RAO <br><br> **MONSTER ENERGY COMPANY'S PROPOSED JURY INSTRUCTIONS DISPUTED BY ISN** <br><br> Hon. Consuelo B. Marshall |

Pursuant to the Court's Order Granting Stipulation to Continue Trial Date (Dkt. No. 355), Plaintiff Monster Energy Company hereby submits and proposes that the Court use the attached jury instructions which Defendant Integrated Supply Network, LLC disputes.

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  October 9, 2018        By:  */s/ Joseph R. Re*
                                    Joseph R. Re
                                    Steven J. Nataupsky
                                    Lynda J. Zadra-Symes
                                    Brian C. Horne
                                    Marko R. Zoretic
                                    Jason A. Champion

                                    Attorneys for Plaintiff,
                                    MONSTER ENERGY COMPANY

-1-

## INDEX OF JURY INSTRUCTIONS

| No. | Title | Source | Page |
|---|---|---|---|
| 1 | Preliminary Instruction—Trademark | AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – Nos. 1.7 (clear and convincing evidence standard), 15.1, 15.3 (modified), 15.8 (modified), 15.9 (modified). | 1 |
| 6 | Infringement—Elements and Burden of Proof—Trademark | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.6 | 7 |
| 7 | Infringement—Elements and Burden of Proof—Trade Dress | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.7 | 9 |
| 8 | Infringement—Elements—Presumed Validity and Ownership—Registered Trademark | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.8 | 11 |
| 10 | Acquisition of Rights in a Portion of a Composite Trademark | *Institut National des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574, 1582 (Fed. Cir. 1992); *Application of Servel, Inc.*, 181 F.2d 192, 196 (C.C.P.A. 1950); *In re Berg Elecs., Inc.*, 163 U.S.P.Q. 487, 487 (T.T.A.B. 1969); J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 19:59 (5th ed. 2017) | 14 |
| 11 | Infringement—Elements—Validity—Unregistered Mark—Distinctiveness | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.10 | 16 |
| 12 | Infringement—Elements—Validity—Distinctiveness—Secondary Meaning | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.11 | 23 |
| 13 | Infringement—Elements— | Ninth Circuit Manual of | 27 |

| No. | Title | Source | Page |
|-----|-------|--------|------|
|  | Validity—Trade Dress—Non-Functionality Requirement | Model Civil Jury Instructions – No. 15.12 |  |
| 14 | Infringement—Likelihood of Confusion—Factors—*Sleekcraft* Test | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.18; Dkt. No. 202 at 5 n.3 (citing *Rearden LLP v. Rearden Commerce*, 683 F.3d 1190, 1212 (9th Cir. 2012); *Waits v. Frito-Lay*, 978 F.2d 1093, 1110 (9th Cir. 1992)) | 31 |
| 15 | Infringement—Likelihood of Confusion—Factor—Strength of Trademark or Trade Dress | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.19 | 35 |
| 16 | Defenses—Abandonment—Affirmative Defense—Defendant's Burden of Proof | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.22 (modified) | 40 |
| 18 | Willful Infringement | *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th Cir. 2015); *Fishman Transducers v. Paul*, 684 F.3d 187, 192-93 (1st Cir. 2012); *Coach, Inc. v. Celco Customs Services Co.*, 2014 WL 12573411 at *19-*20 (C.D. Cal. June 5, 2014); *Hydramedia Corp. v. Hydra Media Grp., Inc.*, 2008 WL 11336118, at *3 (C.D. Cal. Dec. 29, 2008), *aff'd,* 392 F. App'x 522 (9th Cir. 2010) | 42 |
| 19 | Trademark Damages—Plaintiff's Actual Damages | Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.27; *adidas Am., Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812 at *12 (D. Or. Sept. 12, 2008); Dkt. No. 202 at 14 ("A reasonable royalty based on a hypothetical negotiation can | 44 |

| No. | Title | Source | Page |
|-----|-------|--------|------|
|  |  | be a measure of actual damages in a trademark infringement case.") |  |
| 22 | Reasonable Royalty—Possible Factors | AIPLA Model Patent Jury Instructions, 11.14 (revised to apply to trademark context); *Ericsson, Inc. v. D-Link Sys., Inc.*, No. 10-CV-0473, 2014 U.S. App. LEXIS 22778 at *65-69 (Fed. Cir. 2014); *Apple Inc. et al v. Motorola Inc., et al.*, 757 F.3d 1286 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc. et al*, 694 F.3d 51, 60 (Fed. Cir. 2012); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *Monsanto Co. v. McFarling*, 488 F.3d 973 (Fed. Cir. 2007); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-10 (Fed. Cir. 1996); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898-900 (Fed. Cir. 1986); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd sub nom.*, *Georgia Pacific Corp. v. United States Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971) | 46 |
| 23 | Defendant's Profits | Ninth Circuit Manual of Model Civil Jury Instructions | 50 |

| No. | Title | Source | Page |
|---|---|---|---|
|  |  | – No. 15.29 |  |
| 24 | Punitive Damages | Cal. Civ. Code § 3294; Ninth Circuit Manual of Model Civil Jury Instructions – Nos. 1.7 and 5.5 (modified) | 52 |

## **PRELIMINARY INSTRUCTIONS**

### **JURY INSTRUCTION NO. 1**

### **(PRELIMINARY INSTRUCTION—TRADEMARK)**

The plaintiff, Monster Energy, seeks damages against the defendant, Integrated Supply Network, whom I will call ISN, for infringement of its registered and unregistered trademarks and trade dress.  ISN denies infringing the trademarks and trade dress.   ISN also contends that some of Monster Energy's trademarks are invalid, and that Monster Energy's trade dress is invalid. To help you understand the evidence that will be presented in this case, I will explain some of the legal terms you will hear during this trial.

### **Definition and Function of a Trademark**

A trademark is a word, name, symbol, or device, or any combination of these items that indicates the source of goods. The owner of a trademark has the right to exclude others from using that trademark or a similar mark that is likely to cause confusion in the marketplace. The main function of a trademark is to identify and distinguish goods as the product of a particular manufacturer or merchant and to protect its goodwill.

A service mark is the same as a trademark, except that it is used to identify and distinguish a company's services, rather than a company's goods. For convenience, I will refer to both trademarks and service marks as "trademarks" or simply "marks."

### **How a Trademark Is Obtained**

A person acquires the right to exclude others from using the same mark or a similar mark that is likely to cause confusion in the marketplace by being the

-1-

1  first to use it in the marketplace, or by using it before the alleged infringer.

2  Rights in a trademark are obtained only through commercial use of the mark.

3

4  **Trademark Registration**

5  After the owner of a trademark has obtained the right to exclude others

6  from using the trademark, the owner may obtain a certificate of registration

7  issued by the United States Patent and Trademark Office. Thereafter, when the

8  owner brings an action for infringement, the owner may rely solely on the

9  registration certificate to prove that the owner has the right to exclude others

10  from using the trademark or a similar mark that is likely to cause confusion in

11  the marketplace in connection with the type of goods specified in the certificate.

12  These presumptions in favor of the owner created by the certificate of

13  registration can be overcome or rebutted only by certain types of evidence that I

14  will describe to you later as appropriate.

15

16  **Unregistered Marks**

17  Not all trademarks are registered. Unregistered trademarks can be valid

18  and provide the owner with the exclusive right to use that trademark.

19  Only a valid trademark can be infringed.

20

21  **Trade Dress**

22  Trade dress is the non-functional physical detail and design of a product

23  or its packaging, which indicates the product's source and distinguishes it from

24  the products of others.

25  Trade dress is the product's total image and overall appearance, and may

26  include features such as size, shape, color, color combinations, texture, or

27  graphics.  In other words, trade dress is the form in which a person presents a

28

product or service to the market, its manner of display.  A registration is not necessary to have trade dress rights.

### Likelihood of Confusion

To prove infringement of its trademarks and its trade dress, the plaintiff must prove, by a preponderance of the evidence, that the defendant, without the plaintiff's consent, used in commerce a reproduction, copy, counterfeit or colorable imitation of plaintiff's marks or trade dress in connection with the distribution or advertisement of goods, such that the defendant's use of the marks or trade dress is likely to cause confusion as to the source of the goods. It is not necessary that the marks or trade dress used by the defendant be an exact copy of the plaintiff's marks or trade dress. Rather, the plaintiff must demonstrate that, viewed in its entirety, the marks or trade dress used by the defendant is likely to cause confusion in the minds of reasonably prudent purchasers or users as to the source of the product in question.

### Monster Energy's Claims and Burden of Proof

In this case, Monster Energy contends that ISN has infringed Monster Energy's registered and unregistered trademarks and trade dress. First, Monster Energy is asserting a number of registered trademarks that include the word "Monster" alongside other words or elements.  It is also asserting an unregistered trademark in the word "Monster."  I will refer to these trademarks as the Monster marks.  Second, Monster Energy is asserting a number of registered trademarks including the phrase "Unleash the Beast!".  I will refer to these trademarks as the Beast marks.  Third, Monster Energy is asserting trade dress rights in the way it presents its products and marketing materials using the combination of the colors green and black with the word "Monster."  I will refer to this as the Trade Dress asserted by Monster Energy.

Monster Energy has the burden of proving by a preponderance of the evidence that it is the owner of a valid trademark or trade dress and that ISN infringed that trademark or trade dress. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that ISN infringed Monster Energy's trademarks or trade dress.

One way for Monster Energy to prove it has a valid trademark is to show that the trademark is registered. An owner of a trademark may obtain a certificate of registration issued by the United States Patent and Trademark Office and may submit that certificate as evidence of the validity and protectability of the trademark and of the certificate holder's ownership of the trademark covered by that certificate.

Another way for Monster Energy to prove it has a valid trademark is to show that the trademark acts as a trademark in that it identifies a particular source of the goods or services at issue.

### ISN's Defenses and Burden of Proof

ISN contends that some of Monster Energy's trademarks and trade dress are invalid.  In addition, ISN contends that Monster Energy abandoned any rights in the word "Monster."   ISN has the burden of proving by a preponderance of the evidence that the challenged registered trademarks are invalid.  Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the challenged trademarks are invalid or abandoned.  ISN bears the burden of proving by clear and convincing evidence that the unregistered "Monster" trademark has been abandoned.  Clear and convincing evidence is evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true.  This is a higher standard of proof than proof by a

preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – Nos. 1.7 (clear and convincing evidence standard), 15.1, 15.3 (modified), 15.8 (modified), 15.9 (modified)

## <u>INSTRUCTIONS AFTER EVIDENCE BUT BEFORE CLOSING ARGUMENT</u>

### JURY INSTRUCTION NO. 6
### (INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF—TRADEMARK)

On Monster Energy's claims for trademark infringement, Monster Energy has the burden of proving each of the following elements by a preponderance of the evidence:

1. That Monster Energy's trademarks are valid, protectable trademarks;

2. That Monster Energy owns these trademarks; and

3. That ISN used these trademarks or a similar trademark without the consent of Monster Energy in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.

If you find that each of the elements on which Monster Energy has the burden of proof has been proved for the Monster trademarks, you should answer Questions # 1 and 2 on the Verdict Form for Monster Energy.   If you find that each of the elements on which Monster Energy has the burden of proof has been proved for the Beast trademarks, you should answer Question # 4 on the Verdict Form for Monster Energy.   If, on the other hand, Monster Energy has failed to prove any of these elements for the Monster trademarks or the Beast trademarks, your answer should be for ISN with respect to the applicable trademarks.

1  AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2  15.6.

**JURY INSTRUCTION NO. 7**

**(INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF—TRADE DRESS)**

On Monster Energy's claim for trade dress infringement, Monster Energy has the burden of proving by a preponderance of the evidence each of the following elements:

1. That the claimed Trade Dress, including the combination of the colors green and black with the word "Monster," is distinctive;

2. That Monster Energy owns this Trade Dress;

3. That the Trade Dress asserted by Monster Energy is nonfunctional; and

4. That ISN used trade dress similar to the Trade Dress asserted by Monster Energy without the consent of Monster Energy in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of ISN's goods.

If you find that each of the elements on which Monster Energy has the burden of proof has been proved, you should answer Question #5 on the Verdict Form for Monster Energy. If, on the other hand, Monster Energy has failed to prove any of these elements, you should answer Question #5 for ISN.

1  AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2  15.7.

**JURY INSTRUCTION NO. 8**

**(INFRINGEMENT—ELEMENTS—PRESUMED VALIDITY AND OWNERSHIP—REGISTERED TRADEMARK)**

I gave you instruction number 6 that requires Monster Energy to prove by a preponderance of the evidence that its trademarks are valid and protectable and that Monster Energy owns the trademarks. A valid trademark is a word, name, symbol, device, or any combination of these, that indicates the source of goods or services and distinguishes those goods or services from the goods or services of others. A trademark becomes protectable after it is used in commerce.

One way for Monster Energy to prove trademark validity is to show that the trademark is registered. An owner of a trademark may obtain a certificate of registration issued by the United States Patent and Trademark Office and may submit that certificate as evidence of the validity and protectability of the trademark and of the certificate holder's ownership of the trademark covered by that certificate.

Exhibits 1000A through 1013A, 1023A, 1034A through 1037A, and 1043A are certificates of registration from the United States Patent and Trademark Office.  They were submitted by Monster Energy as proof of the validity of the trademarks and that Monster Energy owns the trademarks.

The facts recited in these certificates are that Monster Energy owns valid trademark rights in each of the trademarks listed in the registrations. ISN alleges that one certificate, namely Exhibit 1000A for "MONSTER ENERGY," cannot be considered proof of validity of the trademark because the trademark is

-11-

1   descriptive of . . . [ISN has never argued that the trademark describes the
2   services set forth in this certificate as explained in Monster's Trial Brief on
3   pages 8-9].

4

5   Unless ISN proves by a preponderance of the evidence that the
6   MONSTER ENERGY trademark describes the goods in the certificate of
7   registration, you must consider that trademark to be conclusively proved as
8   valid and owned by Monster Energy. However, if ISN shows that the
9   MONSTER ENERGY trademark describes [the goods in the certificate of
10  registration by a preponderance of the evidence (*see above*)], then the facts
11  stated in Exhibit 1000A as to Monster's ownership and validity of the
12  MONSTER ENERGY trademark are no longer conclusively presumed to be
13  correct. You should then consider whether all of the evidence admitted in this
14  case, in addition to this certificate of registration, shows by a preponderance of
15  the evidence that the trademark is valid and owned by Monster Energy, as I
16  explain in Instruction 6.

17

18  In this case, there is no dispute that Exhibits 1001A through 1004A,
19  1006A, 1009A through 1013A, 1034A, and 1037A are registrations that are
20  "incontestable" under the trademark laws. This means that Monster Energy's
21  registrations of these trademarks are conclusive evidence of Monster Energy's
22  ownership of these trademarks and that the trademarks are valid and protectable.
23  I instruct you that for purposes of Instruction 6, you must find that Monster
24  Energy owns these trademarks and that these trademarks are valid and
25  protectable.

26

27

28

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.8.

**JURY INSTRUCTION NO. 10**

**(ACQUISITION OF RIGHTS IN A PORTION OF A COMPOSITE TRADEMARK)**

A trademark owner may acquire rights in a portion of a larger or composite trademark under some circumstances.  In this case, Monster Energy contends that it has acquired trademark rights in the word "Monster" by using other trademarks that include the word "Monster," such as "Monster Energy®" "Monster Unleaded®" and "Ubermonster®".  To prove that it has rights in the word "Monster," Monster Energy must show by a preponderance of the evidence that the word "Monster" creates a separate commercial impression so that consumers identify the word "Monster" as an indicator of the source of Monster Energy's goods.  That is, the word "Monster" functions as one of Monster Energy's trademarks.

AUTHORITY:  *Institut National des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574, 1582 (Fed. Cir. 1992); *Application of Servel, Inc.*, 181 F.2d 192, 196 (C.C.P.A. 1950); *In re Berg Elecs., Inc.*, 163 U.S.P.Q. 487, 487 (T.T.A.B. 1969); J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 19:59 (5th ed. 2017).

**JURY INSTRUCTION NO. 11**

**(INFRINGEMENT—ELEMENTS—VALIDITY—UNREGISTERED**

**MARK—DISTINCTIVENESS)**

**Strength as a Likelihood of Confusion Factor**

How distinctively a trademark or trade dress indicates that a good comes from a particular source is an important factor to consider in assessing its validity. As I will discuss later, it is also an important factor in determining whether ISN has infringed Monster Energy's trademarks or trade dress.

Monster Energy asserts that the word "Monster" is a valid and protectable trademark for its goods and services, and that the Trade Dress asserted by Monster Energy is a valid and protectable trade dress for its goods and services. Monster Energy contends that ISN's use of the words "Monster" and "Monster Mobile" in connection with ISN's products infringes Monster Energy's "Monster" trademark and is likely to cause confusion about the origin of goods associated with that trademark. Similarly, Monster Energy contends that ISN's use of the words "Monster" and "Monster Mobile" in combination with the colors green and black infringes the Trade Dress asserted by Monster Energy and is likely to cause confusion about the origin of the goods associated with that trade dress.

In order to determine if Monster Energy has met its burden of showing that its "Monster" trademark is a valid trademark, or that the Trade Dress asserted by Monster Energy is a valid trade dress, you should classify it on the spectrum of distinctiveness that I will explain in this instruction.

-16-

An inherently distinctive trademark or trade dress is a word, symbol or device, or combination of them, which intrinsically identifies a particular source of a good or service in the market. The law assumes that an inherently distinctive trademark or trade dress is one that almost automatically tells a consumer that it refers to a brand or a source for a product, and that consumers will be predisposed to equate the trademark with the source of a product.

**Spectrum of Marks and Trade Dress**

Trademark law provides great protection to distinctive or strong trademarks and trade dress.  Conversely, trademarks and trade dress that are not as distinctive or strong are called "weak" trademarks and trade dress, and they receive less protection from infringing uses. Trademarks and trade dress that are not distinctive are not entitled to any trademark protection. For deciding trademark and trade dress protectability, you must consider whether a trademark or trade dress is inherently distinctive.  Trademarks and trade dress are grouped into four categories according to their relative strength or distinctiveness. These four categories are, in order of strength or distinctiveness: arbitrary (which is inherently distinctive), suggestive (which also is inherently distinctive), descriptive (which is protected only if it acquires in consumers' minds a "secondary meaning" which I explain in Instruction 12, and generic names (which are entitled to no protection).

**Arbitrary Trademarks and Trade Dress**. The first category of "inherently distinctive" trademarks and trade dress is arbitrary trademarks and trade dress. They are considered strong marks and are clearly protectable. They involve the arbitrary, fanciful or fictitious use of a word or a trade dress to designate the source of a product. Such a trademark or trade dress in no way

-17-

describes or has any relevance to the particular product it is meant to identify.  It may be a common word used in an unfamiliar way.  It may be a newly created (coined) word or parts of common words which are applied in a fanciful, fictitious or unfamiliar way, solely as a trademark or trade dress.

For instance, the common word "apple" became a strong and inherently distinctive trademark when used by a company to identify the personal computers that company sold. The company's use of the word "apple" was arbitrary or fanciful because "apple" did not describe and was not related to what the computer was, its components, ingredients, quality, or characteristics. "Apple" was being used in an arbitrary way to designate for consumers that the computer comes from a particular manufacturer or source.

**Suggestive Trademarks and Trade Dress**. The next category is suggestive trademarks and trade dress. These trademarks and trade dress are also inherently distinctive but are considered weaker than arbitrary trademarks and trade dress.  Unlike arbitrary trademarks and trade dress, which are in no way related to what the product is or its components, quality, or characteristics, suggestive trademarks and trade dress imply some characteristic or quality of the product to which they are attached. If the consumer must use imagination or any type of multi-stage reasoning to understand the significance of the trademark or trade dress, then the trademark or trade dress does not describe the product's features, but merely suggests them.

A suggestive use of a word involves consumers associating the qualities the word suggests to the product to which the word is attached.  For example, when "apple" is used not to indicate a certain company's computers, but rather "Apple–A–Day" Vitamins, it is being used as a suggestive trademark. "Apple"

does not describe what the vitamins are. However, consumers may come to associate the healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking "Apple–A–Day" Vitamins.

**Descriptive Trademarks and Trade Dress**. The third category is descriptive trademarks and trade dress. Descriptive trademarks and trade dress directly identify or describe some aspect, characteristic, or quality of the product to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.

For instance, the word "apple" is descriptive when used in the trademark "CranApple" to designate a cranberry-apple juice. It directly describes ingredients of the juice. Other common types of descriptive trademarks identify where a product comes from, or the name of the person who makes or sells the product. Thus, the words "Apple Valley Juice" affixed to cider from the California town of Apple Valley is a descriptive trademark because it geographically describes where the cider comes from. Similarly, a descriptive trademark can be the personal name of the person who makes or sells the product. So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice" (rather than CranApple) she is making a descriptive use of her personal name to indicate and describe who produced the apple cider and she is using her first name as a descriptive trademark.

**Generic Names**. The fourth category is entitled to no protection at all. They are called generic names and they refer to a general name of the product, as opposed to the plaintiff's brand for that product. Generic names are part of our common language that we need to identify all such similar products. A generic name is a name for the product on which it appears.

If the primary significance of the alleged mark or alleged trade dress is to name the type of product rather than the manufacturer or provider, the term is a generic name and cannot be a valid trademark or trade dress. If the majority of relevant consumers would understand the term or the trade dress to name the type of product rather than the manufacturer or provider, the primary significance of the term is generic and not entitled to protection as a trademark or trade dress.

The word "apple" can be used as a generic name and not be entitled to any trademark protection. This occurs when the word is used to identify the fruit from an apple tree.

The computer maker who uses the word "apple" as a trademark to identify its personal computer, or the vitamin maker who uses that word as a trademark on vitamins, has no claim for trademark infringement against the grocer who used that same word to indicate the fruit sold in a store. As used by the grocer, the word is generic and does not indicate any particular source of the product. As applied to the fruit, "apple" is simply a commonly used name for what is being sold.

**Mark Distinctiveness and Validity**

If you decide that Monster Energy's "Monster" trademark is arbitrary or suggestive, it is considered to be inherently distinctive.  Similarly, if you decide that the Trade Dress asserted by Monster Energy is arbitrary or suggestive, it is considered to be inherently distinctive.  An inherently distinctive trademark or trade dress is valid and protectable.

On the other hand, if you determine that Monster Energy's "Monster" trademark is generic, or that the Trade Dress asserted by Monster Energy is generic, then they cannot be distinctive and therefore are not valid or protectable.

If you decide that Monster Energy's "Monster" trademark is descriptive, or that the Trade Dress asserted by Monster Energy is descriptive, you will not know if the trademark or trade dress is valid or invalid until you consider whether it has gained distinctiveness by the acquisition of secondary meaning, which I explain in Instruction 12.

1    AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2    15.10.

**JURY INSTRUCTION NO. 12**

**(INFRINGEMENT—ELEMENTS—VALIDITY—DISTINCTIVENESS—SECONDARY MEANING)**

If you determined in Instruction 11 that any of Monster Energy's claimed trademarks or claimed trade dress are descriptive, you must consider the recognition that the mark has among prospective consumers in order to determine whether it is valid and protectable even though it is descriptive. This market recognition is called the "secondary meaning" of the trademark or trade dress.

A word or a trade dress acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective consumers is not the product or service itself, but the identification of the product or service with a single source, regardless of whether consumers know who or what that source is. You must find that the preponderance of the evidence shows that a significant number of the consuming public associates the trademark or trade dress with a single source, in order to find that it has acquired secondary meaning.

When you are determining whether a trademark or trade dress has acquired a secondary meaning, consider the following factors:

(1)     Consumer Perception. Whether the people who purchase the product or service that bears the claimed trademark or trade dress associate the trademark or trade dress with Monster Energy;

(2)    Advertisement. To what degree and in what manner Monster Energy may have advertised under the claimed trademark or claimed trade dress;

(3)    Demonstrated Utility. Whether Monster Energy successfully used this trademark or trade dress to increase the sales of its products or services;

(4)    Extent of Use. The length of time and manner in which Monster Energy used the claimed trademark or claimed trade dress;

(5)    Exclusivity. Whether Monster Energy's use of the claimed trademark or claimed trade dress was exclusive;

(6)    Copying. Whether ISN intentionally copied Monster Energy's trademark or trade dress; and

(7)    Actual Confusion. Whether ISN's use of a similar trademark or trade dress has led to actual confusion among a significant number of consumers.

The presence or absence of any particular factor should not necessarily resolve whether the trademark or trade dress has acquired secondary meaning.

Descriptive trademarks and trade dress are protectable only to the extent you find they acquired distinctiveness through secondary meaning by the public coming to associate the trademark or trade dress with a particular source. Descriptive trademarks and trade dress are entitled to protection only as broad

as the secondary meaning they have acquired, if any. If they have acquired no secondary meaning, they are entitled to no protection and cannot be considered a valid trademark or trade dress.

Monster Energy has the burden of proving that its "Monster" trademark and the Trade Dress asserted by Monster Energy have acquired a secondary meaning.  ISN has the burden of proving that the registered trademarks in this case lack a secondary meaning.

The mere fact that Monster Energy is using a particular trademark or trade dress, or that Monster Energy began using it before ISN, does not mean that the trademark or trade dress has acquired secondary meaning. There is no particular length of time that a trademark or trade dress must be used before it acquires a secondary meaning.

1    AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2    15.11.

**JURY INSTRUCTION NO. 13**

**(INFRINGEMENT—ELEMENTS—VALIDITY—TRADE DRESS—NON-FUNCTIONALITY REQUIREMENT)**

A product feature is functional if it is essential to the product's use or purpose, or if it affects the product's cost or quality. It is non-functional if its shape or form makes no contribution to the product's function or operation. If the feature is part of the actual benefit that consumers wish to purchase when they buy the product, the feature is functional. However, if the feature serves no purpose other than as an assurance that a particular entity made, sponsored or endorsed the product, it is non-functional.

To determine whether a product's trade dress is functional, you should consider whether the trade dress as a whole is functional, that is whether the whole collection of elements making up the trade dress are essential to the product's use or purpose.  In this case, this means you must decide whether the combination of the colors green and black with the word "Monster" is essential to a product's use or purpose.

You should assess the following factors in deciding if the product feature is functional or non-functional:

(1)    The Trade Dress' Utilitarian Advantage. In considering this factor, you may examine whether the particular trade dress yields a utilitarian advantage over how the product might be without that trade dress.  If there is a utilitarian advantage from having the particular trade dress, this would weigh in favor of finding the trade

dress is functional; if it seems merely ornamental, incidental, or arbitrary, it is more likely to be nonfunctional.

(2)    Availability of Alternate Trade Dress. In considering this factor, you may examine whether an alternate trade dress could have been used, so that competition in the market for that type of product would not be hindered by allowing only one person to exclusively use the particular trade dress.   For this to be answered in the affirmative, the alternatives must be more than merely theoretical or speculative. They must be commercially feasible. The unavailability of a sufficient number of alternate trade dresses weighs in favor of finding the trade dress is functional.

(3)    Advertising Utilitarian Advantage in the Trade Dress.   In considering this factor, you may examine whether the particular trade dress has been touted in any advertising as a utilitarian advantage, explicitly or implicitly. If a seller advertises the utilitarian advantages of a particular trade dress, this weighs in favor of finding that trade dress is functional.

(4)    The Method of Manufacture. In considering this factor, you may examine whether the particular trade dress results from a relatively simple or inexpensive method of manufacture. If the trade dress is a result of a particularly economical production method, this weighs in favor of finding the trade dress is functional; if the feature is essential to the use or purpose of the device or affects its cost or quality, it is more likely functional.

1        Monster Energy has the burden of proving non-functionality of its

2   trade dress by a preponderance of the evidence in order to show

3   that the trade dress is valid and protected from infringement.

1    AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2    15.12.

**JURY INSTRUCTION NO. 14**

**(INFRINGEMENT—LIKELIHOOD OF CONFUSION—FACTORS—**
***SLEEKCRAFT* TEST)**

You must consider whether the defendant's use of a trademark or trade dress is likely to cause confusion about the source or affiliation of Monster Energy's or ISN's goods or services.  The likelihood of confusion factors are the same for determining both trademark and trade dress infringement.

I will suggest some factors you should consider in deciding this. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this. As you consider the likelihood of confusion you should examine the following:

(1)    Strength or Weakness of Monster Energy's Marks or Trade Dress. The more the consuming public recognizes Monster Energy's trademarks or trade dress as an indication of origin of Monster Energy's goods, the more likely it is that consumers would be confused about the source or affiliation of ISN's goods if ISN uses a similar trademark or similar trade dress.

(2)    ISN's Use of the Mark or Trade Dress. If ISN and Monster Energy use their trademarks and trade dress on the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source or affiliation of the goods than otherwise.

(3)   Similarity of Monster Energy's and ISN's Marks and Trade Dress. If the overall impression created by Monster Energy's trademarks and trade dress in the marketplace is similar to that created by ISN's trademarks and trade dress in appearance, sound, or meaning, there is a greater chance that consumers are likely to be confused by ISN's use of its trademarks and trade dress. Similarities in appearance, sound or meaning weigh more heavily than differences in finding the marks are similar.

(4)   Actual Confusion. If use by ISN of Monster Energy's trademarks or trade dress has led to instances of actual confusion, this strongly suggests a likelihood of confusion. However actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, ISN's use of its trademarks or trade dress may still be likely to cause confusion. As you consider whether the trademarks or trade dress used by ISN creates for consumers a likelihood of confusion with Monster Energy's trademarks or trade dress, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

(5)   ISN's Intent. Knowing use by ISN of Monster Energy's trademarks or trade dress to identify similar or related goods may strongly show an intent to derive benefit from the reputation of Monster

Energy's trademarks or trade dress, suggesting an intent to cause a likelihood of confusion. On the other hand, even in the absence of proof that ISN acted knowingly, the use of Monster Energy's trademarks or trade dress to identify similar or related goods may indicate a likelihood of confusion.

(6)     Marketing/Advertising Channels. If Monster Energy's and ISN's goods and services are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion.

(7)     Consumer's Degree of Care. The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in Monster Energy's and ISN's trademarks and trade dress.

(8)     Product Line Expansion. When the parties' products differ, you may consider how likely Monster Energy is to begin selling the products for which ISN is using Monster Energy's trademarks or trade dress. If there is a strong possibility of expanding into the other party's market, there is a greater likelihood of confusion.

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.18; Dkt. No. 202 at 5 n.3 (citing *Rearden LLP v. Rearden Commerce*, 683 F.3d 1190, 1212 (9th Cir. 2012); *Waits v. Frito-Lay*, 978 F.2d 1093, 1110 (9th Cir. 1992)).

**JURY INSTRUCTION NO. 15**

**(INFRINGEMENT—LIKELIHOOD OF CONFUSION—**

**FACTOR—STRENGTH OF TRADEMARK OR TRADE DRESS)**

**Strength as a Factor for Evaluating Likelihood of Confusion**

How strongly Monster Energy's trademarks or trade dress indicate that the goods or services come from a particular source is an important factor to consider in determining whether the trademarks or trade dress used by ISN are likely to create confusion with Monster Energy's trademarks and trade dress.

Monster Energy asserts that its Monster marks and Beast marks are trademarks for its goods and/or services and that the Trade Dress asserted by Monster Energy is a trade dress for its goods and services. Monster Energy contends that ISN's use of the words "Monster" and "Monster Mobile" in connection with ISN's products, such as, for example, T-shirts, sweatshirts, hats, belts, socks, gloves, water bottles, tumblers, coolers, refrigerators, bottle openers, back packs, bags, stickers, decals, speakers, lights, helmets, knives, tool boxes, tool carts, creepers, wrenches, screw drivers, impact wrenches, orbital sanders, thermometers, circuit testers, tire-pressure monitors, nuts, beef jerky, and candy infringes Monster Energy's trademarks because the sale of such goods is likely to cause confusion. Monster Energy also contends that ISN's use of the words "Monster" and "Monster Mobile" in combination with the colors green and black in connection with such products infringes the Trade Dress asserted by Monster Energy because such use is likely to cause confusion.

**The Strength of Marks or Trade Dress**

The more distinctive and strong a trademark or trade dress is, the greater the scope of protection the law provides. The law measures trademark and trade dress strength by considering two prongs:

1.    Commercial Strength: This is the amount of marketplace recognition of the trademark or trade dress; and

2.    Conceptual Strength: This is the placement of the trademark or trade dress on the spectrum of marks.

**Commercial Strength**: What is "commercial strength?" Not all trademarks and trade dress are equally well known. Trademark and trade dress strength is somewhat like the renown of people. Only a few very famous people are widely known and recognized around the world. Most people are known and recognized only by a small circle of family and friends.

Some trademarks and trade dress are relatively "strong," in the sense they are widely known and recognized. A few trademarks are in the clearly "famous" category. These "famous" marks are those like "Apple" for computers and mobile phones, "Google" for a search engine, "Coca-Cola" for beverages and "Toyota" for vehicles. Some trademarks and trade dress may be strong and well known only in a certain market niche such as mountain climbing gear, plumbing supplies, or commercial airplane electronics equipment, but relatively weak outside that field.

**Conceptual Strength**: What is "conceptual strength?" All trademarks and trade dress are grouped into two categories: either inherently distinctive or not inherently distinctive. If a trademark or trade dress is inherently distinctive it is immediately protected when first used. If it is not inherently distinctive, to become a legally protected mark, a designation must acquire distinctiveness in people's minds by becoming known as an indication of source of goods or services. The law calls this "secondary meaning," as I explained in Instruction 12.

For determining the conceptual strength of a trademark or trade dress, trademarks and trade dress are grouped on a spectrum according to the nature of the mark. In the spectrum, there are three categories of trademarks and trade dress that the law regards as being inherently distinctive: coined, arbitrary and suggestive. Descriptive trademarks and trade dress are regarded as not being inherently distinctive and require a secondary meaning to become a valid trademark or trade dress.

**Coined** and arbitrary trademarks and trade dress are regarded as being relatively strong. A coined word mark is a word created solely to serve as a trademark. For example, "Clorox" for cleaning products and "Exxon" for gasoline are coined marks.

**Arbitrary** trademarks and trade dress in no way describe or suggest the nature of the goods or services they are used with. For example, "apple" is a common word, but it does not describe or suggest anything about the nature of "Apple" brand computers or smart phones. It is an arbitrary word when used as a mark on those products and is said to be conceptually strong as a mark.

**Suggestive** trademarks and trade dress are regarded as not being as conceptually strong as coined or arbitrary trademarks and trade dress. Suggestive trademarks and trade dress suggest some characteristic or quality of the goods or services with which they are used. If the consumer must use her imagination or think through a series of steps to understand what the trademark or trade dress is telling about the product, then the trademark or trade dress does not directly describe the product's features, but merely suggests them. For example, the trademark "Tail Wagger" for dog food merely suggests that your dog will like the food. As another example, when "apple" is used in the mark "Apple-A-Day" for vitamins, it is being used as a suggestive trademark. "Apple" does not describe what the vitamins are. However, it suggests the healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking "Apple-A-Day" vitamins.

**Descriptive** trademarks and trade dress are not inherently distinctive. These trademarks and trade dress directly describe some characteristic, or quality of the goods or services with which they are used in a straightforward way that requires no exercise of imagination. For instance, the word "apple" is descriptive when used in the trademark "CranApple" to designate a cranberry-apple juice. It directly describes one of ingredients of the juice.

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.19.

**JURY INSTRUCTION NO. 16**

**(DEFENSES—ABANDONMENT—AFFIRMATIVE DEFENSE—**

**DEFENDANT'S BURDEN OF PROOF)**

The owner of a trademark cannot exclude others from using the trademark if it has been abandoned.

ISN contends that the trademark "MONSTER" has become unenforceable because Monster Energy abandoned it. ISN has the burden of proving abandonment by clear and convincing evidence.

The owner of a trademark abandons the right to exclusive use of the trademark when the owner discontinues its use in the ordinary course of trade, intending not to resume using it.

1    AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No.

2    15.22 (modified)

**JURY INSTRUCTION NO. 18**

**(WILLFUL INFRINGEMENT)**

If you find that ISN infringed any of the Monster Energy's trademarks or trade dress, you must also determine whether ISN acted willfully.  Trademark infringement and trade dress infringement are considered willful if Monster Energy shows that ISN's actions were willfully calculated to exploit the advantage of an established trademark or trade dress, or if Monster Energy shows that ISN recklessly disregarded Monster Energy's trademark or trade dress rights. Monster Energy has the burden of proving willfulness by a preponderance of the evidence.

Question #6 on the Verdict Form asks you to decide whether ISN willfully infringed Monster Energy's trademarks or trade dress.

AUTHORITY: *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th Cir. 2015); *Fishman Transducers v. Paul*, 684 F.3d 187, 192-93 (1st Cir. 2012); *Coach, Inc. v. Celco Customs Services Co.*, 2014 WL 12573411 at *19-*20 (C.D. Cal. June 5, 2014); *Hydramedia Corp. v. Hydra Media Grp., Inc.*, 2008 WL 11336118, at *3 (C.D. Cal. Dec. 29, 2008), *aff'd,* 392 F. App'x 522 (9th Cir. 2010).

**JURY INSTRUCTION NO. 19**

**(TRADEMARK DAMAGES—PLAINTIFF'S ACTUAL DAMAGES)**

If you find for Monster Energy on its claim for infringement of registered or unregistered trademarks, or its claim for infringement of the Trade Dress asserted by Monster Energy, you must determine Monster Energy's actual damages.

Monster Energy has the burden of proving actual damages by a preponderance of the evidence. Damages means the amount of money which will reasonably and fairly compensate Monster Energy for any injury you find was caused by ISN's infringement of Monster Energy's trademarks or trade dress. Monster Energy seeks actual damages in the form of a reasonable royalty award.

You should consider the following:

(1)    The injury to Monster Energy's reputation;

(2)    The injury to Monster Energy's goodwill, including injury to Monster Energy's general business reputation; and

(3)    The royalties that Monster Energy would have earned if ISN had taken a license before it began infringement.

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.27; *adidas Am., Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812 at *12 (D. Or. Sept. 12, 2008); Dkt. No. 202 at 14 ("A reasonable royalty based on a hypothetical negotiation can be a measure of actual damages in a trademark infringement case.").

## JURY INSTRUCTION NO. 22
## (REASONABLE ROYALTY—POSSIBLE FACTORS)

In determining the amount of a reasonable royalty, you may, but need not, consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the trademark:

1. Any royalties received by the licensor for the licensing of the trademark, proving or tending to prove an established royalty.

2. The rates paid by ISN to license other trademarks comparable to the trademark.

3. The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain its right to exclude others from using the trademark by not licensing others to use the trademark, or by granting licenses under special conditions designed to preserve that exclusivity.

5. The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6. The effect of selling products bearing the trademark in promoting sales of other products of the licensee; the existing value of the trademark to the licensor as a generator of sales of its non-trademarked items; and the extent of such collateral sales.

7. The term of the license.

-46-

8.  The established profitability of the product bearing the trademark; its commercial success; and its current popularity.

9.  The nature of the trademark; and the benefits to those who have used the trademark.

10. The extent to which ISN has made use of the trademark; and any evidence that shows the value of that use.

11. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the trademark or analogous trademarks.

12. The portion of the profit that arises from the trademark itself as opposed to profit arising from non-trademarked features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

13. The opinion testimony of qualified experts.

14. The amount that a licensor and a licensee (such as ISN) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to use the trademark— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a trademark owner who was willing to grant a license.

15. Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

AUTHORITY: AIPLA Model Patent Jury Instructions, 11.14 (revised to apply to trademark context); *Ericsson, Inc. v. D-Link Sys., Inc*., No. 10-CV-0473, 2014 U.S. App. LEXIS 22778 at *65-69 (Fed. Cir. 2014); *Apple Inc. et al v. Motorola Inc., et al.,* 757 F.3d 1286 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc. et al*, 694 F.3d 51, 60 (Fed. Cir. 2012); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *Monsanto Co. v. McFarling,* 488 F.3d 973 (Fed. Cir. 2007); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-10 (Fed. Cir. 1996); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898-900 (Fed. Cir. 1986); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd sub nom.*, *Georgia Pacific Corp. v. United States Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).

**JURY INSTRUCTION NO. 23**

**(DEFENDANT'S PROFITS)**

You are being asked to determine any profits earned by ISN that are attributable to the infringement, which Monster Energy proves by a preponderance of the evidence.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of ISN's receipts from using the trademark or trade dress in the sale of a product. Monster Energy has the burden of proving ISN's gross revenue by a preponderance of the evidence.

Expenses are all operating, overhead, and production costs incurred in producing the gross revenue. ISN has the burden of proving the expenses and the portion of the profit attributable to factors other than use of the infringed trademark by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of ISN's products using the trademark or trade dress is attributable to factors other than use of the trademark, you should find that the total profit is attributable to the infringement.

AUTHORITY: Ninth Circuit Manual of Model Civil Jury Instructions – No. 15.29.

### JURY INSTRUCTION NO. 24
### (PUNITIVE DAMAGES)

The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future. You may award punitive damages against ISN only if Monster Energy proves by clear and convincing evidence that ISN infringed with malice, oppression, or fraud.

"Malice" means conduct which is intended by ISN to cause harm to Monster Energy or despicable conduct which is carried on by ISN with a willful and conscious disregard of the rights or safety of other.

"Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

"Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to ISN with the intention on the part of ISN of thereby depriving Monster Energy of property or legal rights or otherwise causing harm.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

If you find that Monster Energy has proved by clear and convincing evidence that ISN infringed with malice, oppression, or fraud toward Monster Energy, then you should answer Question #9 in favor of Monster. Otherwise, you should answer Question #9 in favor of ISN.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy

toward any party.  In considering the amount of any punitive damages, consider the degree of reprehensibility of ISN's conduct.  If you find that punitive damages are appropriate, you should enter the amount in response to Question #10.

1  AUTHORITY: Cal. Civ. Code § 3294; Ninth Circuit Manual of Model Civil

2  Jury Instructions – Nos. 1.7 and 5.5 (modified).